MICHAEL J. FREEMAN (OH Bar # 0086797)
Senior Litigation Counsel
JEREMY M. GOLDSTEIN (CA Bar # 324422)
Trial Attorney
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (212) 213-2774
Fax: (202) 514-5847
Email: Michael.Freeman@usdoj.gov

[Additional counsel listed on signature page]

Attorneys for Plaintiff
United States of America

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. |
| *Plaintiff,* | |
| v. | |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | **COMPLAINT** |
| *Defendants.* | |

1.    The United States of America brings this civil action to prevent Hewlett Packard Enterprise Company ("HPE") from acquiring a smaller, but innovative rival, Juniper Networks, Inc. ("Juniper"). HPE and Juniper are the second- and third-largest providers of commercial or "enterprise" wireless networking solutions, respectively, in the United States. The acquisition, if consummated, would result in two companies—market leader Cisco Systems, Inc. ("Cisco") and HPE—controlling well over 70 percent of the U.S. market and eliminate fierce head-to-head competition between Defendants, who offer wireless networking solutions under the HPE Aruba and Juniper Mist brands.

2.    For years, pressure from Juniper has forced HPE to discount deeply and invest in developing advanced software products and features as part of a multifaceted campaign to "Beat Mist."

The "Beat Mist" campaign failed. Having failed to beat Juniper's Mist on the merits, HPE seeks to acquire Juniper instead for $14 billion. This proposed acquisition risks substantially lessening competition in a critically important technology market and thus poses the precise threat that the Clayton Act was enacted to prevent. It should be blocked.

## INTRODUCTION

3.      Wireless networking technology is critical in the modern workplace. Millions of Americans today create and share company resources and access the internet from wireless-enabled devices. Retail employees wirelessly process payments and log inventory. Doctors access medical records on phones and tablets and track patient care on the go. University students take notes on their laptops and access course materials from classrooms, dorm rooms, and school libraries. As mobile technology has improved and more services have migrated to the cloud, wireless networking technology in the workplace has become even more essential. Today, it is the primary means by which many employees connect to their employer's computer network and the internet.

4.      Providing companies with commercial wireless networking technology is itself a big business. Every year, enterprises, including public and private companies, state and local agencies, and non-profit organizations, spend billions of dollars buying wireless networking solutions for their offices, stores, factories, and warehouses. Those solutions are built around wireless access points, which send and receive data via radio signals and are wired to networks through devices called campus switches. Enterprise-grade wireless networking solutions can simultaneously serve a larger number of users and support feature sets and functionalities more advanced than the consumer-grade wireless systems that most Americans have in their homes. Because many workplaces deploy a large number of access points—sometimes thousands across a single corporate campus—network administrators rely on sophisticated network management hardware and software to monitor and control them. By contrast, consumer-grade wireless networking systems that individuals purchase for their homes are generally managed device-by-device, and they often do not include systems for linking and managing multiple access points from a single location.

COMPLAINT

2

5. Enterprise-grade wireless networking solutions generally include wireless access points; the separate hardware or advanced software systems to monitor and manage them; and related logistical support, including security updates and patches (collectively, "enterprise-grade WLAN solutions"). Today, the market for those solutions in the United States is highly consolidated: market-leader Cisco and Defendants collectively represent over 70 percent of it. For years, Cisco and HPE have been the two leading providers of enterprise-grade WLAN solutions to U.S. companies. Despite significant technological advances over the past decade—which, among other things, have radically changed how wireless networks are managed—Cisco and HPE's market positions have stayed relatively stable at number one and number two in the market. While other vendors remain distant competitors, Juniper in recent years has risen to challenge Cisco and HPE. Today, Juniper is the third-largest provider in the United States and, like Cisco and HPE, it offers a portfolio of advanced wireless access points and a sophisticated network management system. It competes aggressively against Cisco and HPE in several distinct customer segments and industries.

6. Juniper's growth in the market for enterprise-grade WLAN solutions has been swift. In 2019, Juniper acquired an independent networking startup, Mist Systems, with a portfolio of wireless access points and campus switches managed by a network management platform called Mist. Mist Systems had already differentiated itself by building tools optimized for remote cloud management and using artificial intelligence and machine learning tools ("AIOps") to streamline network operations and improve the experience for network operators and users. The acquisition combined Mist Systems' innovative technology with Juniper's enterprise sales force and distribution network, and it launched Juniper into the upper tier of wireless system providers. For instance, internal market share estimates circulated by HPE executives show that Juniper increased its market share in North America for enterprise-grade wireless solutions from 1.7 percent in 2019 to 6.5 percent of the market by the end of 2021 despite pandemic-related supply chain constraints. Juniper executives are seeking additional growth in enterprise-grade WLAN solutions, aspiring for double-digit sales growth between 2023 and 2025.

7.     Juniper's ascent capitalized on and helped accelerate the industry's burgeoning focus on AIOps and other tools that simplify and automate network maintenance. Those tools, which can materially decrease the cost of operating a wireless network, include conversational virtual assistants that increase the productivity of network administrators and software that proactively searches for network misconfigurations and other issues before they cause network outages. Customers and competitors have come to associate Juniper with those tools. AI is often the main tool that customers associate with Juniper Mist. Customers acquainted with Juniper's AIOps have demanded other vendors provide them as well.

8.     Juniper's competitors, including HPE, recognize Juniper as a competitive threat and have tracked Juniper's growth in the markets for enterprise-grade wireless and other networking components with concern. In 2021 and 2022, senior HPE executives shared summaries of Juniper's quarterly earnings reports, noting that in one quarter "Mist double[d] revenue!" HPE's Head of Worldwide Sales commented that Juniper "did almost what we did which is concerning for me." Other competitors similarly have shared estimates of Juniper's quarterly performance with concern and considered changing their strategy in response.

9.     HPE executives responded to Juniper's growth in the enterprise-grade wireless and related markets through various initiatives to "Beat Mist" through targeted marketing, competitive pricing, and product innovation. For instance, in 2021 HPE executives created a "Beat Mist" listserv to share competitive intelligence and technical insights about Mist's hardware and software features. The listserv also connected sales teams with engineers who could help them understand and rebut Juniper's claims about its technology, and it helped sales teams better promote HPE's competing network management platform, Aruba Central. The listserv has been in active use since it was created, with HPE executives continuing to share competitive intelligence well after Defendants announced their merger in January 2024. In 2022, HPE executives who believed their sales teams lacked training to effectively compete with Mist launched a "Beat Mist" training program for sales executives and solution engineers. HPE's General Manager of U.S. Sales said he intended to "track every participant" and make the program "100% mandatory."

10.    HPE also invested in specific upgrades to its software to close gaps between its offerings and Juniper's. In late 2021, as part of its development of next generation Aruba Central network management software ("CNX"), HPE launched "Project Gravity," a multi-year project focused on improving Aruba Central's user interface and infusing its platform with features that use artificial intelligence and machine learning. Internally, HPE executives routinely described Project Gravity as critical to "Beat[ing] Mist" and driving sales in competitive matchups. For instance, in late December 2023, HPE's former Head of Software Development, discussing Juniper's competition for college and university customers, explained, "I (we) fully recognize the MIST threat for Aruba [worldwide] and have done so for a long time. . . . The risk is real and NOW. We need to put CNX in the hands of the customers NOW."

11.    The intensity of HPE and Juniper's competition is clear from its ordinary-course documents. During a March 2021 public webinar on Mist's AI-offerings, Juniper executives specifically targeted HPE's network management system, which they characterized as an example of "old" technology compared to Mist's "new" and innovative AI capabilities. Days later, HPE's former Senior Vice President for Sales in the Americas encouraged his teams to combat Juniper's marketing and sales, saying that he was "personally involved in 5 Head to Head street fights with Mist" and "[t]here are no rules in street fights." He concluded his email with an encouragement: "KILL MIST!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"

12.    Having failed to beat Mist on the merits, HPE changed tactics and in January 2024 opted to try to buy Juniper instead. That decision puts at risk myriad consumer benefits that have resulted from competition between Defendants in the market for enterprise-grade WLAN solutions. Front-line sales executives regularly seek deep discounts to win or retain business targeted by the other company, and HPE has contemplated list price reductions for software and hardware products to avoid being undercut by Juniper on price. Defendants' merger, if consummated, would eliminate head-to-head competition that has lowered prices and driven investment in network management software, and it would decrease pressure on HPE to discount and innovate in the future. For these and other reasons set forth in this

1  Complaint, HPE's proposed acquisition of Juniper threatens to substantially lessen competition in

2  violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be blocked.

3  **BACKGROUND ON WIRELESS LOCAL AREA NETWORKING**

4  **A.    Enterprise Wireless Solutions**

5       13.    Networks are comprised of computers, printers, smartphones, and other devices that are

6  linked in order to send and receive data. Networks in single physical locations, like an individual office

7  building or a school, are referred to as local area networks ("LAN") or, alternatively, "campus" or

8  "branch" networks depending on their size. "Wired" devices connect to a LAN using ethernet cables,

9  whereas wireless-enabled devices connect through wireless access points. Wireless access points and

10 wired devices are connected to multi-port devices, called switches, that serve as hubs for transmitting

11 data within a LAN.

12      14.    LANs can be connected to each other using physical lines or the internet to form a wide

13 area network ("WAN"). Many WANs, like those that link a corporation's various offices across the

14 United States, are privately run and accessible only to people granted access; others are open to all.

15 Individual LANs traditionally connected to a WAN using a router, but today can use software

16 replacements, like software-defined WAN ("SD-WAN"). Enterprise switches, routers, and SD-WAN are

17 distinct products from enterprise-grade wireless access points and the associated products used to

18 operate and manage them.

19      15.    University campuses, hospital complexes, and large corporate offices may have

20 thousands of wireless access points, so network administrators rely on hardware and software systems to

21 operate and manage them. Traditionally, network management has been done on-premises using

22 wireless controllers, which are devices that channel and amplify bandwidth from a router, push firmware

23 to wireless access points and configure their code, and aggregate telemetry data to help network

24 administrators monitor connectivity and power use. Many organizations continue to use on-premises

25 controllers, often for compliance or security reasons.

26      16.    In recent years, network management has migrated from on-premises hardware to remote

27 solutions located in the "cloud." Cloud-based network management solutions can remotely calibrate

28

wireless access points and monitor connectivity, making on-premises controllers superfluous. Cloud-managed network management solutions typically have online portals or dashboards where network administrators can easily check the performance of every wireless access point on a LAN or WAN on a single screen. While many customers are still using on-premises management systems, the cloud-managed segment of the industry is growing rapidly due, among other things, to its convenience and efficiency. Using cloud-management, for instance, a network administrator for a national retail chain could monitor the health of access points at stores across the county from one location. The wireless access points in Juniper's Mist and HPE's Aruba portfolios were built to be cloud-managed, making both companies well-situated to take advantage of growth in that market segment.

17.     With improvements in data collection and analysis, networking vendors like HPE and Juniper have introduced increasingly advanced features in their software solutions. Some of these features use artificial intelligence and machine learning to provide network administrators with greater insight into network performance and the causes of network failures. Others can automate functions traditionally performed by network administrators to meet customers' rising demand for tools that control management costs. For instance, Juniper Mist users have access to the Marvis Virtual Network Assistant, an interface that displays information in response to plain-language queries, and Marvis Minis, a tool that proactively searches for network misconfigurations and other potential issues, allowing network administrators to pinpoint and resolve connectivity issues before they impact users. Juniper estimates that at least 40 percent of enterprise customers will adopt some AIOps into their IT systems by 2025, and the company will continue benefiting from customers' increasing interest in those tools.

18.     Vendors' network management solutions differ in the features and capabilities they offer to customers. While some vendors include cutting edge AIOps, others provide cheaper and more bare-bones network management solutions, offering customers a simple cloud-managed platform that monitors connectivity but provides few other features. Customers choose providers that offer products tailored toward their individualized networking needs.

COMPLAINT                                           7

19.     Wireless access points generally reach the end of their useful life and need to be replaced every five to seven years, but vendors launch new generations of wireless hardware more frequently and enterprise customers interested in deploying the best technology in their workplaces will refresh their wireless access points more frequently. A significant portion of enterprise customers keep their existing wireless networking provider during a technology refresh, given the high cost and disruption of replacing technology and re-training network administrators and IT personnel. Other enterprises, though, will solicit quotes from multiple vendors to ensure they are getting the best solutions for their needs.

20.     While some very large enterprises have direct relationships with wireless networking vendors, most use value-added resellers to source their networking equipment. Leading vendors invest heavily in cultivating and growing relationships with value-added resellers; they are key to vendors' distribution networks and, when used effectively, magnify the vendors' own sales forces by encouraging enterprise sales. Those vendors offer their value-added resellers preferred pricing and volume discounts, which value-added resellers in turn pass on to their customers. Enterprise customers will often seek quotes from several value-added resellers to get the best price available from each vendor.

21.     Some enterprises, including state and local governments and agencies, issue formal requests for proposals ("RFPs"), seeking bids from a range of wireless networking vendors. That process may result in a bidding war between vendors.

22.     Large enterprises, regardless of whether they issue formal RFPs, generally expect vendors to offer additional discounts to win their business. They work with their value-added resellers to negotiate those discounts, using the threat of going with a competitor to win additional concessions. Certain value-added resellers are known to work exclusively with large, sophisticated enterprises or Fortune 1000 companies. Those value-added resellers may partner with Cisco, HPE, and Juniper, but not smaller wireless networking vendors that cater to small or medium-sized enterprises. Other value-added resellers that do cater to small and medium-sized businesses may partner with those smaller wireless networking vendors, but not Cisco, HPE, or Juniper.

23.     Wireless networking vendors, like HPE and Juniper, are typically aware of an enterprise's incumbent provider and which of their competitors are competing for an individual contract.

Because each contract is individually negotiated, each vendor has the opportunity to adjust its quotes or bids depending on its perception of the competition it faces for a customer's business.

**B.    HPE and Juniper are Leading Providers of Enterprise-Grade WLAN Solutions**

24.    HPE, headquartered in Spring, Texas, competes in a number of technology markets, including general-purpose servers, cloud storage, and finance. Networking is one of its fastest growing divisions, and the company sells various networking products, including wireless access points and campus switches, under the Aruba brand and its legacy on-premises network management solution, Airwave. Enterprise-grade WLAN solutions in the United States represent a substantial portion of HPE's total campus networking sales.

25.    Juniper, headquartered in Sunnyvale, California, offers a range of networking products, including wireless access points, wired switches, and network management software under the Mist brand. Enterprise-grade WLAN solutions in the United States represent a substantial portion of Juniper's total U.S. campus networking sales.

26.    The U.S. market for enterprise-grade WLAN solutions, which include wireless access points, the hardware or software tools to manage them, and related logistical support, is highly concentrated. Cisco is by far the largest vendor and is more than twice as large as the next largest competitor, HPE. According to estimates from multiple third-party sources used internally by HPE executives, Cisco, HPE, and Juniper collectively represent over 70 percent of U.S. enterprise-grade wireless access point revenue or North America WLAN revenue. Cisco and Defendants' shares of the U.S. enterprise-grade WLAN market are roughly in line with their shares of the U.S. market for access points alone.

27.    Customers choose HPE and Juniper over Cisco and other WLAN vendors for several reasons. Both have well-regarded portfolios of wireless access points and network management solutions that are built for cloud-management. Both have experienced sales forces, technical support organizations, and well-developed distribution channels, and they have track records for working with large, sophisticated enterprises. While the same is true for Cisco, many WLAN customers suffer from

1    "Cisco fatigue" due, among other things, to Cisco's overlapping WLAN product portfolios—it sells

2    wireless access points under two competing brands—and complex licensing practices.

3    **C.    Some WLAN Vendors Face Headwinds Competing for Large Enterprise Customers**

4         28.    While every organization's networking needs is unique, large enterprise customers,

5    including corporate campuses, research universities, and hospitals, tend to buy higher-end wireless

6    access points and network management software that can cover a larger geographic footprint and allow

7    more people to connect. Their networks are more likely to be mission critical than smaller customers'

8    networks; a network failure, for example, could make it impossible for a national retailer to conduct

9    transactions and order inventory, or for health professionals to access medical records and track patient

10   outcomes. As a result, large enterprise customers tend to demand more of their networking providers

11   than smaller ones do.

12        29.    Because of the complexity of their networks, these large enterprise customers are "high

13   touch," requiring vendors to have large and well-trained salesforces that can ensure their purchases

14   integrate with the customer's existing IT infrastructure and that can customize software features where

15   needed. Large enterprise customers also seek vendors that can provide multiple networking components

16   at the same time and offer sophisticated and feature-rich network management solutions. Large

17   enterprise customers are also highly sensitive to vendors' reputations and track-records, given the

18   damage that disruptive network failures can cause their businesses.

19        30.    Many enterprise-grade WLAN vendors in the market today face headwinds competing

20   for large enterprises' business. Several vendors lack sales and support organizations required to design

21   and customize networks for their customers. Some vendors primarily cater toward small businesses

22   rather than Fortune 500 companies, research universities, and other organizations with complex

23   networking needs. Still other vendors use cheap manufacturing components sourced from Chinese

24   manufacturers rather than U.S. corporations like Broadcom and Qualcomm, whose products are

25   considered more reliable and secure, offer shorter warranties or less desirable support packages, or have

26   bare-bones network management software that is less feature-rich than products offered by Cisco, HPE,

27   and Juniper.

28

COMPLAINT                                              10

1    **THE RELEVANT MARKET FOR EVALUATING THE PROPOSED MERGER**

2    31.    The proposed acquisition threatens to substantially lessen competition in the market for

3    enterprise-grade WLAN solutions. That product market constitutes a line of commerce as that term is

4    used in Section 7 of the Clayton Act, 15 U.S.C. § 18, and it is a relevant product market in which

5    competitive effects can be assessed.

6    32.    Market definition is a tool to help courts assess an area of effective competition impacted

7    by a merger. A relevant market includes a product and geographic dimension. Courts define relevant

8    product and geographic markets to help identify where competition may be harmed by a merger.

9    Defining the relevant market "is not an end unto itself; rather, it is an analytical tool used to ascertain the

10   'locus of competition.'"  *United States v. Bertelsmann SE & Co. KGAA*, 646 F. Supp.3d 1, 24 (D.D.C.

11   2022) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320-21 (1962)).

12   33.    There are many tools available to identify relevant markets. The outer boundaries of a

13   relevant product market are determined by looking to the substitution choices made by customers in

14   response to potential changes in price or quality. Courts often look to "practical indicia" to identify the

15   boundaries of an antitrust market or submarket to determine whether two products are economic

16   substitutes and compete within the same market or submarket, *Brown Shoe Co. v. U.S.*, 370 U.S. 294,

17   325 (1962). Courts also utilize economic tools, such as the "hypothetical monopolist" test, which asks

18   whether a firm that was the only present and future seller of the products in a proposed market—a

19   hypothetical monopolist—likely would undertake at least a small but significant and non-transitory

20   increase in price or worsening of terms ("SSNIPT") for at least one product in the proposed market.

21   **D.    Product Market**

22   34.    Enterprise-grade WLAN solutions are a relevant product market and line of commerce

23   within the meaning of Section 7 of the Clayton Act. Enterprise-grade WLAN solutions are sold to

24   businesses, school systems, and other commercial and non-profit organizations. They can serve a large

25   number of users simultaneously and support advanced feature sets and functionalities. Unlike consumer-

26   grade WLAN, enterprise-grade WLAN solutions include systems to manage multiple access points—

27   sometimes thousands of them—across a single location. Systems used to manage multiple access points

28

include hardware-based controllers, cloud-managed services, and network management software. Those systems monitor connectivity, service quality, and other critical network functions.

35.     WLAN vendors offer products with a range of hardware and software features optimized for different environments and customer needs. Because an individual vendor's WLAN solutions may not be ideal for every customer, HPE and Juniper may be able to charge different prices and include different terms for their customers. Customers are also unable to engage in arbitrage by purchasing indirectly from or through other customers to defeat potential price increases or worsening of terms.

36.     The market for enterprise-grade WLAN solutions exhibits many of the "practical indicia" that courts look for when determining the boundaries of a relevant market, including peculiar characteristics and uses, distinct customers, and industry recognition. For example:

- WLAN solutions use radio waves to connect users' devices to a local area network. Consumers do not view wired solutions, which connect user devices directly to campus switches through ethernet cables, as reasonable substitutes, even though both permit users to access the network, because wired connections do not permit users freedom of movement. Wired connections are used more often today for desktop computers, printers, and other stationary devices.

- Customers who purchase enterprise-grade WLAN solutions, which are tailored for commercial environments, with wireless access points designed to be linked to cover a larger geographic area and managed by a hardware or software system, are not generally able to be served by consumer-grade WLAN solutions.

- Customers typically purchase network management software and other control systems along with wireless access points; mixing and matching access points and control systems from multiple vendors generally is not a feasible alternative to a complete WLAN solution. This is because wireless access points sold by Cisco, HPE, Juniper, and other WLAN vendors often cannot be managed by third-party network management software, and these firms generally do not sell their network management software on a standalone basis to be used with third-party hardware.

- Industry analysts, including 650 Group Market Intelligence Research ("650 Group"), regularly track revenue growth for an enterprise-grade WLAN market and calculate various vendors' shares of that market. Those analysts separately track revenues for enterprise-grade and consumer-grade WLAN, and, for enterprise-grade WLAN, include revenues from wireless access points, controllers, and cloud-managed services. Defendants regularly circulate market share estimates produced by 650 Group and other industry analysts and rely on them to gauge their performance relative to competitors.

37.     Purchasing wireless access points from an original device manufacturer and either using a third-party network management software or creating a bespoke software solution in-house is not a reasonable substitute for most customers looking to purchase enterprise-grade WLAN solutions. Among other things, few WLAN customers have the IT resources and expertise to design and procure their own access points and network management systems or the scale needed to make buying directly cost-effective. Customers would not substitute solutions involving third-party or bespoke software in sufficient numbers to deter a hypothetical monopolist of enterprise-grade WLAN solutions from undertaking a SSNIPT.

38.     Consumer-grade WLAN solutions also are not a reasonable substitute for most enterprise-grade WLAN solutions. Consumer wireless access points are typically smaller, capable of handling fewer users simultaneously, less reliable, and designed to cover smaller geographic areas. Among other things, because consumer-grade WLAN solutions are managed device-by-device, they generally do not include systems for linking and managing large numbers of access points from a single location. Customers would not substitute consumer-grade WLAN solutions in sufficient numbers to deter a hypothetical monopolist of enterprise-grade WLAN solutions from undertaking a SSNIPT.

**E.     Geographic Market**

39.     The relevant geographic market for HPE's proposed acquisition of Juniper is the United States. Several enterprise-grade WLAN vendors that are active abroad, including Chinese multinational Huawei Technologies Company ("Huawei"), have been identified as potential security threats by the U.S. government and, under federal law, are barred from competing for business domestically. As a

result, customers in the United States have fewer options than they would if they were based abroad, and HPE and Juniper may be able to charge different prices and include different terms for those customers. Customers in the United States are also unable to engage in arbitrage by purchasing indirectly from or through other customers outside the United States in order to defeat potential price increases or worsening of terms. The geographic market includes all sales made to customers in the United States, regardless of the WLAN vendor's location. Defendants regularly rely on industry analysts, including International Data Corporation ("IDC"), that calculate wireless access point market shares for the United States.

## HPE'S ACQUISITION OF JUNIPER IS PRESUMPTIVELY UNLAWFUL AND THREATENS COMPETITION IN VIOLATION OF THE CLAYTON ACT

40.     The proposed merger has an effect that "may be substantially to lessen competition." *See* 15 U.S.C. § 18. Not only is the transaction presumptively unlawful, but other evidence also illustrates the threat to competition presented by eliminating Juniper as a strong competitive force.

### A.     The Proposed Acquisition is Presumptively Unlawful

41.     The proposed merger is presumptively unlawful. It would significantly increase concentration in an already consolidated relevant market for enterprise-grade WLAN solutions. The proposed acquisition would result in two firms controlling over 70 percent of the relevant market.

42.     To measure market concentration, courts often use the Herfindahl-Hirschman Index ("HHI") as described in Section 2.1 of the 2023 *Merger Guidelines*. *See* United States Department of Justice and Federal Trade Commission, Merger Guidelines (2023 ed.) § 2.1. HHIs range from 0 in markets with no concentration to 10,000 in markets where one firm has 100 percent market share. Under the *Merger Guidelines*, a market with HHI greater than 1,800 is highly concentrated, and a change of more than 100 points is a significant increase. *See Fed. Trade Comm'n v. Kroger Co.,* No. 3:24-cv-00347, 2024 WL 5053016, at *15 (D. Or. Dec. 10, 2024). A merger that creates or further consolidates a highly concentrated market that involves an increase in the HHI of more than 100 points is presumed to substantially lessen competition and is presumptively unlawful. *See id.* at *15 (citing U.S. Dep't of Justice & Fed. Trade Commission, Merger Guidelines § 2.1 (2023)).

43.    The proposed merger between HPE and Juniper easily clears these hurdles in the markets for enterprise-grade WLAN solutions and is presumptively unlawful, with a pre-merger HHI over 3,000 and a change of at least 250 points using IDC's estimates of U.S. market shares for wireless access points. Cisco and Defendants' shares of the U.S. enterprise-grade WLAN market are roughly in line with their shares of the U.S. market for access points alone.

**B.    The Merger Threatens Higher Prices and Less Innovation By Eliminating Fierce Head-to-Head Competition Between Defendants**

44.    HPE and Juniper compete fiercely to win business. They frequently submit bids to provide enterprise-grade WLAN to the same customers, and they are often the top two bidders. Customers—particularly large enterprise customers—frequently benefited from competition between HPE and Juniper, which, among other things, has forced HPE to offer significant discounts to win business in head-to-head matchups against Juniper. For instance:

- In 2021 and 2022, HPE and Juniper were the top two contenders for a multi-million-dollar contract to provide WLAN solutions to a large research university in the Northeast. HPE's sales teams described the opportunity as "a very competitive deal against [Juniper's] Mist that we need to win" and sought approval for a 79 percent discount on hardware and a 73 percent discount on software to win the deal. Juniper ultimately won the contract.

- In 2023, HPE and Juniper were the top two contenders to provide WLAN solutions to a large research university system in the Northwest—an HPE Aruba customer since 2005—and each offered discounts against each other to win the contract. Juniper ultimately won the contract, and an HPE executive described the loss as "a big hit, surprise."

- In 2023, HPE and Juniper were the top two contenders for a $100 million contract to provide WLAN solutions to a large healthcare system. Both parties discounted deeply to win the business, which Juniper ultimately won. Reflecting on the loss, HPE's Head of Sales for the Americas wrote, "This is a huge blow and Juniper will leverage this one and continu[e] to bring credibility to there [sic] solution."

45.     HPE also compares the pricing of its wireless access points and network software licenses to Juniper's and recommends deep discounts below list prices to remain competitive. For instance, an internal July 2022 price calibration report on Aruba Central licenses for advanced wireless access points recommended that HPE lower the price of its software package to "compete better with [Juniper's] Mist and [Cisco's] Meraki," which it identified as HPE's "primary competitors."

46.     In the field, HPE sales teams have raised concerns about Juniper undercutting HPE on price, seeking authority to offer steep pricing discounts to win business against Juniper. For instance, in April 2023, HPE's former Senior Vice President of Software shared feedback that, in a recent head-to-head competition, HPE's "Aruba [product] was very, very expensive" and Juniper's "Mist [product] was [millions of dollars] cheaper." In response, HPE's Head of Sales for the Americas confirmed that, "everything [they] are saying is accurate . . . [o]ur 4x4 6e APs for example is approx. 400.00 list price higher. It is killing us in K12 and Higher Ed." In other words, Juniper was undercutting HPE on price in education, costing HPE business in one of its stronger customer verticals.

47.     Head-to-head competition has also benefited customers by forcing Defendants and other competitors to innovate their network management software. In internal documents, HPE executives recognize the necessity of addressing Juniper's perceived product advantages, and they directly link software initiatives, like Project Gravity, to HPE's efforts to "Beat Mist." HPE's internal documents do not show the same urgency to out-innovate Cisco on network management software, and many enterprise customers do not consider Cisco an innovation leader in AIOps and other advanced software tools. For instance, an October 2022 HPE strategy deck stated that to "grow cloud managed revenues"— one of six strategic priorities and initiatives for the 2023 fiscal year—HPE had to "Beat Mist by leveraging improved [user experience] with [AIOps]-infused workflows." In an email a month later, HPE's former Senior Vice President of Software wrote that while HPE had mostly closed the gap on AIOps, Mist still had an advantage in "their [user interface ("UI")] workflows and speedy UI. . . . We can beat them on the UI workflows with Project Gravity," but it "can't come soon enough." Mist was still putting pressure on HPE's "top customers" in September 2023, leading HPE's former Senior Vice

President of Software to write that, until HPE launched a revamped network management software

solution, "we cannot rest easy."

48.    Many large customers—including each of the three customers mentioned above—

describe Cisco, HPE, and Juniper as the three leading vendors for their customer segments and believe

Cisco's products compare unfavorably to HPE's and Juniper's on price, features, and reliability. Those

customers benefit from having Juniper as a credible alternative to Cisco and HPE in the market. If HPE

successfully acquired Juniper, the acquisition would leave them with fewer credible choices.

### C.    The Proposed Merger Would Facilitate Coordination Among the Remaining Enterprise-Grade WLAN Vendors

49.    The proposed merger will also reduce competition by increasing the risk of coordination

among the remaining vendors. The existing market structure of the enterprise-grade WLAN market is

already conducive to coordinated behavior. A few large players dominate the industry, and information

about their actions is widely known. During customer negotiations, it is common for competitors to

receive bidding information about their competitors from customers in hopes of obtaining better pricing

terms. WLAN vendors follow the same market analysts and seek advice from the same consultants

about go-to-market strategies. Discounting practices have also become fairly standardized over time.

50.    Gross margins for enterprise-grade WLAN vendors are exceedingly high, giving vendors

a strong incentive to prevent competition from leading to discounts that are too deep. HPE executives

are aware of the margins they earn on their WLAN solutions. When discussing unconfirmed rumors of

Mist's acquisition in 2019 before a buyer was identified, a former HPE executive expressed concern that

one prospective buyer may "play the 45 too [sic] 50% gross margin game"—lower than HPE's higher

average gross margins—"and ruin the market for us all."

51.    This acquisition, if allowed to proceed, would result in two firms—Cisco and HPE—

controlling over 70 percent of the relevant market, with a significant gap between HPE and the next

largest vendor in the market. Cisco and HPE would cement their positions as key leaders for the market

to follow, and, with fewer players and obvious leaders, Cisco and HPE may find it easier to reach and

sustain a consensus on price, features, and reliability that harms enterprise customers through coordination.

## **NOTHING OFFSETS THE MERGER'S THREATS TO COMPETITION**

52.     Entry by new vendors of enterprise-grade WLAN in response to the merger would not be timely, likely, or sufficient to offset the anticompetitive effects of the proposed merger of HPE and Juniper. It takes years and significant financial investment for a vendor to design and procure hardware components for a WLAN portfolio; create a management platform that incorporates tools that streamline and automate network maintenance; build a sales and support organization; and recruit value-added resellers and other distribution partners that procure and install equipment for WLAN customers.

53.     To compete effectively for larger enterprises, vendors also need name recognition and a demonstrated track record to convince them to consider switching providers. In addition, vendors may need to build a portfolio of complementary components, like campus switches, because of the increasing number of enterprise customers wishing to consolidate vendors across their networks—upwards of 50 percent according to internal Juniper documents. As one HPE executive explained, "It is a long journey to become successful in this world."

54.     Similarly, there are obstacles to existing enterprise-grade WLAN vendors repositioning or expanding to replace the competition lost from an independent Juniper. Today, only a handful of WLAN vendors are well-positioned to address the most sophisticated use cases. Several smaller WLAN vendors will continue to be disadvantaged due to small sales forces and support organizations, necessary components to developing proven reputations for reliable service that enterprise-grade customers demand. Even well-resourced networking companies in complementary networking markets are unlikely to be strong alternatives to Cisco and HPE immediately, as several face reputational headwinds and have not developed the distribution networks for rapid growth in the enterprise-grade WLAN market.

55.     Defendants have claimed that the proposed acquisition would generate synergies by combining operations and removing duplication in the companies' sales, administrative, and other organizations. But HPE's own executives—and several of HPE's competitors—have expressed doubts about HPE's ability to successfully integrate Juniper's products into its networking portfolio.

Regardless, to the extent the proposed transaction would result in any verifiable, merger-specific efficiencies in the relevant market, such efficiencies are unlikely to be timely or substantial enough to mitigate the risk to competition posed by the transaction.

## JURISDICTION AND VENUE

56.     The United States brings this action under Section 15 of the Clayton Act, 15 U.S.C. § 25, as amended, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18. This Court has subject matter jurisdiction over this action pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25.

57.     HPE and Juniper are engaged in interstate commerce and in activities substantially affecting interstate commerce. They sell enterprise-grade WLAN solutions throughout the United States, and their sales have had a substantial effect on interstate commerce.

58.     This Court has personal jurisdiction over each Defendant. HPE and Juniper each transact business within this District. Aruba Networks, a subsidiary of HPE, is based in Santa Clara, California, and Juniper is headquartered in Sunnyvale, California. HPE and Juniper executives responsible for managing their networking businesses live and work in the San Francisco Bay Area.

59.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and under 28 U.S.C. § 1391(b) and (c).

## DIVISIONAL ASSIGNMENT

60.     Pursuant to Civil Local Rule 3-2(c) and General Order No. 44, this antitrust case shall not be assigned to a particular Division of this District. Instead, it shall be assigned on a District-wide basis.

## VIOLATIONS ALLEGED

61.     HPE's proposed acquisition of Juniper, if allowed to proceed, would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, because the effect of it may be to substantially lessen competition in interstate trade and commerce in the market for enterprise-grade WLAN solutions in the United States for the reasons alleged above.

62.     Unless enjoined, the effect of the proposed acquisition may result in the following anticompetitive effects, among others, in the relevant markets:

1.  Significantly increasing concentration in an already highly concentrated market;

2.  Eliminating head-to-head competition; and

3.  Increasing prices paid by customers and causing a decrease in quality, service, and innovation.

## <u>REQUEST FOR RELIEF</u>

63.  The United States requests that the Court:

(a) Adjudge and decree that HPE's proposed acquisition of Juniper would be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b) Preliminarily and permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating HPE's acquisition of Juniper or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine HPE and Juniper in the United States; and

(c) Award the United States the costs of this action; and award the United States other relief that the Court deems just and proper.

Dated:  January 30, 2025

OMEED A. ASSEFI
Acting Assistant Attorney General

RYAN DANKS
Director of Civil Enforcement

CATHERINE K. DICK
Acting Director of Litigation

JACKLIN CHOU LEM (CA Bar # 255293)
Civil Chief
San Francisco Office

ELIZABETH S. JENSEN (CA Bar # 302355)
Assistant Civil Chief
San Francisco Office

/s/ Jeremy M. Goldstein
MICHAEL J. FREEMAN (OH Bar # 0086797)
Jeremy M. Goldstein (CA Bar # 324422)
Pamela Cole (CA Bar # 208286)
Craig W. Conrath (MN Bar # 0018569)
Don Daniel (TX Bar # 24120575)
Thomas Greene (CA Bar # 57159)
Michael Mikawa (CA Bar # 316787)
Aaron M. Sheanin (CA Bar # 214472)

U.S. Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 4000
Washington, DC 20530
Telephone: (212) 213-2774
Fax: (202) 514-5847
Email: Michael.Freeman@usdoj.gov

*Attorneys for Plaintiff United States of America*