UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC.<br><br>*Defendants*. | Case: 5:25-CV-00951-PCP |

**COMPETITIVE IMPACT STATEMENT**

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the Proposed Final Judgment submitted for entry in this civil antitrust proceeding. Unless otherwise noted, all defined terms in this Competitive Impact Statement have the same meaning as set out in the proposed Final Judgment.

**I.     NATURE AND PURPOSE OF THIS PROCEEDING**

On January 9, 2024, Hewlett Packard Enterprise Co. ("HPE") entered into an agreement to acquire Juniper Networks, Inc. ("Juniper") for approximately $14 billion.[1]

The United States filed a civil antitrust Complaint on January 30, 2025, seeking to enjoin the proposed acquisition. The Complaint alleges that the acquisition likely would substantially

---

[1] Each of HPE and Juniper are referred to in this document as "Defendant" or collectively as "Defendants," as appropriate.

1

lessen competition in the United States for enterprise-grade WLAN solutions in violation of Section 7 of the Clayton Act, § 15 U.S.C. § 18.

On June 27, 2025, the United States filed a Stipulation and Order and proposed Final Judgment designed to remedy the Section 7 violation, eliminating the alleged anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, Defendants are required to divest HPE's Instant On campus and branch business (the "HPE Divestiture Business") to a Divestiture Acquirer and license the source code for Juniper's Mist AI Ops software used in Juniper's WLAN products (the "AI Ops for Mist Source Code License") to one or more Licensees approved by the DOJ. The Divestiture Acquirer of the HPE Divestiture Business and the Licensee(s) of the AI Ops for Mist Source Code License could be the same entity or two separate entities. At the option of the first Licensee, for twelve (12) months following the license, defendants must also provide transitional technical support relating to the license. At the option of the first Licensee, Defendants must also transfer engineers and sales employees familiar with the Mist AI Ops software to assist the Licensee in incorporating the Mist software into its WLAN offerings and marketing it to customers, and to facilitate introductions to Juniper's suppliers, distributors and channel partners.

Under the terms of the Stipulation and Order, the Defendants may consummate the proposed acquisition following signature by the Court of the Stipulation and Order and will for the pendency of the license processes. Under the terms of the Stipulation and Order, Defendants will take certain steps to ensure that the HPE Divestiture Business is operated as a competitively independent, economically viable, and ongoing business concern that will remain independent and uninfluenced by the consummation of the acquisition, and that competition is maintained during the pendency of the ordered divestiture.

The United States and the Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and punish violations thereof.

## II.   DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATION

### A. THE DEFENDANTS AND THE PROPOSED TRANSACTION

Complete descriptions of the Defendants and the proposed transaction are found in the Complaint, filed January 30, 2025. Defendant HPE, headquartered in Spring, Texas, provides products in a number of technology markets, including general-purpose servers, cloud storage, and finance. Networking is one of its fastest growing divisions, and the company sells various networking products, including wireless access points and campus switches, under the HPE Aruba Networking brand and its legacy on-premises network management solution, Airwave.

Juniper, headquartered in Sunnyvale, California, offers a range of networking products, including wireless access points, wired switches, and network management software under the Mist brand.

On January 9, 2024, Hewlett Packard Enterprise Co. ("HPE") entered into an agreement to acquire Juniper Networks, Inc. ("Juniper") for approximately $14 billion.

### B. THE MARKET

#### a. ENTERPRISE-GRADE WLAN SOLUTIONS

Enterprise-grade WLAN solutions are a relevant product market and line of commerce within the meaning of Section 7 of the Clayton Act. Enterprise-grade WLAN solutions are sold to businesses, school systems, and other commercial and non-profit organizations. They can serve a

large number of users simultaneously and support advanced feature sets and functionalities. Unlike consumer-grade WLAN, enterprise-grade WLAN solutions include systems to manage multiple access points— sometimes thousands of them—across a single location. Systems used to manage multiple access points include hardware-based controllers, cloud-managed services, and network management software. Those systems monitor connectivity, service quality, and other critical network functions.

WLAN vendors offer products with a range of hardware and software features optimized for different environments and customer needs. Because customer needs differ, HPE and Juniper may be able to charge different prices and include different terms for their customers. Customers are also unable to engage in arbitrage by purchasing indirectly from or through other customers to defeat potential price increases or worsening of terms.

The market for enterprise-grade WLAN solutions exhibits many of the "practical indicia" that courts look for when determining the boundaries of a relevant market, including peculiar characteristics and uses, distinct customers, and industry recognition. For example:

- WLAN solutions use radio waves to connect users' devices to a local area network. Consumers do not view wired solutions, which connect user devices directly to campus switches through ethernet cables, as reasonable substitutes, even though both permit users to access the network, because wired connections do not permit users freedom of movement.

- Customers who purchase enterprise-grade WLAN solutions, which are tailored for commercial environments, with wireless access points designed to be linked to cover a larger geographic area and managed by a hardware or software system, are not generally able to be served by consumer-grade WLAN solutions.

- Customers typically purchase network management software and other control systems along with wireless access points. This is because wireless access points sold by Cisco, HPE, Juniper, and other WLAN vendors often cannot be managed by third-party network management software, and these firms generally do not sell their network management software on a standalone basis to be used with third-party hardware.

- Industry analysts, including 650 Group Market Intelligence Research ("650 Group"), regularly track revenue growth for an enterprise-grade WLAN market and calculate various vendors' shares of that market. Those analysts separately track revenues for enterprise-grade and consumer-grade WLAN, and, for enterprise-grade WLAN, include revenues from wireless access points, controllers, and cloud-managed services. Defendants regularly circulate market share estimates produced by 650 Group and other industry analysts and rely on them to gauge their performance relative to competitors.

Purchasing wireless access points from an original device manufacturer and either using a third-party network management software or creating a bespoke software solution in-house is not a reasonable substitute for most enterprise-grade WLAN customers. Among other things, few WLAN customers have the IT resources and expertise to design and procure their own access points and network management systems or the scale needed to make buying directly cost-effective. Customers would not substitute solutions involving third-party or bespoke software in sufficient numbers to deter a hypothetical monopolist of enterprise-grade WLAN solutions from undertaking a small but significant non-transitory increase in price ("SSNIP").

    b. **GEOGRAPHIC MARKET**

The relevant geographic market for HPE's proposed acquisition of Juniper is the United States. Several enterprise-grade WLAN vendors that are active abroad, including Chinese

multinational Huawei Technologies Company ("Huawei"), have been identified as potential security threats by the U.S. government and, under federal law, are barred from competing for business domestically. As a result, customers in the United States have fewer options than they would if they were based abroad, and HPE and Juniper may be able to charge different prices and include different terms for those customers. Customers in the United States are also unable to engage in arbitrage by purchasing indirectly from or through other customers outside the United States in order to defeat potential price increases or worsening of terms. The geographic market includes all sales made to customers in the United States, regardless of the WLAN vendor's location.

### C. THE COMPETITIVE EFFECTS OF THE TRANSACTION

Complete descriptions of the potential effects on competition in the market for enterprise-grade WLAN solutions in the United States are found in the Complaint. In the United States, the market for the development and sale of enterprise-grade WLAN solutions is highly concentrated and would become substantially more concentrated as a result of the Proposed Transaction.

Defendants regularly rely on industry analysts, including International Data Corporation ("IDC"), that calculate wireless access point market shares for the United States. Per IDC and as alleged in the Complaint, in 2024, HPE had a share of approximately 15-17% and Juniper had a share of approximately 7-9%. Cisco had approximately 48% of the market, such that post-acquisition these three firms would hold over 70% of the market. Other competitors, including Arista Networks, Inc.; Fortinet, Inc.; Ubiquiti Inc.; Commscope Holding Company Inc.; Extreme Networks, Inc.; Nile Global, Inc.; and Meter, Inc., each had a share between 1% and 10%. Although the combined share of HPE and Juniper is below 30%, the acquisition would result in a highly concentrated market as measured by the Herfindahl-Hirschman Index ("HHI") as

described in Section 2.1 of the 2023 *Merger Guidelines*, with a pre-merger HHI over 3,000 and a change of at least 250 points.

The proposed acquisition would create a combined company with the ability to increase prices by eliminating head to head competition between HPE and Juniper and harm those customers that view Cisco, HPE, and Juniper as the three leading vendors for enterprise-grade WLAN solutions and benefit from having Juniper as a credible alternative to Cisco and HPE in this market.

The proposed acquisition would also reduce competition by increasing the risk of coordination among the remaining vendors. It would result in two firms—Cisco and HPE—controlling over 70 percent of the relevant market, with a significant gap between HPE and the next largest vendor in the market. Cisco and HPE may find it easier to reach and sustain a consensus on price, features, and reliability that harms enterprise customers through coordination.

### III. EXPLANATION OF THE PROPOSED FINAL JUDGMENT

The divestiture and license and other remedial measures of the proposed Final Judgment will eliminate the alleged anticompetitive effects of the acquisition by strengthening one or more existing competitors or facilitating entry of a new competitor for enterprise-grade WLAN solutions in the United States.

*Divestiture of HPE Instant On Business*

The proposed Final Judgment requires Defendants within one hundred and eighty (180) calendar days after the filing of this proposed Final Judgement, or five (5) days after notice of entry of this Final Judgment by the Court, whichever is later to divest HPE's worldwide Instant On campus and branch business (the "HPE Divestiture Business"), including all tangible and intangible assets related to or used in connection with the Instant On Business. The divestiture

will include all contracts, agreements, and customer relationships included in the HPE Divestiture Assets, and for any such contract or agreement that requires the consent of another party to assign or otherwise transfer, Defendants must use best efforts to accomplish the assignment or transfer.

In the event that Defendants do not divest the HPE Divestiture Business, within the periods prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a Divestiture Trustee selected by the United States to sell the HPE Divestiture Business. If a Divestiture Trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the Divestiture Trustee. The Divestiture Trustee's commission will be structured so as to provide an incentive for the Divestiture Trustee based on the price and terms of the divestiture and the speed with which it is accomplished. After its appointment becomes effective, the Divestiture Trustee will file monthly reports with the Court and the United States setting forth its efforts to sell the HPE Divestiture Business. At the end of six (6) months, if the divestiture has not been accomplished, the Divestiture Trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the Divestiture Trustee's appointment.

*AI Ops for Mist Source Code License*

The proposed Final Judgment also requires Defendants, within one hundred and eighty (180) calendar days after the filing of this proposed Final Judgement, or five (5) days after notice of entry of this Final Judgment by the Court, whichever is later, to hold an auction to license the AI Ops for Mist Source Code and enter into a binding agreement to license the AI Ops for Mist Source Code. The AI Ops for Mist Source Code must be licensed in such a way as to satisfy the United States, in its sole discretion, that the operations can and will be operated by the Licensee

as a viable, ongoing business that can compete effectively in the relevant market. Defendants must take all reasonable steps necessary to accomplish the AI Ops for Mist Source Code Auction and AI Ops for Mist Source Code License quickly and shall cooperate with prospective licensees. The United States, in its sole discretion, may agree to extensions of this time period of up to sixty (60) days to complete the divestiture and shall notify the Court in such circumstances. If Defendants receive multiple bids over $8 million for the AI Ops for Mist Source Code, Defendants will also license the technology to a second Licensee (without technical support, the transfer of employees, or introduction to Juniper's suppliers, distributors, and channel partners), giving not one but two competitors access to this technology. Whether to a single or to two bidders, the AI Ops for Mist License will consist of a one-time, perpetual, worldwide, non-exclusive license for the AI Ops for Mist Source Code. For the primary Licensee, Defendants must also provide, at the Licensee's option, a transition services agreements for a period of twelve (12) months whereby Defendants will provide the Licensee with any knowledge transfer assistance, software updates, engineering support for ordinary course maintenance and bug fixes that it releases for the AI Ops for Mist Source Code, and engineering support for integrating the AI Ops for Mist Source Code into the Licensee's software.

    Per the terms of the license, the Licensee will have the right to use the AI Ops for Mist Source Code and further develop and improve it, with the Licensee retaining ownership of any improvements to and derivatives of the AI Ops for Mist Source Code developed after the license date. The Licensee will have the right to grant rights of use to the AI Ops for Mist Source Code to its end users, intermediaries, and service providers as reasonably needed in connection with the sale of networking products. Defendants and Licensee will provide patent cross-licenses to enable the parties' networking activities.

In addition, the Final Judgment provides that Defendants, at the primary Licensee's option, will facilitate the transfer of up to thirty (30) Juniper engineers familiar with the Mist AI Ops Source Code, and up to twenty five (25) Juniper sales personnel experienced in selling Mist to the primary Licensee. Defendants will provide financial incentives to encourage relevant employees to transfer to the Licensee. The license will include a non-solicit provision preventing primary Licensee from soliciting any additional Juniper engineers or sales personnel beyond the agreed upon personnel, which shall lapse twelve (12) months from the date of the license. The license will also include a non-solicit provision preventing Defendants from soliciting to hire any personnel transferred to primary Licensee under the license, which shall lapse (12) months after the date of the license. These provisions will ensure that the Licensee has personnel knowledgeable about the Mist AIOps software to assist the Licensee in incorporating this technology into its own network management software and in marketing that offering to clients.

The transition services agreement will include a provision whereby Defendants will provide the primary Licensee with relevant contact information for and introductions to Juniper's original design manufacturer ("ODM") suppliers for WLAN hardware and Juniper's distributors and channel partners that work with Juniper to sell WLAN in the United States.

In the event that Defendants do not license the AI Ops for Mist Source Code to a Licensee within the periods prescribed in the proposed Final Judgment, the proposed Final Judgment provides that the Court will appoint a License Trustee selected by the United States to effect the AI Ops for Mist Source Code Auction and license the AI Ops for Mist Source Code. If a License Trustee is appointed, the proposed Final Judgment provides that Defendants will pay all costs and expenses of the License Trustee. The License Trustee's commission will be structured so as to provide an incentive for the License Trustee based on the price and terms of the license and the

speed with which it is accomplished. After its appointment becomes effective, the License Trustee will file monthly reports with the Court and the United States setting forth its efforts to accomplish the AI Ops for Mist Source Code Auction and AI Ops for Mist Source Code License. At the end of six (6) months, if the AI Ops for Mist Source Code Auction and AI Ops for Mist Source Code License has not been accomplished, the License Trustee and the United States will make recommendations to the Court, which shall enter such orders as appropriate, in order to carry out the purpose of the trust, including extending the trust or the term of the License Trustee's appointment.

## IV. REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no prima facie effect in any subsequent private lawsuit that may be brought against the Defendants.

## V. PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT

The United States and the Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of the summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court. In addition, comments will be posted on the U.S. Department of Justice, Antitrust Division's internet website and, under certain circumstances, published in the Federal Register.

Written comments should be submitted to:

Civil Chief, San Francisco Office
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI. ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against the Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against HPE's acquisition of Juniper. The United States is satisfied, however, that the divestiture of assets, license, and other relief described in the

proposed Final Judgment will preserve competition for the development and sale of enterprise-grade WLAN solutions in the United States. The proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII. STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

Under the Clayton Act and APPA, proposed Final Judgments, or "consent decrees," in antitrust cases brought by the United States are subject to a 60-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, is required to consider:

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B). In considering these statutory factors, the Court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the

defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *United States v. U.S. Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (explaining that the "court's inquiry is limited" in Tunney Act settlements); *United States v. InBev N.V./S.A.*, No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009) (noting that a court's review of a proposed Final Judgment is limited and only inquires "into whether the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint was reasonable, and whether the mechanisms to enforce the final judgment are clear and manageable").

As the U.S. Court of Appeals for the District of Columbia Circuit has held, under the APPA a court considers, among other things, the relationship between the remedy secured and the specific allegations in the government's Complaint, whether the proposed Final Judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may positively harm third parties. *See Microsoft*, 56 F.3d at 1458–62. With respect to the adequacy of the relief secured by the proposed Final Judgment, a court may not "make de novo determination of facts and issues." *United States v. W. Elec. Co.*, 993 F.2d 1572, 1577 (D.C. Cir. 1993) (quotation marks omitted); *see also Microsoft*, 56 F.3d at 1460–62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001); *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 16 (D.D.C. 2000); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *3. Instead, "[t]he balancing of competing social and political interests affected by a proposed antitrust decree must be left, in the first instance, to the discretion of the Attorney General." *W. Elec. Co.*, 993 F.2d at 1577 (quotation marks omitted). "The court should also bear in mind the *flexibility* of the public interest inquiry: the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but only to confirm that the resulting settlement is within the *reaches* of the public interest." *Microsoft*, 56 F.3d at

1460 (quotation marks omitted); *see also United States v. Deutsche Telekom AG*, No. 19-2232 (TJK), 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). More demanding requirements would "have enormous practical consequences for the government's ability to negotiate future settlements," contrary to congressional intent. *Microsoft*, 56 F.3d at 1456. "The Tunney Act was not intended to create a disincentive to the use of the consent decree." *Id.*

The United States' predictions about the efficacy of the remedy are to be afforded deference by the Court. *See, e.g.*, *Microsoft*, 56 F.3d at 1461 (recognizing courts should give "due respect to the Justice Department's . . . view of the nature of its case"); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) ("In evaluating objections to settlement agreements under the Tunney Act, a court must be mindful that [t]he government need not prove that the settlements will perfectly remedy the alleged antitrust harms[;] it need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." (internal citations omitted)); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (noting "the deferential review to which the government's proposed remedy is accorded"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) ("A district court must accord due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case."). The ultimate question is whether "the remedies [obtained by the Final Judgment are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest.'" *Microsoft*, 56 F.3d at 1461 (*quoting W. Elec. Co.*, 900 F.2d at 309).

Moreover, the Court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the Court to "construct [its] own hypothetical case and then evaluate the decree against

15

that case." *Microsoft*, 56 F.3d at 1459; *see also U.S. Airways*, 38 F. Supp. 3d at 75 (noting that the court must simply determine whether there is a factual foundation for the government's decisions such that its conclusions regarding the proposed settlements are reasonable); *InBev*, 2009 U.S. Dist. LEXIS 84787, at *20 ("[T]he 'public interest' is not to be measured by comparing the violations alleged in the complaint against those the court believes could have, or even should have, been alleged"). Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Microsoft*, 56 F.3d at 1459–60.

In its 2004 amendments to the APPA, Congress made clear its intent to preserve the practical benefits of using judgments proposed by the United States in antitrust enforcement, Pub. L. 108-237 § 221, and added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also U.S. Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of Sen. Tunney). "A court can make its public interest determination based

on the competitive impact statement and response to public comments alone." *U.S. Airways*, 38 F. Supp. 3d at 76 (citing *Enova Corp.*, 107 F. Supp. 2d at 17).[2]

## VIII. DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: June 27, 2025

/s/ Chad Mizelle
CHAD MIZELLE
*Acting Associate Attorney General*

/s/ Stanley Woodward
STANLEY WOODWARD
*Counselor to the Attorney General*

/s/ Ketan Bhirud
KETAN BHIRUD
*Associate Deputy Attorney General*

/s/ Abigail A. Slater
ABIGAIL A. SLATER
*Assistant Attorney General*

ROGER P. ALFORD
*Principal Deputy Assistant Attorney General*

OMEED ASSEFI
MARK HAMER
WILLIAM J. RINNER
*Deputy Assistant Attorneys General*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue N.W.
Washington, DC 20530
Tel.: 202-616-1473

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. Compare 15 U.S.C. § 16(e) (2004), with 15 U.S.C. § 16(e)(1) (2006); see also SBC Commc'ns, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).