MICHAEL J. FREEMAN (OH BAR # 0086797)
Senior Litigation Counsel
JEREMY M. GOLDSTEIN (CA Bar # 324422)
Trial Attorney
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 213-2774
Fax: (202) 514-5847
Email: Michael.Freeman@usdoj.gov

[Additional counsel listed on signature page]

Attorneys for Plaintiff
United States of America

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-CV-00951-PCP |
| *Plaintiff,* | **UNITED STATES' PRE-TRIAL BRIEF** |
| v. | DATE: July 9, 2025 (trial begins) |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | TIME: 9:00 AM<br>JUDGE: Hon. P. Casey Pitts<br>COURTROOM: 8, 4th Floor |
| *Defendants.* | **REDACTED VERSION** |

**TABLE OF CONTENTS**

I.    INTRODUCTION ...............................................................................................1

II.   LEGAL STANDARDS ......................................................................................2

      A.   Section 7 Analysis Focuses On Relevant Markets Defined by Products and
           Geography...............................................................................................2

      B.   The United States May Establish a Prima Facie Case With the "Structural
           Presumption" or With Direct Evidence. ................................................4

      C.   In Rebuttal, Entry or Expansion Must be Timely, Likely, and Sufficient, and
           Efficiencies Must be Cognizable. ..........................................................5

III.  ARGUMENT .....................................................................................................6

      A.   Background on Wireless Local Area Networking (WLAN) ...................6

      B.   The United States Has Established a Strong Prima Facie Case...............7

           1.   There is no dispute that the relevant product market is enterprise-grade
                WLAN solutions and that the United States is a relevant geographic
                market. ......................................................................................7

           2.   There is no dispute that if allowed to proceed, the merger of HPE and
                Juniper will result in two firms with over 75% market share. ..........7

           3.   There is no dispute that HPE's acquisition of Juniper is presumptively
                unlawful under the Merger Guidelines. ....................................8

           4.   The proposed acquisition will substantially lessen competition by
                eliminating head-to-head competition between HPE and Juniper..........9

           5.   The proposed acquisition will increase the risk of coordinated
                interaction in the market for enterprise-grade WLAN.........................11

      C.   HPE and Juniper Cannot Rebut the United States' Strong Prima Facie Case. .................12

           1.   Defendants cannot show that expansion and entry by other firms
                would be timely, likely, and sufficient..............................................12

           2.   Defendants cannot show verifiable and merger-specific efficiencies.................15

           3.   Defendants' other defenses are deficient. .........................................16

IV.   OVERVIEW OF THE UNITED STATES' CASE-IN-CHIEF............................17

      A.   Fact Witnesses .......................................................................................17

      B.   Expert Witnesses....................................................................................19

V.    EVIDENTIARY ISSUES .................................................................................20

VI.   CONFIDENTIALITY........................................................................................24

1

## TABLE OF AUTHORITIES

2

3

**Cases**

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962)..................................................................................................... 2, 3

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ......................................................................................................... 2

*California v. Sutter Health System*,
    130 F. Supp. 2d 1109 (N.D. Cal. 2001) .......................................................................... 3

*Chicago Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ................................................................................. 3, 5, 12

*FTC v. CCC Holdings, Inc.*,
    605 F. Supp. 2d 26 (D.D.C. 2009) .................................................................................. 5

*FTC v. Hackensack Meridean Health, Inc.*,
    30 F.4th 160 (3d Cir. 2022) ........................................................................................... 12

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ................................................................................. passim

*FTC v. Kroger Co. & Albertson's Co.*,
    No. 3:24-CV-00347-AN, 2024 WL 5053016 (D. Or. Dec. 10, 2024)...................... passim

*FTC v. PPG Indus.*,
    798 F.2d 1500 (D.C. Cir. 1986) .................................................................................... 12

*FTC v. Sanford Health*,
    926 F.3d 959 (8th Cir. 2019) ........................................................................................ 12

*FTC v. Staples, Inc.*,
    190 F. Supp. 3d 100 (D.D.C. 2016) ................................................................................ 5

*FTC v. Staples, Inc.*,
    970 F. Supp. 1066 (D.D.C. 1997) ................................................................................... 9

*FTC v. Swedish Match*,
    131 F. Supp. 2d 151 (D.D.C. 2000) ................................................................................ 5

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ........................................................................................ 3

*FTC v. University Health, Inc.*,
    938 F.2d 1206 (11th Cir. 1991) .................................................................................... 11

*FTC v. Warner Commc'ns, Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ........................................................................................ 2

*FTC v. Whole Foods Mkt., Inc.*,
    548 F.3d 1028 (D.C. Cir. 2008) ...................................................................................... 4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Hosp. Corp. of Am. v. FTC*,
  807 F.2d 1381 (7th Cir. 1986) ................................................................................. 2

*Hynix Semiconductor, Inc. v. Rambus, Inc.*,
  2008 WL 504098 (N.D. Cal. Feb. 19, 2008) .......................................................... 21

*In re LDK Solar Sec. Litig.*,
  No. C07-05182 WHA, 2010 WL 724809 (N.D. Cal. Mar. 1, 2010) ........................ 24

*Kamakana v. City & Cnty. of Honolulu*,
  447 F.3d 1172 (9th Cir. 2006) ............................................................................... 24

*Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*,
  275 F.3d 762 (9th Cir. 2001) ................................................................................... 3

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ................................................................................. 3

*ProMedica Health System, Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) .......................................................................... 5, 8, 12

*RSR Corp. v. FTC*,
  602 F.2d 1317 (9th Cir. 1979) ............................................................................... 17

*Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ......................................................................... passim

*Teradata Corp. v. SAP SE*,
  124 F.4th 555 (9th Cir. 2024) ................................................................................. 3

*Tevra Brands LLC v. Bayer HealthCare LLC*,
  No. 19-CV-04312-BLF, 2024 WL 1909156 (N.D. Cal. May 1, 2024) ...................... 3

*United States v. Aetna, Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017) ............................................................................. 9

*United States v. Aluminum Co. of America*,
  377 U.S. 271 (1964) ............................................................................................... 16

*United States v. Anthem, Inc.*,
  855 F.3d 345 (D.C. Cir. 2017) ............................................................................. 2, 3

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ............................................................................... 12

*United States v. Citizens & S. Nat'l Bank*,
  422 U.S. 86 (1975) ................................................................................................... 5

*United States v. Cont'l Can Co.*,
  378 U.S. 441 (1964) ............................................................................................. 4, 7

*United States v. Crawford*,
  239 F.3d 1086 (9th Cir. 2001) ............................................................................... 21

*United States v. E.I. du Pont de Nemours & Co.,*
  351 U.S. 377 (1956) .................................................................................................... 3

*United States v. Gen. Dynamics Corp.,*
  415 U.S. 486 (1974) .................................................................................................. 16

*United States v. H&R Block, Inc.,*
  833 F. Supp. 2d 36 (D.D.C. 2011) ...................................................................... passim

*United States v. Lloyd,*
  807 F.3d 1128 (9th Cir. 2015) ............................................................................ 21, 22

*United States v. Lopez,*
  762 F.3d 852 (9th Cir. 2014) .................................................................................. 21

*United States v. Philadelphia Nat. Bank,*
  374 U.S. 321 (1963)............................................................................................ 4, 16, 17

*United States v. Whittemore,*
  776 F.3d 1074 (9th Cir. 2015) ................................................................................ 21

**Statutes**

15 U.S.C. § 18 ................................................................................................................ 1, 2

**Rules**

Fed. R. Civ. P. 26(a)(2) ................................................................................................ 22

Fed. R. Evid. 1101 ........................................................................................................ 20

Fed. R. Evid. 602 .......................................................................................................... 21

Fed. R. Evid. 701 .......................................................................................................... 21

**Other Authorities**

2023 Merger Guidelines .......................................................................................... 3, 4, 9, 12

# I.  INTRODUCTION

In this merger enforcement action, Plaintiff the United States of America seeks to block Hewlett Packard Enterprise Co. from acquiring Juniper Networks, Inc. HPE and Juniper are the second- and third-largest suppliers of enterprise-grade wireless local area networking ("WLAN") solutions in the country. The transaction violates Section 7 of the Clayton Act, which prohibits any acquisition whose effect "*may be* substantially to lessen competition" in "*any* line of commerce" and "*any* section of the country." 15 U.S.C. § 18 (emphases added). Any acquisition that, as HPE describes it, affords a company "relief" on "price/discounting pressure" in a particular market following the purchase of "its main competitor" clearly meets that standard.

Wireless networking technology is critical in virtually every modern enterprise, whether a workplace, hospital, university or school campus, or retail store. Millions of American workers create and share company resources and access the internet from wireless-enabled devices. Doctors access medical records on phones and tablets and track patient care on the go. University students take notes on their laptops and access course materials from classrooms, dorm rooms, and school libraries. Retail employees wirelessly process payments and log inventory. As mobile technology has improved and more services have migrated to the cloud, wireless networking technology in the workplace has become even more essential. Today, it is the primary means by which many employees connect to their employer's computer network and the internet. The largest enterprises with the most complex needs rely on enterprise-grade WLAN solutions to provide networking connections for their employees, staff, students, and customers.

As is the case for many technology markets, the market for enterprise-grade WLAN solutions in the United States is already highly consolidated. For years, Cisco and HPE have been the two leading providers of enterprise-grade WLAN solutions to U.S. companies. Despite significant technological advances and the appearance and disappearance of players over the past decade, Cisco's and HPE's market positions have stayed relatively stable with most other vendors remaining distant competitors. Only Juniper has risen in recent years to successfully take share from Cisco and HPE. Today, Juniper is the third-largest supplier in the United States, and it is growing. Like Cisco and HPE, it offers a portfolio of advanced wireless access points and a sophisticated network management system. Juniper competes

1    aggressively against Cisco and HPE in several distinct customer segments and industries.

2          In 2019, Juniper acquired Mist, a start-up founded in 2014 by ex-Cisco executives who broke

3    away to create a better, faster product. Since that acquisition, Juniper has disrupted the enterprise-grade

4    WLAN solutions market and has been on a rocket-ship trajectory ever since. Through innovation, an

5    effective sales organization, and aggressive discounting, Juniper has gained approximately ten percent of

6    the market (and growing). Juniper was the first to market and use artificial intelligence to solve

7    networking problems faster, easier, and with less human involvement, forcing the market, including

8    HPE, to compete harder. HPE has been unable to "Beat Mist," despite a resource-intensive campaign.

9    And now with this proposed acquisition, HPE will eliminate a fierce competitor. The United States has

10    sued to block this merger because it will harm consumers with higher prices and less innovation in the

11    enterprise-grade WLAN solutions market.

12                 **II.  LEGAL STANDARDS**

13          Section 7 is "a prophylactic measure." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S.

14    477, 485 (1977). Because the statute condemns any merger that "may" substantially lessen competition,

15    15 U.S.C. § 18, Section 7 analysis is based upon "probabilities, not certainties." *Brown Shoe Co. v.*

16    *United States*, 370 U.S. 294, 323 (1962). The United States, therefore, does not bear the burden of

17    proving a merger will actually result in higher prices. *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389

18    (7th Cir. 1986). Instead, an acquisition is unlawful when it has a "reasonable probability of

19    anticompetitive effect." *FTC v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984).

20          A merger violates Section 7 if it is reasonably probable to result in a substantial lessening of

21    competition in "*any* line of commerce" in "*any* section of the country." 15 U.S.C. § 18 (emphasis

22    added). Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the

23    merger violates Section 7. *Brown Shoe Co.*, 370 U.S. at 337; *see also United States v. Anthem, Inc.*, 855

24    F.3d 345, 368 (D.C. Cir. 2017) (threat of anticompetitive effects in one local market "provides an

25    independent basis for the injunction" prohibiting merger).

26    **A.    Section 7 Analysis Focuses On Relevant Markets Defined by Products and Geography.**

27          A relevant market is the "area of effective competition" that may be lessened through a merger.

28    *Brown Shoe*, 370 U.S. at 324. A relevant market is defined "by reference to a product market (the 'line

of commerce') and a geographic market (the 'section of the country')." *Id.*

A relevant product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956); *see also Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762, 767 (9th Cir. 2001). A product market can be defined with reference to "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325.

Alternatively, product markets may be assessed using the "hypothetical monopolist test," described in Merger Guidelines issued by the U.S. Department of Justice and Federal Trade Commission. *See United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 51-52 & n.10 (D.D.C. 2011); *and* U.S. Dep't of Justice & Fed. Trade Comm'n Merger Guidelines (2023) § 4.3.A ("2023 Merger Guidelines").[1]  Broadly, the hypothetical monopolist test asks if a monopolist of the proposed market could profitably raise prices—or if doing so would repel so many customers that the monopolist would

---

[1] "The *Merger Guidelines* set forth the standards by which the [federal antitrust enforcement agencies, i.e. the Antitrust Division of the Department of Justice and the Federal Trade Commission] decide[] whether or not to challenge a merger." *California v. Sutter Health System*, 130 F.Supp.2d 1109, 1120 (N.D. Cal. 2001). First issued in 1968 (*see* https://perma.cc/YMZ8-Y784), the federal antitrust enforcement agencies periodically update and reissue the Guidelines, most recently in 2023. The 2023 Guidelines are publicly available at: https://www.justice.gov/atr/2023-merger-guidelines.

Courts often find the Merger Guidelines to be a "helpful tool, in view of the many years of thoughtful analysis they represent, for analyzing proposed mergers." *Anthem*, 855 F.3d at 349. "Although the *Merger Guidelines* are not binding, courts have often adopted the standards set forth in the *Merger Guidelines* in analyzing antitrust issues." *Sutter Health*, 130 F.Supp.2d at 1120, citing *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1053 (8th Cir. 1999); *see also Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 n.9 (9th Cir. 2015) ("Although the Merger Guidelines are 'not binding on the courts,'  *Olin Corp. v. F.T.C.*, 986 F.2d 1295, 1299 (9th Cir. 1993), they 'are often used as persuasive authority,' *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431 n.11 (5th Cir.2008).").

"In the short time in which the 2023 Merger Guidelines have been in effect [since December 18, 2023], multiple courts have cited them as persuasive authority." *FTC v. Kroger Co. & Albertson's Co.*, No. 3:24-CV-00347-AN, 2024 WL 5053016, at *15-17 (D. Or. Dec. 10, 2024) (collecting cases); *see also  Teradata Corp. v. SAP SE*, 124 F.4th 555, 566, 569, 570 (9th Cir. 2024) (consulting the 2023 Merger Guidelines for how to define a relevant market in a Sherman Act case); *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-CV-04312-BLF, 2024 WL 1909156, at *3 (N.D. Cal. May 1, 2024) (relying on 2023 Merger Guidelines for principles of market definition).

1  lose money. *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008); 2023 Merger

2  Guidelines § 4.3.A.

3       As for geography, a court considering a proposed geographic market must identify the area

4  where "the effect of the merger on competition will be direct and immediate." *United States v.*

5  *Philadelphia Nat. Bank,* 374 U.S. 321, 357 (1963). "A market's geography depends on the limits that

6  distance puts on some customers' willingness or ability to substitute to some products, or some

7  suppliers' willingness or ability to serve some customers." 2023 Merger Guidelines § 4.3.D.2.

8  **B.      The United States May Establish a Prima Facie Case With the "Structural**

9  **Presumption" or With Direct Evidence.**

10       Market shares or market concentration can create a presumption of illegality. In *Philadelphia*

11  *National Bank*, the Supreme Court found that a combined market share of 30 percent held by the

12  merging parties sufficed to establish that presumption. *See* 374 U.S. at 364; *see also United States v.*

13  *Cont'l Can Co.*, 378 U.S. 441, 459, 461 (1964) (holding a merger presumptively unlawful "in a highly

14  concentrated industry" where acquiring firm's market share increased from 21.9 percent to 25 percent

15  and the number of "significant competitors" was "reduced from five to four"). Courts may also find that

16  a merger is presumptively unlawful because it further concentrates an already concentrated market, by

17  applying the Herfindahl–Hirschman Index ("HHI") thresholds set forth in the Merger Guidelines. *See*

18  *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) (applying thresholds from 1992 Merger

19  Guidelines); *FTC v. Kroger Co., No. 3:24-CV-00347-AN, 2024 WL 5053016, at *15-17 (D. Or. Dec. 10,*

20  *2024)* (applying 2023 Merger Guidelines).

21       HHIs are calculated by summing the squares of individual firms' market shares. 2023 Merger

22  Guidelines § 2.1. Markets with HHIs of 1800 or over are "highly concentrated," and mergers in "highly

23  concentrated" markets that "involve[] an increase in the HHI of more than 100 points [are] presumed to

24  substantially lessen competition[.]" *Id*. In other words, a merger that raises a highly concentrated

25  market's HHI by 100 points is *presumptively unlawful*—even if the combined firm would control less

26  than 30 percent of the market. *See H&R Block*, 833 F. Supp. 2d at 72 (merger creating firm with 28.4

27  percent market share was presumptively unlawful given the increase to market HHI). If the presumption

28  applies, then the burden shifts to defendants to show "that the market-share statistics [give] an inaccurate

account of the [merger's] probable effects on competition." *Heinz*, 246 F.3d at 715 (alterations in original) (quoting *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 120 (1975)).

In addition to structural evidence based on market concentration, the United States may present direct evidence to bolster its prima facie case. *See ProMedica Health System, Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014) (explaining that the Federal Trade Commission "did not merely rest upon the presumption, but instead discussed a wide range of [additional] evidence that buttresses it"). Such evidence includes a history of head-to-head competition: acquisitions "that eliminate head-to-head competition between close competitors often result in a lessening of competition." *FTC v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016) (citing Merger Guidelines).

**C.  In Rebuttal, Entry or Expansion Must be Timely, Likely, and Sufficient, and Efficiencies Must be Cognizable.**

A defendant's rebuttal evidence can take various forms. *See Heinz*, 246 F.3d at 715 n.7. First, a defendant may rebut a prima facie case under Section 7 by showing that entry or expansion by other firms will be timely, likely, and sufficient to counteract the transaction's anticompetitive effects. *See H&R Block*, 833 F. Supp. 2d at 73 (citing 2010 Merger Guidelines § 9). To make that showing, a defendant must do more than merely identify other firms that compete in the relevant market. *See id.* at 73-77; *Chicago Bridge*, 534 F.3d at 436 ("The mere existence of potential entrants does not by itself rebut the anti-competitive nature of an acquisition."). Rather, the defendant must show that the proffered entry or expansion will "fill the competitive void" created by the acquisition. *FTC v. Swedish Match*, 131 F. Supp. 2d 151, 169 (D.D.C. 2000); *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 48-49 (D.D.C. 2009) (evidence of existing competitors that lacked "sufficient[] success" did not rebut prima facie case under Section 7).

Second, although a defendant may theoretically rebut a presumption of harm with an efficiencies defense, courts are extremely cautious when evaluating these arguments. Indeed, "[t]he Supreme Court has never expressly approved an efficiencies defense to a § 7 claim." *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788–89 (9th Cir. 2015) (citing *Heinz*, 246 F.3d at 720). And "none of the reported appellate decisions have actually held that a § 7 defendant has rebutted a prima facie case with an efficiencies defense." *Id.* at 789. Moreover, the courts of appeals have tightly

1    circumscribed its availability. Efficiencies can rebut a presumption of harm only if "the proposed merger

2    will create a more efficient combined entity and thus increase competition" rather than decrease it. *Id.* at

3    790. Efficiencies also must be merger-specific and verifiable. *See H&R Block*, 833 F. Supp. 2d at 89

4    (citing 2010 Merger Guidelines § 10).

5                                          **III.  ARGUMENT**

6         Through the proposed acquisition of Juniper Networks, HPE threatens to eliminate what its CEO

7    Antonio Neri viewed as the company's "biggest threat." Eliminating a price discounter and innovator

8    whose integrations with artificial intelligence have set the pace for an entire industry is not the only

9    effect this acquisition will have. It will also result in just two firms—Cisco and HPE—controlling over

10   75 percent of America's enterprise-grade WLAN solutions market. This is precisely the type of

11   acquisition that Section 7 was designed to prevent.

12        **A.     Background on Wireless Local Area Networking (WLAN)**

13        A WLAN is a group of computers or other devices like cellular phones that form a network

14   based on radio transmissions. A home or office Wi-Fi network is an example of a WLAN set up. The

15   complexity of such a network can range from a consumer-grade home network with a single radio and a

16   handful of users to an enterprise-grade network for a hospital, university, or large business with

17   thousands of radios that can serve many users simultaneously. See United States' Pre-Trial Proposed

18   Findings of Fact and Conclusions of Law ("PFOF-PCOL") § 1.A.

19        Enterprise-grade WLAN solutions typically include several component parts, including software,

20   service, and equipment. WLAN equipment can encompass wireless access points or "APs"—hardware

21   devices that transmit and receive data—and controllers, which monitor and manage access points

22   through hardware devices or software applications. Enterprise-grade wireless access points can be

23   managed with on-premises ("on-prem") or cloud-based management tools. As is the case with many

24   technological marketplaces, customers have recently demonstrated a preference for cloud-based

25   solutions, and suppliers of enterprise-grade WLAN solutions are responding by increasingly offering

26   cloud-based management. PFOF-PCOL § 1.A.1. Network management software is used to monitor,

27   maintain, and troubleshoot networks. This software helps automate operations and reduce IT costs to

28   maintain a network. Network management software can additionally include sophisticated artificial

intelligence technology for IT operations, often called "AIOps" tools. These tools allow customers to optimize the use of IT resources and simplify IT processes by, for example, detecting problems with a networking device and providing remediation steps. PFOF-PCOL § 1.A.1.

**B.     The United States Has Established a Strong Prima Facie Case.**

      **1.     There is no dispute that the relevant product market is enterprise-grade WLAN solutions and that the United States is a relevant geographic market.**

Market definition often looms large in merger cases—but not in this one. The Complaint proposed an antitrust market that Defendants have accepted: enterprise-grade WLAN solutions in the United States. The United States' economic expert, Professor Marc Remer, will testify that practical indicia and economic analyses support defining such a market. Fact witnesses and documents will buttress that opinion. And Defendants' economic expert, Dr. Nicholas Hill, is expected to testify that enterprise-grade WLAN solutions is a relevant product market and that the United States is a reasonable geographic market. The Court should expect no meaningful dispute here. PFOF-PCOL §§ II, III.

      **2.     There is no dispute that if allowed to proceed, the merger of HPE and Juniper will result in two firms with over 75% market share.**

In highly concentrated markets, courts have prohibited mergers that proposed to combine the second- and third-largest competitors, resulting in just two firms controlling a dominant share of the market. *See, e.g.*, *H&R Block*, 833 F. Supp. 2d at 44, 72 (prohibiting acquisition, which would have resulted in the two merged firms holding 28.4 percent market share, and the larger rival holding 62.2 percent of the market); *Heinz*, 246 F.3d at 711 (prohibiting acquisition, which would have resulted in the two merged firms holding 32.8 percent market share, and the larger rival holding 65 percent of the market). *See also Cont'l Can*, 378 U.S. at 459, 461 (holding a merger presumptively unlawful "in a highly concentrated industry" where acquiring firm's market share increased from 21.9 percent to 25 percent and the number of "significant competitors" was "reduced from five to four").Professor Remer—using internal sales data from HPE, Juniper, and other WLAN suppliers— estimated market shares between 2021 and 2024. Those estimates, shown below, confirm both that Juniper alone has consistently increased its share of the enterprise-grade WLAN solutions market and that if allowed to proceed, HPE's acquisition of Juniper will result in just two firms—HPE and Cisco—controlling over

75 percent of the market. Defendants' expert is expected to testify that he agrees that the combined market share for HPE and Cisco would exceed 75 percent. PFOF-PCOL § IV.A.1.

**Figure V.4: Updated Market Shares[419,420]**
*2021–2024*

| Market Participant | Market Share | | | |
|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 |
| HPE | | | | |
| Juniper | | | | |
| Combined | | | | |
| Cisco | | | | |
| Extreme | | | | |
| Ubiquiti | | | | |
| Ruckus | | | | |
| Arista | | | | |
| Fortinet | | | | |
| TP-Link | | | | |
| Adtran | | | | |
| Cambium | | | | |
| Netgear | | | | |
| Others | | | | |
| TOTAL | 100.0% | 100.0% | 100.0% | 100.0% |

### 3. There is no dispute that HPE's acquisition of Juniper is presumptively unlawful under the Merger Guidelines.

A merger between direct competitors is presumptively illegal if it would result in a substantial increase of concentration in a highly concentrated market. *See, e.g., Kroger*, 2024 WL 5053016, at *15-16; *H&R Block*, 833 F.Supp.2d at 72 (merger that would have increased HHI by approximately 400 points to 4,691 created presumption of anticompetitive effects); *Heinz*, 246 F.3d at 716 (merger which increased premerger HHI by 510 points "create[d], by a wide margin, a presumption that the merger w[ould] lessen competition"); *Saint Alphonsus*, 778 F.3d at 785-86 (merger was "presumptively anticompetitive" because HHI calculations demonstrated a significant change in post-merger concentration in an industry that was already highly concentrated) (citing *ProMedica*, 749 F.3d at 568 (noting that the proposed merger "blew through those [HHI screen] barriers in spectacular fashion"

//

//

because, in part, it would have resulted in one relevant market having an HHI of 4,391)); 2023 Merger Guidelines § 2.1.

Under the Merger Guidelines, a merger that increases HHI by more than 100 points in a highly concentrated market (one with HHI greater than 1800) is presumptively unlawful. *See Kroger*, 2024 WL 5053016, at \*15 (citing 2023 Merger Guidelines § 2.1). Professor Remer calculated the HHI for the U.S. enterprise-grade WLAN solutions market as 4,283 in 2021, 3,948 in 2022, 3,850 in 2023, and 3,874 in 2024. These numbers exceed the HHI Merger Guideline threshold of 1800 and indicate that the market is already highly concentrated. Professor Remer also found that, using 2024 market shares, the proposed merger would increase the HHI for the U.S. enterprise-grade WLAN solutions market by 343 points. Again, this change in HHI exceeds the 100-point threshold in the Merger Guidelines. Together, these HHI calculations show that the proposed acquisition is presumptively unlawful. PFOF-PCOL § IV.A.2. Defendants' economic expert is expected to concede that the proposed acquisition meets the thresholds under the Merger Guidelines. PFOF-PCOL § IV.A.2. The Court should therefore expect no dispute as to the application of the structural presumption.

### 4. The proposed acquisition will substantially lessen competition by eliminating head-to-head competition between HPE and Juniper.

The United States can meet its prima facie burden by showing increased concentration in a highly concentrated enterprise-grade WLAN solutions market, but there is more: additional trial evidence will underscore that HPE's proposed acquisition of Juniper threatens to substantially lessen competition because it will eliminate fierce head-to-head competition between the two companies.

Among enterprise WLAN solution vendors, Juniper is a maverick—an aggressive competitor that exerts outsize influence on industry pricing and innovation. *See United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 43, 74 (D.D.C. 2017) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1083 (D.D.C. 1997)) (enjoining merger in part because Aetna was a "particularly aggressive" Medicare Advantage competitor). Juniper acquired Mist Systems in 2019 and has rapidly grown its WLAN revenue to almost ███████████, up from just ████████ in 2019. *See* PFOF-PCOL § I.C. The company's share of the U.S. WLAN market grew to almost ██ percent from █ percent over those years. *See* PFOF-PCOL

//

§ I.C. No other enterprise WLAN solutions vendor matches that performance. With a small share but a superior product and ample room for growth, Juniper has a unique incentive to compete aggressively.

Consistent with that maverick profile, the evidence will show that HPE saw Juniper—and Juniper saw HPE—as a top rival. HPE documents consistently ranked Juniper as a "Tier 1" WLAN competitor (a category generally shared by Cisco) and characterized Cisco and Juniper as "primary competitors" and "key players." PFOF-PCOL § IV.B.1. A year and a half before announcing the proposed acquisition, HPE CEO Antonio Neri told his management team, "i consider [Mist] your biggest threat." PFOF-PCOL § IV.B.1. HPE monitored Juniper's growth, circulated news of Juniper entering new verticals, and looked to Cisco and Juniper when calibrating list prices and discounts. Other WLAN competitors similarly saw HPE, Juniper, and Cisco in a different league than other vendors. PFOF-PCOL § IV.B.1.

Juniper's success so threatened HPE that the company developed an internal initiative specifically to crush Juniper. This initiative—"Kill Mist" and "Beat Mist"—involved mandatory, multiple-hour trainings and workshops to teach field-level sales employees on how to compete against Juniper Mist. HPE created an email distribution list, beat_mist@hpe.com, where HPE employees tracked and shared competitive intelligence about Juniper and circulated guidance on how to compete in specific customer opportunities. These "Beat Mist" activities had support and visibility from high-level HPE executives. For example, one such executive urged HPE employees, "Do not lose . . . You need to win. Bring everything. KILL MIST!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!" PFOF-PCOL § IV.B.2.a.

HPE and Juniper have often bid against each other and are often customers' top two choices. At trial, the United States will present evidence of multiple instances of head-to-head competition, including testimony from higher education customers George Washington University, Pennsylvania State University, and University of Washington. Evidence from the Defendants' ordinary course documents shows additional head-to-head competition for customers in other verticals such as financial services, health care, and retail. Internal sales data from HPE and Juniper, moreover, show hundreds of customers for which HPE and Juniper were each other's primary competitor. PFOF-PCOL § IV.B.2.b.

This head-to-head competition produced deep discounts and spurred both firms to innovate. Beginning in 2022, as HPE attempted to transition its customers from its legacy Airwave product toward

its new Central and Central On-Prem ("COP") network management platforms, Mist's price became an important factor in determining how much HPE would charge for Central/COP to avoid losing customers to Mist. *See* PFOF-PCOL § IV.B.3.a. By November 2023, HPE's head of North America sales, Jeff Dolce, wrote, "Juniper is my biggest concern. They are coming after our higher Ed vertical and successfully taking us out in some of the longest standing accounts. They are telling [our] partners that they will do it at any price. Very aggressive." PFOF-PCOL § IV.B.3.a. HPE's Vice President of US Enterprise Sales and one of Mr. Dolce's direct reports, Chris Collins, wrote to his colleagues, "[t]he feedback we are getting from customers is central in the cloud does not yet have all the features they need. They've been waiting for a long time and are skeptical we will ever get there." Those same customers saw Mist, by comparison, as "a shine[y] new object." PFOF-PCOL § IV.B.3.b. By March 2024, the HPE sales leaders were emphasizing to their team, "Juniper is outselling us being aggressive"; "Increase discounts exponentially"; "Talk track is to change"; and "Take the gloves off." PFOF-PCOL § IV.B.3.b.

While modeling price effects is not required for the United States to prevail, the United States will nonetheless present economic models demonstrating that price increases are likely to result from HPE's proposed acquisition of Juniper. Professor Remer used two economic models to estimate that the proposed acquisition would increase HPE's prices by 3–6 percent and Juniper's prices by 7–14 percent. Defendants' critiques of those models rest on flawed assumptions and straw man caricatures that differ critically from the United States' arguments. PFOF-PCOL § IV.B.5.

> **5.    The proposed acquisition will increase the risk of coordinated interaction in the market for enterprise-grade WLAN.**

This acquisition, if allowed to proceed, would result in two firms—Cisco and HPE—controlling over 75 percent of the relevant market, with a significant gap between the combined firm and the next largest vendor. Cisco and HPE would cement their positions as key leaders for the market to follow, and, with fewer players and obvious leaders, Cisco and HPE may find it easier to pull their competitive punches instead of continuing to compete aggressively. *See, e.g.*, *Heinz*, 246 F.3d at 724-25 ("The combination of a concentrated market and barriers to entry is a recipe for price coordination.") (citing *FTC v. University Health, Inc.*, 938 F.2d 1206, 1218-19 & n.24 (11th Cir. 1991)); *FTC v. PPG Indus.*,

798 F.2d 1500, 1503 (D.C. Cir. 1986) ("[W]here rivals are few, firms will be able to coordinate their behavior, either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels").

Pulling punches post-merger is not an abstract concern. It is precisely the message that was prepared for HPE executives to convey to investors: that following the closing of the Juniper deal, HPE was "expecting some relief" from "price/discounting pressure" particularly in the business unit that included enterprise WLAN where "we [HPE and Juniper] are each other's main competitor." PFOF-PCOL § IV.B.3.a.

**C.    HPE and Juniper Cannot Rebut the United States' Strong Prima Facie Case.**

The combination of the uncontested structural presumption, Juniper's unique competitive profile and aggressive growth, and extensive evidence of direct competition between HPE and Juniper create a compelling record that the merger is prima facie illegal. Given the strength of the United States' prima facie case, Defendants must mount a compelling rebuttal. See, e.g., *ProMedica*, 749 F.3d at 571-72 ("that the [Plaintiff] did not merely rest upon the [structural] presumption, but instead discussed a wide range of evidence that buttresses it, makes [Defendant's] task more difficult still"); *Chicago Bridge*, 534 F.3d at 426 (when the plaintiff presents a strong prima facie case, "the respondent's burden of production on rebuttal is also heightened"); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990) ("The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully."); *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 176-77 (3d Cir. 2022).

**1.    Defendants cannot show that expansion and entry by other firms would be timely, likely, and sufficient.**

To demonstrate that expansion by other competitors will counteract the harm from a transaction, a defendant must do more than merely identify other competitors in the market. *See H&R Block*, 833 F. Supp. 2d at 73-77. Under the Merger Guidelines, entry must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." 2023 Merger Guidelines § 3.2; *see also FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019). Likelihood of entry "hinges upon an analysis of barriers to new firms entering the market or existing firms expanding into new regions of the market." *H&R Block*, 833 F. Supp. 2d at 73.

Here, the evidence will show that several entry barriers preclude fringe competitors from expanding "to fill the competitive void that will result" from the proposed acquisition. *H&R Block*, 833 F. Supp. 2d at 73. First, because the cost of switching enterprise-grade WLAN solutions is significant, customers tend to stay with their existing vendor, which makes it difficult for new or smaller WLAN vendors to grow quickly. Second, many customers—particularly larger enterprises—place significant weight on vendors' product and brand reputations when making purchasing decisions. Those customers' hesitancy to roll the dice with a system that has not been thoroughly vetted by the marketplace makes it less likely that smaller WLAN vendors, or vendors like Ubiquiti with a reputation for catering to the lower end of the WLAN market, will succeed. Third, catering to some enterprises requires a large and well-trained sales organizations and distribution network, both of which require resources that even established WLAN vendors like Ruckus cannot spend. Fourth, regulatory hurdles increase the cost of competing for certain customers' business. For instance, certifying compliance with the Federal Risk and Authorization Management Program ("FedRAMP") standards for cloud-managed architectures and the Federal Information Processing Standards ("FIPS") for on-prem deployments can take years and cost millions in engineering and other resources. Finally, innovation is difficult and time-consuming in the enterprise-grade WLAN industry. Even significant R&D commitments do not guarantee success. PFOF-PCOL § V.A.

The United States expects Defendants to trumpet the fact that other firms such as Arista and Extreme supply enterprise-grade WLAN solutions in the United States. That's true but not surprising. The relevant question is not whether other vendors besides Cisco, HPE, and Juniper compete for WLAN enterprise customers—they do. The relevant question, and the one the Court should focus on, is whether those vendors can expand in a timely, likely, and sufficient manner to counteract the merger's anticompetitive effects. The evidence will show that they cannot. As reflected in Professor Remer's market share estimates and as supported by other evidence, some of which is highlighted below, competition from these firms has not produced another Juniper and will not anytime soon.

**Arista Networks**. Arista specializes in data center networking technology. Its main line of business is selling high-speed switches, routers, and other data center products to a handful of large-scale cloud-based data center providers like Microsoft and Meta. Arista views its WLAN business as

"adjacent to" its core data center products, and despite efforts to expand its WLAN business, Arista's WLAN share has remained at around █ percent. ████████████████████████████████ ███████████████████████████ PFOF-PCOL § V.B.1.

**Extreme Networks**. Extreme is a self-described mid-market WLAN player and does not target large enterprises. In 2023, for example, Extreme's average WLAN deal size was ███████, compared to ███████ for HPE, ███████ for Cisco, and ███████ for Juniper. Other WLAN firms do not view Extreme as a top competitor. HPE, for example, conducted performance tests on Extreme's wireless access points and discovered that they "completely crashed and could not deal with more than 20 clients." Extreme has attained only a small share of the market (█████████), despite having been a networking company for decades. PFOF-PCOL § V.B.2

**Fortinet**. Fortinet is primarily known as a security company. For seven years, Fortinet had only one marketing employee working on WLAN. Approximately ███ of Fortinet's revenue comes from cybersecurity products and services, while just ███ comes from wireless networking. Fortinet's executive testified that █████████████████████████ and that Fortinet is not a WLAN innovator but a "fast follower." PFOF-PCOL § V.B.3.

**Ruckus**. Ruckus is a niche WLAN player. Approximately █████ of Ruckus's sales come from ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████ Expanding outside these verticals is challenging. Ruckus cannot simply copy strategies for its existing verticals to penetrate new verticals. Rather, it must develop new offerings and strategies tailored for each vertical it attempts to enter. PFOF-PCOL § V.B.4.

**Ubiquiti**. With just █████ global sales staff, ███ salespeople responsible for the United States, and ███████████████████████, Ubiquiti sells mostly to ██████████████████████ and is ████████████████████████████████████████████████. Indeed, Ubiquiti makes about █████████████████████████████████████████████ ███████████████████████. Of its approximately ███ reseller relationships only ██████████ ██████. PFOF-PCOL § V.B.5.

//

1        The contrast between Juniper and this handful of fringe competitors will be clear at trial: Juniper

2   has grown on the back of technological leadership and aggressive pricing while the field has stagnated

3   and struggled to achieve parity. Existing competitors will not fill the competitive void left by the

4   proposed acquisition. And neither will other vendors such as Nile, Meter, Palo Alto, or Huawei. PFOF-

5   PCOL § V.C. Indeed, China-based Huawei is not a participant in the U.S. market for enterprise-grade

6   WLAN because it has been identified as a national security risk and is barred from competing for

7   business within the United States. PFOF-PCOL § III.

8            **2.    Defendants cannot show verifiable and merger-specific efficiencies.**

9        The Supreme Court "has never expressly approved an efficiencies defense to a Section 7 claim,"

10  *Saint Alphonsus*, 778 F.3d at 788–89, and the Ninth Circuit is "skeptical about the efficiencies defense

11  in general and about its scope[.]" *Id.* at 790. Moreover, the Ninth Circuit has held that—assuming such

12  an efficiencies defense existed—defendants bear the burden of establishing several critical prerequisites:

13  The claimed efficiencies must be (1) "verifiable, not merely speculative"; (2) "'merger-

14  specific,'…which is to say that the efficiencies cannot readily 'be achieved without the concomitant loss

15  of a competitor'"; and (3) "enhance[] rather than hinder[] competition," meaning that the efficiencies

16  must prevent a reduction in competition in the relevant market and not be anticompetitive themselves.

17  *Saint Alphonsus.*, 778 F.3d at 790-91 (internal citations omitted). *Accord H&R Block*, 833 F. Supp. 2d at

18  89; Merger Guidelines §3.3. "[P]roof of 'extraordinary efficiencies' is required to offset the

19  anticompetitive concerns in highly concentrated markets." *Saint Alphonsus*, 778 F.3d at 790.

20  Defendants cannot make the required showing.

21       Defendants' witnesses may testify that HPE has identified certain cost synergies, *i.e.* reductions

22  in costs that HPE could implement after the merger. HPE will not present evidence demonstrating that

23  those cost synergies are verifiable or merger-specific for purposes of rebutting the presumption that this

24  merger may substantially lessen competition. Moreover, far from showing that the merger will lead to

25  reduced costs, senior executives from HPE will testify either that they have concerns that HPE will have

26  difficulty integrating Juniper or that they have had experience with difficult transitions relating to prior

27  HPE acquisitions. PFOF-PCOL § V.D

28  //

**3.    Defendants' other defenses are deficient.**

Defendants claim that the proposed acquisition will "stimulate competition for WLAN solutions with Cisco, a decades-long entrenched incumbent." ECF No. 41 at 2; *see also* ECF No. 44 at 5:10-13. In other words, Defendants want this Court to bless a presumptively anticompetitive merger because the enterprise-grade WLAN solutions market is already uncompetitive.

But the law commands the opposite conclusion: In markets where concentration is already great, even a small merger-induced increase in concentration is problematic. *See United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 497 (1974) ("the Government [may] rest its case on a showing of even small increases of market share or market concentration in those industries or markets where concentration is already great or has been recently increasing") (citing *United States v. Aluminum Co. of America*, 377 U.S. 271, 279 (1964) and *Philadelphia Nat. Bank*, 374 U.S. at 365 n.42). *See also Kroger*, 2024 WL 5053016, at *39 ("The overarching goals of antitrust law are not met, however, by permitting an otherwise unlawful merger in order to permit firms to compete with an industry giant.").

Here, concentration is already great and there's more than a small increase in concentration, leaving Defendants with a steep hill to climb to prove that the merger would *increase competition*. They have not come close to doing so. HPE's claimed "dominant competitor" defense turns basic antitrust analysis on its head. One of the primary concerns underlying the antitrust laws is that concentration structurally attenuates the incentive to price aggressively and grow one's market share. While growth may enable HPE to extract a larger share of the rents along with Cisco, that is not a cognizable benefit. Juniper is about one-third the market share of the proposed combined firm and thus has structural incentives to behave more disruptively than the combined firm would have—an incentive that would be lost with the merger and not accounted for by the "dominant competitor" defense thrown against the wall by HPE.

Equally unavailing is Defendants' attempt either to suggest a challenge to the product market definition or intimate that there are out-of-market benefits to the transaction. For example, Defendants' Answers suggest that they view consolidation as a fair price for the creation of a "comprehensive, scaled offering," ECF No. 44 at 5:3-4, or an "entire networking stack," ECF No. 41 at 2. But Defendants never define what that means, let alone explain how it rebuts the case that competition *for enterprise-grade*

1    *WLAN solutions* will suffer if HPE acquires Juniper. The sole factfinding inquiry here concerns the

2    market for enterprise-grade WLAN solutions in the United States. *See* Complaint ¶¶ 31–39. Defendants

3    did not contest that market and argue it should include other components in a "full-stack solution";

4    rather their retained expert is expected to concede at trial that enterprise-grade WLAN solutions is a

5    relevant product market.

6        To the extent Defendants are suggesting that the merger will create out-of-market benefits for

7    some ambiguous "full-stack solution," courts regularly exclude evidence of out-of-market effects

8    offered in rebuttal, unless those effects redound to the benefit of competition in the market for

9    enterprise-grade WLAN solutions. *See*, *e.g.*, *RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979)

10   (citing *Philadelphia Nat. Bank*, 374 U.S. at 371) ("[A]nticompetitive effects in one market cannot be

11   offset by procompetitive effects in another market[.]"); *see also* Phillip E. Areeda & Herbert

12   Hovenkamp, Antitrust Law: An Analysis of Antitrust Principes and Their Application § 972 (explaining

13   that the language of Section 7 precludes multi-market balancing of a merger's benefits and harms).

## IV.  OVERVIEW OF THE UNITED STATES' CASE-IN-CHIEF

### A.    Fact Witnesses

16       The United States intends to call 24 fact witnesses in its case-in-chief, either live or by

17   deposition designation. The United States will call 12 witnesses associated with HPE, one associated

18   with Juniper, six associated with Defendants' competitors, and five associated with Defendants'

19   customers. What follows are representative aspects of their anticipated testimony.[2]

20       <u>Current and former employees of HPE and Juniper.</u> The United States intends to call five HPE

21   employees with sales or related management responsibilities: **Alain Carpentier**, the current worldwide

22   VP for sales; **Jeff Dolce**, who reports to Carpentier and is the current head of sales for the Americas;

23   **Lou Serlenga**, Dolce's predecessor and former HPE employee; **Chris Collins**, who reports to Dolce and

24   currently has specific responsibility for WLAN sales to enterprise customers in the United States; and

25   **Phil Mottram**, an executive vice president who leads HPE's enterprise WLAN business. Collectively,

26   the United States expects to elicit from these employees testimony about several issues, including HPE's

---

[2] The United States reserves all rights to modify witness order and mode of testimony and does not through these summary descriptions waive any right to elicit competent testimony not described herein.

head-to-head competition with Juniper; HPE's reactions to Juniper's pricing and innovation pressure; and the creation of the "Beat Mist" sales and training program.

In addition to sales employees, the United States intends to call several HPE employees with product development responsibilities. These witnesses include **Ash Chowdappa**, HPE's former software head for HPE's Aruba business; **David Hughes**, Aruba's chief product and technology officer; **Karthik Ramaswamy**, an Aruba product strategy leader who reports to Hughes; and **Madani Adjali**, a product management and technical marketing leader. Collectively, these witnesses will testify about HPE's efforts to innovate in response to competition from Mist, including through Project Gravity and the development of artificial intelligence features.

Rounding out the United States' HPE witnesses are **Abhi Banka**, **Jeff Lipton**, and **Vishal Mann**. Banka works on go-to-market strategy and has helped with planning for the potential acquisition. He will testify about barriers to entry in enterprise WLAN and about uncertainties latent in HPE's potential integration of Juniper. Lipton is a strategy and corporate development executive who will testify about "Cisco fatigue" and about research and development in enterprise WLAN. Mann works in HPE's "Competitive TME" group, which trains sales staff about the competitive landscape, "Tier 1" suppliers, and how to "Beat Mist."

The United States expects to call **Tom Wilburn** from Juniper. Mr. Wilburn leads sales for Juniper's campus and branch division. He will testify about the history of Mist, Juniper's enduring technological superiority and Juniper's past, present and future innovations.

Current employees of Defendants' competitors. Six employees of Defendants' competitors will testify at trial. **Lawrence Huang (Cisco)**, the general manager of Cisco's networking business, will testify about Juniper's innovation in artificial intelligence and the weakness of other competitors. **Ken Kiser (Arista)**, an Arista sales vice president with responsibility for much of the United States, will testify about Arista's focus on data center networking and the difficulties of entering the enterprise-grade WLAN solutions market. **Stan Kovler (Extreme)**, a top corporate development executive at Extreme Networks, will testify about Juniper's competitive strength and the positioning of Defendants'

//

//

1  competitors, including Extreme. **Chris Hinsz (Fortinet)**, a product and marketing leader at Fortinet,

2  will testify about the company's focus ███████████████████████████████████████████

3  ███████ **Anindya Chakraborty (Ruckus)**, the global product and engineering head for Ruckus, will

4  testify about the company's ██████████████████████████████ Finally, **Safi**

5  **Mojaddidi (Ubiquiti)**, a vice president who oversees Ubiquiti's business development efforts, will

6  testify about Ubiquiti's █████████████████████████████████████

7  ██████████

8      Defendants' customers. Five employees of Defendants' customers will testify at trial. **Andrew**

9  **Davis (George Washington University (GW))**, an information technology director at GW, will testify

10  about the university's request for proposal for enterprise-grade WLAN in 2022 and how the university

11  benefited from head-to-head competition between HPE and Juniper. **Daniel Mesimer (U.S.**

12  **Department of Veterans Affairs (VA))**, an engineering director at the VA, will testify about the federal

13  agency's procurement of enterprise-grade WLAN and its selection of Juniper based on its scalability,

14  AIOps capabilities, and ease of deployment. **Jeff Allen (In-N-Out Burger)**, an information technology

15  executive at In-N-Out, will testify about the market for enterprise WLAN solutions and the

16  ████████████████████████████████████████████████████████████. **Mark**

17  **Campbell (Pennsylvania State University (Penn State))**, an information technology executive at Penn

18  State, will testify about how HPE and Juniper competed head-to-head and ██████████████████

19  █████████████████████████████ Lastly, **Amel Caldwell (University of Washington)**, a

20  technology manager at the University of Washington, will testify about trends in the enterprise-grade

21  WLAN solutions market and about Juniper's capabilities in comparison to competitors.

22      **B.    Expert Witnesses**

23      The United States intends to call one expert witness in its case-in-chief: Professor Marc Remer,

24  an antitrust economist at Swarthmore College. In addition, the United States may call in rebuttal a

25  second expert witness: auditor Adoria Lim, a Certified Public Accountant and Principal with The Brattle

26  Group in San Francisco.

27      **Marc Remer.** Professor Remer is a tenured Associate Professor of Economics at Swarthmore

28  College whose research in industrial organization focuses on merger effects and market regulation.

Broadly, Professor Remer will opine that HPE's proposed acquisition of Juniper will substantially lessen competition and harm customers of enterprise-grade WLAN solutions. He will describe Juniper's rapid growth and unique competitive stature and testify about market share calculations that render this merger presumptively illegal. Professor Remer will describe economic models showing that the proposed acquisition will likely increase HPE's and Juniper's prices for enterprise WLAN solutions by 3–6 percent and 7–14 percent, respectively. He will testify that these estimates are conservative and do not account for lost innovation that may result from Defendants' anticipated post-merger cuts to research and development. Finally, Professor Remer will explain why Defendants' fringe competitors are not likely to fill the competitive void left by HPE's purchase of Juniper.

**Adoria Lim.** Ms. Lim is a Certified Public Accountant and Principal at The Brattle Group, a global consulting firm specializing in accounting, finance, and economics. Ms. Lim, who earned an MBA from Stanford and trained as an auditor at Ernst & Young LLP, has previously analyzed cost synergies in mergers and acquisitions and may rebut Defendants' claimed "efficiencies" here. Whether the United States calls Ms. Lim depends on whether and how Defendants' present an efficiencies case. The United States anticipated that Ms. Lim's testimony would rebut Defendants' expert's testimony on efficiencies. Defendants have since withdrawn their efficiencies expert and provided no information about what claimed efficiencies evidence they intend to introduce. At present and as explained in Plaintiff United States' Omnibus Motion in Limine (ECF No. 154 ("Omnibus MIL")), Defendants should be barred from introducing *any* claimed efficiencies evidence—an outcome that would eliminate the need to call Ms. Lim. But if Defendants introduce claimed efficiencies evidence through fact or other expert witnesses, then the United States may call Ms. Lim in rebuttal to opine that Defendants' claimed efficiencies are not cognizable because they are neither verifiable nor merger-specific.

## V.  EVIDENTIARY ISSUES

Although a bench trial reduces the risk of unfair prejudice and confusion, the Federal Rules of Evidence still apply. *See* Fed. R. Evid. 1101 (applying rules to civil cases in district courts). Here, the United States anticipates various evidentiary disputes. Two issues regarding **efficiencies** and **late-disclosed expert analyses and opinions** have already been identified in the United States' Omnibus MIL (ECF No. 154).

1    In addition, the Court should exclude **improper lay opinion testimony** elicited from five lay

2    industry analysts and participants[3] concerning their predictions about the hypothetical future of

3    competition should the merger proceed and their opinions about the purportedly pro-competitive nature

4    of the transaction. Such testimony is improper under Rule 602's prohibition on speculation and does not

5    meet the test for Rule 701 lay opinions. It is also inadmissible under Rule 802 to the extent the testimony

6    merely relays hearsay and what a witness heard from others. Below, the United States previews the law

7    and facts regarding this issue. After meeting and conferring with defendants, the United States expects

8    to provide additional detail when it files a Joint Party Submission addressing, among other disputes,

9    those regarding deposition designations.

10    "A witness may testify to a matter only if evidence is introduced sufficient to support a finding

11    that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *see also United States v.*

12    *Whittemore*, 776 F.3d 1074, 1082 (9th Cir. 2015) ("Witnesses are not permitted to speculate, guess, or

13    voice suspicions.") (quotation omitted). Rule 701 allows lay opinion testimony only where it is: "(a)

14    rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony

15    or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized

16    knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 701 is intended "to eliminate the risk

17    that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of

18    proffering an expert in lay witness clothing." Fed. R. Evid. 701, adv. committee note (2000). Lay

19    opinion testimony must be based on personal experience, *see, e.g., United States v. Lloyd*, 807 F.3d

20    1128, 1155 (9th Cir. 2015), *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014), cannot include

21    legal conclusions, *see United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001), as amended (Feb.

22    14, 2001), and may not be based on scientific, technical, or other specialized knowledge, *see, e.g., Hynix*

23    *Semiconductor, Inc. v. Rambus, Inc.*, 2008 WL 504098, at *5 (N.D. Cal. Feb. 19, 2008).

24    //

25

---

26    [3] Those witnesses are Sian Morgan (Dell'Oro Group), Tim Zimmerman (Gartner), Anindya Chakraborty
      (CommScope), Michael Schwab (D&H Distributing), and Phillip Privett (TD Synnex), all of whom are
27    on Defendants' final witness list. Defendants have told the United States that they will call all but
      Chakraborty by designation, and Defendants' Final Expert Witness List explicitly "reserve[d] the right
28    to elicit . . . opinion testimony from fact witnesses identified by any of the parties to this action."

Defendants elicited numerous lines of questioning that improperly asked lay witnesses to provide speculative opinions about the future of the proposed transaction and that should be excluded both from designation and from trial. For example, HPE deposed Sian Morgan, a research director with telecommunications consultancy Dell'Oro Group, and Tim Zimmerman, an industry analyst and a vice president with the research consultancy Gartner. Both companies earn revenue by providing market research to industry participants such as HPE or Juniper. Morgan and Zimmerman testified not as industry participants, but as analysts who obtained information from system integrators, resellers, suppliers, customers, and others. That testimony is entirely derived from hearsay, which is an improper basis for lay opinion. *See Lloyd*, 807 F.3d at 1155 (lay witness opinion testimony improper where it "was largely based on statements he heard from unidentified telemarketers and investors, well beyond his own personal experience with investors"). Their opinions also are based on their purported scientific and specialized knowledge, including decades of experience as analysts in the networking industry as well as their financial models and market share data. Thus, Morgan and Zimmerman should have been disclosed as industry experts and subject to expert discovery under Fed. R. Civ. P. 26(a)(2).

HPE elicited predictive opinions from both analysts about the proposed acquisition's competitive impacts on WLAN competitors and customers using previously prepared forecasts and analyses. For instance, Morgan gave her opinion about the proposed acquisition's effects in response to a series of questions regarding a forecast report prepared in July 2024. Even HPE counsel recognized Morgan's testimony to be her opinion: counsel initially asked for the basis of that "opinion" before quickly correcting to ask about the basis for the witness's "belief." This testimony is both speculative and lay opinion testimony going to an ultimate legal question for the Court on competitive impacts. It should be excluded under Rules 602 and 701.

In addition, the Court should preclude Defendants from submitting speculative and lay opinion testimony of industry participants. For example, when HPE asked Michael Schwab, co-president of technology reseller D&H Distributing, to predict how the proposed acquisition would impact competition with Cisco, he offered what he called "[his] opinion." When HPE tried to elicit more "opinions" regarding Schwab's expectation of the competitive impacts of the merger, he admitted, "I don't have the expertise to know." Similarly, HPE questioned Phillip Previtt, a senior vice president at

technology distributor TD Synnex, about his expectations for competition in the enterprise-grade

WLAN solutions market after the proposed acquisition, to which Previtt provided his "personal

opinion." HPE elicited more answers from Previtt on legal issues such as innovation and competitive

effects that further highlight the improper nature of the speculative lay opinion testimony. Prevett's

testimony—often caveated with the words, "I think," or "I believe"— lacked basic foundation,

consisting of sweeping generalizations devoid of personal knowledge required for delivering such

opinions. Finally, HPE's deposition of CommScope senior vice president Anindya Chakraborty,

included a similar series of leading hypotheticals lacking in basic foundational questions. Such

testimony is prohibited under Rules 602 and 701 and should be excluded.

//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//
//

1

## VI.  CONFIDENTIALITY

The Parties plan to introduce documents and testimony that various parties designated as "Confidential" or "Highly Confidential" under this case's protective order. *See generally* ECF No. 107. That order gives producing parties an opportunity to request the sealing of "Confidential" or "Highly Confidential" information at trial, *see id.* at II ("Sealing Confidential Information at Trial"), and multiple producing parties have done so or will do so. The United States will respond to these motions in due course but acknowledges the Ninth Circuit's "strong presumption of access to judicial records" in dispositive proceedings including trials. *See*, *e.g.*, *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006), *In re LDK Solar Sec. Litig.*, No. C07-05182 WHA, 2010 WL 724809, at *1 (N.D. Cal. Mar. 1, 2010) ("[C]ompelling reasons would be needed to justify a closure of a courtroom during trial").

Dated: June 25, 2025

ABIGAIL A. SLATER
Assistant Attorney General

MARK HAMER
Deputy Assistant Attorney General

WILLIAM RINNER
Deputy Assistant Attorney General

RYAN DANKS
Director of Civil Enforcement

CATHERINE K. DICK
Acting Director of Litigation

JACKLIN CHOU LEM (CA Bar # 255293)
Civil Chief, San Francisco Office

ELIZABETH S. JENSEN (CA Bar # 302355)
Assistant Civil Chief, San Francisco Office

 */s/ Michael J. Freeman*
MICHAEL J. FREEMAN (OH bar # 0086797)
BRIAN WHITE
U.S. Department of Justice, Antitrust Division
450 Fifth Street NW, Suite 7100
Washington, DC 20530
Telephone: (212) 213-2774
Fax: (202) 514-5847
Email: Michael.Freeman@usdoj.gov

JEREMY M. GOLDSTEIN (CA Bar # 324422)
AARON M. SHEANIN (CA Bar # 214472)
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
Jeremy.Goldstein@usdoj.gov
Aaron.Sheanin.usdoj.gov

*Attorneys for Plaintiff United States of America*

1

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

2          I, Jeremy Goldstein, am the ECF user whose identification and password are being used

3 to file UNITED STATES' PRE-TRIAL BRIEF. In compliance with Local Rule 5-1(i)(3), I hereby attest

4 that all signatories hereto concur in this filing.

5                                             _/s/ Jeremy Goldstein_

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28