BETH A. WILKINSON (*pro hac vice*)
KOSTA S. STOJILKOVIC (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4010
bwilkinson@wilkinsonstekloff.com
kstojilkovic@wilkinsonstekloff.com

JULIE S. ELMER (*pro hac vice*)
JENNIFER MELLOTT (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
jennifer.mellott@freshfields.com

SAMUEL G. LIVERSIDGE (Bar No. 180578)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com

*Attorneys for Defendant*
HEWLETT PACKARD ENTERPRISE CO.

JACK P. DICANIO (SBN 138782)
MICHAEL C. MINAHAN (SBN 311873)
**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Jack.DiCanio@skadden.com
Michael.Minahan@skadden.com

STEVEN C. SUNSHINE (*pro hac vice*)
TARA L. REINHART (*pro hac vice*)
**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP**
1440 New York Avenue N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 661-8301
Steve.Sunshine@skadden.com
Tara.Reinhart@skadden.com

*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff,* | |
| v. | **DEFENDANTS' PRETRIAL BRIEF** |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC., | **REDACTED VERSION** |
| *Defendants.* | Judge:         P. Casey Pitts<br>Action Filed:  January 30, 2025 |

1

# TABLE OF CONTENTS

2   TABLE OF AUTHORITIES ............................................................................................ ii

3   GLOSSARY OF NETWORKING TERMS ...................................................................... v

4   TABLE OF FACT WITNESSES ..................................................................................... vii

5   INTRODUCTION ............................................................................................................. 1

6   BACKGROUND ............................................................................................................... 4

7       I.      The Networking Industry and WLAN Market Are Intensely Competitive. ............ 4

8       II.     The HPE-Juniper Merger Will Enhance, Not Harm, Competition. ........................ 9

9   LEGAL STANDARD ...................................................................................................... 11

10  ARGUMENT ................................................................................................................... 12

11      I.      DOJ Is Unlikely to Establish a Prima Facie Case. ................................................ 12

12      II.     DOJ Cannot Meet Its Burden of Persuasion. ........................................................ 15

13              A.     The Merger Will Not Substantially Lessen Competition. .......................... 15

14                     1.     The Merger Will Not Cause Unilateral Anticompetitive
                              Effects. .......................................................................................... 15

15

16                     2.     The Merger Will Not Cause Coordinated Anticompetitive
                              Effects. .......................................................................................... 19

17                     3.     The Merger Will Not Harm Innovation. ........................................ 21

18              B.     Market Structure Precludes the Possibility of Anticompetitive
                       Effects. ...................................................................................................... 22

19

20              C.     The Merger Will be Procompetitive. ......................................................... 24

    CONCLUSION ................................................................................................................ 25

21

22

23

24

25

26

27

28

i

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
  509 U.S. 209 (1993)................................................................21

*Brown Shoe v. United States*,
  370 U.S. 294 (1962)................................................................11

*Chi. Bridge & Iron Co. N.V. v. FTC*,
  534 F.3d 410 (5th Cir. 2008) ................................................11, 13, 14

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ........................................*passim*

*FTC v. CCC Holdings, Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ..........................................23

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ........................................13, 14, 22, 23

*FTC v. Hackensack Meridian Health, Inc.*,
  30 F.4th 160 (3d Cir. 2022) ....................................................13

*FTC v. Meta Platforms Inc.*,
  654 F. Supp. 3d 892 (N.D. Cal. 2023) ......................................11

*FTC v. Meta Platforms, Inc.*,
  2024 WL 4772423 (D.D.C. 2024) ..........................................17, 24

*FTC v. Microsoft Corp.*,
  681 F. Supp. 3d 1069 (N.D. Cal. 2023) ....................................11

*FTC v. PPG Indus., Inc.*,
  798 F.2d 1500 (D.C. Cir. 1986) ..............................................13

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) ..................................4, 17, 20, 24

*FTC v. Tapestry, Inc.*,
  755 F. Supp. 3d 386 (S.D.N.Y. 2024)......................................12, 19

*Illumina, Inc. v. FTC*,
  88 F.4th 1036 (5th Cir. 2023) ................................................12, 15

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020)......................................14, 22

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ................................................11, 16

*Olin Corp. v. FTC*,
  986 F.2d 1295 (9th Cir. 1993) ................................................13

ii

**Cases (cont.)**

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
778 F.3d 775 (9th Cir. 2015) ............................................................................ *passim*

*United States v. Syufy Enters.*,
903 F.2d 659 (9th Cir. 1990) ................................................................................ 19, 22

*United States v. Anthem, Inc.*,
236 F. Supp. 3d 171 (D.D.C. 2017) ............................................................................ 11

*United States v. AT&T Inc.*,
310 F. Supp. 3d 161 (D.D.C. 2018) ............................................................................ 19

*United States v. Baker Hughes*,
908 F.2d 981 (D.C. Cir. 1990) ........................................................ 12, 15, 22, 24

*United States v. Bertelsman SE & Co.*,
646 F. Supp. 3d 1 (D.D.C. 2022) ........................................................................ 12, 20

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975) ........................................................................................ 11, 15

*United States v. Country Lake Foods, Inc.*,
754 F. Supp. 669 (D. Minn. 1990) ............................................................................ 25

*United States v. Energy Sols.*, Inc.,
265 F. Supp. 3d 415 (D. Del. 2017) ............................................................................ 22

*United States v. Gen. Dynamics Corp.*,
415 U.S. 486 (1974) ................................................................................................ 12

*United States v. H & R Block, Inc.*,
833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................ 19, 20, 23

*United States v. JetBlue Airways Corp.*,
712 F. Supp. 3d 109 (D. Mass. 2024) ................................................................ 13, 25

*United States v. Oracle Corp.*,
331 F. Supp. 2d 1098 (N.D. Cal. 2004) ............................................................ *passim*

*United States v. Philadelphia Nat'l Bank*,
374 U.S. 321 (1963) ........................................................................................ 1, 12

*United States v. Sungard Data Sys., Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001) ............................................................................ 11

*United States v. Waste Mgmt., Inc.*,
743 F.2d 976 (2d Cir. 1984) ................................................................................ 23

**Statutes**

15 U.S.C. § 18 ................................................................................................ 2, 11

iii

**Other Authorities**

*A Justice Department Perspective,*
   51 ANTITRUST L.J. 287 (1982) .................................................................................................. 13

*Antitrust: What Went Wrong and How to Fix It,*
   35 ANTITRUST 33 (2021) .......................................................................................................... 14

iv

# GLOSSARY OF NETWORKING TERMS

**Access points (AP):** a hardware device that allows wireless-capable devices like laptops, smartphones, printers, and tablets to connect to a wired network.

**Artificial Intelligence / Machine Learning (AI/ML)**: AI is a broad field focused on using computers to perform tasks that typically would require human intelligence. ML is a tool used to create AI in which algorithms learn and recognize patterns from data.

**Artificial Intelligence for IT Operations (AIOps):** the use of AI to identify and resolve performance issues and improve operational efficiency in the IT context, including networking.

**Firewall:** hardware or software that blocks unauthorized traffic from accessing a network to prevent cyberattacks.

**Local area network (LAN):** a network of computing devices in one physical location, such as an office, school or home, linked by wired and wireless connections.

**Network-as-a-Service (NaaS):** a business model where customers rent networking capabilities from cloud service providers, allowing a customer to operate a WLAN network without purchasing, maintaining, or managing its own networking infrastructure.

**On premise (on prem):** management software that controls a company's network infrastructure and is stored on the company's own data center or servers.

**Original Design Manufacturer (ODM):** a company that designs and manufactures hardware, such as access points, that a vendor purchases and markets under its own brand name.

**Private 5G:** cellular technology deployed on a customer's premises to enable wireless connectivity.

**Private cloud:** a cloud computing environment dedicated to a single organization.

**Proof of Concept (POC):** a small-scale networking project that tests the functionality of a technology or solution and how it operates in an enterprise's environment.

**Public cloud:** a cloud computing environment shared by many customers, who typically rent storage space on a consumption basis.

**Request for Proposal (RFP):** a bidding process through which a customer solicits bids from potential suppliers for a product or service.

**Router:** a gateway that passes data between one or more local area networks, allowing devices to connect to and share data over the Internet or an Intranet.

**Secure Access Service Edge (SASE):** software that combines secure service edge with software-defined wide area network, routing, and wide-area network optimization to provide secure cloud access to data.

**Secure Service Edge (SSE):** software that facilitates secure cloud access, allows users to securely access web, cloud, and private applications in the cloud.

v

**Software-Defined Wide Area Network (SD-WAN):** virtual wide area network architecture that securely connects branch users to applications hosted in the cloud or across hybrid IT environments.

**Service Provider Routing (SP Routing):** involves the transmission of data from one point to another inside the computer network.

**Switch:** hardware that connects wired devices (e.g., computers, printers) on a computer network; often called an ethernet switch.

**Wide-Area Network (WAN):** a private WAN connects local area networks across multiple cities or countries into one interconnected network (e.g., connecting a branch office to a company's headquarters). A public WAN connects multiple computers across a geography, like the internet.

**Wi-Fi 7:** latest standard in wireless technology ideal for high bandwidth, low latency use cases. Wi-Fi standards are set by the non-profit Wi-Fi Alliance.

**Wireless Local Area Networking (WLAN):** uses wireless communication to connect any type of network client or device (e.g., laptops, cell phones). Wi-Fi is a specific type of WLAN.

**WLAN (Enterprise Grade):** Enterprise-grade WLAN solutions are sold to businesses, school systems, and other commercial and non-profit organizations. They can serve a large number of users simultaneously and support advanced feature sets and functionalities. Unlike consumer grade WLAN, enterprise-grade WLAN solutions include systems to manage multiple access points across a single location.

**Virtual Extensible Local-Area Network (VXLAN):** standard that allows a single physical network to be shared by different organizations, or "tenants," without any one tenant being able to see the network traffic of another.  In an enterprise, a tenant might be a user group or department.

## TABLE OF FACT WITNESSES

| Name | Position |
|---|---|
| Madani Adjali | Vice President (VP) of Product Management – WLAN, Hewlett Packard Enterprises (HPE) |
| Jeff Allen | Supervisor, Information Technology Infrastructure, In-N-Out Burger |
| Jon Allen | Associate VP, Chief Information Officer (CIO) & Chief Information Security Officer (CISO), Baylor University |
| Abhi Banka | VP WW Strategy & Operations, HPE |
| Amel Caldwell | Assistant Director for Wireless and Mobile Communications, University of Washington |
| Mark Campbell | Associate VP of Information Technology (IT) Infrastructure, Pennsylvania State University |
| Alain Carpentier | Senior Vice President (SVP), Worldwide Sales, HPE Aruba |
| Anindya Chakraborty | SVP, Products and Engineering, Ruckus |
| Ash Chowdappa | Chief Development Officer for Software, Chargepoint; formerly Head of Software Engineering, HPE Aruba |
| Chris Collins | VP of U.S. Enterprise Sales, HPE |
| Andrew Davis | Director of Network, Voice, and Data Centers, George Washington University |
| Imran Dawood | VP of Network Engineering and CISO, Dollar Tree, Inc. |
| Jeff Dolce | VP of Sales, HPE Aruba |
| Tom Dugas | Associate VP, Deputy CIO and CISO, Duquesne University |
| Bob Friday | Chief AI Officer, Juniper Networks; Co-Founder of Mist |
| Lev Gonick | CIO, Enterprise Technology, Arizona State University |
| Sujai Hajela | EVP of AI-Driven Enterprise, Juniper Networks; Co-Founder of Mist |
| Christopher Hinsz | Senior Director, Products & Solutions Marketing, Fortinet |
| Lawrence Huang | SVP and General Manager (GM) Cisco Networking Platform and Wireless, Cisco Systems, Inc. |
| David Hughes | Chief Product Officer, HPE Aruba |
| Kevin Hutchins | SVP of Strategy and Corporate Development, Juniper Networks |

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

| Name | Position |
|---|---|
| Kenneth Kiser | Group VP Sales, Arista Networks |
| Stan Kovler | SVP Finance and Corporate Development, Extreme Networks |
| Jeff Lipton | VP for Corporate & Business Strategy, HPE Aruba |
| Vishal Mann | Technical Marketing Engineer, HPE Aruba |
| Sudheer Matta | SVP of Product Management, Juniper-Mist AI Native Enterprise Portfolio, Juniper Networks |
| Daniel Mesimer | Director of Network Engineering, Department of Veterans Affairs |
| Edward Meyercord | President and CEO, Extreme Networks |
| Safi Mojaddidi | VP of Sales, Ubiquiti |
| Siân Morgan | Research Director, Dell'Oro Group |
| Phil Mottram | EVP and GM, Intelligent Edge, HPE |
| Deepti Nene | VP of Strategy & Corporate Development, Juniper Networks |
| Antonio Neri | President and CEO, HPE |
| Bob Palmieri | Managing Director IT, FedEx Services |
| Patrick Pflaumer | IT Senior Director, Johns Hopkins University |
| Phillip Privett | SVP of Vendor Management, TD Synnex |
| Rami Rahim | CEO, Juniper Networks |
| Karthik Ramaswamy | VP of Product Management, HPE Aruba |
| Fidelma Russo | Chief Technology Officer, HPE |
| Elijah Savage | VP of Infrastructure, Engineering and Operations, Kroger |
| Michael Schwab | Co-President, D&H Distributing |
| Lou Serlenga | Head of Alliances and Partnerships at Anyscale; formerly Chief Revenue Officer, Nile; formerly SVP of Americas Sales, HPE |
| Matt Stollenwerk | VP of Infrastructure and Platforms, Hertz |
| Tom Wilburn | Global VP Sales, Juniper Networks |
| Tim Zimmerman | VP, Gartner, Inc. |

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

**INTRODUCTION**

Virtually all industry participants agree that this merger will not harm competition, which today is dynamic, driven by well-funded, innovative competitors and sophisticated, demanding customers. Only the government believes otherwise. As the CEO of competitor Extreme Networks put it, this deal will be "good for competition," because the "real issue is the size of Cisco" and "the combined HPE and Juniper provide a much greater competitive threat" to Cisco. Ex. 73, Meyercord Dep. 51:1-7, 52:12-16.

Seventeen months ago, Hewlett Packard Enterprise and Juniper Networks agreed to merge to create a world-class technology company capable of competing across the entire networking industry. HPE and Juniper have traditionally specialized in different areas, with HPE focusing on infrastructure, such as servers and storage devices, while Juniper excels in network routers, firewalls, and data center switches. By uniting HPE's and Juniper's complementary portfolios, the deal will deliver a "full stack" of diverse products and solutions to customers, drive innovation, and open new opportunities for other competitors to grow and win business.

The Department of Justice ignores these facts in favor of a myopic focus on an alleged risk of competitive harm in the narrow market for enterprise-grade Wireless Local Area Networks (WLAN). To make the merger sound ominous, DOJ stresses that Cisco, HPE, and Juniper together make up over 75% of that market. But that framing elides the fact that Cisco *alone* already has 54% market share. When pushed, DOJ admits that the market share of HPE and Juniper combined would still be less than half of Cisco's. And that's the elephant in the room—DOJ apparently wants to block this deal because *Cisco* is too big. And *Cisco*, not consumers, would benefit if the Court were to agree.

Because concentration in DOJ's chosen market is not driven by HPE or Juniper, this case lacks the features that typically define successful horizonal merger challenges. Despite its expert's extensive efforts, DOJ concedes that the merged entity will comprise at most 27% of the relevant market—far less than Cisco's share and short of the 30% threshold recognized by the Supreme Court as creating a presumption of harm to competition. *See United States v. Philadelphia Nat'l Bank*, 374 U.S. 321 (1963). What about market participants? After a nearly yearlong investigation, DOJ failed to find a *single* WLAN player willing to say that this transaction would harm competition. Just the

1

1  opposite: DOJ's challenge "came as a shock to the networking market and to solution providers."

2  Ex. 47 at 2. And customers of all types and sizes see the benefit of a merged HPE and Juniper.

3  Unsurprisingly, DOJ's investigation turned up few customers that had any concerns about the deal,

4  let alone concerns about a reduction in competition.

5      Without the traditional ingredients of a Clayton Act suit, DOJ builds its case on a supposed

6  "presumption" of anticompetitive harm established not by Congress or the Judiciary but by the DOJ

7  itself. Under their own Merger Guidelines, the DOJ and FTC can presume that a deal will produce

8  anticompetitive effects when market concentration (as measured by the Herfindahl-Hirschman Index

9  or "HHI") exceeds certain thresholds. But the Guidelines are DOJ's own non-binding guidance for

10 itself. They are not the law, and they are not binding on the Court. For good reason—the Guidelines'

11 HHI thresholds are, at bottom, mere screening metrics that DOJ and FTC have raised and lowered

12 as they see fit. And HHI itself is susceptible to painting a misleading picture of the relevant market,

13 which is precisely what happened here. Again, it is *Cisco's* market share—not that of the merging

14 parties—that pushed the overall market HHI over the Guidelines threshold. In other words, the

15 foundation of DOJ's case rests on the market share of an entrenched third-party that would benefit

16 if Juniper and HPE are blocked from combining to better challenge its dominance.

17     Of course, the government cannot stop a merger in its tracks simply based on its own Guidelines.

18 Instead, DOJ's burden is to prove with hard evidence that the merger would *substantially* lessen

19 competition. *See* 15 U.S.C. § 18. Measured against that standard, DOJ's case falls flat.

20     The evidence will prove that this merger will promote competition, enabling both the combined

21 entity *and* other WLAN players better to compete in a dynamic, evolving, and innovative market.

22 DOJ's conclusory HHI figures—distorted by Cisco's majority share—obscure the realities of

23 competition in the WLAN market. To begin with, Juniper and HPE offer largely complementary

24 WLAN products. Juniper WLAN sales are entirely public cloud offerings. By contrast, the vast

25 majority of HPE's WLAN sales are for on premises ("on prem") or private cloud deployments. In

26 other words, Juniper and HPE do not compete against each other for customers seeking on prem or

27 private cloud WLAN—and those are most of HPE's customers.

28     Beyond HPE and Juniper, at least eight other players routinely compete for, and win, major

2

enterprise WLAN customers in the United States. These are well-capitalized, innovative, and aggressive firms, each bent on taking market share. Some are dominant players in related networking markets and are actively leveraging those strengths to grow in WLAN. Others win business by delivering technological breakthroughs or pioneering flexible service-delivery models. All compete fiercely on price, sometimes discounting by more than 80% to win business. And barriers to entry are low, ensuring a steady flow of newcomers in an already dynamic space.

Defendants' quantitative analyses—as opposed to DOJ's cherry-picked anecdotes—will demonstrate that the transaction would not substantially reduce competition. These analyses—by Dr. Nicholas Hill, the government's economist in several recent, successful merger challenges, and Dr. Elizabeth Bailey, the principal defense economist in the Microsoft-Activision trial, among others—will show that the transaction presents no real risk of increased prices in the United States via either unilateral or coordinated effects and is unlikely to inhibit the global market for WLAN innovation.

Numerous third parties, including reputable industry analysts, resellers of WLAN products, WLAN customers, and even Defendants' own competitors, will testify that the market is filled with hungry competitors jockeying for market share. All agree that the WLAN market is highly competitive and dynamic today and will continue to be after HPE and Juniper merge. And documentary evidence will confirm that existing players and new entrants would prevent any theoretical attempt by the merged entity to raise prices or curtail innovation.

Finally, Defendants will place DOJ's focus on HPE and Juniper's competition in WLAN into a broader, real-world context. Defendants will show that the proposed transaction rests on a vision to combine their complementary offerings into a full stack of server, storage, and networking products and solutions. That combined portfolio would create a stronger challenger to Cisco across multiple markets and enhance the competitive position of other players in the WLAN market. Today, those companies are competing fiercely for business. But they face an obstacle. Once again, the real issue is the size of Cisco: its "stranglehold" on the networking industry—including ingrained customer and distributor relationships—means that Cisco's products are sometimes favored in the sales channel. *See* Ex. 73, Meyercord Dep. 33:7-21, 51:1-52:19. With its full stack of networking products and solutions, the merged entity will shatter that status quo, ultimately benefiting WLAN consumers.

3

1   As an industry analyst put it, the merger ████████████████████████

2   ████████████████████████████████████████████████████████.

3   The government has no answer to these market realities. Instead, DOJ fixates on the undisputed

4   fact that HPE and Juniper have competed for particular WLAN deals. But anecdotes prove nothing.

5   Whenever two firms in a common market seek to merge, there will be historical examples of

6   competition between them. That the parties "compete head-to-head for *some* . . . customers, for *some*

7   end uses," and even the possibility that the merger "may lead to a price increase for *some* customers"

8   is insufficient to show that "the proposed merger, as a whole, is likely" to *substantially* lessen

9   competition. *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 318 (D.D.C. 2020). The question is whether

10  the proposed merger would substantially lessen competition *in the market as a whole*. On that

11  dispositive issue, the DOJ will not come close to meeting its burden of persuasion.

12                                    **BACKGROUND**

13  **I.      The Networking Industry and WLAN Market Are Intensely Competitive.**

14  *The Industry.* An enterprise network is a series of interconnected computers, hardware devices,

15  and software systems that enable enterprises (like stores, corporate offices, universities, or hospitals)

16  to transmit data electronically. Those networks often comprise multiple local area networks (LANs),

17  which enable data transfer in a single physical location, connected by a wide area network (WAN).

18  The networking industry encompasses the wide array of products (often called "solutions") that

19  make enterprise networks work. Those products include access points, which wirelessly connect

20  individual devices, such as laptops or cellphones, to LANs; switches, which aggregate individual

21  access points within a LAN and connect them to a WAN; routers, which manage data as it traverses

22  a network; and security solutions like firewalls, which keep an enterprise's data private. Some

23  networking vendors specialize in a subset of networking solutions, while a rarer few are one-stop

24  shops for customers' enterprise networking needs. The latter are often referred to as "full-stack

25  players" for their ability to deliver solutions across the entire "stack" of networking products.

26  Wireless Local Area Network technology, or WLAN, is just one link in the long networking

27  chain. WLAN includes the hardware and software necessary to wirelessly connect the devices within

28  a single LAN, such as a home, school, retail store, or office.

4

1    Enterprise-grade WLAN solutions consist of two primary components: (1) access points and (2)
2    controllers, which enable IT professionals to monitor and manage the access points within a LAN.
3    Enterprise-grade WLAN can be on-premises ("on-prem"), in which the controller and related
4    software is physically installed and operated at the customer's location, or "cloud-based," where the
5    management software runs remotely on a cloud server. Customers particularly concerned with
6    security and data privacy often prefer on-prem solutions, or solutions that use a "private cloud." On
7    the other hand, solutions on a "public cloud," such as those offered by AWS, Microsoft Azure, and
8    Google, may be more flexible and more easily capable of scale across large enterprises. While
9    demand for cloud-based solutions has grown, most deployments remain on-prem, and geopolitical
10   and security concerns have limited the growth of public cloud solutions.

11       ***The WLAN Market.*** As industry participants universally agree, the market for enterprise-grade
12   WLAN is large, intensely competitive, and dynamic. *See, e.g.*, ███████████████████████
13   ████████████████████████████████████. Sales of WLAN solutions
14   generated over \$3.5 billion in revenue last year in North America. *See* Ex. 65, Hill Rep. ¶¶ 210-11,
15   fig. 32. And at least ten well-capitalized, innovative, aggressive firms (described below) compete for
16   a slice of the pie using differentiated, fast-evolving competitive strategies.

17       In this market, innovation is constant. As customers demand increasingly sophisticated
18   networking solutions, developing new or differentiated products gives suppliers a first-mover
19   advantage. But those advantages are fleeting. Other players respond rapidly to match and improve
20   upon new technologies, often within months. *See* █████████████████████████████
21   █████████████████████████████████████████████████████████
22   ███████████; Ex. 64, Bailey Rep. ¶¶ 91-99. Because WLAN suppliers compete globally, they must
23   react to innovations not only by other providers in the United States, but also by global rivals such
24   as Chinese giant Huawei. *See* Ex. 64, Bailey Rep. ¶¶ 83-89; ████████████████████
25   ████████████████████████████████████████████.

26       Examples from the past five years illustrate the rapid pace of innovation in this market. After its
27   acquisition of Mist Systems in 2019, Juniper deployed Artificial Intelligence for IT Operations
28   (AIOps) functionality into its management software for wired and wireless networking solutions.

5

1   AIOps uses artificial intelligence to optimize and troubleshoot networks, including WLAN

2 components. While Mist was an early mover in AIOps capabilities, today, AIOps is table stakes in

3 WLAN. *See* Ex. 50, Rahim Dep. 82:18-22 (explaining that "in the early days of AIOps" Juniper had

4 "a lead in that space, but over time that lead has diminished"); ████████████████████████

5 ████████████████████████████████████████████████████████████████████

6 ████████████. Similarly, in October 2023, Ruckus was the first player to introduce access points

7 for the next generation of WiFi (WiFi 7) in the United States. ████████████████████████.

8 Within ten months, five other competitors released WiFi 7 products. *See* Ex. 33, at 7. Today, industry

9 participants see enhanced security and new delivery models like Networking as a Service ("NaaS")

10 as the next frontier of innovation. *See, e.g.,* ████████████████████████████████.

11   In addition to developing new product features, WLAN suppliers compete fiercely in sales and

12 marketing, which is often called "go-to-market strategy" in the industry. For example, vendors

13 leverage their strengths in other networking products, like security or switches, to cross-sell WLAN

14 solutions as a package deal. *See, e.g., id.* at 100:20-101:15. Indeed, it is typical for WLAN products

15 to be sold alongside other networking hardware and software, and networking vendors are

16 increasingly seeking to maximize these cross-selling advantages. Other players target their sales

17 efforts at customer segments (called "verticals"), such as retail, healthcare, or hospitality. *See, e.g.,*

18 ████████████████████████. Still others deploy a land-and-expand approach, gaining a

19 foothold in one part of a customer's business (e.g., a single building on a university campus) before

20 attempting to displace the incumbent vendor across the customer's entire footprint. *See, e.g.,* Ex. 7.

21 And all enterprise-grade WLAN players compete on price, offering extraordinarily aggressive

22 discounts—sometimes over 80% off list price—to win business. *See* Ex. 76; Ex. 77.

23   The competition between WLAN vendors in their go-to-market efforts is accentuated by the fact

24 that enterprise-grade WLAN customers are sophisticated, repeat players. Larger customers use multi-

25 round RFP processes that pit vendors against each other on price, service, and product quality and

26 features. This dynamic process forces incumbents and new competitors to bid aggressively. Often

27 customers buy WLAN and other networking products through "channel partners"—distributors and

28 resellers who help design the customers' networking solutions and procure the requisite products.

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

1    ***The Competition.*** Including HPE and Juniper, at least ten well-capitalized, technologically

2    advanced firms currently compete in the enterprise-grade WLAN market in the United States.

3    *Arista.* With over $100 billion market capitalization, Arista has a particular strength in data center

4    technology. *See* ███████████████████████████████████. In 2018, Arista

5    acquired Mojo Networks, expanding its portfolio into cloud-managed enterprise WLAN. Since then,

6    Arista has leveraged its expertise in data centers to grow its WLAN business. *See, e.g.*, Ex. 24 at 4;

7    ██████████████████████. Arista's revenue from WLAN sales increased by 43% between

8    2021-23, Ex. 65, Hill Rep. Fig. 16, and it has won valuable, sophisticated accounts, such as Arizona

9    State University, Johns Hopkins Health System, and Qualcomm, *see* Ex. 49 at 10. In 2024, industry

10   analyst Gartner recognized Arista as a "Visionary" in its annual "Magic Quadrant" of wired and

11   wireless suppliers, placing it among vendors that provide "unique and differentiated" offerings and

12   "have innovated in one or more of the key areas of enterprise network technologies." Ex. 25 at 5, 23.

13   *Cisco.* Cisco is the long-standing leader in many networking markets, including enterprise

14   WLAN where it currently holds at least 54% market share in the United States. With an over $250

15   billion-plus market capitalization, more than 83,000 employees, and a full stack of networking

16   products, Cisco can compete for any customer. *See* ██████████████████; Ex. 28 at 2,

17   4. ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ██████ Cisco is categorized as a "Leader"—the top group of wired and wireless suppliers—in the

20   Magic Quadrant. *See, e.g.*, Ex. 25 at 5.

21   *CommScope (Ruckus).* CommScope entered the WLAN market in 2019, when it acquired Ruckus.

22   Ruckus historically focused its sales efforts on hospitality customers, and it attained a "dominant"

23   position with hotels and similar venues. Ex. 27 at 6; ██████████████████. ████

24   ████████████████████████████████████████████████████

25   ████████████████████████ Like Arista, Ruckus has beaten HPE, Juniper, and Cisco to win

26   significant contracts, including Marriott, AstraZeneca, the City of San Jose, and San Jose Airport.

27   Ex. 37 at 18. Like Arista, Ruckus was categorized as a "Visionary" by Gartner in 2024. Ex. 25 at 5.

28   *Extreme.* Extreme entered the market in 2016 and expanded its WLAN capabilities in 2019

7

1  through the acquisition of a company called Aerohive. *See* Ex. 73, Meyercord Dep. 24:10-25:6.

2  Today, Extreme supplies an extensive portfolio of WLAN solutions, including cloud-based and on-

3  prem offerings. *Id.* at 11:14-12:9. Extreme serves many large, sophisticated customers, such as

4  FedEx, Kroger, Major League Baseball, and the Universities of North Carolina and Baylor. Ex. 56

5  at 5. ███████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████

7  ████████████████████████████████████████████████████████████████

8  ██████████████████████████████████████████████████ Extreme is a

9  "Leader" in Gartner's Magic Quadrant. Ex. 25 at 5.

10      *Fortinet.* With a nearly $80 billion market capitalization, Fortinet has leveraged its reputation in

11  networking security to win significant WLAN business, including contracts with Hertz, Comcast,

12  and Nissan. *See* ████████████████████████████████████. Given security's

13  increasing importance as a differentiator in the networking industry, numerous WLAN players—

14  including Cisco—have identified Fortinet as a rising competitive threat. *See, e.g.*, Ex. 16. Gartner

15  agrees, elevating Fortinet to the "Leader" category in the Magic Quadrant as of 2024. Ex. 25 at 5.

16      *HPE.* HPE was founded in 2015, after Hewlett-Packard spun off its enterprise technology

17  infrastructure, software, and services business units. Today, HPE continues to focus on infrastructure

18  like servers and cloud storage, alongside enterprise networking products like switches and WLAN.

19  HPE offers both on-prem and cloud-based WLAN solutions under its Aruba brand. These solutions

20  included wired networking as well as WLAN, both of which are managed by common operating

21  systems called Aruba Central (current generation) and CNX (next generation).

22      *Juniper.* Juniper was founded in 1996 and initially focused on routing products. Since then, its

23  portfolio has expanded to include data center switches and next-generation firewalls. *See* Ex. 17 at

24  '441, 444. In 2019, Juniper re-entered the WLAN market by acquiring Mist Systems, a public cloud-

25  based networking provider. As with Aruba Central and other competitors' operating software, Mist

26  is about far more than WLAN. It is an end-to-end networking architecture that works with numerous

27  Juniper products, including wired solutions like switches. And Juniper's business is far more than

28  WLAN. In 2023, Juniper earned only $411 million from WLAN solutions, against company-wide

8

1    earnings of $5.6 billion. Ex. 32 at '907.

2    *Meter.* A newer market entrant, Meter pioneered the NaaS delivery model in 2015. NaaS lets

3    customers buy WLAN solutions via subscription, avoiding the costs of owning and operating

4    hardware. Leveraging this strategy, Meter has grown substantially in the last decade and has won

5    major customers, including Bridgewater, Thumbtack, and Lyft. Ex. 74. Reflecting its success, Meter

6    recently raised $170 million in Series C funding. *See* ████████████████████████.

7    *Nile.* Nile is a new entrant and a NaaS player. When it launched in 2022, Nile had "significant

8    financial backing," a "strong and well-connected leadership team," and impressive marketing. Ex.

9    10 at '300-01. Indeed, HPE saw Nile as a direct threat, predicting that Nile would "progress from

10   engaging with small organizations to large enterprises, including the Aruba installed base." *Id.* at

11   301. Nile has grown rapidly, expanding its base of channel and service partners and acquiring major

12   customers, like Dollar Tree and the University of Denver. *See* Ex. 52 Serlenga Dep. 186:5-13; *see*

13   *also* ████████████████████████████████████████.

14   *Ubiquiti.* With a market capitalization of $24 billion, Ubiquiti has the fourth-largest enterprise-

15   grade WLAN market share in North America. Ex. 65, Hill Rep. Fig. 10. Its product portfolio includes

16   WLAN infrastructure and management software, as well as switching products, security gateways,

17   and door-access systems. *See* ██████████████████████████. Ubiquiti is known for

18   its disruptive go-to-market strategy, which has led to major customer wins, including FedEx Forum,

19   Mount St. Mary's University, and Five Guys restaurants. *See* ██████████████████████

20   ████████████████████████.

21   **II.    The HPE-Juniper Merger Will Enhance, Not Harm, Competition.**

22   ***The Transaction.*** In 2023, HPE and Juniper began exploring a potential merger. As HPE and

23   Juniper documents reveal, those discussions did not center on enterprise-grade WLAN—a small area

24   of overlap in the two companies' complementary product portfolios. They hardly could have:

25   Juniper's WLAN revenues, just $411 million in 2023, *see* Ex. 32 at '907, could not have justified the

26   purchase price of $14 billion. Instead, the parties focused on the transformational possibilities that

27   uniting their portfolios could unlock. For HPE, that meant incorporating Juniper's core strengths in

28   routing, switching, and firewalls, which together comprise nearly $3.4 billion in revenues. *Id.* For

                                                    9

Juniper, that included leveraging HPE's depth in servers and storage to better address cutting-edge market opportunities like networking for AI, *see* Ex. 50, Rahim Dep. 121:21-122:9, as well as expanding its sales reach via HPE's larger channel partner network. Ultimately, HPE and Juniper decided that combining their complimentary portfolios would deliver better service to customers, drive innovation across the entire networking stack, and open new opportunities for both companies. *See* Ex. 23; Ex. 51, Neri Dep. 249:22-250:21; Ex. 50, Rahim Dep. 121:21-122:9. On January 9, 2024, the merger was announced.

Industry participants support the merger's potential to create a new full-stack player, increase competition, and drive innovation. For example, Extreme's CEO, Edward Meyercord, testified the deal would be "good for competition" and "could create new opportunities for Extreme" by providing "a stronger, more credible competitor" capable of breaking Cisco's "strong grip" on channel partners and opening competitive space for other players. *See* Ex. 73, Meyercord Dep. 32:8-34:2, 52:6-19.

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████ Ex. 31; *see also* ████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████.

***DOJ's Challenge.*** DOJ began investigating the proposed merger in March 2024. What followed was a nearly year-long saga involving depositions, millions of pages of document discovery, and extensive negotiations. While DOJ's investigation proceeded, regulatory authorities worldwide reviewed and approved the deal. The European Commission concluded that, in the enterprise WLAN market, the merged entity "would continue to face competition from a wide range of competitors, including strong and established players"; "HPE and Juniper are not each other's closest competitors"; and customers' "countervailing buyer power" would constrain price increases. Ex. 40. Thirteen other regulators, including the UK CMA, followed suit. Ex. 41.

Despite countless third-party interviews, DOJ failed to find a single WLAN vendor or industry analyst who indicated that the transaction would harm competition. Nevertheless, on January 30, 2025, DOJ sued to block the merger. It is the only antitrust regulator in the world to have done so.

10

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

**LEGAL STANDARD**

DOJ seeks to block this merger under Section 7 of the Clayton Act. Compl. ¶ 12. To prevail, DOJ must prove the merger may "*substantially* . . . lessen competition." 15 U.S.C. § 18 (emphasis added); *see also United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 180 (D.D.C. 2001) (DOJ bears "the ultimate burden of proving" that a merger is likely to substantially lessen competition).

The first step in a merger challenge is "to determine the relevant market." *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1085 (N.D. Cal. 2023). That requires identifying both "(1) the relevant product market and (2) the relevant geographic market" in which the merger will allegedly produce anti-competitive effects. *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 911 (N.D. Cal. 2023). The product market "must encompass the product at issue as well as all economic substitutes" for it and, by extension, all producers "who have actual or potential ability to deprive each other of significant levels of business." *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008).

If DOJ proves a relevant market, it must then show that the merger is likely to cause a "substantial lessening of competition" within that market that is "sufficiently probable and imminent to warrant relief." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 115 (D.D.C. 2004); *see also United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 122 (1975) ("The Clayton Act is concerned with 'probable' effects on competition, not with 'ephemeral possibilities.'" (quoting *Brown Shoe v. United States*, 370 U.S. 294, 323 (1962)). The mere fact that a merger involves two competitors is insufficient to establish likely anticompetitive effects. Instead, DOJ must prove that the merged firm could "restrict output and achieve profits above competitive levels," either unilaterally or in coordination with other firms in the market. *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 215-16 (D.D.C. 2017).

Courts evaluate the evidence in merger challenges using a "burden-shifting" framework. *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015). Despite the "burden-shifting" moniker, the "shifting" concerns only the burden of production—the "ultimate burden of persuasion" *always* remains "incumbent on the Government." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 423 (5th Cir. 2008). First, DOJ must "establish a prima facie case that a merger is anticompetitive" by "prov[ing]" it "will probably lead to anticompetitive effects in [the relevant] market." *Saint Alphonsus*, 778 F.3d at 783, 785. While statistics about market

11

1  concentration can help support a prima facie case, they are "not conclusive indicators of

2  anticompetitive effects." *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974). "Thus,

3  plaintiffs in § 7 cases generally present other evidence as part of the prima facie case." *Saint*

4  *Alphonsus*, 778 F.3d at 786. If DOJ makes out a prima facie case, the burden of production shifts to

5  the defendant to offer rebuttal evidence, *id.* at 783, either "affirmatively showing why a given

6  transaction is unlikely to substantially lessen competition" or "discrediting the data underlying the

7  initial presumption in the government's favor." *United States v. Baker Hughes*, 908 F.2d 981, 991

8  (D.C. Cir. 1990). Defendants' rebuttal may rely on "any relevant real-world evidence." *United States*

9  *v. Bertelsman SE & Co.*, 646 F. Supp. 3d 1, 47 (D.D.C. 2022). Finally, "if the defendant successfully

10  rebuts the prima facie case, the burden of production shifts back to the Government and merges with

11  the Government's ultimate burden of persuasion." *Id.* at 23 (cleaned up). Though this framework

12  "conjures up images of a tennis match," in practice, "the evidence is often considered all at once and

13  the burdens are often analyzed together." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1057 (5th Cir. 2023).

14  **ARGUMENT**

15  **I.    DOJ Is Unlikely to Establish a Prima Facie Case.**

16  DOJ's prima facie case rests largely on market concentration. Under the law, that is not enough.

17  To be sure, the projected market share of the merged firm, if sufficiently high, can support a

18  prima facie case. *United States v. Philadelphia National Bank* established a rebuttable presumption

19  that a merger that creates a firm controlling a 30 percent share of the relevant market is so "inherently

20  likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly

21  showing that the merger is not likely to have such anticompetitive effects." 374 U.S. 321, 363 (1963);

22  *see also FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 457 (S.D.N.Y. 2024) (explaining presumption).

23  That presumption does not apply here: It is undisputed that this merger will not produce an entity

24  controlling "at least 30%" of the market for enterprise-grade WLAN. *See Phila. Nat'l Bank*, 374 U.S.

25  at 363-64; *see also Baker Hughes*, 908 F.2d at 984. DOJ's expert sought time and again to clear the

26  30% threshold, submitting *three* separate estimates of the merged firm's market share across two

27  different temporal dimensions. *See* Ex. 54, Remer Rep. Fig. V.2; Ex. 59, Remer Corr. Rep. Fig. V.2;

28  Ex. 71, Remer Reply Fig. V.4. Ultimately, however, even Dr. Remer conceded that the merger does

12

1  not trigger the *Philadelphia National Bank* presumption. *See* Ex. 71, Remer Reply Fig. V.5; Ex. 72,
2  Remer Dep. 68:2-75:3; *see also* Ex. 65, Hill Rep. ¶¶ 105-12 (25% market share estimate).

3  Unable to rely on market share, DOJ builds its case on market concentration. HHI measures
4  market concentration by adding up the squared market share of each competitor. The government
5  interprets HHI data via its "Merger Guidelines," "a non-binding statement" published jointly by DOJ
6  and the Federal Trade Commission. Ex. 75. The Guidelines declare that any merger that (1) occurs
7  in a market with an HHI score of at least 1800 and (2) increases the HHI by 100 points or more raises
8  a "[p]resumption of [i]llegality." DOJ-FTC, 2023 Merger Guidelines 2, 5-6.

9  This "presumption," however, binds no one. The Supreme Court has never endorsed any
10  presumption of illegality based on HHI figures. And the Guidelines' thresholds are not binding on
11  courts, private parties, or even the agencies themselves. *Olin Corp. v. FTC*, 986 F.2d 1295, 1300 (9th
12  Cir. 1993); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 n.4 (D.C. Cir. 1986); *FTC v. Hackensack*
13  *Meridian Health, Inc.*, 30 F.4th 160, 167 n.3 (3d Cir. 2022); 2023 Merger Guidelines at 4. Therefore,
14  that a merger increases HHI beyond the Guidelines' thresholds "does not, on its own, sustain a prima
15  facie case." *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 151 (D. Mass. 2024); *see*
16  *also, e.g.*, *Chi. Bridge*, 534 F.3d at 431 ("Market concentration figures should be examined in the
17  context of the entire prima facie case.").

18  Moreover, HHI—like market-share and market-concentration statistics—is merely a *proxy* for,
19  and not a direct measure of, a merger's anticompetitive effects.[1] Rather than blindly following the
20  enforcement agencies' arbitrary lines, courts assign weight to "extremely high HHI" numbers that
21  substantially exceed the Guidelines' thresholds. *See, e.g.*, *Saint Alphonsus*, 778 F.3d at 786-88 (HHI
22  statistics supported prima facie case when HHI increase was 1,607 points in market with HHI of
23  6,219); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) (finding that "[s]ufficiently large
24  HHI figures establish the FTC's prima facie case"). Here, the HHI numbers do not come close to
25  meeting that standard. The merger would increase HHI in the market for enterprise-grade WLAN by
26  a mere *271 points*, *see* Ex. 65, Hill Rep. Fig. 14, far below the increase in most litigated merger cases.

---

27  [1] When DOJ first published HHI thresholds in the Guidelines, the head of the Antitrust Division
28  acknowledged that "[t]he lines themselves are arbitrary" and have no "magical qualities." Baxter, *A Justice Department Perspective*, 51 ANTITRUST L.J. 287, 292 (1982).

13

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

1   *See* Ex. 65, Hill Rep. Fig. 14 (showing average HHI increase in litigated mergers was over *1,900*

2   *points* between 2000 and 2020). The weak HHI result here is far from the "extreme[]" result that the

3   Ninth Circuit found sufficient to make out a prima facie case. *Saint Alphonsus*, 778 F.3d at 788.

4       Even if the low HHI result here could establish a prima facie case under rare circumstances, it

5   cannot for the market here. *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 206

6   (S.D.N.Y. 2020) ("HHI measures may not be as informative as they might first appear in light of

7   complexities particular to the [market]"). Again, Cisco is the real issue. The current HHI for the

8   market is 3,377, but Cisco is responsible for the vast bulk of that figure—2,916 points, or 86.3%—

9   as it controls at least *54%* of the market. Cisco's dominance thus distorts the HHI analysis and curtails

10  its usefulness in predicting the merged entity's market power. *See* Shapiro, *Antitrust: What Went*

11  *Wrong and How to Fix It*, 35 ANTITRUST 33, 45 n.59 (2021) ("The problem with the level of the HHI

12  is that it can be driven by how the market is divided among non-merging firms").

13      Given that Cisco—not the merging parties—is overwhelmingly responsible for the HHI result,

14  predicting harm to competition requires a realistic assessment of the market and how the merger

15  might affect competition with the undisputed market leader (Cisco), among other variables. Indeed,

16  even in cases involving *higher* HHI numbers, plaintiffs "generally present other evidence" beyond

17  market share and concentration statistics "as part of the prima facie case." *Saint Alphonsus,* 778 F.3d

18  at 786, 788 (prima facie case included "extremely high" HHI numbers, "high entry barriers," and

19  "statements and past actions by the merging parties" showing the combined entity was likely to raise

20  prices); *Heinz*, 246 F.3d at 717 (high HHI numbers "bolstered" by facts that merger would establish

21  duopoly in market with high barriers to entry); *Chi. Bridge*, 534 F.3d at 431 (HHI was "just one

22  element in the Government's strong *prima facie* case"). And DOJ's expert agrees that the HHI figures

23  in this case are merely ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮ is required to assess the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 72, Remer Dep. 201:4-

25  11; *see also id.* at 202:7-13 (admitting HHI ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

26      Here, DOJ will offer little evidence about the market as a whole, relying instead on a myopic

27  focus on competition between HPE and Juniper. But that HPE and Juniper are competitors is neither

28  in dispute nor enough to meet DOJ's burden. *See United States v. Oracle Corp.*, 331 F. Supp. 2d

14

1  1098, 1169 (N.D. Cal. 2004) ("Simply because [the merging parties] often meet on the battlefield

2  and fight aggressively does not lead to the conclusion that they do so in the absence of" other

3  competitors). Overwhelming evidence will establish that the WLAN market is defined by vigorous

4  competition and low barriers to entry, which will not change with the merger. The record will thus

5  show that the "market-share statistics [give] an inaccurate account of the acquisitions' probable

6  effects on competition." *Citizens & S. Nat'l Bank*, 422 U.S. at 120. And it will doom DOJ's effort to

7  meet its ultimate burden of proof.

8  **II.    DOJ Cannot Meet Its Burden of Persuasion.**

9       Even if DOJ establishes a prima facie case, its suit must fail. A prima facie case resting on such

10  weak statistics is easily rebutted. *See Arch Coal*, 329 F. Supp 2d at 129 ("Certainly less of a showing

11  is required from defendants to rebut a less-than-compelling prima facie case"; and prima facie case

12  was "not strong" where merger produced 224-point HHI increase); *Baker Hughes*, 908 F.2d at 991.

13  In fact, evidence at trial will show that the merger will have no materially anticompetitive effects;

14  that structural market features make a substantial reduction in competition nearly impossible; and

15  that the merger will *promote* competition in multiple ways.[2]

16       **A.    The Merger Will Not Substantially Lessen Competition.**

17       When analyzing if a merger would cause substantial competitive harm, courts consider two types

18  of potential anticompetitive effects: (1) "unilateral effects" caused by the merged firm unilaterally

19  raising prices, and (2) "coordinated effects" caused by express or tacit collusion between the merged

20  firm and other competitors. *Oracle Corp.*, 331 F. Supp. 2d at 1112-13. DOJ can prove neither here.

21            1.    The Merger Will Not Cause Unilateral Anticompetitive Effects.

22       DOJ's claim of unilateral price effects rests primarily on the premise that the merger would

23  functionally reduce the number of credible competitors in the WLAN market from 3 to 2. But

24  whether the WLAN market is viewed in totality (as the law requires) or at the granular deal-by-deal

25  level DOJ prefers, there is ample evidence that the market consists of far more than 3 players, and

26  that Juniper and HPE face robust competition from at least *eight* other firms.

27       [2] Because evidence in a Section 7 case "is often considered all at once and the burdens are often
28  analyzed together," *Illumina*, 88 F.4th at 1057, this Part considers both DOJ's evidence offered in
   attempt to meet its burden and Defendants' rebuttal evidence.

15

1    ***Data Analysis.*** Dr. Hill's analysis demonstrates that HPE and Juniper infrequently constrain each

2    other on price. Indeed, the data show that the merger is largely complementary even within the

3    WLAN market. Ex. 65, Hill Rep. ¶¶ 138-43. That is because the Defendants' WLAN offerings are

4    differentiated: roughly 75% of HPE's WLAN sales are of on-prem and private cloud solutions, while

5    Juniper offers only WLAN solutions on the public cloud. *Id.* ¶ 143. As even Dr. Remer concedes,

6    many customers have strong preferences for private cloud or on-prem solution. *See* Ex. 59, Remer

7    Corr. Rep. ¶ 37; *see also* ███████████████████████

8    ███████████████. Thus, many of HPE's enterprise-grade WLAN customers would not even

9    consider Juniper a viable alternative supplier. Ex. 65, Hill Rep. ¶¶ 142-43.

10    Given the small overlap in HPE and Juniper's WLAN portfolios, the number of customers at

11    even a theoretical risk from the merger is small. In procurement markets characterized by vendors

12    bidding for customers' business, the customer faces risk from a merger only if the merging "parties

13    are the first and second choices of [that] customer" for the relevant product because "the merger

14    removes the principal constraint (i.e., its second choice) on its preferred choice." Ex. 65, Hill Rep.

15    ¶ 153. Thus, to establish unilateral effects, DOJ must "prove that there are a significant number of

16    customers" that consider the merging parties "their first and second choices." *Oracle*, 331 F. Supp.

17    2d at 1172. But as Dr. Hill shows, HPE and Juniper are customers' first and second choices in only

18    *3 percent* of all WLAN bidding opportunities. Ex. 65, Hill Rep. ¶¶ 153-57, Fig. 25. Put bluntly, in

19    only 3% of all bids does the deal have any chance of unilateral harm. *Id.* In 62% of bidding

20    opportunities, the merger is unlikely to have *any* effect. *Id.* And in the remaining 35%, the merger is

21    likely to *benefit* customers, as any meaningful synergies in the combination of HPE and Juniper in

22    the WLAN market would make the combined entity a more effective competitor in bids where one

23    of the parties is currently the customer's second choice. *Id.*

24    ***Documentary Evidence.*** DOJ focuses on anecdotes of HPE and Juniper competing for particular

25    WLAN contracts. But no one denies that HPE and Juniper have competed in the past. If that were

26    enough to make a merger unlawful, then no horizontal merger could ever occur. That is why antitrust

27    law focuses on the likelihood of anticompetitive effects in the product *market* as a whole, not on

28    individual customers or deals. *Cf. Newcal Indus.*, 513 F.3d at 1045 ("consumers do not define the

16

1    boundaries of the market; the products or producers do."); *see RAG-Stiftung*, 436 F. Supp. 3d at 318.

2    DOJ's approach also fails because it highlights only anecdotes that help its case, and omits

3    evidence of the merging parties competing against *other* players. *See Oracle*, 331 F. Supp. 2d at 1169

4    ("vigorous" competition between merging parties is not sufficient to meet DOJ's burden where

5    competition from other competitors is "equally fierce"). As expected in this dynamic and competitive

6    industry, there are many such instances. Defendants can present numerous examples that they

7    compete just as vigorously with other WLAN market players as with each other, including on price.

8    The record thus supports Dr. Hill's quantitative analyses and shows that HPE and Juniper compete

9    against many other players and across the full networking stack. *See* Ex. 65, Hill Rep. ¶¶ 137-52.

10    Start with DOJ's fixation on HPE documents about "beating Mist." Once HPE's witnesses place

11    those documents into proper context at trial, it will be clear that many (perhaps most) are not focused

12    on WLAN. As noted, Mist is integrated into numerous Juniper solutions beyond WLAN, so HPE

13    employees often discuss "beating Mist" in competition for wired networking products. And language

14    about beating competitors is commonplace in this industry. *See, e.g.*, ██████████████████

15    ████████████████████████████. Competitors' documents are replete with similar

16    examples. *See, e.g.*, Ex. 20, Ex. 35, Ex. 9. As are HPE's, which refer to "beating," "taking out," and

17    even "killing" competitors such as Ruckus, Extreme, Fortinet, Ubiquiti, and Arista. *See, e.g.*, Ex. 1

18    at '857, '878, '906; Ex. 46 at '766; Ex. 11 at '819-20; Ex. 4 at '181; Ex. 8 at '504; Ex. 24 at '674.

19    Such talk may be colorful, but at bottom it simply confirms that WLAN is a highly competitive

20    market in which many players constantly battle for share.

21    This case is nothing like *FTC v. Meta Platforms, Inc.*, where CEO Mark Zuckerberg admitted to

22    orchestrating an acquisition partly to "neutralize a potential competitor." 2024 WL 4772423, at *38

23    (D.D.C. 2024) (cleaned up). Here, by contrast, contemporaneous evidence confirms that WLAN was

24    a secondary consideration in the merger; this deal is about creating a networking company that spans

25    many related markets, not about taking Mist out of the WLAN market. *See, e.g.*, Ex. 22 at '437-40;

26    Ex. 12 at '881. HPE would not spend $14 billion—more than half its market capitalization—to "kill

27    Mist," let alone to beat or kill Juniper's $411 million WLAN business.

28    The record also reveals that HPE and Juniper devoted time and effort to responding to all their

competitors. For instance, HPE created "Battle Cards" and other competitive materials advising sales personnel how to message against competitors including Fortinet, Ruckus, Arista, Extreme, Nile, and Meter. *See, e.g.*, Ex. 42; Ex. 36; Ex. 38; Ex. 29; Ex. 30. So did Juniper. *See, e.g.*, Ex. 15; Ex. 14; Ex. 3; Ex. 6; Ex. 21 at 32-34. And voluminous documentary evidence will show that HPE and Juniper engage in frequent and robust price competition with other WLAN vendors. *See* Ex. 76, Ex. 77.

Such competition with other vendors belies DOJ's theory that Cisco, HPE, and Juniper are the only serious competitors in enterprise WLAN. Between 2021 and 2023, Arista, Extreme, and Ubiquiti all grew their WLAN businesses at a faster rate than the average of HPE and Juniper. Ex. 65, Hill Rep. Fig. 16. And internal HPE and Juniper documents show that they see these and other players as serious threats. For instance, in March 2022, Alain Carpentier, Aruba's global sales head, worried the "[m]arket is shifting to Security and especially Fortinet/PAL" and urged HPE to develop solutions to "kill Fortinet." Ex. 5 at '903; *see also, e.g.*, Ex. 34 at '930 ("Ruckus is killing us on price . . . globally."); Ex. 45 at '801 ("Arista is kicking our butts in Enterprise . . . They are beating our best [sales] teams . . . We need a beat Arista strategy that is wholistic.").[3]

Every deposed third-party competitor testified that they plan to compete vigorously and continue taking share if the deal closes. *See* ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. This testimony was not mere conjecture or hope; instead, the competitors explained their particular strengths and positioning. Several have a larger market capitalization than HPE and Juniper combined and can leverage leadership positions in adjacent markets, while others are actively repositioning within the WLAN market to take share from HPE and Juniper. Other third parties—customers, distributors, and analysts—confirm that numerous players beyond Cisco, HPE, and Juniper deliver complex WLAN solutions and win business in this market. *See* █████████████████████████████████ ████████████████████████████████████████████████. RFP dynamics can

---

[3] Other competitors felt similar pressure. ████████████████████████████
████████████████████████████████████████████████████████████████████████████.

DEFENDANTS' PRETRIAL BRIEF
CASE NO. 5:25-cv-00951-PCP

1    enable them to do just that: a potential loss of competition between Juniper and HPE will be filled

2    by bids from other WLAN companies, *see* ███████████████████, and customers will

3    switch vendors to obtain better prices and products, *see, e.g.*, ███████████. DOJ

4    ignores this market reality.

5        The presence of numerous, aggressive, well-capitalized competitors who are ready and able to

6    compete with the merged entity sharply distinguishes this case from *United States v. H & R Block,*

7    *Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) and other so-called "3-to-2" mergers. There, the court found

8    that potential competitors outside of the leader and the merged entity were either unwilling or unable

9    to compete. *See, e.g.*, *id.* at 73-77 (noting that potential competitor of merged firm had "deci[ded] to

10    prioritize a relaxed lifestyle over robust competition and innovation"). There is nothing comparable

11    in this record. And as Ninth Circuit has recognized, "even the largest firm can lose market share to

12    a feistier and hungrier rival." *United States v. Syufy Enters.*, 903 F.2d 659, 663 (9th Cir. 1990).

13            2.   <u>The Merger Will Not Cause Coordinated Anticompetitive Effects.</u>

14        "Coordinated effects occur when market participants coordinate their behavior, either by overt

15    collusion or implicit understanding in order to restrict output and achieve profits above the

16    competitive levels." *Tapestry*, 755 F. Supp. 3d at 486. DOJ has offered *no* material evidence from

17    which the Court could find that the merger would produce such market effects—only their expert's

18    repeated speculation. And "antitrust theory and speculation cannot trump facts . . . relating to the

19    market and its probable future." *Arch Coal*, 329 F. Supp. 2d at 116.

20        Unlike unilateral effects, "coordinated effects do not lend themselves to a standardized

21    quantitative merger review procedure." Ex. 64, Bailey Rep. ¶ 13. Instead, "the effect of a merger on

22    the risk of collusion depends on the specific characteristics of the industry and the merging parties,"

23    specifically those features that make reaching and enforcing terms of coordination easier or more

24    difficult. *Id.*; *see also Arch Coal*, 329 F. Supp. 2d at 131. Thus, "[i]n order to assess whether a merger

25    will lead to an unacceptable risk of competition-stifling coordination, courts evaluate various market

26    conditions, on the whole." *United States v. AT&T Inc.*, 310 F. Supp. 3d 161, 246 (D.D.C. 2018). In

27    this holistic inquiry, DOJ's market concentration statistics are virtually useless.

28        Beyond concentration statistics, courts, and even the Merger Guidelines, have identified multiple

19

factors for measuring coordinated effects. *RAG-Stiftung*, 436 F. Supp. 3d at 313-17; 2023 Merger Guidelines at 8-10. As Dr. Bailey explains, none is present in the WLAN industry, making coordinated effects highly unlikely. Ex. 64, Bailey Rep. ¶¶ 9-78; *see also Oracle*, 331 F. Supp. 2d at 1113 (no coordinated effects claim where DOJ offered no evidence of relevant market conditions).

First, there is no evidence of historical coordination in the WLAN market. Ex. 64, Bailey Rep. ¶ 19. While Dr. Remer speculates such coordination is possible, he admits that he has seen ██████ ████████████████████████████████████████████████████ in the market. Ex. 59, Remer Corr. Rep. ¶ 306. This sharply distinguishes cases where courts have found that a merger would likely cause coordinated effects. *See, e.g., H & R Block*, 833 F. Supp. 2d at 77-78 (relying on a "highly persuasive historical act of cooperation" between merging parties); *Bertelsman*, 646 F. Supp. 3d at 46 (same).

Second, WLAN products are not homogenous. Ex. 64, Bailey Rep. ¶¶ 20-29; *see also Arch Coal*, 329 F. Supp. 2d at 129 ("[H]eterogeneity of products and producers limit or impede the ability of firms to reach terms of coordination."). While the technology underlying WLAN products is similar, solutions are tailored to each customer's needs and priced accordingly. *See id.*; *see also* Ex. 51, Neri Dep. 70:8-75:15. Again, Dr. Remer agrees. *See* Ex. 72, Remer Dep. 397:19-22. He identifies five dimensions of WLAN product differentiation, directly supporting an inference that the market is *not* susceptible to coordination. *See* Ex. 59, Remer Corr. Rep. ¶¶ 13, 30, 37-38, 68-69, 73, 272; *see also* Ex. 64, Bailey Rep. ¶¶ 21-25.

Third, pricing information is insufficiently observable. Because WLAN products are usually purchased via RFP or negotiation, at steep discounts from list price, and in packages with other non-WLAN products, WLAN players would struggle to obtain reliable, real-time data on competitors' prices. Ex. 64, Bailey Rep. ¶¶ 30-50. This makes collusion less likely, as it is "harder to monitor whether firms engaged in a collusive scheme are adhering to the tacit or explicit agreement." *Id.* ¶ 32. The limited available data on WLAN sales terms are aggregated and delayed, *id.* ¶¶ 46-47, undermining their utility for tracking behavior, *Arch Coal*, 329 F. Supp. 2d at 141. Dr. Remer purports to disagree with this market reality, but he admits that ████████████████████████████ ████████████████ Ex. 72, Remer Dep. 399:14-19; *see also* Ex. 59, Remer Corr. Rep. D-2.

Fourth, WLAN vendors' incentives are not aligned. Coordination requires firms to "recogniz[e]

20

1    their shared economic interests and their interdependence with respect to price and output decisions."

2    *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). But WLAN

3    suppliers' differentiated business models create divergent pricing incentives. Ex. 64, Bailey Rep. ¶¶

4    51-60. For example, Fortinet's and Arista's WLAN sales strategies leverage cross-sales of *different*

5    networking products—firewalls for Fortinet and data center switches for Arista—making it difficult

6    coordinate pricing and terms. *Id.* ¶ 58. Again, Dr. Remer agrees. *See* Ex. 72, Remer Dep. 398:1-6.

7    Finally, Juniper is not a "maverick" that "consistently compete[s] aggressively when it bids,

8    causing other firms to bid more aggressively when it is present." *Arch Coal*, 329 F. Supp. 2d at 146.

9    The fact is that all WLAN players compete aggressively against each other. Though Dr. Remer calls

10    Juniper's pricing strategy particularly aggressive, HPE sales data show that HPE does not discount

11    more steeply or earn a lower margin when competing against Juniper than other WLAN vendors. Ex.

12    64, Bailey Rep. ¶¶ 66-69. Nor has Juniper's growth given it "greater economic incentive to deviate

13    from the terms of coordination than those of its rivals." *Arch Coal*, 329 F. Supp. 2d at 146. Numerous

14    other players—from new entrants like Nile to established players like Arista—have also grown

15    rapidly over the last five years. Ex. 64, Bailey Rep. ¶¶ 70-78.

16                        3.    The Merger Will Not Harm Innovation.

17    DOJ's cursory claim that the deal will reduce innovation also fails. For starters, DOJ defines the

18    market for innovation too narrowly. As numerous industry participants confirm, networking firms

19    compete globally and must innovate globally. *See* ███████████████████████

20    ██████████████████████████████████; Ex. 64, Bailey Rep. ¶¶ 84-89. Both

21    domestic and international players, like Huawei, provide competitive pressure to innovate.

22    DOJ also presents no hard evidence that the merger would reduce innovation in *any* market. Ex.

23    64, Bailey Rep. ¶¶ 79-115. As Dr. Bailey's quantitative analysis shows, many firms are sources of

24    innovation. *Id.* ¶¶ 91-99. DOJ attempts to portray Mist's AIOps functionality as proof that Juniper is

25    at the cutting edge of WLAN innovation. But every major player now incorporates AIOps tools into

26    WLAN, and the technological frontier has moved on to new areas like security and NaaS. *Id.* ¶¶ 106-

27    12. Looking at innovation today as measured by WLAN-related patents and innovation awards,

28    Juniper lags competitors including Ruckus, Extreme, Fortinet, Huawei, and Nile. *Id.* ¶¶ 91-97.

21

1   DOJ's single quantitative argument related to innovation—that HPE-Juniper documents suggest

2   the merged company may reduce research and development spending—rests on a misunderstanding.

3   Trial testimony will show that the projected R&D efficiencies would result from de-duplication of

4   R&D efforts and more focused allocation resources, *not* the elimination of R&D initiatives. As Dr.

5   Bailey explains, "accounting for the elimination of duplication and more effective resource allocation

6   can spur R&D and innovation, not hinder or reduce it." Ex. 64, Bailey Rep. ⫫ 82.

7   Indeed, economic studies show that mergers can enable greater innovation, both by bringing

8   together the combined expertise of the two firms and by unlocking scale efficiencies. Ex. 64, Bailey

9   Rep. ⫫⫫ 80-82. Defendants may thus rebut a prima facie case by showing that a merger "will permit

10  innovation that otherwise could not be accomplished." *Heinz*, 246 F.3d at 723; *see also Deutsche

11  Telekom*, 439 F. Supp. 3d at 215-16 (mergers can "accelerate . . . technological innovation."). As

12  company documents reveal and trial testimony will confirm, the merger will enable HPE and Juniper

13  to better compete in the global market and accelerate their ability to innovate. *See* Ex. 22. It will

14  provide Juniper with the capital necessary to grow its R&D efforts, while supercharging HPE's own

15  plans to develop enhanced technologies. And HPE has given guaranteed employment contracts to

16  key Juniper employees—including CEO Rami Rahim, who will run the combined networking

17  business—which will reinforce innovation in the merged company.

18      **B.    Market Structure Precludes the Possibility of Anticompetitive Effects.**

19  Two key structural market features also undercut DOJ's claim of anticompetitive effects.

20      ***Low barriers to entry and expansion.*** "The existence and significance of barriers to entry are . . .

21  crucial considerations in a rebuttal analysis" because without such barriers, "a company probably

22  cannot maintain supracompetitive pricing for any length of time." *Baker Hughes*, 908 F.2d at 987;

23  *see also Syufy*, 903 F.2d at 664 n.6 ("[A] conclusion [of an antitrust violation] normally should not

24  be drawn where the evidence also indicates that there is no barrier to entry into the relevant market.").

25  Even if a combined firm attempted to charge supracompetitive prices, it cannot maintain those prices

26  if "new firms can easily enter or existing firms can easily expand into the relevant product market,"

27  *United States v. Energy Sols.*, Inc., 265 F. Supp. 3d 415, 443 (D. Del. 2017).

28  The WLAN market is filled with aggressive, innovative competitors primed for growth—well-

1   capitalized, possessing the technical capacity to expand their customer base, and with distinctive

2   strengths positioning them to displace incumbents. A few WLAN vendors may need to reposition

3   their go-to-market efforts to reach customers in new verticals, but this requires only a change in focus.

4   Industry analysts and competitors alike uniformly testified that these players could meet that

5   challenge. *See, e.g.*, ██████████████████████. Many are *already* doing so. *See* Ex.

6   65, Hill Rep. ▌215. ████████████████████████

7   ████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████████████████████████

10  ████████████████████████████████████

11  The "ability and willingness" of these "current competitors to expand their foothold in the market

12  and/or reposition greatly reduces the anticompetitive effects of a merger, and is essentially equivalent

13  to new entry." *FTC v. CCC Holdings, Inc.*, 605 F. Supp. 2d 26, 57 (D.D.C. 2009).

14     And barriers to new entry are low. The WLAN market has grown substantially in the last decade,

15  making it attractive for investment. Ex. 65, Hill Rep. ▌201-11. Technological innovations have made

16  entry easier and faster, for example by allowing potential entrants to buy off-the-shelf hardware and

17  leverage open-source software rather than building their own from scratch. Since 2015, at least five

18  new players besides HPE and Juniper have entered, three through acquisition—Arista, Extreme, and

19  CommScope (Ruckus)—and two via organic entry—Nile and Meter. *Id.* ▌212-14. That alone is

20  enough to establish low entry barriers. *See United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982-84

21  (2d Cir. 1984). The same forces that enabled these entries will constrain the merged entity's capacity

22  to raise prices or reduce innovation. And they further distinguish this case from true 3-to-2 merger

23  cases where "new entry was difficult and improbable." *Heinz*, 246 F.3d at 717 (no entrants in

24  "decades"); *H&R Block*, 833 F. Supp. 2d at 75-78 (firms colluded to create barriers to entry).

25     Finally, to the extent that channel partner relationships currently pose some barrier to expansion,

26  that barrier is attributable to Cisco's dominant market position and "stranglehold" on certain of those

27  relationships. Ex. 73, Meyercord Dep. 33:7-21. The merger would *reduce* this barrier by creating a

28  more formidable competitor to Cisco across multiple markets, including WLAN. As Extreme's CEO

1 explained, by creating "a stronger, more credible competitor," the deal would "open[] up either the

2 channel [partners] or open[] up customers to consider other competitors . . . . If there's a strong

3 second provider, which I believe HPE and Juniper will be . . . they would present . . . greater

4 competition to Cisco and . . . create more opportunities for other players as well." *Id.* at 32:8-34:2;

5 *see also* ████████████████████████████████ (similar).

6     ***Sophisticated customers.*** The presence in the market of power buyers—"sophisticated and

7 powerful customers that are well equipped" to resist price increases—can rebut a prima facie case of

8 anti-competitiveness. *RAG-Stiftung*, 436 F. Supp.3d at 315; *see also Baker Hughes*, 908 F.2d at 986;

9 *Oracle*, 331 F. Supp. 2d at 1131. As the *Oracle* court explained, power buyers are typically

10 "sophisticated and knowledgeable and engage in extensive and intensive one-on-one negotiations

11 with vendors." 331 F. Supp. 2d at 1171-73; *see also RAG-Stiftung*, 436 F. Supp. 3d at 315 (similar).

12 Evidence of power buyers rebuts a prima facie case of unilateral or coordinated effects. *See Oracle*,

13 331 F. Supp. 2d at 1171-73 (unilateral); *RAG-Stiftung*, 436 F. Supp.3d at 315 (coordinated).

14     Enterprise-grade WLAN customers are paradigmatic power-buyers. As DOJ's own expert points

15 out, many purchases are conducted via complex, multi-round RFP processes, involving extensive

16 bargaining that customers sometimes stretch over years. Ex. 59, Remer Corr. Rep. ¶ 62; Ex. 65, Hill

17 Rep. ¶¶ 41, 177; *see also, e.g.*, Ex. 26 (ten-year competition between HPE and Extreme for WLAN

18 at Central College). As Defendants' experts will explain, the presence of many bidders in this type

19 of auction market will discipline the merged company, preventing unilateral price rises. And unlike

20 individual consumers making small purchases as in *H & R Block*, buyers of enterprise networking

21 technologies—including specialized distributors or resellers—are knowledgeable, repeat players

22 contracting for hundreds of thousands if not millions of dollars' worth of sophisticated technology.

23     **C.    The Merger Will be Procompetitive.**

24     Far from substantially harming competition, the HPE-Juniper merger will *promote* competition

25 and innovation in the enterprise WLAN market, ultimately *benefiting* consumers. Defendants can

26 rebut a prima facie case by pointing to "evidence that the proposed merger will create a more efficient

27 combined entity and thus increase competition." *See* S*aint Alphonsus*, 778 F.3d at 790; *see also Meta*

28 *Platforms, Inc.*, 2024 WL 4772423, at *35 (procompetitive justifications include "increased output,

1  decreased prices, improved service or quality, [and] greater innovation").

2     "The merged firms' ability to offer new or enhanced services is itself a procompetitive benefit."

3  *JetBlue*, 712 F. Supp. 3d at 161. HPE and Juniper documents show that is precisely what this merger

4  is about. Today, customers who prefer purchasing from a "one-stop shop" have few options, but a

5  combined HPE-Juniper would disrupt that paradigm. *See* ███████████████████; Ex.

6  22; Ex. 13. As Juniper CEO Rami Rahim explained to HPE's Board of Directors, the merger will

7  "create the best networking business on the planet." Ex. 43. By uniting their complementary

8  portfolios, the merged entity will provide a broader, more compelling offering for customers looking

9  for solutions across all networking market segments. *See* Ex. 22; Ex. 51, Neri Dep. 249:22-250:21.

10    The merged entity will also be poised to challenge Cisco's dominance across the networking

11  industry, putting pressure on Cisco to improve (or cut the price of) its products. *See, e.g.*, Ex. 44

12  (email to HPE CEO outlining a "comprehensive plan for an aggressive Cisco 'competitive' motion

13  post close"); Ex. 12 (February 2023 HPE Board document noting that merger would enable HPE to

14  "go head-to-head vs. Cisco"); ██████████████████████;

15  *cf. United States v. Country Lake Foods, Inc*., 754 F. Supp. 669, 674 (D. Minn. 1990) (declining to

16  enjoin merger that would enable merged firm better "to compete head-to-head" with market leader).

17    Challenging Cisco's dominance *across* the networking stack will also enhance competition

18  *within* each market segment, including WLAN. With a new full-stack competitor in the market,

19  WLAN customers who historically defaulted to Cisco will be more open to considering alternatives,

20  directly benefiting every other player. And the deal will generate more bidding opportunities for

21  smaller players. When customers and channel partners bid out business, they almost never invite

22  only one supplier, so by combining HPE and Juniper, the merger opens slots for other competitors

23  to be invited to and win RFPs. *See* Ex. 73, Meyercord Dep. 43:3-45:7. Put simply, by disrupting

24  Cisco's entrenched position and shattering the status quo in this market, the merger will enhance the

25  competitive position of other WLAN players, to the ultimate benefit of consumers. If the Court were

26  to block this deal, the only winner would be Cisco.

27                              **CONCLUSION**

28    The Court should deny DOJ's requested injunction and permit the challenged merger to close.

                                      25

Dated: June 25, 2025

Respectfully Submitted,

By: */s/ Jack P. DiCanio*

Jack P. DiCanio
*Attorney for Defendant*
*JUNIPER NETWORKS, INC.*

By: */s/ Beth A. Wilkinson*

Beth A. Wilkinson (*pro hac vice*)
*Attorney for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

Jack P. DiCanio (SBN 138782)
Michael C. Minahan (SBN 311873)
**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
525 University Avenue
Palo Alto, CA 94301
Telephone: (650) 470-4500
Facsimile: (650) 470-4570
Jack.DiCanio@skadden.com
Michael.Minahan@skadden.com

Steven C. Sunshine (*pro hac vice*)
Tara Reinhart (*pro hac vice*)
Joseph Rancour (*pro hac vice*)
Ryan J. Travers (*pro hac vice*)
Anisa A. Somani (*pro hac vice*)
**SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP**
1440 New York Avenue N.W.
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 661-8301
Steve.Sunshine@skadden.com
Tara.Reinhart@skadden.com
Joseph.Rancour@skadden.com
Ryan.Travers@skadden.com
Anisa.Somani@skadden.com

*Attorneys for Defendant*
JUNIPER NETWORKS, INC.

Beth A. Wilkinson (*pro hac vice*)
Kosta S. Stojilkovic (*pro hac vice*)
Daniel Epps (*pro hac vice*)
Roxana Guidero (SBN 319299)
Jenna Pavelec (*pro hac vice*)
Kellen M. McCoy (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
2001 M Street NW, 10th Floor
Washington, DC 20036
Telephone: (202) 847-4010
bwilkinson@wilkinsonstekloff.com
kstojilkovic@wilkinsonstekloff.com
depps@wilkinsonstekloff.com
rguidero@wilkinsonstekloff.com
jpavelec@wilkinsonstekloff.com
kmccoy@wilkinsonstekloff.com

Owen W. Gallogly (*pro hac vice*)
**WILKINSON STEKLOFF LLP**
130 W 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8910
ogallogly@wilkinsonstekloff.com

Julie S. Elmer (*pro hac vice*)
Eric Mahr (*pro hac vice*)
Jennifer Mellott (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
eric.mahr@freshfields.com
jennifer.mellott@freshfields.com

Justina K. Sessions (Bar No. 270914)
**FRESHFIELDS US LLP**
855 Main St
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

26

1

2          Samuel G. Liversidge (SBN 180578)
           Daniel Nowicki (SBN 304716)
3          **GIBSON, DUNN & CRUTCHER LLP**
           333 South Grand Avenue
4          Los Angeles, California 90071
           Telephone: (213) 229-7000
5          SLiversidge@gibsondunn.com
           DNowicki@gibsondunn.com
6

7          Stephen Weissman (*pro hac vice*)
           Michael J. Perry (SBN 255411)
8          Kristen C. Limarzi (*pro hac vice*)
           Jamie E. France (*pro hac vice*)
9          **GIBSON, DUNN & CRUTCHER LLP**
           1700 M Street, N.W.
10         Washington, D.C. 20036
           Telephone: (202) 955-8500
11         SWeissman@gibsondunn.com
           MJPerry@gibsondunn.com
12         KLimarzi@gibsondunn.com
           JFrance@gibsondunn.com
13

14         *Attorneys for Defendant*
           *HEWLETT PACKARD ENTERPRISE CO.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

27