**PHIL WEISER**
Attorney General

**NATALIE HANLON LEH**
Chief Deputy Attorney General

**SHANNON STEVENSON**
Solicitor General

**TANJA WHEELER**
Associate Chief Deputy Attorney
General



## STATE OF COLORADO
### DEPARTMENT OF LAW

**RALPH L. CARR**
**COLORADO JUDICIAL CENTER**
1300 Broadway, 10th Floor
Denver, Colorado 80203
Phone (720) 508-6000

**Consumer Protection Section**

September 5, 2025

Leslie Wulff
Civil Chief, San Francisco Office
Antitrust Division
Department of Justice
450 Golden Gate Avenue, Room 10-0101
Box 36046
San Francisco, CA 94102
ATR.Public-Comments-Tunney-Act-MB@usdoj.gov

RE:    *United States v. Hewlett Packard Enterprise Co. and Juniper Networks, Inc.*,
No. 5:25-cv-00951-PCP (N.D. Cal.): Public Comment

Dear Ms. Wulff:

The Attorneys General of the States of Colorado, Arizona, California, Connecticut, Delaware, Hawaii, Illinois, Maine, Massachusetts, Maryland, Michigan, Nevada, New Mexico, New York, North Carolina, Oregon, Rhode Island, Washington, Wisconsin, and the Attorney General for the District of Columbia (the "States") submit this comment opposing the Proposed Final Judgment (the "Settlement") in the HPE/Juniper merger litigation. The States are co-equal enforcers of the federal antitrust laws with the DOJ and the FTC. The States are also enforcers of their own state antitrust laws, some of which mirror the federal antitrust laws, and some of which extend to conduct beyond the federal laws. In instances when the States do not join federal enforcement actions and do not bring their own actions, they look to the federal government to uphold its duty to the public and either litigate or resolve cases on the merits, consistent with the public interest. As the DOJ has apparently failed to meet that standard in this case—the standard codified in the Tunney Act— the States are submitting this comment to object.

In introducing legislation that came to bear his name, Senator John Tunney quoted Justice Louis Brandeis to explain the bill's purpose: "Sunlight is the best of disinfectants," and thus "sunlight . . . is required in the case of lobbying activities attempting to influence the enforcement of the antitrust laws." 119 Cong. Rec. 3453 (1973). Public reporting and extraordinary public remarks by the former Principal

Page 2

Deputy Assistant Attorney General Roger Alford[1] require the Court to examine the process that led to the Proposed Final Judgment in this case (the "Settlement") to uncover whether it has been terminally infected by precisely the type of backroom dealing the Tunney Act was intended to prevent.

Multiple news outlets have reported that the DOJ trial staff working on the case, as well as senior leadership at the Antitrust Division, opposed the Settlement. But higher-level officials at the DOJ—identified by Mr. Alford as Chief of Staff Chad Mizelle and Acting Associate Attorney General Stanley Woodward—were apparently lobbied by individuals with close ties to the President's administration. According to news reports, Mr. Mizelle then allegedly pushed the Settlement through over the Antitrust Division's objection and in a manner that plainly did not address the competitive harms outlined in the complaint.

Mr. Alford has called the Settlement a "scandal" and directly accused Mr. Mizelle and Mr. Woodward of perverting justice and violating the rule of law. Mr. Alford and a colleague within the Antitrust Division were fired for opposing the Settlement. Both were political appointees of President Trump's administration, not career civil servants or "holdovers" from President Biden's administration.

If these reports are true, the process that led to the Settlement violates the public trust and is enough on its own for the Court to reject the Settlement pursuant to the Tunney Act. But a bad process also led to a bad substantive result. The Settlement fails to address the harms alleged by the DOJ. This is a 3-to-2 merger that will result in two firms controlling over 75% of the relevant market. The DOJ predicted that prices will increase by up to 14% on account of this merger. The Settlement fails to cure any of that. Instead, it merely requires HPE to divest—to an unknown buyer who may never materialize—a small business line that is irrelevant to the litigation and was never once mentioned in the Complaint or the pretrial briefing. And it requires HPE to license a portion of Juniper's source code—again to an unknown buyer—while allowing HPE to keep the same source code. None of that addresses the competitive overlap between the two firms, nor will it alleviate the harm of a merger that substantially lessens competition and leaves a market to be dominated by just two firms post-merger.

The Court should hold an evidentiary hearing and require discovery into the Settlement and the allegedly corrupt process that led to it. And if, upon exposing the Settlement to sunlight, the evidence establishes that it was the product of undue influence, then the Court should reject it as against the public interest.

**The Tunney Act Supports a Thorough Judicial Inquiry**

---

[1] Roger P. Alford, The Rule of Law Versus the Rule of Lobbyists, Tech Policy Institute Aspen Forum (Aug. 18, 2025) [hereinafter "Alford Speech"]. A copy of Mr. Alford's speech is attached to this comment as Exhibit A.

The Tunney Act—formally titled the Antitrust Procedures and Penalties Act—applies to "[a]ny proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws." 15 U.S.C. § 16(b). The Tunney Act applies to the Court's consideration of this Settlement.

In passing the Tunney Act, Congress was "[c]oncerned with the appearance of impropriety engendered by the secrecy of consent decree negotiations in antitrust cases, in addition to exposing to 'sunlight' the process by which such consent decrees are negotiated." *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 151-52 (D.D.C. 2002) (citing 119 Cong. Rec. at 24599); *see also* H. Rep. No. 93-1463 (1974), *as reprinted in* 1974 U.S.C.C.A.N. 6535, 6536 ("it is imperative that the integrity of and public confidence in procedures relating to settlements via consent decree procedures be assured"); *United States v. Alex. Brown & Sons, Inc.*, 169 F.R.D. 532, 536-37 (S.D.N.Y. 1996). Congress thus determined that the judiciary must not merely "rubber stamp" proposed consent decrees in antitrust cases, but instead must "make an independent determination as to whether or not entry of a proposed consent decree is in the public interest." S. Rep. No. 93-298 at 5 (1973).

Congress was acutely aware that antitrust violators may "wield great influence and economic power" and "often bring significant pressure to bear on government." 119 Cong. Rec. 24597 (1973). Accordingly, Congress sought to "ensure[] that the economic power and political influence of antitrust violators do not unduly influence the government into entering into consent decrees that do not effectively remedy antitrust violations." *United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 54 (D.D.C. 2019) (quoting *United States v. Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993)); *see also United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 148 (D.D.C. 1982).

Indeed, the Tunney Act was passed in response to just such influence peddling. In 1971, International Telephone and Telegraph Corp. ("ITT") pledged $400,000 for the 1972 Republican National Convention, and President Nixon subsequently ordered the DOJ to let ITT proceed with a merger.[2]

The Tunney Act therefore requires the DOJ and defendants to make certain public disclosures about consent decrees in antitrust cases and empowers district courts to

---

[2] Senator Tunney referenced the ITT settlement in his support for the bill, as well as other examples of the DOJ seemingly succumbing to pressure from large antitrust violators. 119 Cong. Rec. 24598 (1973). A recording of President Nixon ordering a DOJ official to "stay the hell out of" the ITT deal was uncovered as part of the Watergate investigation. *See* Ciara Torres-Spelliscy, *The I.T.T. Affair and Why Public Financing Matters for Political Conventions*, Brennan Center for Justice (Mar. 19, 2014), https://www.brennancenter.org/our-work/analysis-opinion/itt-affair-and-why-public-financing-matters-political-conventions. The Tunney Act was intended to prevent this kind of political interference in antitrust cases.

examine the substance and procedure leading to such consent decrees to ensure that they are in the public interest. *See* 15 U.S.C. § 16. The DOJ, for its part, must publish the proposed consent judgment and other materials in the Federal Register and allow 60 days for public comment; it must file with the court and publish in the Federal Register all the public comments and its responses thereto; and it must disclose any materials "considered determinative in formulating" the proposed judgment. *Id.* § 16(b)-(d). Defendants for their part must disclose their lobbying contacts with the government. *Id.* § 16(g).

The Court must ultimately "determine that the entry of such judgment is in the public interest" before entering the proposed consent judgment, and the Act provides procedures for making that determination. 15 U.S.C. § 16(e)-(f); *United States v. Blavatnik*, 168 F. Supp. 3d 36, 40 (D.D.C. 2016). When determining whether the judgment is in the public interest, the Court must consider:

> **(A)** the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> **(B)** the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).

In making its determination whether the judgment is in the public interest, the Court is empowered to take the following actions:

> **(1)** take testimony of Government officials or experts or such other expert witnesses, upon motion of any party or participant or upon its own motion, as the court may deem appropriate;
>
> **(2)** appoint a special master and such outside consultants or expert witnesses as the court may deem appropriate; and request and obtain the views, evaluations, or advice of any individual, group or agency of government with respect to any aspects of the proposed judgment or the effect of such judgment, in such manner as the court deems appropriate;
>
> **(3)** authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party pursuant to the Federal Rules of Civil Procedure,

examination of witnesses or documentary materials, or participation in
any other manner and extent which serves the public interest as the
court may deem appropriate;

**(4)** review any comments including any objections filed with the United
States under subsection (d) concerning the proposed judgment and the
responses of the United States to such comments and objections; and

**(5)** take such other action in the public interest as the court may deem
appropriate.

15 U.S.C. § 16(f).[3]

As the Ninth Circuit has held, the "statute suggests that a court may, and perhaps
should, look beyond the strict relationship between complaint and remedy in
evaluating the public interest." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th
Cir. 1981). Critically, the Court's role is to ensure "that the government has not
breached its duty to the public." *Id.*

## Public Reporting Raises Suspicion That the Settlement Is the Product of Backroom Dealing

The terms of the Settlement are themselves bizarre and raise suspicion. But public
reporting has now shed light on the events that led to the Settlement; and if it is true
that lobbying pressure and secret side arrangements substituted for antitrust legal
analysis in reaching this outcome, then high-level political appointees at the DOJ
breached the public trust and the Settlement violates the Tunney Act.

According to public reports, HPE hired two consultants to lobby the government for
a favorable settlement.[4] Those consultants are Mike Davis and Arthur Schwartz.[5]
Mr. Davis previously served as Chief Counsel for Nominations to Senate Judiciary
Chairman Chuck Grassley and reportedly advises President Trump on judicial
nominations.[6] Being hired by HPE was a remarkable turnaround for Mr. Davis—

---

[3] *See also* The Antitrust Procedures and Penalties Act: Hearings on S. 782 and S. 1088 Before the
Subcomm. On Antitrust & Monopoly of the S. Comm. On the Judiciary, 93d Cong. 151 (1973)
[hereinafter "Senate Report"] (testimony from Judge W.J. Skelly Wright that in cases of great
importance, the Tunney Act "would require judicial time, necessarily so, and I believe rightfully so" to
get all the information required).

[4] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act
Proceeding Looms*, The Capitol Forum (July 24, 2025), https://thecapitolforum.com/hpe-juniper-as-
fight-between-doj-leadership-and-antitrust-division-broils/.

[5] *Id.* HPE did not disclose Mr. Schwartz as a person who communicated with the Executive Branch
on its behalf. Defs.' Description and Certification of Written and Oral Communications Concerning
the Proposed Final Judgment (July 7, 2025) (Dkt. No. 228). The Court should inquire as to why Mr.
Schwartz was not disclosed.

[6] Mr. Davis stated that he is "helping President Trump find the best judicial and Justice Department
picks he can find." Maria Tedesco, *Former CO GOP Attorney Mike Davis at CPAC: Supporting Trump
from      Outside      the      Government*,      Colo.      Times      Recorder      (Feb.      21,      2025),

Page 6

when the DOJ filed its complaint to block the merger, Mr. Davis praised the lawsuit, saying, "3 into 2?  You must sue."[7]

Gail Slater, the head of the DOJ's Antitrust Division, reportedly urged the merging parties to negotiate directly with her and the DOJ staff working on the litigation, rather than use lobbyists to go over her head.[8]  An internal feud reportedly ensued over the involvement of lobbyists "who weren't antitrust specialists, but were brought in for their connections to administration officials."[9]

The merging parties appear to have ignored Ms. Slater's plea.  One article detailed that HPE's consultants and lawyers engaged in literal "boozy backroom meetings" with DOJ officials at a Washington, DC "private city club."[10]

Several articles describe internal disagreements that took place at the DOJ between Ms. Slater and her Antitrust Division staff, who on the one hand opposed the Settlement, and higher level DOJ officials, who wanted to settle.[11]  Ms. Slater specifically "raised concerns about the Tunney Act process and the disclosures it would require."[12]  She also reportedly "told Justice Department officials . . . that she needs discretion to police mergers and that her team shouldn't be subject to political interference."[13]

Ultimately, Chad Mizelle, the Attorney General's Chief of Staff, reportedly "pushed [the settlement] through" over the objections of Ms. Slater and her Antitrust Division staff.[14]  The Wall Street Journal has reported that HPE "made commitments" to the

---

https://coloradotimesrecorder.com/2025/02/former-co-gop-attorney-mike-davis-at-cpac-supporting-trump-from-outside-the-government/67627/.

[7] See Matt Stoller, *An Attempted Coup at the Antitrust Division*, The Big Newsletter (July 25, 2025), https://www.thebignewsletter.com/p/an-attempted-coup-at-the-antitrust (containing screenshot of Mr. Davis's social media post about the lawsuit).

[8] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra*.

[9] Dave Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, Wall Street Journal (July 29, 2025), https://www.wsj.com/us-news/law/top-justice-department-antitrust-officials-fired-amid-internal-feud-0c98d57c?gaa_at=eafs&gaa_n=ASWzDAiIc1Z8lOohYhICFTYUznPe0pXfdrebsZTtwzj0wnhLE2ikZvs6BNBC&gaa_ts=68b9f675&gaa_sig=GsKyK6Bbn1Q7nwEKjXmWuTNlSBv_HTPu7PLsKmdLVK.

[10] Sohrab Ahmari, *The antitrust war inside MAGA*, UnHerd (July 30, 2025), https://unherd.com/2025/07/the-antitrust-war-inside-maga/?lang=us.

[11] *See, e.g.*, Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, *supra*; Jennifer Jacobs & Jacob Rosen, *Tension over antitrust division crops up inside Trump administration, sources say*, CBS News (July 16, 2025), https://www.cbsnews.com/news/top-trump-administration-antitrust-official-faces-criticism-over-approach-sources-say/.

[12] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra*.

[13] Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, *supra*.

[14] Ahmari, *The antitrust war inside MAGA*, *supra*.  There have also been reports that Mr. Mizelle pushed for the Settlement because he is interested in having the same consultants hired by HPE help

Page 7

government that have not been disclosed and that are not part of the Proposed Final Judgment: that HPE will "create new jobs at a facility in the U.S. . . .  The unusual offer was designed to ease the government's opposition to the company's merger."[15]

Two officials working for Ms. Slater—Roger Alford (Principal Deputy Assistant Attorney General), and William Rinner (the Deputy Assistant Attorney General in charge of mergers)—were reportedly particularly vocal in their opposition to the Settlement.[16]   According to media reports, Mr. Rinner, in a speech at George Washington University in June, declared that "We do not plan to hash out merger settlements over martinis"—a comment now understood to be a reference to the "boozy backroom meetings."[17]

Mr. Alford and Mr. Rinner were fired shortly after the Settlement was reached; although the reason given was "insubordination," reports reflect that their firing was due to their opposition to the process that led to the Settlement.[18]

In a highly unusual move, none of the DOJ trial staff signed the Settlement documents submitted to the Court, which were instead signed by Mr. Mizelle and other higher-level officials at the DOJ.  A former DOJ official "familiar with the turmoil" was quoted as calling this Settlement a "fake settlement."[19]

Even more stunningly, Mr. Alford has now spoken out publicly about the highly irregular process that led to this Settlement.  In remarks to the Tech Policy Institute Aspen Forum on August 18, 2025, which Mr. Alford titled, "The Rule of Law Versus the Rule of Lobbyists," Mr. Alford summarized the Settlement as follows:

> "[I]n the HPE/Juniper merger scandal Chad Mizelle and Stanley Woodward perverted justice and acted inconsistent with the rule of law. I am not given to hyperbole, and I do not say that lightly.  As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the settlement was reached.   Although the Tunney Act has rarely served its intended

---

his wife get a judicial nomination to the United States Court of Appeals for the Eleventh Circuit.  *See* Matt Stoller, *Into the Abyss: Trump's Bizarro New Deal*, The Big Newsletter (July 29, 2025), https://www.thebignewsletter.com/p/into-the-abyss-trumps-bizarro-new?utm_campaign=post (containing screenshot of social media post).

[15] Dave Michaels, *MAGA Antitrust Agenda Under Siege by Lobbyists Close to Trump*, Wall Street Journal (Aug. 6, 2025), https://www.wsj.com/us-news/law/maga-antitrust-agenda-under-siege-by-lobbyists-close-to-trump-18558898?mod=hp_lead_pos8.  The article also reported that the jobs promise is being reviewed by the DOJ's Office of Legal Counsel to determine whether it can be accepted as part of the Settlement.  *Id.*

[16] *See* Khushita Vasant, *Antitrust enforcers Alford, Rinner fired by US DOJ*, MLex (July 29, 2025), https://www.mlex.com/mlex/articles/2370717/antitrust-enforcers-alford-rinner-fired-by-us-doj.

[17] Ahmari, *The antitrust war inside MAGA*, *supra*.

[18] *Id.*; Michaels, Top Justice Department Antitrust Officials Fired Amid Internal Feud, *supra*.

[19] Ahmari, *The antitrust war inside MAGA*, *supra*.

purpose, this time the court may demand extensive discovery and
examine the surprising truth of what happened.  I hope the court blocks
the HPE/Juniper merger.  If you knew what I knew, you would hope so
too.  Someday I may have the opportunity to say more."[20]

Mr. Alford provided a few additional and important details.  He described an outlook
by DOJ officials like Mr. Mizelle whereby they consider some parties, counsel, and
lobbyists to be on the same team as them and "worthy of special solicitude," whereas
they consider others to be "enemies" who "merit particular disfavor."[21]  Based on
regular meetings with Mr. Mizelle, Mr. Alford said that Mr. Mizelle "accepts party
meetings and makes key decisions depending on whether the request or information"
comes from a perceived "friend" on the same team.[22]  "Aware of this injustice,
companies are hiring lawyers and influence peddlers to bolster" their credentials with
those DOJ officials and "pervert traditional law enforcement."[23]  What Mr. Alford
appears to be saying is that antitrust violators wishing to get a sweetheart deal from
the government can do so by hiring the DOJ senior officials' favored friends.

Mr. Alford says that word has now spread that this is the way to get deals done: "The
[DOJ] is now overwhelmed with lobbyists with little antitrust experience going above
the Antitrust Division leadership seeking special favors with warm hugs.  On
numerous occasions in a variety of matters we implored our superiors and the lawyers
on the other side to call off the jackals.  But to no avail.  Today cases are being resolved
based on political connections, not the legal merits."[24]

Mr. Alford also levied criticism on HPE's hired lobbyists, arguing that "Mike Davis
and Arthur Schwartz have made a Faustian bargain of trading on relationships with
powerful people to reportedly earn million-dollar success fees by helping
corporations" to, among other things, "hurt working class Americans, break the rules,
and then try to cover it up."[25]

Finally, reflecting on his firing, Mr. Alford stated that, "All it took to be fired were
lobbyists exerting influence on my superiors to retaliate against me for protecting the
rule of law against the rule of lobbyists."[26]

The Tunney Act is meant to ensure that the rule of law, not the rule of lobbyists,
applies in antitrust cases.  The Court should fully inquire into the process that led to
the Settlement to see whether law or lobbyists ruled here.

---

[20] Alford Speech at 3-4.
[21] *Id.* at 4.
[22] *Id.*
[23] *Id.*
[24] *Id.* at 5.
[25] *Id.*
[26] *Id.* at 6.

Page 9

**The Settlement Does Not Address the Concerns Raised in the Complaint**

As is often the case, a bad process led to a bad result. The Settlement fails to address the harms alleged by the DOJ. The DOJ alleged harm in the market for enterprise-grade WLAN solutions because this would be essentially a 3-to-2 merger where three firms currently control over 75% of the market: Cisco, HPE, and Juniper. United States' Pre-Trial Brief (June 30, 2025) (Dkt. No. 221). The merger would combine the second-largest (HPE) and third-largest (Juniper) firms in the market. Pursuant to well-established case law, the DOJ has thus established that the merger is presumptively unlawful because the market is already highly concentrated and the merger would lead to an undue increase in concentration according to HHI measures. *See* U.S. Dep't of Justice & FTC Merger Guidelines (2023) § 2.1 (describing presumption of illegality based on HHI measures); see *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 785-86 (9th Cir. 2015) (market share as a method of demonstrating competitive harm); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001) ("[s]ufficiently large HHI figures establish the FTC's prima facie case that a merger is anti-competitive").

Remarkably, the Defendants did not contest the DOJ's market definition, market share figures, or HHI calculations—all points of analysis that are typically hotly contested in merger cases—thus largely clearing the way for the DOJ to establish its prima facie case. This should have made DOJ confident in its case and provided significant leverage in any legitimate settlement negotiation.

Furthermore, the DOJ alleged fierce head-to-head competition between HPE's Aruba business line and Juniper's Mist business line. The Complaint, and the DOJ's pretrial brief, provide several examples of HPE and Juniper competing for clients, and HPE having to substantially lower its prices to compete with Juniper—all to the benefit of consumers. The DOJ also emphasized that HPE created an internal "Beat Mist" or "Kill Mist" campaign, thus devoting significant attention and resources on Juniper as a top competitor, with HPE's CEO even considering Juniper to be HPE's biggest competitive threat. United States' Pre-Trial Brief at 10 (June 30, 2025) (Dkt. No. 221). Based on economic modeling, the DOJ's expert economist estimated that a combination of HPE and Juniper would result in a price increase of 3-6% on HPE products and 7-14% on Juniper products. *Id.* at 11.

And yet the Settlement does not address these harms. Rather, the Settlement basically has two components: (1) a divestiture of HPE's Instant On business line to an unknown entity, and (2) a license for Juniper's AIOps for Mist source code to an unknown entity.

The Instant On business line is totally irrelevant to this case. It is not mentioned anywhere in the Complaint or in DOJ's pretrial brief. Rather, the DOJ's contentions focus on HPE's Aruba business line. Defendants likewise focus on Aruba, plainly

stating that HPE offers WLAN solutions "under its Aruba brand." Defs.' Pretrial Brief at 8 (July 1, 2025) (Dkt. No. 222). The Instant On business is HPE's offering for small businesses, but this case is clearly focused on large enterprises. Indeed, DOJ's planned customer witnesses for trial were all representatives from large enterprises. United States' Pre-Trial Brief at 19 (June 30, 2025) (Dkt. No. 221).

Even the HPE CEO could not help but spill the beans in bragging to investors about how great a deal the company got from the DOJ, explaining that Instant On is "*a distinct offering separate from the traditional HPE Aruba platform and Aruba Central. It was specifically designed to serve the small business segment, particularly the 'S' in SMB and represents a small portion of our overall business.*"[27] (Emphasis added). The first component of the settlement therefore has nothing to do with the issues in the case.

Nor does the second component meaningfully address the alleged harm. The DOJ's Competitive Impact Statement fails to explain the potential competitive significance of requiring HPE to license the Mist AIOps code. And according to the Defendants' own statements, there may be no competitive significance at all. In their pretrial brief, Defendants laid bare that although Juniper may have been an early mover with its AIOps, "today, AIOps is table stakes in WLAN." Defs.' Pretrial Brief at 6 (July 1, 2025) (Dkt. No. 222). And here again the HPE CEO celebrated the minimal concession to be made by HPE, explaining that HPE would only have to license a "portion" of Mist's code.[28]

Moreover, the Settlement does not require HPE to divest the AIOps code, only to license it. That means that HPE nevertheless gets to keep the code and use it for itself, so this remedy does not address the major concerns over combining HPE and Juniper. And in light of the high barriers to entry identified by the DOJ in their pretrial brief, there is no reason to believe that licensing the Mist AIOps code will lower those barriers or somehow aid another competitor.

And although the license is permanent, the transition services needed for a prospective licensee to integrate the code into their existing WLAN platform, or stand up an entirely new platform, only last for one year. Should the licensee fail to fully integrate the code within that timeframe, there's a risk the licensee's platform will fail to derive competitive benefit, or even fail entirely. In essence, the framework of the license puts the competitive risk on a competitor who obtains the license—and ultimately consumers in the market, which is abnormal to say the least. The better method would be to require a divestiture of the code and supporting assets, with a

---

[27] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra* (quoting HPE CEO comments on a July 10, 2025 call with investors).

[28] *HPE CEO: We can offer true client-to-cloud networking solutions with Juniper deal*, CNBC (July 2, 2025), https://www.cnbc.com/video/2025/07/02/hpe-ceo-we-can-offer-true-client-to-cloud-networking-solutions-with-juniper-deal.html.

potential license back to the merging parties, thus putting the risk on the merging parties.  *See* Negotiating Merger Remedies, Statement of the Bureau of Competition of the FTC, at 9 (Jan. 2012).[29]

And in the event the merging parties fail to identify an acceptable buyer within the auction period, there is no effective penalty.  All that happens in that scenario is that the DOJ must apply to the Court to appoint a license trustee to complete an auction.  *See* Proposed Final Judgment (Dkt. No. 217-1) at § V.2.  The trustee would then complete the auction process with no penalty to the merged firm for further delay.  The post-merger firm is therefore incentivized to delay and use all that time to entrench its market share, lock in customers, and develop strategies to minimize the competitive impact that the buyer may have.

Finally, in the wake of public backlash to the Settlement, some DOJ officials have started to defend the Settlement based on national security grounds.[30]  Yet, no national security issue was raised in the DOJ's Tunney Act submissions, which are supposed to explain to the public the reasoning for the Settlement.  Nor did HPE disclose any meetings with national security officials in its filing.  Moreover, the DOJ has a process for vetting potential national security issues before filing a complaint, to prevent wasting resources litigating.[31]  Put simply, the national security argument appears to be a post-hoc rationalization, rather than a substantive reason that drove the DOJ to settle.

**The Tunney Act Was Designed to Stop This Situation: Apparent Backroom Dealings Resulting in an Inadequate Remedy**

Backroom deals by political appointees with friendly lobbyists for antitrust violators, reached over the objections of staff who are most familiar with antitrust principles and the facts of the case, do not serve the public interest and should not be tolerated.  This does not appear to be a case where superiors made a difficult and unpopular decision after closely weighing the facts and making a judgment based on policy or a view of the risks of litigation that differed from those of staff.  Rather, this is the type of settlement that the Tunney Act was designed to address.  It has raised such high alarm among former DOJ officials that they felt compelled to speak out.  It has resulted in the firing of two senior lawyers at the Antitrust Division who dared to argue against it.  And it has led to the extraordinary circumstance of one of those officials giving a public speech decrying the "rule of lobbyists" and pleading for the Court to block the merger.

---

[29] *Available at* https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf.
[30] Ahmari, *The antitrust war inside MAGA*, *supra*.
[31] *See id.*

Page 12

Accordingly, the Court should hold an evidentiary hearing to bring to light the process that led to the Settlement, and confirm whether the public reports are true. The Court is fully empowered to do so. *See* 15 U.S.C. § 16(f). If the public reports are true, then the Settlement was the product of undue influence and represents a breach of the government's duty to the public.

The Tunney Act is not without teeth, and several courts have exercised their authority under the Tunney Act to obtain more information about proposed settlements and hold further proceedings. Most recently, in 2019, a district court held an evidentiary hearing on a proposed consent decree in the merger of CVS and Aetna. *See United States v. CVS Health Corp.*, 407 F. Supp. 3d 45 (D.D.C. 2019).[32] The court in that case decided that, "Rather than risk an uninformed public interest determination" based on perfunctory responses and bald assertions from the DOJ, the court would hold a hearing to assist in its public interest determination. *Id.* at 51. The evidentiary hearing lasted two days, with several amici curiae presenting three witnesses: a health policy expert, an expert economist, and the Chief Medical Officer of the AIDS Healthcare Foundation. *Id.* at 51. The merging parties presented two witnesses: a CVS executive and an expert economist. *Id.* And the government and merging parties jointly presented another witness, an Aetna executive to testify about the proposed divestiture. *Id.* The amici and the parties were then permitted to submit supplemental briefing, and the court held oral argument. *Id.* at 52. The court ultimately approved the proposed consent decree, but closely scrutinized it and thoroughly examined the concerns of the amici.

In 2006, a district court held several hearings and allowed a few rounds of briefing to aid its review of proposed consent decrees in two simultaneously filed cases, concerning the Verizon/MCI and SBC/AT&T mergers. *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007). The court allowed several third parties to participate as amici and to submit briefs and declarations from economists and other experts in opposition to the consent decrees. *Id.* at 8-10. The government and the merging parties submitted supplemental briefing, and the government submitted a declaration from an economist and other supporting documents. *Id.* at 9-10. The court held a hearing to permit argument from the amici, government, and merging parties before rendering its decision. *Id.* at 10.

The courts in cases involving Sherman Act claims against Microsoft and AT&T likewise held oral arguments and heard from interested third parties. *See Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1206 (D.C. Cir. 2004) (describing district court hearing and permission for third parties to participate as amici); *Am.*

---

[32] The court remarked that, if the Tunney Act means anything, it "surely must mean that no court should rubberstamp a consent decree approving the merger of 'one of the largest companies in the United States' and 'the nation's third-largest health-insurance company,' . . . simply because the Government requests it!" *CVS*, 407 F. Supp. 3d at 48 (citation omitted).

*Tel. & Tel. Co.*, 552 F. Supp. at 147 (court held two-day hearing involving oral argument from 18 third parties).

Here, the Court can, and should, hear testimony from the lobbyists and government officials who have knowledge of and were involved in reaching this Settlement, including Mike Davis, Chad Mizelle, Stanley Woodward, Roger Alford, William Rinner, and Gail Slater. The Court would also benefit from hearing from an expert economist who can discuss whether the Settlement would address the harms alleged in the Complaint and the DOJ's pretrial brief and, as in CVS/Aetna, some fact witnesses from the industry. And the Court should provide for discovery of documents related to the Settlement, which may include emails and text messages between and among the people involved in the Settlement. A full hearing will "assure that the courtroom rather than the backroom" is the "final arbiter" in this matter. *See* Senate Report at 1.

One or more of the States signing onto this comment are prepared to participate in further proceedings to expose to sunlight the process that led to this anticompetitive Settlement by, for example, moving to intervene in the Tunney Act proceeding and/or the underlying action. The public reporting, especially Mr. Alford's remarks, represent allegations that go to the very heart of the Tunney Act's purpose and merit a full investigation. No court hearing a Tunney Act proceeding has ever been confronted with such explosive and dangerous accusations.

Sincerely,

Phil Weiser
Attorney General

KRIS MAYES
*Attorney General*
*State of Arizona*

Page 14



Rob Bonta
California Attorney General



WILLIAM TONG
*Attorney General of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*
Delaware Department of Justice

Hawaii Attorney General

Kwame Raoul
Attorney General



AARON M. FREY
Attorney General of Maine

Andrea Joy Campbell
Massachusetts Attorney General

Anthony G. Brown
Maryland Attorney General

Dana Nessel
Michigan Attorney General

AARON D. FORD
Attorney General of Nevada

Page 16



RAÚL TORREZ
*Attorney General*
*State of New Mexico*

Letitia James
Attorney General

Jeff Jackson
North Carolina Attorney General

Dan Rayfield
Oregon Attorney General

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*

Page 17

NICHOLAS W. BROWN
Attorney General
State of Washington

JOSHUA L. KAUL
Attorney General
State of Wisconsin

Attorney General, District of Columbia

# Exhibit A

# The Rule of Law Versus the Rule of Lobbyists

Roger P. Alford

Tech Policy Institute Aspen Forum

August 18, 2025

Thank you for the opportunity to be here today.  I'm truly honored.  Having served in and out of government for the past decade I have noticed something ironic.  As a law professor I have so much to say, but so few are eager to listen.  But as a senior government official, I have many eager to listen, but there is little I'm allowed to say.  So today I'm in the fortunate position of being a law professor and recent senior government official who has so much to say and so many who are eager to listen.

I'm here today as someone who is happy and grateful, and hopeful that in the wake of the HPE/Juniper merger scandal, the Department of Justice may course correct with a few policy and personnel changes. Although challenging, I loved my time at the Department of Justice as the second highest official in the Antitrust Division.  But I love being back home at Notre Dame even more. It feels a little like I've returned to the Shire after fighting the Orcs in the Battle of Helm's Deep.

I want to speak with you today about the battle within the Republican party over the future of the second Trump Administration.  I am not talking about the well-known ideological battle between traditional conservatives and Trump supporters.  I am talking about the battle between genuine MAGA reformers and MAGA-In-Name-Only lobbyists. It's a fight over whether Americans will have equal justice under law, or whether preferential access to our justice system is for sale to the wealthy and well-connected.

Will America be governed by the rule of law or the rule of lobbyists?  For the words "equal justice under law" to be more than just a phrase etched in marble, it must be practiced by those privileged to enforce it. Attorney General Pam Bondi testified about this in her confirmation hearing.  "If confirmed, I will work to restore confidence and integrity to the Department of Justice …. America must have one tier of justice for all."

The true MAGA Republicans know that we cannot restore integrity and protect the interests of the average American by allowing wealthy and powerful corporations to hire politically connected lobbyists to receive special treatment. Officials like my boss Assistant Attorney General Gail Slater and so many others are working hard to remain true to President Trump's core message that resonated so well with working-class Americans.  Antitrust enforcement that applies equal justice under the law can prove that the DOJ is not for sale and deliver tangible results for millions of

1

Americans. As I said in my Senate Judiciary testimony last December, we are committed to "common sense populism [that] seeks to make housing more affordable, reduce the cost of higher education, promote choice and competition in healthcare, and adopt economic policies that drive down the cost of living and prices for everyday goods and services."

The MAGA-In-Name-Only lobbyists and DOJ officials enabling them are pursuing a different agenda. Their loyalty is not to the President's antitrust agenda or to rebuild confidence and integrity in the DOJ. Regardless of the outcome, their commitment is to exert and expand their influence and enrich themselves as long as their friends and supplicants are in power. If the rule of lobbyists prevails, the Republican vision of a realignment toward the average American will die.

The current front in this battle is being fought within the Department of Justice. It will not surprise you when I say that AAG Slater and Deputies Mark Hamer, Dina Kallay, Bill Rinner, and Chetan Sanghvi have been wonderful colleagues, and we are united in the battle to protect the average American by vigorously enforcing the antitrust laws. The same cannot be said for senior leadership above and around her.

Similar to my mentor James Buckley's call for Richard Nixon to resign in March 1974, I'm speaking out reluctantly as a friend because I know that what I have to say will bring pain and distress to many people I respect. I'm asking for statesmanship and courage by senior government officials to promote this Administration's antitrust agenda, restore integrity to the DOJ, and serve the greater interests of the nation.

I am speaking out now because it is still early days in this Administration and I think correcting the problems at the DOJ is still possible, either by political will or judicial decree. I experienced nothing remotely like this when I served at the DOJ the last time, and hopefully this is a short-term aberration.

To be clear, I have absolutely no reason to think the White House or other departments are involved in the current HPE/Juniper merger scandal. Nor do I think Deputy Attorney General Todd Blanche is involved. I met with him almost every week and I never had a negative experience with him. There are things I don't know, but I perceive him to be a man of character who is leading the DOJ under extremely difficult circumstances.

But I cannot say the same about a small set of actors in senior leadership within the DOJ. I met with the most senior officials of the DOJ regularly, and my concerns expressed today are not based on conjecture. The core problem is simple: AG Bondi has delegated authority to leaders like her Chief of Staff Chad Mizelle and Associate Attorney General nominee Stanley Woodward who do not share her commitment to the rule of law and to one tier of justice for all. With the DOJ led by a mix of officials with varying commitments to restore integrity to the Department of Justice, good may yet prevail, but at least with respect to senior DOJ oversight of antitrust enforcement, we are on a path toward injustice.

Let me discuss the battle lines that have been drawn between true MAGA Republicans and MAGA-In-Name-Only lobbyists and offer just a few reflections on the difference between the rule of law and the rule of lobbyists.

First, under the rule of law, rules matter and must be respected, both in substance and in procedure. Sir Thomas More in a *Man for All Seasons* put it this way in his <u>famous quote</u> about giving the devil the benefit of the law: "This country is planted thick with laws from coast to coast, man's law not God's!  And if you cut them down, … do you really think you could stand upright in the winds that would blow then?  Yes, I'd give the Devil the benefit of law, for my own safety's sake." When Thomas More explained to Richard Rich why he could not accept even a small bribe such as a silver cup, he said with real power there will be offers of all sorts of things—homes, manors, and coats of arms. Only those with principles strong enough to reject the little temptations are worthy to serve in senior government where there will be offers of big temptations.

Under the rule of lobbyists, antitrust laws are nuisances or obstacles to overcome.  Rather than the legitimate lobbyists who have expertise and perform traditional functions of education and engagement, corrupt lobbyists with no relevant expertise are perverting actual law enforcement through money, power, relationships and influence.  In a *Man for All Seasons*, Thomas Cromwell beckoned Richard Rich to betray Sir Thomas More in exchange for a bribe.  Rich did so and immediately felt guilty.  Cromwell reassured Rich that while Sir Thomas More is a man of incorruptible principle, Rich has common sense, and accepting bribes gets easier with time.  The corrupt Richard Rich rose to the heights of power, while the principled Thomas More resigned and then was imprisoned and martyred for insubordination.

There are people within the DOJ who follow the law and care deeply about protecting Americans from anticompetitive behavior. That is true of the leadership and career staff at the Antitrust Division.  They believe in the principles that undergird the antitrust laws and want to enforce those laws for the common good.  They reject the silver cup of temptation to betray the law for personal gain.

Sadly, there are other people inside and outside government who offer and accept the silver cup and who care little for the antitrust laws.  They consider law enforcement not as binding rules but an opportunity to leverage power and extract concessions. They have, shall we say, a loose relationship with the law.

It goes without saying that the most senior law enforcement officials in the United States should care deeply about the rule of law. They should know the law and follow it.  And they should not punish those who defend it.

Although I am limited in what I can say, it is my opinion that in the HPE/Juniper merger scandal Chad Mizelle and Stanley Woodward perverted justice and acted inconsistent with the rule of law. I am not given to hyperbole, and I do not say that lightly.  As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the

settlement was reached. Although the Tunney Act has rarely served its intended purpose, this time the court may demand extensive discovery and examine the surprising truth of what happened. I hope the court blocks the HPE/Juniper merger. If you knew what I knew, you would hope so too. Someday I may have the opportunity to say more.

The second distinction between the rule of law and the rule of lobbyists is that those who follow the rule of law show no special favors to the parties and counsel appearing before them. By contrast, the rule of lobbyists cares deeply about benefits they can extract in transactional relationships with perceived friends. At the Antitrust Division we routinely have lawyers appear before us whom we know and respect, but we also meet lawyers who are unethical scoundrels and malcontents—the kind who game the system and crow about it. We ignore the affiliations of these lawyers—whether friend or foe, Republican or Democrat—and attempt to treat everyone equally. That's how we maintain one tier of justice and restore the integrity of the Department.

Others at the DOJ and elsewhere in government consider some parties, counsel, and lobbyists to be on the "same MAGA team" and worthy of special solicitude. They consider others to be "enemies of MAGA" that merit particular disfavor. In my opinion based on regular meetings with him, Chad Mizelle accepts party meetings and makes key decisions depending on whether the request or information comes from a MAGA friend. Aware of this injustice, companies are hiring lawyers and influence peddlers to bolster their MAGA credentials and pervert traditional law enforcement.

Third, the rule of law provides predictability while the rule of lobbyists guarantees instability. Violations of antitrust laws impose grave risks to companies, including criminal prosecution, massive civil penalties, company breakups, and the blocking of mergers. Lawyers and their clients need a stable and predictable environment to do business. The Antitrust Division uniformly seeks to promote the rule of law in both litigation and merger enforcement. I personally have heard lawyers say that the political uncertainty of this Administration is more difficult than the predictable but hostile environment of the Biden Administration.

I should emphasize that I welcome all lawful competition and all procompetitive mergers. Before recent events, the original topic for my talk today was in praise of Little Tech innovation and pro-competitive mergers. Nor is there anything wrong with lobbying done the right way. But this new pay-to-play approach is so far removed from legitimate lobbying or traditional antitrust enforcement that it is creating massive legal and economic uncertainty. Those adopting this new approach care little about the instability this creates for the markets.

The cost to the country of this new pay-to-play approach to antitrust enforcement is enormous. For thirty pieces of silver, MAGA-In-Name-Only lobbyists are influencing their allies within the DOJ and risking President Trump's populist conservative agenda. This goes far beyond traditional lobbying functions. Their goal is to line their own pockets by working for any corporation that will pay top dollar to settle antitrust cases on the cheap. Doing so undermines the rule of law and desperately harms the average American. At risk are President Trump's antitrust goals of

reforming health care, addressing monopoly abuses, promoting deregulation, and helping renters, farmers and blue-collar workers.

Is this the new normal, with every law firm hiring an influence peddler to dual track and sidestep the litigation and merger review process? That's what law firms are now considering. The Department of Justice is now overwhelmed with lobbyists with little antitrust expertise going above the Antitrust Division leadership seeking special favors with warm hugs. On numerous occasions in a variety of matters we implored our superiors and the lawyers on the other side to call off the jackals. But to no avail. Today cases are being resolved based on political connections, not the legal merits.

Which case is the next casualty? Will the same senior DOJ officials ignore the President's Executive Order just because Live Nation and Ticketmaster have paid a bevy of cozy MAGA friends to roam the halls of the Fifth Floor in defense of their monopoly abuses? I wonder what the national security arguments will be in that case.

What must the antitrust bar think? If the new game in town is to hire well-connected lobbyists ignorant of the law to get your deal done or your case dismissed by going around and above AAG Slater, what role are respected, ethical antitrust lawyers supposed to play? Why did the lawyers advising the parties in the HPE/Juniper merger scandal not appreciate the risk they were generating, not only for their clients and their law firms, but for the entire antitrust bar?

Lastly, there are real costs for the lobbyists, the companies and lawyers who hired them, and the officials within government. Their reputations are forever linked to their unethical behavior. Mike Davis and Arthur Schwartz have made a Faustian bargain of trading on relationships with powerful people to reportedly earn million-dollar success fees by helping corporations undermine Trump's antitrust agenda, hurt working class Americans, break the rules, and then try to cover it up. Outside the small circle of transactional MAGA friends seeking and giving favors, do these lobbyists and their friends in power actually know what traditional or populist conservatives think about them? When lobbyists like Mike Davis and Will Levi go to their Supreme Court clerkship reunions, how do honorable conservative lawyers who clerked for the great Justices Alito and Gorsuch view their shenanigans? Do the executives and the lawyers who hire these lobbyists know what the antitrust bar and the Division's leaders and lawyers think of their behavior? They have long memories.

Those who forsake the rule of law are violating fundamental moral principles. "A just king gives a country stability, but one who demands bribes destroys it." (Proverbs 29:4). "You shall not pervert justice. You shall not show partiality…. Justice, and only justice, you shall follow." (Deuteronomy 16:19-20). "A wicked man receives a bribe in secret to pervert the ways of justice." (Proverbs 17:23). "Do not show partiality in judging; hear both the small and great alike." (Deuteronomy 1:17). I know many in and out of government who sincerely respect these moral principles. Perhaps now is the time to implement them. The influence peddlers and allies in government will hide behind their friends in power, excuse their behavior, claim we are naïve, and

hope this all goes away.  But many of their friends in power have principles and want to avoid further scandal.

How will the Department of Justice recover from the current crisis?  Will there be policy or personnel changes among the senior leadership at the Department of Justice? Will AAG Slater have the freedom to enforce the law and fire or hire her deputies consistent with the Administration's true antitrust agenda? At a minimum, will the Department of Justice remove the compromised Chad Mizelle and Stanley Woodward from any antitrust oversight, and have Gail Slater report directly to Todd Blanche?  In the absence of reforms at the DOJ, must State AGs now join every DOJ antitrust lawsuit and merger challenge as a check on influence peddling?  The status quo is simply unsustainable.

When I began my service at the DOJ, I swore a solemn oath to well and faithfully discharge the duties of my office.  What will be done when senior DOJ officials betray their oath?  What will be done to a nominee who has already shown he cannot be trusted to honor such an oath?

Let me conclude with a personal reflection.  President Roosevelt was one of the great antitrust reformers and lately I've been thinking about his famous speech "The Man in the Arena."

> "Credit belongs to the man who is actually in the arena, whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly."

In my first tour of duty at the DOJ, I loved that quote because I could relate to the triumph of high achievement as AAG Makan Delrahim and I successfully negotiated an agreement on fundamental due process signed by over seventy countries. In my second tour of duty at the DOJ, I love that quote for what it says about failing while daring greatly.

My position while I served in government was simple: lobbyists and lawyers are subordinate to the law. Yet by stating this truth, I was dismissed for insubordination. My termination letter is now framed and hangs on the wall in my office at Notre Dame. I joke with friends that I've never been fired before, and I've been working since my first job as a young teenager at the Dairy Queen in Sherman, Texas.  All it took to be fired were lobbyists exerting influence on my superiors to retaliate against me for protecting the rule of law against the rule of lobbyists.

A final thought on the subject of taking risks to serve our country in these difficult times.  Is it really worth leaving the Shire to battle the Orcs?  On both occasions that I was offered a senior position within the DOJ I was told that I should not accept the offer because the risks were just too great.  For me that was not a sufficient reason to say no.  I knew I would be attacked.  I knew it would be difficult. But I also know that the rule of law is not just an inheritance, it also an

opportunity and obligation. Soldiers are willing to go to war and risk their lives to serve our country.  So why shouldn't we take lesser risks to serve our country and protect the rule of law? The principles inscribed in marble at the Department of Justice building only survive if each generation takes up the fight. Failure is always a possibility. But so too is triumph. I would rather fail while daring greatly than not serve at all.  Thank you.