HENRY C. SU (CA Bar # 211202)
Senior Litigation Counsel
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 705-6338
Henry.Su@usdoj.gov

JEREMY M. GOLDSTEIN (CA Bar # 324422)
MICHAEL G. LEPAGE (DC Bar # 1618918)
Trial Attorneys
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 934-5300
Jeremy.Goldstein@usdoj.gov

*Attorneys for Plaintiff*
*United States of America*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-CV-00951-PCP |
| *Plaintiff,* | JUDGE: Hon. P. Casey Pitts |
| v. | MAGISTRATE JUDGE: Hon. Susan van Keulen |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC., | **PLAINTIFF'S OPPOSITION TO MOTION FOR INTERVENE** |
| *Defendants.* | |

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

STANDARD ........................................................................................................................ 4

ARGUMENT ....................................................................................................................... 6

    I.    The Moving States Intend to Push the Proceedings Beyond the Scope of the Tunney Act ............................................................................................................... 6

        A.    The Tunney Act Sets Forth a Specific Form of Judicial Review of a Proposed Antitrust Settlement's Competitive Impact ............................... 7

        B.    The Tunney Act Does Not Grant the States Oversight of the Federal Government ...................................................................................................... 9

        C.    The Proposed Settlement Readily Satisfies the Tunney Act ................................. 12

    II.    The Moving States Have Not Established a Basis for Intervention Under Rule 24 ............................................................................................................................ 14

        A.    The Moving States' Motion Fails At This Late Stage ............................................ 14

        B.    The Moving States Are Not Entitled to Intervene As of Right Under Rule 24(a) ......................................................................................................... 17

            1.    The Tunney Act Does Not Confer Intervention as of Right ...................... 17

            2.    The Moving States Have Not Shown Impairment of a Protectable Interest ............................................................................. 18

        C.    The Court Should Deny Permissive Intervention Under Rule 24(b) .................... 20

            1.    Rule 24(b)(2) Is Inapplicable Because the States Do Not Administer The Clayton Act ............................................................... 20

            2.    Rule 24(b)(1)(B) Is Inapplicable Because the Moving States Do Not Have Claims that Share Common Questions with This Action ................................................................................................... 21

            3.    The Moving States' Participation Will Result in Undue Delay And Prejudice ....................................................................................... 23

CONCLUSION ................................................................................................................... 24

1

# TABLE OF AUTHORITIES

2

## <u>Cases</u>

3

*Aleut Corp. v. Tyonek Native Corp.*,
4     725 F.2d 527 (9th Cir. 1984) ............................................................................. 15

*Arizonans for Official English v. Arizona*,
5     520 U.S. 43 (1997) ............................................................................................. 20

*Arlington Hghts. v. Metropolitan Housing Dev. Corp.*,
6     429 U.S. 252 (1977) ........................................................................................... 10

*California v. Am. Stores Co.*,
7     495 US 271 (1990) ....................................................................................... 19, 20

*Callahan v. Brookdale Senior Living Cmty., Inc.*,
8     42 F.4th 1013 (9th Cir. 2022) ........................................................................ 5, 19

9  *Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
      595 U.S. 267 (2022) ........................................................................................... 16

10 *Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*,
      717 F.3d 189 (D.C. Cir. 2013) ........................................................................... 19
11
   *DOC v. New York*,
12    588 U.S. 752 (2019) ........................................................................................... 10

13 *FCC v. Consumers' Rsch.*,
      145 S. Ct. 2482 (2025) ......................................................................................... 8

14 *Fin. Co. of Am. v. Park Holding Corp.*,
      60 F.R.D. 504 (W.D. Pa. 1973) ............................................................................ 5
15
   *FTC v. Warner Commc'ns, Inc.*,
16    742 F.2d 1156 (9th Cir. 1984) ........................................................................... 10

*Georgia v. Penn. RR*,
      324 U.S. 439 (1945) ........................................................................................... 20
17
   *In re Cheney*,
18    544 F.3d 311 (D.C. Cir. 2008) ........................................................................... 11

19 *In re FDIC*,
      58 F.3d 1055 (5th Cir. 1995) ............................................................................. 11
20
   *In re United States (Holder)*,
21    197 F.3d 310 (8th Cir. 1999) ............................................................................. 11

22 *In re United States (Jackson)*,
      624 F.3d 1368 (11th Cir. 2010) ......................................................................... 11

23 *In re United States (Kessler)*,
      985 F.2d 510 (11th Cir. 1993) ........................................................................... 11
24
   *In re United States Dep't of Educ.*,
25    25 F.4th 692 (9th Cir. 2022) .............................................................................. 11

*Karnoski v. Trump*,
26    926 F.3d 1180 (9th Cir. 2019) ........................................................................... 11

*Karsner v. Lothian*,
27    532 F.3d 876 (D.C. Cir. 2008) ........................................................................... 16

*League of United Latin Am. Citizens v. Wilson*,
28    131 F.3d 1297 (9th Cir. 1997) ............................................................................. 4

*Love v. Vilsack*,
      304 F.R.D. 85 (D.D.C. 2014), *aff'd,* 2014 WL 6725758 (D.C. Cir. Nov. 18, 2014) .......................... 16

*Mass. Sch. of L. at Andover, Inc. United States*,
  118 F.3d 776 (D.C. Cir. 1997).................................................................................passim
*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004)............................................................................. 22
*McHenry v. Comm'r*,
  677 F.3d 214 (4th Cir. 2012) ................................................................................ 21
*NAACP v. FPC*,
  425 U.S. 662 (1976) ............................................................................................. 8
*Nat. Res. Def. Council v. Costle*,
  561 F.2d 904 (D.C. Cir. 1977)............................................................................. 16
*Nat'l Urban League v. Ross*,
  Case No. 20-CV-05799-LHK, 2020 WL 6290353 (N.D. Cal. Oct. 26, 2020).......... 5
*New York Cent. Sec. Corp. v. United States*,
  287 U.S. 12 (1932) ............................................................................................... 8
*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020).................................................................. 18
*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
  960 F.3d 603 (9th Cir. 2020)................................................................................. 5
*Perry v. Prop. 8 Official Proponents*,
  587 F.3d 947 (9th Cir. 2009) ................................................................................ 5
*Petrol Stops Nw. v. Cont. Oil Co.*,
  647 F.2d 1005 (9th Cir. 1981) .............................................................................. 5
*Roeder v. Islamic Republic of Iran*,
  333 F.3d 228 (D.C. Cir. 2003)............................................................................. 15
*Sam Fox Publ'g Co. v. United States*,
  366 U.S. 687 (1961) ........................................................................................... 18
*Simplex Time Recorder Co. v. Sec'y of Labor*,
  766 F.2d 575 (D.C. Cir. 1985)............................................................................. 11
*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ........................................................................................... 20
*Town of Chester, N.Y., v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017) ........................................................................................... 20
*United Airlines, Inc. v. McDonald*,
  432 U.S. 385 (1977) ........................................................................................... 16
*United States v. Aerojet Gen. Corp.*,
  606 F.3d 1142 (9th Cir. 2010) ............................................................................ 17
*United States v. Alex. Brown & Sons*,
  169 F.R.D. 532 (S.D.N.Y. 1996)......................................................................... 18
*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004) .......................................................................... 14, 16
*United States v. Archer-Daniels-Midland Co.*,
  272 F. Supp. 2d 1 (D.D.C. 2003).......................................................................... 9
*United States v. Armour & Co.*,
  402 U.S. 673 (1971) ........................................................................................... 24
*United States v. AT&T Co.*,
  552 F. Supp. 131 (D.D.C. 1982).............................................................. 17, 18, 22
*United States v. Bechtel Corp.*,
  648 F.2d 660 (9th Cir. 1981) ..................................................................... 8, 14, 24

*United States v. BNS Inc.*,
   858 F.2d 456 (9th Cir. 1988) ............................................................................. 8, 9

*United States v. Chicago*,
   870 F.2d 1256 (7th Cir. 1989) .................................................................................. 14

*United States v. CVS Health Corp.*,
   Civ. A. No. 18-02340 (RJL) (D.D.C. Dec. 17, 2018) ............................................ 22

*United States v. Google*,
   Case No. 20-cv-3010, Dkt. No. 1153 (Jan. 27, 2025), *aff'd,* 2025 WL 88052 (D.C. Cir. Mar. 21, 2025)
   ............................................................................................................................. 17

*United States v. Heileman*,
   563 F. Supp. 642 (D. Del. 1983) .................................................................. 17, 18, 22

*United States v. InBev N.V./S.A.*,
   Civ. A. No. 08-1965 (JR) (D.D.C. Feb. 3 2009) .................................................... 22

*United States v. Iron Mountain, Inc.*,
   217 F. Supp. 3d 146 (D.D.C. 2016) .......................................................................... 9

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C. Cir. 1995) ........................................................................ 7, 9, 12

*United States v. Morgan*,
   313 U.S. 409 (1941) ................................................................................................ 11

*United States v. Oregon*,
   913 F.2d 576 (9th Cir. 1990) ........................................................................... 2, 4, 14

*United States v. SBC Commc'ns, Inc*,
   489 F. Supp. 2d 1 (D.D.C. 2007) ....................................................................... 9, 12

*United States v. SBC Commc'ns, Inc.*,
   Civ. A. Nos. 05-2102 (EGS), 05-2103 (EGS), 2007 WL 1830866 (D.D.C. June 26, 2007) .......... 22, 23

*United States v. Thomson Corp.*,
   Civ. A. No. 96-1415 (PLF), 1997 WL 90992 (D.D.C. Feb. 27, 1997) ................... 22

*United States v. US Airways Grp., Inc.*,
   38 F. Supp. 3d 69 (D.D.C. 2014) .............................................................................. 9

## Statutes

15 U.S.C. § 16 .............................................................................................. passim
15 U.S.C. § 18 ............................................................................................... 3, 21
15 U.S.C. § 21 ..................................................................................................... 21
15 U.S.C. § 25 ............................................................................................... 19, 21
15 U.S.C. § 26 ..................................................................................................... 19

## Other Authorities

51 Cong. Rec. S14,476 (daily ed. Aug. 31, 1914) .............................................. 21
90 Fed. Reg. 30685 (July 10, 2025) ....................................................................... 4
H. Rep. No. 93-1463 (1974) ................................................................................. 12
*Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 93d Cong. 40 (1973) ................................................... 10
S. Rep. No. 93-298 (1973) .................................................................................... 12

**<u>Rules</u>**

Fed. R. Civ. P. 24.................................................................................................................. passim

**<u>Treatises</u>**

7C Wright & Miller's Federal Practice and Procedure § 1904 (3d Sept. 2025 Update)............................ 5

The United States of America ("United States") respectfully files this opposition to the Motion for Intervention ("Motion") filed by the Attorneys General for the states of Colorado, California, Connecticut, Hawaii, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington, and Wisconsin, and the District of Columbia (collectively, the "Moving States"). *See* Dkt. No. 236 ("Mot."); *see also* Dkt. No. 237 (excepting responses to the Moving States' Motion from the Court's stay). For the reasons stated below, the Moving States' untimely Motion should be denied.

### INTRODUCTION

On January 30, 2025, the United States sued to enjoin Hewlett Packard Enterprise Co.'s ("HPE's") acquisition of Juniper Networks, Inc. ("Juniper"), alleging that the acquisition threatened to substantially lessen competition in the market for enterprise-grade wireless local area network ("WLAN") solutions. After vigorously litigating the case to the brink of trial, the United States negotiated a settlement that directly addresses competitive harms alleged in the Complaint through a targeted divestiture and licensing requirements that promote innovation and competition in the enterprise-grade WLAN market. The proposed Final Judgment and Competitive Impact Statement were filed on June 27, 2025, and the United States invited public comment over a 60-day period. The United States received only 12 comments. None came from WLAN consumers or competitors. Once the United States publishes the comments and files its response, the Court will have all the material needed to conduct a "public interest" analysis approving the settlement as set forth in the Tunney Act. And although the United States does not expect the Court will need additional proceedings after undertaking that review, it can hold a hearing without granting this Motion. Intervention by a handful of states would be a counterproductive distraction from the Court's exercise of its Tunney Act authority.

Despite the late stage of this litigation, the Moving States purportedly seek to intervene to protect two interests: "preventing unlawful mergers from harming their citizens" and "ensuring that antitrust settlements are in the public interest." *See* Mot. at 1. The first interest is a red herring. Any of the Moving States could have brought their own action to enjoin the acquisition at any point after it was announced in January 2024. They could still do so today or in the future, as nothing in the proposed settlement bars any action by the Moving States. Regarding the second interest, the Moving States may

have an interest in ensuring that their *own* antitrust settlements are in the public interest, but they have no protectable interest in ensuring that antitrust settlements *by the United States* are in the public interest. The Tunney Act affords the public, including the States, the opportunity to submit comments. The Moving States did so here, and this Court may consider those comments when applying the Tunney Act's specific criteria to assess the competitive impact of the proposed settlement. The Tunney Act does not, however, empower the Moving States to second-guess the federal government's decision-making. Nor does it authorize their proposed intrusive inquiry into the Department of Justice's internal deliberations. Indeed, such an inquiry would constitute an improper intrusion into the function of the Executive Branch.

The process sought by the Moving States would also chill merger enforcement and discourage settlement. If pre-trial compromises in high-risk cases could trigger a mini-trial and a probe into the Department's reasoning and internal deliberations, the agency may opt to bring cases only where trial victory is virtually certain. This would contravene the public interest and undermine the Tunney Act's goal of encouraging settlements that conserve enforcement resources and provide prompt relief. Extended proceedings would also delay the remedies' implementation, prolonging market uncertainty and denying consumers timely protections.

The Moving States have failed to establish any basis for intervention under Rule 24 of the Federal Rules of Civil Procedure.

*First and foremost,* the Motion is untimely. It is black-letter law that "[t]imeliness is the threshold requirement for intervention" under Rule 24 of the Federal Rules of Civil Procedure. *United States v. Oregon*, 913 F.2d 576, 588 (9th Cir. 1990). HPE's acquisition was announced nearly 21 months ago, the United States filed this action nearly nine months ago, and the proposed settlement was filed nearly four months ago. The Moving States' failure to act sooner precludes their intervention today.

*Second,* the Moving States are not entitled to intervention of right under Rule 24(a). The Tunney Act expressly does not require intervention; to the contrary, the Act states clearly that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). Moreover, the Moving States fail to identify a single

protectable right that is impaired by the proposed Final Judgment and not adequately represented by the United States. The proposed Final Judgment is not binding on the States and, when entered, will have no preclusive effect on any claim they decide to bring in their own litigation.

*Third*, the Moving States have not made the case for permissive intervention under Rule 24(b). Neither the Clayton Act nor the Tunney Act implicates the Moving States' roles and duties as state government officers, and they are not involved in *any* other litigation that shares a common question of law or fact with this one. And while the Moving States may disagree with the United States' assessment of the public interest, simply contesting that assessment is not a sufficient basis for intervention. Moreover, their participation would result in undue and unjustifiable delay.

For these reasons and as explained further below, the Court should deny the Motion.

## BACKGROUND

On January 9, 2024, HPE announced its intention to acquire Juniper. Decl. of Jeremy M. Goldstein In Support of Pl.'s Opp'n to Mot. for Intervention ("Goldstein Decl.") ¶ 4. On January 30, 2025, after a nearly one-year investigation, the United States filed the Complaint seeking to enjoin HPE's acquisition of Juniper. *Id.* The Complaint alleged that the acquisition likely would substantially lessen competition in the United States market for enterprise-grade WLAN solutions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Dkt. No. 1 ("Compl.").

The Parties engaged in extensive fact discovery on an expedited basis. Goldstein Decl. ¶ 5; Dkt. No. 104 (setting April 28 and May 28, 2025, as the deadlines for written and document discovery and testimonial discovery, respectively). Between February and May 2025, the Parties collectively served nine requests for production of documents and data, over 200 third-party subpoenas, and three rounds of interrogatories. The United States noticed 25 depositions of fact witnesses (including two 30(b)(6) depositions) and took 23; Defendants noticed 24 depositions and took 22. The Parties served reports from five experts and deposed three of them. *Id.*

On June 27, 2025, less than two weeks before the scheduled start of trial, the United States and Defendants filed a Joint Stipulation and Order that, among other things, indicated the Parties had reached a settlement; a proposed Final Judgment containing the terms of the settlement; and a

3

Competitive Impact Statement, as required by 15 U.S.C. § 16(b). Goldstein Decl. ¶ 6; Dkt. No. 217. The Court entered the Joint Stipulation on June 30, 2025. Dkt. No. 220.

In compliance with the Tunney Act, which provides the public a 60-day period to submit comments to the United States regarding the proposed Final Judgment, the United States published the Complaint, the proposed Final Judgment, and the Competitive Impact Statement, together with directions for submitting written comments, in the *Federal Register* on July 10, 2025. 15 U.S.C. § 16(b); 90 Fed. Reg. 30685 (July 10, 2025). The United States also caused notice of the settlement and comment procedures to be published in the *Washington Post* between July 9 and July 15, 2025, and in the *Mercury News* between July 9 and July 16, 2025. The period for submitting comments closed in mid-September. Goldstein Decl. ¶ 8.

In total, the United States received 12 comments. None were submitted by customers or competitors in the enterprise-grade WLAN market. The United States reviewed all comments and is prepared to file its response shortly after the partial stay in this matter is lifted. Goldstein Decl. ¶ 9.

On September 5, 2025, nineteen states and the District of Columbia, including all the Moving States, submitted a public comment pursuant to the Tunney Act. Goldstein Decl. ¶ 10; Dkt. No. 236-2. (Arizona, Delaware, Maine, Maryland, Michigan, Nevada, and New Mexico signed the comment, but are not among the Moving States.) On October 14, 2025—over a month later—the Moving States filed the instant Motion to intervene pursuant to Federal Rule of Civil Procedure 24 and 15 U.S.C. § 16. The Motion largely repeats arguments raised in the Moving States' September 5 comment.

## STANDARD

Federal Rule of Civil Procedure 24 governs intervention by non-parties, including intervention in Tunney Act proceedings. Fed. R. Civ. P. 24; *Mass. Sch. of L. at Andover, Inc. ("MSL") v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997). Rule 24 provides for two types of intervention: intervention of right, Fed. R. Civ. P. 24(a), and permissive intervention, Fed. R. Civ. P. 24(b). Under either prong of Rule 24, "[t]imeliness is the threshold requirement for intervention." *Oregon*, 913 F.2d at 588. However, courts "analyze the timeliness element more strictly" in the context of permissive intervention. *League of*

*United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997); *see also Nat'l Urban League v. Ross*, Case No. 20-CV-05799-LHK, 2020 WL 6290353, at *3 (N.D. Cal. Oct. 26, 2020).

A movant seeking intervention of right under Rule 24(a) must also establish (1) a significantly protectable interest related to the subject of the action; (2) that it may have that interest impaired by the disposition of the action; and (3) that it will not be adequately represented by existing parties. Fed. R. Civ. P. 24(a)(2); *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020) (denying intervention). A movant seeking permissive intervention under Rule 24(b), which courts may grant or deny at their discretion, must also establish that they have "a claim or defense that shares with the main action a common question of law or fact," Fed. R. Civ. P. 24(b)(1)(B), or are "a federal or state governmental officer or agency . . . if a party's claim or defense is based on a statute or executive order administered by the officer or agency," Fed. R. Civ. P. 24(b)(2)(A), as well as that intervention will not "unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

"In evaluating whether these requirements are met, courts are guided primarily by practical and equitable considerations," *Callahan v. Brookdale Senior Living Cmty., Inc.*, 42 F.4th 1013, 1020 (9th Cir. 2022) (internal quotation marks and citation omitted), and a prospective intervenor bears the burden of proving that these requirements, including timeliness, are met, *Petrol Stops Nw.  v. Cont. Oil Co.*, 647 F.2d 1005, 1010 n.5 (9th Cir. 1981) (affirming denial of intervention on timeliness grounds). "Failure to satisfy any one of the requirements is fatal to the application." *Perry v. Prop. 8 Official Proponents*, 587 F.3d 947, 950 (9th Cir. 2009). The Federal Rules do "not require that rights of indiscriminate intervention be recognized." *Fin. Co. of Am. v. Park Holding Corp.*, 60 F.R.D. 504, 506 (W.D. Pa. 1973). The Rule "should not be understood . . . as meaning that every possible doubt is to be resolved in favor of allowing intervention whenever it is sought," as "[t]he original parties have an interest in the prompt disposition of their controversy and the public also has an interest in efficient disposition of court business." 7C Wright & Miller's Federal Practice and Procedure § 1904 (3d Sept. 2025 Update).

1

**ARGUMENT**

2      The Moving States fail to establish a legal or factual basis for intervention. First, their Motion

3  misstates the purpose and scope of the Tunney Act's public interest inquiry, which only requires courts

4  to consider the *competitive impact* of a proposed consent decree. *See infra* Section I.A. The Moving

5  States' desired probe into the Department's decision-making exceeds the scope of the Act,

6  impermissibly intrudes on the workings of the Executive Branch, and threatens to chill merger

7  settlements. *See infra* Section I.B. Ultimately, the proposed Final Judgment clears the Tunney Act's

8  deferential public interest standard, and the Moving States would be unlikely to establish otherwise,

9  even if their Motion was granted. *See infra* Section I.C.

10      Second, the Moving States have not established a basis for intervention under Rule 24. Their

11  Motion—which comes nearly two years after the merger was announced, nine months after the

12  Complaint was filed, and four months after a settlement was reached—is untimely, and the Moving

13  States offer no justification for their delay. *See infra* Section II.A. Nor do they show that they are

14  entitled to intervention either as of right under Rule 24(a) or permissively under Rule 24(b). There is no

15  intervention as of right under the Tunney Act, but even if that were not the case, the Moving States

16  identify no protectable interest impeded by the proposed Final Judgment—a prerequisite under Rule

17  24(a). *See infra* Section II.B. The Moving States also are not entitled to permissive intervention under

18  Rule 24(b) because they do not administer the Clayton Act, the statute at issue in this case, or identify a

19  claim or defense sharing a common question of law or fact with this case. Moreover, the Moving States'

20  belated intervention would result in undue delay and prejudice the Parties, as their roving discovery plan

21  would drag the proceeding to a halt. *See infra* Section II.C.

22      The Motion should be denied.

23  **I.      The Moving States Intend to Push the Proceedings Beyond the Scope of the Tunney Act**

24      At the outset, the Moving States' Motion fails because it is predicated on a mistaken

25  understanding of the purpose and scope of Tunney Act proceedings. The proposed settlement readily

26  satisfies the Act's public interest standard, which is highly deferential to the Department's assessment of

27  a remedy's competitive impact. Even if they were permitted to intervene, the Moving States could not

28

show otherwise and, to date, have not attempted to do so. Indeed, as the Tunney Act focuses the Court

on the *impact* of the proposed Final Judgment on the relevant market, the Moving States' probe of the

Department's decision-making would impermissibly exceed the scope of the Tunney Act's public

interest analysis and raise both constitutional and other policy concerns.

A. **The Tunney Act Sets Forth a Specific Form of Judicial Review of a Proposed Antitrust Settlement's Competitive Impact**

The Tunney Act prescribes a limited role for the judiciary in reviewing proposed consent

decrees. *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995) (cautioning that

while courts "can and should inquire . . . into the purpose, meaning, and efficacy of the decree" and

insist ambiguities or implementation difficulties be addressed, they "must be careful not to exceed

[their] constitutional role"). The Court's authority is binary: it may approve a decree that falls within the

"reaches of the public interest," or it may reject one that does not. *Id.* at 1461–62. "Short of that

eventuality, the Tunney Act cannot be interpreted as an authorization for a district judge to assume the

role of Attorney General." *Id.* at 1462. The relevant portion of the Tunney Act states:

(e) Public interest determination

> (1) Before entering any consent judgment proposed by the
> United States under this section, the court shall determine that the entry of
> such judgment is in the public interest. For the purpose of such
> determination, the court shall consider—
>
>> (A) the competitive impact of such judgment, including
>> termination of alleged violations, provisions for enforcement and
>> modification, duration of relief sought, anticipated effects of
>> alternative remedies actually considered, whether its terms are
>> ambiguous, and any other competitive considerations bearing upon
>> the adequacy of such judgment that the court deems necessary to a
>> determination of whether the consent judgment is in the public
>> interest; and
>>
>> (B) the impact of entry of such judgment upon competition in the
>> relevant market or markets, upon the public generally and
>> individuals alleging specific injury from the violations set forth in
>> the complaint including consideration of the public benefit, if any,
>> to be derived from a determination of the issues at trial.
>
> (2) Nothing in this section shall be construed to require the court to
> conduct an evidentiary hearing or to require the court to permit anyone to
> intervene.

7

15 U.S.C. § 16(e).

While the statute does not define the term "public interest," the term's scope is delineated by a list of factors that a court "shall consider" as part of its public interest determination.[1] *See* 15 U.S.C. § 16(e)(1)(A) & (B). All of the factors enumerated in both Section 16(e)(1)(A) and (B) share a common aim: they require the court to consider the *competitive impact* of the proposed consent judgment on individuals, businesses, and the economy.

With respect to the adequacy of the relief secured by the proposed judgment, the Ninth Circuit has held that a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)). Instead:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is "*within the reaches of the public interest.*" More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted). Further, a court's "ultimate authority under the [Tunney] Act is limited to approving or disapproving the consent decree." *BNS*, 858 F.2d at 464. A court cannot compel the Department to pursue litigation if the Executive Branch, in its discretion, determines not to do so.

Furthermore, a court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations because this may only reflect underlying weakness in the government's case or concessions made during

---

[1] The Supreme Court has "long held that the words 'public interest' in a regulatory statute do not encompass the general public welfare but rather take meaning from the purposes of the regulatory legislation." *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2507 (2025) (quoting *NAACP v. FPC*, 425 U.S. 662, 669 (1976)) (internal quotation marks omitted). To determine these purposes and inform its interpretation of the term, the Court must look to the "broader statutory context[]." *Id.* at 2503; *see also New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932) ("It is a mistaken assumption" that the phrase "public interest" is "a mere general reference to public welfare without any standard to guide determinations"; rather, "[t]he purpose of the [Transportation] Act, the requirements it imposes, and the context of the provision in question show the contrary").

8

negotiation." *United States v. SBC Commc'ns, Inc*, 489 F. Supp. 2d 1, 17 (D.D.C. 2007); *see also Microsoft*, 56 F.3d at 1461 (a court should be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75-76 (D.D.C. 2014) (a court should not reject the proposed remedies because it believes others are preferable and room must be made for the government to grant concessions in the settlement negotiation process); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (a court should grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). The United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *accord United States v. Iron Mountain, Inc*., 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (also stating that the United States need only provide a factual basis for concluding that a settlement is reasonably adequate).

### B.    The Tunney Act Does Not Grant the States Oversight of the Federal Government

The implications of the Moving States' request cannot be overstated. The Moving States wish to probe the process that led to the proposed settlement. Mot. at 6. But none of the Tunney Act's enumerated factors authorizes or requires an inquiry into the Department's internal decision-making. As explained above, the factors enumerated in Section 16(e)(1)(A) and (B) of the Tunney Act only require a court to consider the *impact* of the proposed consent judgment *on competition*. Indeed, when Congress amended the Tunney Act in 2004, it modified the Act's catchall clause allowing court examination of "any other considerations bearing upon the adequacy of such judgment" by adding the adjective "*competitive*" before "considerations." *Compare* 15 U.S.C. § 16(e)(1) (effective to June 21, 2004), *with* 15 U.S.C. § 16(e)(1)(A) (effective June 22, 2004) (emphasis added). This modification confirms that Congress wished to focus the court's analysis on *competitive* considerations. Furthermore, the Ninth Circuit has emphasized that the court's "ultimate authority under the [Tunney] Act is limited to approving or disapproving the consent decree." *BNS*, 858 F.2d at 464.

Even if that were not the case, the Moving States' request for all "communications, documents, and information exchanged between Defendants or their representatives and the DOJ during settlement

1   discussions," Mot. at 7, is flatly at odds with the Tunney Act's well-considered transparency provision.

2   *See* 15 U.S.C. § 16(g). The Tunney Act requires HPE to disclose "any and all written or oral

3   communications" by or on behalf of HPE by the company's officers, directors, employees, or agents

4   "with any officer or employee of the United States," but specifically *exempts* from disclosure "any such

5   communications made by counsel of record alone with the Attorney General or the employees of the

6   Department of Justice alone." 15 U.S.C. § 16(g).[2]

7        The Moving States claim an interest in investigating "the process that led to the settlement," *see*

8   Mot. at 10, but they can point to no act of Congress that would justify disclosure beyond that required by

9   the Tunney Act's carefully delineated transparency provision, let alone grant the States oversight over

10  the Executive Branch of the federal government. In their public comments, the Moving States repeatedly

11  quote a former political appointee's speech about the settlement agreement, including criticism that there

12  had not been "lobbying done the right way." Ex. A to State Comments at 4, Dkt. No. 236-2. But Tunney

13  Act proceedings are not vehicles for courts—let alone the Moving States—to opine on what constitutes

14  "legitimate lobbying," to use the former political appointee's term. Rather, to protect against the

15  possibility that lobbying may have led to a settlement agreement that does not address the harms alleged

16  in an antitrust complaint, the Tunney Act provides the statutory roadmap for a court to substantively

17  assess the settlement agreement itself. *See* 15 U.S.C. § 16(e)(1). To the extent the Moving States have

18  concerns about the proposed settlement by the United States, they may avail themselves of the Tunney

19  Act's public comment process, as they have done.

20       Beyond that, probing the Department's internal deliberation would intrude improperly into

21  Executive Branch processes. The Supreme Court has long recognized "that further judicial inquiry into

22  'executive motivation' represents 'a substantial intrusion' into the workings of another branch of

23  Government and should normally be avoided." *DOC v. New York*, 588 U.S. 752, 781 (2019) (quoting

24  *Arlington Hghts. v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268, n.18 (1977)). Some evidence

25  would be shielded by the deliberative process privilege or other privileges. *See FTC v. Warner*

26  _____

    [2] This exemption was purposeful, as Senator Tunney wanted to ensure "the free flow of opinion"
27  between counsel for the United States and defendants about the "various ramifications of the
    settlement." *Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies and*
28  *Commercial Law of the H. Comm. on the Judiciary*, 93d Cong. 40 (1973) (statement of Sen. Tunney).

*Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (defining bounds of common law deliberative process privilege). In addition, compelling testimony from senior Department officials about their reasons for taking official actions would raise significant separation of powers concerns. *See United States v. Morgan*, 313 U.S. 409, 421–22 (1941) (explaining that a court's inquiry into the Secretary of Agriculture's "mental processes" offended the independence of the Executive Branch); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586–87 (D.C. Cir. 1985) (citing *Morgan*'s reasoning in upholding administrative law judge's decision to bar testimony from four sub-cabinet Department of Labor officials). Indeed, courts of appeals have issued writs of mandamus when district courts, absent clear necessity and legal justification, sought to compel production of privileged evidence from Executive Branch agencies or force testimony from senior Executive Branch officials. *See, e.g.*, *In re United States Dep't of Educ.*, 25 F.4th 692, 703–06 (9th Cir. 2022) (writ of mandamus to quash deposition subpoena to former Secretary of Education because of failure, among other factors, to show clear necessity of testimony); *Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (writ of mandamus to vacate discovery orders because district court did not adequately consider application of presidential communications privilege and deliberative process privilege); *In re United States (Jackson)*, 624 F.3d 1368 (11th Cir. 2010) (writ of mandamus to prevent compelled testimony of EPA Administrator); *In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008) (writ of mandamus to prevent compelled testimony of Vice President's chief of staff); *In re United States (Holder)*, 197 F.3d 310 (8th Cir. 1999) (writ of mandamus to prevent compelled testimony of Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055 (5th Cir. 1995) (writ of mandamus to quash deposition subpoenas to three FDIC board members); *In re United States (Kessler)*, 985 F.2d 510 (11th Cir. 1993) (writ of mandamus to prevent compelled 30-minute telephone testimony of FDA Commissioner).

Even if the Court desires additional information after reviewing the upcoming submissions—which the United States does not believe will be necessary—involving the States as parties would be counterproductive to resolving any issues. The Tunney Act adds to antitrust settlements a layer of judicial review, not political theater. Allowing intervention by states whose political leadership disagrees

1    with the merger enforcement decisions of the United States would risk undermining the independent

2    judicial process.

3         Finally, the process sought by the Moving Parties may chill merger settlements and contravene

4    the public interest and the Tunney Act's purpose, expressed in its legislative history, of encouraging

5    reasonable resolutions that promptly restore competition. *See*, *e.g.*, S. Rep. No. 93-298, at 7 (1973)

6    ("[T]he [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust

7    enforcement tool."); H. Rep. No. 93-1463, at 6 (1974) (expressing intent to preserve the policy of the

8    antitrust laws to encourage settlement).

9        **C.**    **The Proposed Settlement Readily Satisfies the Tunney Act**

10         The Moving States argue that the proposed settlement "fails to address the competitive concerns

11    outlined in the United States' own Complaint," Mot. at 9, but they cannot supplant the United States's

12    determination of the proposed Final Judgment's efficacy with their own. *See SBC Commc'ns, Inc*,

13    489 F. Supp. 2d at 17 (the nature of Tunney Act proceedings call for limited review); *Microsoft*, 56 F.3d

14    at 1461 (review of a proposed consent decree should not presume that the complaint's allegations have

15    been made out). The United States "need only provide a factual basis for concluding that the settlements

16    are reasonably adequate remedies for the alleged harms," and the United States has easily done so here.

17    *See SBC Commc'ns*, 489 F. Supp. 2d at 17. Their intervention in this case, then, is unlikely to affect the

18    Court's determination of whether the proposed Final Judgment is in the public interest.

19         As will be addressed in fuller detail in the United States's forthcoming response to public

20    comments, the proposed settlement improves competitive conditions in the relevant market of

21    enterprise-grade WLAN services in several ways.

22         **The proposed settlement requires the Defendants to divest "Instant On," an enterprise-**

23    **grade WLAN business.** This divestiture is designed to create opportunities for business growth, product

24    innovation, and increased competition in the market for enterprise-grade WLAN solutions. The

25    proposed settlement requires that within 180 calendar days after the filing of the proposed Final

26    Judgment, or five days after the entry of the Final Judgment, whichever is later, HPE must divest HPE's

27    worldwide Instant On campus and branch business. Dkt. No. 217-1 at 5. The Instant On business

28

operates in the market for enterprise-grade WLAN solutions alleged in the Complaint. *See* Dkt. No. 1 ¶¶ 34-38. Its divestiture to a company that can compete in that market should create opportunities for business growth, product innovation, and increased competition in the market for enterprise-grade WLAN solutions, regardless of whether Instant On is aimed today at small, medium, or large enterprises. The proposed Final Judgment also takes steps to ensure the success of the divestiture by mandating divestiture of *all* tangible and intangible assets related to or used in connection with this business, including contracts, agreements, and customer relationships included in the business. Dkt. No. 217-1 at 5.

**The proposed settlement requires the Defendants to license relevant and valuable source code.** The proposed settlement requires that within 180 calendar days after the filing of the proposed Final Judgment, or five days after the entry of the Final Judgment, whichever is later, HPE must hold an auction to issue one or more perpetual, worldwide, non-exclusive licenses for the AI Ops for Mist Source Code. Dkt. No. 217-1 at 10. As the Complaint alleges, Juniper Mist's AI Ops capabilities competitively differentiate its enterprise-grade WLAN solutions. Compl. ¶¶ 6-7. Since 2019, Juniper has leveraged that technology to increase its revenues and market share, forcing HPE to compete more aggressively in response, including by investing resources into further developing its own AI Ops offerings. *Id.* ¶¶ 8-11. Requiring HPE to license a key ingredient of Juniper's competitive success to one or more companies that can compete in the market for enterprise-grade WLAN solutions is designed to increase competition and innovation in that market. Under the terms of the auction, HPE must issue two licenses if more than one bid exceeds $8 million. Dkt. No. 217-1 at 12. As the licensees have the right to further develop the licensed source code for their networking products, they would own improvements developed after the license date—a term that will encourage additional innovation in the market. *Id.* at 13.

Again, the proposed Final Judgment takes steps to ensure the success of the auction by permitting the primary licensee to contract with HPE for transition services, including the transfer of up to 30 engineers familiar with the source code and 25 sales personnel experienced in selling Juniper's enterprise-grade WLAN solutions. Dkt. No. 217-1 at 11. HPE must facilitate introductions for the

13

primary licensee to Juniper's suppliers, distributors, and channel partners in the United States. *Id.* at 11–12. These transition services will provide the primary licensee with the expertise and support needed to fully integrate the Mist source code into its product lines and develop new business opportunities. The proposed Final Judgment also provides for the appointment of a Trustee should HPE not license the source code in a timely manner. *Id.* at 13–16. In addition, the United States reserves the absolute right to reject any proposed licensee. *Id.* at 10.

**The proposed settlement includes other terms to protect competition in the relevant market.** The proposed Final Judgment requires HPE to submit affidavits to the United States every 30 days documenting the company's efforts to sell the divestiture assets and conduct the source code auction. Dkt. No. 217-1 at 18. HPE has timely submitted these affidavits. The proposed Final Judgment also provides a mechanism for the United States to inspect HPE's records and operations to ensure compliance with the terms of the judgment. *Id.* at 19.

\* \* \*

The proposed settlement is well "within the reaches of the public interest." *See Bechtel*, 648 F.2d at 666. Thus, the Moving States are unlikely to establish that the proposed settlement fails the Tunney Act's deferential public interest standard, even if they were permitted to intervene.

## II.    The Moving States Have Not Established a Basis for Intervention Under Rule 24

Setting aside the merits of the consent decree and the role of the judiciary in reviewing it, the Moving States have not satisfied the requirements for intervention. The Moving States are untimely in seeking intervention. And they have also failed to satisfy the remaining requirements of either intervention as a matter of right or permissive intervention.

### A.    The Moving States' Motion Fails At This Late Stage

Regardless of whether the Moving States are seeking to intervene by right or permissively, they fail to establish that their request is timely. *See Oregon*, 913 F.2d at 588. A Rule 24 timeliness analysis focuses on three primary factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004); *see also United States v. Chicago*, 870 F.2d

1256, 1263 (7th Cir. 1989) ("The purpose of the requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." (internal quotation marks and citation omitted)). *No factor supports the Moving States' belated intervention.*

Specifically, intervention is untimely here because it comes at a very late stage in the litigation. *See, e.g., Aleut Corp. v. Tyonek Native Corp.*, 725 F.2d 527, 530 (9th Cir. 1984) (affirming denial of intervention motion on "the eve of settlement" as untimely). Defendants announced their merger on January 9, 2024—nearly two years ago. The United States initiated this lawsuit nine months ago. Written and document discovery closed in April; testimonial discovery closed in May; and expert discovery closed several weeks later. The Parties then drafted and exchanged expert reports; proposed findings of fact and conclusions of law; and prepared for trial. Ultimately, the Parties announced a settlement and a proposed Final Judgment over four months ago. Even the Tunney Act's public comment period has been closed for over a month. The arguments attacking the proposed settlement that the Moving States now assert in their Motion recycle what they have presented in their public comments over seven weeks ago. At no point prior to now—in the midst of a government shutdown with reduced Department and judicial resources—have the Moving States indicated an interest in joining this case.

Rule 24 does not countenance the Moving States' delay. Timeliness is measured from the date an intervenor knew or should have known that its rights would be affected by the litigation. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003). The Moving States claim an interest in protecting their citizens from anticompetitive harms flowing from unlawful mergers. Mot. at 1, 7. As they concede, though, the United States alleged in January 2025 that Defendants' acquisition would result in exactly those harms, putting them on notice that their purported interests were implicated by this action. *See, e.g.*, Mot. at 3, 5 (arguing that the settlement does not address harms alleged in the United States' Complaint and pretrial brief). That the Moving States nonetheless did nothing for the better part of a year, while this case proceeded to trial under the Court's schedule, is fatal to their Rule 24 application. *Compare Roeder*, 333 F.3d at 233 (intervention was timely when the government moved to intervene less than 30 days after receiving notice of potential conflict implicating its interests).

The Moving States try sidestepping the issue by saying they "reasonably believed their interests were protected" by the United States until it settled. Mot. at 9. But Rule 24's timeliness standard rarely excepts periods in which others were representing a putative intervenor's interests, and no exception should be applied here. *Compare Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 277–78 (2022) (permitting a state attorney general to intervene after health secretary declined opportunity to continue defending state law in federal court). The Moving States have identified no meaningful change in litigation posture; on the contrary, the United States brought an enforcement action to protect competition in the relevant market and then reached a settlement with Defendants designed to do exactly that. And, even after the settlement terms were announced in June, the Moving States continued to sit on the sidelines. No argument is asserted now that was not available to the Moving States months ago—and no argument the Moving States bring is directed to the competitive impact of the proposed Final Judgment. Rule 24 does not sanction their "strategic choice" to delay intervention until litigation was not only "quite advanced," but nearly completed. *See Love v. Vilsack*, 304 F.R.D. 85, 91 (D.D.C. 2014), *aff'd,* 2014 WL 6725758 (D.C. Cir. Nov. 18, 2014) (denying intervention).

Moreover, the Moving States offer no justification for their delay. *See Alisal Water*, 370 F.3d at 921. Even accepting their argument that they believed their interests were represented by the United States during litigation, they provide no colorable reason for waiting nearly four months after the terms of the proposed Final Judgment were made public in June 2025 and three months after the July 2025 public reporting cited in their Motion. *Cameron*, 595 U.S. at 279–80 ("[T]he most important circumstance relating to timeliness is that the attorney general sought to intervene as soon as it became clear that the Commonwealth's interests would no longer be protected by the parties in the case"—*two* days after learning that a state secretary would no longer continue to defend a state statute (internal quotation marks and citation omitted));[3] Mot. at 1 n.1. Earlier this year, a court rejected Apple's tardy attempt to intervene in *United States v. Google* because Apple waited 76 days after the United States

---

[3] *See also United Airlines, Inc. v. McDonald*, 432 U.S. 385, 390, 394 (1977) (intervention sought only 18 days after entry of final judgment); *Karsner v. Lothian*, 532 F.3d 876, 886 (D.C. Cir. 2008) (intervention sought less than a month after petition to confirm the stipulated award); *Nat. Res. Def. Council v. Costle*, 561 F.2d 904, 907 (D.C. Cir. 1977) (intervention sought within 23 days of receiving notice of settlement).

filed a proposed remedy affecting its interests. *See, e.g.,* Mem. Op. and Order, *United States v. Google*, Case No. 20-cv-3010, Dkt. No. 1153 (Jan. 27, 2025), *aff'd,* 2025 WL 88052 (D.C. Cir. Mar. 21, 2025). There, the State of Colorado and several other Moving States *opposed* Apple's motion as untimely, even though Apple acted faster than those same States did in seeking intervention here.

The Moving States' reliance on *United States v. Aerojet Gen. Corp.*, Mot. at 9, does not help their cause. There, the parties did not dispute the timeliness of the applicants' motion to intervene within four months of learning of a proposed consent decree. And, regardless, the applicants moved to intervene within one month of receiving information from the Environmental Protection Agency in response to Freedom of Information Act requests. 606 F.3d 1142, 1148–49 (9th Cir. 2010).

Because the Moving States' eleventh-hour attempt to intervene in this case is untimely, it should be rejected out of hand.

## B.    The Moving States Are Not Entitled to Intervene As of Right Under Rule 24(a)

The Moving States seek intervention of right pursuant to Rule 24(a)(2), arguing that they have an interest in ensuring a thorough Tunney Act review and rejection of settlements reached by the United States that are not in the public interest. Mot. at 7. But the Tunney Act does not permit intervention as a matter of right. Even if it did, the Moving States have not identified a single significant protectable right that is impaired by the disposition of the case and not adequately represented by the United States.

### 1.    The Tunney Act Does Not Confer Intervention as of Right

As a threshold issue, by the Tunney Act's express terms, the Court is not required to allow any party to intervene. 15 U.S.C. § 16(e)(2) ("Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene."). Thus, Rule 24(a) is not an available avenue for intervention by the Moving States because "in cases under the [Tunney Act] no third-party participation is of right." *United States v. Heileman,* 563 F. Supp. 642, 647–48 (D. Del. 1983); *United States v. AT&T Co.*, 552 F. Supp. 131, 218 (D.D.C. 1982) ("Congress intended intervention, and the scope of the intervention if allowed, to be discretionary.").

Before a settlement agreement between the Department of Justice and a party charged with violations of the federal antitrust laws takes effect, the Tunney Act requires the court to "determine that

the entry of such judgment is in the public interest." 15 U.S.C. § 16(e). In making that determination, the Act provides that "the court *may* . . . authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance *amicus curiae* [and] intervention as a party pursuant to the Federal Rules of Civil Procedure[.]" *Id.* § 16(f)(3) (emphasis added). Courts interpret Section 16(f) as signifying that, despite the Federal Rules' providing for intervention of right in other contexts, Tunney Act "intervention is committed entirely to the discretion of the court." *Heileman*, 563 F. Supp. at 647; *see also AT&T*, 552 F. Supp. at 218 (holding that the means of information gathering under the Tunney Act "were to be regarded as permissive"). The Moving States' attempt to shoehorn their untimely Motion under Rule 24(a) therefore fails.

### 2.     The Moving States Have Not Shown Impairment of a Protectable Interest

The Tunney Act's plain language that it does not provide intervention of right should be the end of the analysis under Rule 24(a). As a separate reason to deny intervention under Rule 24(a), the Moving States have also failed to identify an impairment of a protected interest and Article III standing.

The Moving States first assert a "strong interest" in "preventing unlawful mergers from harming their citizens." *See*, *e.g.,* Mot. at 1, 7. But the proposed Final Judgment does not impede that interest in any way. The proposed Final Judgment is not binding on the Moving States; when entered, it will have no preclusive effect on any claim they may wish to raise in their own litigation. *Compare Sam Fox Publ'g Co. v. United States*, 366 U.S. 687, 689 (1961) (even a person who shares an interest in government antitrust litigation is "not bound by the eventuality of such litigation"), *with MSL*, 118 F.3d at 781 ("A decree with *res judicata*, collateral estoppel, or *stare decisis* effect might very well affect [the potential intervenor's] ability to protect its interests"). Entry of the proposed Final Judgment does not prejudice the Moving States' ability to bring their own Clayton Act challenge to the merger if they question the sufficiency of the settlement reached by the United States. *See*, *e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225 n.21 (S.D.N.Y. 2020). Nor is there any pending litigation in which documents from this case might be relevant and which the Moving States can *only* obtain by intervening in this Tunney Act proceeding. *See MSL*, 118 F.3d at 781-82 (granting intervention as of right in Tunney Act proceeding to private party seeking documents for use in separate lawsuit); *United*

*States v. Alex. Brown & Sons*, 169 F.R.D. 532, 539–40 (S.D.N.Y. 1996) (same). The Moving States'
acknowledgement that they retain an independent ability to "pursue a claim for relief to block
Defendants' merger," Mot. at 7, 9, but have not yet done so, defeats any showing of impairment in this
case.

The Moving States next argue that their participation in Tunney Act processes is needed because
the proposed Final Judgment is flawed and the United States and Defendants are "parties to the
Settlement and will advocate for its approval." Mot. at 11. But the United States' failure to secure a
settlement on what may be the Moving States' preferred terms is not enough to establish that the two
sides' interests are misaligned. *See Callahan*, 42 F.4th at 1021 (attacking the sufficiency of a settlement
"ultimately amounts to a disagreement over litigation strategy," not a substantive misalignment of
interests); *MSL*, 118 F.3d at 781 ("[W]e do not think representation is inadequate just because a would-
be intervenor is unable to free-ride as far as it might wish—a well-nigh universal complaint."). Were it
otherwise, any state or other dissatisfied party could intervene in Tunney Act proceedings as a matter of
right. *See Deutsche Bank Nat. Tr. Co. v. F.D.I.C.*, 717 F.3d 189, 192–93 (D.C. Cir. 2013) (describing an
intervenor's argument as "swimming up river" because, if allowed, there would be no basis to reject
similarly situated others).[4]

The Moving States also assert "an interest in ensuring a thorough Tunney Act review and in
rejection of settlements reached by the federal government that are not in the public interest." Mot. at 7.
But that too does not qualify the States for intervention as right. The Moving States do not have a
protectable interest in reviewing Department-negotiated antitrust settlements under either the Clayton
Act or the Tunney Act, neither of which grants the Moving States special status as "sovereign and joint
enforcers of the antitrust laws[.]" Mot. at 9. The Clayton Act, in fact, treats the Moving States no
differently than private citizens. Unlike the Department of Justice, which is expressly identified as a
statutory enforcer under the Act, the Moving States are "person[s]" who may sue to enjoin a merger in
their *parens patriae* capacity as representatives of their citizens. *See* 15 U.S.C. §§ 25, 26; *California v.*

---

[4] Unsurprisingly, Tunney Act proceedings generally reflect agreement between the United States and antitrust defendants, as they negotiated a settlement and presented a consent decree for approval. There is nothing unusual about the posture of the Parties in this case.

PLAINTIFF'S OPPOSITION TO MOTION FOR INTERVENTION
CASE NO. 5:25-CV-00951-PCP

1  *Am. Stores Co.*, 495 US 271, 278-79, 293-94 & n.28 (1990) (holding that the State of California, suing

2  as a private party under Section 16, could seek the equitable remedy of divestiture).[5] *See also Georgia v.*

3  *Penn. RR*, 324 U.S. 439, 447 (1945) (states seek injunctive relief as "a 'person' within the meaning of

4  [Section] 16 of the Clayton Act"). The Tunney Act similarly bestows on the Moving States no special

5  investigative status, and the Moving States cite no case law saying otherwise.

6      Without a protectable interest in this case, the Moving States also lack standing to intervene as of

7  right. "[A]n intervenor of right must have Article III standing in order to pursue relief that is different

8  from that which is sought by [the parties]." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433,

9  439–40 (2017) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). And "[a]n interest shared

10  generally with the public at large in the proper application of the . . . laws will not do." *Arizonans for*

11  *Official English v. Arizona*, 520 U.S. 43, 64 (1997). Indeed, the Moving States had no standing to

12  intervene as of right in the *United States*' antitrust case at any point; to the extent the Moving States

13  believe there is a competitive problem with the transaction, they can bring their own federal antitrust law

14  claim (as a private party) or pursue the transaction under state law. *See* 15 U.S.C. §§ 16(d), 26. *Cf.* Mot.

15  at 10 ("States likewise may settle cases with or without the United States."). Nor have the Moving States

16  failed to avail themselves of any right to be heard—they have already taken advantage of the Tunney

17  Act process by filing a public comment voicing their concerns with the proposed settlement. *See* Dkt.

18  No. 236-2. They have not explained why these avenues are insufficient for their purposes. Intervention

19  should be denied.

20      **C.    The Court Should Deny Permissive Intervention Under Rule 24(b)**

21          **1.    Rule 24(b)(2) Is Inapplicable Because the States Do Not Administer the**

22              **Clayton Act**

23      Rule 24(b)(2) permits a court to grant intervention to a "state governmental officer or agency" if

24  an original party to the lawsuit's claim or defense is based on "a statute or executive order administered

---

25      [5] The States mischaracterize this precedent twice, selectively quoting the opinion to say: "state
26  enforcement of federal antitrust laws" and "authority given to State Attorneys General 'was an integral
   part of the congressional plan for protecting competition.'" Mot. at 9-10, 12. The full quote clearly, and
27  accurately, describes state enforcement as that of a private party: "Private enforcement of the Act was in
   no sense an afterthought; it was an integral part of the congressional plan for protecting competition."
28  *Am. Stores*, 495 U.S. at 284.

by the officer or agency" or "any regulation, order, requirement, or agreement issued or made under the statute or executive order." Fed. R. Civ. P. 24(b)(2). Here, however, the Moving States (or any other State) do not "administer" the Clayton Act, the federal statute at issue in this litigation. When enacting the Clayton Act in 1914 and authorizing private parties to seek injunctive relief in Section 16, 15 U.S.C. § 26 ("Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief"), Congress considered and rejected a statutory provision that would have authorized "the attorney general of any State [to] bring suit in the name of the United States to enforce any of the antitrust laws." 51 Cong. Rec. S14,476 (daily ed. Aug. 31, 1914). To this day, that duty rests solely with the Department, 15 U.S.C. § 25, and the Federal Trade Commission, 15 U.S.C. § 21.

Today, the Hart-Scott-Rodino Act tasks "the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice" with conducting merger reviews. *See* 15 U.S.C. § 18a. There is no equivalent provision in the federal antitrust laws for the state enforcers, who are permitted to sue to enjoin mergers using the same federal statutory provision available to private parties, or to bring an action under applicable State law. *See supra* Section II.B.2. Similarly, the States do not "manage[], direct[], or supervise[] the application of" the statute. *McHenry v. Comm'r*, 677 F.3d 214, 220–21 (4th Cir. 2012) (rejecting the Virgin Islands' argument "that it has an interest in the IRS's" enforcement of a tax provision because "claiming an interest arising from [a] disagreement with the [federal agency] over enforcement of the [statute] is quite distinct from claiming that the [potential intervenor] administers any provision of" the statute) (emphases omitted).

### 2. Rule 24(b)(1)(B) Is Inapplicable Because the Moving States Do Not Have Claims that Share Common Questions with This Action

Rule 24(b)(1)(B) applies only if the proposed intervenor "has a claim or defense that shares with the main action a common question of law or fact."[6] Fed. R. Civ. P. 24(b)(1)(B). In the Tunney Act context, courts have found that an intervenor meets this "threshold requirement" when they filed a separate lawsuit seeking "to prove and remedy some of the very same anticompetitive conduct" alleged in the government's complaint. *See MSL*, 118 F.3d at 782 (allowing law school to intervene for purposes

---

[6] Because the Tunney Act does not give "a conditional right to intervene," Rule 24(b)(1)(A) is also not applicable. Fed. R. Civ. P. 24(b)(1)(A).

of Tunney Act appeal where it brought an antitrust suit more than a year and a half before the government filed its complaint with overlapping legal and factual issues); *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1234–36 (D.C. Cir. 2004) (allowing two associations to intervene for purposes of a Tunney Act appeal where members of those associations had brought antitrust suits that overlapped with the government's case).[7] Here, in contrast, the Moving States point to no other litigation they are involved with that raises common claims or defenses. And there is none.

Even in the handful of Tunney Act proceedings where courts found that putative intervenors met the Rule 24(b)(1)(B) threshold without a separate lawsuit, the courts made those findings when considering whether intervention should be allowed for an appeal of the court's public interest finding—not for opening wide-ranging discovery well beyond the scope of the Tunney Act, as the Moving States seek here. *See United States v. SBC Commc'ns, Inc.*, Civ. A. Nos. 05-2102 (EGS), 05-2103 (EGS), 2007 WL 1830866, at *1–2 (D.D.C. June 26, 2007) (finding that potential intervenor met Rule 24(b)(1)(B)'s threshold requirement for intervention for purposes of an appeal); *United States v. Thomson Corp.*, Civ. A. No. 96-1415 (PLF), 1997 WL 90992, at *4–5 (D.D.C. Feb. 27, 1997) (allowing intervention for purposes of appeal); *see also AT&T*, 552 F. Supp. at 217–20 (differentiating between intervention pre-judgment and post-judgment). In this matter, the Court has not yet entered a judgment, and an appeal is not ripe.

Finally, the Tunney Act does not entitle the Moving States to expand the scope of the Court's public interest inquiry through intervention. "They are not entitled to intervene simply to advance their own ideas of what the public interest requires." *Heileman*, 563 F. Supp. at 648. "[C]ourts have consistently denied intervention to private parties whose views about the proper terms for an antitrust settlement differed from those of the United States." *Id.*; *see also United States v. CVS Health Corp.*, Civ. A. No. 18-02340 (RJL) (D.D.C. Dec. 17, 2018) (denying motion to intervene); *United States v. InBev N.V./S.A.*, Civ. A. No. 08-1965 (JR) (D.D.C. Feb. 3, 2009) (same); *United States v. Thomson Corp.*, Civ. A. No. 96-1415 (PLF), 1996 WL 554557, at *3 (D.D.C. Sept. 25, 1996) (same).

---

[7] Because the Rule 24(b)(1)(B) threshold was previously codified in Rule 24(b)(2), these decisions, among others, cite to Rule 24(b)(2). The same holds true for the Rule 24(b)(3) delay or prejudice standard, which was also previously codified in Rule 24(b)(2).

1  **3.  The Moving States' Participation Will Result in Undue Delay And Prejudice**

2      Even if the Moving States could satisfy the requirements of Rule 24(b)(1)(B) or 24(b)(2), they

3  must also show that their intervention will not unduly delay or prejudice the adjudication of the Parties'

4  rights under Rule 24(b)(3). *See* Fed. R. Civ. P. 24(b)(3). They cannot do so here.

5      The Moving States' proposed new discovery would halt the proceeding in its tracks while they

6  revisit the merits of the case and reevaluate the efficacy of the proposed Final Judgment—months after

7  the close of discovery. *See* Mot. at 13 (outlining the Moving States' plan to "issue straightforward initial

8  discovery requests," "determine what, if any, further discovery should be conducted," and *then* "offer

9  the Court a specific proposal for an evidentiary hearing"). The Moving States characterize their "initial

10 discovery requests" as modest, but in fact responding to them would not be straightforward at all. Their

11 plan would impose a substantial unnecessary burden on the United States, as well as on Defendants and

12 non-parties. The Parties' pretrial materials, including their expert reports and planned trial exhibits,

13 include materials with dozens of third parties' protected confidential information. Releasing that

14 information to the States could require modification of the Protective Order and entail time-intensive

15 third-party notifications. The time needed for the Parties to deliver, and for the States to assess, such

16 information would impose extreme delays in concluding the Tunney Act process. And without doubt,

17 the States' "initial" discovery would be followed by efforts to demand more. Furthermore, if the Moving

18 States were permitted to intervene and conduct discovery, this Court could not then reasonably deny the

19 Parties the opportunity to take discovery from the States as well. The States' intervention would lead to

20 wasted judicial and party resources and would cause undue prejudice.

21      Further, in applying Rule 24(b)(3) in the context of the Tunney Act, courts have correctly

22 recognized that "the intervention issue and the merits merge." *MSL*, 118 F.3d at 783. Accordingly, it is

23 appropriate for the Court to "take a 'peek at the merits'" when deciding whether permissive intervention

24 is warranted. *Id.* (permissive intervention only warranted in a Tunney Act proceeding if the potential

25 intervenor can show that the proposed judgment is not in the public interest). *See also SBC Commc'ns*,

26 2007 WL 1830866, at *2–3 (permissive intervention unwarranted after taking a peek at the merits).

27

28

1    Here, a peek at the merits shows that entry of the proposed Final Judgment is in the public

2  interest and addresses competitive harms alleged in the Complaint. *See supra* Section I.C. The

3  divestiture of Instant On—a fully operational enterprise-grade WLAN business including hardware,

4  software, and intellectual property—will create or strengthen an independent competitor in the market at

5  issue. The mandatory licensing of Mist AI Ops source code provides access to the technology that

6  enabled Juniper to spur price and product innovation, Compl. ¶¶ 6–11, 44–48, allowing multiple firms to

7  develop competing solutions. These remedies directly address the loss of head-to-head competition

8  alleged in the Complaint while preserving any procompetitive aspects of the merger. Notably, not a

9  single customer or competitor filed a public comment opposing the proposed Final Judgment.

10    Critically, the settlement embodies a prudent compromise that accounts for litigation risk. While

11  the United States mounted a case that it believed had a likelihood of success, the Defendants advanced

12  credible defenses that introduced meaningful uncertainty. *See* Dkt. Nos. 200–01. In such scenarios,

13  settlements serve the public interest by securing tangible protections rather than gambling on an all-or-

14  nothing trial that could leave consumers with no relief. Requiring the Department to reject reasonable

15  settlements and litigate every case to conclusion—even those where success is uncertain—would waste

16  scarce government and private resources, delay benefits to consumers, and create perverse incentives

17  that discourage enforcement of mergers with less-than-certain violations. *See United States v. Armour &*

18  *Co.*, 402 U.S. 673, 681 (1971) (noting the benefits of consent decrees in saving parties from "the time,

19  expense, and inevitable risk of litigation," and how such agreements are naturally compromises in which

20  "the parties each give up something they might have won had they proceeded with the litigation").

21    Accordingly, because the compromises embodied in the proposed Final Judgment are reasonable

22  and well "within the reaches of the public interest," *Bechtel*, 648 F.2d at 666, the Moving States are

23  unlikely to succeed in arguing that the proposed Final Judgment should be rejected. Intervention by the

24  Moving States would only unduly delay the proceeding. The Moving States' request for permissive

25  intervention should be denied.

### CONCLUSION

27    For all the foregoing reasons, the Court should deny the Moving States' Motion to Intervene.

Dated: October 28, 2025

ELIZABETH S. JENSEN (CA Bar # 302355)
Assistant Civil Chief
San Francisco Office

/s/ Henry C. Su
HENRY C. SU (CA BAR # 211202)
Senior Litigation Counsel
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 615-2165
Email: Henry.Su@usdoj.gov

JEREMY M. GOLDSTEIN (CA Bar # 324422)
MICHAEL G. LEPAGE (DC Bar # 1618918)
U.S. Department of Justice
Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 229-2934
Email: Jeremy.Goldstein@usdoj.gov

*Attorneys for Plaintiff United States of America*

## **ATTORNEY ATTESTATION**

I, Jeremy M. Goldstein, am the ECF user whose identification and password are being used to file PLAINTIFF'S OPPOSITION TO MOTION FOR INTERVENTION. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

/s/ *Jeremy M. Goldstein*
Jeremy M. Goldstein