SAMUEL G. LIVERSIDGE (Bar No. 180578)
ERIC VANDEVELDE (Bar No. 240699)
DANIEL NOWICKI (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com


JULIE S. ELMER (*pro hac vice*)
JENNIFER MELLOTT (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
jennifer.mellott@freshfields.com


*Attorneys for Defendant*
HEWLETT PACKARD ENTERPRISE CO.

[Additional counsel listed on signature
page]


# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff,* | |
| v. | **HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR INTERVENTION** |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC., | |
| *Defendants.* | Judge:          P. Casey Pitts<br>Action Filed:   January 30, 2025 |

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ...................................................................................................3

    A.    HPE and Juniper Announce Merger To Combine Complementary Offerings ........3

    B.    DOJ Sues Over WLAN Market, But Evidence Shows Extensive Competition ......4

    C.    Parties Settle On Terms Directly Addressing The Complaint's Allegations...........5

    D.    Former DOJ Appointee Who Was Overruled Criticizes Settlement .......................5

    E.    With the Merger Closed, HPE And Juniper Integrate, And Tunney Process
    Continues ..................................................................................................................6

    F.    Months After The Merger Closes, States Move To Intervene..................................6

III.    THE SETTLEMENT ADDRESSES THE DOJ ALLEGATIONS ...........................6

IV.     ARGUMENT ...........................................................................................................8

    A.    Intervention Should Be Denied Because the Non-Parties Lack Standing ..............9

    B.    Intervention Should Be Denied Because The Motion Is Untimely ......................10

    C.    There Is No Grounds To Intervene As Of Right....................................................13

        1.    The Non-Parties Have No "Significantly Protectable Interest"................14

        2.    The Non-Parties' Interests Will Not Be Impaired ....................................15

        3.    The Non Parties' Interests Are Adequately Represented .........................16

    D.    There Is No Basis For Permissive Intervention ....................................................21

        1.    States Do Not "Administer" the Clayton Act ...........................................21

        2.    There Is No Common Question of Law or Fact ........................................22

        3.    The Court Should Exercise Its Discretion To Deny Intervention.............23

V.      CONCLUSION......................................................................................................25

1

## **TABLE OF AUTHORITIES**

**Cases**

2

3

*Alaniz v. Tillie Lewis Foods,*
572 F.2d 657 (9th Cir. 1978) .......................................................................... 12, 13

4

*Am. Inst. of Certified Pub. Accts. v. Internal Revenue Serv.,*
746 F. App'x 1 (D.C. Cir. 2018) ............................................................................ 22

5

6

*Am. Med. Ass'n v. United States,*
1985 WL 1753 (N.D. Ill. June 14, 1985) .............................................................. 18

7

*Blake v. Pallan,*
554 F.2d 947 (9th Cir. 1977) ................................................................................ 15

8

9

*Cal., ex rel., Van de Kamp v. Tahoe Reg'l Plan.,*
792 F.2d 779 (9th Cir. 1986) ................................................................................ 15

10

*California v. Am. Stores Co.,*
495 U.S. 271 (1990) ......................................................................................... 14, 22

11

12

*Campbell Cnty., Tenn. v. Fed. Hous. Fin. Agency,*
2013 WL 4777326 (E.D. Tenn. Sept. 5, 2013) ..................................................... 22

13

*Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,*
386 U.S. 129 (1967) .............................................................................................. 17

14

15

*Chiglo v. City of Preston,*
104 F.3d 185 (8th Cir. 1997) ................................................................................ 20

16

*Cooper v. Newsom,*
13 F.4th 857 (9th Cir. 2021) ................................................................................. 13

17

18

*Dilks v. Aloha Airlines,*
642 F.2d 1155 (9th Cir. 1981) .............................................................................. 15

19

*Donnelly v. Glickman,*
159 F.3d 405 (9th Cir. 1998) ................................................................................ 21

20

21

*Empire Blue Cross v. Janet Greeson's,*
62 F.3d 1217 (9th Cir. 1995) ................................................................................ 10

22

*Heckler v. Chaney,*
470 U.S. 821 (1985) .............................................................................................. 18

23

24

*Kalbers v. DOJ,*
22 F.4th 816 (9th Cir. 2021) ................................................................................. 10

25

*Kootenai v. Veneman,*
313 F.3d 1094 (9th Cir. 2002), 630 F.3d 1173 (9th Cir. 2011) ............................ 23

26

27

*League of United Latin Am. Citizens v. Wilson,*
131 F.3d 1297 (9th Cir. 1997) .............................................................................. 10

28

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR INTERVENTION
CASE NO. 5:25-cv-00951

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................................. 9

*Massachusetts v. Microsoft Corp.*,
  373 F.3d 1199 (D.C. Cir. 2004) ........................................................................................ 24

*Mausolf v. Babbitt*,
  85 F.3d 1295 (8th Cir. 1996) ............................................................................................ 20

*McHenry v. Comm'r*,
  677 F.3d 214 (4th Cir. 2012) ............................................................................................ 22

*Moosehead Sanitary Dist. v. S. G. Phillips Corp.*,
  610 F.2d 49 (1st Cir. 1979) ............................................................................................... 21

*MSL v. United States*,
  118 F.3d 776 (D.C. Cir. 1997) ............................................................................... 16, 19, 24

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................................................................. 14

*Orange Cnty. v. Air California*,
  799 F.2d 535 (9th Cir. 1986) ...................................................................................... 10, 13

*SEC v. Citigroup Global Mkts., Inc.*,
  752 F.3d 285 (2d Cir. 2014) ............................................................................................. 24

*Smith v. Marsh*,
  194 F.3d 1045 (9th Cir. 1999) (*Marsh*) ............................................... 10, 11, 12, 13

*Town of Chester v. Laroe Estates, Inc.*,
  581 U.S. 433 (2017) ............................................................................................................. 9

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................................................................. 2

*United States v. Aerojet Gen. Corp.*,
  606 F.3d 1142 (9th Cir. 2010) .......................................................................................... 18

*United States v. Airline Tariff Pub. Co.*,
  1993 WL 95486 (D.D.C. Mar. 8, 1993) ...................................................................... 14, 25

*United States v. Alex. Brown & Sons, Inc.*,
  169 F.R.D. 532 (S.D.N.Y. 1996) ...................................................................................... 13

*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004) ............................................................................................ 12

*United States v. Am. Tel. & Tel. Co.*,
  552 F. Supp. 131 (D.D.C. 1982) ....................................................................................... 14

*United States v. Auto. Mfrs. Ass'n*,
  307 F. Supp. 617 (C.D. Cal. 1969) ............................................................................. 14, 17

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR INTERVENTION
CASE NO. 5:25-cv-00951

*United States v. Blue Chip Stamp Co.*,
     272 F. Supp. 432 (C.D. Cal. 1967), *aff'd*, 389 U.S. 5801 (1968) .............................................. 16

*United States v. Carrols Dev. Corp.*,
     454 F. Supp. 1215 (N.D.N.Y. 1978) ...................................................... 14, 16, 23, 25

*United States v. Fokker Servs. B.V.*,
     818 F.3d 733 (D.C. Cir. 2016) ................................................................... 19, 24

*United States v. G. Heileman Brewing Co.*,
     563 F. Supp. 642 (D. Del. 1983) .................................................... 16, 17, 18, 23, 25

*United States v. Gannett Co.*,
     2014 WL 6844302 (D.D.C. Nov. 18, 2014) ............................................................ 24

*United States v. Int'l Bus. Machines Corp.*,
     1995 WL 366383 (S.D.N.Y. June 19, 1995) ......................................... 15, 17, 21, 25

*United States v. Int'l Tel. & Tel. Corp.*,
     1974 WL 822 (D. Conn. Jan. 14, 1974) ............................................................ 19

*United States v. Int'l Tel. & Tel. Corp.*,
     349 F. Supp. 22 (D. Conn. 1972) .............................................. 15, 17, 18, 21

*United States v. Loc. 638*,
     347 F. Supp. 164 (S.D.N.Y. 1972) .............................................................. 22

*United States v. Microsoft Corp.*,
     2003 WL 1191753 (D.D.C. Feb. 7, 2003) ........................................................ 23

*United States v. Microsoft Corp.*,
     56 F.3d 1448 (D.C. Cir. 1995) ............................................................... 12, 24

*United States v. Petlechkov*,
     72 F.4th 699 (6th Cir. 2023) ............................................................... 18, 19

*United States v. Phila. Nat'l Bank*,
     374 U.S. 321 (1963) .............................................................................. 4

*United States v. SBC Commc'ns, Inc.*,
     489 F. Supp. 2d 1 (D.D.C. 2007) ................................................................ 19

*United States v. State of Or.*,
     745 F.2d 550 (9th Cir. 1984) ................................................................... 11

*United States v. Stroh Brewery Co.*,
     1982 WL 1852 (D.D.C. June 8, 1982) ............................................................. 16

*United States v. Texas*,
     599 U.S. 670 (2023) .......................................................................... 2, 10

*United States v. US Airways Grp., Inc.*,
     38 F. Supp. 3d 69 (D.D.C. 2014) ................................................................ 12

*Washington v. U.S. Food & Drug Admin.*,
    108 F.4th 1163 (9th Cir. 2024) ................................................................................ 9

*Wilderness Soc'y v. U.S.F.S.*,
    630 F.3d 1173 (9th Cir. 2011) ................................................................................ 13

**Rules**

Fed. R. Civ. P. 24 ............................................................................................... passim

**Treatises**

Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed.) ................................ 17

**Regulations**

90 Fed. Reg. 30685 (July 10, 2025) .......................................................................... 5

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR INTERVENTION
CASE NO. 5:25-cv-00951

# I.    **INTRODUCTION**

Four months ago, HPE, Juniper, and the DOJ entered into a settlement agreement to resolve the DOJ's concerns about the HPE-Juniper merger.  HPE agreed to remedies that directly addressed the DOJ's allegations, agreeing to: (1) divest its Instant On networking business, which includes enterprise WLAN solutions (effectively handing competitors an entire business unit with which to compete in the enterprise WLAN space and networking more broadly); and (2) license the source code for Juniper's AIOps software for WLAN to at least one competitor (removing the concern that HPE was acquiring Juniper's AIOps WLAN technology so it would not have to compete with it).  On June 30, 2025, with the Court's approval, the transaction closed, and HPE moved forward with the integration of the two companies.  Since then, the comment period under the Tunney Act has run and is now closed, and HPE understands that *not a single* competitor or customer has objected to the deal or even commented.  The lack of opposition to the settlement demonstrates both the efficacy of the proposed remedies and the industry participants' view of the alleged competitive harm that gave rise to the DOJ's enforcement action.  Their collective silence speaks volumes.

Now, a group of nonparties (the "Non-Parties") has moved to intervene in this case.  While these Non-Parties briefly assert the settlement is deficient, they do not raise any meaningful challenge to the settlement itself.  Indeed, the Non-Parties do not even bring a claim that the merger is anticompetitive.  Instead, they ask to intervene in this case to investigate how the DOJ decided on the settlement terms.  The Non-Parties essentially ask to be admitted as parties to this proceeding so they can assume oversight over the DOJ—and take discovery about the DOJ's decision-making process in entering its settlement.  No court has *ever* allowed anything like this—not in the Tunney Act context, or any other context.  An intervenor cannot become a "party" to an action for the purpose of taking discovery from the federal government about how it exercises prosecutorial discretion.

In the Tunney Act context specifically, intervenors are *never* allowed to take discovery— much less take discovery about why the DOJ chose to enter a particular settlement.  The Constitution entrusts the Executive Branch with the authority to choose the terms on which it wishes to settle its lawsuits.  And courts have repeatedly held that Tunney Act review is limited to whether the settlement, on its face, is within the reaches of the public interest, giving deference to DOJ's expertise,

1

prosecutorial discretion, and interest in avoiding litigation risk and conserving scarce enforcement resources. As long as the settlement terms are clear, enforceable, and aimed at responding to the DOJ's allegations, the consent decree should be approved. Unsurprisingly, given the narrow scope of review, no court has ever allowed a nonparty to intervene in Tunney Act proceedings as a "party" with full discovery rights. Indeed, courts often deny nonparties any right to participate altogether, explaining that the Tunney Act already allows nonparties to express any relevant views on the settlement by submitting comments during the 60-day comment period after the settlement is announced—a step the Non-Parties have already taken. In those instances where some participation is allowed, courts limit nonparties to serving as *amici* so they can submit a brief with their arguments.

The Non-Parties ignore all this precedent and demand the ability to serve as "parties" with full discovery rights, claiming they need to investigate an alleged DOJ "scandal" somehow connected to the settlement. Setting aside that what the Non-Parties demand would violate the Constitution, they cite no factual evidence of a "scandal"; instead, they point to news reports that certain DOJ officials "overruled" other DOJ officials and approved the settlement. The Non-Parties' only other support for their Motion consists of quotes from a speech given by a former DOJ official whose employment was terminated after the settlement; but the speech offers no facts about the settlement, and merely recounts that he (a self-anointed "MAGA Republican") is locked in an internecine squabble with his perceived opponents (who he calls "MAGA-In-Name-Only-Lobbyists").

While DOJ internal disputes may be good fodder for Washington reporters, they are irrelevant to this case. The Non-Parties cannot intervene for the purpose of investigating, or taking sides in, an intra-DOJ policy disagreement over litigation and settlement strategy. Such a disagreement creates no Article III case or controversy. And because of bedrock separation of powers principles, courts cannot sit in judgment of the exercise of prosecutorial discretion about which cases to pursue or settlements to agree to. "Under Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants ....'" *United States v. Texas*, 599 U.S. 670, 678 (2023) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021)); *id.* at 685 ("[T]he Federal Judiciary" cannot "order the Executive Branch to take enforcement actions against violators of federal law").

The Non-Parties' interest in the DOJ's deliberative process also does not create any basis for intervention under either Rule 24(a) or 24(b). They have no right to intervention under Rule 24(a) (indeed, no court has *ever* allowed intervention as of right in a Tunney Act proceeding), and their claim that the DOJ should be investigated does not share a common question with this case under Rule 24(b). What's more, the Non-Parties' months-long delay to bring this motion, after learning of the settlement in June, also requires denying intervention.

HPE has no interest in serving as the collateral damage in a political proxy war—whether between DOJ officials or between the Executive Branch (currently controlled by Republicans) and the Non-Parties (associated with the Democrats). HPE simply wants to complete the Tunney Act review process. The purpose of the Tunney Act is to allow courts an opportunity to determine whether a settlement's terms are responsive to the harm alleged in the DOJ's complaint. The Tunney Act is not for the benefit of nonparties who may have other issues or agendas they want to pursue— and it certainly does *not* permit nonparties to investigate the DOJ's decision-making process, much less take sides in an alleged policy dispute between DOJ officials. Allowing the Non-Parties' requested intervention would violate the Constitution and Rule 24, be contrary to *every* Tunney Act intervention case, and create a sideshow that would prolong this proceeding and cause extreme prejudice to HPE. The motion should be denied so that this case can move towards a final resolution.

## II.    BACKGROUND

### A.    HPE and Juniper Announce Merger To Combine Complementary Offerings

On January 9, 2024, HPE announced an agreement to acquire Juniper. ECF 222 at 10. The goal was to combine HPE and Juniper's highly complementary product portfolios: HPE's traditional strength in storage and servers, and Juniper's in data center switches and routers. *Id.* at 1, 9–10. HPE and Juniper largely did not compete in these business segments. The parties' WLAN offerings were a minor piece of the merger and accounted for a small fraction of their revenue: less than 6% of HPE's and just over 7% of Juniper's 2023 revenue. ECF 222 at 8–9.

The focus of the deal was on combining HPE's and Juniper's wider offerings to create a company that could compete across the "full stack" of networking products. *Id.* at 1, 3. For years, Cisco has dominated the networking industry, in part because it offers products across the full

3

1  networking stack, allowing customers to use Cisco as a "one stop shop" for all networking needs.

2  *Id.* at 3, 25.  As a full stack player, the combined HPE/Juniper entity provides a viable alternative to

3  Cisco, thus increasing customer choice and competition.  *Id.*

4  **B.    DOJ Sues Over WLAN Market, But Evidence Shows Extensive Competition**

5          Aside from the DOJ, thirteen jurisdictions around the world completed their regulatory

6  reviews of the transaction, including the European Commission and the UK Competition and

7  Markets Authority, and *none* opposed the transaction.  *Id.* at 10.  Despite findings by other agencies

8  that "HPE and Juniper are not each other's closest competitors," and the merged entity "would

9  continue to face competition from a wide range of competitors," the DOJ sued to block the merger.

10  ECF 222 at 10.

11          Though WLAN is a small part of HPE's and Junipers' revenues, it is the focus of the DOJ's

12  Complaint, which alleges the merger may lessen competition for enterprise-grade WLAN solutions.

13  Compl. ¶ 40.  In the Complaint, "enterprise-grade" WLAN solutions refers to WLAN solutions sold

14  to companies or organizations (of any size, big or small), rather than to individuals.  Compl. ¶¶ 1, 5.

15  The DOJ does not take issue with any other market.  *See id.*  The Complaint specifically references

16  Juniper's "AIOps" offering, which is a suite of tools for managing Juniper's enterprise WLAN

17  products.  *Id.* ¶ 6.  The Complaint alleges that allowing HPE to acquire Juniper's AIOps would

18  decrease HPE's incentive "to innovate [its own] network management software."  *Id.* ¶ 47.

19          The DOJ's evidence of market concentration was uncharacteristically weak.  The vast

20  majority of litigated DOJ and FTC horizontal merger cases involve a combined entity that would

21  have more than 30% market share, a threshold the Supreme Court has held presumptively

22  anticompetitive.  *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963).  The combined

23  share of the HPE/Juniper entity is 25%.  ECF 222 at 13.  Despite this, the DOJ pushed forward toward

24  trial.  HPE and Juniper jointly filed a comprehensive pretrial brief (ECF 222) and 100+ pages of

25  proposed findings of fact and conclusions of law.  Although the Parties produced over 800,000

26  documents and sat through depositions of 21 company witnesses and 25 third-party witnesses, the

27  Government could not identify a *single* WLAN market participant willing to say the transaction

28  would harm competition.  ECF 222 at 1, 10.  The evidence, in fact, shows there are at least seven

1  other competitors in the enterprise-grade WLAN market in addition to HPE and Juniper.  *Id.* at 7.

2  Moreover, barriers to expansion in the enterprise-grade WLAN market are low and new entrants are

3  common.  *Id.* at 22–23.  There is no evidence that WLAN competitors would stop competing just

4  because of the merger.

5  **C.    Parties Settle On Terms Directly Addressing The Complaint's Allegations**

6          The Parties reached a settlement on June 27, 2025—more than 18 months after the merger

7  was first announced.  That same day, the Parties filed a Stipulation that publicly disclosed all terms

8  of the settlement.  ECF 217.  First, the settlement required HPE to divest its "Instant On" networking

9  and WLAN business.  ECF 217-1 at 3–5.  Second, it required HPE to license Juniper's AIOps for

10  WLAN source code to at least one competitor and transfer personnel to that competitor to support

11  the software's continued development, use, and sale.  *Id.* at 3, 10–13.  The Stipulation requires HPE

12  to hold the Instant On assets separate and move promptly to sell those assets and license the AIOps

13  for WLAN technology.  ECF 217 at 6–9.  The settlement terms filed with the Court are the only

14  terms HPE and Juniper agreed to with the Government; there is no other, undisclosed deal.  Ex. A,

15  Neri Decl. ¶ 3; Ex. B, Schultz Decl. ¶ 12.

16          On June 30, 2025, the Court approved the Stipulation, allowing the transaction to close.  ECF

17  220 at 5; ECF 217-2 at 2 ("the Defendants may consummate the proposed acquisition following

18  signature by the Court of the Stipulation and Order").  And on July 10, 2025, the DOJ published the

19  Proposed Final Judgment and the Competitive Impact Statement in the Federal Register, thereby

20  commencing a 60-day comment period under the Tunney Act.  90 Fed. Reg. 30685 (July 10, 2025).

21  **D.    Former DOJ Appointee Who Was Overruled Criticizes Settlement**

22          On July 16, CBS published an article claiming that Chad Mizelle, the DOJ's Acting Associate

23  Attorney General (the third-highest official in the DOJ), "overrule[d] [Gail] Slater" (the head of the

24  DOJ's Antitrust Division), to accept the HPE-Juniper settlement.  ECF 280-3 at 4.  On July 28,

25  certain U.S. Senators sent a letter to this Court, claiming that "officials in the Antitrust Division may

26  have been sidelined because they opposed the backroom negotiations that led to this settlement."

27  ECF 230 at 3.  Over the next few days, major media outlets (e.g., New York Times) reported that

28  senior DOJ officials (including Mizelle) overruled Slater and other political appointees under her

1    when agreeing to the settlement, and that two of those appointees had been terminated.  ECF 280-4.

2        Then, on August 18, 2025, Roger Alford—one of those former DOJ appointees—gave a

3    speech at a think-tank event.  In it, he referenced what he called "the HPE/Juniper merger scandal"—

4    without further explanation—and assailed more broadly what he viewed as an intra-party political

5    rift between "genuine MAGA reformers" (like him) and "MAGA-In-Name-Only-Lobbyists."  ECF

6    280-2 at 1.  While Alford's speech was heavy on opinions and innuendo, it was entirely devoid of

7    any facts about the so-called "HPE/Juniper merger scandal" and did not identify any issue with the

8    merger or settlement.

9    **E.    With the Merger Closed, HPE And Juniper Integrate, And Tunney Process Continues**

10        After the Court signed the Stipulation on June 30, the transaction closed and HPE began

11   integrating Juniper's operations into its own.  *See* Schultz Decl. ¶ 3.

12        HPE is not aware of a single WLAN customer or competitor who complained about the

13   settlement terms during the entirety of the public comment period.  Then on September 5, just days

14   before the comment period closed, the Attorneys General of various States (including those seeking

15   to intervene here) submitted a comment repeating the now months-old public reporting about the

16   internal disagreements within the DOJ about the settlement.  ECF 236-2.  On October 1, the Parties

17   jointly moved to stay the case until the government shutdown ended.  ECF 235.

18   **F.    Months After The Merger Closes, States Move To Intervene**

19        On October 14, over three months after the settlement terms were publicly disclosed and the

20   merger closed, and more than a month after the States submitted their public comment, the Non-

21   Parties filed the instant motion to intervene.  They request to be added as "parties" yet acknowledge

22   they do not have, and are not prepared to bring, any claims.  ECF 236 at 2, 14.  Rather, their stated

23   intent is to investigate the DOJ's decision-making process, including by seeking broad discovery

24   from high-ranking DOJ officials.  *Id*. at 6–7, 10.  On October 15, this Court granted the Parties' joint

25   motion to stay the case, except it allowed the Non-Parties' motion to intervene to proceed.  ECF 237.

26   Two days later, the Non-Parties moved to lift the stay to seek an injunction.  ECF 256.

27            **III.    THE SETTLEMENT ADDRESSES THE DOJ ALLEGATIONS**

28        Although the Non-Parties focus their attention on the DOJ's determination to settle, they also

6

1   briefly and without support suggest the settlement does not address the harm alleged in the Complaint.

2   Mot. at 5–6.  That is for this Court to resolve at the conclusion of the Tunney Act process, not here.

3   Nevertheless, the Non-Parties' criticisms are wrong, and HPE briefly responds to them here.

4          As noted earlier, HPE agreed to merge with Juniper to combine their complementary assets.

5   Nevertheless, the DOJ's Complaint challenged the merger on the basis that it might harm competition

6   in *one* particular market where they competed: enterprise WLAN offerings.  The DOJ alleged Juniper

7   was particularly innovative in that space, especially because of its AIOps tools.  Compl. ¶¶ 6–7, 47.

8          The settlement directly addresses these allegations.  Specifically, HPE must: (1) divest its

9   Instant On business, which provides enterprise-grade WLAN solutions for small-to-medium sized

10  companies, and (2) license the source code for Juniper's AIOps for WLAN to at least one competitor

11  and provide personnel to that competitor to continue the software's development and use.

12         The basic inaccuracies of the Non-Parties' allegations expose both their disinterest in the

13  competition issues underlying the DOJ's Complaint and their non-substantive motivations for this

14  Motion.  They contend Instant On is "irrelevant" because it "is directed to small businesses" instead

15  of large enterprises and is "not mentioned anywhere in the Complaint."  Mot. at 5–6.  But the

16  Complaint alleged injury to the entire enterprise-grade WLAN market, which includes small

17  businesses.  The parties also calculated market shares using the same definition of enterprise-grade

18  WLAN the DOJ alleged in the Complaint (i.e., using a market that included small businesses).  *See*

19  ECF 221 at 7; ECF 222 at 12–13.  The fact that the literal words, "Instant On," are not in the

20  Complaint or pretrial briefs is irrelevant—the Instant On business is one of HPE's enterprise-grade

21  WLAN solutions, and thus directly part of this case.  *See also* Ex. C, Hughes Decl. ¶ 4.  Further,

22  while Instant On customers are predominantly small-to-medium sized businesses, Instant On

23  wireless access points are fully capable of serving large businesses as well—in fact, a buyer of the

24  Instant On business that HPE is divesting will be able to offer additional enterprise-grade features

25  that HPE's current Instant On offering does not.  *Id.* ¶¶ 6, 8.

26         The Non-Parties also criticize the AIOps license remedy on the theory that the bid threshold

27  ($8 million) is an estimate of its value.  Mot. at 6.  Because this is much smaller than the price for

28  Juniper's *entire* business ($14 billion), the Non-Parties claim AIOps "has little to do with Juniper's

7

value" and thus the license will not address the alleged harms. *Id*. This argument is nonsensical. First, the Non-Parties wrongly assume Juniper's *entire value* is derived from the enterprise-grade WLAN market that was the focus of the Complaint. WLAN is a tiny part of Juniper's business (~7% by revenue); HPE paid $14 billion to acquire Juniper's *other* businesses. Second, the Non-Parties overlook that Juniper's alleged advantage in AIOps was central to the DOJ's theory, Compl. at 3–4, 7, and the license thus resolves a key aspect of the DOJ's alleged competitive harm.

## IV.    ARGUMENT

The Non-Parties' motion should be denied for each of the following independent reasons.

*First*, the Non-Parties do not have standing under Article III to intervene in a case, without bringing any claims, for the purpose of investigating the federal government. No court has ever allowed such claim-less intervention for the purpose of taking discovery of the DOJ.

*Second,* the Non-Parties' motion is untimely: they knew about the settlement as soon as it was filed on June 27—and they claim it is deficient on its face—yet they waited months to intervene. They do not even try to justify this delay, which is another reason to deny their motion in full.

*Third*, the Non-Parties have not satisfied *any* of the elements of mandatory intervention under Rule 24(a). Their general interest in seeing the antitrust laws enforced is not protected by Rule 24(a), and, in any event, such an interest will not be impaired by the settlement—the Non-Parties are free to bring their own claims. While the Non-Parties say the DOJ does not represent their interests in antitrust enforcement, the DOJ is presumed to represent the public interest in enforcing the antitrust laws. No party has *ever* been allowed to intervene as of right in a Tunney Act proceeding under Rule 24(a), and the Non-Parties provide no reason that they should be the first.

*Fourth*, the Non-Parties have not satisfied the requirements of permissive intervention under Rule 24(b). The Non-Parties do not have any claims that share a common question with this case under Rule 24(b)(1)(B)—they admit they are not currently bringing any claim, and they do not know if they ever will. The Non-Parties also do not "administer" the Clayton Act under Rule 24(b)(2); states do not "administer" federal antitrust law. In any event, even if the Non-Parties could satisfy the preliminary requirements of Rule 24(b), intervention should be denied because it would needlessly delay and prolong this proceeding. If the Non-Parties wish to file an *amici* brief

8

1  expressing their objections to the settlement (to the extent they have any), they are free to do so.

2     The motion is without precedent in the history of the Tunney Act—and should be denied.

3  **A.    Intervention Should Be Denied Because the Non-Parties Lack Standing**

4     Intervenors who wish to do anything *other* than adopt the position of a pre-existing party

5  must establish standing under Article III. But the Non-Parties do not have standing to do what they

6  demand—i.e., promulgate wide-ranging discovery investigating the DOJ's internal deliberations and

7  decision-making process. For that reason alone, their motion should be denied.

8     "When [a] party attempting to intervene—whether as of right or permissively—seeks

9  different relief than the original plaintiff, [courts] review whether the intervening party has Article III

10  standing to pursue the claims advanced in its complaint." *Washington v. U.S. Food & Drug Admin.*,

11  108 F.4th 1163, 1172 (9th Cir. 2024) (citing *Town of Chester v. Laroe Estates, Inc*., 581 U.S. 433,

12  438 (2017)). Courts "consider not just the legal form of the parties' claims, but also their ultimate

13  objectives." *Id.* at 1173. If there is a "deep and obvious conflict between the parties' objectives,"

14  courts "cannot conclude that [the intervenor] seeks the 'same relief' as" the original plaintiff—so the

15  intervenor must prove its own standing. *Id.* at 1174.

16     Here, the Non-Parties are not seeking the same relief as the Government did in its Complaint,

17  and thus they must independently demonstrate they have Article III standing, which they cannot do.

18  The Complaint seeks injunctive relief under the Clayton Act to stop the HPE/Juniper merger to

19  prevent alleged harm to the enterprise-grade WLAN market. *See* Compl. But the Non-Parties are

20  not bringing a claim under the Clayton Act, or any other law, to enjoin the merger. Instead, they

21  move to intervene to take "discovery into the Settlement and the process that led to it." Mot. at 6.

22  Thus, there is "a deep and obvious conflict between" the Non-Parties' and the Government's

23  "objectives" and the relief they seek. *Washington*, 108 F.4th at 1174.

24     Accordingly, the Non-Parties must independently meet Article III's "case or controversy"

25  requirement. But where, as here, a party (or proposed party) does not bring any claims, there is no

26  standing. Although the Non-Parties suggest that they *might*, later, bring a Clayton Act claim, they

27  admit that they do not have a basis to do so now. Mot. at 14. An intervenor's argument that it *might*

28  raise a claim in the *future* is not enough to establish standing *now*. *See, e.g.*, *Lujan v. Defs. of Wildlife*,

1   504 U.S. 555, 564 (1992) ("'some day' intentions" do not show standing).  And the Non-Parties'

2   suggestion that they wish to force the Government to drop the settlement and pursue this case does

3   not give them standing: a State does not have standing to seek an "order [that] the Executive Branch

4   ... take enforcement actions." *Texas*, 599 U.S. at 685; *id.* at n.6 (States cannot "challenge ... exercise

5   of the Executive's enforcement discretion").

6       Because the Non-Parties do not show they have Article III standing, they cannot intervene.

7   **B.    Intervention Should Be Denied Because The Motion Is Untimely**

8       A motion to intervene must be denied unless the intervenors carry their burden of showing it

9   is timely.  *See League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

10  In evaluating timeliness, courts consider three factors:  "(1) the stage of the proceeding at which an

11  applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of

12  the delay."  *Kalbers v. DOJ*, 22 F.4th 816, 822 (9th Cir. 2021).  Each factor must be assessed as of

13  "the crucial date . . . when proposed intervenors should have been aware that their interests would

14  not be adequately protected by the existing parties."  *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir.

15  1999) (*Marsh*).  As the Ninth Circuit has held in other cases involving intervenors who tried to

16  intervene after a settlement was reached, "parties who delay in attempting to intervene, and who end

17  up doing so only after the original parties have reached an acceptable settlement, should not be able,

18  without good reason, to intervene when their intervention may well cause substantial prejudice to the

19  original parties."  *Empire Blue Cross v. Janet Greeson's*, 62 F.3d 1217, 1219 (9th Cir. 1995).

20      ***Stage of the proceeding***.  The Non-Parties did not seek to intervene until nearly four months

21  after the settlement was signed and filed—and even after the 60-day Tunney Act comment period

22  had concluded.  This "weigh[s] heavily against" intervention.  *Orange Cnty. v. Air California*, 799

23  F.2d 535, 538 (9th Cir. 1986) ("Although Irvine did intervene before the Stipulated Judgment was

24  officially approved by the district court, the fact that Irvine waited until after all the parties had come

25  to an agreement after five years of litigation should nevertheless weigh heavily against Irvine.").

26      Here, the "crucial date" on which the Non-Parties "should have been aware their interests

27  would not be adequately protected" was the date the settlement was publicly filed:  June 27.  *See*

28  *Marsh*, 194 F.3d at 1052.  The Non-Parties' motion argues the settlement is "facially inadequate"

1    because it purportedly "does not appear to address the harms alleged in the Complaint and the United

2    States' pretrial brief." Mot. at 2.[1]  That means that, as soon as it was filed, the Non-Parties should

3    have known the Government had agreed to a settlement that—according to them—was deficient on

4    its "fac[e]," so they should have intervened immediately.  In their Motion, the Non-Parties seem to

5    concede they should have known their interest were not represented as of the settlement date—saying

6    they "believed their interests were protected *until* the United States entered into a Settlement that

7    facially fails to address the competitive concerns" in the Complaint—but also contradictorily suggest

8    they did not know there was an issue until "public reporting emerged in August 2025 that the

9    Settlement may have been the product of improper influence."  Mot. at 9 (emphasis added).  This

10   does not make sense.  Either the settlement is "facially inadequate," or it is not.  The Non-Parties did

11   not need "public reporting" about the settlement process to determine it was facially inadequate.

12        In any event, the "public reporting" the Non-Parties reference began in mid-July, not August,

13   when it was widely reported that some DOJ officials overruled others to settle the case.  *Supra* 5–6.

14   The Non-Parties' own Tunney Act comments cite articles from July.  ECF 236-2 at 5, n.4.  The Non-

15   Parties also point to an August 18 speech given by a former DOJ official, Roger Alford, but that

16   speech revealed nothing about the settlement—it just obliquely referenced the prior press reporting

17   (claiming there was a "scandal" without explanation).  *Supra* 6.

18        In short, the Non-Parties knew about the settlement by the end of June and were aware of the

19   "public reporting" by July.  Yet the Non-Parties waited nearly 6 weeks after submitting their

20   September 5 comment to file this motion, even though it is largely a cut-and-paste of that comment.

21        ***Prejudice to the Parties.***  HPE has been directly prejudiced as a result of this delay.

22   "[P]rejudice to existing parties is 'the most important consideration in deciding whether a motion for

23   intervention is untimely." *Smith*, 830 F.3d at 857 (quoting *United States v. State of Or.*, 745 F.2d

24   550, 552 (9th Cir. 1984)).  And in the context of a case resolved by settlement, the delay can be

25   prejudicial when late intervention would disrupt a negotiated resolution of the case:  "For example,

26   if granting a belated motion to intervene would threaten the delicate balance reached by existing

27   parties after protracted negotiations, this factor may weigh against intervention." *Smith*, 830 F.3d at

---

[1] As explained, this claim is false (*supra* 7–8), but HPE accepts it as true for evaluating timeliness.

857.  The Ninth Circuit has repeatedly "affirmed the denial of motions to intervene in cases where granting intervention might have compromised long-litigated settlement agreements or delicate consent decrees."  *United States v. Alisal Water Corp.*, 370 F.3d 915, 922 (9th Cir. 2004).

Here, the merger was consummated months ago, and HPE has been working since then to integrate Juniper's operations, conduct a prompt sale of the assets that it agreed to divest, and conduct a prompt auction for the AI Ops for Mist source code.  Schultz Decl. ¶¶ 3–7.  Any delay or disruption to this proceeding would inject uncertainty into the ongoing auction processes, putting the success of these remedies at risk.  *Id.* ¶¶ 8–11.  Simply put, the transaction has already been consummated, and injecting new parties would both threaten HPE with significant costs and "threaten the delicate balance reached by existing parties after protracted negotiations."  *Smith*, 830 F.3d at 857; *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir. 1978) (rejecting intervention to challenge consent decree, because "the decree is already being fulfilled; to countermand it now would create havoc and postpone the needed relief").

In addition, the Non-Parties seek to radically and inappropriately expand the scope of this proceeding—from a review of whether the settlement sufficiently addresses the issues in the Complaint to be adequate under the Tunney Act, to a wide-ranging inquiry into the DOJ's litigation strategies.  Tunney Act review is limited to looking at the terms of the settlement, as measured against the government's complaint:  "'the court is only authorized to review the decree itself,' and not to 'effectively redraft the complaint' and inquire into matters that the United States did not pursue."  *United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76 (D.D.C. 2014) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1459 (D.C. Cir. 1995)).  But the Non-Parties do not say they will limit their participation to addressing whether the proposed consent decree responds to the harm alleged in the Complaint.  To the contrary, they expressly argue they should be allowed broad "discovery into the process that led to the settlement to confirm whether public reporting is accurate."  Mot. at 10.  In other words, the Non-Parties want to insert themselves into the internal deliberations between DOJ officials—even though DOJ decision-making processes, including potential internal disputes about litigation objectives, have nothing to do with the Tunney Act, and are not even

1  something over which this Court can exercise jurisdiction.  *Supra* 10, *infra* 18-19.[2]  The Non-Parties

2  thus seek to "expand[] the scope of the litigation and caus[e] delay," which will at least delay the

3  benefit—and could jeopardize consummation —of the agreed-on remedies.  *Marsh*, 194 F.3d at 1051

4  (intervention prejudicial when intervenors "sought to inject new issues and matters that are well

5  beyond the scope of [the plaintiffs'] claims and the [defendants'] defenses"); *Alaniz*, 572 F.2d at 659.

6      ***No Excuse for the Delay***.  "[T]o prevail, [the Non-Parties] must convincingly explain [the]

7  delay in filing [their] motion to intervene."  *Orange Cnty.*, 799 F.2d at 538 .  But they do not provide

8  *any explanation whatsoever* for their delay—they simply assert they "promptly moved."  Mot. at 9.[3]

9  Because the Non-Parties do not provide any explanation for sitting on their hands for months—and

10  because HPE would suffer significant harm if the Non-Parties' motion were granted—their motion

11  should be denied.  *See Orange Cnty*, 799 F.2d at 538.

12      **C.    There Is No Grounds To Intervene As Of Right**

13      The Non-Parties move to intervene as of right under Rule 24(a)(2), which recognizes a right

14  to intervene where the would-be intervenor "claims an interest relating to the property or transaction

15  that is the subject of the action, and is so situated that disposing of the action may as a practical

16  matter impair or impede the movant's ability to protect its interest, unless existing parties adequately

17  represent that interest."  Courts apply a four-part test:  "(1) the motion must be timely; (2) the

18  applicant must claim a 'significantly protectable' interest relating to the property or transaction which

19  is the subject of the action; (3) the applicant must be so situated that the disposition of the action may

20  as a practical matter impair or impede its ability to protect that interest; and (4) the applicant's interest

21  must be inadequately represented by the parties to the action.'"  *Cooper v. Newsom*, 13 F.4th 857,

22  864 (9th Cir. 2021) (quoting *Wilderness Soc'y v. U.S.F.S.*, 630 F.3d 1173, 1177 (9th Cir. 2011)).

23      The Non-Parties cannot satisfy any of these elements.  Their motion is untimely (*supra* 10–

24  13), and they cannot show their interests will be impaired or they are not adequately represented.

25  ―――――――――――――――

26  [2] In addition, any discovery into the DOJ's settlement decision-making would presumably be barred by the deliberative process privilege—so it is unclear how the Non-Parties could get any of the discovery they seek, even if they *did* intervene.  *See, e.g.*, *United States v. Alex. Brown & Sons, Inc.*,

27  169 F.R.D. 532, 543 (S.D.N.Y. 1996) (DOJ "Settlement Memorandum" drafted to analyze antitrust settlement "falls within the governmental deliberative process privilege").

28  [3] And in the case they rely on, timeliness was not even disputed.  *See Aerojet*, 606 F.3d at 1149.

1.     **The Non-Parties Have No "Significantly Protectable Interest"**

No court has *ever* allowed *any* party to intervene as of right in a Tunney Act proceeding under Rule 24(a).  "It is clear from the language of the Tunney Act, its legislative history, and from the cases that there is no right to intervene; to the contrary, Congress intended intervention, and the scope of the intervention if allowed, to be discretionary."  *United States v. Am. Tel. & Tel. Co*., 552 F. Supp. 131, 218 (D.D.C. 1982); *United States v. Airline Tariff Pub. Co*., 1993 WL 95486, at *1 (D.D.C. Mar. 8, 1993) ("[T]here is no right to intervene in a Tunney Act proceeding.").  This is for good reason: a Tunney Act proceeding simply resolves whether the U.S. may settle its suit with a particular defendant, and does not impact any third party—so it is impossible for a third-party intervenor (like the Non-Parties) to have a significantly protectable interest in the litigation.

For example, in *United States v. Auto. Mfrs. Ass'n*, 307 F. Supp. 617 (C.D. Cal. 1969), the court rejected motions to intervene filed by numerous states and municipalities, who sought to challenge an antitrust settlement between the Government and defendants.  *See id.* at 619.  As the court explained, potential antitrust plaintiffs (like the states and municipalities) "do not have an 'interest' cognizable under Rule 24(a) ... in Government anti-trust actions seeking injunctive relief." *Id.* (collecting numerous cases).  While *Automobile Manufacturers* was a pre-Tunney Act case, its analysis of Rule 24(a) remains good law:  potential antitrust plaintiffs, including States, have no cognizable interest in an antitrust suit brought by the Government.  *See United States v. Carrols Dev. Corp*., 454 F. Supp. 1215, 1220 (N.D.N.Y. 1978) (Tunney Act case relying on *Automobile Manufacturers*, and other cases, to hold that antitrust "claimants do not have an interest cognizable under Rule 24(a)(2) in Government antitrust actions seeking injunctive relief").

Citing two cases that did not involve intervention, the Non-Parties say they "have a mandate to protect their citizens from antitrust violations," and they "have an interest in ensuring that settlements reached by the United States in antitrust cases are in the public interest."  Mot. 9-10 (citing *California v. Am. Stores Co*., 495 U.S. 271, 284 (1990) & *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225 n.21 (S.D.N.Y. 2020)).  But this is nothing more than a statement that the Non-Parties have a generalized interest in seeing the antitrust laws enforced.  The claim that potential intervenors are "representatives of the public who desire to see that the antitrust laws are enforced"

14

1   is not sufficient to support mandatory intervention. *United States v. Int'l Tel. & Tel. Corp.*, 349 F.

2   Supp. 22, 27 (D. Conn. 1972), *aff'd*, 410 U.S. 919 (1973). And as the Ninth Circuit has repeatedly

3   held, a state official does not have a protectable interest in seeing the laws enforced or properly

4   applied—even when (unlike here), the laws at issue are state law. *See, e.g.*, *Dilks v. Aloha Airlines*,

5   642 F.2d 1155, 1157 (9th Cir. 1981) ("the general concern of the California Corporation

6   Commissioner in a proper interpretation of the California corporation laws" could not support "a

7   right to intervene in an action in which those laws were to be interpreted"); *Cal., ex rel., Van de*

8   *Kamp v. Tahoe Reg'l Plan.*, 792 F.2d 779, 782 (9th Cir. 1986) ("general desire to ascertain the legal

9   status of" state law is not sufficient for intervention). Likewise, a state's desire to protect the "public

10  interest" is insufficient to support intervention as of right. *Blake v. Pallan*, 554 F.2d 947, 953 (9th

11  Cir. 1977) (nonparty cannot "establish[] intervention of right solely on public interest grounds").

12      Because the Non-Parties have not identified a sufficiently protectable interest in this action,

13  their request to intervene as of right fails for that reason alone.

14      **2.      The Non-Parties' Interests Will Not Be Impaired**

15      Even if the Non-Parties had identified a relevant interest, no such interest will be impaired.

16      The Non-Parties claim to have an interest in "determining [whether the Settlement] is in the

17  public interest, and if it is not, advocating for its rejection." Mot. 11. Again, this is a generalized

18  interest shared by anyone—it is not a protectable interest under Rule 24(a). But even setting that

19  aside, courts in Tunney Act proceedings have repeatedly held that non-parties do not need to

20  intervene as parties to protect whatever interest they might have, since they have the ability to (1)

21  participate in the Tunney Act comment process, (2) make whatever arguments they wish to make

22  regarding the settlement as an *amicus*, and (3) bring their own lawsuit. *United States v. Int'l Bus.*

23  *Machines Corp.,* 1995 WL 366383, at *3-4 (S.D.N.Y. June 19, 1995) (non-parties had no right to

24  intervene because they could "participate in this action as amicus," had "the opportunity, along with

25  other members of the public, to comment," and could file "a private legal action").

26      The Non-Parties here have each of these alternative means of representing their interests.

27  Indeed, the Non-Parties have already utilized the comment process to voice their objections. *See*

28  ECF 236-2. Congress intended for nonparties to express themselves through the comment process,

15

1  not through "intervention with all of the attendant problems, complexities and delays that such

2  participation would inevitably involve." *United States v. G. Heileman Brewing Co.*, 563 F. Supp.

3  642, 652-53 (D. Del. 1983) ("[T]he legislative history reveals that the main purpose of the bill was

4  []to encourage additional comments ... and not to invite intervention ...."). "The comment procedures

5  of the Tunney Act are adequate to permit these movants a full and fair opportunity to present their

6  views on relevant antitrust considerations bearing upon entry of the proposed final judgment."

7  *United States v. Stroh Brewery Co.*, 1982 WL 1852, at *2 (D.D.C. June 8, 1982) (denying

8  intervention).  In addition, the Non-Parties could petition the Court to participate as *amici*—which

9  "is far and away ... preferred" over intervention.  *G. Heileman*, 563 F. Supp. at 653.

10         Finally, the Non-Parties are free to initiate their own legal action if they are dissatisfied with

11  the merger, even after the settlement.  The entry of a consent decree under the Tunney Act is not a

12  final determination of the merits of the merger and has no "estoppel" effect on non-parties—who are

13  free to bring their own lawsuit challenging the merger even after Tunney Act approval.  *See, e.g.,*

14  *MSL v. United States*, 118 F.3d 776, 781 (D.C. Cir. 1997).  For that reason, a nonparty's interest in

15  antitrust enforcement and pursuing its own lawsuit is not "in any way 'impaired or impeded' by

16  settlement of the Government's case."  *United States v. Blue Chip Stamp Co.*, 272 F. Supp. 432, 438

17  (C.D. Cal. 1967) (rejecting effort to intervene in antitrust case), *aff'd*, 389 U.S. 5801 (1968); *G.*

18  *Heileman*, 563 F. Supp. at 649 (same); *Carrols*, 454 F. Supp. at 1220 (same).

19         Because the Non-Parties are free to protect any interests they have through alternative, far

20  less prejudicial means, they cannot satisfy the interest impairment requirement of Rule 24(a)(2).

21         **3.    The Non-Parties' Interests Are Adequately Represented**

22         Even if the Non-Parties could satisfy all the other elements of Rule 24(a), their motion would

23  still fail because the Government is presumed to represent their interests.

24         "Congress has vested in the Department of Justice the duty of instituting proceedings in

25  equity to prevent and restrain antitrust violations."  *Blue Chip*, 272 F. Supp. at 438.  As a result, there

26  is a nearly irrebuttable presumption that the Government adequately represents the interests of the

27  public in enforcing the antitrust laws: "in the absence of a very compelling showing to the contrary,

28  it will be assumed that the United States adequately represents the public interest in antitrust suits."

16

1  Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1909 (3d ed.) (collecting cases); *IBM*, 1995 WL

2  366383, at *1–2 (same) (collecting cases).  "[A] mere showing that the Justice Department failed to

3  agree with the movants' version of proper antitrust policy falls wide of proof that the public interest

4  was inadequately represented." *Int'l Tel. & Tel.*, 349 F. Supp. at 27.

5          In fact, the Supreme Court has only found the DOJ failed to represent the public interest in

6  antitrust litigation a *single* time—in *Cascade Natural Gas Corp. v. El Paso Natural Gas Co.*, 386

7  U.S. 129 (1967)[4]—and ever since, courts have held that *Cascade* is "sui generis," and that, unless a

8  case presents the same fact pattern, the government is presumed to represent the public interest in an

9  antitrust case.  *Auto. Mfrs.*, 307 F. Supp. at 619 n.3.  "In *Cascade*, ... an acquisition had been found

10 to violate the antitrust laws, [and] the Supreme Court 'directed the district court to 'order divestiture

11 without delay.''"  *IBM*, 1995 WL 366383, at *2 (quoting 386 U.S. at 131).  But the government

12 violated this order, "consent[ing] to a decree delaying divestiture for more than three years and [that]

13 did not provide for the scope of divestiture ordered by the Supreme Court."  *Id.*  Because "of this

14 blatant failure by the Government to effectuate the Court's prior ruling, the Court permitted the State

15 of California ... and two private parties directly affected by the acquisition to intervene in hearings

16 held on the decree, ... to aid the execution of the Court's mandate."  *Id.*  *Cascade* was subsequently

17 limited to its facts—and as a result, "*Cascade* stands virtually alone, and ... the usual rule, both before

18 *Cascade* and after, has been that private parties will not be allowed to intervene in government

19 antitrust litigation."  *IBM*, 1995 WL 366383, at *2.  This rule applies to states just as it applies to

20 private parties.  *See, e.g.*, *Auto. Mfrs. Ass'n*, 307 F. Supp. at 619 & n.2 (denying states and

21 municipalities intervention to object to antitrust consent decree).

22         The Non-Parties do not even mention this rule, much less try to show they qualify for

23 *Cascade*'s exceedingly narrow exception (i.e., where the government flouts an order of the Supreme

24 Court).  They say that the "burden of" showing inadequacy is "minimal," and can be met whenever

25 an intervenor seeks to make "arguments" that are different from the arguments a party would make.

26

27 [4] This is particularly remarkable because, until 1974, the judgment in an antitrust case brought by
   the DOJ was directly appealable to the Supreme Court—so it heard many antitrust consent-decree
28 cases that denied intervention, and summarily affirmed them all (save *Cascade*).  *See, e.g.*, *G.
   Heileman*, 563 F. Supp. at 648 (collecting cases denying intervention with summary affirmances).

17

1  Mot. at 11.  But the "minimal" burden standard applies in *other* litigation, *not* DOJ antitrust suits,

2  where a far higher showing—described as "strong," *Am. Med. Ass'n v. United States*, 1985 WL 1753,

3  at *2 (N.D. Ill. June 14, 1985), or "very compelling," *supra* 16—is required.[5]  And the Non-Parties'

4  argument that the DOJ "failed to agree with the movants' version of proper antitrust policy falls wide

5  of proof that the public interest was inadequately represented." *Int'l Tel. & Tel.*, 349 F. Supp. at 27.

6  Because the DOJ is presumed to represent the Non-Parties' interests in enforcing the antitrust laws—

7  and because the Non-Parties do not try to (and cannot) meet the narrow *Cascade* exception to that

8  presumption—the Non-Parties cannot show the DOJ's representation of their interests is inadequate.

9     To be sure, some courts have suggested in *dicta* that intervention might be appropriate in an

10  antitrust case if there is proof of "bad faith or malfeasance" by the Government.  *See, e.g.*, *G.*

11  *Heileman*, 563 F. Supp. at 649.  But there is no caselaw squarely applying such an exception, and no

12  court has *ever* found "bad faith or malfeasance" justifying intervention in a Government antitrust

13  action.  And the existence of an exception that required examining the DOJ's motives or subjective

14  intent in entering a settlement would raise constitutionality concerns over separation of powers

15  principles.  The Executive Branch has absolute authority to determine how to exercise its discretion

16  when settling a case, and the Supreme Court "has recognized on several occasions over many years

17  that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a

18  decision generally committed to an agency's absolute discretion." *Heckler v. Chaney*, 470 U.S. 821,

19  831 (1985).  Courts cannot supervise the DOJ or take sides in intra-DOJ debates about how to resolve

20  case:  "AUSAs are members of the Executive Branch, and the Constitution vests the executive power

21  in the President alone.... That means the President and his officers, not the courts, supervise AUSAs

22  and the investigations they perform." *United States v. Petlechkov*, 72 F.4th 699, 709 (6th Cir. 2023).

---

23  [5] None of the cases the Non-Parties cite for the inadequacy argument involved antitrust.  *See* Mot. at
24  11.  Only one case even involved a consent decree (*United States v. Aerojet Gen. Corp.*, 606 F.3d
   1142 (9th Cir. 2010)), and in that case, the intervenors were directly affected by the proposed decree.
25  *Aerojet* involved a CERCLA settlement between the EPA and some—but not all—alleged polluters
   in the San Gabriel Valley (known as "potentially responsible parties" or "PRPs"). *Id.* at 1146.  Under
26  the terms of the settlement, the settling PRPs would not have to contribute any cleanup costs to non-
   settling PRPs, so the non-settling PRPs intervened to stop the settlement and protect their right to
27  contribution.  *Id.* at 1147-48.  The Ninth Circuit easily concluded that the non-settling PRPs' interests
   were not protected by the Government, because they had a direct, pecuniary interest in contribution.
28  *Id.* at 1152-53.  Here, by contrast, the States have no pecuniary interest that is affected by the
   proposed consent decree.  *Supra* 14-15.

18

1    "Congress has not authorized courts to run prosecutors' offices, and under our system, we doubt it

2    could." *Id.* (court could not force DOJ to investigate alleged conspiracy).  In light of these concerns,

3    it is unsurprising that no court has ever *found* "bad faith or malfeasance" justifying intervention.

4         This holds true in the Tunney Act context, just like in the context of criminal prosecutions.

5    As the D.C. Circuit has held, Tunney Act review must necessarily be "narrow[]" and focused on the

6    settlement's terms—not the DOJ's decision-making process—"in 'part because of the constitutional

7    questions that would be raised if courts were to subject the government's exercise of its prosecutorial

8    discretion to non-deferential review.'" *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C.

9    Cir. 2016) (quoting *MSL*, 118 F.3d at 783).  The Tunney Act thus "confers no new power in the

10   courts to scrutinize and countermand the prosecution's exercise of its traditional authority over

11   charging and enforcement decisions." *Id.*  And "[t]he judiciary has neither the power nor the facilities

12   to initiate and conduct investigations into the conduct of members of the executive branch of the

13   government." *United States v. Int'l Tel. & Tel. Corp.*, 1974 WL 822, at *4 (D. Conn. Jan. 14, 1974)

14   (rejecting claim that consent decree should be rejected because of impropriety in negotiations).

15        A "bad faith" exception to the presumption of adequate representation that permitted an

16   examination of the DOJ's decision-making process when exercising its discretion to settle a case

17   would contravene these constitutional principles.  It would also contravene the Tunney Act, which

18   requires courts to examine the *terms* of the parties' settlement—and the settlement's impact on the

19   relevant market—not the DOJ's decision-making process leading up to the settlement. *Supra* 12,

20   *infra* 24.  Even if the Court could constitutionally exercise its Tunney Act authority to review the

21   DOJ's decision-making process for bad faith, the authority to investigate the settlement rests with

22   the Court alone—it cannot be usurped by an intervenor to conduct its own free-floating investigation.

23   *See, e.g., United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 10–11 (D.D.C. 2007) (while court

24   has broad authority under the Tunney Act, no intervenor has a right of participation).  No court has

25   applied a "bad faith" exception to justify antitrust intervention, and this Court should not be the first.

26        In any event, the Non-Parties have not made any attempt to satisfy a "bad faith or

27   malfeasance" exception to the presumption of adequate representation, to the extent it even exists.

28   Since no court has applied a "bad faith or malfeasance" intervention standard in antitrust cases, what

19

1    would satisfy the standard is unclear.  In other contexts (outside of antitrust) where "misfeasance or

2    nonfeasance" has sufficed to rebut the presumption that a government party represents the public's

3    interests, the intervenor has provided "evidence that the government had waived and failed to

4    enforce" the law at issue, *Chiglo v. City of Preston*, 104 F.3d 185, 188 (8th Cir. 1997), or "breached"

5    a particular statutory obligation, *Mausolf v. Babbitt*, 85 F.3d 1295, 1303 (8th Cir. 1996).

6         The Non-Parties say "public reporting [has] emerged alleging that the Settlement was the

7    product of undue influence by Defendants' well-connected lobbyists who engaged in secretive

8    backroom dealing with higher level officials at the DOJ, including then-Chief of Staff Chad Mizelle

9    and Acting Associate Attorney General Stanley Woodward."  Mot. at 4 (citing Ex. 1 at 2).  But all

10   the Non-Parties cite for this is one page of their own Tunney Act comments, which itself says, in

11   total, that: "DOJ trial staff" and "senior leadership at the Antitrust Division, opposed the Settlement";

12   "higher-level officials at the DOJ", i.e., "Staff Chad Mizelle and Acting Associate Attorney General

13   Stanley Woodward, ... were apparently lobbied by individuals with close ties to the President's

14   administration"; "Mr. Mizelle then allegedly pushed the Settlement through over the Antitrust

15   Division's objection"; "Mr. Alford has called the Settlement a 'scandal' and directly accused Mr.

16   Mizelle and Mr. Woodward of perverting justice and violating the rule of law"; and "Mr. Alford and

17   a colleague within the Antitrust Division were fired for opposing the Settlement."  Ex. 1 at 2.  The

18   Non-Parties' allegations boil down to a claim that senior DOJ officials talked to "individuals with

19   close ties to the ... administration," overruled other DOJ officials, and approved the Settlement.

20        This is not even an allegation of illegality but rather a disagreement with the "litigation

21   strategy or objectives" of the Government.  *Chiglo*, 104 F.3d at 188 (even outside of antitrust, this

22   disagreement is insufficient to show inadequacy).  The Non-Parties rely on Alford's speech to

23   suggest there was some issue with the settlement—but Alford said nothing factual about the

24   settlement at all.  He referenced what he called the "HPE-Juniper merger scandal," without

25   explanation of what that is, said it was his "opinion" that, somehow, "Chad Mizelle and Stanley

26   Woodward perverted justice and acted inconsistent with the rule of law," and claimed, again without

27   any explanation, that "[i]f you knew what I knew," "you" would hope the merger was blocked.  ECF

28   280-2 at 1, 3.  All that can be gleaned from Alford's innuendo is that he is angry at Mizelle and

Woodward.  Alford's fact-free assertions ("[i]f you knew what I knew") are not evidence of illegality or wrongdoing sufficient to show inadequacy.  *See Int'l Tel. & Tel*, 349 F. Supp. at 27 n.4 (intervenor must "make a clear showing rather than a mere allegation that his interest is not adequately represented"); *Moosehead Sanitary Dist. v. S. G. Phillips Corp.*, 610 F.2d 49, 54 (1st Cir. 1979) ("a petitioner must produce something more than speculation as to the purported inadequacy").  As explained in the accompanying declarations, there is no other deal or agreement—the only agreement is the agreement that has been presented to the Court.  Neri Decl. ¶ 3; Schultz Decl. ¶ 12.

Because the United States adequately represents the Non-Parties' interests, and because the Non-Parties have not provided any evidence, or even specific factual allegations, of bad faith or malfeasance, the Non-Parties have failed to make the requisite showing under Rule 24(a)(2).

**D.     There Is No Basis For Permissive Intervention**

In the alternative, the Non-Parties seek permissive intervention under Rule 24(b), which is entirely discretionary.  "An applicant who seeks permissive intervention must prove that it meets three threshold requirements: (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and (3) the court has an independent basis for jurisdiction over the applicant's claims."  *Donnelly v. Glickman*, 159 F.3d 405, 412 (9th Cir. 1998).  As an alternative to the first element, a governmental entity may show its "claim or defense is based on ... a statute or executive order administered by the officer or agency."  Fed. R. Civ. P. 24(b)(2)(A).  "Even if an applicant satisfies those threshold requirements, the district court has discretion to deny permissive intervention."  *Donnelly*, 159 F.3d at 412.  "In exercising its discretion, the district court must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties."  *Id.*  Applying this analysis, "courts have consistently exercised their discretion to deny motions for permissive intervention in antitrust consent proceedings."  *IBM*, 1995 WL 366383 at *5.

The Non-Parties fail to carry their burden at every step of the analysis.

**1.     States Do Not "Administer" the Clayton Act**

The Non-Parties' lead argument on permissive intervention is that the Court should permit them to intervene under Rule 24(b)(2)(A), which gives the Court discretion to "permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on ... a statute

21

1  or executive order administered by the officer or agency." But the Non-Parties do not satisfy this

2  subsection, as they do not "administer[]" the Clayton Act—the only basis for a "claim" in this case.

3    The Non-Parties' argument that they administer the Clayton Act is composed of a single

4  sentence, citing *American Stores* for the proposition that they are "charged with enforcing Section 7

5  of the Clayton Act." Mot. at 12. But all *American Stores* says is that private parties may bring claims

6  under the Clayton Act. 495 U.S. at 284. *American Stores* does not say States "administer" the Act.

7    The mere fact that States can bring claims under the Clayton Act does not mean they

8  "administer" it. "To satisfy the requirement that [they] administer[] the statute," the Non-Parties

9  "must demonstrate that [they] manage[], direct[], or supervise[] the application of [it]." *McHenry v.*

10  *Comm'r*, 677 F.3d 214, 220 (4th Cir. 2012). This has been interpreted to mean that regulatory

11  agencies that perform administrative functions under a law—like promulgating regulations pursuant

12  to it—"administer" the law. For example, the IRS is authorized to "administer ... the execution and

13  application of the internal revenue laws or related statutes." *Am. Inst. of Certified Pub. Accts. v.*

14  *Internal Revenue Serv.*, 746 F. App'x 1, 10 (D.C. Cir. 2018). And the Commissioner of Revenue for

15  Tennessee "administers" Tennessee's Transfer Tax law, and collects taxes pursuant to it. *Campbell*

16  *Cnty., Tenn. v. Fed. Hous. Fin. Agency*, 2013 WL 4777326, at *1 (E.D. Tenn. Sept. 5, 2013).

17    But no court has ever held that a state agency "administer[s]" a federal statute merely because

18  it has the right to bring a claim under it. To the contrary, when a New York City agency sought to

19  intervene in a case under the Civil Rights Act, the court flatly rejected the proposition that a state

20  agency may "administer[]" a "federal statute." *See United States v. Loc. 638*, 347 F. Supp. 164, 166

21  (S.D.N.Y. 1972) ("The action is exclusively based on a federal statute, the Civil Rights Act of 1964,

22  which is not administered by any state agency ...."). So too here. The Non-Parties have no rights to

23  promulgate regulations or perform any administrative function under the Clayton Act—they merely

24  have the right to sue, just like private parties. *See Am. Stores*, 495 U.S. at 284. These state entities

25  do not "administer[]" the Clayton Act, "a federal statute." *Loc. 638*, 347 F. Supp. at 166.

26    **2.**  **There Is No Common Question of Law or Fact**

27    In the alternative, the Non-Parties—in one paragraph of their Motion, without citing any

28  caselaw—argue they should be granted permissive intervention under Rule 24(b)(1)(B), which

22

1  provides that a "court may permit anyone to intervene who … (B) has a claim or defense that shares

2  with the main action a common question of law or fact." Mot. at 14. But the Non-Parties are not

3  bringing claims at all, so they do not have a claim that shares questions with the DOJ's action.

4      The Non-Parties argue they share a common question with the DOJ's claim because they

5  "have authority to assert ... the same claim that the United States asserted in its Complaint." Mot. at

6  14. But the Non-Parties do not have *any* claim, and they do not know if they will bring one. *Supra*

7  6. "The language of the rule makes clear that if the would be intervenor's claim or defense contains

8  no question of law or fact that is raised also by the main action, intervention under Rule 24(b)(2)

9  must be denied." *Kootenai v. Veneman*, 313 F.3d 1094, 1111 (9th Cir. 2002), *abrogated on other*

10 *grounds by Wilderness v. USFS*, 630 F.3d 1173 (9th Cir. 2011). Here, the Non-Parties have no

11 claims at all—and nonexistent claims cannot share questions with the claim in the main action.

12     *United States v. Microsoft Corp.*, 2003 WL 1191753 (D.D.C. Feb. 7, 2003), a Tunney Act

13 case, is instructive. The court could not determine whether the proposed intervenors had a claim that

14 shared a question with the main action because the intervention motion merely pointed to "defects"

15 in the proposed judgment, rather than stating a "claim" the intervenors wished to bring. *Id.* at *4.

16 The court was "left to guess exactly how the specific defects [the proposed intervenor] raise[d]

17 constitute common questions of law and fact," particularly in the absence of any "pleading" "setting

18 forth the claim or defense for which intervention is sought." *Id.* Likewise, in *G. Heileman*, the court

19 denied intervention in a Tunney Act proceeding in a case—like this one—involving a Clayton Act

20 claim, because the intervenors sought to "raise issues" with the transaction but not bring a Clayton

21 Act claim themselves. 563 F. Supp at 649. And in *Carrols*, the court denied intervention in a Tunney

22 Act case when the intervenors were not asserting antitrust claims and thus did "not raise any

23 questions of law or fact in common with those involved in the main action." 454 F. Supp. at 1221.

24     Here, the Non-Parties do not state they are bringing *any* claim that would share common

25 questions with the Government's Clayton Act claim. They cannot invoke Rule 24(b)(1)(B).

26   **3.    The Court Should Exercise Its Discretion To Deny Intervention**

27     Finally, even if the other elements of permissive intervention were met (they are not), the

28 Court should still exercise its discretion to deny intervention. "In part because of the constitutional

23

1    questions that would be raised if courts were to subject the government's exercise of its prosecutorial

2    discretion to non-deferential review," the Tunney Act inquiry is "construed ... narrowly."  *MSL*, 118

3    F.3d at 783.  "The court is required to determine not whether a particular decree is the one that will

4    best serve society, but whether the settlement is 'within the reaches of the public interest.'"  *Bechtel*,

5    648 F.2d at 666 (quoting *NBC*, 449 F.Supp. at 1143).  Given the narrow scope of this review, there

6    is no reason to allow the Non-Parties to embark on a constitutionally suspect investigation into the

7    DOJ's decision-making processes and permit them to take sweeping discovery about deliberations

8    that are likely privileged in any event.  As numerous courts have recognized when denying similar

9    motions to intervene, the Tunney Act provides would-be intervenors with other, less-disruptive

10    opportunities to make their voice heard regarding the settlement.  They can comment (as the Non-

11    Parties have) and they may file an *amici* brief expressing their arguments.  What they cannot do is

12    side-track the final review of the merger with their own discovery demands into irrelevant issues.

13        Given the separation-of-powers issues that would arise if a court were to second-guess the

14    DOJ's exercise of prosecutorial discretion, "the Tunney Act cannot be interpreted as an authorization

15    for a district judge to assume the role of Attorney General."  *Fokker*, 818 F.3d at 743.  "Consequently,

16    a district court should not 'reject a consent decree simply because it believes the [g]overnment could

17    have negotiated a more exacting decree,'" *id.* (quoting *Massachusetts v. Microsoft Corp.*, 373 F.3d

18    1199 (D.C. Cir. 2004)), "or because it believes the government 'failed to bring the proper charges,'"

19    *id.* (quoting *SEC v. Citigroup Global Mkts., Inc.*, 752 F.3d 285, 297 (2d Cir. 2014)).  "A court's

20    review of a proposed final judgment is highly deferential; thus, approval should be withheld 'only if

21    any of the terms appear ambiguous, if the enforcement mechanism is inadequate, if third parties will

22    be positively injured, or if the decree otherwise makes a mockery of judicial power.'"  *United States*

23    *v. Gannett Co.*, 2014 WL 6844302, at *2 (D.D.C. Nov. 18, 2014) (quoting *Massachusetts*, 373 F.3d

24    at 1236).  "[T]he district court is not empowered to review the actions or behavior of the Department

25    of Justice; the court is only authorized to review the decree itself."  *Microsoft*, 56 F.3d at 1459.  And

26    courts cannot "assume that the allegations in the complaint have been formally made out" or

27    "measure the remedies in the decree as if they were fashioned after trial," given that concessions

28    "may well reflect an underlying weakness in the government's case."  *Id.* at 1461.

24

1    Due to the limited scope of this review—focused on the terms of the decree, not the DOJ's
2 discretionary decision-making—allowing the Non-Parties to intervene to take discovery about the
3 DOJ's deliberative process would both be unnecessary and delay proceedings.  And courts recognize
4 that when denying intervention in the Tunney Act context:  when intervenors "seek authority to
5 conduct discovery, present evidence, introduce new issues, and otherwise influence the pace and
6 direction of the proceedings, ... the potential for their participation as intervenors to delay this action
7 and prejudice the public's interest in an orderly and expeditious resolution of this matter far
8 outweighs any likely benefit to be derived from permitting intervention." *IBM*, 1995 WL 366383,
9 at *6.  Allowing intervenors to inject "extraneous issues [that] are not part of the government's case,"
10 and thus not part of Tunney Act review, would "unnecessarily delay [and] prejudice the adjudication
11 of the rights of the original parties." *G. Heileman*, 563 F. Supp. at 649–50 (collecting cases); *Carrols*,
12 454 F. Supp. at 1221 (intervention to explore issues not in complaint "would defeat entry of the
13 consent decree and would prolong this litigation").  "[A]n order to compel production of documents,
14 such as that sought by [the Non-Parties], runs the risk of turning the flexible proceedings of the
15 Tunney Act into a full-scale trial," which is not what "Congress contemplated." *Airline Tariff*, 1993
16 WL 95486, at *2 (rejecting intervention when intervenors sought discovery).

17    Granting the Non-Parties full "party" status to engage in wide-ranging discovery and thereby
18 prolong these proceedings is particularly unnecessary here, where it is HPE's understanding that *not
19 a single competitor or customer* objected to the settlement during the Tunney Act comment period.
20 There is no reason to allow the Non-Parties to hold-up final review of the settlement when *no* actual
21 market participants have expressed concerns with its terms.  Moreover, there are ample other
22 methods for the Non-Parties to voice any concerns they have.  Again, "the main purpose" of the
23 Tunney was to encourage "comments," "not to invite intervention," and the Non-Parties have already
24 commented.  *G. Heileman*, 563 F. Supp. at 652-53.  To the extent they believe they have an additional
25 argument that was not already raised in their comment, they can present it in an *amici* brief.  *See id.*
26 at 653 (amici status "is far and away the preferred method" for participating in Tunney Act case).

27    **V.    CONCLUSION**

28    The Non-Parties' motion to intervene should be denied.

25

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR INTERVENTION
CASE NO. 5:25-cv-00951

Dated: October 28, 2025

By: */s/ Samuel G. Liversidge*

Samuel G. Liversidge
*Attorney for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

Samuel G. Liversidge (Bar No. 180578)
Eric Vandevelde (Bar No. 240699)
Daniel Nowicki (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Michael J. Perry (Bar No. 255411)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
SWeissman@gibsondunn.com
MJPerry@gibsondunn.com
KLimarzi@gibsondunn.com

Julie S. Elmer (*pro hac vice*)
Jennifer Mellott (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
eric.mahr@freshfields.com
jennifer.mellott@freshfields.com

Justina K. Sessions (Bar No.  270914)
**FRESHFIELDS US LLP**
855 Main St
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

*Attorneys for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

26