PHILIP J. WEISER
Attorney General
ARTHUR BILLER (Admitted *Pro Hac Vice*)
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
        Bryn.Williams@coag.gov

*Attorneys for Movants*

[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff,* | **REPLY ON MOTION FOR INTERVENTION** |
| vs. | |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | Judge: P. Casey Pitts<br>Action Filed: January 30, 2025<br>Hearing Requested: November 18, 2025 at 10:00 am |
| *Defendants.* | |

# TABLE OF CONTENTS

**ARGUMENT** ..................................................................................................................1

    I.      The States' Proposed Intervention Is Fully Contemplated By the Tunney Act. ........1

    II.     The Motion Is Timely. ......................................................................................3

    III.    The States Are Entitled to Intervention of Right. .......................................................6

        A.     The States' Interest Would Be Practically Impaired Without Intervention ..6

        B.     There Is No Longer Adequate Representation ............................................. 8

    IV.    The States Are Entitled to Permissive Intervention ....................................................9

        A.     The States Are Sovereign and Joint Enforcers of the Clayton Act. ........... 10

        B.     The States' Claims Share Common Questions of Law or Fact with This
            Action. ................................................................................................ 11

    V.     The States Unmistakably Have Article III Standing. ...............................................12

    VI.    A "Peek At the Merits" Supports Intervention. ........................................................13

    VII.   There Is No Separation of Powers Violation. ...........................................................14

1

# TABLE OF AUTHORITIES

2

<u>**Cases**</u>

*Aleut Corp. v. Tyonek Native Corp.,*
  725 F.2d 527 (9th Cir. 1984) ............................................................................ 5
*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
  458 U.S. 592 (1982)........................................................................................... 7
*Arakaki v. Cayetano,*
  324 F.3d 1078 (9th Cir. 2003) .......................................................................... 8
*Bordenkircher v. Hayes,*
  434 U.S. 357 (1978)......................................................................................... 15
*California ex rel. Lockyer v. United States,*
  450 F.3d 436 (9th Cir. 2006) ............................................................................ 9
*Cascade Natural Gas Corp v. El Paso Natural Gas Co.,*
  386 U.S. 129 (1967)........................................................................................... 9
*Citizens for Balanced Use v. Montana Wilderness Ass'n,*
  647 F.3d 893 (9th Cir. 2011) ........................................................................ 6, 8
*City of Houston v. Am. Traffic Sols., Inc.,*
  668 F.3d 291 (5th Cir. 2012) ............................................................................ 9
*Fresno Cty. v. Andrus,*
  622 F.2d 436 (9th Cir. 1980) ............................................................................ 6
*In re Morgan,*
  506 F.3d 705 (9th Cir. 2007) .......................................................................... 15
*Lockyer v. Mirant Corp.,*
  398 F.3d 1098 (9th Cir. 2005) .......................................................................... 6
*Lopez v. Monterey Cnty.,*
  525 U.S. 266 (1999)......................................................................................... 10
*Love v. Vilsack,*
  304 F.R.D. 85 (D.D.C. 2014) ............................................................................ 5
*Massachusetts School of Law v. United States,*
  118 F.3d 776 (D.C. Cir. 1997)......................................................................... 13
*McHenry v. Comm'r,*
  677 F.3d 214 (4th Cir. 2012) .......................................................................... 10
*Mistretta v. United States,*
  488 U.S. 361 (1989)......................................................................................... 15
*New York v. Deutsche Telekom AG,*
  439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................. 10
*Nuesse v. Camp,*
  385 F.2d 694 (D.C. Cir. 1967)........................................................................... 6
*Ramey v. Stevedoring Servs. of Am.,*
  134 F.3d 954 (9th Cir. 1998) .......................................................................... 14
*Roeder v. Islamic Republic of Iran,*
  333 F.3d 228 (D.C. Cir. 2003) ................................................................... 12, 13
*Smith v. Los Angeles Unified Sch. Dist.,*
  830 F.3d 843 (9th Cir. 2016) ............................................................................ 4
*Smuck v. Hobson,*
  408 F.2d 175 (1969) ...................................................................................... 6, 7

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016).................................................................................. 13

*Sw. Ctr. for Biological Diversity v. Berg*,
   268 F.3d 810 (9th Cir. 2001) ...................................................................... 9

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
   581 U.S. 433 (2017).................................................................................. 12

*United States ex rel. Hernandez v. Team Finance, L.L.C.*,
   80 F.4th 571 (5th Cir. 2023) ..................................................................... 11

*United States v. Aerojet Gen. Corp.*,
   606 F.3d 1142 (9th Cir. 2010) ................................................................. 5,8

*United States v. Airline Tariff Pub. Co.*,
   836 F. Supp. 9 (D.D.C. 1993)..................................................................... 2

*United States v. Alcan Aluminum, Inc.*,
   25 F.3d 1174 (3d Cir. 1994) ....................................................................... 6

*United States v. Alex. Brown & Sons, Inc.*,
   169 F.R.D. 532 (S.D.N.Y. 1996)........................................................... 5, 13

*United States v. Alisal Water Corp.*,
   370 F.3d 915 (9th Cir. 2004) ...................................................................... 5

*United States v. Am. Tel. & Tel. Co.*,
   552 F. Supp. 131 (D.D.C. 1982)............................................................. 2, 3

*United States v. Auto. Mfrs. Ass'n*,
   307 F. Supp. 617 (C.D. Cal. 1969) ............................................................ 7

*United States v. Bechtel Corp.*,
   648 F.2d 660 (9th Cir. 1981) ...................................................................... 3

*United States v. Carrols Dev. Corp.*,
   454 F. Supp. 1215 (N.D.N.Y. 1978).................................................... 8, 12

*United States v. Childs*,
   5 F.3d 1328 (9th Cir. 1993) ...................................................................... 15

*United States v. CVS Health Corp.*,
   407 F. Supp. 3d 45 (D.D.C. 2019)..................................................... 2, 3, 9

*United States v. G. Heileman Brewing Co.*,
   563 F. Supp. 642 (D. Del. 1983)............................................................... 12

*United States v. Gamma Tech Indus., Inc.*,
   265 F.3d 917 (9th Cir. 2001) .................................................................... 15

*United States v. Google*,
   Case No. 20-cv-3010, 2025 WL 88052 (D.C. Cir. Mar. 21, 2025) ............. 5

*United States v. Lyon*,
   No. CV F 07-0491 LJO MJS, 2011 WL 1810322 (E.D. Cal. May 11, 2011) ... 4

*United States v. Microsoft Corp.*,
   56 F.3d 1448 (D.C.Cir.1995)...................................................................... 9

*United States v. Microsoft Corp.*,
   231 F. Supp. 2d 144 (D.D.C. 2002) ........................................................... 1

*United States v. Miller*,
   722 F.2d 562 (9th Cir. 1983) .................................................................... 15

*United States v. Oregon*,
   745 F.2d 550 (9th Cir. 1984) ...................................................................... 4

*United States v. Samueli*,
   575 F. Supp. 2d 1154 (C.D. Cal. 2008) .................................................... 15

Reply on Motion For Intervention – Case No. 5:25-cv-00951-PCP

*United States v. SBC Comm'ns, Inc.*,
    489 F. Supp. 2d 1 (D.D.C. 2007) ................................................................................ 3
*United States v. Thomson Corp.*,
    Civ. A. No. 96-1415 (PLF), 1996 WL 554557 (D.D.C. Sept. 25, 1996) ..................... 12
*United States v. Williams*,
    68 F.4th 564 (9th Cir. 2023) .................................................................................... 15
*Washington v. FDA*,
    108 F.4th 1163 (9th Cir. 2024) ................................................................................ 12

## Statutes

15 U.S.C. § 15f ........................................................................................................ 11
15 U.S.C § 16 ................................................................................................... *passim*
15 U.S.C § 15c ........................................................................................................ 10
28 U.S.C. § 1404(a) ................................................................................................ 11
28 U.S.C. § 1407(g) ................................................................................................ 11

## Rules

Fed. R. Crim. P. 11 .................................................................................................. 15

## Other Authorities

119 Cong. Rec. 24 (daily ed. July 18, 1973) ...................................................... 1, 2
Wright & Miller's Federal Practice & Procedure (3d ed. 2025) ............................... 7,8,10
H. Rep. No. 93-1463 (1974) ...................................................................................... 1
The Antitrust Procedures and Penalty Act: Hearings on S.782 and S. 1088 Before the Subcomm. On
    Antitrust & Monopoly of the S. Comm. on the Judiciary, 93d Cong. 151 (1973) ......................... 5
Advisory Comm. on Rules of Practice & Procedure, Report (Sept. 1965) ....................... 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Parties would have this Court turn the Tunney Act into a rubber stamp. They ignore the role that reported improper lobbying played in this Settlement and the wide range of tools the Court has to review that process. They also ignore the States' sovereign interests in protecting their citizens. The Parties are wrong. The Tunney Act and Rule 24 fully authorize the States' intervention and a comprehensive judicial review of the Settlement process and its substance.

## ARGUMENT

### I.    The States' Proposed Intervention Is Fully Contemplated By the Tunney Act.

The Parties portray the States' intervention and concerns with the process that led to the Settlement as outside the scope of the Tunney Act. DOJ Opp.[1] at 6-12; HPE Opp. at 12-13. To the contrary, scrutinizing and, if necessary, preventing a Settlement like this is the Tunney Act's reason for being, and all that the States have proposed is expressly within the Court's power to order.

First, the Tunney Act expressly empowers the Court to take a wide range of actions to aid in its public interest determination, including granting "full or limited participation . . . by interested persons or agencies, including . . . intervention as a party pursuant to the Federal Rules of Civil Procedure, examination of witnesses or documentary materials," holding an evidentiary hearing to "take testimony of Government officials or experts or such other expert witnesses . . . as the court may deem appropriate," and taking any "other action in the public interest as the court may deem appropriate." 15 U.S.C. § 16(f).

Second, contrary to the Parties' arguments, the Court is fully authorized to examine the *process* that led to the Settlement as part of its public interest determination, and not just the four corners of the Settlement. In passing the Tunney Act, Congress was "[c]oncerned with the appearance of impropriety engendered by the secrecy of consent decree negotiations in antitrust cases, in addition to exposing to 'sunlight' the *process by which such consent decrees are negotiated*." *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 151-52 (D.D.C. 2002) (citing 119 Cong. Rec. at 24,599) (emphasis added); *see also* H. Rep. No. 93-1463 (1974), *as reprinted in*

---

[1] "DOJ Opp." refers to Plaintiff's Opposition to Motion for Intervention (Dkt. No. 299). "HPE Opp." refers to Hewlett Packard Enterprise Co.'s Opposition to Motion for Intervention (Dkt. No. 298). "Motion" or "Mtn." refers to the Motion for Intervention (Dkt. No. 236). Other abbreviations and capitalized terms not defined herein have the meaning ascribed in the Motion.

1974 U.S.C.C.A.N. 6535, 6536 ("it is imperative that the integrity of and public confidence in procedures relating to settlements via consent decree procedures be assured").  Congress was acutely aware that antitrust violators may "wield great influence and economic power" and "often bring significant pressure to bear on government." 119 Cong. Rec. 24,597 (1973). Accordingly, Congress sought to "ensure[] that the economic power and political influence of antitrust violators do not unduly influence the government into entering into consent decrees that do not effectively remedy antitrust violations."  *United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 54 (D.D.C. 2019) (quoting *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993)).

In fact, the Tunney Act was passed directly in response to such influence peddling.  In 1971, International Telephone and Telegraph Corp. ("ITT") pledged $400,000 for the 1972 Republican National Convention, and President Nixon subsequently ordered the DOJ to let ITT proceed with a merger.[2]  Senator Tunney referenced the ITT scandal in his support for the bill that came to bear his name, as well as other examples of the DOJ succumbing to pressure from large antitrust violators. *See* 119 Cong. Rec. 24,598 (1973).  There is no question that Congress intended the term "public interest" in the statute to encompass whether an antitrust violator unduly influenced the government. *See United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 148-49 (D.D.C. 1982) ("Congress sought to ensure that the Justice Department's use of consent decrees in antitrust cases would fully promote the goals of the antitrust laws and foster public confidence in their fair enforcement.").

This is also evident in the statute, which requires defendants to disclose *directly to the court*, all their communications with the United States, including through lobbyists, about the proposed settlement.  15 U.S.C. § 16(g).  That provision would be meaningless if courts were not allowed to inquire as to the substance of those communications and whether there was undue influence.

The court in the 1982 iteration of monopolization litigation against AT&T explicitly recognized that it could consider the prior "inappropriate collaboration" between AT&T and the federal government (one of the problematic cases cited in the Tunney Act legislative history), and

---

[2] *See* Ciara Torres-Spelliscy, *The I.T.T. Affair and Why Public Financing Matters for Political Conventions*, Brennan Center for Justice (Mar. 19, 2014), https://www.brennancenter.org/our-work/analysis-opinion/itt-affair-and-why-public-financing-matters-political-conventions (Watergate investigation revealed a recording of President Nixon ordering a DOJ official to "stay the hell out of" the ITT deal).

that it warranted applying closer scrutiny than what might otherwise apply in a "more routine antitrust case." *Am. Tel. & Tel. Co.*, 552 F. Supp. at 153.

The United States' argument that the 2004 amendments to the Tunney Act somehow changed any of that is meritless. *See* DOJ Opp. at 9. Those amendments were intended to strengthen the principle that courts must not merely rubber stamp settlements. *United States v. SBC Comm'ns, Inc.*, 489 F. Supp. 2d 1, 12 (D.D.C. 2007); *see also CVS*, 407 F. Supp. 3d at 54 n.11 (2004 amendments meant to overrule courts taking a narrow view of Tunney Act). Accordingly, Congress explicitly directed courts to examine various factors to make for a more rigorous public interest determination—but those amendments did not alter the Act's purpose, and certainly did not direct courts to turn a blind eye to the lobbying disclosures and any potential mischief that may have tainted the process. *See SBC Comm'ns*, 489 F. Supp. 2d at 12. Indeed, one of the factors the Court must consider is the "alternative remedies actually considered," which would entail an examination of the negotiations and settlement process, including demands that the DOJ made before HPE's lobbyists waded into the process. 15 U.S.C. § 16(e)(1)(A). A determination of the impact of the Settlement "upon the public generally" would also require examination of the process to ensure "that the government has not breached its duty to the public." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). The notion that the Court should ignore whether the DOJ gave in to high-powered lobbyists is simply false and lays bare the Parties' desire to avoid judicial scrutiny.

In arguing that the Court may not look at the Settlement process, the parties essentially take the position squarely rejected by *Am. Tel. & Tel. Co.*, "that courts must unquestioningly accept a proffered decree." 552 F. Supp. at 151. But "to do so would be to revert to the 'rubber stamp' role which was at the crux of the congressional concerns when the Tunney Act became law." *Id.*

## II.     The Motion Is Timely.

The Parties agree that courts assess timeliness based on three factors: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *See* DOJ Opp. at 14; HPE Opp. at 10. Under these factors, the Motion is plainly timely. *See* Mtn. at 8-9. Critically, the States filed the Motion before the DOJ has completed its requirements under the Tunney Act and before the Parties have moved for entry of

1   final judgment.  The States are aware of no case—and the Parties have cited none—that found

2   intervention in a Tunney Act proceeding to be untimely where the filing was made before the DOJ

3   had completed its obligation to file and respond to public comments.

4        The United States argues timeliness should be measured from the start of the lawsuit.  *See*

5   DOJ Opp. at 14-15.  But timeliness is assessed from the "crucial date" when the States should have

6   learned that their interests were no longer adequately represented by the United States, not the date

7   the States learned of the litigation.  *See* Mtn. at 8-9.  Even HPE does not go so far as to assert that

8   the "crucial date" was the start of the litigation.  *See* HPE Opp. at 10-11.

9        Similarly, HPE's position that timeliness should be measured from the filing of the

10  Settlement is also too early.  The States became aware that their interests were no longer adequately

11  represented once public reporting started to emerge about the improper Settlement process.  *See*

12  Mtn. at 9.  But regardless, whether one starts the clock as of June 27, 2025, or a month later makes

13  no material difference—it took at most three and half months for the States to review the Settlement

14  and the public reporting, draft a public comment, and move to intervene.  *See United States v. Lyon*,

15  No. CV F 07-0491 LJO MJS, 2011 WL 1810322, at *4 (E.D. Cal. May 11, 2011) (intervention into

16  proposed consent decree timely where city submitted timely public comment under CERCLA and

17  met other court deadlines); *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir.

18  2016) (where a change of circumstances is "major reason" for intervention, "the stage of proceedings

19  factor should be analyzed by reference to the change in circumstances"); *United States v. Oregon*,

20  745 F.2d 550, 552 (9th Cir. 1984) (finding Idaho's August 1983 motion to intervene timely—even

21  though it was filed fifteen years after the case began and five years after a settlement—because a

22  significant change in circumstances occurred in 1982).

23       The Parties' citations to cases about general post-settlement intervention are inapposite, as

24  they do not involve settlements with a Congressionally mandated public comment and court

25  approval process like one under the Tunney Act.  *See* DOJ Opp. at 15-17; HPE Opp. at 10-11.

26  Indeed, accepting the Parties' analogy to general post-settlement cases would render the Tunney

27  Act's intervention provision a nullity.  *See* 15 U.S.C. § 16(f)(3).

28       The United States' reliance on *United States v. Google* is also wrong.  There, the court

- 4 -

1  rejected Apple's motion to intervene because Apple did not dispute that it had known, or should

2  have known, that its contractual rights were at stake since the case's inception four years earlier.

3  Mem. Op. and Order, *United States v. Google*, Case No. 20-cv-3010, Dkt. No. 1153 at 4 (Jan. 27,

4  2025), *aff'd*, 2025 WL 88052 (D.C. Cir. Mar. 21, 2025).[3]

5       The United States cites cases where intervention occurred earlier than here, but fails to

6  identify any decision holding that a motion filed within a similar timeframe as here is untimely.

7  Instead, the Parties attempt to downplay the Ninth Circuit's decision in *United States v. Aerojet Gen.*

8  *Corp.*, 606 F.3d 1142, 1148-49 (9th Cir. 2010), because the parties did not dispute timeliness, but

9  the court there nevertheless affirmatively found intervention timely when filed within four months

10  of learning of a proposed consent decree. *See* DOJ Opp. at 17; HPE Opp. at 13 n.3.

11       HPE's arguments about prejudice are also unavailing. *See* HPE Opp. at 11-12. The

12  arguments about holding up the auction process presume that the Settlement will be approved, which

13  at best puts the cart in front of the horse. There is no prejudice in the Court granting intervention to

14  assist it in what it must do regardless—determine whether the Settlement is in the public interest.

15  Nor is there prejudice in carrying out a process mandated by Congress.[4] Moreover, as detailed in

16  the Motion and the States' public comment, there are serious issues with the Settlement that need to

17  be examined, and any potential delay has to be viewed in light of the seriousness of the issues and

18  the benefit to the Court of the States' ability to vigorously litigate those issues. *See United States v.*

19  *Alex. Brown & Sons, Inc.*, 169 F.R.D. 532, 538-39 (S.D.N.Y. 1996).

20       Lastly, the Parties' claim that the States must provide a stronger justification for the timing

21  of their intervention is unfounded. *See* DOJ Opp. at 16-17; HPE Opp. at 13. Courts routinely find

22  

23  [3] The United States' other cases likewise involved lengthy delays unlike the situation here. *See Love*
   *v. Vilsack*, 304 F.R.D. 85, 91 (D.D.C. 2014), *aff'd*, 2014 WL 6725758 (D.C. Cir. Nov. 18, 2014)

24  (proposed intervenor waited nearly thirteen years after complaint, almost three years after the
   government publicly announced claims process, and over a year after process was finalized); *United*

25  *States v. Alisal Water Corp.*, 370 F.3d 915, 922-23 (9th Cir. 2004) (intervenor was on constructive
   notice of United States' potentially adverse interest for ten months before seeking to intervene);

26  *Aleut Corp. v. Tyonek Native Corp.*, 725 F.2d 527, 528-30 (9th Cir. 1984) (proposed intervenors
   waited more than three years after a key decision that directly implicated their interests).

27  [4] *See* The Antitrust Procedures and Penalties Act: Hearings on S. 782 and S. 1088 Before the

28  Subcomm. On Antitrust & Monopoly of the S. Comm. on the Judiciary, 93d Cong. 151 (1973)
   [hereinafter "Senate Report"] (Judge W.J. Skelly Wright testimony that in cases of great importance,
   the Tunney Act "would require judicial time, necessarily so, and I believe rightfully so").

intervention timely when the motion is filed shortly after the consent decree is lodged and the applicant acts reasonably to protect its interests.  *See United States v. Alcan Aluminum, Inc.*, 25 F.3d 1174, 1181-82 (3d Cir. 1994).

**III.    The States Are Entitled to Intervention of Right.**

The States established that they meet the elements for intervention of right.  Mtn. at 8-12.  In response, the Parties advocate a rigid approach to analyzing the States' interests that contravenes Rule 24's liberal policy of intervention and misstates the law on adequacy of representation when the federal government is a party.  *See* DOJ Opp. at 17-20; HPE Opp. at 13-21.

**A.  The States' Interest Would Be Practically Impaired Without Intervention.**

The Ninth Circuit has held that "the 'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  *Fresno Cty. v. Andrus*, 622 F.2d 436, 438 (9th Cir. 1980) (quoting *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).  This accords with the amendment to Rule 24 in 1966, which intended "to provide that if a person who would be affected in a practical sense by the disposition of an action is not joined as a party, he has a right to intervene unless he is adequately represented by an existing party."  Advisory Comm. on Rules of Practice & Procedure, Report, Ex. B, at 11 (Sept. 1965).  Courts have therefore warned against "a myopic fixation upon interest."  *Smuck v. Hobson*, 408 F.2d 175, 179 (1969) (quotation omitted).  Rather, the Court's review must be guided by "practical considerations, not technical distinctions."  *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (quotation omitted).

The States meet this practical standard.  *See* Mtn. at 8-12.  Contrary to the Parties' assertions, the States have an important governmental interest in enforcing federal antitrust law to prevent anticompetitive harm to their citizens.  *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1107-09 (9th Cir. 2005) (enforcement of Section 7 of Clayton Act is part of a State's police or regulatory power).  If the Settlement were approved, that would create a practical impediment to the States' ability to seek relief.  For example, the remedy of unwinding the merger—through a divestiture of Juniper—would be impeded by licensing a portion of Juniper's source code to a competitor.  Moreover, the continued integration of HPE and Juniper also creates practical impediments to relief, insofar as it complicates

1   the task of a divestiture—hence why the States are also seeking a hold separate order.

2   Additionally, the execution of a settlement that fails to remedy alleged anticompetitive harm
3   and that was procured through improper influence is in itself a harm to the States' citizens, which
4   the States have a sovereign interest to prevent. Despite the Parties' attempts to frame this situation
5   as nothing more than an internal squabble at the DOJ, it is much more than that. This is about
6   whether an antitrust case has been resolved on the merits, or instead because a large company had
7   the right connections to the right people at the DOJ, which deeply offends the public interest.

8   States are uniquely situated because their *parens patriae* authority empowers them to protect
9   their citizens and quasi-sovereign interests. *See, e.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico*,
10  458 U.S. 592, 600-608 (1982) (discussing State's *parens patriae* authority to sue when its sovereign
11  or quasi-sovereign interests are implicated). Private parties that may object to settlements through
12  public comments are not so situated and could not claim the same interests as States; allowing the
13  States to intervene in no way opens the floodgates. *See* DOJ Opp. at 19; HPE Opp. at 14-15, 17.

14  Moreover, the floodgates argument ignores the unprecedented nature of this case—not since
15  the Nixon era have we seen the kind of improper behavior in antitrust enforcement that has been
16  reported here. The magnitude of the alleged conduct warrants a commensurate response; and one
17  would hope this conduct does not become commonplace.

18  The Parties' arguments that the States would not be bound by approval of the Settlement are
19  irrelevant to the question of interest. DOJ Opp. at 18-19; HPE Opp. at 16. Those arguments may
20  have carried the day before 1966, but not today. *See Smuck*, 408 F.2d at 180 ("Rule 24(a) as
21  amended requires not that the applicant would be 'bound' by a judgment in the action."); Wright &
22  Miller's Federal Practice & Procedure § 1908.1 n.19 (3d ed. 2025) (explaining that amendment
23  "clearly was intended to do away with the former interpretation" requiring that "a judgment in the
24  action would bind the absentee as a matter of res judicata").

25  HPE's argument that there can be "no cognizable interest" in government antitrust cases
26  seeking injunctive relief is wrong and blatantly misquotes the cited cases, which state only that
27  "*treble damage claimants* do not have an 'interest' cognizable under Rule 24(a) . . . in Government
28  anti-trust actions seeking injunctive relief." *United States v. Auto. Mfrs. Ass'n*, 307 F. Supp. 617,

- 7 -

619 (C.D. Cal. 1969) (emphasis added); *United States v. Carrols Dev. Corp.*, 454 F. Supp. 1215, 1220 (N.D.N.Y. 1978) (same).  The States do not seek damages here.

Put simply, the States' interests are threatened, and they are entitled to intervene.  *Citizens for Balanced Use*, 647 F.3d at 900 ("intervention of right does not require an absolute certainty;" rather, "a party whose interests are threatened may intervene . . . to protect those interests directly").

**B.  There Is No Longer Adequate Representation.**

The Motion established that the United States no longer adequately represents the States' interests because it apparently succumbed to lobbying pressure and entered into a settlement that it now defends and that the States oppose as not in the public interest.  Mtn. at 1-3.  HPE argues "the DOJ is presumed to represent the public interest in enforcing the antitrust laws" and that the presumption is "nearly irrebuttable."  HPE Opp. at 8, 16.  HPE is wrong.  It is only "presumed that [the government] adequately represents its citizens *when the applicant shares the same interest*."  *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (emphasis added).  Where the interests of the intervenor and government diverge, no presumption applies.  *See id.* ("The most important factor in determining the adequacy of representation is how the interest compares with the interests of existing parties.").  Here, DOJ has an interest in securing judicial approval of the consent decree; the States oppose that objective.  Because the States' objective is adverse to that of both parties, no presumption of adequate representation applies.  *See Aerojet*, 606 F.3d at 1153.

Even if a presumption of adequacy applied in this matter, the States easily overcome that presumption by making a "very compelling showing" that DOJ cannot adequately represent the States' interests.  *Arakaki*, 324 F.3d at 1086 (quoting Wright & Miller's Federal Practice & Procedure § 1909 (3d ed. 2025)).  The States have pointed to evidence that the Settlement is the product of undue influence by Defendants' well-connected lobbyists who engaged in secretive backroom dealings with high-ranking DOJ officials.  *See* Mtn. 4-5, Ex. 1 at 2, Ex. A.  Such evidence includes statements by Mr. Alford, a former top deputy at the DOJ, who claimed that DOJ officials had perverted justice and "acted inconsistent with the rule of law."  Mtn. Ex. 1 at Ex. A pp.3-4.  Although HPE tries to downplay this, and other public reporting, as mere disagreement over litigation strategy, it is much more than that—it is about DOJ officials subverting the public interest

- 8 -

in striking a deal that fails to remedy the alleged harm.  Evidence that raises significant doubts about the government's motives in reaching an agreement, shows a likelihood that the government might abandon a potentially meritorious position, or otherwise reveals incongruent interests between the intervenor and the government, is sufficient to overcome any presumption of adequacy.  *See City of Houston v. Am. Traffic Sols., Inc.*, 668 F.3d 291, 294 (5th Cir. 2012) (intervenors' interests may be inadequately represented where "they have raised substantial doubts about City's motives and conduct"); *California ex rel. Lockyer v. United States*, 450 F.3d 436, 444-45 (9th Cir. 2006) (presumption rebutted where government would "take a position that actually compromise[d] (and potentially eviscerate[d]) the protections" of the challenged law); *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 823 (9th Cir. 2001) (presumption rebutted "because Applicants and [government] Defendants do not have sufficiently congruent interests").  The States have presented such evidence here.

HPE argues that an intervenor can overcome the presumption of adequate representation in a government antitrust action only on facts identical to those in *Cascade Natural Gas Corp v. El Paso Natural Gas Co.*, 386 U.S. 129 (1967)—where the government agreed to a decree that violated a prior Supreme Court mandate.  HPE Opp. 17-18.  Not so.  The Tunney Act—which was enacted after *Cascade* and applies to government antitrust actions—explicitly authorizes intervention.  15 U.S.C. § 16(f)(3).

The suggestion of a "nearly irrebuttable presumption" that DOJ has acted in the public interest is precisely the kind of excessive deference that the Tunney Act sought to curtail.  *See United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C.Cir.1995) (Tunney Act prevents judicial "rubber stamping" of antitrust consent decrees); *CVS*, 407 F. Supp. 3d at 54 n.11 (2004 amendments rejected a "narrow reading of *Microsoft*").

## IV.    The States Are Entitled to Permissive Intervention

The States established that they are also entitled to permissive intervention as state government officers who enforce Section 7 of the Clayton Act, and because they have claims that share common questions of fact with this action.  *See* Mtn. at 12-14.

**A.  The States Are Sovereign and Joint Enforcers of the Clayton Act.**

The Parties argue that the States do not "administer" the Clayton Act.  HPE Opp. at 21-22; DOJ Opp. at 20-21.  In support, they both cite *McHenry v. Comm'r*, 677 F.3d 214, 220-21 (4th Cir. 2012) for the definition of "administer."  The Fourth Circuit there took the definition from *Lopez v. Monterey Cnty.*, 525 U.S. 266, 278-79 (1999).  The issue in *Lopez* was whether a county was subject to the Voting Rights Act when it was merely following a change in state law to which it had no say or discretion.  The Supreme Court cited to various dictionary definitions of the word "administer" to define it in the context of the Voting Rights Act and found that the word "is consistently defined in purely nondiscretionary terms" and that it "encompasses nondiscretionary acts."  *Id*.

The context in which the word "administer" was defined there can have no application here.  Indeed, under that definition—as dealing with nondiscretionary acts—even the DOJ does not "administer" the Clayton Act because the DOJ of course exercises vast prosecutorial discretion in deciding whether to bring enforcement actions under the Clayton Act.  Rather, the way that "administer" has been viewed in intervention cases is best summarized by the leading Wright & Miller treatise: the "whole thrust" of the rule is to "allow[] intervention liberally to governmental agencies and officers seeking to speak for the public interest."[5]  Wright & Miller's Federal Practice & Procedure § 1912 (3d ed. 2025).  There is no question that the States fit that criterion here.

Moreover, the Parties' attempts to analogize the States to mere private parties under the Clayton Act are far off-base.  The States are not "private parties," and represent the public interest just as the federal government does.  *See New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 225 n.21 (S.D.N.Y. 2020) (rejecting argument that federal government "represent[s] the national public interest more so than any state").  The States are sovereigns with *parens patriae* authority to protect their citizens and quasi-sovereign interests, which is explicitly recognized in the Clayton Act, as amended by the Hart Scott Rodino Act.  15 U.S.C § 15c.  In fact, the United States is required to notify States of antitrust actions that may impact them, and to share its investigative file with States on request so that States may evaluate whether to join an action or pursue relief separately.

---

[5] The Fourth Circuit in *McHenry* was in an odd procedural posture, as it was reviewing a Tax Court decision denying intervention, to which it was required to show great deference, and "the Federal Rules of Civil Procedure are not applicable to Tax Court." 677 F.3d at 216, 218.

15 U.S.C. § 15f.

Congress has also recognized this concept by enacting the State Antitrust Venue Act, which mandates that State enforcement actions under federal antitrust laws are exempt from multidistrict consolidation with private actions.  28 U.S.C. § 1407(g); *see also* The Government Plaintiff's Response to Defendant's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) at 8, *United States, et al., v. Google LLC,* No. 23-108 (E.D. Vir. Mar. 3, 2023) ("policy justifications for this exemption are clear: antitrust actions brought by government plaintiffs serve the critical purpose of protecting the nation's economy from harm brought about by anticompetitive behavior.").

The idea that Congress treats the States the same as private parties when it comes to the antitrust laws is plainly wrong, as is the notion that the States have no role in administering the Clayton Act, especially as *parens patriae*.  Permissive intervention is warranted on this ground.

**B.  The States' Claims Share Common Questions of Law or Fact with This Action.**

The States established grounds for permissive intervention under Rule 24(b)(1) as well.  Mtn. at 14.  The Parties' response takes a rigid view of the term "claim."  HPE Opp. at 22-23; DOJ Opp. at 21-22.  That term does not require an intervenor to have filed a separate lawsuit, as HPE seems to suggest; and in fact, the United States acknowledges cases in which intervention was granted without the existence of a separate lawsuit.  DOJ Opp. at 22.  The United States attempts to distinguish those cases on the grounds that they were in the appellate context, "not for opening wide-ranging discovery well beyond the scope of the Tunney Act."  *Id.*  That argument fails because, as shown above, what the States seek here is fully within the scope of the Tunney Act, and is targeted at the problems with this Settlement, not "wide-ranging."

Moreover, the term "claim" in this context merely refers to an "'interest or remedy recognized at law.'"  *United States ex rel. Hernandez v. Team Finance, L.L.C.*, 80 F.4th 571, 577 (5th Cir. 2023).  As *Hernandez* points out, this is why permissive intervention is routinely granted to third parties to challenge, modify, or seek protection under protective orders.  *Id.* at 577-78.  Properly viewed in this way, the States have a claim here for the same reasons that they have an interest as described for intervention of right.

Finally, a common thread running through the cases cited by the Parties where permissive

- 11 -

1    intervention was denied in the Tunney Act context is that the intervenors were private parties raising

2    private disputes, rather than serious questions about the public interest. *United States v. G. Heileman*

3    *Brewing Co.*, 563 F. Supp. 642, 648-49 (D. Del. 1983) (competitor sought to intervene); *Carrols*

4    *Dev. Corp.*, 454 F. Supp. at 1221-22 (primary interest of proposed intervenors was to protect their

5    rights to continued payments under certain agreements); *United States v. Thomson Corp.*, Civ. A.

6    No. 96-1415 (PLF), 1996 WL 554557, at *3 (D.D.C. Sept. 25, 1996) (competitor sought to

7    intervene).  The States are not private parties trying to inject a private dispute into a government

8    antitrust case; they are sovereigns with independent authority under the antitrust laws.

9    **V.    The States Unmistakably Have Article III Standing.**

10    The Parties argue that the States lack Article III standing.  HPE Opp. at 9-10; DOJ Opp. at

11    20.  This argument is misguided and wrong.  The Supreme Court recently clarified how to review

12    the issue of standing in the context of intervention.  The general rule is "[a]t least one plaintiff must

13    have standing to seek each form of relief requested in the complaint," and the "same principle applies

14    to intervenors of right." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

15    "Thus, at the least, an intervenor of right must demonstrate <u>Article III</u> standing *when it seeks*

16    *additional relief beyond that which the plaintiff requests*." *Id.* (emphasis added).

17    The Ninth Circuit has explained that only intervenors who seek different relief than the

18    original plaintiff must establish Article III standing, while "'intervenors that seek the same relief

19    sought by at least one existing party . . . need not do so.'" *Washington v. FDA*, 108 F.4th 1163,

20    1172 (9th Cir. 2024).  As the D.C. Circuit observed, "requiring standing for an applicant wishing to

21    come in on the side of a plaintiff who has standing runs into the doctrine that Article III is satisfied

22    so long as one party has standing." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 233 (D.C.

23    Cir. 2003).

24    Here, the United States has asserted a claim under Section 7 of the Clayton Act to enjoin the

25    merger.  Complaint § 61.  Despite now attempting to settle that claim, it remains the live claim in

26    the case.  The States do not pursue a different claim or additional relief beyond that requested in the

27    United States' Complaint.  As a result, there is no need to examine standing.

28    HPE's argument that there is a conflict between the relief sought by the States and the United

1   States misunderstands the nature of the inquiry.  This kind of argument was rejected in *Alex. Brown*

2   *& Sons*, where the court explained that one cannot narrowly focus on what the issues might be in a

3   Tunney Act proceeding: "This attempt to narrowly define the 'main action' to mean only the Tunney

4   Act proceeding inappropriately limits the court's discretion to permit intervention. . . .  The 'main

5   action,' within the meaning of the rule, is not the Tunney Act proceeding, but the entire Government

6   action seeking to remedy alleged violations of the antitrust law."  169 F.R.D. at 538.

7        Nevertheless, were the Court to examine standing, the States have established it.  "With

8   respect to intervention as of right in the district court, the matter of standing may be purely academic.

9   One court has rightly pointed out that any person who satisfies Rule 24(a) will also meet Article III's

10  standing requirement."  *Roeder*, 333 F.3d at 233.  Indeed, the States' injury is the same as their

11  expressed interest in preventing a settlement against the public interest that would permit an

12  anticompetitive merger.  That injury is traceable to HPE's conduct and redressable by judicial relief.

13  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

14  **VI.    A "Peek At the Merits" Supports Intervention.**

15       The United States cites *Massachusetts School of Law v. United States*, 118 F.3d 776 (D.C.

16  Cir. 1997) ("*MSL*"), to argue that this court should "peek at the merits" of the Settlement now,

17  conclude that the Settlement "is in the public interest and addresses the competitive harms alleged

18  in the Complaint," and deny the Motion.  DOJ Opp. at 23-34.  The law does not require a peek at

19  the merits, but doing so here shows the Settlement is not in the public interest.

20       The United States, in trying to justify the Settlement, merely makes wholly conclusory

21  statements that the Settlement will boost competition, and that the Settlement was a "prudent

22  compromise" because success at trial was not guaranteed.  DOJ Opp. at 24.  None of that is

23  supported, and a peak at the merits tends to show otherwise.

24       First, there is no explanation of how the divestiture of Instant On would actually promote

25  competition.  Instead, the Complaint and pretrial briefing focused on head-to-head competition

26  between HPE's Aruba platform and Juniper's Mist.  Mtn. at 5-6.  HPE's public statements also cast

27  doubt on this remedy.  *Id.* (HPE's CEO has publicly described it as a "distinct offering" representing

28  only a "small portion" of the company's business).  Second, the same is true of the proposed license

1  for Juniper's Mist AIOps code.  The Settlement covers only a "portion" of the code, and the

2  Settlement is vague as to what portion that is.  *Id.* at 6.  The Settlement places its expected valuation

3  at $8 million—seemingly insignificant in the context of a $14 billion merger, and a tiny fraction of

4  Juniper's $411 million in WLAN revenues in 2023.[6]  *Id.*

5         Finally, and fundamentally, the public reporting and highly alarming statements by Mr.

6  Alford suggest the Settlement is not the product of a "prudent" decision upon an honest assessment

7  of the merits, but of the kind of powerful lobbying that the Tunney Act was designed to stop.  *See*

8  Mtn. at 3-6.  Notably, neither of the Parties contested any of the numerous highly problematic

9  allegations about the Settlement process, other than to baldly claim that Mr. Alford is "angry."  HPE

10 Opp. at 20-21.  Indeed, HPE completely omitted its role in this fiasco, desperately trying to portray

11 the matter as a mere internal squabble at the DOJ, totally ignoring that they are the ones who hired

12 the lobbyists to push through a deal and avoid having to defend themselves on the merits at trial.  If

13 the Court is inclined to take a "peek," it should peek at the process, not just the outcome.

14        Although a "peek at the merits" would lead to the conclusion that intervention is warranted,

15 conducting such a "peek" is not compelled by law in any event.  No court in the Ninth Circuit has

16 adopted the reasoning or standard articulated in *MSL*.  Moreover, none of the cases cited by the

17 United States support examining the merits prior to the completion of the Tunney Act process and

18 the development of a full record.

19 **VII.    There Is No Separation of Powers Violation.**

20        The Parties contend that judicial review of the process leading to the Settlement may violate

21 separation of powers.  *See* DOJ Opp. at 7-12; HPE Opp. at 18-19, 23-25.  This is wrong.  First, and

22 critically, the Tunney Act does not authorize a court to order the DOJ to prosecute a case, nor do the

23 States seek such relief.  Rather, the Tunney Act only authorizes a court to either accept or reject a

24 settlement based on a public interest evaluation.  This does not offend separation of powers.

25        Separation of powers principles "are intended to preserve the constitutional system of

26 'checks and balances.'"  *Ramey v. Stevedoring Servs. of Am.*, 134 F.3d 954, 958 (9th Cir. 1998).  As

27 the Supreme Court has recognized, "the greatest security" against excessive authority in a single

28

_____

[6] The States' public comment references other potential problems with the license as well.

1  branch "lies not in a hermetic division among the Branches, but in a carefully crafted system of

2  checked and balanced power within each Branch.'" *Mistretta v. United States*, 488 U.S. 361, 381-

3  82 (1989).  In accordance with those constitutional principles, the Tunney Act provides a judicial

4  check against settlements that contravene the public interest.  15 U.S.C. § 16(e)-(f).

5       Courts have similar authority in other areas.  In the criminal context, Rule 11(c) of the

6  Federal Rules of Criminal Procedure grants the court "considerable discretion to assess the wisdom

7  of plea bargains." *In re Morgan*, 506 F.3d 705, 712 (9th Cir. 2007).  Like the Tunney Act, Rule 11

8  allows for rejection of plea bargains that are "not in the public interest." *United States v. Miller*,

9  722 F.2d 562, 563 (9th Cir. 1983).  Courts routinely exercise their Rule 11 discretion to reject plea

10 agreements. *See, e.g., United States v. Samueli*, 575 F. Supp. 2d 1154, 1156 (C.D. Cal. 2008) ("The

11 Court cannot accept a plea agreement that gives the impression that justice is for sale").  "[T]he

12 court does not improperly intrude on an executive function when it refuses to follow the terms of a

13 plea agreement." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 925 (9th Cir. 2001).

14       Moreover, "prosecutorial discretion is not absolute and may, at times, be subject to review."

15 *United States v. Williams*, 68 F.4th 564, 571 (9th Cir. 2023).  Although the Parties cite cases that

16 caution against judicial intrusion into the executive function (DOJ Opp. at 8-11, HPE Opp. at 18-

17 19), there can be "no doubt" that prosecutorial discretion "carries with it the potential for both

18 individual and institutional abuse" and there are "undoubtedly constitutional limits upon its

19 exercise." *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1978) (footnote omitted).  Thus, in

20 considering plea agreements, courts are authorized to review a prosecutor's conduct during plea

21 negotiations. *See, e.g., United States v. Childs*, 5 F.3d 1328, 1336-37 (9th Cir. 1993) (reviewing

22 prosecutor's representation during plea negotiations regarding amount of restitution sought).

23       The Tunney Act is therefore not unique in providing for a judicial check on the executive's

24 prosecutorial functions, but is in line with other areas of the law that seek to ensure that the executive

25 acts in the public interest.

26 Dated: November 4, 2025

27                                              PHILIP J. WEISER
                                               Attorney General

28
                                               */s/ Arthur Biller*

- 15 -

ARTHUR BILLER (*Admitted Pro Hac Vice*)
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
JONATHAN B. SALLET (*pro hac vice application forthcoming*)
Special Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
       Bryn.Williams@coag.gov
       Jon.Sallet@coag.gov

*Attorneys for the State of Colorado*

ROB BONTA
Attorney General of California

*/s/ Brian D. Wang*
PAULA L. BLIZZARD, Senior Assistant Attorney General (SBN 207920)
MICHAEL W. JORGENSON, Supervising Deputy Attorney General (SBN 201145)
BRIAN D. WANG, Deputy Attorney General (SBN 284490)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
(415) 510-4400
Brian.Wang@doj.ca.gov

*Attorneys for the State of California*

WILLIAM TONG
ATTORNEY GENERAL

*/s/  Nicole Demers*
Nicole Demers (*pro hac vice application forthcoming*)
Deputy Associate Attorney General
Antitrust Section
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel.: (860) 808-5030
nicole.demers@ct.gov

*Attorneys for the State of Connecticut*

BRIAN SCHWALB
Attorney General of the District of Columbia

*/s/ Coty Montag*
Coty Montag (SBN 255703)
Deputy Attorney General, Public Advocacy Division
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 417-5402
Coty.Montag@dc.gov

*Attorneys for the District of Columbia*

ANNE E. LOPEZ
Attorney General

*/s/ Rodney I. Kimura*
RODNEY I. KIMURA (*Admitted Pro Hac Vice*)
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii. 96813
Telephone:  (808) 586-1180
Email:  Rodney.i.kimura@hawaii.gov

*Attorneys for State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

*/s/ Paul J. Harper*
*(Admitted Pro Hac Vice)*

ELIZABETH L. MAXEINER
*(Admitted Pro Hac Vice)*
Chief, Antitrust Bureau
PAUL J. HARPER
Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street, 35th Floor
Chicago, Illinois 60603
773-590-7935 | elizabeth.maxeiner@ilag.gov

- 17 -

773-590-6837 | paul.harper@ilag.gov

*Attorneys for State of Illinois*

COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

*/s/ Anthony W. Mariano*
Anthony W. Mariano (*Admitted Pro Hac Vice*)
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(781) 835-7990
Anthony.Mariano@mass.gov

*Attorneys for*
*Commonwealth of Massachusetts*

KEITH ELLISON
Attorney General

*/s/ Jon M. Woodruff*
(*Admitted Pro Hac Vice*)

ELIZABETH ODETTE (*Admitted Pro Hac Vice*)
Manager, Assistant Attorney General
Antitrust Division

JON M. WOODRUFF
Assistant Attorney General
Antitrust Division

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7425
elizabeth.odette@ag.state.mn.us
jon.woodruff@ag.state.mn.us

*Attorneys for State of Minnesota*

LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO

- 18 -

Chief Deputy Attorney General
Economic Justice Division

*/s/ Elinor Hoffmann*
*(Admitted Pro Hac Vice)*

ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY McFARLANE
*(Admitted Pro Hac Vice)*
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ
*(Admitted Pro Hac Vice)*
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for State of New York*

JEFF JACKSON
Attorney General of North Carolina

*/s/ Kunal J. Choksi*
*(Admitted Pro Hac Vice)*

Kunal Janak Choksi
Senior Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6032
E-Mail: kchoksi@ncdoj.gov

*Attorneys for State of North Carolina*

Dan Rayfield
Attorney General of Oregon

*/s/ Rachel K. Sowray*
Rachel K. Sowray (*Admitted Pro Hac Vice*)
Senior Assistant Attorney General
Timothy D. Smith (*Admitted Pro Hac Vice*)
Attorney-in-Charge
Economic Justice Section

- 19 -

Oregon Department of Justice
100 SW Market St, Portland OR 97201
503.689.0249 | Rachel.Sowray@doj.oregon.gov
503.798.3297 | tim.smith@doj.oregon.gov

*Attorneys for State of Oregon*


NICHOLAS W. BROWN
Attorney General of Washington


*/s/ Amy N. L. Hanson*
*(Admitted Pro Hac Vice)*

JONATHAN A. MARK (*Admitted Pro Hac Vice*)
Antitrust Division Chief
AMY N.L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Email: jonathan.mark@atg.wa.gov
Email: amy.hanson@atg.wa.gov
Tel: 206-389-3806 (Mark)
Tel: 206-464-5419 (Hanson)

*Attorneys for State of Washington*


JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/Caitlin M. Madden*
Caitlin M. Madden (*Admitted Pro Hac Vice*)
Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-1311
caitlin.madden@wisdoj.gov

*Attorneys for State of Wisconsin*