HENRY C. SU (CA Bar # 211202)
Senior Litigation Counsel
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 615-2165
Email: Henry.Su@usdoj.gov

JEREMY M. GOLDSTEIN (CA Bar # 324422)
MICHAEL G. LEPAGE (DC Bar # 1618918)
Trial Attorneys
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 229-2934
Email: Jeremy.Goldstein@usdoj.gov

[Additional counsel listed on signature page]

*Attorneys for Plaintiff*
United States of America

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              *Plaintiff,*<br><br>v.<br><br>HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC.<br><br>                              *Defendants*. | CASE NO.  5:25-CV-00951-PCP<br><br>**RESPONSE OF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL JUDGMENT**<br><br>JUDGE: Hon. P. Casey Pitts |

        Pursuant to the Antitrust Procedures and Penalties Act (the "APPA" or "Tunney Act"), 15 U.S.C. § 16(d) , the United States submits this response to the public comments received regarding the proposed Final Judgment resolving this case. *See* Dkt. No. 217-1. The United States does not request any action by the Court at this time. Instead, the United States will provide notice of this response in the *Federal Register* and then submit a motion requesting that the Court enter the proposed Final Judgment, as amended. *See infra* section V.C.

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................5

        A.      The United States Brought this Action to Protect Competition in the Market for Enterprise-Grade Wireless Local Area Networks in the United States. .......................5

        B.      Shortly Before Trial, The United States and Defendants Reached Agreement to Resolve this Action in Return for Steps to Protect Competition in the Relevant Market. ..........................................................5

                1.      The Proposed Final Judgment Requires the Defendants to Divest "Instant On," an Enterprise-Grade WLAN Business. .............................6

                2.      The Proposed Final Judgment Requires the Defendants to License Relevant and Valuable Source Code. ...........................................7

                3.      The Proposed Final Judgment Includes Other Terms to Protect Competition in the Relevant Market. ..........................................8

                4.      The Amendments to the Proposed Final Judgment Further Protect Competition in the Relevant Market. .....................................9

        C.      The United States and Defendants Promptly Provided Notice and Took Additional Steps as Required by the Tunney Act. ..................................9

III.    STANDARD OF JUDICIAL REVIEW UNDER THE TUNNEY ACT ...................10

IV.     SUMMARY OF PUBLIC COMMENTS AND RESPONSES ...................................12

        A.      The Substantive Terms of the Proposed Final Judgment Satisfy the Tunney Act's Public Interest Requirement. ...........................................13

                1.      The Stipulation and Amended Proposed Final Judgment Constitute the Entire Agreement Between the United States and Defendants. ...................13

                2.      The Proposed Final Judgment Represents a Reasonable Compromise of Claims. ...........................................13

                3.      Defendants' Divestiture of "Instant On" Is Designed to Protect Competition in the Enterprise-Grade WLAN Market. ...........................14

                4.      Defendants' Forced Licensing of the Valuable Mist Source Code is Designed to Protect Competition in the Enterprise-Grade WLAN Market. ...........................................16

                5.      The Other Purported Substantive Concerns Raised by Commenters Are Not Well Taken. ...........................................17

B.     Speculation About the Department of Justice's Internal Deliberative Process Is Outside the Scope of the Tunney Act. ...........................................................................19

C.     The Identity of the Specific Signatories on the Documents Submitted with the Proposed Final Judgment Is Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest. ....................................................................22

D.     Unsubstantiated Assertions About Defendants' Disclosure Under 15 U.S.C. 16(g) Are Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest. ...........................................................................................................23

E.     The Remaining Comments Are Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest. ....................................................................24

V.     FINALIZING THE PROPOSED SETTLEMENT ............................................................24

A.     The Proposed Settlement Is in the Public Interest and Should Be Approved. .................24

B.     The Court's Role Under the Tunney Act Is Limited to Approval or Disapproval. ...................................................................................................26

C.     The United States Intends to Submit a Motion to Enter the Amended Proposed Final Judgment ...........................................................................................27

D.     An Evidentiary Hearing, Live Testimony, Evidentiary Submissions, and Amici Participation Are Neither Necessary Nor Appropriate. ..........................................27

VI.     CONCLUSION...........................................................................................................31

1

TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Arlington Heights v. Metropolitan Housing Dev. Corp.,*

5
   429 U.S. 252 (1977)...........................................................................................29

6

*Assembly of State of Cal. v. Dep't of Commerce,*
   968 F.2d 916 (9th Cir. 1992) ...........................................................................29

7

*Comm'r of Internal Revenue v. Lundy,*

8
   516 U.S. 235 (1996)...........................................................................................24

9

*Dep't of Commerce v. New York,*

10
   588 U.S. 752 (2019)...........................................................................................29

11

*FCC v. Consumers' Rsch.,*
   606 U.S. 656 (2025)...........................................................................................20

12

*Fischer v. United States,*

13
   603 U.S. 480 (2024)...........................................................................................20

14

*FTC v. Warner Commc'ns Inc.,*

15
   742 F.2d 1156 (9th Cir. 1984) .........................................................................29

16

*Gustafson v. Alloyd Co.,*
   513 U.S. 561 (1995)...........................................................................................20

17

*Heckler v. Chaney,*

18
   470 U.S. 821 (1985)...........................................................................................26

19

*In re Cheney,*

20
   544 F.3d 311 (D.C. Cir. 2008) .........................................................................30

21

*In re FDIC,*
   58 F.3d 1055 (5th Cir. 1995) ...........................................................................30

22

*In re IBM Corp.,*

23
   687 F.2d 591 (2d Cir. 1982) ............................................................................27

24

*In re United States (Holder),*

25
   197 F.3d 310 (8th Cir. 1999) ...........................................................................30

26

*In re United States (Jackson),*
   624 F.3d 1368 (11th Cir. 2010) ......................................................................30

27

*In re United States (Kessler),*

28
   985 F.2d 510 (11th Cir. 1993) .........................................................................30

*In re United States Dep't of Educ.*,
    25 F.4th 692 (9th Cir. 2022) ...................................................................................................... 30

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ................................................................................................... 30

*Massachusetts v. Microsoft Corp.*,
    373 F.3d 1199 (D.C. Cir. 2004) ................................................................................................. 24

*NAACP v. Fed. Power Comm'n*,
    425 U.S. 662 (1976) .................................................................................................................... 20

*New York Cent. Sec. Corp. v. United States*,
    287 U.S. 12 (1932) ...................................................................................................................... 20

*Sam Fox Publ'g Co. v. United States*,
    366 U.S. 683 (1961) .................................................................................................................... 30

*Simplex Time Recorder Co. v. Sec'y of Labor*,
    766 F.2d 575 (D.C. Cir. 1985) ................................................................................................... 29

*United States v. Archer-Daniels-Midland Co.*,
    272 F. Supp. 2d 1 (D.D.C. 2003) ............................................................................................... 14

*United States v. Armour & Co.*,
    402 U.S. 673 (1971) .................................................................................................................... 25

*United States v. Bechtel Corp.*,
    648 F.2d 660 (9th Cir. 1981) ....................................................................................... 11, 14, 26

*United States v. BNS Inc.*,
    858 F.2d 456 (9th Cir. 1988) ............................................................................... 11, 15, 22, 26

*United States v. CVS Health Corp.*,
    407 F. Supp. 3d 45 (D.D.C. 2019) ....................................................................................... 28, 29

*United States v. Deutsche Telekom AG*,
    Civil Action No. 19-2232 (TJK), 2020 WL 1873555 (D.D.C. Apr. 14, 2020) ..................... 28

*United States v. Iron Mountain, Inc.*,
    217 F. Supp. 3d 146 (D.D.C. 2016) ........................................................................................... 14

*United States v. JDS Uniphase Corp.*,
    Civil Action No. 00-2227 (TEH), 2000 WL 33115892 (N.D. Cal. Oct. 3, 2000) ......... 11, 28

*United States v. Mercedes-Benz of North America, Inc.*,
    547 F. Supp. 399 (N.D. Cal. 1982) ............................................................................................ 27

*United States v. Microsoft Corp.*,
    56 F.3d 1448 (D.C. Cir. 1995) ....................................................................................... 11, 12, 14, 26

*United States v. Morgan*,
   313 U.S. 409 (1941) ............................................................................................................... 29

*United States v. SBC Commc'ns, Inc.*,
   489 F. Supp. 2d 1 (D.D.C. 2007) ................................................................................... 12, 14

*United States v. Stone Canyon Indus. Holdings LLC*,
   No. 1:21-cv-01067-TJK, 2021 WL 4304760 (D.D.C. Aug. 10, 2021) ................................... 18

*United States v. United Techs. Corp.*,
   No. 1:20-cv-00824-DLF, 2020 WL 4810850 (D.D.C. July 22, 2020) ................................... 18

*United States v. US Airways Group, Inc.*,
   38 F. Supp. 3d 69 (D.D.C. 2014) ................................................................................... 14, 28

*United States v. Williams*,
   553 U.S. 285 (2008) ............................................................................................................... 20

**Statutes**

15 U.S.C. § 16(b) ............................................................................................................... 1, 10, 24

15 U.S.C. § 16(c) ............................................................................................................................ 10

15 U.S.C. § 16(d) ............................................................................................................... 1, 27, 31

15 U.S.C. § 16(e) ............................................................................................................................ 10

15 U.S.C. § 16(e) (effective until June 21, 2004) ................................................................... 11, 21

15 U.S.C. § 16(e)(1) ............................................................................................................ 11, 20, 22, 23

15 U.S.C. § 16(e)(1)(A) .......................................................................................................... passim

15 U.S.C. § 16(e)(1)(B) ............................................................................................................ 20, 21, 30

15 U.S.C. § 16(e)(2) ...................................................................................................................... 28

15 U.S.C. § 16(g) ...................................................................................................................... 23, 24

15 U.S.C. § 18 ................................................................................................................................. 5

Antitrust Criminal Penalty Enhancement and Reform Act of 2004,
   Pub. L. No. 108-237, tit. II, § 221(a)(1)(B), 118 Stat. 661 (2004) ........................... 11, 21, 27

**Legislative History**

119 Cong. Rec. 24,598 (1973) ................................................................................... 21, 25, 28

119 Cong. Rec. 3452 (1973) ........................................................................................... 21

150 Cong. Rec. S3613 (daily ed. Apr. 2, 2004) (statement of Sen. Hatch) ....................... 12

150 Cong. Rec. S3618 (daily ed. Apr. 2, 2004) (statement of Sen. Kohl) ......................... 21

90 Fed. Reg. 30685 (July 10, 2025) ................................................................................. 10

H.R. Rep. No. 93-1463 (1974) ................................................................................... 20, 25

*Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*,
93rd Cong. 40 (1973) (statement of Sen. Tunney) ............................................... 23

*Hearings on S. 782 and S. 1088 Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*,
93rd Cong. 22-23 (1973) (discussion between Senator Tunney, Harvey Goldschmid, and Gregory Gregorich) ................................................................................................ 22

S. Rep. No. 93-298 (1973) ............................................................................................. 25

**Other Authorities**

*Agencies: Grid/Map View*, U.S. Dep't of Justice, https://www.justice.gov/agencies/chart/map (last visited Nov. 7, 2025) ................................................................................................ 19

UNIFI CASE STUDIES, https://casestudies.ui.com (last visited Nov. 7, 2025) ........................ 15

Zeus Kerravala, *Cisco brings Meraki to the enterprise*, NETWORK WORLD (Jan. 27, 2015), https://www.networkworld.com/article/934892/cisco-brings-meraki-to-the-enterprise.html ............. 16

## I.    INTRODUCTION

The United States respectfully submits this response to public comments and urges the Court to approve the amended proposed Final Judgment without an evidentiary hearing. The original proposed Final Judgment, submitted on June 27, 2025, achieved what the Tunney Act requires: it directly remedied competitive harms alleged in the Complaint through a targeted divestiture and licensing requirements that promote competition in the relevant market. Not a single consumer or competitor submitted a comment opposing it. The amended proposed Final Judgment, submitted today, includes several provisions added in response to public comments that improve the original proposal. The Court should approve it promptly and decline invitations to conduct an inquiry into the Department of Justice's internal deliberations—an inquiry that would undermine future merger enforcement.

On January 30, 2025, the United States brought this antitrust enforcement action against Hewlett Packard Enterprises Co. ("HPE") and Juniper Networks, Inc. ("Juniper"), alleging that HPE's proposed $14 billion acquisition of Juniper threatened to substantially lessen competition in the market for enterprise-grade wireless local area network ("WLAN") solutions. The Complaint alleged that the merger would eliminate head-to-head competition between two leading innovators in a critical technology sector, potentially leading to higher prices, reduced innovation, and diminished choices for businesses relying on advanced wireless networking infrastructure.

After months of intensive litigation—including extensive discovery, depositions, expert reports, and pre-trial motions—the parties reached a settlement on the eve of trial that directly addresses these competitive harms through two remedies: (1) HPE must divest its "Instant On" enterprise-grade WLAN business, which operates in the relevant market alleged in the Complaint and may create or strengthen an independent competitor; and (2) HPE must license the source code for Juniper's Mist AI Ops technology—the innovative network management solution that the Complaint credits with enabling Juniper's rapid growth and disruptive competitive impact in the market—allowing other firms to access this valuable technology and compete more effectively. This settlement seeks to protect competition in enterprise-grade WLAN solutions while avoiding the substantial risk, uncertainties, delays, and expenses of a trial where the outcome was not assured.

Pursuant to the Antitrust Procedures and Penalties Act (the "Tunney Act"), 15 U.S.C. § 16(b),

the United States filed the proposed Final Judgment and Competitive Impact Statement on June 27, 2025, and invited public comments over a 60-day period. *See* Dkt. Nos. 217-1 & 217-2. The United States received 12 comments, which are attached as exhibits and will be described in the *Federal Register* as ordered by this Court. *See* Dkt. No. 234. Not a single comment opposing the settlement came from those with the most direct interest in its competitive effects: consumers of enterprise-grade WLAN solutions, who would bear the brunt of any anticompetitive harm unaddressed by the settlement, and competitors in the relevant market, who would be best positioned to identify shortcomings in the remedies. This absence of concern from market participants speaks volumes about the settlement's adequacy in protecting competition. Indeed, although the United States disagrees, one commenter argued that "the merger did not exhibit sufficient signs of anticompetitive concerns to warrant antitrust enforcement" in the first place. Exh. A-14 at 1.

The remaining comments were submitted largely by politicians and advocacy groups. They primarily focus not on the settlement's competitive impact but on speculative allegations about the Department of Justice's internal decision-making process—matters that fall outside the Tunney Act's purview.

The United States has carefully reviewed all comments and, where substantively warranted, negotiated amendments with HPE to strengthen the proposed Final Judgment. In direct response to concerns raised by former Antitrust Division professionals, the amended judgment now expressly requires that both the divestiture buyer and source code licensees possess "the intent and capability, including the necessary managerial, operational, technical, and financial capability, to compete effectively in the market for the provision of enterprise-grade WLAN solutions in the United States," and further requires them to satisfy the United States that they will use these assets to compete in the relevant market. Exh. A-1 at 18–19. Additional enhancements include requiring HPE to use "best efforts" to complete the divestiture and licensing "as expeditiously as possible," extending potential transition services from 12 to 18 months, strengthening trustee oversight provisions, and providing explicit authority for the United States to seek contempt sanctions for violations. *See* Exh. A-1 at 8, 11, 16–18, 22–23.

This Court should find that entry of the amended proposed Final Judgment is in the public

interest and conclude that an evidentiary hearing is unnecessary. The reasons supporting this conclusion fall into three categories: (1) the settlement's substantive terms readily satisfy the Tunney Act's deferential "public interest" standard by providing effective relief directed to the alleged harms; (2) the public comments—dominated by process-oriented speculation rather than competitive analysis—do not warrant expanded proceedings; and (3) convening a hearing would negatively impact future antitrust enforcement while implicating deliberative process privilege and constitutional separation of powers principles. Moreover, the Court's role under the Tunney Act is limited to a binary choice—approval or disapproval of the amended proposed Final Judgment.

**First, the amended judgment satisfies the Tunney Act's deferential public interest standard**. Courts must accord deference to the government's predictions about remedy efficacy and need only determine whether a settlement falls within the reaches of the public interest—not whether it represents the perfect remedy or one the Court would craft itself if the case were successfully litigated to judgment. Settlements often reflect underlying weakness in the government's case or compromises made to achieve a pre-trial resolution, and courts may not demand that remedies perfectly match the alleged violations.

Here, the amended proposed Final Judgment is designed to address the competitive harms alleged in the Complaint. The divestiture of Instant On—a fully operational enterprise-grade WLAN business, including hardware, software, customer relationships, and intellectual property—may create or strengthen an independent competitor in the market at issue. The mandatory licensing of Mist AI Ops source code will provide access to the technology that enabled Juniper to "spur both price and product innovation," Dkt. No. 1 ¶¶ 6–11, 44–48, and could allow multiple firms to develop or strengthen competing solutions. These remedies address concerns about the loss of head-to-head competition alleged in the Complaint while preserving any procompetitive aspects of the merger. The amendments to the proposed Final Judgment further enhance the remedies by requiring acquirers and licensees to demonstrate competitive capability and intent, extending transition support, and incorporating robust enforcement tools including trustee monitoring and contempt authority. Exh. A-1 at 8, 11, 16-18, 22-23.

Critically, the settlement embodies a prudent compromise that accounts for litigation risk. While the United States was prepared to present a strong case, the Defendants advanced credible defenses that

introduced meaningful uncertainty. *See* Dkt. Nos. 200–201; Dkt. No. 298 at 4–5. In such scenarios, settlements serve the public interest by securing tangible protections rather than gambling on an all-or-nothing trial that could leave consumers with no relief. Courts have repeatedly recognized that consent judgments need not eliminate every harm but may reflect reasonable compromises. Requiring the Department to reject reasonable settlements and litigate every case to conclusion—even those where success is uncertain—would waste scarce government and private resources, delay benefits to consumers, and create perverse incentives that discourage reasonable compromises.

**Second, the public comments do not warrant further proceedings**. The Tunney Act directs courts to assess "the competitive impact" of proposed judgments based on specific factors: "termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other *competitive* considerations bearing upon the adequacy of such judgment." 15 U.S.C. § 16(e)(1)(A) (emphasis added). The comments here fail to raise material competitive concerns that fall within the scope of this provision. Indeed, the commenters have no commercial stakes in the enterprise-grade WLAN market. They focus instead on alleged irregularities in the Department's internal processes—speculating about involvement by senior officials, alleged internal disagreements based on press reports, signatory identities, and supposed undisclosed "side deals." These process-oriented allegations do not bear upon whether the settlement's substantive terms adequately protect competition, which is the ***only*** question the Tunney Act authorizes this Court to decide. Holding a hearing on such comments would risk turning an economic inquiry into a political circus. Courts have wisely declined hearings even in controversial, high-profile cases.

**Third, an evidentiary hearing would cause substantial harm**. The Tunney Act explicitly provides that hearings are discretionary, and courts routinely approve consent judgments on the papers alone. The existing record here—the Complaint, the Competitive Impact Statement, public comments, this response, and additional filings and declarations from the United States and HPE—provides ample basis for review. In contrast, a hearing probing the Department's internal deliberation would constitute an improper intrusion into Executive Branch processes. Compelling testimony from senior Department officials or the production of privileged evidence from the Department would raise even graver

RESPONSE TO PUBLIC COMMENTS
CASE NO. 5:25-CV-00951-PCP

concerns. Indeed, courts of appeals have issued writs of mandamus to prevent such actions absent clear necessity, recognizing it would have serious repercussions for the relationship between two coequal branches of government.

For all these reasons, the Court should find that the amended proposed Final Judgment is in the public interest under the Tunney Act and enter it without further proceedings.

## II.    FACTUAL BACKGROUND

### A.  The United States Brought this Action to Protect Competition in the Market for Enterprise-Grade Wireless Local Area Networks in the United States.

On January 30, 2025, the United States filed a civil antitrust Complaint seeking to enjoin the proposed acquisition of Juniper by HPE. The Complaint alleges that the acquisition likely would substantially lessen competition in the United States for enterprise-grade WLAN solutions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Dkt. No. 1. The Complaint defines enterprise-grade WLAN solutions to include wireless access points, the separate network-management hardware or software systems to monitor or manage them, and related logistical support. *Id.* ¶ 5.

HPE and Juniper were the second- and third-largest enterprise-grade WLAN solutions providers in the United States, with both trailing market leader Cisco. Dkt. No. 1 ¶ 5. The Complaint alleges that Juniper utilized its innovative network management software platform, Mist, to grow rapidly in the enterprise-grade WLAN market and spur both price and product innovation competition with HPE. *Id.* ¶¶ 6–11, 44–48. The Complaint further alleges that Mist's artificial intelligence and machine learning tools (known as "AI Ops") were a critical component of Mist's appeal to customers, as these tools can proactively identify, diagnose, and resolve technical issues before they cause network outages, thereby increasing the productivity of network administrators. *Id.* ¶¶ 6–7. The Complaint alleges a single relevant market for enterprise-grade WLAN solutions, without submarkets for small-, medium-, or large-sized enterprises. *See id.* ¶¶ 34–38.

### B.  Shortly Before Trial, The United States and Defendants Reached Agreement to Resolve this Action in Return for Steps to Protect Competition in the Relevant Market.

On June 27, 2025, the United States and both Defendants filed a Joint Stipulation and Order and proposed Final Judgment that helps remedy the Section 7 of the Clayton Act violation and allows the

merger to proceed. Dkt. No. 217. The Court entered the Joint Stipulation on June 30, 2025. Dkt. No. 220.

After considering the public comments submitted, the United States and HPE have agreed to amend the proposed Final Judgment to include additional provisions to further ensure that the process for the divestiture and license protects competition in the relevant market, and to provide enhanced enforcement provisions. Exh. A-1.

### 1. The Proposed Final Judgment Requires the Defendants to Divest "Instant On," an Enterprise-Grade WLAN Business.

The proposed Final Judgment requires that within 180 calendar days after the filing of the proposed Final Judgment, or five days after the entry of the Final Judgment, whichever is later, HPE must divest HPE's worldwide Instant On campus and branch business. Exh. A-1 at 5; Dkt. No. 217-1 at 5. The Instant On business operates in the market for enterprise-grade WLAN solutions alleged in the Complaint. *See* Dkt. No. 1 ¶¶ 34–38; Dkt 298 at 13. Its divestiture to a company that can compete in that market should create opportunities for business growth, product innovation, and increased competition in the market for enterprise-grade WLAN solutions—whether for small, medium, or large enterprises.

HPE's Instant On divestiture will include all tangible and intangible assets related to or used in connection with this business, including all contracts, agreements, and customer relationships included in the business. Exh. A-1 at 5; Dkt. No. 217-1 at 5. To the extent any contract or agreement requires the consent of another party to assign or otherwise transfer, HPE must use best efforts to accomplish the assignment or transfer. Exh. A-1 at 5; Dkt. 217-1 at 5

In the event that HPE does not divest Instant On within the required time frame, the proposed Final Judgment provides that the Court will appoint a Divestiture Trustee selected by the United States to sell the business. Exh. A-1 at 6; Dkt. No. 217-1 at 6. HPE would be required to pay all costs and expenses related to the Trustee, and it cannot object to a sale consummated by the Trustee except on grounds of malfeasance. Exh. A-1 at 6-7; Dkt. No. 217-1 at 6–7. Should the Trustee not sell Instant On within six months of his or her appointment, the Trustee must file with the Court a report documenting efforts to sell the business, the reasons for not accomplishing the sale of the business, and recommendations for future action. Exh. A-1 at 8; Dkt. No. 217-1 at 8.

Crucially, the United States has sole discretion on whether to accept any divestiture acquirer. Exh. A-1 at 5; Dkt. No. 217-1 at 5.

All of the terms described in this section are included in both the original and the amended proposed Final Judgment.

**2. The Proposed Final Judgment Requires the Defendants to License Relevant and Valuable Source Code.**

The proposed Final Judgment requires that within 180 calendar days after the filing of the proposed Final Judgment, or five days after the entry of the Final Judgment, whichever is later, HPE must hold an auction to issue one or more perpetual, worldwide, non-exclusive licenses for the AI Ops for Mist source code. Exh. A-1 at 10; Dkt. No. 217-1 at 10. As the Complaint alleges, Mist's AI Ops capabilities competitively differentiated Juniper's enterprise-grade WLAN solutions offerings and increased its market share. Dkt. No. 1 ¶¶ 6-7. Indeed, customers often associate Juniper's WLAN solutions with Mist's AI Ops capabilities. *Id.* ¶ 7. Since 2019, Juniper has succeeded in increasing its revenues and share in the market for enterprise-grade WLAN solutions, causing HPE to compete more aggressively, including by investing resources into further developing its own AI Ops offerings. *Id.* ¶¶ 8–11. Requiring HPE to license a key ingredient of Juniper's competitive success to one or possibly two companies that can compete in the market for enterprise-grade WLAN solutions should increase competition and innovation in that market.

Under the terms of the auction, HPE must issue two licenses if more than one bid exceeds $8 million. Exh. A-1 at 12–13; Dkt. No. 217-1 at 12. This requirement ensures that a robust market response to this competitive opportunity is accommodated. Both licensees, one of whom would be deemed the primary licensee, would have the right to utilize and further develop the licensed source code for their networking products, and any further improvements developed after the license date would be owned by the licensee—a term that will encourage further innovation in the market. Exh. A-1 at 13; Dkt. No. 217-1 at 13. The primary licensee also has the right to contract with HPE for 12 months of support services, including the transfer of up to 30 engineers familiar with the source code and up to 25 sales personnel experienced in selling Mist. Exh. A-1 at 11; Dkt. No. 217-1 at 11. HPE must also facilitate introductions for the primary licensee to: (1) Juniper's original design manufacturer suppliers

for WLAN hardware; (2) Juniper's distributors for WLAN in the United States; and (3) channel partners that worked with Juniper to sell WLAN in the United States. Exh. A-1 at 12; Dkt. No. 217-1 at 11–12. These transition services will provide the primary licensee with the expertise and support needed to fully integrate the Mist source code into its product lines and develop new business opportunities.

The proposed Final Judgment also provides for the appointment of a Trustee should HPE not license the source code in a timely manner. Exh. A-1 at 13–17; Dkt. No. 217-1 at 13–16. In addition, the United States has sole discretion on whether to accept any proposed licensee. Exh. A-1 at 10; Dkt. No. 217-1 at 10.

All of the terms described in this section are included in both the original and the amended proposed Final Judgment.

### 3. The Proposed Final Judgment Includes Other Terms to Protect Competition in the Relevant Market.

In addition to specifying detailed terms and procedures for carrying out the Instant On divestiture and source code licensing, the proposed Final Judgment requires HPE to submit affidavits to the United States every 30 days documenting the company's efforts to sell the divestiture assets and conduct the source code auction. Exh. A-1 at 20; Dkt. No. 217-1 at 18. HPE has been timely submitting these affidavits, and the United States is satisfied that the company is making adequate efforts to complete the divestiture and the licensing.

The proposed Final Judgment also provides a mechanism for the United States to inspect HPE's records and operations to ensure compliance with the terms of the judgment. Exh. A-1 at 20-22; Dkt. No. 217-1 at 19-20. Specifically, the United States could require HPE to: (1) produce copies of books, records, data, and documents related to any matters contained in the proposed Final Judgment; (2) make officers, employees, and agents of the company available for interview by the United States about matters contained in the proposed Final Judgment; and (3) submit written reports about matters contained in the proposed Final Judgment. *Id.*

All of the terms described in this section are included in both the original and the amended proposed Final Judgment.

**4. The Amendments to the Proposed Final Judgment Further Protect Competition in the Relevant Market.**

After carefully reviewing and considering the comments to the proposed Final Judgment, the United States has proposed amendments to provide additional procedural protections to support the divestiture and licensing agreed in the proposed Final Judgment, to which HPE has agreed. The amended proposed Final Judgment is attached to this response as Exhibit A-1.

First, the amended proposed Final Judgment requires HPE to use best efforts to divest Instant On and license the source code as expeditiously as possible. Exh. A-1 at 18. In addition, the Trustee(s) must sell Instant On and/or license the source code as quickly as possible. Exh. A-1 at 6, 14. The amended proposed Final Judgment also specifies that the Trustee(s) will serve until Instant On is divested and/or the source code is licensed (unless otherwise ordered by the Court), and that the United States may seek the replacement of the Trustee(s) if he or she is not acting diligently or in a reasonably cost-effective manner. Exh. A-1 at 8, 16–17.

Though the proposed Final Judgement grants the United States sole discretion on whether to accept any divesture acquiree or licensee, the amendments make clear that the divestiture and license(s) must be accomplished in such a way as to satisfy the United States, in its sole judgment, that Instant On and the AI Ops for Mist source code can and will be used by the acquirer and licensee(s) to compete in the market for the provision of enterprise-grade WLAN solutions in the United States. Exh. A-1 at 18–19. In addition, the amendments add a provision by which the transition services for the source code may be extended by an additional 6 months at the request of the primary licensee and with the approval of the United States. Exh. A-1 at 11.

Finally, the amended proposed Final Judgment includes enhanced enforcement provisions beyond those in the original proposed Final Judgment. Specifically, it allows the United States to seek relief from the Court, including contempt sanctions, should HPE not comply with the terms of the final judgment. Exh. A-1 at 22–23.

**C. The United States and Defendants Promptly Provided Notice and Took Additional Steps as Required by the Tunney Act.**

At the same time as the filing of the proposed Final Judgment with the Court, a Competitive

Impact Statement was filed as required by 15 U.S.C. § 16(b). Dkt. 217-2. The United States published

the Complaint, the proposed Final Judgment, and the Competitive Impact Statement, together with

directions for the submission of written comments relating to the proposed Final Judgment, in the

*Federal Register* on July 10, 2025. *See* 90 Fed. Reg. 30685 (July 10, 2025). The United States also

caused notice of the settlement and comment procedures to be published in the *Washington Post* on July

9–15, 2025, and in the *Mercury News* on July 9, 10, 11, 12, 14, 15, and 16, 2025. 15 U.S.C. § 16(c).

The Tunney Act provides for a 60-day period for the public to submit comments to the United

States regarding the proposed Final Judgment. 15 U.S.C. § 16(b). That 60-day comment period has

ended.

## III.    STANDARD OF JUDICIAL REVIEW UNDER THE TUNNEY ACT

The Tunney Act sets forth a specific form of judicial review for entry of antitrust consent

judgments between the United States and another party. Specifically, the Tunney Act states:

(e) Public interest determination

(1) Before entering any consent judgment proposed by the United States under this section, the court shall determine that the entry of such judgment is in the public interest. For the purpose of such determination, the court shall consider—

(A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

(B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

(2) Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.

15 U.S.C. § 16(e).

As the text of the statute makes clear, Tunney Act review concerns an assessment of whether the

entry of the proposed Final Judgment is in the "public interest" as that term is defined by the statute. In

applying the statutory factors set forth in Sections 16(e)(1)(A) and (B), the court looks to the terms of

the proposed judgment and considers, among other things, the relationship between the remedy secured

and the specific allegations in the government's complaint, whether the proposed judgment is

sufficiently clear, whether its enforcement mechanisms are sufficient, and whether it may harm third

parties. *See United States v. JDS Uniphase Corp.*, Civil Action No. 00-2227 (TEH), 2000 WL

33115892, at *11 (N.D. Cal. Oct. 3, 2000) (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461–

62 (D.C. Cir. 1995)). With respect to the adequacy of the relief secured by the proposed judgment, the

Ninth Circuit has held that a court may not "engage in an unrestricted evaluation of what relief would

best serve the public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *United

States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)). Instead:

> [t]he balancing of competing social and political interests affected by a proposed
> antitrust consent [judgment] must be left, in the first instance, to the discretion of the
> Attorney General. The court's role in protecting the public interest is one of insuring
> that the government has not breached its duty to the public in consenting to the
> decree. The court is required to determine not whether a particular decree is the one
> that will best serve society, but whether the settlement is "*within the reaches of the
> public interest*." More elaborate requirements might undermine the effectiveness of
> antitrust enforcement by consent [judgment].

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted). Further, the court's "ultimate authority

under the [Tunney] Act is limited to approving or disapproving the consent [judgment]." *BNS*, 858 F.2d

at 464.

The current iteration of Section 16(e)(1)(A) and (B) reflects a 2004 amendment to the Tunney

Act, Pub. L. No. 108-237, enacted in response to complaints that some courts were limiting their review

solely to whether the proposed judgment would make a "mockery of the judicial function."[1] The

amended statute made consideration of specific public interest factors mandatory rather than

discretionary. *Compare* 15 U.S.C. § 16(e) (effective until June 21, 2004), *with* 15 U.S.C. § 16(e)(1)

(effective as of June 22, 2004). Congress also modified the list of factors, such as by adding a new factor

---

[1] *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, tit. II, § 221(a)(1)(B), 118 Stat. 661, 668 (2004) (explaining that "it would misconstrue the meaning and Congressional intent in enacting the Tunney Act to limit the discretion of district courts to review antitrust consent judgments solely to determining whether entry of those consent judgments would make a 'mockery of the judicial function'").

RESPONSE TO PUBLIC COMMENTS
CASE NO. 5:25-CV-00951-PCP

1   (whether the terms of the judgment are ambiguous) that the D.C. Circuit had already made clear was

2   appropriate to consider. *See* 15 U.S.C. § 16(e)(1)(A); *Microsoft*, 56 F.3d at 1461–62. Thus, Senator

3   Hatch, the chairman of the Senate Judiciary Committee at the time of the 2004 amendment, observed

4   that the "amendment essentially codifie[d] existing case law [ ]." 150 Cong. Rec. S3613 (daily ed.

5   Apr. 2, 2004) (statement of Sen. Hatch); *see also United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d

6   1, 11 (D.D.C. 2007) (concluding that the 2004 amendment "effected minimal changes" to Tunney Act

7   review).

8          Absent from the list of enumerated factors is any suggestion that courts should inquire into the

9   internal processes or motivations of a co-equal branch of government. Such an inquiry is not warranted

10  by the Tunney Act and would be barred by longstanding judicial precedent. *See infra* sections IV.B

11  & V.D. The Court should therefore limit its review to the enumerated statutory factors and decline any

12  invitations to conduct a more wide-ranging inquiry into the operation of the Executive Branch.

13  **IV.    SUMMARY OF PUBLIC COMMENTS AND RESPONSES**

14         The United States received 12 comments, which are attached to this response as Exhibits A-4

15  through A-14.[2] The comments included letters from members of Congress, 20 state or territorial

16  Attorneys General ("State AGs Letter"), former employees of the U.S. Department of Justice's Antitrust

17  Division ("Former Division Professionals Letter"), the American Antitrust Institute, the American

18  Economic Liberties Project, the Protect Democracy Project, the Dekleptocracy Project, the Mercatus

19  Center at George Mason University, and members of the public.

20         Notably, the United States received no comments from consumers in the relevant product market

21  or competitors to the merging companies. None of the comments expressed concerns that the remedies

22  in the proposed Final Judgment would harm consumers or competing businesses. Instead, 11 of the 12

23  comments expressed varying concerns with the adequacy of the remedies or the alleged process.[3] The

24  United States has carefully reviewed these comments and, as explained below, addressed many of the

25  ───────────────

26         [2] Two public comments submitted to and noticed by the Court, *see* Dkt. No. 231, are combined in Exhibit A-6.

27         [3] The comment from the Mercatus Center stands alone in arguing that the complaint should not have been filed in the first place and that no remedies are warranted. Exh. A-14. The comment does not
28  discuss the specific remedies in the proposed Final Judgment.

concerns raised with new language in the amended proposed Final Judgment filed today. The remaining comments do not change the fact that entry of the proposed Final Judgment, as amended, satisfies the Tunney Act's public interest requirement.

### A. The Substantive Terms of the Proposed Final Judgment Satisfy the Tunney Act's Public Interest Requirement.

The Court's analysis pursuant to the Tunney Act should focus on evaluating whether the amended proposed Final Judgment satisfies the specific "public interest" factors provided in Sections 16(e)(1)(A) and (B). As this section explains in more detail, the substantive terms of the amended proposed Final Judgment satisfy these requirements.

### 1. The Stipulation and Amended Proposed Final Judgment Constitute the Entire Agreement Between the United States and Defendants.

As an initial matter, the United States observes that some commenters, parroting public news reports, ask why neither the proposed Final Judgment nor the Competitive Impact Statement discloses or discusses the existence of an alleged agreement between the parties for HPE to make further investments in the United States. *See*, *e.g.*, Exh. A-11 at 8. Other commenters speculate that there are unspecified "side deals" beyond the materials filed with this Court, with one commenter asking, "Is the written agreement the full settlement agreement or, as is widely reported, were there side deals that the merging parties negotiated under the table with senior DOJ officials that related to the settlement agreement and that remain undisclosed?" Exh. A-10 at 16.

The proposed Final Judgment (as amended) embodies the entirety of the agreement between the parties to resolve this litigation. Indeed, HPE's President and Chief Executive Officer, Antonio Neri, submitted a sworn declaration as an exhibit to a recent HPE brief confirming that the proposed Final Judgment represents the entirety of the agreement between the parties to resolve this litigation. *See* Dkt. No. 298-1 ¶ 3. A separate declaration by HPE's Executive Vice President and Chief Operating & Legal Officer, John Schultz, attests to the same. *See* Dkt. No. 298-2 ¶ 12.

### 2. The Proposed Final Judgment Represents a Reasonable Compromise of Claims.

Some commenters assert that the settlement is at odds with allegations in the Complaint about the nature of the enterprise-grade WLAN market and the inherent competitive concerns with allowing

two companies to control roughly 70% of the market. *See, e.g.*, Exh. A-8 at 2; Exh. A-10 at 10–11. But in determining whether a proposed settlement is in the public interest, a district "[c]ourt must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations because this may only reflect underlying weakness in the government's case or concessions made during negotiation." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for a court to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. US Airways Group, Inc.*, 38 F. Supp. 3d 69, 75–76 (D.D.C. 2014) (noting that a court cannot reject the proposed remedies because it believes others are preferable and that "room must be made for the government to grant concessions in the negotiation process for settlements"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that a court must grant "due respect to the government's prediction as to the effect of proposed remedies, its perception of the market structure, and its view of the nature of the case"). The United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *accord United States v. Iron Mountain, Inc*., 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (also stating that the United States need only provide a factual basis for concluding that a settlement is reasonably adequate).

Here, the United States determined that the settlement is a reasonable compromise between the parties that addresses competitive concerns, given the risk inherent in successfully litigating the matter to a court judgment. The divestiture of Instant On and licensing of the Mist AI Ops source code should provide opportunities for other companies to grow, increase market share, and innovate in the enterprise-grade WLAN market. At the same time, the settlement avoids the possibility of the United States losing at trial and securing no remedies for the anticompetitive allegations outlined in the Complaint. The compromises embodied in the amended proposed Final Judgment are reasonable and "within the reaches of the public interest." *Bechtel*, 648 F.2d at 666.

### 3. Defendants' Divestiture of "Instant On" Is Designed to Protect Competition in the Enterprise-Grade WLAN Market.

Numerous commenters assert that the divestiture of Instant On, an enterprise-grade WLAN solution that has been aimed at small businesses, will not address the competitive concerns alleged in the

Complaint, either because they mistakenly believe Instant On falls outside the United States' alleged

market for enterprise-grade WLAN solutions or because they perceive that the Complaint focuses

exclusively on competitive concerns surrounding enterprise-grade WLAN solutions for larger

enterprises. *See*, *e.g.*, Exh. A-5 at 2–3; Exh. A-8 at 9–10; Exh. A-11 at 6–7.

Many of these criticisms are not supported by the record in this case. For example, the Complaint

alleges a market for enterprise-grade WLAN solutions and does not distinguish customers by size of

enterprise. *See* Dkt. No. 1 ¶¶ 34–38. The alleged product market only distinguishes between enterprise-

and consumer-grade WLAN solutions; consumer-grade wireless access points are "typically smaller,

capable of handling fewer users simultaneously, less reliable, and cover smaller geographic areas" than

enterprise-grade WLAN solutions. *Id.* ¶ 38. Accordingly, requiring the divestiture of Instant On from

HPE, the second-largest provider of enterprise-grade WLAN solutions, to a smaller participant or new

entrant in the market should increase competition in the market for enterprise-grade WLAN solutions.[4]

The record also does not support commenters' contention that divesting Instant On will have no

positive impact on the market for large-enterprise WLAN. First, while Instant On as marketed today

lacks features common in large-enterprise WLAN offerings, the purchaser of Instant On will receive

code for some additional features not currently available in HPE's offering (such as location services,

automatic quality of service, and firewall capabilities). The purchaser could add those and other features

to Instant On to make it more competitive for large enterprises, or integrate Instant On into their existing

products for larger-enterprise customers. *See* Dkt. No. 298-3 ¶¶ 7–9.

Second, over the years, WLAN vendors that were more successful in specific segments of the

U.S. market for enterprise-grade WLAN solutions have expanded their offerings to compete more

effectively in other segments. For example, Ubiquiti Inc. historically focused on smaller or mid-market

enterprises but has recently tried to expand its footprint in the large-enterprise segment of the market.[5]

Indeed, had this case gone to trial, the United States expected Defendants to present evidence about the

---

[4] To the extent commenters want the Court to redefine the market, the Tunney Act "does not authorize a district court to base its public interest determination on antitrust concerns in markets other than those alleged in the government's complaint." *BNS*, 858 F.2d at 462–63.

[5] Among other larger customers, Ubiquiti has WLAN contracts with a large arena, a college, and two school districts. UNIFI CASE STUDIES, https://casestudies.ui.com (last visited Nov. 7, 2025).

1  ability of Ubiquiti and other competitors to serve larger-enterprise WLAN customers. A similar

2  progression followed Cisco's acquisition in 2012 of Meraki, an enterprise-grade WLAN product initially

3  popular with small and medium-sized businesses that Cisco later successfully marketed to larger

4  enterprises. *See* Zeus Kerravala, *Cisco brings Meraki to the enterprise*, NETWORK WORLD (Jan. 27,

5  2015), https://www.networkworld.com/article/934892/cisco-brings-meraki-to-the-enterprise.html.

6  Finally, some large, distributed enterprises purchase solutions designed for smaller enterprises.

7  For example, many hotels forgo installation of sophisticated, feature-rich WLAN solutions in individual

8  hotel rooms and turn instead to products that support fewer devices across a smaller geographic area.

9  Instant On may be a useful solution for those customers. *See* Dkt. No. 298-3 ¶ 6. Accordingly, even if

10  Instant On's new owner initially continues to market the product as a small-business solution, that

11  company's success with smaller or mid-market enterprises could provide a foundation for later success

12  with large and sophisticated enterprises.

13  For these reasons, the commenters' critique of the Instant On divestiture does not change the

14  United States' conclusion that the settlement is in the public interest.

15  Nonetheless, the United States has reviewed and considered the comments carefully and has

16  reached agreement with HPE for certain amendments to the proposed Final Judgment to help ensure the

17  acquirer will use the divestiture to restore competition lost by the merger. In response to a concern raised

18  in the Former Division Professionals Letter, Exh. A-11 at 6, the amended proposed Final Judgment now

19  includes language stating that the divestiture of Instant On must be made to an acquiring company that

20  has "the intent and capability, including the necessary managerial, operational, technical, and financial

21  capability, to compete effectively in the market for the provision of enterprise-grade WLAN solutions in

22  the United States." Exh. A-1 at 18–19. Further, the divestiture acquirer must satisfy the United States

23  that it will use the Instant On assets to compete in the enterprise-grade WLAN market. *Id.* These

24  changes help ensure that the divestiture will restore competition lost by the merger and directly address

25  those commenter concerns.

26  **4.  Defendants' Forced Licensing of the Valuable Mist Source Code is Designed to**

27  **Protect Competition in the Enterprise-Grade WLAN Market.**

28  Other comments focus on the licensing of the Mist AI Ops source code as a remedy. Some

16

commenters suggest that the source code may no longer have much competitive significance because other companies' AI offerings have caught up to Juniper's. *See, e.g.*, Exh. A-8 at 10; Exh. A-11 at 7. But roughly a dozen potential licensees have already expressed interest in bidding for the source code. *See* Exh. A ¶ 21. This robust interest shows that the source code still has significant value.

The State AGs Letter also questions why the proposed Final Judgment requires the licensing of the source code rather than full divestiture. Exh. A-8 at 10. These commenters fail to recognize that this remedy arises from a pre-trial compromise of disputed claims, not a trial victory on the merits. The United States has determined that licensing the source code is a reasonable remedy to increase competition in the market and avoid the risks of further litigation.

For all these reasons, the commenters' concerns about the licensing remedy are not well grounded, and do not change the United States' conclusion that the settlement is in the public interest.

However, as discussed above, the United States considered the comments carefully and made certain amendments to the proposed Final Judgment. The amended proposed Final Judgment addresses two concerns raised by the Former Division Professionals Letter. Exh. A-11 at 6. First, the amended proposed Final Judgment includes more detailed information delineating the metes and bounds of the source code. Exh. A-1 at 3. Second, it includes language stating that the source code must be licensed to companies that have "the intent and capability, including the necessary managerial, operational, technical, and financial capability, to compete effectively in the market for the provision of enterprise-grade WLAN solutions in the United States." Exh. A-1 at 18–19. Further, the licensees must satisfy the United States that they will use the source code to compete in the enterprise-grade WLAN market. *Id.* The amended proposed Final Judgment also addresses a concern raised in the State AGs Letter, Exh. A-8 at 10–11, by providing that the one year of transition services provided to the primary licensee may be extended by an additional six months at the request of the primary licensee and with the approval of the United States. Exh. A-1 at 11.

### 5. The Other Purported Substantive Concerns Raised by Commenters Are Not Well Taken.

Commenters raised a handful of other substantive concerns about the proposed Final Judgment. The American Economic Liberties Project questions why the parties did not arrange upfront a specific

divestiture acquirer for Instant On or specific licensees for the Mist source code. Exh. A-10 at 11–12. While the United States prefers naming a divestiture acquirer at the time of settlement, it is not always possible, and some recent settlements have not provided for upfront divestiture buyers. *See*, *e.g.*, *United States v. Stone Canyon Indus. Holdings LLC*, No. 1:21-cv-01067-TJK, 2021 WL 4304760 (D.D.C. Aug. 10, 2021) (approving consent judgment with required divestiture but no named purchaser ); *United States v. United Techs. Corp.*, No. 1:20-cv-00824-DLF, 2020 WL 4810850 (D.D.C. July 22, 2020) (same). In this case, the settlement was agreed to less than two weeks before trial, and there was no time under the circumstances to identify and vet an adequate divestiture acquirer or licensee. But that should not present any cause for concern because the amended proposed Final Judgment clearly states the United States has sole discretion on whether to accept any divestiture acquirer or licensee. Exh. A-1 at 5.

Both the Former Division Professionals Letter and the State AGs Letter express concerns about the timeline for the divestiture of Instant On and the licensing of the source code. The Former Division Professionals Letter argues that the 180-day timeline is too long, while the State AGs Letter argues that the proposed Final Judgment lacks any mechanism to prevent HPE from endlessly delaying the divestiture or the licensing. Exh. A-8 at 11; Exh. A-11 at 8. With regard to the 180-day timeline, a longer timeline is necessary for the United States to conduct adequate due diligence on potential acquirers or licensees. As for potential further delays, these concerns are alleviated by Section VII, Paragraph A of the proposed Final Judgment (as amended), which requires HPE to submit affidavits to the United States every 30 days documenting the company's efforts to sell the divestiture assets and conduct the source code auction. Exh. A-1 at 20. HPE has been timely submitting these affidavits, and the United States is currently satisfied with HPE's efforts to implement the divestiture and license the source code in a timely manner. Finally, in response to these comments, the amended proposed Final Judgment now requires HPE to use best efforts to divest Instant On and license the source code as expeditiously as possible. Exh. A-1 at 18. It also includes stronger enforcement provisions that will allow the United States to seek relief from the Court, including contempt sanctions, should HPE violate the judgment's requirements to expeditiously complete the divestiture and the licensing. Exh. A-1 at 22-23.

Two commenters assert that allowing the HPE-Juniper merger to proceed will create a

monopoly. Exh. A-6. The United States did not allege that the merger would create a monopoly and does not believe it will do so. As mentioned in the Competitive Impact Statement, HPE and Juniper have a combined market share below 30% in the enterprise-grade WLAN market, while market leader Cisco has an approximately 48% share. *See* Dkt. 217-2 at 6. Several other companies, including Arista Networks, Inc.; Fortinet, Inc.; Ubiquiti Inc.; Commscope Holding Company Inc.; Extreme Networks, Inc.; Nile Global, Inc.; and Meter, Inc., each have smaller shares of the market. *See id*.

Other commenters question why the Competitive Impact Statement does not discuss reported national security justifications for the merger. *See*, *e.g.*, Exh. A-9 at 6–7. The Tunney Act requires the Court to consider whether entry of the proposed Final Judgment is in the public interest based on its competitive impact, not national security or other justifications. Accordingly, the United States is asking the Court to approve the proposed Final Judgment based on its competitive impact under the factors set forth in Sections 16(e)(1)(A) and (B), and not on other considerations urged by commenters.

**B.  Speculation About the Department of Justice's Internal Deliberative Process Is Outside the Scope of the Tunney Act.**

Several commenters expressed concern about the Department of Justice's internal deliberative process in reaching and finalizing the settlement. For example, four United States Senators stated in a comment that "there have been reports regarding the abnormally close involvement in this settlement of . . . appointees in the senior leadership offices of the Justice Department, who signed onto the settlement and reportedly overruled the Antitrust Division's analysis." Exh. A-5 at 3 (footnotes omitted).[6] Citing public statements by a former Department official who reportedly opposed the settlement, the State AGs Letter asserts that there were differing views within the Department concerning the terms of the settlement. Exh. A-8 at 1–2. Several other commenters make similar assertions.

Any such alleged internal disagreements within the Department of Justice are beyond the scope of Tunney Act review. The Tunney Act's public interest standard directs the Court to review the terms

---

[6] At the time the initial proposed Final Judgment in this matter was submitted to the Court, Chad Mizelle served as both the Attorney General's Chief of Staff and as the Acting Associate Attorney General. The Assistant Attorney General for Antitrust reports to the Associate Attorney General, who in turn reports to the Deputy Attorney General and the Attorney General of the United States. *See Agencies: Grid/Map View*, U.S. Dep't of Justice, https://www.justice.gov/agencies/chart/map (last visited Nov. 7, 2025).

and the competitive impact of the proposed Final Judgment, not the internal decision-making process and motivations of the Department of Justice. The text of 15 U.S.C. § 16(e)(1) requires the Court to determine whether the proposed Final Judgment is in the public interest. While the statute does not define the term "public interest," the Supreme Court has "long held that the words 'public interest' in a regulatory statute do not encompass the general public welfare but rather take meaning from the purposes of the regulatory legislation." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 690 (2025) (quoting *NAACP v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976) (internal quotation marks omitted)). To determine these purposes and inform its interpretation of the term, the Supreme Court has looked to the "broader statutory context[]." *See id*. at 684; *see also New York Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932) (noting "[i]t is a mistaken assumption that" the phrase "public interest" is "a mere general reference to public welfare without any standard to guide determinations," and recognizing "[t]he purpose of the Act, the requirements it imposes, and the context of the provision in question show the contrary"). Indeed, the House committee report for the Tunney Act stated "that the content of the phrase, 'public interest,' is a product of judicial construction in the context of particular statutes . . . ." H.R. Rep. No. 93-1463, at 11 (1974). Also relevant is the well-established principle that a word or term "is given more precise content by the neighboring words with which it is associated" in order to avoid ascribing to that word or term "a meaning so broad that it is inconsistent with the company it keeps." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008) and *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) (internal quotation marks omitted)).

In the Tunney Act, the term "public interest" keeps company with the rest of 15 U.S.C. § 16(e)(1), which states that the district court "shall consider" a number of factors as part of its public interest determination. *See* 15 U.S.C. § 16(e)(1)(A) & (B); *supra* at 10. All of the factors enumerated in both Sections 16(e)(1)(A) and (B) share a common aim: they require the court to consider the *impact* of the proposed consent judgment on individuals, businesses, and the economy. None of the enumerated factors authorizes a court inquiry into the internal decision-making processes of the Department of Justice. To read the term "public interest" to allow a consideration of such issues would effectively rewrite the statute and stretch its meaning beyond what statutory context allows.

Legislative history also supports this reading of the Tunney Act's public interest standard.

Senator Tunney introduced the legislation in 1973 in response to concerns about the substantive adequacy of several consent judgments negotiated by the Department of Justice over a multi-decade period. *See* 119 Cong. Rec. 24,598 (1973) (questioning the substantive adequacy of six consent judgments negotiated between 1941 and 1971, including the ITT settlement mentioned by several public comments in this matter). While other provisions of the Tunney Act address public comments (15 U.S.C. § 16(d)) and negotiation transparency (15 U.S.C. § 16(g)), Senator Tunney specifically described the legislation's public interest standard as "demand[ing] that the court consider both the narrow and the broad *impacts of the decree*" on alleged anticompetitive behavior, on private parties allegedly harmed by that behavior, and on the general public. *See* 119 Cong. Rec. 3452 (1973) (emphasis added). And in the 2004 amendment, Pub. L. No. 108–237, Congress modified the original public interest factors and added additional factors to further emphasize that courts should focus on the impact of the proposed consent judgment. Specifically, it added the requirements that courts examine both whether the *judgment's* terms are ambiguous as well as the impact of the *judgment* upon competition in the relevant market or markets. *See* 15 U.S.C. § 16(e)(1)(A)–(B). It also modified the catchall clause allowing court examination of "any other considerations bearing upon the adequacy of such judgment" by adding the adjective "*competitive*" before "considerations." *Compare* 15 U.S.C. § 16(e)(1) (effective until June 21, 2004), *with* 15 U.S.C. § 16(e)(1)(A) (effective as of June 22, 2004) (emphasis added).

This last modification is particularly telling. It confirms that Congress wished to focus the Court on *competitive* considerations, not considerations unrelated to the competitive impact of the proposed judgment. As Senator Kohl, a primary sponsor of the 2004 Tunney Act amendment, explained, the changes "ensure that the Tunney Act review is properly focused on the likely competitive impact of the judgment, rather than extraneous factors irrelevant to the purposes of antitrust enforcement." 150 Cong. Rec. S3618 (daily ed. Apr. 2, 2004) (statement of Sen. Kohl). Consistent with the legislative intent, the Court should therefore limit its Tunney Act review to the terms and competitive impact of the proposed Final Judgment, as amended.[7]

---

[7] For the same reason, the Court should not conduct an extra-statutory national security analysis of the merger, as suggested by the American Economic Liberties Project in its comment letter. *See* Exh. A-10 at 13–15. In addition, the American Economic Liberties Project's suggestion that the Court "has broad discretion under the Tunney [Act] to take actions beyond blocking the merger or amending the

The American Antitrust Institute tries to shoehorn its process concerns into a different section of the Tunney Act, § 16(b)(3), which requires the Competitive Impact Statement to provide "an explanation of any unusual circumstances giving rise" to the proposed Final Judgment or any of its sections. Exh. A-9 at 3–9. But the legislative history shows that the intent of this language was ensuring the court was informed of unique substantive reasons that would justify terms of the settlement, such as weaknesses in the government's case or changed economic or competitive circumstances since the filing of the complaint. *See Hearings on S. 782 and S. 1088 Before the Subcomm. on Antitrust and Monopoly of the S. Comm. on the Judiciary*, 93rd Cong. 22-23 (1973) (discussion between Senator Tunney, Harvey Goldschmid, and Gregory Gregorich). The United States has described any such circumstances in its filings with the Court.

The concerns raised by commenters about the Department of Justice's internal deliberations are not germane to the inquiry under the Court's public interest review pursuant to 15 U.S.C. § 16(e)(1).

### C. The Identity of the Specific Signatories on the Documents Submitted with the Proposed Final Judgment Is Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest.

A number of the commenters expressed concerns about the identity of the specific signatories on documents submitted with the original proposed Final Judgment. For example, certain state attorneys general stated: "In a highly unusual move, none of the DOJ trial staff signed the Settlement documents submitted to the Court," which were instead signed by "other higher-level officials at the DOJ." Exh. A-8 at 7; *see also* Exh. A-9 at 7.

There is no dispute that the Department of Justice personnel who signed the settlement documents were authorized to approve a settlement for the United States. Indeed, the documents cited by commenters were signed by Abigail Slater, Assistant Attorney General of the Antitrust Division as well as more senior Department leaders. Dkt. No. 217 at 10; Dkt. No. 217-2 at 17.

At bottom, the identity of the specific Department of Justice signatories on documents submitted

---

Proposed Final Judgment," Exh. A-10 at 9, is at odds with Ninth Circuit precedent stating that the Court's "ultimate authority under the [Tunney] Act is limited to approving or disapproving the consent [judgment]." *BNS*, 858 F.2d at 464.

with the original proposed Final Judgment is not relevant to the Court's public interest review under 15 U.S.C. § 16(e)(1). All that matters is that the proposed Final Judgment reflects the considered judgment and decision of the United States, as represented by the Department of Justice.

### D.   Unsubstantiated Assertions About Defendants' Disclosure Under 15 U.S.C. 16(g) Are Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest.

Multiple commenters raise questions about the adequacy of HPE's required disclosure under 15 U.S.C. § 16(g). This section, which is separate from the Tunney Act's public interest analysis in § 16(e)(1), requires HPE to "file with the district court a description of any and all written or oral communications" by or on behalf of HPE by the company's officers, directors, employees, or agents "with any officer or employee of the United States" regarding the proposed Final Judgment. Specifically exempted from this disclosure requirement are "any such communications made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone." The commenters suggest that HPE failed to disclose certain individuals representing the company or did not provide adequate details of its meetings with the government. *See*, *e.g.*, Exh. A-5 at 3; Exh. A-11 at 2-3.

As a threshold matter, 15 U.S.C. § 16(g) places the responsibility on HPE, not the United States, to file an adequate disclosure with the Court. The United States does note, however, that some commenters are incorrect as a matter of law about Section 16(g)'s requirements.

First, the Protect Democracy Center suggests that the Court ignore Section 16(g) by ordering the parties to disclose communications between party counsel of record and the Department of Justice. Exh. A-12 at 2. That action would directly contravene the statute, and the commenter provides no alternative statutory justification. It would also undermine the purpose of this specific Section 16(g) carveout, which, according to Senator Tunney, was aimed at ensuring "the free flow of opinion" between counsel for the United States and defendants about the "various ramifications of the settlement." *Hearings on H.R. 9203, H.R. 9947, and S. 782 Before the Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 93rd Cong. 40 (1973) (statement of Sen. Tunney).

Second, one commenter argues that Section 16(g) requires defendants to disclose contacts with the Legislative and Judicial Branches in addition to those with the Executive Branch. Exh. A-4. This argument misconstrues Section 16(g), as the D.C. Circuit explained at length in *Massachusetts v.*

*Microsoft Corp.*, 373 F.3d 1199, 1250 (D.C. Cir. 2004). The relevant passage from that opinion is quoted in full below:[8]

> Reference is made to "United States" 18 times in the Tunney Act. See §§ 15 U.S.C. 16(b)-(h). In all 17 references other than the disputed one in § 16(g) the term plainly denotes only the Executive Branch. *See, e.g., id.* § 16(b) ("Any proposal for a consent judgment submitted by the United States for entry in any civil proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court ... and published by the United States in the Federal Register"). It is a commonplace of statutory construction that "identical words used in different parts of the same act are intended to have the same meaning." *See Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 250, 116 S.Ct. 647, 655, 133 L.Ed.2d 611 (1996). [Commenters] offer no reason to believe the reference in § 16(g) to communications between Microsoft and "any officer or employee of the United States" uniquely extends the latter term beyond the Executive Branch. Moreover, because only the Executive Branch can settle an antitrust case, only contacts with the Executive Branch are relevant to the purpose of the Tunney Act — namely, to block settlements that are not in the public interest. We therefore conclude, as did the district court, the term "United States" as used in § 16(g) refers only to the Executive Branch.

*Id.*

### E.  The Remaining Comments Are Not Relevant to Whether the Proposed Final Judgment Is in the Public Interest.

For the same reasons, additional comments relating to the process by which the settlement was reached are outside the scope of Tunney Act review. For example, some commenters include allegations of unspecified insider trading by unknown persons. *See*, *e.g.*, Exh. A-10 at 6; Exh. A-13 at 6. While these allegations are serious if true, they do not fall within the scope of Tunney Act review pursuant to Section 16(e)(1).

## V.    FINALIZING THE PROPOSED SETTLEMENT

### A.  The Proposed Settlement Is in the Public Interest and Should Be Approved.

Under the Tunney Act's enumerated factors and the relevant case law, entry of the amended proposed Final Judgment is in the public interest. The forced divestiture of Instant On and the licensing of the Mist AI source ops code are remedies intended to address the competitive harms in the U.S. market for enterprise-grade WLAN solutions that were alleged in the Complaint. The proposed Final

---

[8] Although the D.C. Circuit's analysis concerned the version of the Tunney Act in force before the 2004 amendment, its reasoning applies with equal force to the current version of the Tunney Act.

Judgment also lays out detailed procedures for carrying out the divestiture and licensing. In response to public comments, the United States added additional provisions in the amended proposed Final Judgment to ensure that the divestiture and licensing are carried out in a timely manner and to ensure that the divestiture buyer and licensees will use the assets to compete in the enterprise-grade WLAN market. In addition, third parties are not harmed by the proposed judgment. Indeed, no third-party consumers or competitors filed a comment opposing the proposed Final Judgment.

The remedies are particularly reasonable in light of the risks associated with proceeding to trial. While the United States outlined a strong case-in-chief in its pre-trial briefing, *see* Dkt. No. 202, and believed the facts justified enjoining the merger, there was no guarantee that the Court would agree. Defendants also outlined a substantial defense in their filings. *See* Dkt. No. 200–201. In such scenarios, settlements serve the public interest by securing tangible protections rather than gambling on an all-or-nothing trial that could leave consumers with no relief. Requiring the Department to reject reasonable settlements and litigate every case to conclusion—even those where success is uncertain—would waste scarce government and private resources, delay benefits to consumers, and create perverse incentives that discourage enforcement of mergers with less-than-certain violations. *See United States v. Armour & Co.*, 402 U.S. 673, 681 (1971) (noting the benefits of consent judgments in saving parties from "the time, expense, and inevitable risk of litigation," and how such agreements are naturally compromises in which "the parties each give up something they might have won had they proceeded with the litigation"); H.R. Rep. No. 93-1463, at 11–12 (1974) (endorsing *Armour*'s reasoning in the Tunney Act context). Doing so would also contravene the Tunney Act's purpose, expressed in its legislative history, of encouraging reasonable resolutions that promptly restore competition. *See*, *e.g.*, 119 Cong. Rec. 24,598 (daily ed. July 18, 1973) (statement of Sen. Tunney) ("[I]t is most important that the consent [judgment] be preserved as a viable settlement option. This is the Government's philosophy and this remains the philosophy of our bill."); S. Rep. No. 93-298, at 7 (1973) ("[T]he [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool."); H.R. Rep. No. 93-1463, at 6, 8 (1974) (expressing intent to preserve the policy of encouraging settlement of antitrust cases by consent judgment).

Accordingly, the United States and Defendants negotiated a reasonable compromise that is well

"within the reaches of the public interest." *Bechtel*, 648 F.2d at 666.

**B. The Court's Role Under the Tunney Act Is Limited to Approval or Disapproval.**

Should the Court disagree with the United States' conclusion, however, the Tunney Act limits the Court in what it can do based on its review of the amended proposed Final Judgement. *See Microsoft*, 56 F.3d at 1462 (cautioning that while courts "can and should inquire . . . into the purpose, meaning, and efficacy of the decree" and insist ambiguities or implementation difficulties be addressed, they "must be careful not to exceed [their] constitutional role"). The Court's authority is essentially binary: it may approve a decree that falls within the "reaches of the public interest," or it may reject one that does not. *Id.* at 1461–62; *see also BNS*, 858 F.2d at 464 (court's authority under Tunney Act "limited to approving or disapproving the consent [judgment]"). "Short of that eventuality, the Tunney Act cannot be interpreted as an authorization for a district judge to assume the role of Attorney General." *Microsoft*, 56 F.3d at 1462.

The United States has exercised its prosecutorial discretion to challenge this merger, litigate it for months, and determine that this settlement represents fair and adequate relief that better serves the public interest. This judgment embodies the Department's considered assessment—informed by extensive investigation, litigation, and evaluation of trial risks—of the relief appropriate to remedy the alleged competitive harm. The Department brought this case because it believed the merger threatened substantial harm; having secured meaningful remedies, it has fulfilled its enforcement obligations.

The task before the Court is approval or disapproval of the amended proposed Final Judgment. If the Court concludes the settlement falls within the reaches of the public interest—as the United States respectfully submits it does—it should approve the decree. If the Court were to reject the settlement, the United States would face a choice about how to proceed in the exercise of its prosecutorial discretion. The Executive Branch possesses unreviewable discretion over whether to pursue enforcement actions, and that discretion extends to decisions about whether continued litigation serves the public interest when negotiated relief is unavailable. *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (recognizing "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). The Court cannot compel the United States to litigate this case, and a voluntary dismissal of the Complaint would not be subject to Tunney

Act review. *See In re IBM Corp.*, 687 F.2d 591, 600–04 (2d Cir. 1982) (holding that voluntary dismissal stipulations are not subject to Tunney Act judicial review and issuing writ of mandamus directing dismissal of case); *United States v. Mercedes-Benz of North America, Inc.*, 547 F. Supp. 399, 400-01 (N.D. Cal. 1982) (holding that voluntary dismissal stipulations are not subject to Tunney Act judicial review). Accordingly, disapproval of the proposed settlement based on speculative process concerns unrelated to competitive impact would serve no statutory purpose and would only return the matter to the Department's discretion about whether further proceedings advance the public interest.

### C. The United States Intends to Submit a Motion to Enter the Amended Proposed Final Judgment

The United States does not request that this Court take any action at this time based on this response to public comments. Instead, the next step is for the United States to provide notice in the *Federal Register* as required by statute and ordered by this Court. *See* 15 U.S.C. § 16(d); Dkt. No. 234. Once the United States confirms that the *Federal Register* notice has been completed and published, the United States will submit a motion to enter the amended proposed Final Judgment. Once this Court approves that motion, the proposed Final Judgment will take effect and govern the obligations of HPE and the United States with respect to the divestiture and licensing.

### D. An Evidentiary Hearing, Live Testimony, Evidentiary Submissions, and Amici Participation Are Neither Necessary Nor Appropriate.

Multiple comment letters call for the Court to hold an evidentiary hearing, take testimony from witnesses, request evidentiary submissions from the United States and HPE, or allow intervention by outside parties and amici.[9] The Court should decline these invitations because it can and should find that the amended proposed Final Judgment meets the Tunney Act's requirements based on the existing submissions. Furthermore, such a judicial inquiry into the Department of Justice's decision-making process would be barred by longstanding judicial precedent.

In its 2004 amendment to the Tunney Act, Pub. L. 108-237, § 221, Congress added the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct

---

[9] Several state attorneys general have already moved for intervention, which the United States has opposed. *See* Dkt. Nos. 236 & 299.

RESPONSE TO PUBLIC COMMENTS
CASE NO. 5:25-CV-00951-PCP

an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2); *see also US Airways*, 38 F. Supp. 3d at 76 (indicating that a court is not required to hold an evidentiary hearing or to permit intervenors as part of its review under the Tunney Act). This language explicitly wrote into the statute what Congress intended when it first enacted the Tunney Act in 1974. As Senator Tunney explained: "The court is nowhere compelled to go to trial or to engage in extended proceedings which might have the effect of vitiating the benefits of prompt and less costly settlement through the consent [judgment] process." 119 Cong. Rec. 24,598 (1973); *see also JDS Uniphase*, 2000 WL 33115892, at *11 (quoting this statement). "A 'public interest' determination can be made properly on the basis of the Competitive Impact Statement and Response to Comments filed pursuant to the [Tunney Act]." *JDS Uniphase*, 2000 WL 33115892, at *11 n.1; *see also United States v. Deutsche Telekom AG*, Civil Action No. 19-2232 (TJK), 2020 WL 1873555, at *3 (D.D.C. Apr. 14, 2020) (determining that a hearing was not necessary); *US Airways*, 38 F. Supp. 3d at 76 ("A court can make its public interest determination based on the competitive impact statement and response to public comments alone.").

Accordingly, most proposed consent judgments are approved under the Tunney Act solely on the papers. It is rare for courts to hold a hearing and even rarer to hold an evidentiary hearing with live witnesses. Indeed, courts have forgone hearings for high-profile mergers involving much larger companies in more consumer-facing industries than here. For example, in the Tunney Act proceeding for the $26 billion Sprint-T-Mobile merger, the United States received 32 comment letters, including several from industry participants, and yet the court saw no need for a hearing. *See Deutsche Telekom*, 2020 WL 1873555, at *3. Same for the American Airlines-US Airways merger that created the world's largest airline. Despite skeptical public comments from competing airlines, consumer organizations, and senior members of Congress, the court determined that no hearing was necessary. *See US Airways*, 38 F. Supp. 3d at 76.[10]

---

[10] Some commenters point to the court's evidentiary hearing in *United States v. CVS Health Corp.*, Civil Case No. 18-2340 (RJL) (D.D.C.), as a model for this Court to follow. In that matter, unlike in this matter, the United States received many public comments opposing the proposed settlement from participants in the relevant market, such as the American Medical Association. *See United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 50-51 (D.D.C. 2019). Even with such public opposition, the *CVS* court's decision to hold an evidentiary hearing with live testimony stands as an outlier in the history of Tunney Act reviews. And despite holding such an unusual evidentiary hearing, the court ultimately approved the proposed final judgment with no modifications, finding that it was "well within the reaches

To the extent that commenters ask the Court to conduct an intrusive examination into the Department of Justice's internal processes, motivations, or alleged non-competitive considerations for settling this case, such an inquiry would be unwarranted under the Tunney Act, as discussed in Section IV.B *supra*. The Supreme Court has also long recognized "that further judicial inquiry into 'executive motivation' represents 'a substantial intrusion' into the workings of another branch of Government and should normally be avoided." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019) (quoting *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)).

Much of the evidence sought by commenters would be shielded by the common law deliberative process privilege, which protects internal governmental communications that are "predecisional" and "deliberative in nature, containing opinions, recommendations, or advice about agency policies." *FTC v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). The purpose of the privilege "is to allow agencies freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Assembly of State of Cal. v. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992). While the privilege can be overcome "if [the] need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure," *Warner Commc'ns*, 742 F.2d at 1161, there is no such need here, because information about internal Department of Justice processes, motivations, or non-competitive considerations is not relevant to the Court's public interest determination. *See supra* at 19–22.

Further, to the extent commentators suggest taking testimony from high-ranking Department of Justice officials, courts have recognized the serious separation of powers concerns at play when a senior Executive Branch official is compelled to testify about their reasons for taking official actions. *See United States v. Morgan*, 313 U.S. 409, 421–22 (1941) (explaining that a court's inquiry into the Secretary of Agriculture's "mental processes" offended the independence of the Executive Branch); *Simplex Time Recorder Co. v. Sec'y of Labor*, 766 F.2d 575, 586–87 (D.C. Cir. 1985) (citing *Morgan*'s reasoning in upholding administrative law judge's decision to bar testimony from four sub-cabinet Department of Labor officials).

---

of the public interest." *Id.* at 59 (internal quotation marks omitted). Given the differences in context, this Court should not take the evidentiary hearing in *CVS* as a model.

RESPONSE TO PUBLIC COMMENTS
CASE NO. 5:25-CV-00951-PCP

Indeed, courts of appeals have issued writs of mandamus when district courts, absent clear necessity and legal justification, sought to compel production of privileged evidence from Executive Branch agencies or force testimony from senior Executive Branch officials. *See*, *e.g.*, *In re United States Dep't of Educ.*, 25 F.4th 692, 703–06 (9th Cir. 2022) (writ of mandamus to quash deposition subpoena to former Secretary of Education because of failure, among other factors, to show clear necessity of testimony); *Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (writ of mandamus to vacate discovery orders because district court did not adequately consider application of presidential communications privilege and deliberative process privilege); *In re United States (Jackson)*, 624 F.3d 1368 (11th Cir. 2010) (writ of mandamus to prevent compelled testimony of EPA Administrator); *In re Cheney*, 544 F.3d 311 (D.C. Cir. 2008) (writ of mandamus to prevent compelled testimony of Vice President's chief of staff); *In re United States (Holder)*, 197 F.3d 310 (8th Cir. 1999) (writ of mandamus to prevent compelled testimony of Attorney General and Deputy Attorney General); *In re FDIC*, 58 F.3d 1055 (5th Cir. 1995) (writ of mandamus to quash deposition subpoenas to three FDIC board members); *In re United States (Kessler)*, 985 F.2d 510 (11th Cir. 1993) (writ of mandamus to prevent compelled 30-minute telephone testimony of FDA Commissioner).

The principles highlighted above also counsel against the Court utilizing its inherent powers to conduct an inquiry into the process leading to the settlement, which some commenters have suggested. *See*, *e.g.*, Exh. A-10 at 9. Furthermore, such an inquiry is not supported by dictum in the Supreme Court's decision in *Sam Fox Publ'g Co. v. United States*, 366 U.S. 683 (1961), which is cited in the American Antitrust Institute's comment letter. Exh. A-9 at 9. In that case, which predated passage of the Tunney Act and concerned whether a third party could intervene to challenge the adequacy of a consent judgment, the Court stated that "sound policy would strongly lead" it to not "assess the wisdom of the Government's judgment in negotiating and accepting [a] consent [judgment], at least in the absence of any claim of bad faith or malfeasance on the part of the Government in so acting." *Id.* at 689. Applied to this case, the *Sam Fox* dictum is consistent with this Court's statutory duty to review the adequacy of the proposed Final Judgment under the enumerated factors spelled out in 15 U.S.C. § 16(e)(1)(A) and (B). It does not provide support for a wide-ranging judicial inquiry into the Department of Justice's internal processes, motivations, or alleged considerations other than the competitive impact of the judgment.

1    For these reasons, the Court should decline the invitations to hold an evidentiary hearing, take

2    testimony, require additional evidentiary submissions, or allow participation by outside parties.

3    **VI.    CONCLUSION**

4    After careful consideration of the public comments, the United States continues to believe that

5    the proposed Final Judgment, as negotiated and amended, provides an effective and appropriate remedy

6    for the antitrust violations alleged in the Complaint and is therefore in the public interest. The United

7    States will move this Court to enter the proposed Final Judgment after this response is published in the

8    Federal Register as required by 15 U.S.C. § 16(d).

9    Dated: November 14, 2025

10

11    ELIZABETH S. JENSEN (CA Bar #302355)
      *Assistant Civil Chief, San Francisco Office*

12    */s/ Henry C. Su*
      HENRY C. SU (CA Bar # 211202)
      Senior Litigation Counsel

13    U.S. Department of Justice, Antitrust Division
      450 Fifth Street, NW, Suite 4000

14    Washington, DC 20530
      Telephone: (202) 615-2165
      Email: Henry.Su@usdoj.gov

15    JEREMY M. GOLDSTEIN (CA Bar # 324422)

16    MICHAEL G. LEPAGE (DC Bar # 1618918)
      Trial Attorneys

17    U.S. Department of Justice, Antitrust Division
      450 Golden Gate Ave, Room 10-0101

18    San Francisco, CA 94102
      Telephone: (415) 229-2934

19    Email: Jeremy.Goldstein@usdoj.gov

20

21    *Attorneys for Plaintiff United States of America*

22

23

24

25

26

27

28

1

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

2        I, Jeremy M. Goldstein, am the ECF user whose identification and password are being used

3  to file RESPONSE OF UNITED STATES TO PUBLIC COMMENTS ON THE PROPOSED FINAL

4  JUDGMENT. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur

5  in this filing.

6                                                */s/  Jeremy M. Goldstein*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28