# Exhibit A-9



September 8, 2025

**VIA EMAIL**
Civil Chief, San Francisco Office, Antitrust Division
Department of Justice
450 Golden Gate Avenue, Room 10–0101
P.O. Box 36046
San Francisco, CA 94102
ATR.Public-Comments-Tunney-Act-MB@usdoj.gov

>        **Re:** *United States v. Hewlett Packard Enterprise Co. ("HPE") and Juniper Networks, Inc. ("Juniper"),* **No. 5:25–CV–00951–PCP, Tunney Act Comments of the American Antitrust Institute**

To Whom It May Concern:

The American Antitrust Institute ("AAI") is an independent nonprofit organization devoted to promoting competition that protects consumers, businesses, and society. It serves the public through research, education, and advocacy on the benefits of competition and the use of antitrust enforcement as a vital component of national and international competition policy. See http://www.antitrustinstitute.org.[1]

AAI submits these comments pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16 ("APPA" or the "Tunney Act"). AAI respectfully submits that the Department of Justice (DOJ) has not fulfilled its Tunney Act obligation to provide "an explanation of any unusual circumstances" giving rise to the Proposed Final Judgment ("PFJ") in the above-referenced matter.[2] As explained more fully below, unusual circumstances abound, are extraordinary in kind and degree, and have not been addressed.

Many of these unusual circumstances were detailed in a recent speech delivered by Professor Roger Alford. Professor Alford teaches at the University of Notre Dame Law School, served in the Antitrust Division of the DOJ as the Deputy Assistant Attorney General for International Affairs from 2017-2019 and, in March 2025, was appointed Principal Deputy Assistant Attorney General—the second highest ranking position in the Antitrust Division. In July 2025, he was removed from his position in connection with this case.

---

[1] AAI enjoys the input of an Advisory Board that consists of over 130 prominent antitrust lawyers, law professors, economists, and business leaders. Individual views of members of AAI's Board of Directors or its Advisory Board may differ from AAI's positions.
[2] 15 U.S.C. § 16(b)(3).

1

In his speech, delivered at the Technology Policy Institute's Aspen Forum, Professor Alford described the settlement in this case as a "scandal" stemming from a "pay-to-play approach" at the Antitrust Division, in which "cases are being resolved based on political connections, not the legal merits."[3] He described a "new normal" at the Antitrust Division that is "far removed from legitimate lobbying or traditional antitrust enforcement."[4] Rather, "the new game in town is to hire well-connected lobbyists ignorant of the law to get your deal done or your case dismissed by going around and above [Assistant Attorney General Abigail] Slater."[5]

Professor Alford also said the following:

> [I]t is my opinion that in the HPE/Juniper merger scandal, [former DOJ Chief of Staff and current Acting Assistant Attorney General] Chad Mizelle and [Counselor to the Attorney General and current nominee for Assistant Attorney General] Stanley Woodward perverted justice and acted inconsistent with the rule of law. I am not given to hyperbole, and I do not say that lightly. As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the settlement was reached. Although the Tunney Act has rarely served its intended purpose, this time the court may demand extensive discovery and examine the surprising truth of what happened. I hope the court blocks the HPE/Juniper merger. If you knew what I knew, you would hope so too.[6]

A former high-ranking DOJ official with direct knowledge thus has alleged that HPE/Juniper settlement is the product of influence-peddling that overrode the informed judgment of the expert leadership and staff at the Antitrust Division. At a minimum, these highly unusual circumstances demand an explanation, as the Tunney Act requires.

Before the district court may permissibly enter the PFJ, § 16(e) of the Tunney Act provides that the court "shall" evaluate all requisite information "necessary to a determination of whether the consent judgment is in the public interest."[7] For reasons explained more fully below, AAI submits that the court cannot enter the PFJ prior to conducting additional fact discovery. The DOJ's Competitive Impact Statement ("CIS") does not provide a factual foundation for its prediction that the PFJ will cure the harms alleged in the complaint. Moreover, "a complete ventilation of what is going on behind closed doors,"[8] consistent with the Tunney's Act's fundamental purpose, is necessary to determine whether the PFJ is in the public interest.

---

[3] Roger P. Alford, Remarks at the Technology Policy Institute Aspen Forum: The Rule of Law Versus the Rule of Lobbyists (Aug. 18, 2025), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5396537.

[4] *Id*. at 4–5.

[5] *Id*. at 5.

[6] *Id*. at 3–4.

[7] 15 U.S.C. § 16(e).

[8] *Hearings on S. 782 and Related Bills Before the H.R. Subcomm. on Monopolies and Commercial Law of the H. Comm. on the Judiciary*, 93rd Cong. (Sept. 10, 1973), *reprinted in* 9 Earl W. Kintner, The Legislative History of the Federal Antitrust Laws and

Through these comments, AAI wishes to notify the district court that it stands ready to assist the court in this proceeding, including, if appropriate, to intervene as a party to assist in examining witnesses or documentary materials or to participate "in any other manner and extent which serves the public interest as the court may deem appropriate."[9] AAI has previously participated as a witness in a Tunney Act hearing[10] and has participated as an amicus curiae in numerous Tunney Act proceedings spanning more than twenty years.[11]

## I.    Unusual Circumstances Remain Unexplained

HPE and Juniper announced their proposed $14 billion merger on January 9, 2024.[12] On January 30, 2025, the DOJ filed a lawsuit challenging the merger under Section 7 of the Clayton Act.[13] The DOJ's complaint alleges that the merger would combine the second and third largest providers of enterprise-grade wireless local area networking ("WLAN") solutions and give two firms—the merged firm and Cisco—control over 70% of the market.[14] It further alleges that the merger comfortably clears Herfindahl-Hirschman Index ("HHI") thresholds for presumptive illegality under the federal Merger Guidelines.[15]

The complaint alleges that HPE competes fiercely with Juniper. Juniper's Mist platform allegedly enjoyed explosive growth from 2019-2021 and projected double-digit growth from 2023-2025, due to its successful deployment of popular and innovative "AIOps" services.[16] Mist's cutting edge AIOps tools allegedly helped Juniper win numerous head-to-head contests with HPE for enterprise customers.[17] HPE allegedly launched an internal "Beat Mist" campaign, invested heavily to improve its Aruba platform, and offered steep discounts to fight for the customers it was losing to Juniper.[18]

Related Statutes 6626 (1984) [hereinafter "House Hearings"] (statement of Sen. John V. Tunney).

[9] 15 U.S.C. § 16(f)(3).

[10] *AAI Testifies on Behalf of Consumer Groups at Rare Tunney Act Hearing on Proposed Merger of CVS and Aetna*, AMERICAN ANTITRUST INSTITUTE (June 4, 2019), https://www.antitrustinstitute.org/work-product/aai-testifies-on-behalf-of-consumer-groups-at-rare-tunney-act-hearing-on-proposed-merger-of-cvs-and-aetna/.

[11] *See, e.g.*, Amicus Brief of the American Antitrust Institute, *United States v. Microsoft*, 231 F.Supp.2d 144 (D.D.C. 2002) (No 98-1232 (CKK)).

[12] Press Release, Juniper Networks, HPE to Acquire Juniper Networks to Accelerate AI-Driven Innovation (Jan. 9, 2024), available at https://investor.juniper.net/investor-relations/press-releases/press-release-details/2024/HPE-to-Acquire-Juniper-Networks-to-Accelerate-AI-Driven-Innovation/default.aspx.

[13] Complaint, *United States v. Hewlett Packard Enter.*, No. 5:25–CV–00951–PCP (N.D. Cal. filed Jan. 30, 2025), ECF No. 1 [hereinafter "Complaint"].

[14] *Id.* at 1.

[15] *Id.* at 14–15.

[16] *Id.* at 3.

[17] *Id.* at 3–5.

[18] *Id.* at 1, 4–5.

Still, HPE allegedly was not able to kill off the Juniper threat.[19] Instead, it changed tactics, buying Juniper and eliminating Mist as a rival platform. In so doing, the complaint explains, HPE "risks substantially lessening competition in a critically important technology market and thus poses the precise threat that the Clayton Act was enacted to prevent."[20]

### A. Attempts to Remedy Incurable Mergers Are Unusual

The DOJ's complaint makes clear that it sees the combination of HPE and Juniper as an "incurable" merger—that is, one that cannot be fixed with a remedy. This alone makes the circumstances of the remedy unusual.

The DOJ's complaint twice states explicitly that the HPE/Juniper merger "should be blocked," not just enjoined.[21] This language distinguishes this complaint from the typical merger complaint and every other merger complaint filed during the current administration.[22] An anticompetitive merger that should be *enjoined* is potentially curable using remedies, which often entail partial or conditional injunctions that permit a merger to be consummated subject to divestiture or behavioral commitments. In contrast, *blocked* is a term reserved for mergers that threaten incurable anticompetitive effects, "[w]here a remedy that would effectively preserve competition is unavailable."[23] As the DOJ has previously put it: "In cases in which neither conduct nor structural relief, nor a combination of the two, would effectively preserve competition, the Division will seek to block the transaction."[24]

---

[19] *Id.* at 2, 5.

[20] *Id.* at 2.

[21] *Id*. at 2, 6.

[22] *Compare id*., *with*, *e.g.*, Complaint at 3, *United States v. Global Business Travel Group*, No. 1:25-cv-00215-VM-GS (S.D.N.Y. filed Jan. 10, 2025) ("should be enjoined"); Complaint at 1, *United States v. Keysight Techs.* 1:25-cv-01734 (D.D.C. filed June 2, 2025) ("should be enjoined"); Complaint at 1, *United States v. SAFRAN S.A.*, 1:25-cv-01897 (D.D.C. filed June 17, 2025) ("should, therefore, be enjoined").

[23] U.S. Dep't of Justice, Antitrust Div. Policy Guide to Merger Remedies at 3 (June 2011), *superseded* Sept. 2020 [hereinafter "2011 DOJ Remedies Guide"]. *See also* U.S. Dep't of Justice, Antitrust Div. Policy Guide to Merger Remedies at 14–15 (Oct. 2004), *superseded* June 2011 [hereinafter "2004 DOJ Remedies Guide"] (noting that "the entity that needs to be divested may actually be the firm itself," in which case "blocking the entire transaction rather than accepting a divestiture may be the only effective solution.")

[24] 2011 DOJ Remedies Guide, *supra* note 23, at 4. In its official guidance, the DOJ has consistently drawn the distinction between blocking and remedying mergers for decades. *See, e.g.*, U.S. Dep't of Justice, Antitrust Div., Merger Remedies Manual at 7, n.26 (Sept. 2020), *withdrawn* April 2022 (distinguishing between a licensing remedy and "blocking the deal"); *id*. at 10 (distinguishing between "suing to block the entire transaction rather than accepting a divestiture"); *see also* 2011 DOJ Remedies Guide, *supra* note 23, at 2, 3, 4, 6, 14, 17, 19 n.42 (distinguishing between blocking and remedying); 2004 DOJ Remedies Guide, *supra* note 23, at 14–15, 15 n.22 (same).

The complaint's repeated statement that the merger should be blocked makes the timing and circumstances of the proposed remedy all the more unusual. On June 28, 2025, twelve days before trial was scheduled to begin, the DOJ issued a press release announcing that it had agreed to settle the lawsuit in exchange for a combination of conduct and structural commitments.[25] The timing of the settlement is out of the ordinary; most consent decrees are published concomitantly with the complaint, and they are rarely if ever entered on the eve of trial, after the government has already invested considerable resources.

The content of the press release also is atypical. It describes the settlement as a "novel approach," and it includes a quote from Assistant Attorney General Slater thanking the hard-working employees of the Antitrust Division but without making any mention of the merits of the settlement.[26] It also departs from precedent by including a quote from Mr. Mizelle, who alone described the settlement as a "victory."[27]

### B. Political Interventions into Antitrust Merger Control Are Unusual

On July 16, 2025, CBS News, citing multiple sources, reported that Mr. Mizelle had overruled Assistant Attorney General Slater in choosing to accept the settlement.[28] That development, if accurately reported, is exceedingly unusual.

CBS News also reported that there has been "internal friction" between the Antitrust Division and other Trump administration officials, including specifically over the handling of the HPE/Juniper investigation.[29] Assistant Attorney General Slater, the leader of the Antitrust Division, was reportedly a target of criticism from other officials and business leaders because she had reportedly told companies under investigation by the Antitrust Division to work with the Division in attempting to resolve competition concerns and "not to try to engage with the administration via Trump-aligned lobbyists and consultants."[30] Reportedly, "[f]rustration with that tack led business leaders to reach out to White House officials."[31] Assistant Attorney General Slater reportedly was then summoned to the White House for a July 17 meeting on merger policy.[32] These developments, if accurately reported, are unusual.

---

[25] Press Release, U.S. Dep't of Justice Office of Public Affairs, Justice Department Requires Divestitures and Licensing Commitments in HPE's Acquisition of Juniper Networks (June 28, 2025), https://www.justice.gov/opa/pr/justice-department-requires-divestitures-and-licensing-commitments-hpes-acquisition-juniper.

[26] *Id.*

[27] *Id.*

[28] Jennifer Jacobs & Jacob Rosen, *Tension over antitrust division crops up inside Trump administration, sources say*, CBS NEWS (July 16, 2025), www.cbsnews.com/news/top-trump-administration-antitrust-official-faces-criticism-over-approach-sources-say/.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id*.

### C. Forced Firings of the Assistant Attorney General's Deputies Are Unusual

On July 28, 2025, the Wall Street Journal, along with numerous other outlets, reported that Professor Alford, as well as William Rinner, the Deputy Assistant Attorney General in charge of overseeing merger enforcement at the Antitrust Division, had been fired "after internal disagreements over how much discretion their division should have to police mergers and other business conduct that threatens competition."[33] It also reported that Assistant Attorney General Slater "didn't support the final [settlement] agreement or the firings, which were seen as a move to weaken her independence," and that "the feud stemmed from the involvement of outside lawyers hired by HPE who weren't antitrust specialists but were brought in for their connections to administration officials."[34] These developments, if accurately reported, also are unusual.

### D. Reversing A Merger Challenge Based on a National-Champions Theory, But Nonetheless Remedying the Merger's Effects, Is Unusual

On July 30, 2025, Axios published a story that appeared to contradict certain elements of the CBS News reporting.[35] A national security official reportedly told Axios that it was "the U.S. intelligence community," rather than HPE's non-antitrust lobbyists and consultants, that "intervened to persuade the Justice Department" to approve the merger, citing national security reasons.[36] The national security reasons reportedly pertained to the international market, where HPE competes with foreign sellers to win the business of foreign enterprise-grade WLAN customers.[37] Specifically, the national security official reportedly told Axios that the intelligence community believed allowing the merger would "help[] [HPE] compete with China's Huawei Technologies," and that these "China-specific national-security concerns were a big reason the Justice Department decided last month" to allow the merger.[38] A DOJ spokesperson lent credence to the security official's claims by reportedly telling Axios that the DOJ "works very closely with our partners in the IC [intelligence community] and always considers their views when deciding how best to proceed with a case."[39]

The DOJ spokesperson's statement, if accurately reported and reflective of the DOJ's reasons for choosing to settle rather than block the merger, is unusual. For decades, both the DOJ and the Federal Trade Commission have jointly rejected a "national champions" theory of international competitiveness. They have always

---

[33] Dave Michaels, *Top Justice Department Officials Fired Amid Internal Feud*, WALL ST. J. (July 29, 2025), https://www.wsj.com/us-news/law/top-justice-department-antitrust-officials-fired-amid-internal-feud-0c98d57c.

[34] *Id*.

[35] Mike Allen*, Scoop: U.S. intelligence intervened with DOJ to push HPE-Juniper merger*, AXIOS (July 30, 2025), https://www.axios.com/2025/07/30/merger-hpe-juniper-networks-national-security.

[36] *Id.*

[37] *Id.*; Complaint, *supra* n.13 at 13. The complaint defines the relevant geographic market as the United States because Huawei is barred from competing in the United States. Complaint, *supra* n.13 at 13.

[38] Allen, *supra* note 35.

[39] *Id.*

maintained that "competition in the domestic market, regardless of its origin, begets efficient, productive firms, which are better able to compete in global markets," and "government efforts to 'stabilize' industry sectors, for example, through … encouragement of anticompetitive, inefficient mergers, obviously conflict with modern competition policy and are unlikely to promote industry competitiveness in the longer run."[40] Whenever the federal antitrust agencies have been asked whether promoting national champions or promoting merger control should be prioritized, they have unequivocally answered the same way: "We believe that the latter (merger control) should be prioritized."[41]

Mr. Mizelle and Mr. Woodward, neither of whom has previously held themselves out publicly as an expert in either U.S. antitrust law or international competitiveness, are the lead signatories on the Competitive Impact Statement ("CIS") filed with the court.[42] Notably, the CIS states only that "[t]he United States is satisfied" that the PFJ will benefit competition "for the development and sale of enterprise-grade WLAN solutions *in the United States*."[43] Notwithstanding that the Tunney Act requires disclosure of information "considered determinative in formulating" the consent decree and "an explanation" of the consent decree's "anticipated effects on competition,"[44] the CIS makes no mention at all of the consent decree having any anticipated effects on international competition.

Even more unusual, the CIS suggests the PFJ will undo the very effects that would purportedly strengthen HPE's competitive position internationally. Instead of allowing the merger to fortify HPE's international competitiveness against Huawei by enhancing its competitive position domestically, the CIS states that the PFJ's remedy will "eliminate the alleged anticompetitive effects of the acquisition."[45] In other words, the DOJ asserts that the remedy will fully restore the pre-merger status quo—leaving HPE no stronger competitively than it was before. To maintain that the merger's anticompetitive effects should be tolerated as a means of bolstering HPE's international competitiveness, while at the same time insisting those effects will be extinguished through the remedy, would be unusual.

---

[40] Contribution from the United States, *Competition Policy, Industrial Policy, and National Champions*, OECD GLOBAL FORUM ON COMPETITION (2009), p.3, *available at* https://www.justice.gov/sites/default/files/atr/legacy/2011/05/05/270443.pdf (quoting Deborah Platt Majoras, "National Champions: I Don't Even Think it Sounds Good," Remarks at the Int'l Competition Conference/EU Competition Day, Munich, Germany (Mar. 26, 2007) at 2, https://www.ftc.gov/sites/default/files/documents/public_ statements/national-champions-i-dont-even-think-it-sounds-good/070326munich.pdf) (cleaned up).

[41] *Id.* at 3 (cleaned up).

[42] Competitive Impact Statement at 17, *United States v. Hewlett Packard Enter.*, No. 5:25–CV–00951–PCP (N.D. Cal. filed Jan. 30, 2025), ECF No. 217-2 [hereinafter "CIS"].

[43] *Id.* at 12–13 (emphasis added).

[44] 15 U.S.C. § 16(b), (b)(3).

[45] CIS, *supra* note 42, at 7.

### E. Relying on an Entry or Repositioning Remedy Despite Believing that Entry and Repositioning Are Unlikely to Be Timely, Likely or Sufficient, Is Unusual

The CIS states that the PFJ will eliminate the merger's anticompetitive effects by "strengthening one or more existing competitors or facilitating entry of a new competitor."[46] The PFJ would do so by requiring the merged firm to (1) divest HPE's Instant On campus and branch business to an unidentified buyer, and (2) license the Mist AIOps source code to either one or two unidentified licensees.[47] However, the mechanism by which this remedy would achieve entry or repositioning is not apparent.

HPE's CEO reportedly stated in a recent investor call that Instant On "was specifically designed to serve the small business segment, particularly the 'S' in SMB and represents a small portion of our overall business."[48] And, the PFJ values the source code license at $8 million,[49] begging two questions. First: Why is HPE paying $14 billion to acquire Juniper if the competitive value of Mist is embodied in an $8 million source-code license? And second: Why not simply require Juniper to license the $8 million source code directly to HPE instead of facilitating an anticompetitive merger?[50] The DOJ has used antitrust consent decrees to impose mandatory licensing obligations for national security reasons before.[51] The PFJ's conclusion that a source code license is sufficient to replicate the competitive pressure Juniper currently imposes on HPE would seem to demand the parallel conclusion that the government need not allow this anticompetitive merger for national security reasons.[52]

Moreover, the complaint makes extensive allegations supporting its claim that "[e]ntry by new vendors of enterprise-grade WLAN in response to the merger would not be timely, likely, or sufficient to offset the anticompetitive effects of the proposed merger," and "[s]imilarly, there are obstacles to existing enterprise-grade WLAN vendors repositioning or expanding to replace the competition lost from an independent Juniper."[53] For the PFJ to rely on an entry or repositioning remedy after the DOJ has already determined that entry and repositioning remedies are not viable, is unusual.

---

[46] *Id.*

[47] *Id.* at 7–11.

[48] CAPITOL FORUM, HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms (July 24, 202), https://thecapitolforum.com/hpe-juniper-as-fight-between-doj-leadership-and-antitrust-division-broils/.

[49] Proposed Final Judgment at 12, *United States v. Hewlett Packard Enter.*, No. 5:25–CV–00951–PCP (N.D. Cal. filed Jan. 30, 2025), ECF No. 217-1 [hereinafter "PFJ"].

[50] *See* Complaint, *supra* note 13, at 18–19.

[51] *See, e.g.*, *United States v. W. Elec. Co.*, Civil Action No. 17-49., 1956 U.S. Dist. LEXIS 4076, at *1 (D.N.J. Jan. 24, 1956) (compelling AT&T to license its entire patent portfolio to other U.S. firms on reasonable and non-discriminatory terms where national-defense industries were implicated).

[52] Complaint, *supra* note 13, at 18–19.

[53] *Id.* at 18.

Nothing in the CIS explains any of the aforementioned unusual circumstances giving rise to the PFJ, as the Tunney Act requires.

## II. The DOJ's Determination that the Proposed Remedies Will Cure the Alleged Violation Is Not Reasonable Because It Lacks a Factual Foundation

In describing the legal standards governing the district court's Tunney Act review, the DOJ's CIS offers several relevant points of law. First, the government usually has "broad discretion to settle with the defendant within the reaches of the public interest."[54] Second, "the court's function is not to determine whether the resulting array of rights and liabilities is the one that will *best* serve society, but rather only to confirm" that the settlement is within the reaches of the public interest.[55] Third, "A district court must accord due respect to the government's prediction as to the effect of proposed remedies."[56]

However, the CIS also omits several relevant points of law. First, just as a district court must accord due respect to the government's prediction as to the effect of proposed remedies, it must also accord due respect to the government's prediction of harm in the complaint.[57] Second, the Supreme Court has made clear that deference is warranted only "in the absence of any claim of bad faith or malfeasance on the part of the Government."[58] Third, notwithstanding the government's broad discretion, "the government's determination that the proposed remedies will cure the antitrust violations alleged in the complaint" must be "reasonable,"[59] and there must be "a factual foundation for the government's decisions such that its conclusions regarding the proposed settlement are reasonable."[60]

AAI respectfully submits that the DOJ has not provided a factual foundation for its prediction that the PFJ will "eliminate the alleged anticompetitive effects of the acquisition by strengthening one or more existing competitors or facilitating entry of a new competitor."[61] Rather, the DOJ has done nothing more than describe the terms of a proposed divestiture and licensing commitment and state its prediction of complete relief as a conclusion. Because the CIS does not provide a factual basis that could explain how the divestiture and licensing commitment will restore competition or why the public and the court should reasonably expect they will work, the DOJ's determination that the proposed remedies will cure the alleged violation is not reasonable.

---

[54] CIS, *supra* note 42, at 13–14 (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995)).

[55] *Id*. at 14 (quoting *Microsoft*, 56 F.3d at 1460)

[56] *Id.* at 15 (quoting *United States v. Archer-Daniels-Midland Co.*, 272 F.Supp.2d 1, 6 (D.D.C. 2003)

[57] *United States v. Abitibi-Consolidated Inc.*, 584 F.Supp.2d 162, 165 (D.D.C. 2008)

[58] *Sam Fox Pub. Co. v. United States*, 366 U.S. 683, 689 (1961)

[59] *United States v. InBev N.V./S.A.*, Civil Action No. 08-1965 (JR), 2009 U.S. Dist. LEXIS 84787, at *3 (D.D.C. Aug. 11, 2009).

[60] *United States v. SBC Communs., Inc.,* 489 F. Supp. 2d 1, 16 (D.D.C. 2007)

[61] CIS, *supra* note 42, at 7.

"[T]he starting point is identifying the harm predicted in the Complaint."[62]  The complaint predicts both unilateral and coordinated anticompetitive effects that will not be cured by entry or repositioning.[63] Importantly, the CIS does not ever make any express prediction that the remedy will actually lead a new or existing firm to enter or reposition into the enterprise WLAN market. The prospect of entry or repositioning is merely an assumption that is implicit in the DOJ's generic claim that the PFJ will eliminate all of the merger's anticompetitive effects. Assumptions, unlike predictions, cannot be accorded deference. Moreover, the CIS does not provide any factual foundation that could support its assumptions.

For example, the complaint predicts, among other things, that entry will not be timely, likely or sufficient because "[i]t takes years and significant financial investment for a vendor to design and procure hardware components for a WLAN portfolio; create a management platform that incorporates tools that streamline and automate network maintenance; build a sales and support organization; and recruit value-added resellers and other distribution partners that procure and install equipment for WLAN customers."[64] The CIS does not make a prediction, nor does it offer a factual basis for an implicit assumption, that a hypothetical buyer of Instant On and/or licensee(s) of the Mist AIOps source code will be able to accomplish all or even any of these tasks. Given the absence of a factual basis to conclude any will do so, it is not reasonable to expect any firm will timely, likely, or sufficiently accomplish these tasks.

The complaint also predicts that, "[t]o compete effectively for larger enterprises, vendors also need name recognition and a demonstrated track record to convince them to consider switching providers."[65] Here, too, the CIS does not make a prediction, nor does it offer a factual basis for an implicit assumption, that a new or repositioned firm could achieve name recognition and a demonstrated track record. At a minimum, a *demonstrated* track record for a new or repositioned firm would appear to be a contradiction in terms. Given the absence of any factual basis to conclude otherwise, it is not reasonable to expect a new or repositioned firm will timely, likely or sufficiently achieve name recognition and a demonstrated track record to compete effectively.

The complaint further predicts that "[e]ven well-resourced networking companies in complementary networking markets are unlikely to be strong alternatives to Cisco and HPE immediately, as several face reputational headwinds and have not developed the distribution networks for rapid growth in the enterprise-grade WLAN market."[66] Once again, the CIS does not make a prediction, nor does it offer a factual basis for an implicit assumption, that a hypothetical divestiture buyer and/or licensee will be able to timely, likely or sufficiently develop a distribution network and build a dependable reputation. It is therefore not reasonable to expect this will occur.

---

[62] *Abitibi-Consolidated*, 584 F.Supp.2d at 165.
[63] Complaint, *supra* note 13, at 14–18.
[64] *Id.* at 18.
[65] *Id.*
[66] *Id.*

The CIS simply does not clear the reasonableness threshold set by the Tunney Act. It does not provide a factual foundation for the assumptions embodied in its conclusory statement that the PFJ will restore the competition eliminated by the merger.

### III. The Tunney Act Was Created to Increase Public Confidence in Antitrust Settlements By Requiring an Explanation of Unusual Circumstances, Lobbying Disclosures, and Reasonableness

The legislative history of the Tunney Act reveals that the Act was created for cases like this one. The Act ensures disclosure of information to the public when there are (1) exceedingly unusual circumstances giving rise to the consent decree; (2) public reports of extensive lobbying activity and credible allegations that government antitrust specialists were overruled; and (3) a remedy proposal that is facially dubious because it lacks a factual foundation.

In legislative proceedings addressing the bill that became his eponymous law, Senator Tunney observed that "it is already certain that excessive secrecy in the affairs of Government, and negotiating sessions conducted in total isolation from the public eye, create the potential for grave excesses that undermine the very framework of democratic government."[67]

Senator Tunney's expression of certainty was an allusion to a known scandal of the Nixon administration. After President Nixon's DOJ brought an antitrust case against the International Telephone & Telegraph Corporation ("ITT"), the agency later agreed to a notoriously weak settlement that looked more like a giveaway than a serious effort to address competitive problems. It later came to light that, shortly before the settlement, ITT had donated $400,000 to the Republican National Committee that helped re-elect Nixon in 1972.

The ITT scandal was first discovered by newspaper reporting.[68] In an article published in the Washington Post, syndicated columnist Jack Anderson revealed that he had uncovered direct evidence that the settlement was "privately arranged" between the Attorney General of the DOJ and "the top lobbyist for the company involved."[69] Anderson obtained a memo, which had been marked for destruction, indicating that "the antitrust case had been fixed" and that "the fix was a payoff" in exchange for the pledged election contribution.[70] Thanks to the Watergate tapes, it also later came to light that the Nixon White House had directly overruled the Antitrust Division in express instructions to Deputy Attorney General Richard Kleindienst, who was nominated to be Attorney

---

[67] Senate Debate, 119 Cong. Rec. 24597 (July 18, 1973), *reprinted in* 9 Kintner, *supra* note 8, at 6610 [hereinafter "Senate Debate"] (statement of Sen. John V. Tunney).
[68] Ciara Torres-Spelliscy, *The I.T.T. Affair and Why Public Financing Matters for Political Conventions*, BRENNAN CENTER FOR JUSTICE (Mar. 19, 2014) https://www.brennancenter.org/our-work/analysis-opinion/itt-affair-and-why-public-financing-matters-political-conventions?utm_source=chatgpt.com
[69] Jack Anderson, *Secret Memo Bares Mitchell-ITT Move*, WASH. POST (Feb. 29, 1972), *available at* https://joanwebstermurder.yolasite.com/resources/wash%20post%202-29-72%20secret%20memo%20bares%20mitchell-itt%20move.pdf?inline=1
[70] *Id.*

General before his deceit was uncovered and he resigned in disgrace.[71] But without this original investigative reporting, the true nature of the ITT settlement may never have been discovered.

Senator Tunney, citing directly to the ITT scandal, observed that "with greater public awareness, these abuses might have been stopped."[72] Consent decrees "are subject to the possibility of abuse," he explained, "unless you have a complete ventilation of what is going on behind closed doors, and unless the public is made aware of what the nature of the decree is—what the agreement is."[73] Senator Tunney's co-sponsor of the legislation, Senator Gurney, explained further that "[t]he key here is information, information on what is being contemplated, how it came to pass, what the public impact may be, and how individuals affected might obtain recourse in the case of injury."[74]

Senator Tunney emphasized, in particular, the critical importance of fully vetting the influence of lobbying activity on antitrust consent decrees. He believed "there is a great deal to be gained by having a corporate official who seeks to influence a pending antitrust case through pressure, know that his activity is subject to public view."[75] The lobbying disclosure requirement, among other requirements imposed by the Act, was designed to help "assure that adequate safeguards govern the manner and extent of corporate influence."[76]

Senator Tunney noted that "[t]he problem is particularly critical where the antitrust laws are concerned because to a considerable extent those laws are viewed as a direct threat by those who exercise the greatest corporate influence. And because the stakes are high the level of lobbying is equally high. For this reason, it is particularly important to assure some measure of public scrutiny of the exercise of that influence."[77]

D.C. Circuit Judge J. Skelly Wright's testimony in support of the legislation, which Senator Tunney quoted at length in his own testimony, elaborated on the core theory of good governance underpinning the legislation:

> By definition, antitrust violators wield great influence and economic power. They can often bring significant pressure to bear on Government, and even on the courts, in connection with the handling of consent decrees…. Because of the powerful influence of antitrust defendants and the complexity and importance of antitrust litigation, the public reasonably asks in many instances whether, in reaching a settlement, the government gave up more than it need have or should have. Some response to this public concern is desirable, in my opinion, not only to ensure that the compromise

---

[71] Torres-Spelliscy, *supra* note 68.

[72] Senate Debate, *supra* note 67, at 6607 (statement of Sen. John V. Tunney).

[73] House Hearings, *supra* note 8, at 6627 (statement of Sen. John V. Tunney).

[74] *Remarks of Sen. John V. Tunney & Sen. Edward J. Gurney Introducing S. 782*, 93d Cong., 119 Cong. Rec. 3449 (Feb. 6, 1973), *reprinted in* 9 Kintner, *supra* note 8, at 6563 [hereinafter "Introductory Remarks"] (statement of Sen. Edward J. Gurney).

[75] *Id.* at 6562 (statement of Sen. John V. Tunney).

[76] *Id*. at 6561.

[77] *Id*.

struck by the Justice Department is fair from the public's point of view, but also to alleviate fears, which, even if unfounded, are unhealthy in and of themselves.[78]

"If I could sum up the true meaning and purpose of this act," Senator Tunney further elaborated, "I would cite the crisp and clear words of Justice Louis Brandeis: Sunlight is the best of disinfectants. It is more sunlight that we are seeking to shed on the methods and manner by which we settle complex and costly antitrust suits through the consent decree process."[79] "And it is sunlight which is required in the case of lobbying activities attempting to influence the enforcement of the antitrust laws."[80] "[T]he courtroom rather than the backroom [should be] the final arbiter in antitrust enforcement."[81]

## III. Conclusion

The district court here should conduct extensive, fact-based discovery of the "methods and manner" in which the HPE/Juniper merger was settled and fully "ventilate what is going on behind close doors." The court should exercise its authority under the Tunney Act to hold hearings and appoint a disinterested party, represented by experienced antitrust counsel, to fully participate in the proceedings, including to take testimony from (1) government officials involved in the settlement, including both current and former DOJ officials as well as any national security officials who may possess relevant information; (2) employees and agents of the merging parties involved in reaching the settlement, including lobbyists retained by either or both of the merging parties; and (3) expert witnesses qualified to opine on (a) the competitive impact of the settlement in domestic and international enterprise-grade WLAN markets, and (b) the federal antitrust agencies' policies and standards in crafting merger remedies and blocking mergers. The court should also liberally authorize full or limited participation in hearings, as well as appearances as amicus curiae, by interested persons, agencies, and public interest organizations.

If, after extensive discovery into the method and manner of settlement, the DOJ still has failed to make the requisite showing that the settlement is in the public interest, the district court can protect the public without improperly intruding upon any executive branch officer's mental processes or free exercise of prosecutorial discretion by simply rejecting the settlement outright in the same manner in which courts sometimes reject

---

[78] Senate Debate, *supra* note 72, *reprinted in* 9 Kintner, *supra* note 8, at 6606 (statement of Sen. John V. Tunney) (quoting *S. Hearings on S. 782 and Related Bills Before the S. Subcomm. on Antitrust and Monopoly of the S. Comm. On the Judiciary*, 93rd Cong. (April 5, 1973), *reprinted in* 9 Kintner, *supra* note 8, at 6593 (testimony J. Skelly Wright, Judge, U.S. Court of Appeals for the District of Columbia Circuit)).

[79] *Id*. at 6609.

[80] Introductory Remarks, *supra* note 74, at 6561 (statement of Sen. John V. Tunney).

[81] *Hearings on S. 782 Before the Subcomm. on Antitrust and Monopoly of the Senate Comm. on the Judiciary*, 93d Cong. (March 15, 1973), *reprinted in* 9 Kintner, *supra* note 8, at 6566.

federal prosecutors' criminal plea agreements.[82] Indeed, nothing less would be sufficient to protect the public interest in principled enforcement of the antitrust laws.

*    *    *

Thank you for considering AAI's views. AAI, or qualified counsel appearing on its behalf, are available to assist the district court in conducting any aspect of its Tunney Act review.

Sincerely,

Randy Stutz, President
Kathleen Bradish, VP & Dir. of Legal Advocacy
David O. Fisher, Senior Counsel
American Antitrust Institute
1025 Connecticut Avenue, NW, #1000
Washington, DC 20036
(202) 905-5420

---

[82] *See* Darren Bush, *The Death of the Tunney Act at the Hands of an Activist D.C. Circuit*, 63 ANTITRUST BULL. 113, 127–31 (2018).