# Exhibit A-10



September 8, 2025

Leslie Wulff
Civil Chief, San Francisco Office
Antitrust Division
Department of Justice
450 Golden Gate Avenue, Room 10-0101
Box 36046
San Francisco, CA 94102
ATR.Public-Comments-Tunney-Act-MB@usdoj.gov

Re:     *United States v. Hewlett Packard Enterprise Co. and Juniper Networks, Inc.,* No. 5:25-cv-00951-PCP (N.D. Cal.)

Dear Ms. Wulff:

      The American Economic Liberties Project, a nonprofit organization that advocates for faithful enforcement of the antitrust laws, submits this public comment pursuant to the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b)-(h) (the "APPA" or "Tunney Act") and the procedures set forth in the Federal Register, 90 FR 30685.

      This comment provides the procedural background leading to the proposed settlement, a summary of the highly irregular circumstances surrounding the proposed settlement, a brief summary of the authorities conferred upon the court by the Tunney Act (including specific actions the court may take to further safeguard the public interest), and an analysis of the inadequacy of the Proposed Final Judgment. Finally, this comment concludes with a list of proposed interrogatories to which the government, defendants and third-party interlopers should respond over the course of these proceedings.

I.     INTRODUCTION

      These Tunney Act proceedings flow from the government's proposed settlement of a challenge to Hewlett Packard Enterprise Co.'s ("HPE") $14 billion acquisition of its head-to-head rival, Juniper Networks, Inc. ("Juniper"). As set forth in this comment, the Proposed Final Judgment fails to address the anticompetitive concerns set forth in the government's complaint. The core divestiture and license remedies are peripheral at best to the relevant market for enterprise-grade WLAN services, and the post-merger entity would retain all of the upside of a presumptively illegal merger without any meaningful mitigation. Remarkably, the government and parties do not present any argument to the contrary.

      Even if the divestiture and license remedies could be construed as adequate in theory, the government and parties have failed to identify any upfront acquirer or licensee – or to provide any representation than any such suitable acquirer or licensee exists. Typically, the Antitrust Division will decide that an upfront buyer is unnecessary under limited circumstances.[1] The

---

[1] Merger Remedies Manual, U.S. Department of Justice, Antitrust Division ("DOJ"), September 2020, at 22.

government does not even attempt to make that representation here. Instead, failure to identify an upfront buyer risks a remedy that never comes to fruition, and it deprives the court of any opportunity to assess the fitness of the buyer. Worse, the proposed Final Judgment places the court in the untenable position of ongoing management and potential revision of its final decree.

If the adequacy of the proposed Final Judgment were the only concern, the court's obligation might be straightforward. Instead, the circumstances surrounding the eleventh-hour settlement of HPE's $14 billion acquisition of bitter rival Juniper provide the fodder of a larger scandal. In the immediate wake of the settlement, reports emerged of an "attempted coup" at the Antitrust Division, precipitated by internal discord over potentially corrupt interference in the matter.[2] In the weeks that followed, the Antitrust Division's second-in-command Roger Alford and senior enforcer William Rinner were fired for "insubordination" amid tension over the proposed settlement in this case.[3] Then, in prepared remarks before the Tech Policy Institute, Alford accused two senior aides to Attorney General Pam Bondi, Chad Mizelle and Stanley Woodward, of "corrupting" the department's typical law-enforcement process.[4] Alford did not mince words:

> "Rather than the legitimate lobbyists who have expertise and perform traditional functions of education and engagement, corrupt lobbyists with no relevant expertise are perverting actual law enforcement through money, power, relationships and influence."[5]

Alford continued, "I hope the court blocks the HPE/Juniper merger. If you knew what I knew, you would hope so too," adding, "Someday I may have the opportunity to say more."

The Tunney Act proceedings in this case must provide that opportunity to Mr. Alford, and the court must fulfill its statutory obligation to independently scrutinize the adequacy of the Proposed Final Judgment for consistency with the public interest. Should the court find that the Proposed Final Judgment is inconsistent with the public interest, the court should exercise its authority to block the merger outright and order specific additional relief to safeguard the public interest in this and other matters before the Antitrust Division.

Above all, we encourage the court not to treat the Tunney Act as a formality, but to recognize the obligation and opportunity it presents to uphold the rule of law over the rule of lobbyists.

---

[2] Matt Stoller, "An Attempted Coup at the Antitrust Division," The Big Newsletter (July 25, 2025); "HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms," The Capitol Forum (July 24, 2025).
[3] Kushita Vasant, "Antitrust enforcers Alford, Rinner fired by US DOJ," MLex (July 29, 2025).
[4] Dave Michaels, "Bondi Aides Corrupted Antitrust Enforcement, Ousted DOJ Official Says," The Wall Street Journal (August 18, 2025).
[5] Roger P. Alford, "The Rule of Law Versus the Rule of Lobbyists," Tech Policy Institute Aspen Forum (August 18, 2025).

I.      **FACTUAL BACKGROUND**

   A. **The Merger, the Complaint, and the Proposed Final Judgment.**

In January 2024, Hewlett Packard Enterprise Co. ("HPE") announced that it had entered into an agreement to acquire Juniper Networks, Inc. ("Juniper"), a rival provider of commercial or "enterprise" wireless network solutions, for approximately $14 billion.[6] In January 2025, the U.S. Department of Justice ("DOJ") filed a Complaint to enjoin the merger, alleging it would substantially lessen competition in the market for enterprise-grade wireless local area network ("WLAN") solutions.[7] Prior to consummation of the merger, HPE through its Aruba Central division and Juniper through its Mist division were the second and third largest providers of enterprise WLAN equipment in the United States.

The merger is presumptively unlawful. Together with market leader Cisco Systems, Inc. the brands control 70% of the market.[8] The 2023 Merger Guidelines characterize markets with an HHI greater than 1,800 as "highly concentrated," and a change of more than 100 points as a "significant increase."[9] The higher the concentration metrics over these thresholds, the greater the risk to competition, and the stronger the evidence needed to rebut or disprove it.[10] In the instant case, the pre-merger relevant market has an HHI over 3,000, and the merger would result in a change of at least 250 points – metrics well in excess of the structural presumption of illegality.[11]

For years, HPE and Juniper had engaged in intense head-to-head competition, driven by Juniper's swift growth and produce differentiation since its acquisition of Mist Systems in 2019.[12] The Complaint details how HPE responded to Juniper's rapid growth with various initiatives to "Beat Mist" with targeted marketing campaigns, price cuts, and product innovation.[13] Both HPE and Juniper cater to large enterprise customers – including state and local governments and agencies, corporate campuses, research universities, and hospitals – and it is common for these customers to pit competitors against each other to obtain better prices.[14] According to the Complaint, eliminating this rivalry would heighten the risk of coordination among remaining vendors and harm enterprise customers by removing competitive pressure that had driven down prices and spurred product innovation.[15]

The Complaint specifically rejected representations by HPE and Juniper that the proposed acquisition would generate effective or timely synergies, referencing statements of

---

[6] Press Release, "HPE to acquire Juniper Networks to accelerate AI-driven innovation," HPE, January 9, 2024.
[7] Complaint, *United States v. Hewlett Packard Enterprise Co. and Juniper Networks, Inc.*, No. 3:25-cv-00951 (N.D. Cal. Jan. 30, 2025) ("Complaint").
[8] Id. at 3.
[9] 2023 Merger Guidelines, U.S. Department of Justice and the Federal Trade Commission, December 18, 2023, at 5-6.
[10] Id.
[11] Complaint, at 15.
[12] Id.
[13] Id. at 4.
[14] Id. at 17.
[15] Id. at 17, 20

HPE's own executives expressing doubts about HPE's ability to successfully integrate Juniper's products.[16] Nor did the Complaint mince words when alleging that nothing would offset the merger's threats to competition: entry by new vendors would not be timely, likely or sufficient, and smaller WLAN vendors would be crowded out of the market.[17]

On June 27, a mere two weeks prior to the scheduled trial date of July 9, 2025, the DOJ and defendants HPE and Juniper announced a proposed settlement of the case to allow the merger to proceed, subject to certain conditions.[18] Adequacy of the Proposed Final Judgment is at issue in these Tunney Act proceedings. In relevant part, the Proposed Final Judgment would:

1) require HPE to divest its "Instant On" campus and branch business to an unspecified acquirer, unless the divestiture cannot be completed within 6 months of the court's entry of Final Judgment, in which case the court shall make further orders at its discretion;[19] and
2) require HPE to hold an auction to license their "AI Ops for Mist Source Code" to unspecified licensees, unless no license is entered into within 6 months of the court's entry of Final Judgment, in which case the court shall make further orders at its discretion.[20]

The settlement also allows the initial licensee of the Mist AI software to receive transitional support, including the option for some Juniper staff to assist with integrating and marketing the Mist technology.[21] To be clear, the Propose Final Judgment does not specify any potential acquirer or licensee for the subject assets.

Concurrent with the Proposed Final Judgment, the DOJ filed a Competitive Impact Statement pursuant to Section 2(b) of the Tunney Act[22] and a Joint Stipulation and Proposed Order which, upon entry by the court, allowed HPE to consummate its acquisition of Juniper.[23] On June 30, the court granted the parties' Joint Stipulation,[24] and on July 2, HPE announced its successful completion of its acquisition of Juniper.[25]

### B. The "HPE/Juniper merger scandal" Rocks the Justice Department.

Separate and apart from the substance of the Proposed Final Judgment and Competitive Impact Statement, which we discuss below, the circumstances of the settlement have attracted widespread scrutiny for their high degree of irregularity and public allegations of corruption.

---

[16] Id. at 18.
[17] Id. at 18-19.
[18] Proposed Final Judgment, *U.S. v. HPE & Juniper*, No. 3:25-cv-00951, Dkt. No. 217-1 (N.D. Cal. June 27, 2025).
[19] Id. at 5-8.
[20] Id. at 10-16.
[21] Id. at 11
[22] Competitive Impact Statement, *U.S. v. HPE & Juniper*, No. 3:25-cv-00951, Dkt. No. 217-2 (N.D. Cal. June 27, 2027).
[23] Joint Stipulation and Proposed Order, *U.S. v. HPE & Juniper,* No. 3:25-cv-00951, Dkt. No. 217 (N.D. Cal. June 27, 2025).
[24] Order Granting Joint Stipulation, *U.S. v. HPE & Juniper*, No. 3:25-cv-00951, Dkr. No. 220 (N.D. Cal. June 30, 2025).
[25] Press Release, "Hewlett Packard Enterprise closes acquisition of Juniper Networks to offer industry-leading comprehensive, cloud-native, AI-driven portfolio," HPE, July 2, 2025.

The case against the HPE-Juniper merger was filed on January 30, 2025, just 10 days after the inauguration of President Trump, leading many to believe that a bipartisan trend toward rigorous enforcement of the antitrust laws would continue into the current administration.[26] Among the vocal supporters of the enforcement action was Mike Davis, an attorney and founder of the Article III Project,[27] an advocacy organization dedicated to appointing conservative judges, who responded to the announcement on social media: "The Trump 47 Justice Department's Antitrust Division is already off to a strong start. 3 into 2? You must sue."[28]

When the Justice Department announced its proposed settlement of the HPE-Juniper merger challenge, there were immediate signs of something amiss. Contrary to standard practice, the proposed consent decree was not signed by any staff in the Antitrust Division, but by senior officials in the Justice Department's front office, namely Chad Mizelle, Stanley Woodward, and Ketan Bhirud.[29] The proposed settlement was accompanied by a government Press Release, which included a conspicuously tepid quote from Assistant Attorney General for the Antitrust Division Gail Slater, which did not celebrate the settlement itself but thanked the "hardworking men and women of the Antitrust Division for their work on this case."[30]

In short order, these minor peculiarities began to snowball into much clearer signs of discord within the Justice Department. On July 16, CBS News first reported that internal friction within the Justice Department regarding the handling of the HPE-Juniper case had sparked conversations about whether to push out longtime staff in the Antitrust Division.[31] At the center of the discord was Antitrust Division head Gail Slater, who, according to several sources, had told representatives of HPE and Juniper not to engage with the administration via Trump-aligned lobbyists and outside consultants. Among those Trump-aligned lobbyists and outside consultants were Arthur Schwartz, a political adviser to Donald Trump Jr., and Mike Davis, who had since been hired by HPE despite his earlier full-throated support of the merger enforcement action.[32]

According to the same CBS News report, multiple sources said that Attorney General Pam Bondi's chief of staff, Chad Mizelle, had overruled Slater to accept the HPE-Juniper settlement proposal. The Wall Street Journal corroborated this account, reporting that Slater had told top Justice Department officials that she needed discretion to police mergers and that her team "shouldn't be subject to political interference."[33] According to sources spoken to by the Wall Street Journal, Mizelle had "pushed [the settlement] through."

---

[26] David Dayen, "The Law that Could Blow Open Trump Antitrust Corruption," The American Prospect (July 29, 2025).
[27] Article III Project (A3P), www.article3project.org.
[28] @mrddmia via X: https://x.com/mrddmia/status/1885042892026069019.
[29] Joint Submission Regarding Settlement, *U.S. v. HPE & Juniper*, No. 5:25-cv-00951, Dkt. No. 218 (N.D. Cal., June 28, 2025).
[30] Press Release, "Justice Department Requires Divestitures and Licensing Commitments in HPE's Acquisition of Juniper Networks," U.S. Department of Justice, Office of Public Affairs (June 28, 2025).
[31] Jennifer Jacobs, Jacob Rosen, "Tension over antitrust division crops up inside Trump administration, sources say," CBS News (July 16, 2025).
[32] Id.
[33] Dave Michaels, "Top Justice Department Antitrust Officials Fired Amid Internal Feud," The Wall Street Journal (July 29, 2025).

Speculation spread to social media, where Laura Loomer, described variously as "Trump's attack dog"[34] and "de facto national security adviser,"[35] posted in since-deleted tweets:

> "SCOOP: Sources tell me that some of the consultants involved in forcing a settlement between HPE and the DOJ were each paid $1 million for their influence peddling, and that [Chad Mizelle] forced the settlement with anti-Trust (sic) division against their will. He turned a blind eye to the influence peddling because he wants his wife Kat Mizelle to be appointed to the 11th Circuit as a federal appellate judge and needs consultants to lobby for her."[36]

Loomer further alleged, "Someone with advanced knowledge inside the DOJ leaked the news regarding the settlement before it was filed, because the markets reveal massive insider trading the morning of the settlement, which wasn't filed until midnight the same day."[37] Adding to allegations of potential insider trading, popular social media account "@unusual_whales" reported:

> "I am convinced things are leaking in the DOJ and leaking to Wallstreet (sic) ahead of time.
>
> Today $HPE had their settlement with the DOJ announced. $HPE is up 12%.
>
> ON FRIDAY $HPE HAD THE MOST OTM CALL OPTIONS IN THE LAST 90 DAYS, AND THE MOST AMOUNT OF CALL VOLUME.
>
> Someone put $1.11 million in 9% OTM calls at 11:09AM, and CLOSED THIS MORNING!
>
> This is a blatant example of leaks happening, and isn't the first time we've caught this."[38]

Meanwhile, less than one month after entry of the proposed settlement, on July 26, 2025 MLex reported that two of the Department's top antitrust enforcers, Principal Deputy Assistant Attorney General Roger Alford and Deputy Assistant Attorney General William Rinner, were placed on administrative leave by Chief of Staff Chad Mizelle.[39] On July 29, CNN reported that both Alford and Rinner had been fired following "weeks of tension" "due to internal turmoil over how to handle" the HPE-Juniper matter.[40] CNN confirmed with an anonymous DOJ official that Alford and Rinner had been fired for "insubordination" amid a "continuing battle inside the Justice Department between career officials and political appointees."[41]

---

[34] Maggie Haberman, Jonathan Swan, Ken Bensinger, "Trump Fires 6 N.S.C. Officials After Oval Office Meeting With Laura Loomer," New York Times (April 3, 2025).
[35] James Risen, "Maga influencer and de facto national security adviser Laura Loomer holds outsized sway on Trump," The Guardian (July 6, 2025).
[36] @matthewstoller on X: https://x.com/matthewstoller/status/1949995374606745741/photo/3
[37] Id.
[38] @unusual_whales on X: https://x.com/unusual_whales/status/1939750029230494049
[39] Khushita Vasant, "Two US DOJ Antitrust Division enforcers placed on administrative leave," MLex (July 26, 2025).
[40] Hannah Rabinowitz, David Goldman, "Justice Department fires two senior antitrust attorneys, alleging insubordination," CNN (July 29, 2025).
[41] Id.

On August 18, 2025, Alford delivered a speech to the Tech Policy Institute Aspen Forum titled, "The Rule of Law Versus the Rule of Lobbyists," in which he characterized the "fight over whether Americans will have equal justice under law, or whether preferential access to our justice system is for sale to the wealthy and well-connected" as "being fought within the Department of Justice."[42] He characterized Slater and other colleagues within the Antitrust Division as "united in the battle to protect the average Americans by vigorously enforcing the antitrust laws," but, "the same cannot be said for senior leadership." Of the HPE/Juniper settlement, Alford offered:

> "Although I am limited in what I can say, it is my opinion that in the HPE/Juniper merger scandal Chad Mizelle and Stanley Woodward perverted justice and acted inconsistent with the rule of law. I am not given to hyperbole, and I do not say that lightly. As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the settlement was reached."

Alford added, "I hope the court blocks the HPE/Juniper merger. If you knew what I knew, you would hope so too."

## II.     THE TUNNEY ACT IS NOT A FORMALITY.

When introducing the Antitrust Procedures and Penalties Act (the "Tunney Act") at a hearing before the United States Senate Subcommittee on Antitrust and Monopoly on March 15, 1973, Senator John Tunney issued a frank pronouncement:

> "The Nation's antitrust laws no longer sufficiently protect the public against abuses by giant corporations… [C]orporations have grown in power and influence through mergers, and their inner dealings with the Government agencies that supposedly regulate them remain behind closed doors."[43]

Senator Tunney went on to declare the intent of the law that would bear his name:

> "Our legislation will bring the consent decree process into the full light of day and will increase penalties for offenders. It will make our courts an independent force rather than a rubber stamp in reviewing consent decrees, and it will assure that the courtroom rather than the backroom becomes the final arbiter in antitrust enforcement."[44]

Senator Tunney and his colleague Senator Gurney introduced the Tunney Act in response to a history "replete with instances of antitrust settlements hammered out behind closed doors completely out of public view, and with virtually no regard for the requisites of due process."[45] Invoking Justice Brandeis' enduring aphorism, "Sunlight is the best of disinfectants," Senator

---

[42] Roger Alford, "The Rule of Law Versus the Rule of Lobbyists," Speech before the Tech Policy Institute Aspen Forum (August 18, 2025).
[43] Hearings on S. 782 and S. 1088, Before the Senate Subcomm. on Antitrust and Monopoly of the Judiciary, 93rd Congress, at 1 (March 16, 1973).
[44] Id.
[45] Antitrust Procedures and Penalties Act, Cong. Rec. 24598 (July 18, 1973).

Tunney argued, "And it is sunlight which is required in the case of lobbying activities attempting to influence the enforcement of the antitrust laws."[46]

In accordance with Congress' intent to shine a light on backroom dealing by corporate lobbyists, the Tunney Act authorizes the court, on its own motion, to: 1) take testimony of government officials or expert witnesses; 2) appoint a special master and such outside consultants or expert witnesses; 3) authorize full or limited participation in proceedings before the court by interested persons or agencies, including appearance amicus curiae, intervention as a party, examination of witnesses or documentary materials; 4) review any comments including any objections filed with the United States concerning the settlement; and 5) take such other action in the public interest as the court may deem appropriate.[47]

But the Tunney Act is more than a mere transparency law. To the contrary, the Tunney Act requires the court to "determine that the entry of [any consent] judgment is in the public interest."[48] Further, the district court is statutorily "required" to take into account "competitive considerations bearing on the adequacy" of the consent decree.[49] Further, the court must "evaluate both 'the competitive impact of the proposed remedies, *i.e.*, how well the settlement remedies the harms alleged in the complaint [],' as well as 'issues unrelated to the competitive impact of the settlement.'" *United States v. AT&T Inc.,* F. Supp. 2d 2, 6 (D.D.C. 2008) (quoting *United States v. SBC Commc'ns, Inc. et al.,* 489 F. Supp. 2d 1, 17 (D.D.C. 2007)). "In making its determination the Court may not simply 'rubberstamp' the government's proposal, but rather it must engage in an 'independent determination of whether a proposed settlement is in the public interest.'" *United States v. AT&T Inc.*, 541 F. Supp. 2d 2, 7 (D.D.C. 2008) (quoting *United States v. Microsoft Corp.*, 56 F.3d 1448, 1458 (D.C. Cir. 1995)).

In other words, the court is obligated to conduct an independent review of the anticompetitive concerns alleged in the complaint and to modify the proposed consent decree or block the merger outright if the consent decree inadequately protects the public interest. In the course of fulfilling this obligation, the court may commission independent economic analyses of the competitive effects of the proposed remedy and call for the production of evidence, including all communications, documents, and other records pertaining to the highly irregular circumstances giving rise to the proposed consent decree. This is particularly necessary in the instant case, where the government appears to have contravened its obligation to include in the Competitive Impact Statement a full accounting of the circumstances giving rise to the proposed settlement, despite those circumstances having been revealed elsewhere.[50]

Nor must the court confine itself to the anticompetitive competitive concerns set forth in the Competitive Impact Statement or elsewhere in the record. Here, the settlement's narrow focus also fails to account for the broader context in which this merger occurs, notably the lack of foreign competition due to security bans. When weighing the public interest, the court may consider not only whether the decree resolves the competitive issues alleged in the Complaint,

---

[46] Antitrust Procedures and Penalties Act, Cong. Rec. 3453 (February 6, 1973).
[47] 15 U.S.C. § 16(f).
[48] 15 U.S.C. § 16(e)(1).
[49] 15 U.S.C. § 16(e)(1)(A).
[50] 15 U.S.C. §16(b)(3).

but also whether the remedy undermines the public interest in other ways. As detailed below, by allowing a high level of market concentration in a crucial industry with only cosmetic fixes, the settlement is likely contrary to the public interest standard of the Tunney Act, which encompasses the impact on competition and the public generally.

Finally, the court may invoke its inherent equitable powers to prevent any further abuse, oppression, and injustice. The court's equitable powers are not abridged by the Tunney Act or any other statute. Rather, the Tunney Act's broad catch-all provision reinforces its power to "take such other action in the public interest as the court may deem appropriate." In the instant case, such additional action may include:

- Ordering restoration of the POST Application Programming Interface (API) to Regulations.gov, which is a tool that allows for the submission of public comments to federal agencies via third party API integration. This tool was removed by the General Services Administration on or around August 8, 2025, coinciding with the public comment period in the instant matter.[51]
- Barring specific individuals, including Arthur Schwartz, Mike Davis or other representatives of the Article III Project, from any further contact with the Justice Department in the instant matter or any other matter under the jurisdiction of the Antitrust Division.
- Ordering criminal referrals for any individuals where the facts suggest that insider trading occurred, or to other disciplinary proceedings consistent with enforcement of applicable rules of professional conduct.

While the court's authority is not limitless, the court nevertheless has broad discretion under the Tunney to take actions beyond blocking the merger or amending the Proposed Final Judgment, where the evidence justifies additional safeguarding of the public's interest.

### III. THE HPE-JUNIPER SETTLEMENT DOES NOT MEET THE PUBLIC INTEREST STANDARD OF THE TUNNEY ACT.

Although the settlement aims to address the Clayton Act violation, the consent decree seems to fall short in several ways: 1) the divestiture of HPE's "Instant On" campus/branch Wi-Fi business appears inadequate, because it involves a relatively narrow, lower-end segment of HPE's portfolio rather than core assets; 2) the process for vetting the divestiture buyer and the buyer's fitness to compete is unclear and potentially insufficient to ensure a robust new entrant; 3) the Mist AI software license remedy is limited and may not fully replace the innovative competition Juniper provided; and 4) the settlement fails to address broader national security concerns that arise from increased market concentration in critical network infrastructure.

#### A. The Divestiture of HPE's "Instant On" Campus/Branch Business is Inadequate and Inconsistent with the Public Interest in Blocking the Merger.

---

[51] "Trump Quietly Removes Public Comment Tool," Public Citizen (August 18, 2025).

9

The primary remedy in the settlement is the divestiture of HPE's "Instant On" business, which comprises HPE Aruba's global campus and branch wireless LAN unit focused on small-to-medium sized businesses ("SMB"). Under the decree, HPE must sell this entire Instant On unit, including its Wi-Fi access point hardware, related campus switches, cloud management software, R&D personnel, and customer contracts, to an independent buyer approved by DOJ.[52] HPE has 180 days post-merger to complete this sale.[53] The apparent purpose of this divestiture is to create or strengthen a competitor in the WLAN market by giving the buyer a ready-made product line and customer base in the campus/branch segment, but neither the Proposed Final Judgment nor the Competitive Impact Statement explain how the divestiture will resolve the government's concerns about the likely anticompetitive effects of the acquisition.[54]

This divestiture is inadequate for the simple reason that it has no bearing whatsoever on the relevant market for enterprise-grade WLAN services. HPE's "Instant On" line is an SMB-focused offering, designed for easy, out-of-the-box deployment with minimal IT support.[55] By HPE's own description, Instant On provides a "cloud-based package" of basic wired and wireless networking gear aimed at small offices and retail locations.[56] By contrast, the relevant market set forth in the Complaint includes large enterprise customers, including corporate campuses, government agencies, research universities, hospitals, and other highly complex, "high touch" customers.[57] Divestiture of HPE's Instant On division has no bearing on the enterprise-grade WLAN market. An effective divestiture might have included HPE's flagship Aruba products or Juniper's Mist business. Instead, HPE retains all of Juniper's assets and its own core Aruba enterprise portfolio, leaving the merged HPE-Juniper's position in the relevant market intact. It would be generous to characterize the proposed divestiture as a remedy to peripheral overlaps, while allowing the merger to eliminate head-to-head competition in the relevant, high-value segment of the market.

Even if the divestiture is successful – and nothing in the Proposed Final Judgment or Competitive Impact Statement suggests it will be – the post-merger market would remain a duopoly controlling 70% of the market. The Instant On divestiture assets, even if acquired by an approved, qualified entity, would not place the acquirer in any better position to overcome the obstacles to entering the relevant market – which, as detailed in the Complaint, include the sales forces and support organizations, reputational headwinds, and distribution networks in the relevant market.[58] Even if divesting Instant On "helps diversify the market at the SMB level," as

---

[52] Id. at 5
[53] Id. at 6
[54] Compare the Competitive Impact Statement in the instant case to the representations set forth in *United States v. CVS Health Corp. and Aetna, Inc.*, No. 1:18-cv-02340, Dkt. No. 3 (D.D.C. October 10, 2018) ("The divestiture mandated by the proposed Final Judgment will resolve the United States' concerns about the likely anticompetitive effects of the acquisition by requiring CVS to divest Aetna's individual PDP business nationwide. To ensure that the acquirer of Aetna's business will replace Aetna as an effective competitor and innovator in each of the 16 markets in which the Complaint alleges that the proposed merger would harm competition, the United States carefully scrutinized Defendants' businesses to identify a comprehensive package of assets for divestiture.")
[55] Instant On, HPE Networking Instant On Access Points, https://instant-on.hpe.com/products/access-points/
[56] https://www.networkworld.com/article/4014283/hpe-juniper-deal-clears-doj-hurdle-but-settlement-requires-divestitures.html
[57] Complaint, at 10.
[58] Complaint, at 18.

one analyst suggests, its effect will be to bolster competition for smaller WLAN deployments outside the relevant market.[59]

Ultimately, divestiture of HPE's own SMB-targeted asset leaves untouched the crown jewel of the acquisition: Juniper's highly innovative, rapidly growing enterprise-grade WLAN business.[60] A court reviewing the Proposed Final Judgment for consistency with the public interest must question whether shedding a small segment outside the relevant market mitigates the loss of competition fervently alleged in the Complaint.

### i. The parties' refusal to identify an upfront Divestiture Acquirer is unjustifiable.

The effectiveness of any divestiture remedy depends heavily on the capabilities of the buyer that acquires the divested assets.[61] In the instant case, the Proposed Final Judgment requires that the Instant On business be sold to a purchaser approved by the DOJ, and it obligates HPE to ensure the unit remains a viable, independent business until sold.[62] However, the settlement documents do not identify a specific buyer, nor do they detail stringent upfront criteria to guarantee the buyer's competitive fitness.

Because the parties are potentially allowed to close the merger before the divestiture occurs,[63] there is a risk that the selection of a buyer could be rushed or motivated by expediency rather than long-term competitive considerations. If the buyer ultimately chosen is not a firm with the resources, expertise, and strategic commitment to compete in enterprise networking, then the divestiture could fail to preserve meaningful competition.[64] For example, if the assets were sold to a purely financial purchaser like a private investment firm without industry experience or to a smaller tech company lacking a strong sales network, the new entity might struggle to scale up and replace Juniper's presence in the market. The settlement's requirement of DOJ approval implies that the government will vet the buyer but is silent on specific

---

[59] Masha Abrinova, "DOJ, HPE reach compromise on the $14B Juniper deal," Fierce Network (June 30, 2025).
[60] Complaint at 1, U.S. v. HPE. & Juniper Networks, Inc., No. 3:25-cv-00951 (N.D. Cal. Jan. 30, 2025); Proposed Final Judgment at 10, U.S. v. HPE. & Juniper Networks, Inc., No. 3:25-cv-00951 (N.D. Cal. June 27, 2025).
[61] Merger Remedies Manual, Antitrust Division, U.S. Department of Justice (September 2020) ("In most merger cases, the Division will require the divestiture of a specific package of assets to an acceptable buyer that has been identified before the Division enters into the consent decree. In such cases, the parties must identify an acceptable "upfront" buyer and then negotiate, finalize, and execute the purchase agreement and all ancillary agreements with that buyer before the Division enters into the consent decree. Identification of an upfront buyer is particularly important in cases where the Division determines that there are likely to be few acceptable and interested buyers who will effectively preserve competition in the relevant market post-divestiture.")
[62] Proposed Final Judgment, *U.S. v. HPE. & Juniper Networks, Inc.*, No. 3:25-cv-00951 (N.D. Cal. June 27, 2025).
[63] *Id.* at 5; Asset Preservation and Hold Separate Stipulation and Order ¶ IV.D, *United States v. Hewlett Packard Enterprise Co. & Juniper Networks, Inc.*, No. 5:25-cv-00951 (N.D. Cal. filed June 27, 2025)
[64] See e.g., *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 71 (D.D.C. 2017) ("In short, before even looking at [divestiture buyer] Molina's internal emails, there are reasons to doubt that it has the internal capabilities needed to manage the divestiture plans. Molina executives and board members have the same concerns, at least when expressing their views candidly at the time. It seems more likely that Molina and its board moved forward with the divestiture because, for the price, it was low-risk and high-reward for the company, despite their belief that Molina was not well positioned to be an effective competitor.")

qualifications such as requiring the buyer to have relevant industry experience or to preserve the assets long-term.

By contrast, stronger consent decrees sometimes identify an upfront buyer or at least set clear standards to ensure the buyer can viably compete. For instance, they sometimes require that the buyer not be unduly dependent on the merged firm, has adequate financial stability, etc.[65] Observers have speculated about possible candidates to buy Instant On – ranging from large tech companies like Amazon to existing networking vendors like Extreme Networks, Arista, or even cybersecurity firms looking to expand into wireless.[66] If a major player or a well-established networking company purchases the assets, they might have the means to enhance and aggressively market the divested business. Still, there is no guarantee that the assets will be relevant to injecting competition into the relevant market for enterprise-grade WLAN services. On the other hand, if a less established company or new entrant is the acquirer, it may take considerable time and investment before they can exert competitive pressure, in the relevant market or elsewhere. There are legitimate concerns on either end of the spectrum. Remarkably, the parties provide no consideration of these concerns, instead leaving selection of a Divestiture Acquirer solely to DOJ's internal approval process, which is outside public scrutiny.

This lack of a defined, robust buyer vetting process creates serious risks to the efficacy of the Proposed Final Judgment. Recent history is not lacking for examples of divestiture plans gone awry. Yet the parties would leave the court to determine the adequacy of the divestiture plan while blindfolded. The court need not wait and see whether a viable purchaser emerges in the next 18 months, and should instead cause the parties to go back to the drawing board or block the merger outright.

### B. The Mist AI License is Inadequate and Inconsistent with the Public Interest in Blocking the Merger.

The second centerpiece of the settlement is the requirement that the merged HPE-Juniper make Juniper's Mist AI Ops software available to competitors through a source code license. Juniper's Mist platform had been a key differentiator in the WLAN market: it introduced advanced artificial intelligence operations tools – such as virtual network assistants and automated troubleshooting – which significantly improved network management and performance. Customers came to associate Juniper with these cutting-edge AI capabilities, and Juniper's success with Mist forced rivals including HPE to develop similar features to keep up. In fact, HPE regarded Juniper's Mist as a serious competitive threat, with HPE executives internally noting rapid growth ("Mist double[d] revenue!") and strategizing to "Beat Mist" through aggressive pricing and product upgrades.[67] The loss of Juniper as an independent

---

[65] See, e.g., Agency Decision-Making in Merger Cases, FTC & DOJ (2016), at 4, available at FTC.gov (stating that a divestiture buyer must be "established and financially sound," have the intent to compete, and remain free of long-term entanglements with the merged entity).
[66] See e.g., Masha Abarinova, "DOJ, HPE Reach Compromise on the $14B Juniper Deal, Fierce Network" (June 30, 2025) (reporting that analysts said "Amazon … is one potential bidder for the HPE assets. Others … include Extreme Networks … Arista, securities companies like Fortinet and Palo Alto or even private equity looking to establish new entrants in the space") https://www.fierce-network.com/broadband/doj-hpe-reach-compromise-14b-juniper-deal
[67] Complaint at 4, U.S. v. HPE. & Juniper Networks, Inc., No. 3:25-cv-00951 (N.D. Cal. Jan. 30, 2025)

innovator therefore poses a significant competitive harm: the merger would "eliminate head-to-head competition…that has lowered prices and driven investment in network management software," reducing HPE's incentive to continue discounting and innovating post-merger.[68]

The Mist license provision is an attempt to mitigate this harm by seeding one or more existing or potential competitors with Juniper's AI software technology. However, this remedy is inherently limited and may not fully preserve the innovation competition that Juniper represented. First, the license is non-exclusive and potentially available to up to two competitors via auction, without any certainty that the licensee(s) can overcome other substantial barriers to entry set forth in the Complaint. Further, because the license is perpetual but does not transfer ownership of the technology, the merged HPE-Juniper will retain Mist's core intellectual property and presumably continue developing it independently. The licensees, by contrast, receive a snapshot of the Mist software with some transitional support for a year, after which they must rely on their own R&D to improve or adapt the code. In ill-fitting licensee will quickly fall behind the merged firm's ongoing advancements to the Mist platform, undermining their ability to rival HPE-Juniper's technology in the long run. In essence, the remedy gives competitors a time-limited starting kit rather than a self-sustaining innovation engine, while granting a permanent competitive advantage to HPE-Juniper for all the years that follow.

Second, it is not clear that the most capable industry players will even avail themselves of the Mist license. Again, the Proposed Final Judgment fails to identify any potential licensee. Industry analysts have expressed skepticism that major enterprise networking vendors like Cisco or Extreme Networks would pay to license Juniper's AI software, given that many already have their own AI-driven network management initiatives and might prefer to develop in-house rather than rely on a rival's code.[69] The Mist source code might be "more appealing to smaller-scope Wi-Fi providers" or new entrants, but those providers will not be viable competitors in the relevant market for enterprise-grade WLAN services.[70] For the same reason that the failure to identify a suitable divestiture buyer undermines the efficacy of that remedy, the failure to identify any potential licensee capable of applying competitive pressure in the relevant market fails here.

The Mist license remedy will likely fall short of preserving the level of innovation and competitive vitality that Juniper's Mist brought to the market. It does not offer the full integration of technology, branding, customer base, and ongoing R&D that made Juniper such an effective challenger. The Clayton Act seeks to prevent mergers that eliminate such competition, and a partial licensing fix is insufficient to prevent the substantial lessening of competition that the DOJ alleged in its own Complaint.

    C. **The Proposed Final Judgment Fails to Address Critical National Security Concerns.**

---

[68] Id. at 5.
[69] Masha Abarinova, DoJ, HPE Reach Compromise on the $14B Juniper Deal, Fierce Network (June 30, 2025) https://www.fierce-network.com/broadband/doj-hpe-reach-compromise-14b-juniper-deal
[70] Id.

In an August 18 story in Bloomberg, a Justice Department spokesperson is quoted as saying that the resolution of the merger was "based on the merits of the transaction, including national security concerns raised directly to Department leadership by the intelligence community."[71] Conspicuously, this was the first the public had heard of a national security justification, or of any involvement of the intelligence community, and national security concerns make no appearance in the government's Competitive Impact Statement. The government provides no additional information at all regarding how national security concerns may have thwarted a more robust remedy in this case.

Contrary to this post-hoc national security justification, the HPE–Juniper merger and its settlement may in fact aggravate national security and supply-chain concerns. The enterprise networking equipment market has unique importance for security: wireless networking is critical to government agencies, educational institutions, hospitals and large businesses, and the infrastructure must be trusted and reliable. Notably, certain foreign telecommunications suppliers have been excluded from the U.S. market due to security threats. The DOJ's Complaint observed that major Chinese network vendors (like Huawei Technologies) are barred by federal law from selling enterprise WLAN gear in the United States for security reasons.[72] This means the U.S. relies on a limited number of domestic or allied suppliers for secure networking solutions, which heightens the impact of any consolidation among those suppliers. With Huawei and similar firms effectively out of the picture, a merger that reduces independent U.S. competitors from three to two raises alarms not only about prices and innovation, but also about concentration of technology supply in fewer hands.

The Proposed Final Judgment, however, is focused narrowly on competitive remedies and does not contain any provisions aimed at enhancing national security. There are no conditions regarding supply chain integrity, U.S. manufacturing, government procurement assurances, or restrictions on foreign involvement in the merged company's operations. Some of these issues might normally be addressed by national security reviews (e.g. CFIUS), but HPE and Juniper are both American companies, so formal review was not triggered. Nonetheless, a reduction in the number of trusted networking vendors risks making U.S. networks more homogeneous and more vulnerable if a single company's products have a flaw or backdoor. Critics have noted that Juniper's custom ASICs and Junos OS are vital to telecommunications infrastructure and losing or consolidating them has national security implications.[73] HPE's acquisition of Juniper could further limit the number of trusted U.S. suppliers, especially with Chinese vendors excluded from the market, making independent domestic capabilities more critical. This consolidation may also heighten disruption risks, as outages at either company

---

[71] Josh Sisco, Leah Nylen, "DOJ 'Perverted Justice' in HPE Deal, Dismissed Official Says," Bloomberg Technology (August 18, 2025).

[72] Complaint at 13-14, U.S. v. HPE. & Juniper Networks, Inc., No. 3:25-cv-00951 (N.D. Cal. Jan. 30, 2025)

[73] See, e.g., Matthew Palmer, "DOJ scrutiny of HPE's acquisition of Juniper Networks likely stems from concerns over national security and Juniper's critical telecom technologies," SDxCentral (Nov. 20, 2024) ("Core telecom networking is dominated by a small number of vendors such as Cisco, Juniper, Nokia, Ciena, and Arista. This makes Juniper's core telecom assets, including its ASICs and Junos operating system, indispensable to the national telecommunications infrastructure.")

would reduce options for large customer groups. Similar vulnerabilities have already emerged in other industries, like when the CrowdStrike outage grounded flights for several airlines.[74]

The Proposed Final Judgment does not mitigate these concerns. It does not, for example, require any safeguards for government customers or impose any ongoing oversight on the merged firm's security practices. By allowing the merger to proceed with relatively modest and highly uncertain divestitures, the agreement arguably prioritizes a quick antitrust fix, at best, over a more cautionary approach that this vital infrastructure sector deserves. This settlement does not protect this competitive benefit beyond an untestable attempt to prop up a smaller competitor with hand-me-down assets.

### IV.     FURTHER PROPOSED INTERROGATORIES

The court begins these proceedings with an incomplete picture. Indeed, despite the foregoing summary of facts, highly irregular circumstances, and substantive concerns with the anticompetitive effects of the Proposed Final Judgment, there are more questions raised than are answered.

In the interest of ensuring that the proceedings facilitate a more complete record and better understanding of the highly peculiar proposed settlement in this case, we submit the below list of questions to help guide a thorough public inquiry:

(1) Who drafted the settlement agreement and, specifically, did the Antitrust Division leadership have any role in drafting or editing it?
(2) Did any of the Antitrust Division leadership or career attorneys object to the settlement and, if so, how and why?
(3) Did any of the Antitrust Division leadership or career attorneys threaten to resign after reviewing the settlement agreement? If so, why?
(4) Did any of the Antitrust Division leadership sign the settlement agreement under duress? If so, what was the nature of that duress?
(5) Typically consent decrees are signed by attorneys in the Antitrust Division. Why did no Antitrust Division career attorneys sign the settlement agreement? Why did senior DOJ officials outside of the Antitrust Division (e.g., Chad Mizelle, Stanley Woodward, and Ketan Bhirud) sign the settlement agreement?
(6) Were there differences between the settlement that was signed and the commitments the Antitrust Division leadership thought were necessary to preserve competition?
(7) How will the commitments in the settlement resolve the competitive concerns raised by the Antitrust Division in the complaint?
(8) Did the settlement agreement include the standard terms and conditions that the Antitrust Division typically uses in consent decrees, and if not, why not?

---

[74] Greg Iacurci, "Delta Air Lines to Seek Compensation over Cyber Outage," CNBC (July 29, 2024).

(9) Is the written agreement the full settlement agreement or, as is widely reported, were there side deals that the merging parties negotiated under the table with senior DOJ officials that relate to the settlement agreement and that remain undisclosed?

(10) If there were under the table deals, why were they not disclosed, what were the nature of those commitments, and how did they relate to preserving competition in the market? Were these commitments structured in a manner to avoid disclosure?

(11) Were all of the government officials, including individuals in the intelligence agencies, that communicated with the officials, lobbyists, or lawyers of the merging parties about the merger or settlement disclosed in court filings?

(12) Were all of the officials, lobbyists or lawyers of the merging parties who communicated with government officials, including individuals in the intelligence agencies, about the merger or settlement disclosed in court filings?

(13) What role did disclosed and undisclosed lobbyists and lawyers for the merging parties play in negotiating or lobbying for the settlement, and what were the terms of their retention agreements?

(14) Which officials, lobbyists and lawyers for the merging parties communicated with which government officials about the merger or settlement and when and where were those communications?

(15) Given the obligation in the DOJ Ethics Handbook to avoid even the appearance of impropriety, did any of the senior DOJ officials have any conflicts of interest and should any of them have been recused from negotiating the settlement based on their connections to or relationships with any of the officials, lobbyists, or lawyers of the merging parties?

(16) Did any of the officials, lobbyists, or lawyers for the merging parties make direct or indirect promises, assurances, or threats of a personal, professional, familial, or financial nature to any of the senior DOJ officials that negotiated the settlement that may have influenced their decision to approve the settlement?

(17) Were any of the officials, lobbyists, or lawyers for the merging parties or any senior DOJ or Antitrust Division officials involved in insider trading, or the sharing of information that led to insider trading, that may have influenced approval of the settlement or the date and timing of the settlement?

(18) On August 18, 2025, the Department of Justice stated that "resolution of the merger was based on the merits of the transaction, including national security concerns raised directly to the Department leadership by the intelligence community." When, where, to whom, and by whom were those communications made? What was the precise nature of the national security concerns? Did those national security concerns relate to competition in the United States market? Other than the purported national security concerns, how did the settlement agreement resolve the competition concerns raised by the Antitrust Division in the complaint?

(19) Which government officials, including officials within the intelligence community, determined that there were national security concerns that justified approving the settlement and were those officials disclosed in court filings?

(20) Was the Antitrust Division leadership ever briefed by officials in the national security or intelligence community before challenging the merger and, if so, did these officials raise concerns about challenging the merger?

(21) Was the Antitrust Division leadership ever briefed by officials in the national security or intelligence community after challenging the merger and, if so, did these officials raise concerns about challenging the merger?

(22) Are any of the privileges that attach in connection with communications, deliberations, or work product related to this settlement subject to exceptions, including the government misconduct exception or the crime/fraud exception?

## V.   CONCLUSION

The instant case provides a unique and critical opportunity for the court to exercise its full authority under the Tunney Act to interrogate the ability and willingness of the government to faithfully execute the antitrust laws free from powerful forces of corruption. Corruption concerns are perhaps most poignant in the context of the antitrust laws, which are designed not only to preserve competition, but to thwart concentrations of power that are most capable of wielding undue influence.

For the reasons described herein, the consent decree's merger conditions do not safeguard competition to the degree required by law. Moreover, the circumstances surrounding the settlement – including outright public allegations of corruption – call into question the government's ability to preserve competition in the relevant markets, to uphold the rule of law, and to protect the public's interest more broadly. We encourage the court to exercise the full breadth of its discretion to shine a light into the dark corners of this administration and to take all actions necessary to uphold Congress' unambiguous intent when adopting the Tunney Act.


Respectfully submitted,


American Economic Liberties Project