PHILIP J. WEISER
Attorney General
ARTHUR BILLER *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
        Bryn.Williams@coag.gov

*Attorneys for Intervenors*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff*, | **MOTION FOR HOLD SEPARATE ORDER** |
| vs. | |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | Judge: P. Casey Pitts<br>Action Filed: January 30, 2025<br>Hearing Requested:  TBD |
| *Defendants*. | |

Intervenors, the Attorneys General for the States of Colorado, California, Connecticut, Hawaii, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington, Wisconsin, and the District of Columbia (the "States") hereby move for entry of a hold separate order to prevent further integration of Defendants HPE and Juniper.  The States have conferred with the parties to this case of this Motion and have been informed that the United States takes no position at this time, and that Defendants oppose this Motion and do not consent to its filing.

**TABLE OF CONTENTS**

**INTRODUCTION** ................................................................................................... 1

**BACKGROUND** ..................................................................................................... 2

I.   The United States Sues To Block the HPE/Juniper Merger. ................................ 2

II.   The Proposed Settlement. .................................................................................. 4

III.   Public Reporting and Statements by a Former DOJ Official Expose the Settlement as the Product of Undue Influence by HPE Lobbyists. ......................................... 5

IV.   HPE and Juniper's Integration Efforts. ............................................................. 9

V.   The States' Motion To Intervene. ....................................................................... 9

**STANDARD** ........................................................................................................... 9

**ARGUMENT** ........................................................................................................ 11

I.   The Likelihood of Success on the Tunney Act Merits. ...................................... 12

II.   The Likelihood of Irreparable Harm. ................................................................ 14

III.   The Balance of the Equities. ............................................................................. 15

IV.   The Public Interest. .......................................................................................... 16

**THE SCOPE OF THE PROPOSED ORDER** ....................................................... 9

**CONCLUSION** ..................................................................................................... 18

1

2

**TABLE OF AUTHORITIES**

3

**Cases**

4

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ............................................................ 10, 11

5

*Bennett v. Isagenix International LLC*,
  118 F.4th 1120 (9th Cir. 2024) ................................................................ 10

6

*Boardman v. Pac. Seafood Grp.*,
  822 F.3d 1011 (9th Cir. 2016) ................................................................ 17

7

*California v. Valero Energy Corp.*,
  No. 17-cv-3786, 2017 WL 4122830 (N.D. Cal. Sept. 17, 2017) ............................ 10

8

*Clear Channel Outdoor, Inc. v. City of Los Angeles*,
  340 F.3d 810 (9th Cir. 2003) ................................................................ 11

9

*F.T.C. v. Exxon Corp.*,
  636 F.2d 1336 (D.C. Cir. 1980) .............................................................. 10

10

*F.T.C. v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ............................................................ 15, 16

11

*F.T.C. v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016) .................................................................. 15

12

*F.T.C. v. Weyerhaeuser Co.*,
  665 F.2d 1072 (D.C. Cir. 1981) .......................................................... 10, 16

13

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ................................................................ 16

14

*Pablo Sequen v. Kaiser*,
  No. 25-cv-06487, 2025 WL 2203419 (N.D. Cal. Aug. 1, 2025) ............................. 10

15

*United States v. Acorn Eng'g Co.*,
  No. 80-cv-3388, 1981 WL 2112 (N.D. Cal. June 18, 1981) ............................. 10, 16

16

*United States v. Bazaarvoice, Inc.*,
  No. 13-cv-133, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ................................ 14

17

*United States v. BNS Inc.*,
  858 F.2d 456 (9th Cir. 1988) .......................................................... passim

18

*United States v. Columbia Pictures Indus., Inc.*,
  507 F. Supp. 412 (S.D.N.Y. 1980) ........................................................... 16

19

*United States v. CVS Health Corp.*,
  407 F. Supp. 3d 45 (D.D.C. 2019) ........................................................... 13

20

*United States v. CVS Health Corp.*,
  No. 18-cv-2340 (D.D.C. 2018) ........................................................... 11, 18

21

*United States v. Ivaco, Inc.*,
  704 F. Supp. 1409 (W.D. Mich. 1989) ................................................... 15, 16

22

*United States v. Siemens Corp.*,
  621 F.2d 499 (2d Cir. 1980) ................................................................ 16

23

*United States v. Trib. Publ'g Co.*,
  No. 16-cv-1822, 2016 WL 2989488 (C.D. Cal. Mar. 18, 2016) ...................... 15, 16, 17

24

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................... 10, 14

25

26

27

28

**Statutes**

15 U.S.C. § 16(b)(3) ................................................................................................ passim
15 U.S.C. § 18 ............................................................................................................... 12
28 U.S.C. § 1651(a) ...................................................................................................... 11

**Other Authorities**

119 Cong. Rec. 3453 ................................................................................................. 2,17
H. Rep. No. 93-1463 ..................................................................................................... 1

1

**INTRODUCTION**

2    Intervenors, the Attorneys General for the States of Colorado, California, Connecticut,

3 Hawaii, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington,

4 Wisconsin, and the District of Columbia (collectively, the "States"), move for entry of a hold

5 separate order to prevent further integration of Defendants HPE and Juniper.  There have been

6 disturbing public reports and statements by a former Department of Justice official that the

7 proposed settlement in this case was the product of lobbying influence by HPE.  Those

8 allegations merit a thorough inquiry into whether the settlement is in the public interest, as

9 required by the Tunney Act.  But HPE and Juniper closed their merger in early July and are

10 currently integrating.  A hold separate is therefore necessary to freeze integration efforts,

11 safeguard the Tunney Act process, and prevent irreparable harm to competition while the Court

12 reviews the settlement.

13    The Tunney Act requires that the Court independently review the proposed settlement to

14 ensure it is in the public interest.  15 U.S.C. § 16(e)(1).  The Tunney Act was enacted on the

15 "imperative that the integrity of and public confidence in procedures relating to settlements via

16 consent decree procedures be assured."  H. Rep. No. 93-1463 (1974), *as reprinted in* 1974

17 U.S.C.C.A.N. 6535, 6536.  That imperative is at its apex in a case like this—where there appears

18 to be a significant incongruity between settlement remedies and alleged harms, following a

19 settlement negotiation process that knowledgeable sources have said was infected by

20 impropriety.  The Tunney Act directs the Court to probe any impropriety and determine if the

21 settlement is in the public interest.  However, as the Ninth Circuit has held, "[t]hat very interest

22 could be harmed irreparably by permitting a merger to become a *fait accompli* while the court

23 awaited public comments and performed its [Tunney Act] review function."  *United States v.*

24 *BNS Inc.*, 858 F.2d 456, 461–62 (9th Cir. 1988).  "[I]f after review of public comments [the]

25 court were to disapprove [the] proposed consent decree because of the possibility of a substantial

26 lessening of competition, and the government were to reconsider its position in view of the

27 court's decision, harm from the interim restraints of trade could be irreparable."  *Id.* at 462.

A hold separate order is necessary here to maintain the status quo and to protect the

28

1

Tunney Act process and the ability of this Court to make its public interest determination effective.  HPE has closed its acquisition of Juniper and presumably continues efforts to integrate Juniper assets into HPE.[1]  But this case is not closed.  As envisioned by the Tunney Act, this Court will review the settlement to ensure that it is in the public interest and to shed "sunlight" on the settlement process.  *See* 119 Cong. Rec. 3453 (1973) ("Sunlight is the best of disinfectants," and thus "sunlight . . . is required in the case of lobbying activities attempting to influence the enforcement of the antitrust laws.").  To ensure the efficacy of that review, the Court should grant the States' Motion and issue the attached hold separate order.

## BACKGROUND

### I.    The United States Sues To Block the HPE/Juniper Merger.

The United States filed its Complaint on January 30, 2025, seeking to block outright the merger between Hewlett Packard Enterprise Co. ("HPE") and Juniper Networks, Inc. ("Juniper").  The Complaint alleged a presumptively unlawful "3 to 2" merger, stating that "HPE and Juniper are the second- and third-largest providers of commercial or 'enterprise' wireless networking solutions, respectively, in the United States," and that the merger "would result in two companies—market leader Cisco Systems, Inc. ('Cisco') and HPE—controlling well over 70 percent of the U.S. market and eliminate fierce head-to-head competition between Defendants, who offer wireless networking solutions under the HPE Aruba and Juniper Mist brands."  Complaint ¶ 1 (Jan. 30, 2025) (Dkt. No. 1).  Specifically, the Complaint alleged that the merger would substantially lessen competition in the market for enterprise-grade WLAN solutions in the United States.  *Id.* ¶¶ 31, 34, 39.  And it alleged the merger would be presumptively unlawful under well-established market concentration metrics—the relevant market is already highly concentrated with a pre-merger HHI score of over 3,000, and the merger would increase concentration by at least 250 points.  *Id.* ¶¶ 42–43.

---

[1] *Hewlett Packard Enterprise Closes Acquisition of Juniper Networks To Offer Industry-Leading Comprehensive, Cloud-Native, AI-Driven Portfolio*, Hewlett Packard Enterprise (July 2, 2025), https://www.hpe.com/us/en/newsroom/press-release/2025/07/hewlett-packard-enterprise-closes-acquisition-of-juniper-networks-to-offer-industry-leading-comprehensive-cloud-native-ai-driven-portfolio.html.

In the months that followed, the United States vigorously litigated the case, conducting fact and expert discovery, and readying the case for trial, including the filing of pretrial briefs. In its pretrial brief, the United States previewed the evidence supporting its action and the expert analysis it planned to rely on at trial to demonstrate that HPE's acquisition of Juniper should be permanently enjoined. The United States identified Juniper as "a maverick—an aggressive competitor that exerts outsize influence on industry pricing and innovation"—and argued that its elimination from the market through acquisition by HPE threatens to substantially lessen competition in the market for enterprise-grade WLAN solutions. United States' Pretrial Brief at 9 (June 30, 2025) (Dkt. No. 221).

The United States also marshaled evidence of fierce head-to-head competition between the merging parties, including HPE losing business to Juniper, HPE lowering prices to better compete with Juniper, and HPE launching a "Kill Mist" campaign internally to more aggressively compete against the maverick Juniper. *Id.* at 9–11. HPE's CEO apparently considered Juniper to be HPE's biggest competitive threat. *Id.* at 10.

The United States' Pretrial Brief also previewed its expert economic analysis. Its expert would show that HPE, Juniper, and Cisco control over 75% of the relevant market—a conclusion apparently uncontested by the Defendants. *Id.* at 7–8. Also uncontested would be the economic analysis showing that the merger would result in presumptively unlawful market concentration. *Id.* at 8–9. According to the United States, this acquisition would be a presumptively unlawful 3-to-2 merger. *Id.*

The United States also asserted that economic analysis of price effects would show that the merger would likely raise prices by an estimated 3–6% on HPE products and 7–14% on Juniper products. *Id.* at 11.

Finally, the United States argued that the merger would result in coordinated effects because post-merger "Cisco and HPE may find it easier to pull their competitive punches instead of continuing to compete aggressively." *Id.* According to the United States, this was not an abstract concern, as HPE was prepared to tell its investors that after closing the merger, "HPE was 'expecting some relief' from 'price/discounting pressure' particularly in the business unit

that included enterprise WLAN where 'we [HPE and Juniper] are each other's main competitors.'" *Id.* at 12.

## II.     The Proposed Settlement.

On the eve of trial, despite the significant evidence it was prepared to present, the United States abruptly settled the case, on terms that do not appear to address the allegations of anticompetitive harm and—as described below—under highly suspicious circumstances. The Proposed Final Judgment (the "Settlement") has two main components: (1) HPE must divest its Instant On business line; and (2) HPE must license Juniper's AIOps for Mist source code. Proposed Final Judgment at 9 (June 27, 2025) (Dkt. No. 217-1). Neither of these components address the harms alleged in the Complaint or in the United States' pretrial brief.

As to the first component, a divestiture of the Instant On business is outside the focus of the United States' allegations, which focused on HPE's Aruba business line. The very first paragraph of the Complaint calls out the "fierce" competition between HPE's Aruba business line and Juniper's Mist. Complaint ¶ 1. Instant On, conversely, is not mentioned anywhere in the Complaint or in the pretrial briefing. Defendants for their part also plainly admitted that HPE offers WLAN solutions "under its Aruba brand." Defs.' Pretrial Brief at 8 (July 1, 2025) (Dkt. No. 222). HPE's CEO confirmed the irrelevance of this divestiture when explaining it to HPE's investors, describing Instant On as "a distinct offering separate from the traditional HPE Aruba platform and Aruba Central," and stating that Instant On "was specifically designed to serve the small business segment," and "represents a small portion of our overall business."[2]

The second component likewise appears to fail to remedy the merger's harm. Here again, HPE's CEO explained the minimal concession made by the company, stating that the license relates to only a "portion" of Mist's code.[3] The minimal relative value of the portion of the code

---

[2] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, The Capitol Forum (July 24, 2025) (quoting HPE CEO comments on a July 10, 2025 call with investors), https://thecapitolforum.com/hpe-juniper-as-fight-between-doj-leadership-and-antitrust-division-broils/.

[3] *HPE CEO: We can offer true client-to-cloud networking solutions with Juniper deal*, CNBC (July 2, 2025), https://www.cnbc.com/video/2025/07/02/hpe-ceo-we-can-offer-true-client-to-cloud-networking-solutions-with-juniper-deal.html.

to be licensed is demonstrated by the fact that the parties anticipate that auctioning the license will only yield $8 million—compared to the $14 billion that HPE is paying to buy Juniper and Juniper's WLAN annual revenue of $411 million in 2023.  Proposed Final Judgment at 12; Defs. Pretrial Brief at 8.  Whatever this "portion" of code is, it seems to have little to do with Juniper's value.  Moreover, in light of the high barriers to entry in the relevant market identified by the United States, there is no reason to believe that licensing the Mist AIOps code will lower those barriers or somehow aid another competitor.  United States' Pretrial Brief at 13; *see also* Complaint ¶¶ 52–54.

The United States has not provided any explanation for why this Settlement is an adequate remedy for the harms alleged in the Complaint.  The Tunney Act requires the United States to file a competitive impact statement that must, among other things, explain "the anticipated effects on competition" of the relief obtained in the settlement.  15 U.S.C. § 16(b)(3).  The United States' Competitive Impact Statement here does no such thing—although it describes the terms of the Settlement, nowhere does the United States explain, even in a summary fashion, how the Settlement would impact competition, or lessen in any way the harm the United States alleged from the merger, such as the estimated increased prices or coordinated effects.

**III.    Public Reporting and Statements by a Former DOJ Official Expose the Settlement as the Product of Undue Influence by HPE Lobbyists.**

Soon after the Settlement was announced, reporting emerged alleging that the Settlement was the product of undue pressure and influence by HPE's well-connected lobbyists on high-level officials at the Department of Justice ("DOJ").  Those officials are said to have engaged in secretive backroom dealings with HPE's lobbyists and then pushed the Settlement through over the objection of officials within the Antitrust Division and career staff working on this case.

HPE hired Mike Davis, among others, to lobby the DOJ for a settlement.[4]  Mr. Davis

---

[4] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra*; *see also* Defs.' Description and Certification of Written and Oral Communications Concerning the Proposed Final Judgment (July 7, 2025) (Dkt. No. 228) (listing Mr. Davis).

previously served as Chief Counsel for Nominations to Senate Judiciary Chairman Chuck Grassley and reportedly advises President Trump on judicial nominations.[5]  Lobbying on behalf of HPE and the proposed merger was a stunning reversal for Mr. Davis—when the DOJ filed its complaint to block the merger, Mr. Davis praised the lawsuit, saying, "3 into 2?  You must sue."[6]

The head of the DOJ's Antitrust Division, Assistant Attorney General Gail Slater, reportedly tried to push back against HPE's lobbying efforts and urged the merging parties to negotiate directly with her and the staff working on the litigation.[7]  An internal feud at the DOJ reportedly ensued over the involvement of lobbyists "who weren't antitrust specialists, but were brought in for their connections to administration officials."[8]  Several news articles describe intense internal disagreements that apparently took place at the DOJ between Antitrust Division attorneys who opposed the Settlement and higher-level DOJ officials who pushed for the Settlement.[9]  Ms. Slater, according to reports, specifically "raised concerns about the Tunney Act process and the disclosures it would require."[10]  She also reportedly "told Justice Department officials . . . that she needs discretion to police mergers and that her team shouldn't be subject to

---

[5] Mr. Davis stated that he is "helping President Trump find the best judicial and Justice Department picks he can find."  Maria Tedesco, *Former CO GOP Attorney Mike Davis at CPAC: Supporting Trump from Outside the Government*, Colo. Times Recorder (Feb. 21, 2025), https://coloradotimesrecorder.com/2025/02/former-co-gop-attorney-mike-davis-at-cpac-supporting-trump-from-outside-the-government/67627/.

[6] *See* Matt Stoller, *An Attempted Coup at the Antitrust Division*, The Big Newsletter (July 25, 2025), https://www.thebignewsletter.com/p/an-attempted-coup-at-the-antitrust.

[7] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra*.

[8] Dave Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, Wall Street Journal (July 29, 2025), https://www.wsj.com/us-news/law/top-justice-department-antitrust-officials-fired-amid-internal-feud-0c98d57c?gaa_at=eafs&gaa_n=ASWzDAiIc1Z8lOohYhICFTYUznPe0pXfdrebsZTtwzj0wnhLE2ikZvs6BNBC&gaa_ts=68b9f675&gaa_sig=GsKyK6Bbn1Q7nwEKjXmWuTNlSBv_HTPu7PLsKmdLVK.

[9] *See, e.g.*, Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, *supra*; Jennifer Jacobs & Jacob Rosen, *Tension over antitrust division crops up inside Trump administration, sources say*, CBS News (July 16, 2025), https://www.cbsnews.com/news/top-trump-administration-antitrust-official-faces-criticism-over-approach-sources-say/.

[10] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, *supra*.

political interference."[11]  Ultimately, Chad Mizelle, the Attorney General's then-Chief of Staff, reportedly "pushed [the settlement] through" over the objections of Ms. Slater and her Antitrust Division staff.[12]

In a highly unusual move, none of the DOJ trial staff signed the Settlement documents submitted to the Court, which were instead signed by Mr. Mizelle and other higher-level officials at the DOJ.  *See* Joint Submission Regarding Settlement at 3 (June 28, 2025) (Dkt. No. 218).  A former DOJ official "familiar with the turmoil" was quoted as calling this Settlement a "fake settlement."[13]

Two officials working for Ms. Slater—Roger Alford (Principal Deputy Assistant Attorney General), and William Rinner (the Deputy Assistant Attorney General for Civil Enforcement)—were reportedly vocal in their opposition to the Settlement.[14]  Mr. Alford and Mr. Rinner were fired shortly after the Settlement was reached.  Although the reason given was "insubordination," reports reflect that their firing was due to their opposition to the process that led to the Settlement.[15]

Mr. Alford has now spoken out publicly about the highly "perver[se]" process that led to this Settlement.  In remarks on August 18, 2025, which Mr. Alford titled, "The Rule of Law Versus the Rule of Lobbyists," Mr. Alford summarized the Settlement as follows:

> [I]n the HPE/Juniper merger scandal Chad Mizelle and Stanley Woodward perverted justice and acted inconsistent with the rule of law.  I am not given to hyperbole, and I do not say that lightly.  As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the settlement was reached.  Although the Tunney Act has rarely served its intended purpose, this time the court may demand extensive discovery and examine the surprising truth of what happened.  I hope the court blocks the

---

[11] Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, *supra*.
[12] Sohrab Ahmari, *The antitrust war inside MAGA*, UnHerd (July 30, 2025), https://unherd.com/2025/07/the-antitrust-war-inside-maga/?lang=us.
[13] Ahmari, *The antitrust war inside MAGA*, *supra*.
[14] *See* Khushita Vasant, *Antitrust enforcers Alford, Rinner fired by US DOJ*, MLex (July 29, 2025), https://www.mlex.com/mlex/articles/2370717/antitrust-enforcers-alford-rinner-fired-by-us-doj.
[15] *Id.*; Michaels, *Top Justice Department Antitrust Officials Fired Amid Internal Feud*, *supra*.

HPE/Juniper merger.  If you knew what I knew, you would hope so too.  Someday I may have the opportunity to say more.

Motion for Intervention, Ex. 1, at 21–22[16] (Oct. 14, 2025) (Dkt. 236-2) [hereinafter, "Alford Speech"].

Mr. Alford provided a few additional and important details.  He contended that important DOJ officials like Mr. Mizelle considered some parties, counsel, and lobbyists to be on the same team as them and "worthy of special solicitude," whereas they considered others to be "enemies" who "merit particular disfavor."  *Id.* at 22.  Based on regular meetings with Mr. Mizelle, Mr. Alford said that Mr. Mizelle "accepts party meetings and makes key decisions depending on whether the request or information" comes from a perceived "friend" on the same team.  *Id.* "Aware of this injustice, companies are hiring lawyers and influence peddlers to bolster" their credentials with those DOJ officials and "pervert traditional law enforcement."  *Id.*

Mr. Alford says that word has now spread that this is the way to get deals done: "The [DOJ] is now overwhelmed with lobbyists with little antitrust experience going above the Antitrust Division leadership seeking special favors with warm hugs.  On numerous occasions in a variety of matters we implored our superiors and the lawyers on the other side to call off the jackals.  But to no avail.  Today cases are being resolved based on political connections, not the legal merits."  *Id.* at 23.

Mr. Alford also levied criticism on HPE's hired lobbyists, arguing that "Mike Davis and Arthur Schwartz have made a Faustian bargain of trading on relationships with powerful people to reportedly earn million-dollar success fees by helping corporations" to, among other things, "hurt working class Americans, break the rules, and then try to cover it up."  *Id.*

Finally, reflecting on his firing, Mr. Alford stated, "All it took to be fired were lobbyists exerting influence on my superiors to retaliate against me for protecting the rule of law against the rule of lobbyists."  *Id.* at 24.

---

[16] Page numbers refer to the ECF-stamped pagination.

Motion for Hold Separate Order - Case No. 5:25-cv-00951-PCP

### IV.    HPE and Juniper's Integration Efforts.

On July 2, 2025, HPE and Juniper closed their merger.[17]  Juniper, formerly a publicly traded company, is no longer listed on the New York Stock Exchange and its shares have ceased trading.[18]  The Court entered a narrow Asset Preservation and Hold Separate Stipulation and Order on June 30, 2025.  (Dkt. No. 220).  That stipulated order applied only to the assets to be divested pursuant to the Settlement; that is, HPE is required to "operate, preserve, and maintain the full economic viability, marketability, and competitiveness of the HPE Divestiture Assets,"[19] in the manner set forth in the order.  *See id.* at § V.A.  HPE is otherwise permitted to integrate its business with that of Juniper, and those efforts appear to be underway,[20] although the States do not know what exact integration steps have been completed at this point and what integration steps remain to be taken.

### V.    The States' Motion To Intervene.

On September 5, 2025, the States (along with several other State Attorneys General) submitted a public comment to the DOJ opposing the Settlement.  The States have now moved to intervene as parties to the litigation to aid the Court in its review of the Settlement under the Tunney Act.

### STANDARD

"A hold separate order is a form of preliminary relief which permits the challenged transaction to go forward, but requires the acquiring company to preserve the acquired company (or certain of the acquired assets) as a separate and independent entity during the course of

---

[17] *Hewlett Packard Enterprise closes acquisition of Juniper Networks to offer industry-leading comprehensive, cloud-native, AI-driven portfolio*, *supra*.

[18] *Id.*

[19] The Asset Preservation and Hold Separate Stipulation and Order defines the "HPE Divestiture Assets" as "the HPE Instant On Business."  *Id.* at § I.J.

[20] HPE executives offered some insights in a September 3, 2025 earnings call, noting that "integration is progressing really well," and that HPE is working on "onboarding the employees into our systems," "combination of benefits and other things," and "harmonization of the sales force."  *Fiscal 2025 Third Quarter Earnings Conference Call*, Hewlett Packard Enterprise (Sept. 3, 2025), https://investors.hpe.com/~/media/Files/H/HP-Enterprise-IR/documents/q3-2025/q3-2025-earnings-transcript.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

antitrust proceedings." *F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7 (D.C. Cir. 1981); *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1344 (D.C. Cir. 1980) (noting the court's "inherent equitable powers" to issue a hold separate order in a merger case). Such an order "maintain[s] an acquired unit as a viable competitor while the litigation unfolds . . . to safeguard 'unscrambled' the assets acquired so that they may be divested effectively should the government ultimately prevail." *Weyerhaeuser*, 665 F.2d at 1075 n.7.

While a hold separate order is a less drastic restraint than a temporary restraining order or a preliminary injunction, *id.* at 1084, courts generally evaluate hold separate orders under the same four-part test. *See United States v. Acorn Eng'g Co.*, No. 80-cv-3388, 1981 WL 2112, at *1 (N.D. Cal. June 18, 1981) ("[T]he elements of inquiry in assessing the propriety of a hold-separate order are similar to those for normal preliminary injunctive relief."). That is, a showing by the moving party "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Pablo Sequen v. Kaiser*, No. 25-cv-06487, 2025 WL 2203419, at *2 (N.D. Cal. Aug. 1, 2025). Because it is a lesser restraint, "[a] hold-separate order may be granted where the standards for preliminary injunctive relief are not met, and the central focus of such an order is preserving the possibility of effective relief." *Acorn Eng'g*, 1981 WL 2112, at *1; *cf. California v. Valero Energy Corp.*, No. 17-cv-3786, 2017 WL 4122830, at *5 (N.D. Cal. Sept. 17, 2017) (denying a preliminary injunction but ordering lesser relief to allow a transaction to be unwound if necessary following trial).

The Ninth Circuit has also adopted a "serious questions" test—a version of a "sliding scale" approach to the inquiry, where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011); *see also Bennett v. Isagenix International LLC*, 118 F.4th 1120, 1126 (9th Cir. 2024). Specifically, injunctive relief may issue where "serious questions going to the merits were raised" under the likelihood of success on the merits prong, the balance of equities "tips sharply" in the movant's favor, and the other two prongs—likelihood of irreparable harm and the public

interest—are also met.  *All. for the Wild Rockies*, 632 F.3d at 1131–32 (quoting *Clear Channel Outdoor, Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir. 2003)).

In the Tunney Act context, the test is modified such that the court need not, indeed cannot, address the underlying merits of whether the merger violates Section 7 of the Clayton Act.  The Tunney Act requires that "[b]efore entering any consent judgment proposed by the United States," the Court "shall determine that entry of such judgment is in the public interest." 15 U.S.C. § 16(e)(1).  While the Court has vast discretion in its procedures for making this determination, 15 U.S.C. § 16(f), the Court is ultimately limited to "approving or disapproving the consent decree" and cannot reach the ultimate merits of whether a transaction should be enjoined.  *BNS*, 858 F.2d at 464 ("The district court does not have authority under the [Tunney Act] to enjoin permanently the proposed acquisition.").  Accordingly, when it comes to injunctive relief pending Tunney Act proceedings, the "test of success on the merits is inapplicable." *Id.*

In making its "public interest" determination under the Tunney Act, the Court is empowered to take actions "in the public interest as the court may deem appropriate." 15 U.S.C. § 16(f)(5); *see also* 28 U.S.C. § 1651(a).  Among these, a court may order merging parties to operate acquired assets independently, *see* Memorandum Order, *United States v. CVS Health Corp.*, No. 18-cv-2340 (D.D.C. Dec. 21, 2018), or may issue injunctions "to maintain the status quo while determining whether a proposed consent decree is in the public interest," *BNS*, 858 F.2d at 461.

## ARGUMENT

The Tunney Act requires that the Court review the proposed Settlement to ensure it is in the public interest.  15 U.S.C. § 16(e)(1).  "That very interest could be harmed irreparably by permitting a merger to become a *fait accompli* while the court awaited public comments and performed its [Tunney Act] review function." *BNS*, 858 F.2d at 461–62.  Accordingly, the States seek a hold separate order to prevent further integration and to preserve the status quo pending completion of the Tunney Act proceedings by this Court.  Given the apparent incongruity between the harm alleged in this case and the purported remedies in the Settlement, along with

the serious accusations of impropriety in the negotiation of this Settlement, thorough Tunney Act proceedings are essential. To ensure those proceedings are as effective as possible, the requested hold separate order is necessary. *Id.* at 462 ("[I]f after review of public comments [the] court were to disapprove [the] proposed consent decree because of the possibility of a substantial lessening of competition, and the government were to reconsider its position in view of the court's decision, harm from the interim restraints of trade could be irreparable.").

## I.     The Likelihood of Success on the Tunney Act Merits.

Because, in reviewing the proposed Settlement under the Tunney Act, the Court "does not have authority . . . to enjoin permanently the proposed acquisition," the "test of success on the merits is inapplicable." *BNS*, 858 F.2d at 464. The Court need go no further in its analysis of this factor than to recognize that under binding Ninth Circuit precedent, this factor is inapplicable where, as here, the Court is limited to "approving or disapproving the consent decree" and cannot reach the ultimate merits of whether a transaction should be enjoined. *Id.*

Nevertheless, if the Court were to choose to make an assessment of likelihood of success on the merits, or of serious questions going to the merits, the relevant issue would be whether the Settlement is in the public interest pursuant to the Tunney Act. Merits under the Tunney Act center squarely on the proposed Settlement and the Court's determination of whether it is in the "public interest." 15 U.S.C. § 16(e)(1). This is a more straightforward inquiry than the merits on the claim underlying the Complaint—that is, whether the merger itself is likely "substantially to lessen competition," under Section 7 of the Clayton Act, 15 U.S.C. § 18—which is not the question the Court must answer now.

As to the Tunney Act merits, for the reasons set forth in the States' Motion To Intervene, Motion for Intervention (Oct. 14, 2025) (Dkt. 236), and the States' public comment letter, Motion for Intervention, Ex. 1 (Oct. 14, 2025) (Dkt. 236-2), the States are likely to succeed in their argument that the Settlement is not in the public interest, or at minimum that the States have certainly presented serious questions on that issue. As discussed in those documents, the Settlement is not in the public interest for two reasons. First, there is a facial incongruity between the harms alleged by the United States in its Complaint and Pretrial Brief, and the

remedies offered by the Settlement.  As part of its Tunney Act review, a court "shall consider," not only "whether the consent decree is in the public interest," but also "the impact of entry of such judgment upon competition in the relevant market" including based on "the violations set forth in the complaint."  15 U.S.C. § 16(e)(1); *see also BNS*, 858 F.3d at 462–63; *United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 53 (D.D.C. 2019).  In its Complaint, the United States alleged that the merger would result in the "eliminat[ion]" of "fierce head-to-head competition between . . . the HPE Aruba and Juniper Mist brands."  Complaint ¶ 1 (Jan. 30, 2025) (Dkt. 1). But the Settlement does nothing to prevent the integration of the Aruba and Mist business lines. Instead, the Settlement requires HPE to divest a distinct small business component—Instant On—never mentioned in the United States' Complaint or Pretrial Brief.  The Settlement also requires divestiture of a "portion" of Mist's AIOps source code.  But the United States has already thrown cold water on the prospect that entry or expansion could resolve the anticompetitive effects of this transaction.  *See* Complaint ¶¶ 52–54 ("Entry by new vendors of enterprise-grade WLAN in response to the merger would not be timely, likely, or sufficient to offset the anticompetitive effects of the proposed merger of HPE and Juniper.").

Second, the incongruity apparent here between Complaint and Settlement—sufficient on its own for the Court to reject the Settlement—is explained by allegations from Mr. Alford that the Settlement was reached following a campaign by "corrupt lobbyists with no relevant experience" who "are perverting actual law enforcement through money, power, relationships and influence."  Alford Speech at 21.  Those allegations—made by a former political appointee of the Antitrust Division, who was reportedly fired for his opposition to the Settlement—indicate the Settlement was not reached in the public interest.  He called clearance of the merger a "scandal," the result of "perverted justice" and actions "inconsistent with the rule of law."  *Id.* And, importantly, he invited scrutiny of the transaction through Tunney Act proceedings:

> As part of the forthcoming Tunney Act proceedings, it would be helpful for the court to clarify the substance and the process by which the settlement was reached. Although the Tunney Act has rarely served its intended purpose, this time the court may demand extensive discovery and examine the surprising truth of what happened.  I hope the court blocks the HPE/Juniper merger.  If you knew what I knew, you would hope so too.  Someday I may have the opportunity to say more.

13

1    *Id.* at 21–22.  With such serious allegations of impropriety, there are already clear factual

2    grounds pursuant to which the Court could conclude that the Settlement is not in the public

3    interest.  Although not required under the *BNS* standard, the States are likely to succeed on the

4    merits of the Tunney Act objections, and have certainly raised serious questions going to the

5    merits of the Tunney Act, satisfying the requirements of both *Winter* and the "serious questions"

6    test.  The Court should therefore stay further integration of the parties' operations to preserve its

7    jurisdiction under the Tunney Act.  *See BNS*, 858 F.2d at 461.

8    **II.    The Likelihood of Irreparable Harm.**

9        In evaluating the likelihood of irreparable harm in this context, the Court must consider

10    the likelihood of irreparable harm if the transaction "is consummated prior to completion of the

11    court's [Tunney Act] evaluation."  *BNS*, 858 F.2d at 464–65.  The Ninth Circuit has recognized

12    that a hold separate order is warranted to prevent a merger from becoming a *fait accompli* before

13    a court completes its Tunney Act review of a proposed settlement.  *Id.* at 462 (noting that "harm

14    from the interim restraints of trade could be irreparable" and "the unwinding of a completed

15    merger would present mammoth obstacles").  Here, a "'hold separate' requirement certainly

16    lessens the difficulty that might arise if the court rejected the consent decree."  *Id.* at 465.[21]

17        The likelihood of irreparable harm, in addition to endangering the ability of this Court to

18    engage in a meaningful Tunney Act review, is further demonstrated by the compelling case the

19    federal government was pressing prior to reaching the proposed Settlement.  Again, the United

20    States' own Complaint sets out the potential for irreparable harm, including the "eliminat[ion]"

21    of "fierce head-to-head competition," which has "lowered prices and driven investment," and

22    "decrease[d] pressure on HPE to discount and innovate in the future."  Complaint ¶¶ 1, 12.  The

23    government's pretrial brief underscored these risks, outlining evidence sufficient to trigger a

24    structural presumption that the merger is unlawful.  *See* United States' Pre-Trial Brief at 7–12

25

26    _____

27    [21] While unwinding a consummated transaction presents challenges, *BNS*, 858 F.2d at 462, even fully closed transactions may be challenged and remedied with a divestiture or other relief, *see, e.g.*, *United States v. Bazaarvoice, Inc.*, No. 13-cv-133, 2014 WL 203966, at *75 (N.D. Cal. Jan. 8, 2014).

28

(June 30, 2025) (Dkt. No. 221).  Moreover, the risk that competitively sensitive business information will be shared between the merging parties is a harm that cannot easily be undone. *See BNS*, 858 F.2d at 465 (access to confidential information prior to court's Tunney Act review "poses a legitimate threat of immediate, irreparable injury"); *F.T.C. v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 353 n.11 (3d Cir. 2016).  The presence of these risks to competition establishes the likelihood of irreparable harm warranting a hold separate order.[22]

Because the precise stage of HPE's integration with Juniper is not in the public record, the States also seek, through this Motion, an order that the Defendants provide a declaration, affidavit, or other report sufficient to enable the States to asses the extent and nature of their efforts to integrate their operations and share information to date.  The Defendants have already announced that the transaction has closed.  But what exactly that means is unclear.  A prompt and thorough report from the Defendants would illuminate the extent of integration activity to date, and what integration efforts remain.

### III.    The Balance of the Equities.

The balance of the equities sharply favors the issuance of a hold separate order.  "The public interest and the balance of hardships inquiries are interrelated and both weigh in favor of an injunction" in the case of a merger threatening a substantial lessening of competition.  *United States v. Trib. Publ'g Co.*, No. 16-cv-1822, 2016 WL 2989488, at *5 (C.D. Cal. Mar. 18, 2016); *see also United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich. 1989) ("[P]reservation of competition is always in the public interest.").  This "public interest in effective enforcement of the antitrust laws" is the most important consideration in balancing the equities.  *F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 726 (D.C. Cir. 2001).   HPE and Juniper have vigorously competed for years and continued to operate separately during the pendency of this litigation, until the Settlement was reached.  Indeed, the Settlement came approximately eighteen

---

[22] The need for a hold separate order is reinforced by the Court's partial grant of a stay.  *See* Order (Oct. 15, 2025) (Dkt. No. 237).  The uncertainty caused by the federal government shutdown and resulting indeterminate length of a stay only provides HPE more time to integrate with Juniper before the Court's Tunney Act determination.

months after the transaction was first announced (in January 2024).  *See* Complaint ¶ 12.  If the Defendants have a strong financial interest in engaging in this merger, they can afford the Court the time to review it.  *See H.J. Heinz*, 246 F.3d at 726 (finding, in the absence of evidence to the contrary, "[i]f the merger makes economic sense now," there is "no reason why it would not do so later").

Although Defendants may face some cost associated with the delay necessary to allow this Court to conduct its public interest review of the proposed Settlement, that kind of "private, financial harm must, however, yield to the public interest in maintaining effective competition." *Ivaco*, 704 F. Supp. at 1430; *see also, e.g.*, *Weyerhaeuser*, 665 F.2d at 1083 ("Private equities do not outweigh effective enforcement of the antitrust laws."); *H.J. Heinz*, 246 F.3d at 727; *Trib. Publ'g Co.*, 2016 WL 2989488, at *5; *United States v. Columbia Pictures Indus., Inc.*, 507 F. Supp. 412, 434 (S.D.N.Y. 1980); *United States v. Siemens Corp.*, 621 F.2d 499, 506 (2d Cir. 1980).  A hold separate order may prevent the Defendants from realizing their anticipated, potential financial benefits from the merger, but that delay is necessary to allow the Court time to assess the *nature* of those benefits—that is, whether they arise from an anticompetitive premium associated with the "eliminat[ion of] head-to-head competition that has lowered prices and driven investment" and "decrease[d] pressure on HPE to discount and innovate."  Complaint ¶ 12.

## IV.    The Public Interest.

"By enacting Section 7, Congress declared that the preservation of competition is always in the public interest." *Ivaco*, 704 F. Supp. at 1430.  "[T]he central purpose of the antitrust laws, state and federal, is to preserve competition.  It is competition . . . that these statutes recognize as vital to the public interest." *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000).  "[T]he public interest lies primarily in preventing the allegedly anticompetitive effect of [the] acquisition.  Since divestiture may prove to be the most or only effective remedy for such an effect, the public interest in preserving the possibility of a successful divestiture is quite strong." *Acorn Eng'g*, 1981 WL 2112, at *3.  Accordingly, where, as here, a merger is reasonably likely to substantially lessen competition, an injunction is in the public interest.  *See,*

*e.g.*, *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023–24 (9th Cir. 2016); *Trib. Publ'g Co.*, 2016 WL 2989488, at *5.

Moreover, given the allegations of impropriety in reaching the proposed Settlement, the Tunney Act itself recognizes the public interest in allowing for a meaningful review that will allow the Court to test these allegations. *See* 119 Cong. Rec. 3453 (1973) ("Sunlight is the best of disinfectants," and thus "sunlight . . . is required in the case of lobbying activities attempting to influence the enforcement of the antitrust laws.").

### THE SCOPE OF THE PROPOSED ORDER

The States respectfully request that this Court issue a hold separate order to restrain HPE and Juniper from any further integration actions. Specifically, the States seek a hold separate order with the following basic terms:[23]

(1) HPE must provide to the Court and the States a report explaining what steps have been taken to date on integration between, and consolidation of, HPE and Juniper, no later than 7 days from the date of entry of the order;

(2) HPE must immediately cease all actions relating to further integration of HPE and Juniper;

(3) HPE must put in place any necessary procedures to prevent the sharing of confidential information between HPE and legacy Juniper, including erecting firewalls;

(4) HPE must operate legacy Juniper as a separate and distinct unit from HPE, and put measures in place to maintain legacy Juniper as an ongoing, economically viable, and active competitor;

(5) HPE must not influence the management of Juniper; Juniper personnel must maintain control over Juniper's decisionmaking, including pricing, product offerings, product development, and personnel; and

(6) Juniper personnel must retain no less than their current compensation and benefits, and may not be hired by HPE.

"The review process in merger cases would be undermined if courts were unable to maintain the status quo while determining whether a proposed consent decree is in the public interest." *BNS*,

---

[23] The proposed order submitted herewith contains the specific relief requested.

858 F.2d at 462.  Therefore, the temporary hold separate order sought by the States is appropriate to maintain the status quo and to facilitate meaningful review by this Court under the Tunney Act.  This relief is likewise consistent with the type of relief previously ordered to facilitate review under the Tunney Act in a merger settlement deserving of close scrutiny.  *See* Memorandum Order, *United States v. CVS Health Corp.*, 18-cv-2340 (D.D.C. Dec. 21, 2018).  The scope of the relief requested is also commensurate to the harm alleged by the federal government in this case, which sought to "block" the transaction in its entirety, arguing that the integration of these companies "risks substantially lessening competition in a critical important technology market."  Complaint ¶ 2.[24]

## CONCLUSION

For the foregoing reasons, the States respectfully request that this Court grant this Motion and enter the accompanying proposed hold separate order.


Dated: November 18, 2025

PHILIP J. WEISER
Attorney General

*/s/ Arthur Biller*
ARTHUR BILLER *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
JONATHAN B. SALLET *(Admitted Pro Hac Vice)*
Special Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
        Bryn.Williams@coag.gov
        Jon.Sallet@coag.gov

*Attorneys for the State of Colorado*

---

[24] To allow the United States, the Defendants, and the States time to consider the Court's ultimate Tunney Act ruling and take any necessary steps thereafter to protect their rights, the States move for a hold separate order that will remain in place for thirty days after the Court's Tunney Act ruling.

1

2　ROB BONTA
　　Attorney General of California
3

4　/s/ Brian D. Wang
　　PAULA L. BLIZZARD, Senior Assistant Attorney
5　General (SBN 207920)
　　MICHAEL W. JORGENSON, Supervising Deputy
6　Attorney General (SBN 201145)
　　BRIAN D. WANG, Deputy Attorney General (SBN
7　284490)
　　Office of the Attorney General
8　California Department of Justice
9　455 Golden Gate Avenue, Suite 11000
　　San Francisco, California 94102
10　(415) 510-4400
11　Brian.Wang@doj.ca.gov

12　*Attorneys for the State of California*

13

14　WILLIAM TONG
　　ATTORNEY GENERAL
15

16　/s/ Nicole Demers
　　Nicole Demers (*pro hac vice application*
17　*forthcoming*)
　　Deputy Associate Attorney General
18　Antitrust Section
　　Connecticut Office of the Attorney General
19　165 Capitol Ave.
　　Hartford, CT 06106
20　Tel.: (860) 808-5030
21　nicole.demers@ct.gov

22　*Attorneys for the State of Connecticut*

23

24　BRIAN SCHWALB
　　Attorney General of the District of Columbia
25

26　/s/ Coty Montag
　　Coty Montag (SBN 255703)
27　Deputy Attorney General, Public Advocacy
　　Division
28

Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 417-5402
Coty.Montag@dc.gov

*Attorneys for the District of Columbia*

ANNE E. LOPEZ
Attorney General

*/s/ Rodney I. Kimura*
RODNEY I. KIMURA *(Admitted Pro Hac Vice)*
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii. 96813
Telephone:  (808) 586-1180
Email:  Rodney.i.kimura@hawaii.gov

*Attorneys for State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

*/s/ Paul J. Harper*
*(Admitted Pro Hac Vice)*

ELIZABETH L. MAXEINER
*(Admitted Pro Hac Vice)*
Chief, Antitrust Bureau
PAUL J. HARPER
Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street, 35th Floor
Chicago, Illinois 60603
773-590-7935 | elizabeth.maxeiner@ilag.gov
773-590-6837 | paul.harper@ilag.gov

*Attorneys for State of Illinois*

COMMONWEALTH OF MASSACHUSETTS

1
2

ANDREA JOY CAMPBELL
Attorney General

3

*/s/ Anthony W. Mariano*
Anthony W. Mariano *(Admitted Pro Hac Vice)*

4

Chief, Antitrust Division
Office of the Massachusetts Attorney General

5

One Ashburton Place, 20th Floor

6

Boston, MA 02108
(781) 835-7990

7

Anthony.Mariano@mass.gov

8

*Attorneys for*

9

*Commonwealth of Massachusetts*

10

KEITH ELLISON

11

Attorney General

12

*/s/ Jon M. Woodruff*

13

*(Admitted Pro Hac Vice)*

14

ELIZABETH ODETTE *(Admitted Pro Hac Vice)*

15

Manager, Assistant Attorney General
Antitrust Division

16

JON M. WOODRUFF

17

Assistant Attorney General
Antitrust Division

18
19

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600

20

Saint Paul, MN 55101
Telephone: (651) 300-7425

21

elizabeth.odette@ag.state.mn.us
jon.woodruff@ag.state.mn.us

22
23

*Attorneys for State of Minnesota*

24
25

LETITIA JAMES
Attorney General of the State of New York

26

CHRISTOPHER D'ANGELO

27

Chief Deputy Attorney General
Economic Justice Division

28

21

*/s/ Elinor Hoffmann*
*(Admitted Pro Hac Vice)*

ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY McFARLANE
*(Admitted Pro Hac Vice)*
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ
*(Admitted Pro Hac Vice)*
Assistant Attorney General

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for State of New York*

JEFF JACKSON
Attorney General of North Carolina

*/s/ Kunal J. Choksi*
*(Admitted Pro Hac Vice)*

Kunal Janak Choksi
Senior Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6032
E-Mail: kchoksi@ncdoj.gov

*Attorneys for State of North Carolina*

Dan Rayfield
Attorney General of Oregon

*/s/ Rachel K. Sowray*
Rachel K. Sowray *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General

Timothy D. Smith *(Admitted Pro Hac Vice)*
Attorney-in-Charge
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR 97201
503.689.0249 | Rachel.Sowray@doj.oregon.gov
503.798.3297 | tim.smith@doj.oregon.gov

*Attorneys for State of Oregon*


NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Amy N. L. Hanson*
*(Admitted Pro Hac Vice)*

JONATHAN A. MARK *(Admitted Pro Hac Vice)*
Antitrust Division Chief
AMY N.L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Email: jonathan.mark@atg.wa.gov
Email: amy.hanson@atg.wa.gov
Tel: 206-389-3806 (Mark)
Tel: 206-464-5419 (Hanson)

*Attorneys for State of Washington*


JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/Caitlin M. Madden*
Caitlin M. Madden *(Admitted Pro Hac Vice)*

Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-1311
caitlin.madden@wisdoj.gov

*Attorneys for State of Wisconsin*