1  SAMUEL G. LIVERSIDGE (Bar No. 180578)
2  ERIC VANDEVELDE (Bar No. 240699)
   DANIEL NOWICKI (Bar No. 304716)
3  **GIBSON, DUNN & CRUTCHER LLP**
   333 South Grand Avenue
4  Los Angeles, California 90071
   Telephone: (213) 229-7000
5  SLiversidge@gibsondunn.com
   EVandevelde@gibsondunn.com
6  DNowicki@gibsondunn.com

7

8  JULIE S. ELMER (*pro hac vice*)
   JENNIFER MELLOTT (*pro hac vice*)
9  **FRESHFIELDS US LLP**
   700 13th St NW
10 Washington, DC 20005
   Telephone: (202) 777-4500
11 julie.elmer@freshfields.com
   jennifer.mellott@freshfields.com
12

13

14 *Attorneys for Defendant*
   HEWLETT PACKARD ENTERPRISE CO.
15
   [Additional counsel listed on signature
16 page]

17

18                    **UNITED STATES DISTRICT COURT**

19                  **NORTHERN DISTRICT OF CALIFORNIA**

20                          **SAN JOSE DIVISION**

21 UNITED STATES OF AMERICA,              CASE NO. 5:25-cv-00951-PCP

22                      *Plaintiff*,

23              v.                         **HEWLETT PACKARD ENTERPRISE
                                           CO.'S OPPOSITION TO MOTION FOR
24 HEWLETT PACKARD ENTERPRISE CO.         HOLD SEPARATE ORDER
   and JUNIPER NETWORKS, INC.,
25
                    *Defendants*.          Judge:        P. Casey Pitts
26                                         Action Filed: January 30, 2025

27

28

---

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND .....................................................................................5

      A.    The Merger and DOJ Lawsuit.........................................................5

      B.    The Settlement, Tunney Act Comments, and the States' Belated Intervention.......6

      C.    The Merged Entities Already Operate as a Single Business: HPE
            Networking ...........................................................................7

III.  ARGUMENT ...........................................................................................8

      A.    The States' Request for A Mandatory Injunction Fails ...........................8

            1.    The States' Injunction Would Radically Alter The Status Quo..................9

            2.    The States Fail the Mandatory Injunction Test For Multiple Reasons ......12

                  a.    The *Winter* Test Is Heightened Further For Mandatory
                        Injunctions........................................................12

                  b.    The States Do Not Address The Mandatory Injunction
                        Requirements ......................................................12

                  c.    The States Do Not Show They Prevail On The Merits..................13

                  d.    The States Do Not Show Irreparable Injury. .......................18

                  e.    The States Cannot Show The Equities Or Public Interest
                        Favor Them. .......................................................20

      B.    Even If *BNS* Applied, The States Have Not Satisfied It .......................22

IV.   CONCLUSION........................................................................................25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4
*Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp.*,
   116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...................................................................... 21

5

6
*Bradt v. T-Mobile US, Inc.*,
   2020 WL 1809716 (N.D. Cal. Feb. 28, 2020) ............................................................ 17

7
*In re Combined Metals*,
   557 F.2d 179 (9th Cir. 1977) ................................................................................ 18, 24

8

9
*Connecticut v. Sandoz, Inc.*,
   2025 WL 3043397 (D. Conn. Oct. 31, 2025) ............................................................. 21

10
*Cooper v. Simpson Strong-Tie Co., Inc.*,
   460 F. Supp. 3d 894 (N.D. Cal. 2020) ....................................................................... 13

11

12
*Delphix Corp. v. Actifo, Inc.*,
   2014 WL 4628490 (N.D. Cal. Mar. 19, 2014) ........................................................... 13

13
*DeMartini v. Microsoft Corp.*,
   2023 WL 3569993 (N.D. Cal. May 19, 2023) ....................................................... 18, 24

14

15
*Doe v. Snyder*,
   28 F.4th 103 (9th Cir. 2022) ...................................................................................... 9, 12

16
*Edstrom v. Anheuser-Busch*,
   2013 WL 5124149 (N.D. Cal. Sept. 13, 2013) ........................................................... 12

17

18
*Farris v. Seabrook*,
   677 F.3d 858 (9th Cir. 2012) ...................................................................................... 3, 12

19
*Fed. Trade Comm'n v. Microsoft Corp.*,
   136 F.4th 954 (9th Cir. 2025) ........................................................ 2, 4, 14, 16, 23

20

21
*Fry v. Cap. One Fin. Corp.*,
   2025 WL 1397163 (N.D. Cal. May 14, 2025) .......................................... 14, 15, 20, 22

22
*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) (en banc) ................................... 1, 3, 4, 9, 12, 13, 14, 18

23

24
*Ginsburg v. InBev NV/SA*,
   623 F.3d 1229 (8th Cir. 2010) .................................................................................... 21

25
*Haig v. Agee*,
   453 U.S. 280 (1981) .................................................................................................... 22

26

27
*Hansen Beverage Co. v. N2G Distrib., Inc.*,
   2008 WL 5427602 (S.D. Cal. Dec. 30, 2008) ....................................................... 19, 24

28

*Holloway v. US,*
    789 F.2d 1372 (9th Cir. 1986) ............................................................................ 18, 24

*Missouri ex rel. Koster v. Harris,*
    847 F.3d 646 (9th Cir. 2017) .................................................................................... 19

*LA All. for Hum. Rts. v. Cnty. of Los Angeles,*
    14 F.4th 947 (9th Cir. 2021) ............................................................ 14, 17, 18, 19

*Malaney v. UAL Corp.,*
    2010 WL 3790296 (N.D. Cal. Sept. 27, 2010) ...................................... 15, 19, 20, 24

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,*
    571 F.3d 873 (9th Cir. 2009) ............................................ 3, 4, 9, 12, 18, 20

*Nachum v. Allstate,*
    1997 WL 580522 (C.D. Cal. July 21, 1997) .................................................... 18, 23

*Native Songbird Care & Conservation v. LaHood,*
    2013 WL 3355657 (N.D. Cal. July 2, 2013) ................................................................. 9

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
    762 F.2d 1374 (9th Cir. 1985) .................................................................................... 24

*Olin Corp. v. F.T.C.,*
    986 F.2d 1295 (9th Cir. 1993) .................................................................................... 15

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
    810 F.3d 631 (9th Cir. 2015) ........................................................................ 3, 13, 14

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.,*
    636 F.3d 1150 (9th Cir. 2011) ............................................................................ 13, 19

*Saint Alphonsus v. St. Luke's Health,*
    778 F.3d 775 (9th Cir. 2015) .................................................................................... 15

*Soo Park v. Thompson,*
    851 F.3d 910 (9th Cir. 2017) .................................................................................... 13

*Starbucks Corp. v. McKinney,*
    602 U.S. 339 (2024) ............................................................................................ 12

*Taleff v. Sw. Airlines Co.,*
    828 F. Supp. 2d 1118 (N.D. Cal. 2011) ............................................................ 20, 21

*Tanner Motor Livery v. Avis, Inc.,*
    316 F.2d 804 (9th Cir. 1963) ........................................................................ 9, 10, 11

*United States v. BNS Inc.,*
    858 F.2d 456 (9th Cir. 1988) ........................................ 2, 14, 17, 22, 23, 24, 25

*United States v. Gen. Dynamics Corp.,*
    415 U.S. 486 (1974) ............................................................................................ 15

iii

*United States v. JetBlue Airways Corp.*,
   712 F. Supp. 3d 109 (D. Mass. 2024) ........................................................................ 15

*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963) ................................................................................................ 3, 15

*United States v. Syufy Enters.*,
   903 F.2d 659 (9th Cir. 1990) ................................................................................... 4, 16

*Western Airlines, Inc. v. International Brotherhood of Teamsters*,
   480 U.S. 1301 (1987) ........................................................................ 10, 11, 12, 20, 25

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................ 3, 12, 18, 20, 22

*Younger v. Jensen*,
   605 P.2d 813 (Cal. 1980) ........................................................................................... 13

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR HOLD SEPARATE ORDER
CASE NO. 5:25-cv-00951

## I.     <u>INTRODUCTION</u>

The States ask this Court for an injunction that would cause enormous, permanent harm to HPE while offering no conceivable benefit to the States.  Although the States style their requested injunction as an order to keep Juniper "separate" from HPE during the pendency of the Tunney Act process, there is no "separate" Juniper—and has not been for months.  HPE and Juniper merged in early July and have been operating as a combined company and integrating ever since.  Juniper has no U.S. employees; they are all employed by HPE.  Juniper has no separate data or competitive information; all its information has been shared with HPE.  There is one unified networking business with one leadership team, one group of employees, and one collection of data and IP.  If the States' injunction were granted, HPE would be split apart—forced to create two new networking companies (crude facsimiles of the nonexistent "legacy" Juniper and "legacy" HPE networking business) staffed with people and using assets that are currently part of one, unified business—and *then*, after the Tunney Act process is complete, HPE apparently would be put back together again.  It is difficult to fathom how such an injunction could ever be justified.  The States offer no justification.

If the States wanted to keep HPE and Juniper separate, they should have filed suit and sought an injunction long ago.  The merger has been public since January 2024.  But the States took no action; they did not investigate the merger or even contact HPE to discuss it.  It is fundamentally unfair for them to come in now, months after the fact, to (temporarily) undo what was already done.

What the States are demanding is an extreme *mandatory injunction*.  Whereas "prohibitory" injunctions maintain the status quo (such as pausing a merger *before* it happens), a "mandatory" injunction "orders a responsible party to take action."  *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc) (quotations omitted).  Such injunctions are "particularly disfavored," and subject to extremely high burdens of proof: a movant "must establish that the law and facts *clearly favor* her position, not simply that she is likely to succeed."  *Id.*

Here, the States have not proven that the law "*clearly favor[s]*" their claim, *id.*—indeed, they have not attempted to prove any claim at all.  The States are demanding the merger be temporarily stopped and unwound, after the fact, based on a filing with no evidence or declarations—and in a situation where they have no claims, did not even investigate the merger, and have not proven *any*

injury, much less an irreparable one.  There is no basis for this "extraordinary" demand, whether described as mandatory or prohibitory.  *Fed. Trade Comm'n v. Microsoft Corp.*, 136 F.4th 954, 967 (9th Cir. 2025) (rejecting pre-merger injunction as unsupported by evidence).  And the fact that the requested injunction is *temporary*—because, as the States acknowledge, they cannot *permanently* enjoin the merger—does not remedy the extreme harm it would inflict on HPE, employees, and customers.  It just makes the injunction more bizarre and pointless.

The States try to justify their extraordinary request by relying on *United States v. BNS Inc.*, 858 F.2d 456 (9th Cir. 1988), but *BNS* has nothing to do with the extreme *mandatory* injunction the States seek.  In *BNS*, the *target* of a hostile tender offer moved to temporarily stop the tender offer **before** it happened, pending completion of the Tunney Act process.  *See id.* at 463.  This made sense: Pausing the tender offer **before** it closed provided a simple way to prevent the hostile acquiror from obtaining the target's competitively sensitive information or disrupting the target's operations.  *Id.* at 465.  If the target's competitive information had been acquired and its operations disrupted, and the acquisition was ultimately blocked, the target would have been irreparably harmed—and pausing the acquisition *before* it happened "maintain[ed] the status quo" and prevented that harm.  *Id.* at 461.

*BNS* is nothing like this case.  The States are not seeking a *prohibitory* injunction to "maintain the status quo" by protecting one company from sharing its confidential information with a separate company—the companies are *not* separate, and Juniper's confidential information has *already* been shared with HPE.  The States seek a *mandatory* injunction to unwind a merger that already happened.  And unlike the movant in *BNS*, the States do not show *any* irreparable harm to themselves.

At the hearing on their intervention motion, the States claimed that they might be "harmed" if HPE divests Instant On or licenses the AIOps source code to a competitor before the Tunney Act process concludes.  But there is no threat of this occurring before the Tunney Act process concludes—because under the terms of the Parties' settlement, HPE cannot complete the divestiture and licensing until *after* the Tunney Act process is complete.  HPE even offered to the States that it would be willing to delay these actions for another 30 days if the settlement is approved, so the States can appeal and seek a stay if they wish.  Yet the States have continued to demand their injunction, without any explanation as to what purported "irreparable harm" this would prevent.

2

1   The States have failed to show any entitlement to a mandatory injunction. Under the four-

2   part test of *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), a proponent of a

3   preliminary injunction must show that "(1) she is likely to succeed on the merits, (2) she is likely to

4   suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her

5   favor, and (4) an injunction is in the public interest." *Garcia*, 786 F.3d at 740 (quoting *Farris v.*

6   *Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)). And a movant seeking a *mandatory* injunction, like

7   the States, must meet an even higher burden, showing "the law and facts *clearly favor* her position"

8   (*id.*), and that "extreme or very serious damage will result." *Marlyn Nutraceuticals v. Mucos Pharma*

9   *GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The States fail every element of the *Winter* test.

10   *First*, the States have not proven that they are so likely to succeed "that the law and facts

11   *clearly favor*" their position. *Garcia*, 786 F.3d at 740. They have not brought a claim on which they

12   even *could* succeed. And the fact that they are not bringing any claim to unwind the merger is fatal

13   to their attempt to unwind the merger through a preliminary injunction. *Pac. Radiation Oncology,*

14   *LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015) ("When a plaintiff seeks injunctive

15   relief based on claims not pled in the complaint, the court does not have the authority to issue an

16   injunction."). Even if the States *were* pursuing a claim to unwind the merger, they have utterly failed

17   to support such a claim. The States have made no showing whatsoever that the merger would violate

18   the Clayton Act and cause substantial harm to competition in the enterprise-grade WLAN market.

19   The entire point of the merger is to *increase* competition by creating a more viable competitor to

20   Cisco—the dominant player (with 50% or market share) across the networking industry. Numerous

21   antitrust agencies across the globe approved the deal, and customers and partners overwhelmingly

22   support it—they know stopping the merger only empowers Cisco and *hurts* competition.

23   The DOJ's affirmative case was extraordinarily weak—the combined market share of HPE

24   and Juniper is only 25%, easily below the 30% threshold adopted by the Supreme Court as creating

25   a rebuttable presumption of harm to competition. *See United States v. Philadelphia Nat'l Bank*, 374

26   U.S. 321 (1963). And HPE's evidence showed there was no harm at all. HPE and Juniper vigorously

27   compete with at least *eight* other companies (including Cisco). Barriers to entry are low: at least five

28   other players have entered the enterprise WLAN space in the last ten years, further proving the DOJ's

3

1    case was meritless.  *See United States v. Syufy Enters.*, 903 F.2d 659, 671 n.21 (9th Cir. 1990).

2          The States do not address any of this.  Instead, they say the DOJ claimed it had a case, so the

3    Court should assume it was right—and ignore HPE's evidence to the contrary.  That is not how a

4    preliminary injunction works.  This "construe-everything-my-way standard is more suited for

5    defending against a summary-judgment dismissal of claims than it is for obtaining provisional

6    affirmative injunctive relief."  *Microsoft*, 136 F.4th at 967.  The States must *prove* a claim through

7    evidence so convincing and dispositive that it overcomes all other evidence and establishes "that the

8    law and facts *clearly favor*" them—and they have not attempted to do that.  *Garcia*, 786 F.3d at 740.

9          The States also ignore the remedies the DOJ and HPE agreed to, and do not (and cannot)

10   prove the merger would harm competition with those remedies.  The DOJ's complaint and trial

11   briefing focused on Juniper's AIOps for WLAN—claiming that Juniper's AIOps for WLAN was so

12   innovative that it drove competition, which would be lost if it merged with HPE.  HPE agreed to

13   license the AIOps code to up to two third parties to remedy any alleged anticompetitive effect.  The

14   States themselves acknowledge the strength of this remedy—they argued to this Court at the

15   intervention hearing that licensing that source code is so competitively significant that it would be

16   impossible to construct a competitive Juniper business if the license were completed.  And HPE has

17   *also* agreed to divest an enterprise-grade networking business (Instant On) that is part of the relevant

18   market and earned over $130 million in revenue last year, about $35 million of which was from

19   WLAN.  The States do not provide *any* evidence showing these remedies are inadequate.

20         *Second*, the States do not even *try* to show irreparable harm *to themselves*, much less the

21   "extreme or very serious damage" required to obtain a mandatory injunction.  *Marlyn*, 571 F.3d at

22   879.  That is because there is no harm to them.  They have known about the merger since January

23   2024 and knew it would close in early July 2025—yet they *never* investigated the merger and *never*

24   brought a case challenging it.  They only became involved in this case because they want to

25   investigate the settlement negotiations of the DOJ (with whom they are political rivals).  Regardless

26   of whether that is appropriate under the Tunney Act, it does not provide a basis for finding irreparable

27   harm to the States—and cannot possibly be grounds for them to enjoin the merger.

28         *Third*, the balance of equities tips heavily in HPE's favor.  The States' injunction would cause

irreparable and extraordinary harm to HPE, its employees, and its customers. The States demand that HPE "operate legacy Juniper as a separate and distinct unit from HPE"—but there is no "legacy Juniper," and this extraordinary demand would require creating a new company. The States also demand that HPE "cease all actions relating to further integration." But this is nonsensical when there is a single "integrated" company acting as a single unit. HPE's networking business is made up of former Juniper and HPE employees working side by side, every day, on solutions based on the technology of both pre-merger HPE and Juniper. HPE could not "cease ... integration" without dissolving its networking business and creating separate HPE and Juniper businesses. There would be widespread confusion as employees wonder what projects they could work on without violating the injunction, or whether their jobs would be lost. Customers would have no idea what products HPE could offer, and what products, if any, a hastily reconstituted "legacy Juniper" could offer.

*Fourth*, the States have not shown that an injunction is in the public interest. The purpose of the antitrust laws is to protect customers in the relevant market. It is extremely telling that *no* customer has objected to the settlement. Customers want the ability to continue to rely on the merged entity as a strong competitive counterweight to Cisco. The deal is also important for the national security interests of the United States, because it provides an alternative to Huawei—which is compromised by the Chinese government—to international companies and allies of the United States, and it strengthens the product offerings that HPE can provide to the U.S. national security agencies that rely on HPE technology. On the other hand, the States show no interest that is forwarded by temporarily splitting HPE apart and then putting it back together.

The States do not even attempt to meet the extraordinary burden required to prove that HPE should be ripped apart (and its integrated operations somehow stopped) while the Tunney Act process is completed. Their injunction should be denied.

## II.    BACKGROUND

### A.    The Merger and DOJ Lawsuit

On January 9, 2024, HPE and Juniper announced they would merge to create a world-class technology company capable of competing across the networking industry. The business thesis was simple: unite HPE's and Juniper's complementary portfolios to create a company capable of

5

delivering solutions across the "full stack" of networking products—challenging Cisco, the entrenched networking monopolist, and providing an international alternative to Huawei.

The DOJ began investigating the proposed merger in March 2024. The focus of the investigation was on a single, narrow aspect of the firms' respective businesses: enterprise-grade Wireless Local Area Networks (WLAN). Thirteen regulatory authorities reviewed and approved the deal, including the European Commission and United Kingdom's CMA. ECF 222 at 10. HPE is not aware of any of the States investigating the transaction.

Even though the merger was approved by numerous authorities across the globe, on January 30, 2025, the DOJ sued to block it—alleging the merger would harm competition in the enterprise WLAN market and stop Juniper's innovation in "AIOps." Compl. ¶¶ 6-7, 17, 47. But the case was extremely weak from the start.[1] The DOJ's own expert was forced to concede that the merged entity would have less than 30% of the enterprise WLAN market. Hill Decl. ¶ 7. Discovery further confirmed that there were at least *eight* other highly capitalized competitors in the market—in addition to HPE and Juniper—and that competition would remain robust following the close of the transaction. Hill Decl. ¶¶ 9-11; *see also* ECF 222 at 7-9 (detailed descriptions of competitors).

**B.    The Settlement, Tunney Act Comments, and the States' Belated Intervention**

On June 27, 2025, HPE, Juniper, and the DOJ entered into a settlement agreement to resolve the DOJ's concerns. HPE agreed to license the source code for Juniper's AIOps software for WLAN to competitors—thereby removing the concern that HPE was acquiring Juniper's WLAN AIOps technology so it would no longer have to compete with it—and divest its Instant On networking business, which includes enterprise WLAN solutions. On June 30, 2025, the Court approved the parties' stipulation disclosing the terms of the settlement, allowing the transaction to close. ECF 220 at 5; ECF 217-2 at 2. The merger closed on July 2, 2025. Despite public disclosure of the settlement and the consummation of the merger, the States did not contact HPE to object, file a lawsuit to block the transaction, or otherwise act to stop the merger before (or even shortly after) it closed.

The comment period under the Tunney Act has ended. No competitor, customer, or other

---

[1] The DOJ's investigative file did not include *any* customer depositions, declarations, or written complaints, which is extremely unusual in a merger case the DOJ chooses to take to litigation.

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR HOLD SEPARATE ORDER
CASE NO. 5:25-cv-00951

industry participant objected to the settlement, further confirming that industry participants do not see any harm.  The States did not move to intervene until October 14, 2025—and, for the first time, vaguely raised the possibility of seeking "a mandatory pause in integration."  ECF 236 at 6-7.  Three days later, on October 17, 2025, the States filed a motion to lift the stay in this case, which attached a proposed motion to "hold separate."  ECF 256-2.  But the States were not participants in the case and did not file the motion until after being granted intervention, on November 18, 2025.  ECF 317.

**C.    The Merged Entities Already Operate as a Single Business: HPE Networking**

On July 2, 2025, HPE closed its acquisition of Juniper subject to the terms of the Hold Separate Stipulation entered by the Court.  ECF 220; Schultz Decl. ¶ 2.  Juniper's shareholders tendered their shares in return for approximately $14 billion.  *Id.* ¶ 4.  By the closing date, integration planning had been underway for well over a year.  *Id.* ¶ 5.  It was imperative that the long-delayed integration occur immediately to minimize the confusion that can accompany a merger of this scale and to build confidence amongst employees, customers, and partners.  *Id.* ¶¶ 6-8.  Accordingly, HPE moved immediately after closing to integrate Juniper employees, product offerings, systems, intellectual property, finances, sales, channel partners and distributors, and corporate structures.

HPE's networking business and Juniper Networks are now a single operating business: HPE Networking.  *Id.* ¶ 5.  On the day the transaction closed, HPE announced that Juniper's former CEO, Rami Rahim, would lead the unified HPE Networking business, followed by announcing Rahim's leadership team, made up of former Juniper *and* HPE Aruba leaders.  *Id.* ¶ 11.  The product, sales, marketing, finance, legal, and HR functions are also consolidated under new leadership, resulting in a substantially altered leadership structure and the resignation of numerous former Juniper leaders and employees, including the former Chief Product Officer, Chief Sales Officer, Chief Financial Officer, Chief Marketing Officer, General Counsel, and Chief People Officer.  Ghosh Decl. ¶ 4.

There are no U.S. Juniper employees; only HPE employees.  *Id.* ¶ 6.  These ~4,000 new U.S. HPE employees (and nearly 1,700 non-U.S. employees) have transitioned to HPE's IT, payroll, and benefits system, and their unvested equity converted to HPE equity.  *Id.*  The budgets and financial results for the legacy Juniper and HPE Aruba businesses are also combined.  Schultz Decl.  ¶ 19.  HPE reported on the quarterly results of the combined business on September 3, 2025 and December

7

4, 2025 and provided 2026 financial guidance to shareholders last month.  *Id.*

Since the closing, all competitively sensitive information relating to the entire product portfolios of legacy HPE and Juniper has been shared within the integrated company, including product roadmaps, pricing information, and customer, supplier, and vendor accounts and contracts, in order to implement a unified product portfolio, including with respect to product development, sales and marketing, and supply chains.  Rahim Decl. ¶¶ 2-3.  There is now one HPE Networking team working on product development.  *Id.*.  These changes and new product roadmaps have already been communicated to distributors, channel partners, and customers who have already started making business and purchasing decisions based on them.  *Id.* ¶¶ 4-6.

Sales integration is also fundamentally complete.  Both HPE and Juniper have primarily sold networking products through a global network of distributors and channel partners, and HPE already eliminated duplication in the network of legacy HPE Aruba and legacy Juniper partners.  *Id.* ¶¶ 8-10; Schultz Decl. ¶¶ 20-21.  The HPE Aruba and legacy Juniper sales teams have been selling together for the better part of four months.  Rahim Decl. ¶ 8.  FY26 Sales quotas for account representatives are based on sales of a *combined* portfolio of HPE and Juniper products.  Rahim Decl. ¶ 10.  Branding and marketing functions have been consolidated.  Schultz Decl. ¶ 17.

Simply stated, there is no HPE Aruba and Juniper; there is only HPE Networking.  Stopping or reversing integration at this stage would cause irreparable harm to HPE, as well as its employees, customers, partners, and investors.  *See* Schultz Decl.; Rahim Decl. ¶ 11; Ghosh Decl. ¶¶ 13-17.  HPE could not cease all integration efforts and continue to operate as it currently exists.  *Id.*

## III.     ARGUMENT

### A.     The States' Request for A Mandatory Injunction Fails

Although the States frame their motion as a request for a "hold separate" to "preserve the status quo" pending the Tunney Act process, it is indisputable that what they seek is actually a mandatory injunction.  Mot. at 11.  Over five months of integration have occurred since the closing of the transaction, and there is no Juniper to "hold separate."  As a result, the States do not seek to maintain the status quo—a status quo that consists of a combined, unified HPE Networking business—but rather to return to a time more than five months ago when Juniper had the ability to

8

1   operate as a separate networking business. This would require splitting HPE apart to create two new

2   networking companies that would somehow compete with each other—and with the other formidable

3   competitors in the marketplace—in the same way they competed before the merger and integration.

4   And *then*, after the Tunney Act process is over, HPE would be put back together again.

5       The States do not even try to show they are entitled to such extraordinary relief. They have

6   provided no evidence, no declarations, no support, and have not even asserted a claim outside of the

7   Tunney Act proceeding. Every prong of the mandatory injunction test overwhelmingly favors HPE.

8       **1.    The States' Injunction Would Radically Alter The Status Quo**

9       "A preliminary injunction can take two forms": (1) a "prohibitory injunction" or (2) a

10  "mandatory injunction." *Marlyn*, 571 F.3d at 878-79. A "prohibitory injunction 'freezes the

11  positions of the parties until the court can hear the case on the merits.'" *Id.* at 879. A "mandatory

12  injunction," by contrast, "goes beyond simply maintaining the status quo and orders the responsible

13  party to take action." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). The "status quo" is the state

14  of the world that exists when the movant raises "the pending controversy." *Tanner Motor Livery v.*

15  *Avis, Inc.*, 316 F.2d 804, 807, 809 (9th Cir. 1963) ("status quo" was "state of affairs when this action

16  was filed," which was when plaintiff first tried to enjoin defendant from its ongoing business

17  operations); *Garcia*, 786 F.3d at 740 & n.4 (status quo was video displayed on defendant's website,

18  before plaintiff sued to remove it); *Native Songbird Care & Conservation v. LaHood*, 2013 WL

19  3355657, at *11 (N.D. Cal. July 2, 2013) (status quo was state of world before movants sought

20  injunction; defendant's conduct existed before plaintiffs complained, and thus ending that conduct

21  required mandatory injunction).

22      Here, the "status quo" is a single, unified HPE Networking business formed through the

23  months-long integration of Juniper's employees, operations, and intellectual property into HPE and

24  its Aruba business. The States did not file their motion to hold separate until November 18, 2025,

25  after they intervened. ECF 317. That is the date by which the status quo should be measured; until

26  then, the States had not taken any action to stop the merger and had not filed any suit against HPE

27  (which they still have not done). At a minimum, the earliest possible date for measuring the status

28  quo would be October 14, 2025, when the States filed their motion to intervene—which was the first

9

1  time they even *suggested* they might try to stop the merger.  *See* ECF 236.  By then, the merger had

2  been closed for well over three months following the Court's June 30, 2025 signing of the parties'

3  stipulation, authorizing HPE and Juniper to consummate the transaction.  Immediately after closing,

4  integration began: a combined HPE Networking business led by Juniper's former CEO was publicly

5  announced; a new consolidated leadership team was identified and created (with the executives who

6  did not transition to HPE leaving the company); Juniper employees were moved into integrated teams

7  with HPE employees; a new HPE Networking single unified sales structure was created; Juniper's

8  data and intellectual property came under HPE control; products that integrate both HPE's and

9  Juniper's technologies were developed and announced.  Schultz Decl. ¶¶14-16, 21-23.  This

10  integration work was critical to avoiding the fear, uncertainty, and doubt that can arise among

11  employees, customers, partners, and vendors following the close of a major transaction.  *Id*. ¶¶ 6-7.

12      The state of the merged and operationally integrated HPE Networking business when the

13  States filed their motion to hold separate is the status quo.  *Tanner* is instructive.  There, the defendant

14  was "operating an extensive business" before the plaintiff sued, alleging the defendant's business

15  violated the plaintiff's trademarks.  316 F.2d at 809.  The district court enjoined the defendant from

16  continuing its allegedly infringing operations—but the Ninth Circuit reversed, holding that the

17  defendant's operation of its business was the status quo before the plaintiff moved to enjoin it, and

18  that by seeking to change this preexisting status, the injunction, "rather than preserving the status

19  quo, completely changes it."  *Id*. at 808-09.  Similarly, in *Western Airlines, Inc. v. International*

20  *Brotherhood of Teamsters*, 480 U.S. 1301 (1987), Justice O'Connor, sitting as Circuit Justice for the

21  Ninth Circuit, held that enjoining a merger on the *eve* of closing would disturb the status quo, given

22  that it would cause upheaval and disruption to longstanding business plans: "[f]or several months,

23  the [merging parties] have been planning to combine their large-scale, complex, interrelated, and

24  heavily regulated operations," "[l]arge numbers of [the acquired company's] management personnel,

25  without whom it cannot operate as an independent entity, are to be severed" and "have presumably

26  arranged for new employment," and the acquiring company negotiated new contracts.  *Id*. at 1308-

27  09.  "To assume that enjoining of the merger would do no more than preserve the 'status quo,' in the

28  face of this upheaval, would be to blink at reality."  *Id*. at 1309.  This conclusion applies *a fortiori*

10

1  here, when the merger *already* closed; HPE has not just *planned* integration, but *executed* for months.

2      By seeking to upend the status quo, the States seek a mandatory injunction. The States

3  demand, for example, that HPE "must operate legacy Juniper as a separate and distinct unit from

4  HPE," "not influence the management of legacy Juniper" and "not ... hire[]" Juniper's employees.

5  ECF 317-1 at 2.  But "legacy Juniper" no longer exits, Juniper's management has already joined

6  HPE (or left), and Juniper's employees are already part of HPE.  *Supra* Part II.C.  This injunction

7  thus necessarily requires splitting HPE apart and creating some new simulacrum of "legacy Juniper"

8  (albeit without a significant number of leaders that have departed).  The States also demand that HPE

9  "prevent the sharing of competitively sensitive information between HPE and legacy Juniper."  ECF

10  317-1 at 2.  But Juniper's competitively sensitive information was *already* shared with HPE, and

11  HPE Aruba's sensitive information has *also* been shared with legacy Juniper employees, and is being

12  used to support the combined HPE Networking business's products and sales strategies.

13      The States' demand that HPE "cease all actions relating to further integration," *id.,* similarly

14  ignores reality.  HPE cannot "cease" integration when it already is an integrated company.

15  Thousands of Juniper employees have been hired, onboarded, and work every day to provide

16  *integrated* solutions to customers.  Juniper and HPE sales teams have been *combined* to sell a unified

17  portfolio.  HPE has spent months developing new products that integrate technology from both HPE

18  and Juniper and has created a product roadmap, shared with customers, explaining when it will offer

19  its newly integrated products.  The States' injunction would require HPE to deconstruct the HPE

20  Networking business teams and create independent HPE and Juniper teams, abandon all work done

21  on integrated products, tell its customers it is no longer following its product roadmap, and force it

22  to develop *new* products (and a new roadmap), based only on pre-merger technology, to replace the

23  integrated products it was forced to abandon.  Schultz Decl. ¶ 23; Rahim Decl. ¶¶ 6-7.  That would

24  require radical change to HPE's business plans, product development, and communications with

25  customers—i.e., a mandatory injunction.  *Western*, 480 U.S. at 1309; *Tanner*, 316 F.2d at 809.

26      Rather than address these issues, the States baldly assert that the injunction they demand "is

27  appropriate to maintain the status quo."  Mot. at 18.  If the States mean to argue that the "status quo"

28  is a world where no merger had occurred and Juniper and HPE had not integrated, they are wrong—

1   the "status quo" is the state of the world when the controversy between the parties arises, and the

2   States did not raise any complaint with the merger when it closed. *Supra* Part II.B. The States cannot

3   now claim to be surprised by HPE's efforts to complete the merger; HPE and the DOJ explicitly

4   stated that the transaction would close once the Court signed their stipulation (*supra* Part II.B), and

5   it is both permissible and expected to consummate a merger pending the completion of the Tunney

6   Act review. *See Edstrom v. Anheuser-Busch*, 2013 WL 5124149, at *7 (N.D. Cal. Sept. 13, 2013),

7   *aff'd*, 647 F. App'x 733 (9th Cir. 2016) ("plaintiffs assume ... companies may not complete [a]

8   transaction until the district court enters final judgment. Nothing in the Tunney Act so requires.").

9          The States' injunction would transform HPE as it now exists, send its business into chaos,

10  and upend its relationships with customers. The States' claim that this "would do no more than

11  preserve the 'status quo,' ... blink[s] at reality." *Western Airlines*, 480 U.S. at 1309. The injunction

12  would force HPE "to take action" and constitutes a "mandatory injunction." *Doe*, 28 F.4th at 111.

13         **2.      The States Fail the Mandatory Injunction Test For Multiple Reasons**

14                **a.      The *Winter* Test Is Heightened Further For Mandatory Injunctions**

15         All preliminary injunctions (mandatory and prohibitory) involve the use of the four-part test

16  set out in *Winter v. NRDC*, 555 U.S. 7 (2008). *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 346

17  (2024). The *Winter* test requires that a proponent of an injunction demonstrate that "(1) she is likely

18  to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary

19  relief, (3) the balance of equities tips in her favor, and (4) an injunction is in the public

20  interest." *Garcia*, 786 F.3d at 740 (quoting *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012)).

21         While the burden to obtain the "extraordinary remedy" of a preliminary injunction is high

22  even when the requested injunction is *prohibitory*, the "burden ... is doubly demanding" when a

23  movant "seeks a *mandatory* injunction." *Id.* (emphasis added). A movant seeking a mandatory

24  injunction "must establish that the law and facts *clearly favor* her position, not simply that she is

25  likely to succeed." *Id.* (emphasis in original). A movant seeking a mandatory injunction must also

26  show "extreme or very serious damage will result" without the injunction. *Marlyn*, 571 F.3d at 879.

27                **b.      The States Do Not Address The Mandatory Injunction Requirements**

28         The States do not even mention the mandatory injunction requirements in their Motion, much

1    less try to meet them.  Because the States do not explain how they meet "the correct legal rule"

2    governing their mandatory injunction, it should be denied for that reason alone.  *Park Vill. Apartment*

3    *Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1163 (9th Cir. 2011) (reversing mandatory

4    injunction that did not reference and was not based on proper mandatory injunction standards).

5                    **c.    The States Do Not Show They Prevail On The Merits**

6            Even if the States' failure to address the mandatory injunction standard were excused, they

7    cannot meet that standard.  The first and "most important" aspect of the *Winter* test—as modified for

8    mandatory injunctions—is that the movant "establish that the law and facts *clearly favor* her

9    position" on the merits.  *Garcia*, 786 F.3d at 740.  The States fail this test for several reasons.

10           ***The States have no claim.***  The States cannot show the "law and facts *clearly favor*" their

11   claim because they have no claim to begin with.  *Garcia*, 786 F.3d at 740.  "When a plaintiff seeks

12   injunctive relief based on claims not pled in the complaint, the court does not have the authority to

13   issue an injunction."  *Pac. Radiation*, 810 F.3d at 633.  As the Court's intervention order explains,

14   the States have intervened "to participate as parties in the Court's Tunney Act review proceedings,"

15   but *not* to bring a Clayton Act claim to enjoin the merger.  ECF 332 at 12.  The States' intervention

16   motion tacitly acknowledges the States have not investigated the merger and do not have a basis to

17   challenge it.  ECF 236 at 14.  When the States adopted the Complaint for purposes of intervening in

18   the Tunney Act process, the States adopted the allegations "on information and belief," further

19   demonstrating "that [they] likely lack[] knowledge of underlying facts" and have no good faith basis

20   to challenge the merger.  *Delphix Corp. v. Actifo, Inc.*, 2014 WL 4628490, at *2 (N.D. Cal. Mar. 19,

21   2014).[2]  As the Court directed, "[s]hould the states wish to pursue an independent challenge to the

22   merger in these proceedings, they must file a separate motion to intervene for that purpose," which

23   they have not done.  ECF 332 at 12.  Because the States have not pleaded a live claim challenging

24   the merger itself, "the court does not have the authority to issue an injunction" against the merger on

---

25   [2] Adopting allegations on information and belief is appropriate "only when the facts that would
26   support the allegations are solely within the defendant's knowledge or control."  *Cooper v. Simpson Strong-Tie Co., Inc.*, 460 F. Supp. 3d 894, 907 (N.D. Cal. 2020) (citing *Soo Park v. Thompson*, 851
27   F.3d 910, 928 (9th Cir. 2017)).  But the States do not need information from HPE to investigate competition in the enterprise WLAN market or the merger's effects on the market.  Indeed, the States
28   have broad investigative powers that they could have used at any time in the last two years (*see, e.g.*, *Younger v. Jensen*, 605 P.2d 813, 818 (Cal. 1980)); yet they never used them to investigate the merger.

1  their behalf.  *Pac. Radiation*, 810 F.3d at 633; *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th

2  947, 957 (9th Cir. 2021) (reversing injunction "based on claims that Plaintiffs did not allege").

3      The States say they do not need to bring a claim to obtain a temporary injunction pending

4  completion of the Tunney Act process, because the Court "does not have authority . . . to enjoin

5  permanently the proposed acquisition" through the Tunney Act process. Mot. at 12 (citing *BNS*, 858

6  F.2d at 464).  This gets the analysis backward.  "A preliminary injunction is appropriate when it

7  grants relief of the same nature as that to be finally granted."  *Pac. Radiation*, 810 F.3d at 636.  The

8  fact that a merger cannot be *permanently* enjoined at the end of the Tunney Act process also means

9  that it cannot be *temporarily* enjoined pending that process.  The case the States rely on, *BNS*, carved

10 out an exception to this rule for *prohibitory* injunctions that pause a merger *before* it happens, and

11 thus "maintain the status quo" pending Tunney Act review.  *BNS*, 858 F.2d at 458.  But the injunction

12 here is *mandatory* and comes over five months *after* the merger; it does not "maintain the status

13 quo," *id.*  Even if *BNS* did apply, it does not support the States, as explained below.  *Infra* Part III.B.

14      **The States have not proven a claim.**  Even if the States' adoption of the DOJ's Complaint

15 for purposes of the Tunney Act is construed as *also* adopting the Complaint to *bring* a Clayton Act

16 claim (and it should not be, as the States have not intervened for that purpose), the States have not

17 attempted to show they could prevail on such a claim, much less that the "law and facts *clearly favor*"

18 it.  *Garcia*, 786 F.3d at 740.  The States do not argue they will prevail on a Clayton Act claim.  At

19 most, they argue that the DOJ's Complaint *alleged* the merger would cause harm to competition in

20 the enterprise WLAN market. Mot. at 14 (citing Compl. ¶¶ 1, 12).  But an injunction must be based

21 on "*evidentiary proof.*"  *Microsoft*, 136 F.4th at 971 (rejecting merger injunction as unsupported by

22 evidence).  "[B]are allegations in a complaint cannot satisfy [the States'] burden to offer some

23 'evidentiary proof' to support their prima facie showing" on the merits.  *Fry v. Cap. One Fin. Corp.*,

24 2025 WL 1397163, at *3 n.4 (N.D. Cal. May 14, 2025) (quoting *Microsoft*, 136 F.4th at 971).

25      The only "evidence" the States point to is the DOJ's pretrial brief, which, the States say,

26 "outlin[ed] evidence sufficient to trigger a structural presumption that the merger is unlawful." Mot.

27 at 14.  This is a reference to the DOJ's argument that the merger would cause HHI, a market

28 concentration statistic, to increase by 343 points, which exceeds the current threshold set by the DOJ

1    and FTC in their "Merger Guidelines."  ECF 221 at 9.  But even if this 343-point increase were

2    accurate, the DOJ's Merger Guidelines are not law—and "are not binding on the courts." *Olin Corp.*

3    *v. F.T.C.*, 986 F.2d 1295, 1299 (9th Cir. 1993); *see also United States v. JetBlue Airways Corp.*, 712

4    F. Supp. 3d 109, 151 (D. Mass. 2024) (exceeding Guidelines' thresholds "does not, on its own,

5    sustain a prima facie case").  In any event, the claimed 343-point increase is *not* accurate; as HPE's

6    expert explained, the increase here is only 271 points.  This is *far* below the average increase in

7    litigated merger cases.  ECF 222 at 13-14; Hill Decl. ¶ 8.[3]  The only statistical threshold the Supreme

8    Court has adopted in Clayton Act cases is a market share threshold (not HHI) of 30%, which triggers

9    a rebuttable presumption of harm.  *Phila. Nat'l Bank*, 374 U.S. at 363.  It is undisputed that this

10   presumption does not apply; the combined market share of HPE and Juniper is 25%.  Hill Decl. ¶ 7.

11          The meager statistical evidence the DOJ marshalled in support of its case cannot support

12   mandatory injunctive relief.  "[S]tatistics concerning market share and concentration" are "not

13   conclusive indicators of anticompetitive effects."  *United States v. Gen. Dynamics Corp.*, 415 U.S.

14   486, 498 (1974).  Following this rule, courts have repeatedly held that a merger cannot be enjoined

15   based on market statistics alone.  *See, e.g.*, *Fry*, 2025 WL 1397163, at *4 ("binding Supreme Court

16   and Ninth Circuit precedent hold[s] that market share statistics are not dispositive"); *Malaney v. UAL*

17   *Corp.*, 2010 WL 3790296, at *7 (N.D. Cal. Sept. 27, 2010), *aff'd*, 434 F. App'x 620 (9th Cir. 2011)

18   (rejecting preliminary injunction based on statistical evidence).

19          Even in cases where (unlike here) market concentration statistics show a sufficiently large

20   increase to trigger a presumption of harm, such a presumption is *always* rebuttable by evidence that

21   the merger will not harm competition.  *Gen. Dynamics*, 415 U.S. at 498.  That is the case here.  As

22   HPE explained in its filings, beyond HPE and Juniper, at least *eight* other players routinely compete

23   for major enterprise WLAN customers in the United States.  Every deposed third-party competitor

24   testified that they plan to compete vigorously and continue taking market share if the deal closes.

25   *See* ECF 222 at 18.  And HPE's expert showed that there is no harm, that HPE and Juniper competed

26   with numerous other WLAN players, and that HPE and Juniper were *not* each other's primary

---

[3] When courts have given weight to HHI increases, the increases have been far in excess of the Government's Guidelines' thresholds.  *See Saint Alphonsus v. St. Luke's Health*, 778 F.3d 775, 783 (9th Cir. 2015) ("extremely high" HHI increase of *1,607 points* supported prima facie case).

15

1  competitor.  Hill Decl. ¶¶ 9-12.  Further, HPE showed barriers to entry are low.  Since 2015, at least

2  five new players besides HPE and Juniper have entered the market.  ECF 222 at 23.  When "there

3  are no significant barriers to entry," a Clayton Act claim fails.  *Syufy*, 903 F.2d at 664, 671 n.21.

4      The States do not present *any* evidence disproving HPE's showing.  And they cannot claim

5  that the mere fact that HPE and the DOJ had competing arguments about the merger somehow *proves*

6  their entitlement to an injunction.  As the Ninth Circuit recently explained when denying a

7  preliminary injunction sought by the FTC, a party seeking to enjoin a merger cannot claim there is a

8  *conflict* in the evidence and then demand an injunction.  *Microsoft*, 136 F.4th at 967.  This "construe-

9  everything-my-way standard is more suited for defending against a summary-judgment dismissal of

10  claims than it is for obtaining provisional affirmative injunctive relief."  *Id.*  The States have not

11  disproven HPE's evidence (or even *addressed* it), so their motion fails for that reason as well.

12      ***The States have no evidence that the remedies are insufficient.***  Even if the States proved

13  substantial harm to competition under the Clayton Act (and they have not), they have not attempted

14  to prove that the proposed settlement remedies fail to address any such harm.  The DOJ alleged the

15  merger would harm the enterprise WLAN market, including by removing the competitive pressure

16  created by Juniper's innovative AIOps tools.  Compl. ¶¶ 6–7, 17, 47.  But the agreed-on remedies

17  directly address these allegations, given that HPE must: (1) license the source code for Juniper's

18  AIOps for WLAN to at least one third party and provide supporting personnel, and (2) divest its

19  Instant On business, which provides a suite of enterprise-grade WLAN solutions.  Schultz Decl. ¶ 2.

20      The States criticize the AIOps license, claiming it must be insignificant because the minimum

21  required bid ($8 million) is much smaller than the $14 billion that HPE paid to acquire *all* of Juniper.

22  Mot. at 4-5.  But WLAN is a small part of Juniper's business (~7% by revenue); HPE paid $14 billion

23  to acquire Juniper's *other* businesses.  Moreover, Juniper's alleged advantage in AIOps was central

24  to the DOJ's theory, and the license thus resolves a key aspect of the DOJ's alleged competitive harm.

25  Indeed, the States argued at the intervention hearing that the license is so competitively important

26  that they *had* to intervene to stop it—saying the license is "the thing that really impairs our interest

27  if we were to stand Juniper back up as an independent competitor."  Hearing Tr. 19:11-12.  Their

28  argument now that the license is competitively insignificant is both disingenuous and wrong.

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR HOLD SEPARATE ORDER
CASE NO. 5:25-cv-00951

1    The States say Instant On is irrelevant because it is "not mentioned anywhere in the

2  Complaint." Mot. at 4. But the Complaint alleged injury to the entire enterprise-grade WLAN

3  market, and the parties calculated market shares based on the entire enterprise-grade WLAN market

4  (i.e., a market that includes all businesses). ECF 221 at 7; ECF 222 at 12–13. The fact that the literal

5  words "Instant On" are not in the Complaint is irrelevant—the Instant On business is one of HPE's

6  enterprise-grade WLAN solutions, and part of the market and this case. ECF 317, Ex. C, Hughes

7  Decl. ¶ 4. Notably, the Instant On business's value is substantial when compared to the economic

8  harm the DOJ predicted from this merger. HPE's overall Instant On business generates over $130

9  million in revenue, about $35 million of which comes from WLAN. Schultz Decl. ¶ 2.

10    The States do not provide any *evidence* proving the remedies are insufficient. Their "fail[ure]

11  to offer any evidence to demonstrate that the mitigating requirements imposed by the DOJ ... are

12  insufficient to ameliorate the anticompetitive effects of the proposed merger," is another reason they

13  cannot possibly show *any* injunction is justified. *Bradt v. T-Mobile US, Inc.*, 2020 WL 1809716, at

14  *3 (N.D. Cal. Feb. 28, 2020) (rejecting prohibitory injunction of merger).

15    ***The States' allegations about the settlement negotiations are irrelevant and meritless.***

16  Finally, the States say they have shown a likelihood of success because they have presented "serious

17  allegations of impropriety" from a former DOJ employee (Roger Alford), and thus they are likely to

18  succeed in showing the settlement should not be approved under the Tunney Act. Mot. at 13. But

19  whether the *settlement* should be approved is irrelevant to whether the States have shown they will

20  succeed on a *claim* supporting an injunction. *See LA All.*, 14 F.4th at 957. Even if the question of

21  whether the *settlement* should be approved under the Tunney Act *were* relevant to the injunction

22  analysis (and it is not), the States do not explain how allegations about settlement *negotiations* are

23  relevant to the Tunney Act. The Tunney Act focuses on the "antitrust concerns in markets ... alleged

24  in the government's complaint." *BNS*, 858 F.2d at 462–63. The negotiation process is irrelevant.

25    In any event, the States have not submitted any evidence of wrongdoing involving negotiation

26  of the settlement, because none exists. They cite Alford's conclusory assertion that two senior DOJ

27  leaders "perverted justice and acted inconsistent with the rule of law" by approving the settlement,

28  and parrot Alford's claim that HPE hired "lobbyists," but the States offer no explanation for what

17

law they claim was violated or what the "impropriety" is.  Mot. at 7.  The States do not claim that an undisclosed side agreement or *quid pro quo* exists.  They do not contest the declarations from HPE's CEO and COO/CLO attesting that the only agreement between HPE and the DOJ is the settlement presented to the Court.  ECF 298-1 ¶ 3, ECF 298-2 ¶ 12.  They do not claim anyone participated in the settlement negotiations without authority or received some personal benefit from the settlement. The States provide no evidence of actual wrongdoing, because there is none.

Ultimately, the issue is simple: the States are not pursuing *any* "claims" on which a mandatory injunction could be based.  *LA All.*, 14 F.4th at 957.  Even if they were, they have failed to show "that the law and facts *clearly favor*" such a claim, *Garcia*, 786 F.3d at 740, so their motion fails.

### d.    The States Do Not Show Irreparable Injury.

To meet their burden under the second prong of the preliminary injunction test, the States must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22.  To obtain a *mandatory* injunction, this requires showing "extreme or very serious damage will result."  *Marlyn*, 571 F.3d at 879.  The States do not even attempt to make such a showing.

In their argument on "irreparable harm," the States do not address whether *they* will suffer harm; rather, they argue *competition* in the enterprise WLAN market may be harmed.  Mot. at 14- 15.  These arguments fail, as explained.  *Infra* Part III.B.[4]  Moreover, the States cannot seek an injunction without showing irreparable harm *to themselves*, not just alleged harm in a national market.  The States "argument, at bottom, is if they have shown a likelihood the merger will have anticompetitive effects, and thus a likelihood of success on the merits, they have shown the irreparable harm required for issuance of a preliminary injunction. But that is not the law." *DeMartini v. Microsoft Corp.*, 2023 WL 3569993, at *3 (N.D. Cal. May 19, 2023) (collecting cases). "Simply put, [the States] have not demonstrated in any way that they themselves will suffer any

---

[4] The States also say an injunction is necessary because "the risk that competitively sensitive business information will be shared between the merging parties is a harm that cannot easily be undone."  ECF 317 at 15.  But this is nonsensical, because the merger has *already* happened and any "competitively sensitive business information" has *already* been shared in both directions.  *Supra* Part II.C.  The States cannot claim they need an injunction to *prevent* a supposedly irreparable (i.e., irreversible) injury that has *already* occurred.  *E.g.*, *LA*, 14 F.4th at 960 (injunction "failed to explain ... how the relief ordered ... is tailored to [the] injuries" alleged); *Nachum v. Allstate*, 1997 WL 580522, at *8 (C.D. Cal. July 21, 1997) ("an injunction to prohibit ... past conduct is moot." (citing *In re Combined Metals*, 557 F.2d 179, 189 (9th Cir. 1977); *Holloway v. US*, 789 F.2d 1372, 1374 (9th Cir. 1986)).

1    specific harm were preliminary relief denied." *Malaney*, 2010 WL 3790296, at *14.  "Absent such

2    evidence of [the States'] likely injuries, [the States] have satisfied neither the baseline *Winter*

3    standard nor the heightened standard ... [for] mandatory injunctions." *Park Vill.*, 636 F.3d at 1161.

4           The States also do not try to show there is widespread, *irreparable* harm to their citizenry

5    that would prove an injury on a *parens patriae* basis.  "States asserting *parens patriae* standing must

6    meet both the basic requirements of Article III standing and the unique requirements of that

7    doctrine." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017).  To satisfy *parens*

8    *patriae*, a State must show more "than injury to an identifiable group of individual residents"; it must

9    show "injury to a sufficiently substantial segment of its population."  *Id.*  But this is not a consumer

10   products case involving numerous State citizens.  The States do not provide *any* evidence showing

11   their citizens are enterprise WLAN customers who will suffer irreparable harm, much less show "the

12   statewide magnitude" of the injury.  *Id.* at 652 (rejecting *parens patriae* as states had no "specific

13   allegations about the statewide magnitude of the" harms).  By contrast, *granting* the injunction would

14   harm the several thousand HPE employees who live and work in these States.  Ghosh Decl. ¶ 13.

15          Nor do the States attempt to explain how the injunction *addresses* any *irreparable* harm to

16   them.  The States' proposed injunction would terminate 30 days after the Tunney Act process ends—

17   regardless of whether the Court approves or rejects the settlement.  ECF 317-1 at 2.  The States do

18   not explain how this would remedy any irreparable harm from the merger itself.  Nor do they explain

19   how any injunction would reverse *irreparable* harm (which is, by definition, irreversible), given that

20   the merger *already* happened.  *Supra* n.4.  The incongruity between the States' injunction and any

21   irreparable injury is another fatal flaw.  *LA*, 14 F.4th at 960 ("relief" must be "tailored to [] injuries").

22          The States' delay in raising this challenge—doing nothing for nearly *twenty-two months* after

23   the merger was announced, and waiting over three months after the merger had closed to seek to

24   intervene—also demonstrates a lack of irreparable injury.  "Delays in requesting an injunction,

25   whether for months or years, tend to negate a claim of irreparable harm." *Hansen Beverage Co. v.*

26   *N2G Distrib., Inc.*, 2008 WL 5427602, at *6 (S.D. Cal. Dec. 30, 2008) (collecting cases).  If the

27   merger irreparably harmed the States, they would have sued over a year ago.  They still have not.

28          The States have completely failed to show their requested injunction will prevent irreparable

1  harm *to them*—much less the "extreme or very serious damage" required for a mandatory injunction.

2  *Marlyn*, 571 F.3d at 879.  This is another reason their motion fails.

3          **e.     The States Cannot Show The Equities Or Public Interest Favor Them.**

4          The balance of the equities and the public interest determination are closely related and are

5  "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter*, 555

6  U.S. at 32.  Given that the States waited until long after the merger was closed to bring this motion—

7  and long after HPE had invested enormous time and resources to integrate Juniper and its

8  employees—the balance of the equities weighs "overwhelmingly" against the States.  *Taleff v. Sw.*

9  *Airlines Co.*, 828 F. Supp. 2d 1118, 1124 (N.D. Cal. 2011), *aff'd*, 554 F. App'x 598 (9th Cir. 2014)

10  (rejecting injunction to unwind merger when movant waited until after merger occurred to attack it).

11          The burdens of delaying a merger are enormous and weigh heavily against granting an

12  injunction—even in cases when an injunction is sought *before* the merger has closed.  For example,

13  in *Western Airlines*, Justice O'Connor held that "the balance of the equities ... clearly weigh[ed]"

14  against enjoining a merger the day before it was scheduled to close, and explained that "[t]he cost of

15  enjoining this huge undertaking only hours before its long awaited consummation is simply

16  staggering in its magnitude, in the number of lives touched and dollars lost." 480 U.S. at 1309.  Other

17  courts, following Justice O'Connor, have likewise held that the equities weigh strongly against

18  entering an injunction "delaying [a] merger," given "the loss of significant revenue synergies and

19  cost savings, [the companies'] continued vulnerability to exogenous shocks that a merged entity

20  could withstand, [the] threatened job security for tens of thousands of employees who will benefit

21  from a more stable employer, and ... the continued deferral of capital and technology investments."

22  *Malaney*, 2010 WL 3790296, at *14; *see also Fry*, 2025 WL 1397163, at *7.

23          All these harms are present here as well—HPE has invested heavily in integrating Juniper's

24  business and has already spent months doing so, Juniper's management and employees have

25  transitioned into new roles at HPE or left, and HPE has developed new products and created new

26  product roadmaps using integrated technologies.  *See* Schultz Decl.; Rahim Decl.; Ghosh Decl.  An

27  injunction would delay gains of the merger and create massive uncertainty, force HPE to endure the

28  enormous burden of spinning off the integrated Juniper business, and jeopardize customers' ability

20

1   to plan their IT investments.  Schultz Decl. ¶¶ 11, 23.  HPE's competitors have already leveraged

2   uncertainty created by this case to poach business from HPE—with Cisco even making public

3   statements about using this case to acquire business—which will only increase if the merger is

4   enjoined.  Cisco Earnings Call, (Nov. 13, 2025), https://tinyurl.com/4eyyj9zj ("confusion in the

5   marketplace" about merger has "been positive for us").  And the States say the Tunney Act process

6   should not conclude until *over seven months from now*, which would force HPE to endure the

7   incredible burden of maintaining a duplicative, "separate" Juniper until the latter half of next year.

8          In addition to the enormous harms the States' injunction would cause, the fact that the States

9   waited for months after the merger closed to bring this motion is grounds, on its own, to deny it.  In

10  *Taleff*, the court held that the plaintiffs could not obtain injunctive relief under the Clayton Act

11  "because Plaintiffs delayed in filing their suit until after Defendants' merger had already been

12  consummated."  828 F. Supp. 2d at 1124.  As the court explained, "[a] similar conclusion has been

13  reached by other courts that have considered lawsuits brought by private plaintiffs[5] who: (1) sought

14  divestiture of companies that had already combined their operations as the result of a merger, where

15  (2) the plaintiffs' delay in filing suit meant that the court, if it were to order a divestiture, would have

16  to compel defendants that had already integrated their operations to separate themselves into two

17  distinct companies."  *Id.* & n.9 (citing *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235–36 (8th Cir.

18  2010); *Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp.*, 116 F. Supp. 2d 1159, 1173 (C.D.

19  Cal. 2000)).  This rule applies with equal force here, as the States are seeking "to compel defendants

20  that had already integrated their operations to separate themselves into two distinct companies."  *Id.*

21         Not only does the enormous burden on HPE, its employees, and its customers weigh heavily

22  against the States' injunction, but the public interest in national security does as well.  The merged

23  company can provide a "full stack" of networking services, allowing it to compete against Huawei,

24  a Chinese company that has been banned from competing in the United States because of the national

25  security risks it poses.  Schultz Decl. ¶ 10.  In the past, the lack of a credible alternative to Huawei

26  resulted in governments outside the U.S. selecting Huawei as a supplier for critical networking

27  _____
    [5] The States are treated as "private plaintiffs" for purposes of the Clayton Act analysis.  *See, e.g.*,
28  *Connecticut v. Sandoz, Inc.*, 2025 WL 3043397, at *6 (D. Conn. Oct. 31, 2025) ("States are treated
    as private parties when they invoke Section 16" of the Clayton Act) (collecting cases).

1   infrastructure.  *Id*.  Unwinding the merger would severely undermine the merged company's ability

2   to win this business from Huawei.  Further, HPE currently provides products and services to the U.S.

3   intelligence and defense communities, and any effort to pause or reverse integration would jeopardize

4   HPE's ability to supply technology to these communities.  *Id.* ¶ 9.  The national security needs of the

5   U.S. are "of great importance" here.  *Haig v. Agee*, 453 U.S. 280, 307 (1981); *Winter*, 555 U.S. at

6   24.

7        The States do not identify any strong countervailing interests that would support an

8   injunction.  They merely cite cases holding that the general interest in "public enforcement of the

9   antitrust laws" supported a preliminary injunction where the movant had made a strong showing that

10  the merger was unlawful.  Mot. at 15.  But the States have made no such showing here.  *Supra* Part

11  III.A.2.c.  And they "offer no evidence to meet their burden of showing that the public interest

12  disfavors the proposed merger, and they do not even attempt to assert allegations specific to this

13  case."  *Fry*, 2025 WL 1397163, at *7.  "Instead, they recite generic antitrust principles 'enunciated

14  and dating from Adam Smith to Justice Marshall,'" which cannot justify the extraordinary remedy

15  of a preliminary injunction (*id.*)—much less a mandatory injunction.

16       The States have offered no support for their contention that an injunction is required to protect

17  the public interest in competition.  HPE, on the other hand, has demonstrated that an injunction

18  jeopardizes not only HPE's viability as a company and the jobs of its employees, but also the nation's

19  security interests.  The balance of equities and the public interest determination favor HPE.

20  **B.    Even If *BNS* Applied, The States Have Not Satisfied It**

21       While the States rely on *BNS*, that case does not apply to a *mandatory* injunction seeking to

22  upend the status quo, stop an already-merged company from integrating, and unwind a merger, like

23  the injunction the States seek.  *Supra* Part II.B.  But even if the States' injunction were prohibitory—

24  and allowed by *BNS*—their motion would still fail.  *BNS* still requires a movant to satisfy the

25  "traditional requirements" of an injunction, including the showing of success on the merits (i.e.,

26  whether there is "irreparable harm to competition"), a showing of "irreparable harm" to the movant,

27  and that "the balance of hardships" favors the injunction.  858 F.2d at 461, 464-66.  As explained

28  above, the States fail to establish any of these elements, much less all of them.  *Supra* Part III.A.

1   ***No irreparable harm to competition***.  To obtain an injunction under *BNS*, a movant must

2   show "that serious questions exist regarding the possibility of irreparable harm to competition ... if

3   the [transaction] is consummated prior to completion of the court's APPA evaluation." *BNS*, 858

4   F.2d at 464-65.  But as explained above, the States have not even *attempted* to show irreparable harm

5   to competition.  *Supra* Part III.A.2.d.  They merely point to the DOJ's allegations and arguments,

6   but they do not attempt to explain how that evidence overcomes HPE's evidence that the merger is

7   procompetitive and there are no significant barriers to entry.  *Supra* Part III.A.2.d.  Even under the

8   *prohibitory* injunction standard, a movant must still establish that its evidence *overcomes* the

9   nonmovants' contrary evidence.  *See Microsoft*, 136 F.4th at 967.  The States do not try to do that.

10   *BNS* itself demonstrates why the States' motion fails.  In that case, a British company (Beazer,

11   the owner of BNS) made a hostile tender offer for an American company (Koppers).  858 F.2d at

12   458–60.  One of Beazer's subsidiaries competed with a Koppers subsidiary in the Southern California

13   "aggregate" market.  *Id*. at 458–59.  The DOJ filed a complaint alleging Beazer's acquisition of

14   Koppers' aggregate business would be anticompetitive, simultaneously filed a proposed judgment

15   (agreed to by Beazer) requiring Beazer to divest Koppers' aggregate business, and asked the Court

16   to approve the proposal under the Tunney Act.  *Id*.  Koppers *immediately* moved to participate in the

17   Tunney Act proceedings, and moved for and obtained an injunction to stop the transaction *before* it

18   had occurred.  *Id*.  On appeal, the court held Koppers had proven irreparable harm to both the market

19   and itself through the uncontroverted affidavit of an executive, who testified that allowing the

20   acquisition to go forward would result in Koppers sharing its "confidential information" with Beazer

21   (its competitor) and allow Beazer to derail or stop Koppers' plans "to acquire additional aggregate

22   reserves and dredging equipment."  *Id*. at 464.  This harm to competition (and to Koppers) was

23   "irreparable" because it could not be undone if the court ultimately blocked the merger.  *Id*. at 465.

24   The States have made no such showing here.  Again, the merger has *already* closed and all

25   of Juniper's confidential information has *already* been shared with HPE (and, conversely, Juniper's

26   former employees have been exposed to HPE's information).  *Supra* Part II.C.  The States cannot

27   seek an injunction to prevent a supposedly *irreparable* injury that has *already* occurred.  *See, e.g.*,

28   *Nachum*, 1997 WL 580522, at *8 ("Plaintiffs' request for an injunction to prohibit ... past conduct is

23

1  moot." (citing *Combined Metals*, 557 F.2d at 189; *Holloway*, 789 F.2d at 1374).  The States have not

2  shown "irreparable harm to competition" avoided by their injunction.  *BNS*, 858 F.2d at 464-65.

3     ***No irreparable harm to the States***.  *BNS* also requires—like every preliminary injunction

4  case—that the movant show "irreparable harm" *to themselves*.  "[T]he party seeking the injunction

5  must show that a significant threat of irreparable harm exists."  *BNS*, 858 F.2d at 464 (citing *Oakland

6  Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1376 (9th Cir. 1985)); *Oakland Tribune*, 762

7  F.2d at 1376 (rejecting injunction when plaintiff did not show harm *to itself*).  In *BNS*, the same

8  evidence that showed irreparable harm to competition *also* showed irreparable harm to Koppers,

9  because forcing Koppers to share its confidential information would harm it directly.  *BNS*, 858 F.2d

10 at 463-64 (evidence showed "irreparable harm to competition" *and* to "the business to be acquired").

11    Here, there is no evidence of irreparable harm to the States—as explained above, the States

12 do not argue they will suffer harm *themselves*, instead arguing *competition* may be harmed.  *Supra*

13 Part III.A.2.d.  But the States cannot seek an injunction without irreparable harm *to themselves*.

14 *Supra* Part III.A.2.d.  The States "argument, at bottom, is if they have shown a likelihood the merger

15 will have anticompetitive effects, and thus a likelihood of success on the merits, they have shown

16 the irreparable harm required for issuance of a preliminary injunction. But that is not the law."

17 *DeMartini*, 2023 WL 3569993, at *3.  The States "have not demonstrated in any way that they

18 themselves will suffer any specific harm were preliminary relief denied."  *Malaney*, 2010 WL

19 3790296, at *14.  The States also do not explain how their injunction *addresses* any irreparable harm

20 to them.  *Supra* Part III.A.2.d.  If the States truly believed the merger harms them, then it is unclear

21 why they would seek to temporarily unwind the merger for the pendency of this Tunney Act

22 proceeding—but then let the merger restart all over again once the proceeding is completed.  *Supra*

23 Part II.B.  The States' prolonged delay in raising this challenge—which they raised over 1.5 years

24 after the merger was announced, and months after it closed—also demonstrates a lack of irreparable

25 injury.  "Delays in requesting an injunction, whether for months or years, tend to negate a claim of

26 irreparable harm."  *Hansen*, 2008 WL 5427602, at *6 (collecting cases); *supra* Part III.A.2.d.  For

27 that reason as well, their motion fails under *BNS*.

28    ***Balance of hardships favors HPE***.  *BNS* also requires a court to "balance the interests of all

1  parties and weigh the damage to each before granting an injunction." 858 F.2d at 465 (quotations

2  omitted). The court held that BNS (the acquirer) had shown it would suffer harm from delay of its

3  tender offer, although it also concluded that the "threatened harm" to the market that would occur if

4  the merger was consummated "was substantial," and thus justified some injunction. *Id.* at 465-66.

5  Nevertheless, the Ninth Circuit narrowed the injunction:  the Ninth Circuit allowed the tender offer

6  to close, and ordered only that BNS hold separate the particular Koppers subsidiary that competed

7  in the aggregate market, until completion of the Tunney Act process. *Id.* at 467.

8       Here, the burden of the injunction on HPE, its employees, its customers, and the public

9  interest is far greater than the burden BNS suffered. BNS merely had to keep separate a particular

10  subsidiary that it had never acquired in the first place—but HPE would have to rip itself apart and

11  unwind months of effort that it has spent integrating Juniper and building a joint business, after the

12  States did nothing for months before seeking this injunction. *Supra* Part II.C. *BNS* itself recognized

13  that "the unwinding of a completed merger would present mammoth obstacles," and justified the

14  remedy it ordered as a far *lesser* burden than such an "unwinding." *BNS*, 858 F.2d at 462. As Justice

15  O'Connor explained in *Western Airlines*, "[t]he cost of enjoining this huge undertaking only hours

16  before its long awaited consummation is simply staggering in its magnitude, in the number of lives

17  touched and dollars lost." 480 U.S. at 1309. The cost is even more staggering here, where the merger

18  happened *months* ago. On the other side of the ledger, *BNS* had clear, unrebutted evidence of

19  "substantial" irreparable harm to competition, 858 F.2d at 466, unlike the States, which have not

20  proven any such harm or even investigated the merger*, supra* Part I. In addition, unlike the "narrowly

21  tailored" hold separate in *BNS*, 858 F.2d at 464, the States' injunction is not tailored at all. They do

22  not focus on Juniper's enterprise WLAN business—the only business at issue in the DOJ's

23  complaint—but rather demand HPE recreate "legacy Juniper" in its entirety. ECF 317-1 at 2.

24       The States fail every part of the *BNS* test. Even if *BNS* governs, the motion should be denied.

25            **IV.**    **CONCLUSION**

26  The motion should be denied.

27

28

HEWLETT PACKARD ENTERPRISE CO.'S OPPOSITION TO MOTION FOR HOLD SEPARATE ORDER
CASE NO. 5:25-cv-00951

Dated: December 9, 2025

By: */s/ Samuel G. Liversidge*
Samuel G. Liversidge
*Attorney for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

Samuel G. Liversidge (Bar No. 180578)
Eric Vandevelde (Bar No. 240699)
Daniel Nowicki (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Michael J. Perry (Bar No. 255411)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
SWeissman@gibsondunn.com
MJPerry@gibsondunn.com
KLimarzi@gibsondunn.com

Julie S. Elmer (*pro hac vice*)
Jennifer Mellott (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
eric.mahr@freshfields.com
jennifer.mellott@freshfields.com

Justina K. Sessions (Bar No. 270914)
**FRESHFIELDS US LLP**
855 Main St
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

*Attorneys for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

26