PHILIP J. WEISER
Attorney General
ARTHUR BILLER (*pro hac vice*)
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
         Bryn.Williams@coag.gov

*Attorneys for Intervenors*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff*, | **REPLY IN SUPPORT OF MOTION FOR HOLD SEPARATE ORDER** |
| vs. | |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | Judge: P. Casey Pitts
Action Filed: January 30, 2025
Hearing: January 8, 2026 at 9:00 am |
| *Defendants*. | |

# Table of Contents

**ARGUMENT**.............................................................................................................................2

    I.    The States Seek a Prohibitionary Injunction to Freeze Further Integration Efforts

        and Maintain the Status Quo..........................................................................................2

    II.   Relief Remains Available and Appropriate. ..................................................................3

    III.  The States Have Satisfied the Tests in *Winter* and *BNS* for a Hold Separate Order. .8

        A.    The Likelihood of Success on the Tunney Act Merits ................................. 8

        B.    The Likelihood of Irreparable Harm ......................................................... 12

        C.    The Balance of the Equities and the Public Interest. .................................. 13

**CONCLUSION** ........................................................................................................................14

1

## TABLE OF AUTHORITIES

2

### Cases

*Edstrom v. Anheuser-Busch InBev SA/NV*,
 13-cv-1309, 2013 WL 5124149 (N.D. Cal. Sept. 13, 2013)..................................................15
*F.T.C. v. H.J. Heinz Co.*,
 246 F.3d 708 (D.C. Cir. 2001)............................................................................................13
*F.T.C. v. Kroger Co.*,
 No. 3:24-cv-00347, 2024 WL 5053016 (D. Or. Dec. 10, 2024)..........................................10
*F.T.C. v. Staples, Inc.*,
 190 F. Supp. 3d 100 (D.D.C. 2016).....................................................................................10
*F.T.C. v. Weyerhaeuser Co.*,
 665 F.2d 1072 (D.C. Cir. 1981).....................................................................................8, 13
*ProMedica Health Sys., Inc. v. F.T.C.*,
 749 F.3d 559 (6th Cir. 2014)...............................................................................................15
*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
 778 F.3d 775 (9th Cir. 2015)...............................................................................................10
*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
 988 F.3d 690 (4th Cir. 2021)...............................................................................................15
*United States v. Acorn Eng'g Co.*,
 No. 80-cv-3388, 1981 WL 2112 (N.D. Cal. June 18, 1981) ................................................8
*United States v. BNS Inc.*,
 858 F.2d 456 (9th Cir. 1988) ........................................................................................passim
*United States v. CVS Health Corp.*,
 No. 18-cv-2340 (Dkt. No. 27) (D.D.C. Dec. 3, 2018)..........................................................6
*United States v. CVS Health Corp.*,
 No. 18-cv-2340 (Dkt. No. 44) (D.D.C. Dec. 18, 2018)........................................................7
*United States v. E. I. du Pont de Nemours & Co.*,
 366 U.S. 316 (1961)............................................................................................................15
*United States v. Ivaco, Inc.*,
 704 F. Supp. 1409 (W.D. Mich. 1989) ...............................................................................13
*United States v. US Airways Grp., Inc.*,
 38 F. Supp. 3d 69 (D.D.C. 2014).....................................................................................1, 14
*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008)..................................................................................................................8

### Statutes

15 U.S.C. § 16(e)(1) ..................................................................................................................7

### Other Authorities

119 Cong. Rec. 3453 ................................................................................................................13

22

23

24

25

26

27

28

The same day the Court permitted the States to intervene as parties in this matter, the States filed a Motion for a Hold Separate Order to "prevent further integration of Defendants HPE and Juniper." Mot.[1] at 1. The States were clear that they "d[id] not know what exact integration steps have been completed . . . and what integration steps remain to be taken," *id.* at 9, but the States sought to "freeze integration efforts," whatever stage they may have reached, to "maintain the status quo and to protect the Tunney Act process and the ability of this Court to make its public interest determination effective," *id.* at 1–2.

Rather than respond to the States' Motion on the merits, HPE resorts to sleight of hand, recasting the States' motion as a request to unwind a transaction already consummated and then attacking the straw man they created. But on the States' actual argument—that the Court should "prevent *further* integration," Mot. at 1—HPE has little to say. HPE is not forthcoming about the integration steps still outstanding or why a freeze of those steps for the next few months would be inappropriate.

HPE's insistence that the companies have been integrated and that there is little the Court can do is just another step in HPE's orchestrated strategy to undermine the intent and integrity of the Tunney Act process. By securing a settlement through questionable means, immediately closing on the deal, and rapidly integrating the two companies, HPE effectively argues—wrongly—that no equitable remedy exists to prevent further harm during the pendency of a Tunney Act review. Treating what it has done and—critical to this Motion—what it has yet to do as a *fait accompli* beyond the reach of this Court, HPE seeks to undermine the Court's role to independently determine whether the Settlement is in the public interest. To allow HPE to do so would trivialize the entire purpose of the Tunney Act.

The Tunney Act is not a mere procedural formality. It is a substantive safeguard with legal force. And attempts to circumvent its review process may carry significant consequences. HPE has chosen to pursue this course at its own peril. *See United States v. US Airways Grp., Inc.*, 38 F. Supp.

---

[1] "Motion" or "Mot." refers to the Motion for Hold Separate Order (Dkt. No. 317). "Opposition" or "Opp." refers to Hewlett Packard Enterprise Co.'s Opposition to Motion for Hold Separate Order (Dkt. No. 338). Other abbreviations and capitalized terms not defined herein have the meaning ascribed in the Motion.

3d at 69, 83–84 (D.D.C. 2014) ("As the United States points out, by choosing to close their merger prior to entry of the Final Judgment, Defendants have accepted the risk of undoing the merger should it prove necessary.").

**ARGUMENT**

**I.    The States Seek a Prohibitionary Injunction to Freeze Further Integration Efforts and Maintain the Status Quo.**

HPE seeks to manufacture confusion regarding the States' Motion, but the Motion is clear: "Intervenors . . . move for entry of a hold separate order to prevent further integration of Defendants HPE and Juniper." Mot. at 1. That focus—on preventing further integration efforts—was explicit throughout the Motion. *Id.* at 1 ("freeze integration efforts" and "maintain the status quo"), 11 ("prevent further integration and to preserve the status quo"), 14 ("stay further integration of the parties' operations"), 17 ("restrain HPE and Juniper from any further integration actions"), 18 ("maintain the status quo").

Rather than addressing that Motion, HPE responds to a motion that was never made. The Opposition begins by recasting the Motion: "What the states are demanding is an extreme *mandatory injunction*." Opp. at 1 (emphasis in original). From there, HPE is off to the races, raising the stakes, applying heightened burdens of proof, and marching through a parade of horribles that would result from the granting of relief that the States never sought. The reason for the sleight of hand is clear. By reframing the States' Motion, HPE shifts to more favorable, but inapplicable, legal and factual terrain.

On the law, HPE claims the States' Motion is for a "mandatory injunction," which it argues is "particularly disfavored" and "subject to extremely high burdens of proof," requiring a showing by the movant that "the law and facts *clearly favor* her position, not simply that she is likely to succeed." Opp. at 1. HPE waves away the proper standard in a Tunney Act proceeding—that articulated in *United States v. BNS Inc.*, 858 F.2d 456 (9th Cir. 1988)—by saying it has "nothing to do with the extreme *mandatory* injunction the States seek." Opp. at 2. But, as set forth in the Motion, when the proper test is employed, the States satisfy each element for injunctive relief to maintain the status quo pending the Tunney Act proceedings.

By recasting the Motion as one to unwind integration efforts already undertaken, HPE wrongly claims that the injunction sought "would transform HPE as it now exists, send its business into chaos, and upend its relationships with customers."  Opp. at 12; *see also id.* at 20 ("force HPE to endure the enormous burden of spinning off the integrated Juniper business").  But the Motion makes plain that the States do not seek to unwind any of the integration steps already taken—only to pause those steps yet to occur.

**II.     Relief Remains Available and Appropriate.**

By shifting the focus to reversing integration efforts that have already taken place and then attacking the straw man, HPE obscures what matters most to this Motion—that is, what integration activities remain outstanding.  The States' Motion seeks this information:

> Because the precise stage of HPE's integration with Juniper is not in the public record, the States also seek, through this Motion, an order that the Defendants provide a declaration, affidavit, or other report sufficient to enable the States to assess the extent and nature of their efforts to integrate their operations and share information to date. The Defendants have already announced that the transaction has closed.  But what exactly that means is unclear.  A prompt and thorough report from the Defendants would illuminate the extent of integration activity to date, and *what integration efforts remain.*

Mot. at 15 (emphasis added).  The Opposition is replete with accounts of integration efforts to date, but short on candor regarding what remains.  That *forthcoming* integration is the focus of the relief sought by the States, but, on that question, HPE leaves the Court in the dark.  In the absence of a Court order directing a clear answer, HPE appears unwilling to provide one.

Although HPE protests that integration is largely complete, the record reflects that integration efforts are ongoing.  In fact, as HPE alludes to and public reporting reflects, *integrated* products have yet to be offered to customers, but they may be available in the coming weeks and months.  Among these developments:

- A "new HPE Aruba-Juniper dual platform Wi-Fi 7 Access Point . . . will be delivered in

the third quarter of next year."[2]

- "HPE Juniper Networking's renowned Mist AI Large Experience Model (LEM) and Marvis AI virtual assistant will be available in the first quarter of next year on HPE Networking Central."[3]

- "HPE Aruba's AI-based client profiling capabilities and AI organizational insight functionality in the first quarter of next year will move to HPE Juniper Mist."[4]

- "HPE is also making Aruba Networking's Agentic Mesh Technology available for Juniper Mist, bringing AI-based anomaly detection and root cause analysis with autonomous networking capabilities to the popular Mist AI networking platform."[5]

- "HPE is launching what it is calling the 'world's highest- performance Ultra Ethernet Transport Ready' network switch: the 100 percent liquid-cooled HPE Juniper Networking QFX5250 . . . [a]vailable in the first quarter next year."[6]

Importantly, some of these upcoming products demonstrate how, today, HPE and Juniper products are still separate for consumers. *See* Rahim Decl. ¶ 4 (Dkt. No. 338-4) ("HPE is developing Wi-Fi 7 access points that *work across both Mist and Aruba Central*" and "a single family of access points for Wi-Fi 8 that will also run *both Mist and Aruba Central, depending on customer deployment*," i.e., the customer can choose one or the other) (emphasis added). HPE argues these developments

---

[2] Steven Burke, *HPE Networking Unveils First Combined Juniper-Aruba Networking Products*, The Channel Co. (Dec. 3, 2025), https://www.crn.com/news/networking/2025/hpe-networking-unveils-first-combined-juniper-aruba-networking-products?page=1 (reporting on "[t]he new combined HPE Aruba and Juniper product barrage" HPE presented at the HPE Discover conference in Barcelona); *see also* Rahim Decl. (Dkt. No. 338-4) at ¶ 4 (omitting a timeline for delivery).

[3] Burke, *supra* note 2; *HPE accelerates AI deployments with first AMD "Helios" AI rack-scale architecture with open, scale-up networking built with Broadcom*, Hewlett Packard Enterprises (Dec. 2, 2025), https://www.hpe.com/us/en/newsroom/press-release/2025/12/hpe-accelerates-ai-deployments-with-first-amd-helios-ai-rack-scale-architecture-with-open-scale-up-networking-built-with-broadcom.html.

[4] Burke, *supra* note 2.

[5] *Id.*

[6] *Id.*; *HPE disrupts networking industry with expanded AI-native portfolio; reimagines future of IT operations with self-driving networks strategy*, Hewlett Packard Enterprise Co. (Dec. 3, 2025), https://www.hpe.com/us/en/newsroom/press-release/2025/12/hpe-disrupts-networking-with-new-ai-native-advances-for-self-driving-operations.html. HPE discussed many of these developments at a recent conference in Barcelona. *See* HPE Discover Barcelona 2025, HPE, https://www.hpe.com/-us/en/discover/barcelona.html (last visited Dec. 22, 2025).

1   are too late to stop, when by their own admissions these are merely "product and engineering

2   roadmap[s]" or products "in development."  *See* Rahim Decl. ¶¶ 4–7 (Dkt. No. 338-4).

3          With new, integrated products going out to customers in the coming months, injunctive relief

4   pausing their release would be timely and effective at preventing harm from the transaction.  Despite

5   HPE's protestations to the contrary, nothing suggests halting further integration is unworkable.  HPE

6   notes, "By the end of October 2025, HPE had already onboarded 951 Partners that had previously

7   sold either legacy Aruba or Juniper products, but not both, to sell the combined HPE Networking

8   portfolio *consisting of both legacy Aruba and legacy Juniper products*."  Schultz Decl. ¶ 20 (Dkt.

9   No. 338-2) (emphasis added).  But HPE never explains why these sales teams cannot continue to

10  sell the "legacy Aruba" and "legacy Juniper" products they sell today, rather than the new, integrated

11  products that have not yet been rolled out.  HPE's strategy appears to be to hold its own customers

12  hostage by shifting them to newly introduced joint products that may well have to be unwound.

13  And, no doubt, if HPE is permitted to release integrated products, it will turn around and complain

14  that unwinding the transaction—which may ultimately become necessary if the Court does not

15  approve the settlement—would be disruptive and impractical.[7]  As HPE prepares to deploy new

16  products to customers—products developed following consummation of a merger this Court is still

17  reviewing—the Court faces an inflection point: it should grant the States' Motion, maintain the

18  status quo, and hold effective Tunney Act proceedings.

---

[7] The prospect of the unwinding of this transaction is not limited to this litigation.  While HPE boasts that "[t]hirteen regulatory authorities reviewed and approved the deal, including the European Commission and United Kingdom's CMA," Opp. at 6, HPE omits that the transaction is still under review by Canada's Competition Bureau, *see* Flavia Fortes, *HPE-Juniper, Omnicom-IPG deal reviews still pending in Canada*, MLex (Dec. 18, 2025), https://www.mlex.com/mlex/articles/2423914/hpe-juniper-omnicom-ipg-deal-reviews-still-pending-in-canada; Government of Canada, *Report of Merger Reviews*, https://competition-bureau.canada.ca/en/mergers-and-acquisitions/report-concluded-merger-reviews (last visited Dec. 22, 2025) (identifying the review of the transaction as "[o]ngoing").  It is also unclear what HPE means by "approved," which could just mean that regulatory authorities declined to challenge the deal.  In any event, the reaction of foreign regulators is beside the point, given the different competitive dynamics in the United States, including the absence of Huawei as a competitor.  Complaint ¶ 2 (Dkt. No. 1) ("Several enterprise-grade WLAN vendors that are active abroad, including Chinese multinational Huawei Technologies Company ('Huawei'), have been identified as potential security threats by the U.S. government and, under federal law, are barred from competing for business domestically.  As a result, customers in the United States have fewer options than they would if they were based abroad, and HPE and Juniper may be able to charge different prices and include different terms for those customers.").

1    Prospective relief in the form of a hold separate order remains available and appropriate.

2  HPE should provide the Court and the States with "a report to the Court explaining what steps have

3  been taken to date on integration between, and consolidation of, HPE and Defendant Juniper

4  Networks, Inc.," including what steps remain to be taken and their anticipated timeline, *see* Proposed

5  Order at 1 (Dkt. 317-1).  HPE should "immediately cease all actions relating to further integration

6  and consolidation of HPE and Juniper" and "[t]o the extent that it is impossible to immediately cease

7  any particular actions, HPE [should] immediately notify the Court of any such actions and provide

8  a proposal as to how to cease those actions or otherwise perform them in a manner that complies

9  with the other provisions" of the Hold Separate Order.  *Id.* at 2.  HPE complains that it cannot comply

10  with other provisions of the proposed Hold Separate Order.  Opp. at 1.  But HPE offers no clarity as

11  to forthcoming integration efforts or why compliance with such an order would be impossible, as

12  opposed to merely inconvenient.  In the absence of clarity from HPE, and facing the likelihood of

13  irreparable harm in the intervening months from continued integration of a merger that the Court

14  has not found to be in the public interest, the Court should grant the requested relief.

15    Such relief has been granted before.  In *United States v. CVS Health Corp.*, the United States

16  District Court for the District of Columbia faced Tunney Act proceedings regarding CVS Health

17  Corporation's proposed acquisition of Aetna Inc., following a challenge and settlement by the

18  United States.  The initial Asset Preservation Stipulation and Order agreed upon by the United States

19  and the merging parties in that case required CVS and Aetna to hold separate only the contemplated

20  divestiture assets, but the Court was "less convinced of the sufficiency of the Government's

21  negotiated remedy than the Government."  Order To Show Cause at 2, *United States v. CVS Health*

22  *Corp.*, No. 18-cv-2340 (Dkt. No. 27) (D.D.C. Dec. 3, 2018).  The Court ordered the parties to "show

23  cause why I should not order CVS to hold its acquired Aetna business as a separate entity and to

24  insulate the management of the CVS business from the management of the Aetna business, and vice

25  versa, until I have made my determination as to whether to enter final judgment in this case."  *Id.* at

26  3.  CVS responded cooperatively, committing to prospectively take actions to allay the court's

27  concerns: operating Aetna's business as a distinct unit within CVS, under the leadership of legacy

28  Aetna employees; maintaining Aetna's historical control over pricing and product offerings;

retaining Aetna personnel at current compensation and benefits levels; and implementing a firewall to prevent the exchange of competitively sensitive information between CVS and Aetna. CVS Health Corp.'s Memorandum in Response to the Court's December 3, 2018 Order To Show Cause at 15–16, *United States v. CVS Health Corp.*, No. 18-cv-2340 (Dkt. No. 33) (D.D.C. Dec. 14, 2018). The Court ordered CVS to comply with these terms and provide quarterly reports, concluding, "[b]ased on CVS's constructive and appropriate representations, I am satisfied that, so long as these measures remain in place, the assets involved in the challenged acquisition will remain sufficiently separate as to facilitate and complete the statutory review of the parties' proposed consent judgment and my determination of whether 'entry of [the proposed] judgment is in the public interest.'" Memorandum Order, *United States v. CVS Health Corp.*, No. 18-cv-2340 (Dkt. No. 44) (D.D.C. Dec. 21, 2018) (quoting 15 U.S.C. § 16(e)(1)).

Outside the Tunney Act context, the parties took a similar approach even while closing a merger in *United States v. AT&T Inc.* In that case, the merging parties, AT&T and Time Warner, succeeded at trial, defeating a Department of Justice suit to block the merger. During the pendency of an appeal, AT&T agreed that it would manage Turner networks as part of a separate business unit; that AT&T would not set Turner's prices; that Turner personnel would largely be retained and continue at the same compensation and benefit level; and that a firewall would be established between Turner and AT&T to prevent the exchange of competitively sensitive information. Joint Motion To Modify Case Management Order at Ex. A, *United States v. AT&T Inc.*, No. 17-cv-2511 (Dkt. No. 148-1) (D.D.C. June 14, 2018). The parties voluntarily agreed to abide by these restrictions for eight months. *Id.*

Unlike in the *CVS* and *AT&T* cases, HPE here takes no such "constructive and appropriate" approach, instead brazenly seeking to move full steam ahead without any deference to the Court's role in making an independent public interest determination. Because "[t]he review process in merger cases would be undermined if courts were unable to maintain the status quo while determining whether a proposed consent decree is in the public interest," *BNS*, 858 F.2d at 462, the Court can and should issue an appropriate hold separate order in this matter, pending Tunney Act review.

**III.    The States Have Satisfied the Tests in *Winter* and *BNS* for a Hold Separate Order.**

The hold separate order here is a modest restraint that "requires the acquiring company to preserve the acquired company (or certain of the acquired assets) as a separate and independent entity during the course of antitrust proceedings" in order "to safeguard 'unscrambled' the assets acquired so that they may be divested effectively should the government ultimately prevail." *F.T.C. v. Weyerhaeuser Co.*, 665 F.2d 1072, 1075 n.7 (D.C. Cir. 1981). The focus is not, as HPE claims, on unwinding a merger already consummated, but rather "preserving the possibility of effective relief" following a decision on the merits. *United States v. Acorn Eng'g Co.*, No. 80-cv-3388, 1981 WL 2112, at *1 (N.D. Cal. June 18, 1981).

The traditional test for a preliminary injunction requires a showing by the moving party of four elements: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The burden is lessened in the context of a hold separate order. *See Acorn Eng'g*, 1981 WL 2112, at *1 ("A hold-separate order may be granted where the standards for preliminary injunctive relief are not met, and the central focus of such an order is preserving the possibility of effective relief."). The test is modified in the Tunney Act context, where—because there is not a "merits" determination to be made at all—the court skips the first element. *BNS*, 858 F.2d at 464 (explaining that because "[t]he district court does not have authority under the [Tunney Act] to enjoin permanently the proposed acquisition," the "test of success on the merits is inapplicable").

**A.    The Likelihood of Success on the Tunney Act Merits**

HPE gets the analysis of likelihood of success on the merits wrong twice in its Opposition. First, HPE inflates the standard to a requirement that "the law and facts clearly favor" the movant's position. Opp. at 1, 3. But HPE makes this argument only by mischaracterizing the nature of the relief sought by the Motion. For the prohibitory injunction sought here, at most, the standard would be whether the States could show a likelihood of success on the merits. *Winter* 555 U.S. at 20. Second, HPE never grapples with or even responds to the conclusion in *BNS* that the likelihood of success on the merits element does not apply in the context of a Tunney Act injunction. *BNS*, 858

1   F.2d at 464 ("test of success on the merits is inapplicable").

2        Eschewing the binding case law, HPE makes four arguments for why the States do not meet

3   the "success on the merits" element. None stand up to scrutiny. First, HPE argues that "[t]he States

4   have no claim." Opp. at 13. But, as HPE knows, the States have adopted the United States'

5   Complaint in this matter. *See* Notice of Adoption of United States' Complaint (Dkt. No. 322).

6   Moreover, this precise argument was rejected in *BNS*, where the Ninth Circuit affirmed a hold

7   separate order issued upon motion by a Tunney Act "participant." In *BNS*, the Ninth Circuit

8   explained that the movant's "lack of party status in no way deprived the court of jurisdiction to

9   consider its argument, as an interested 'participant,' that an injunction should be entered." *BNS*, 858

10   F.2d at 461. By granting the motion, the court explained, "the court could prevent the difficulties

11   involved in the unwinding of a nearly two billion dollar merger, which might be required if the court

12   determined later that approval of the decree was not in the public interest." *Id.*

13        Second, HPE argues that the States have not "proven a claim." Opp. at 14. As an initial

14   matter, for the reasons stated in the Motion, even if the Court were to require a likelihood of success

15   on the Tunney Act merits—and *BNS* says this element should be skipped—the States pass that bar

16   based on the allegations in the Complaint as supplemented by the evidence cited in the government's

17   Pretrial Brief. *See* Mot. at 12–14. The United States proffered evidence of a highly concentrated

18   market and a significant increase in concentration from the merger, triggering a structural

19   presumption of anticompetitive harm. United States' Pretrial Brief at 8–10 (Dkt. No. 221). HPE

20   quibbles with the increase in concentration, suggesting the HHI increase is 271, rather than 343, as

21   if the discrepancy between the two numbers affected the presumption of harm—it doesn't. *See* 2023

22   Merger Guidelines § 2.1 (mergers presumptively unlawful where they result in a highly concentrated

23   market, with an HHI greater than 1,800, and an increase in HHI of more than 100 points).

24        HPE drifts even farther afield with its argument that the HHI increase in this case is "below

25   the average increase in litigated merger cases." Opp. at 15. But, of course, that there have been

26   proposed mergers in the past that would have been even worse than this one proves nothing at all.

27   This merger far exceeds presumptive levels by HPE's own admission, and regardless whether the

28   structural presumptions under the Merger Guidelines are "binding" on courts, they are routinely

adopted by courts. *See, e.g.*, *F.T.C. v. Kroger Co.*, No. 3:24-cv-00347, 2024 WL 5053016, at *16 (D. Or. Dec. 10, 2024) (collecting cases); *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 n.9 (9th Cir. 2015). Based on the evidence available to the States, the Complaint and the Pretrial Brief are sufficient to establish a likelihood of success on the Tunney Act merits.[8]

But the evidence in this case is not just HHIs or market shares—though those provide sufficient evidence for a structural presumption of a substantial lessening of competition—because, here, the United States set forth compelling evidence that HPE and Juniper were especially close competitors and that the merger was HPE's way of taking a major competitive threat off the field: "For years, pressure from Juniper has forced HPE to discount deeply and invest in developing advanced software products and features as part of a multifaceted campaign to 'Beat Mist.' The 'Beat Mist' campaign failed. Having failed to beat Juniper's Mist on the merits, HPE seeks to acquire Juniper instead for $14 billion." Complaint ¶ 2 (Dkt. 1). The Complaint discusses HPE's laser focus on Juniper as a competitive threat—monitoring Juniper's growth, creating "Beat Mist" initiatives and training programs, and innovating specifically to respond to Juniper technologies. *Id.* ¶¶ 8–10. HPE executives tracked their head-to-head wins in "street fights," as they worked to "KILL MIST!!!!!!!!!!!!!!!!!!!!!!! !!!!!!!!!!!!!!!!!!!!" *Id.* ¶ 11; *see also id.* ¶¶ 44–48. The fierce head-to-head competition between HPE and Juniper—from which consumers benefited for years—establishes a likelihood of success on the merits here. *See F.T.C. v. Staples, Inc.*, 190 F. Supp. 3d 100, 131 (D.D.C. 2016) ("Mergers that eliminate head-to-head competition between close competitors often result in a lessening of competition.").

Third, HPE argues that the States offer no evidence "that the remedies are insufficient." Opp.

---

[8] HPE seeks to weaponize its dilatory and obstructive tactics by complaining in one breath "[t]he States have not disproven HPE's evidence (or even *addressed* it)," Opp. at 16, while refusing to provide its underlying evidence in the next, *see* Joint Case Management Statement at 13 (Dkt. No. 337) ("It is HPE's position that no discovery should be conducted by parties or intervenors as part of the Court's Tunney Act review"). The Court recently asked HPE why it would not want to give the States their trial evidence—particularly if that evidence is as favorable as HPE says it is. Status Conf. Tr. at 21:9–14 (Dec. 16, 2025) ("[W]hy isn't it in your interest to . . . give that record to the States so that they can, you know, see if they agree that . . . you were ready to put on an incredibly fulsome defense of the merger if the case went to trial?").

at 16.  HPE has been steadfast that the Tunney Act inquiry requires no more than a comparison of the settlement to the Complaint.  Status Conf. Tr. at 17:20–23 (Dec. 16, 2025) (arguing review is limited to "comparing the remedies proposed in the settlement to the allegations in the complaint and determining whether it was a reasonable compromise").  That is wrong, as the States have argued elsewhere, but HPE fails even by that test.  *See* Mot. at 12–13.  The settlement, on its face, does nothing to remedy the "eliminat[ion]" of "fierce head-to-head competition between . . . the HPE Aruba and Juniper Mist brands."  Complaint ¶ 1 (Dkt. 1).  Instead, the settlement requires HPE to divest a distinct small business component—Instant On—never mentioned in the United States' Complaint or Pretrial Brief, and to license a "portion" of Mist's AIOps source code.  Mot. at 4–5; *see* Mot. Hr'g Tr. at 48:24-49:4 (Nov. 18, 2025) ("I was knee deep in the weeds of the parties' briefing on this issue; and I don't recall reading about Instant On at any point as I was going through the detailed discussions of the evidence that had been generated, the expert reports, the various entities that had been surveyed about their use of the various enterprise networking WLAN technology.").

Fourth, HPE argues that the "States' allegations about the settlement negotiations are irrelevant and meritless."  Opp. at 17.  HPE does not explain why the allegations of impropriety are "irrelevant," nor could they, as that question goes to the heart of the Tunney Act.  *See* Order Granting Motion for Intervention at 9 (Dkt. 332) ("Congress passed the Tunney Act in response to influence peddling, including in particular President Nixon's having ordered the Antitrust Division to settle challenges to an acquisition by International Telephone & Telegraph Corporation under questionable circumstances.").  That one of the most senior political appointees of the Antitrust Division said that DOJ officials "perverted justice and acted inconsistent with the rule of law" raises serious questions about whether any settlement reached in such a manner could be consistent with the public interest.  Motion for Intervention, Ex. 1, at 21–22 (Oct. 14, 2025) (Dkt. No. 236-2) ("I hope the court blocks the HPE/Juniper merger.  If you knew what I knew, you would hope so too.  Someday I may have the opportunity to say more.").  Those kinds of allegations likewise raise serious concerns as to whether the Settlement "bears the hallmarks of regularity and principled decision-making."  Order Granting Motion for Intervention at 9 (Dkt. 332).  And if the allegations

1   of impropriety were truly "meritless" as HPE claims, the Court might expect HPE to fight a little

2   less stridently against basic discovery into these questions.  *See* Status Conf. Tr. at 41:8–13 (Dec.

3   16, 2025) (Counsel for HPE: "I think the back and forth on settlement negotiations I think would be

4   -- those would be confidential settlement communications under Rule 408.  There may be other --

5   there may be other privileges that apply to them as well, but I think there are certainly going to be

6   some privileges that are applied to them.").

7       **B.  The Likelihood of Irreparable Harm.**

8          The States have an interest in protecting the benefits of competition within their borders and

9   for their business and consumer constituents.  HPE waves this interest away, saying that the States

10  must show harm to "themselves."  Opp. at 18.  But state attorneys general act to protect not just

11  themselves, but also their citizens and their economies.  These interests are affected, and irreparable

12  harm occurs, when an anticompetitive merger is consummated and significant head-to-head

13  competition is eliminated, as is the case here.  *See* Complaint ¶¶ 1, 12 (alleging "eliminat[ion]" of

14  "fierce head-to-head competition," which has "lowered prices and driven investment," and

15  "decrease[d] pressure on HPE to discount and innovate in the future").  HPE cavalierly dismisses

16  the States' interest here, but combatting anticompetitive conduct, including anticompetitive mergers,

17  is central to the work and responsibilities of state attorneys general.  *See* Order Granting Motion for

18  Intervention at 6 (Dkt. 332) (explaining that "states play an important, distinct role in antimerger

19  enforcement").  This Court has already rightly recognized that there is "undoubtedly a valid and

20  protectable state interest" in "preventing anticompetitive harms to their citizens [that] might be

21  impaired by HPE's acquisition of Juniper and the consequent loss of rivalry in the relevant market."

22  *Id.* at 7.

23         But the Court need not rely on "the states' special role in the country's antitrust system," *id.*

24  at 6, to recognize the irreparable harm here.  In *BNS*, the Court found it sufficient when a Tunney

25  Act "participant"—there, a private party—demonstrated "that serious questions exist regarding the

26  possibility of irreparable harm to competition in the . . . market" if the transaction were

27  consummated prior to final approval by the Court.  *BNS*, 858 F.2d at 464–65.  So too here.  As in

28  *BNS*, a hold separate order is warranted to prevent a merger from becoming a *fait accompli* before

1   a court completes its Tunney Act review of a proposed settlement.  *Id.* at 462 (noting that "harm

2   from the interim restraints of trade could be irreparable").  That risk is especially pronounced where,

3   as here, HPE has announced its intention to release new, integrated products in the coming months

4   and to shift consumers away from their "legacy Aruba" and "legacy Juniper" products, depriving

5   consumers of competitive choice, entrenching the combined entity for consumers, and making

6   unwinding the transaction more complicated.  The presence of these risks to competition presents

7   the likelihood of irreparable harm warranting a hold separate order.

8       **C.  The Balance of the Equities and the Public Interest.**

9       The balance of the equities and the public interest sharply favor the issuance of a hold

10  separate order.  HPE does not address the commonsense principle that "preservation of competition

11  is always in the public interest."  *United States v. Ivaco, Inc.*, 704 F. Supp. 1409, 1430 (W.D. Mich.

12  1989).  Instead, HPE complains of the private, pecuniary harm it may suffer from the delay of a few

13  months.  Opp. at 20–22.  But these private interests yield to the public's interest in effective

14  enforcement of the antitrust laws.  *See F.T.C. v. H.J. Heinz Co.*, 246 F.3d 708, 726–27 (D.C. Cir.

15  2001); *see also, e.g.*, *Weyerhaeuser*, 665 F.2d at 1083 ("Private equities do not outweigh effective

16  enforcement of the antitrust laws.").

17      Moreover, the Tunney Act recognizes that the public interest is served through meaningful

18  scrutiny of proposed settlements, to ensure such deals are not infected by the improper influence of

19  political favoritism.  *See* 119 Cong. Rec. 3453 (1973) ("Sunlight is the best of disinfectants," and

20  thus "sunlight . . . is required in the case of lobbying activities attempting to influence the

21  enforcement of the antitrust laws.").  Given the allegations of undue lobbying influence in reaching

22  the proposed settlement in this case, the public interest is further served by such proceedings here;

23  and the integrity of those proceedings is undermined if the parties are permitted to continue

24  integrating and to treat the merger as a *fait accompli*.

25      HPE even invokes the specter of "national security" to try to persuade the Court to press no

26  further.  *See* Opp. at 21–22.  HPE argues that it "currently provides products and services to the U.S.

27  intelligence and defense communities, and any effort to pause or reverse integration would

28  jeopardize HPE's ability to supply technology to these communities."  *Id.* at 22.  HPE offers no

support for this conclusory statement, nor does it withstand scrutiny. The United States does not suggest that so-called "national security" considerations played any role in consideration of the merger here. *See* Response of United States to Public Comments on the Proposed Final Judgment at 19 (Dkt. No. 311) ("The Tunney Act requires the Court to consider whether entry of the proposed Final Judgment is in the public interest based on its competitive impact, not national security or other justifications."). And former Deputy Assistant Attorney General for the Antitrust Division, Roger Alford, also dismissed those claims as not "serious" in recent congressional testimony:

> Representative Balint: I wanted to give you time to respond to my colleague from Wyoming about the national security concerns in the HPE/Juniper merger. Do you have—do you have something that you'd like to say on that?
>
> Former DAAG Alford: Yeah, so, it's interesting. The suggestion that this was really about national security is belied by the fact that it was never presented to the Antitrust Division as a serious argument. Obviously, it would've been the kind of thing that we would've considered had it been considered relevant. The Department of Justice right now in the hearings of the Tunney Act in California before the federal court have not mentioned, not one time, the national security argument. That's not even in any of the arguments. So they recognize that that's not the kind of thing that should have been a factor in the determination of whether or not to settle that case.[9]

In any event, there is no exception under Section 7 of the Clayton Act for companies that provide products and services to the U.S. intelligence and defense communities. Those customers, like any others, benefit from head-to-head competition in a dynamic marketplace.

## CONCLUSION

HPE complains that the injunction—or the ultimate unwinding of the transaction—may be disruptive to its business. Opp. at 20–21. That may be so. But HPE knowingly assumed that risk when it chose to begin integration efforts before the Court had the opportunity to engage in its necessary public interest review. *See US Airways Grp.*, 38 F. Supp. 3d at 83–84 ("As the United States points out, by choosing to close their merger prior to entry of the Final Judgment, Defendants have accepted the risk of undoing the merger should it prove necessary."). Regardless of the

---

[9] *Anti-American Antitrust: How Foreign Governments Target U.S. Businesses: Hearing before the H. Subcomm. on the Admin. State, Regul. Reform, and Antitrust*, 119th Cong. (2025), https://www.youtube.com/watch?v=Y5AO6BXTDbI (testimony of December 16, 2025, quoted passage at 1:21:06–1:21:58).

outcome of the instant Motion, if the Court rejects the Settlement as not in the public interest, and if the evidence shows that the merger would result in a substantial lessening of competition in violation of Section 7 of the Clayton Act, HPE may face the consequences of its choice to assume those risks. *See United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 329 (1961) ("The very words of s 7 suggest that an undoing of the acquisition is a natural remedy."); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 724 (4th Cir. 2021) (affirming order of divestiture in a post-merger challenge); *ProMedica Health Sys., Inc. v. F.T.C.*, 749 F.3d 559, 573 (6th Cir. 2014) (same); *Edstrom v. Anheuser-Busch InBev SA/NV*, 13-cv-1309, 2013 WL 5124149, at *7 (N.D. Cal. Sept. 13, 2013), *aff'd*, 647 F. App'x 733 (9th Cir. 2016) ("While practical difficulties may well be presented where, after consummation of a merger, a district court finds a proposed consent judgment is not in the public's interest, such court nonetheless retains the authority to take remedial action by, for example, an order of divestiture.").

Regardless of HPE's rush to integrate before the Settlement has even been reviewed, the Court can still order that any further integration efforts be put on hold. For the foregoing reasons, the States respectfully request that this Court grant the Motion and enter a hold separate order.

Dated: December 23, 2025

PHILIP J. WEISER
Attorney General

*/s/ Arthur Biller*
ARTHUR BILLER *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
JONATHAN B. SALLET *(Admitted Pro Hac Vice)*
Special Assistant Attorney General
ROBIN ALEXANDER (*Admitted Pro Hac Vice*)
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
    Bryn.Williams@coag.gov
    Jon.Sallet@coag.gov
    Robin.Alexander@coag.gov

*Attorneys for the State of Colorado*

ROB BONTA
Attorney General of California

*/s/ Brian D. Wang*
PAULA L. BLIZZARD, Senior Assistant Attorney
General (SBN 207920)
MICHAEL W. JORGENSON, Supervising Deputy
Attorney General (SBN 201145)
BRIAN D. WANG, Deputy Attorney General (SBN
284490)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
(415) 510-4400
Brian.Wang@doj.ca.gov

*Attorneys for the State of California*

WILLIAM TONG
ATTORNEY GENERAL

*/s/ Nicole Demers*
Nicole Demers (*pro hac vice application forthcoming*)
Deputy Associate Attorney General
Antitrust Section
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel.: (860) 808-5030
nicole.demers@ct.gov

*Attorneys for the State of Connecticut*

BRIAN SCHWALB
Attorney General of the District of Columbia

*/s/ Coty Montag*
Coty Montag (SBN 255703)
Deputy Attorney General, Public Advocacy Division
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001

- 16 -

Telephone: (202) 417-5402
Coty.Montag@dc.gov

*Attorneys for the District of Columbia*


ANNE E. LOPEZ
Attorney General

*/s/ Rodney I. Kimura*
RODNEY I. KIMURA *(Admitted Pro Hac Vice)*
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii. 96813
Telephone:  (808) 586-1180
Email:  Rodney.i.kimura@hawaii.gov

*Attorneys for State of Hawaii*


KWAME RAOUL
Attorney General of Illinois

*/s/ Paul J. Harper*
*(Admitted Pro Hac Vice)*

ELIZABETH L. MAXEINER
*(Admitted Pro Hac Vice)*
Chief, Antitrust Bureau
PAUL J. HARPER
Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street, 35th Floor
Chicago, Illinois 60603
773-590-7935 | elizabeth.maxeiner@ilag.gov
773-590-6837 | paul.harper@ilag.gov

*Attorneys for State of Illinois*


COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

*/s/ Anthony W. Mariano*
Anthony W. Mariano *(Admitted Pro Hac Vice)*
Chief, Antitrust Division
Office of the Massachusetts Attorney General

- 17 -

One Ashburton Place, 20th Floor
Boston, MA 02108
(781) 835-7990
Anthony.Mariano@mass.gov

*Attorneys for*
*Commonwealth of Massachusetts*


KEITH ELLISON
Attorney General

*/s/ Jon M. Woodruff*
*(Admitted Pro Hac Vice)*

ELIZABETH ODETTE *(Admitted Pro Hac Vice)*
Manager, Assistant Attorney General
Antitrust Division

JON M. WOODRUFF
Assistant Attorney General
Antitrust Division

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7425
elizabeth.odette@ag.state.mn.us
jon.woodruff@ag.state.mn.us

*Attorneys for State of Minnesota*


LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

*/s/ Elinor Hoffmann*
*(Admitted Pro Hac Vice)*

ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY McFARLANE
*(Admitted Pro Hac Vice)*
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ

- 18 -

1

*(Admitted Pro Hac Vice)*
Senior Enforcement Counsel, Antitrust Bureau

2

New York State Office of the Attorney General

3

28 Liberty Street
New York, NY 10005

4

Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

5

6

*Attorneys for State of New York*

7

8

JEFF JACKSON
Attorney General of North Carolina

9

*/s/ Kunal J. Choksi*

10

*(Admitted Pro Hac Vice)*

11

Kunal Janak Choksi
Senior Deputy Attorney General

12

North Carolina Department of Justice

13

114 W. Edenton St.
Raleigh, NC 27603

14

Telephone: (919) 716-6032
E-Mail: kchoksi@ncdoj.gov

15

16

*Attorneys for State of North Carolina*

17

18

Dan Rayfield
Attorney General of Oregon

19

*/s/ Rachel K. Sowray*

20

Rachel K. Sowray *(Admitted Pro Hac Vice)*

21

Senior Assistant Attorney General
Timothy D. Smith *(Admitted Pro Hac Vice)*

22

Attorney-in-Charge
Economic Justice Section

23

Oregon Department of Justice
100 SW Market St, Portland OR  97201

24

503.689.0249 | Rachel.Sowray@doj.oregon.gov

25

503.798.3297 | tim.smith@doj.oregon.gov

26

*Attorneys for State of Oregon*

27

28

NICHOLAS W. BROWN
Attorney General of Washington

- 19 -

1
2

*/s/ Amy N. L. Hanson*
*(Admitted Pro Hac Vice)*

3
4
5
6
7
8
9
10
11

JONATHAN A. MARK *(Admitted Pro Hac Vice)*
Antitrust Division Chief
AMY N.L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
Email: jonathan.mark@atg.wa.gov
Email: amy.hanson@atg.wa.gov
Tel: 206-389-3806 (Mark)
Tel: 206-464-5419 (Hanson)

*Attorneys for State of Washington*

12
13

JOSHUA L. KAUL
ATTORNEY GENERAL

14

*/s/Caitlin M. Madden*
Caitlin M. Madden *(Admitted Pro Hac Vice)*

15
16
17
18
19

Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-1311
caitlin.madden@wisdoj.gov

20

*Attorneys for State of Wisconsin*

21
22
23
24
25
26
27
28

Reply In Support of Motion for Hold Separate Order –
Case No. 5:25-cv-00951-PCP