HENRY C. SU (CA Bar 221202)
JEREMY M. GOLDSTEIN (CA Bar 324422)
MICHAEL G. LEPAGE (DC Bar 1618918)
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
henry.su@usdoj.gov
jeremy.goldstein@usdoj.gov
michael.lepage@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC.,<br><br>Defendants. | CASE NO. 5:25-cv-00951-PCP<br><br>**UNITED STATES' NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT**<br><br>Judge:        P. Casey Pitts<br>Action Filed:    January 30, 2025<br>Hearing Requested:  March 23, 2026<br>                 10:00 a.m. |

1

<u>TABLE OF CONTENTS</u>

2    NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT.......................1

3    MEMORANDUM OF POINTS AND AUTHORITIES ..................................................1

4    I.    OVERVIEW OF THE UNITED STATES' SETTLEMENT.................................1

5    II.    THE UNITED STATES' COMPLIANCE WITH THE TUNNEY ACT .............2

6    III.    STANDARD OF JUDICIAL REVIEW .................................................3

7    IV.    ENTRY OF THE AMENDED PROPOSED FINAL JUDGMENT IS IN

8        THE PUBLIC INTEREST........................................................................4

9        A.    The Mandatory Licensing of the Mist AI Ops Source Code Will

10            Address Competitive Concerns Raised in the Complaint..........................4

11        B.    The Divestiture of Instant On Will Address Competitive Concerns

12            Raised in the Complaint...................................................................6

13        C.    The Amended Proposed Final Judgment Satisfies All of the 16(e)(1)

14            Factors.........................................................................................8

15        D.    An Evidentiary Hearing Is Not Necessary or Appropriate. ........................9

16    V.    CONCLUSION.....................................................................................12

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Conservation Northwest v. Sherman,*
   715 F.3d 1181 (9th Cir. 2013) .................................................................................................. 9

5

*United States v. Armour & Co.,*
   402 U.S. 673 (1971) .................................................................................................................. 8

6

*United States v. Microsoft Corp.,*
   56 F.3d 1448 (D.C. Cir. 1995) ............................................................................................... 11

7

8

*United States v. Oregon,*
   913 F.2d 576 (9th Cir. 1990) ................................................................................................... 9

9

*United States v. SBC Commc'ns, Inc.,*
   489 F. Supp. 2d 1 (D.D.C. 2007) ........................................................................................... 10

10

11

*United States v. US Airways Group, Inc.,*
   38 F. Supp. 3d 69 (D.D.C. 2014) ........................................................................................... 11

12

**Statutes**

13

15 U.S.C. § 16(b) ............................................................................................................................ 1, 2

14

15 U.S.C. § 16(d) ............................................................................................................................ 2, 3

15

15 U.S.C. § 16(e) ................................................................................................................................. 1

16

15 U.S.C. § 16(e)(1) ....................................................................................................................... 3, 8

17

15 U.S.C. § 16(e)(1)(A) .................................................................................................................. 3, 8

18

15 U.S.C § 16(e)(1)(B) ....................................................................................................................... 9

19

15 U.S.C. § 16(e)(2) ....................................................................................................................... 3, 9

20

15 U.S.C. § 16(f)(1) .......................................................................................................................... 11

21

15 U.S.C. § 16(f)(2) .......................................................................................................................... 11

22

15 U.S.C. § 18 ................................................................................................................................. 1, 4

23

**Other Authorities**

24

90 Fed. Reg. 30,685 ............................................................................................................................ 2

25

90 Fed. Reg. 52,097 ............................................................................................................................ 3

26

119 Cong. Rec. 24,598 ...................................................................................................................... 12

27

H.R. Rep. No. 93–1463 ..................................................................................................................... 10

28

ii

1
S. Rep. No. 93–298 ................................................................................................................. 9
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES' NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951-PCP

**NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT**

PLEASE TAKE NOTICE that on Monday, March 23, 2026, at 10:00 a.m., or on such date and time as the Court may otherwise set, in the United States Courthouse, 280 South 1st Street, San Jose, California 95113, Courtroom 8, 4th Floor, the United States of America will move the Court, pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act, 15 U.S.C. § 16(b) ("Tunney Act"), to enter the proposed Final Judgment filed in this civil antitrust proceeding on June 27, 2025 (Dkt. No. 217-1), as amended on November 14, 2025 (Dkt. No. 311-2) (attached as Exhibit A).

The amended proposed Final Judgment may be entered at this time without further proceedings if the Court determines that entry is in the public interest. 15 U.S.C. § 16(e). The Competitive Impact Statement and Response of the United States to Public Comments on the Proposed Final Judgment ("Response to Public Comments") filed in this matter on June 27, 2025, and November 14, 2025, respectively, (Dkt. Nos. 217-2 and 311) explain why entry of the amended proposed Final Judgment is in the public interest. The United States is also filing a Certificate of Compliance (attached as Exhibit B) attesting that the parties have complied with all applicable provisions of the Tunney Act and certifying that the United States has satisfied the 60-day statutory public comment period requirement. 15 U.S.C. § 16(b).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      OVERVIEW OF THE UNITED STATES' SETTLEMENT**

On January 30, 2025, the United States filed a civil antitrust Complaint seeking to enjoin the proposed acquisition of Juniper Networks, Inc. ("Juniper") by Hewlett Packard Enterprise Co. ("HPE") (collectively, "Defendants"). The Complaint alleges that the likely effect of this acquisition would be to substantially lessen competition in the market for enterprise-grade wireless local area networking ("WLAN") solutions in the United States, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This loss of head-to-head competition between the companies likely would result in higher prices and less innovation in the relevant market.

On June 27, 2025, the United States and Defendants informed the Court that they had reached a settlement of the United States' claim. The United States filed an Asset Preservation

and Hold Separate Stipulation and Order ("Stipulation and Order"), a proposed Final Judgment, and a Competitive Impact Statement describing the events giving rise to the alleged violation and explaining the proposed consent judgment, including the relief to be obtained and its anticipated effects on competition. Dkt. No. 217. The Stipulation and Order, which was agreed to by the parties and entered by the Court on June 30, 2025 (Dkt. No. 220), provides that the proposed Final Judgment may be entered by the Court once the requirements of the Tunney Act have been met. The amended proposed Final Judgment requires Defendants, among other things, to divest HPE's "Instant On" WLAN solution and license source code for Juniper's Mist AI Ops capabilities to one or more third parties, who would then use these assets to compete in the United States market for enterprise-grade WLAN solutions. Entry of the amended proposed Final Judgment will terminate this action, except that the Court will retain jurisdiction to construe, modify, or enforce the provisions of the Final Judgment and to punish violations thereof.

## II.    THE UNITED STATES' COMPLIANCE WITH THE TUNNEY ACT

The Certificate of Compliance filed with this Motion and Memorandum attests that all the requirements of the Tunney Act have been satisfied. In particular, the Tunney Act requires a period of at least 60 days for the submission of written comments relating to the proposed Final Judgment. 15 U.S.C. § 16(b). In compliance with the Tunney Act, the United States filed the proposed Final Judgment and the Competitive Impact Statement with the Court on June 27, 2025; published the proposed Final Judgment and the Competitive Impact Statement in the *Federal Register* on July 10, 2025 (*see* 90 Fed. Reg. 30,685 (July 10, 2025)); and caused a summary of the terms of the proposed Final Judgment and the Competitive Impact Statement, along with directions for the submission of written comments, to be published in *The Washington Post* and *Mercury News* for seven days beginning on July 9, 2025.

The United States received twelve comments. As required by 15 U.S.C. § 16(d), the United States filed a Response to Public Comments on November 14, 2025 (Dkt. No. 311), along with an amended proposed Final Judgment (Dkt. No. 311-2). As authorized by 15 U.S.C. § 16(d) and the Court's Order Granting Administrative Motion in Part, on September 24, 2025 (Dkt.

2

No. 234), the United States published in the *Federal Register* its Response to Public Comments, the location on the Antitrust Division's website at which the public comments are accessible, the identity of each person or entity that submitted a comment, the total number of comments received, and a summary of the content of the comments, including the total number of comments supporting or opposing approval of the proposed settlement (*see* 90 Fed. Reg. 52,097 (Nov. 19, 2025)).

### III.    STANDARD OF JUDICIAL REVIEW

Before entering the amended proposed Final Judgment, the Tunney Act requires the Court to determine whether entry "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the Court, in accordance with the statute as amended in 2004, "shall consider":

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) and (B). Section 2(e)(2) of the Tunney Act states that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2).

In its Competitive Impact Statement and Response to Public Comments, the United States discussed the meaning and the proper application of the public interest standard under the Tunney Act to the amended proposed Final Judgment and now incorporates that discussion by reference. *See*, *e.g.*, Dkt. No. 311 at 10–12, 13-14, 19–22, 25-31.

1

2

### IV.    ENTRY OF THE AMENDED PROPOSED FINAL JUDGMENT IS IN THE PUBLIC INTEREST

3    The United States alleged in its Complaint that HPE's acquisition of Juniper would

4 substantially lessen competition in the United States market for enterprise-grade WLAN

5 solutions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. As explained in more

6 detail in the Competitive Impact Statement and the Response to Public Comments, the amended

7 proposed Final Judgment addresses the likely anticompetitive effects of the acquisition alleged

8 by the United States by requiring Defendants, among other things, to license source code for

9 Juniper's Mist AI Ops capabilities and divest HPE's "Instant On" WLAN solution to one or

10 more third parties, who would use these assets to compete in the United States market for

11 enterprise-grade WLAN solutions. The public, including affected competitors and customers, has

12 had an opportunity to comment on the proposed Final Judgment, and the United States has duly

13 considered those comments and amended the proposed Final Judgment in the process.

14 Accordingly, as explained in more detail in the Competitive Impact Statement and the Response

15 to Public Comments, entry of the amended proposed Final Judgment is in the public interest.

16    **A.    The Mandatory Licensing of the Mist AI Ops Source Code Will Address Competitive Concerns Raised in the Complaint.**

17

18    The mandatory licensing of the Mist AI Ops source code provides multiple firms access

19 to the very technology that enabled Juniper to spur price and product innovation, *see* Dkt. No. 1

20 ¶¶ 6–11, 44–48, allowing them to develop competing solutions for the relevant market. Artificial

21 intelligence and machine learning tools, known colloquially as "AI Ops," are popular features in

22 enterprise-grade WLAN solutions because they simplify and automate network maintenance. *Id.*

23 ¶¶ 6–7. The tools can materially decrease the cost of operating a wireless network, and they often

24 include conversational virtual assistants that can increase the productivity of network

25 administrators and software that proactively searches for network misconfigurations and other

26 issues before they cause network outages. *Id.* ¶ 7. As the Complaint alleges, Juniper invested in

27 Mist's AI Ops capabilities to competitively differentiate its enterprise-grade WLAN solutions.

28 *Id.* ¶¶ 6–7. Since 2019, Juniper has leveraged that technology to increase its revenues and market

4

1  share, forcing HPE to compete more aggressively in response, including by investing resources

2  into further developing its own AI Ops offerings. *Id.* ¶¶ 8–11.

3        The amended proposed Final Judgment requires that within 180 calendar days after the

4  filing of the proposed Final Judgment, or five days after the entry of the Final Judgment,

5  whichever is later, HPE must hold an auction to issue one or more perpetual, worldwide, non-

6  exclusive licenses for the Mist AI Ops source code. *See* Dkt. No. 311-2 at 10. In response to a

7  public comment, the amended proposed Final Judgment includes more detailed information

8  delineating the metes and bounds of the source code that will be licensed, specifying that it

9  "includes the source code for proactively monitoring and analyzing wireless networks to pinpoint

10  and address specific areas of network performance that fall below set standards defined as

11  service level expectations." *Id.* at 3.

12        The amended proposed Final Judgment also takes steps to ensure the success of the

13  auction of Mist AI Ops by permitting the primary licensee to contract with HPE for transition

14  services, including the transfer of up to 30 engineers familiar with the source code and 25 sales

15  personnel experienced in selling Juniper's enterprise-grade WLAN solutions.  *Id.* at 11. HPE

16  must facilitate introductions for the primary licensee to Juniper's suppliers, distributors, and

17  channel partners in the United States. *Id.* at 12. These transition services will provide the primary

18  licensee with the expertise and support needed to fully integrate the Mist AI Ops source code

19  into its product lines and develop new business opportunities.

20        The amended proposed Final Judgment also provides for the appointment of a Trustee

21  should HPE not license the source code in a timely manner. *Id.* at 13–17. The United States

22  reserves the absolute right to reject any proposed licensee. *Id.* at 10. In response to public

23  comments, the amended proposed Final Judgment includes language stating that the source code

24  must be licensed to companies that have "the intent and capability, including the necessary

25  managerial, operational, technical, and financial capability, to compete effectively in the market

26  for the provision of enterprise-grade WLAN solutions in the United States." *Id.* at 19. Further,

27  the licensees must satisfy the United States that they will use the source code to compete in the

28  enterprise-grade WLAN market. *Id.* at 18-19.

1    Requiring the licensing of a key ingredient of Juniper's competitive success to one or

2    more companies that can compete in the market for enterprise-grade WLAN solutions should

3    preserve competition and innovation in that market. Developing network management software

4    requires significant resources and time. Between 2021 and 2024, for instance, HPE had 80 to 100

5    employees working on Project Gravity, its attempt to improve Aruba Central's user interface and

6    user experience by, among other things, investing in the further development of AI Ops. *See* Dkt.

7    No. 202-2 ¶¶ 131–35. The Mist AI Ops auction allows one or more firms to bring to market a

8    competitive network management solution without expending the time and resources required to

9    develop related artificial intelligence and machine learning tools from scratch. Moreover,

10   because licensees have the right to further modify the licensed source code for their networking

11   products, they will exclusively own such improvements and derivative works developed after the

12   license date—a provision that will encourage additional innovation in the market. *See* Dkt.

13   No. 311-2 at 13.

14   **B.    The Divestiture of Instant On Will Address Competitive Concerns Raised in**

15   **the Complaint.**

16   The divestiture of HPE's Instant On—a fully operational enterprise-grade WLAN

17   business including hardware, software, and intellectual property—will also create or strengthen

18   an independent competitor in the relevant market. Although it is not specifically mentioned in

19   the Parties' Pretrial Briefs, the Instant On business operates in the relevant market for enterprise-

20   grade WLAN solutions alleged in the Complaint. *See* Dkt. No. 1 ¶¶ 34–38. Its divestiture to a

21   company that is competing or can compete in the relevant market should create opportunities for

22   business growth, product innovation, and increased competition in that market—whether for

23   small, medium, or large enterprise customers.

24   The amended proposed Final Judgment helps to ensure the success of the divestiture by

25   mandating divestiture of *all* tangible and intangible assets related to or used in connection with

26   this business, including contracts, agreements, and customer relationships included in the

27   business. *See* Dkt. No. 311-2 at 5. The United States has sole discretion on whether to accept any

28   divestiture buyer. *Id.* In response to a public comment, the amended proposed Final Judgment

6

now includes language stating that the divestiture of Instant On must be made to an acquiring

company that has "the intent and capability, including the necessary managerial, operational,

technical, and financial capability, to compete effectively in the market for the provision of

enterprise-grade WLAN solutions in the United States…" *Id.* at 19. Further, the divestiture

acquirer must satisfy the United States that it will use the Instant On assets to compete in the

enterprise-grade WLAN market. *Id.* In the event that HPE does not timely divest Instant On, the

amended proposed Final Judgment provides that the Court will appoint a Divestiture Trustee

selected by the United States to sell the business. *Id.* at 6.

While Instant On is marketed today primarily at small and medium enterprises, the

divestiture buyer of Instant On will receive code for some additional features not currently

available in HPE's offering (such as location services, automatic quality of service, and firewall

capabilities) that are common in WLAN offerings for larger enterprises. *See* Dkt. No. 298-3

¶¶ 6–7. The buyer could add those and other features to Instant On to make it more competitive

for large enterprise customers or integrate Instant On into its existing products for such

customers. *Id.* ¶¶ 7–9.

In addition, over the years, WLAN vendors that were more successful in specific

segments of the U.S. market for enterprise-grade WLAN solutions have expanded their offerings

to compete more effectively in other segments. For example, Ubiquiti Inc. historically focused

on smaller or mid-market enterprises but has recently tried to expand its footprint in the large-

enterprise segment of the market. *See* Dkt. No. 311 at 15–16. A similar progression followed

Cisco's acquisition in 2012 of Meraki, an enterprise-grade WLAN product initially popular with

small and medium-sized businesses that Cisco later successfully marketed to larger enterprises.

*Id.*; Dkt. No. 298-3 ¶ 10.

Furthermore, some large, distributed enterprises purchase solutions designed for smaller

enterprises. For example, many hotels forgo installation of sophisticated, feature-rich WLAN

solutions in individual hotel rooms and turn instead to products that support fewer devices across

a smaller geographic area. Instant On may be a useful solution for those customers. *See* Dkt. No.

298-3 ¶ 6. Accordingly, even if Instant On's new owner initially continues to market the product

7

1  as a small-business solution, that company's success with smaller or medium enterprises could

2  provide a foundation for later success with larger and more sophisticated enterprises.

3    **C.    The Amended Proposed Final Judgment Satisfies All of the 16(e)(1) Factors.**

4        The amended proposed Final Judgment satisfies each of the factors the Court "shall

5  consider" in performing a public interest analysis under the Tunney Act. *See supra* Section III

6  (quoting factors set forth in 15 U.S.C. § 16(e)(1)). Starting with the factors in

7  Section 16(e)(1)(A), the amended proposed Final Judgment is reasonably expected to achieve the

8  desired competitive impact because it contains clear and robust provisions for implementation,

9  enforcement, and modification. Indeed, in response to public comments, the United States

10  clarified the scope of the licensing and divestiture and enhanced the implementation and

11  enforcement provisions. *See* Dkt. No. 311-2 at 3, 18–20, & 22–23. Specifically, the amended

12  proposed Final Judgment requires HPE to use its best efforts to effectuate the licensing and

13  divestiture and to refrain from doing anything that would hamper or interfere with a licensee or

14  divestiture buyer's ability to compete effectively in the relevant market. *Id.* at 18–19. Moreover,

15  should HPE violate the amended proposed Final Judgment, the United States may seek an

16  extension of the judgment, contempt sanctions, and recovery of attorney's fees and other

17  expenses. *Id.* at 23. The amended proposed Final Judgment also is in force for ten years, an

18  appropriate duration. *Id.* at 23–24. The terms of the judgment are clear. Indeed, some terms were

19  made clearer in response to public comments. *See id.* at 3 (providing more detailed description of

20  metes and bounds of "AI Ops for Mist Source Code" in Section II.F).

21        Further, the amended proposed Final Judgment is superior to the alternative remedy that

22  was actually considered by the United States: a trial on the merits with an uncertain outcome. *See*

23  Dkt. No. 217-2, at 12–13 (§ VI). While the United States outlined a strong case-in-chief in its

24  pre-trial briefing, *see* Dkt. No. 202, and believed the facts justified enjoining the merger, there

25  was no guarantee that the Court would agree. At the same time, Defendants outlined a substantial

26  defense in their filings. *See* Dkt. Nos. 200–201. In such scenarios, settlements serve the public

27  interest by securing tangible protections rather than gambling on an all-or-nothing trial that could

28  leave consumers with no relief. *See United States v. Armour & Co.*, 402 U.S. 673, 681 (1971)

8

1  ("[a consent judgment] normally embodies a compromise; in exchange for the saving of cost and

2  elimination of risk, the parties each give up something they might have won had they proceeded

3  with the litigation."); *Conservation Northwest v. Sherman,* 715 F.3d 1181, 1185 (9th Cir. 2013)

4  ("a consent [judgment] typically represents an amalgam of delicate balancing, gross

5  approximations, and rough justice") (internal quotation marks omitted). Requiring the United

6  States to reject reasonable settlements and litigate every case to conclusion—even those where

7  success is uncertain—would waste scarce government and private resources, delay benefits to

8  consumers, and create perverse incentives that discourage enforcement of mergers with less-

9  than-certain violations. For these and other reasons, the Court "need only be satisfied that the

10  [consent judgment] represents a reasonable factual and legal determination." *United States v.*

11  *Oregon*, 913 F.2d 576, 581 (9th Cir. 1990) (internal quotation marks omitted).

12      Turning to the factors under Section 16(e)(1)(B), entry of the amended proposed Final

13  Judgment will address the competitive harms from the acquisition and preserve competition in

14  the relevant market for enterprise-grade WLAN solutions alleged in the Complaint. Both the

15  licensing of the Mist AI Ops source code and the divestiture of Instant On will enable one or

16  more third parties to compete in the relevant market, whether through enhancement, entry, or

17  repositioning. Customers in the relevant market and the public more generally will benefit from

18  the continuing competition and innovation with respect to enterprise-grade WLAN solutions.

19  Notably, during the public comment period, *not a single* major customer, competitor, or other

20  market participant voiced any objections to the proposed Final Judgment.

21      **D.    An Evidentiary Hearing Is Not Necessary or Appropriate.**

22      The Court should decline the proposal from the State Intervenors ("the States") to hold an

23  evidentiary hearing with witness testimony. *See* 15 U.S.C. § 16(e)(2) (stating that "[n]othing in

24  this section shall be construed to require the court to conduct an evidentiary hearing"). Congress

25  intended for courts to hold Tunney Act evidentiary hearings only when additional factual

26  development from live witness testimony is "imperative." *See* S. Rep. No. 93–298, at 6 (1973)

27  ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral

28  arguments, this is the approach that should be utilized. Only where it is imperative that the court

9

1  should resort to calling witnesses for the purpose of eliciting additional facts should it do so.");

2  H.R. Rep. No. 93–1463, at 8 (1974) (indicating agreement with the views in the Senate report).

3  That is not the case here. Unlike most prior Tunney Act proceedings, the Court has ordered the

4  United States to provide the States with the pretrial record that was submitted to the Court. *See*

5  Dkt. No. 350 at 5–6. This record will equip the States with a far broader resource of information

6  about the United States' claims than has been available in any prior Tunney Act proceeding.

7  Indeed, most Tunney Act proceedings are resolved without discovery or a developed evidentiary

8  record, as proposed final judgments are typically presented to the court before discovery occurs.

9  Here, the States will be able to use the evidence in the parties' extensive pretrial submissions to

10  the Court to make any arguments they wish regarding the adequacy of the amended proposed

11  Final Judgment. An evidentiary hearing is therefore unnecessary to address the issues that the

12  Court identified in its December 31, 2025 Order as core to this Tunney Act proceeding. *See* Dkt.

13  No. 350 at 3–4 (recognizing that the Court's Tunney Act review should "focus[] primarily on the

14  proposed judgment's competitive effect").

15       Indeed, it is unclear what an evidentiary hearing could add. In conducting its Tunney Act

16  review, the Court can examine extensive written submissions relating to the amended proposed

17  Final Judgment and the underlying matter, including the original Complaint, the Competitive

18  Impact Statement, the twelve comments filed by members of the public, and the United States's

19  Response to Public Comments. Unlike in most Tunney Act proceedings, the Court will also have

20  the benefit of additional submissions from the United States, HPE, and the States. Those

21  submissions afford the States, in particular, an opportunity to highlight for the Court any

22  evidence in support of their position, including declarations from any witnesses they may choose

23  to obtain. Should the Court determine that it still needs additional information before making its

24  public interest determination, it may request additional briefing or evidentiary submissions from

25  the United States, HPE, and the States on specific questions. *See United States v. SBC*

26  *Commc'ns, Inc.*, 489 F. Supp. 2d 1, 9–10 (D.D.C. 2007) (forgoing evidentiary hearing and

27  inviting supplemental evidentiary submissions and briefing from the United States, merging

28

UNITED STATES' NOTICE OF MOTION AND MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951-PCP

1    parties, and *amici*). And, if need be, any remaining questions from the Court could be answered

2    at a subsequent hearing by counsel for the United States, HPE, or the States.

3         Three months after seeking intervention, however, the States have shown little inclination

4    to focus on the issues that the Court has identified as core to this Tunney Act proceeding. They

5    have yet to identify any experts, industry participants, or other individuals whose live testimony

6    at an evidentiary hearing would be necessary for the Court to evaluate the competitive impact of

7    the amended proposed Final Judgment. *Cf.* 15 U.S.C. §§ 16(f)(1) (court may obtain "testimony

8    of . . . experts or such other expert witnesses"), 16(f)(2) (court may "request and obtain the

9    views, evaluations, or advice of any individual, group or agency of government with respect to

10   any aspects of the proposed judgment or the effect of such judgment"). Instead, the States have

11   signaled, both in their briefing and in initial discovery requests, that they wish to focus any

12   evidentiary hearing on allegations of lobbying and the Department of Justice's internal decision-

13   making process. For example, on December 22, 2025, the States gave notice to the United States

14   and HPE that they are issuing document and deposition subpoenas to six individuals who have

15   been mentioned in news reports about alleged lobbying in relation to this case. *See* Dkt. No. 337

16   at 24 (stating that the Court should hear from witnesses regarding alleged lobbying in relation to

17   the settlement). But as the Court correctly stated in its December 31, 2025 Order, these concerns

18   "fall largely outside the scope of the Tunney Act," which does not "mandate a probing judicial

19   inquiry into the Department of Justice's internal decision-making process, which could give rise

20   to substantial privilege and separation-of-powers concerns." [1] Dkt. No. 350 at 4–5 and n.2; *see*

21   *also United States v. Microsoft Corp.,* 56 F.3d 1448, 1459 (D.C. Cir. 1995) ("To be sure, the Act

22   also authorizes the district judge to take testimony of Government officials . . . as the court may

23   deem appropriate. We do not read this language, however, to authorize the district judge to seek

24   the kind of information concerning the government's investigation and settlement negotiations

25   _____

26   [1] Similarly, the court in *United States v. US Airways Group, Inc.*, 38 F. Supp. 3d 69 (D.D.C. 2014),
     confronting allegations of lobbying, determined that an evidentiary hearing was not necessary and
27   focused its public interest analysis on what the Tunney Act directed it to consider: the substance
     and competitive impact of the proposed consent judgment. *See* Dkt. No. 337 at 9–10 (discussing
28   *US Airways* and that court's Tunney Act proceeding).

1   that he wished to obtain here.") (internal citations omitted). Calling Department of Justice

2   officials at an evidentiary hearing, if that is the States' intent, would guarantee substantial

3   disputes—and to no purpose, since the type of deliberative-process testimony the States

4   apparently seek would be far afield from the narrow issues the Tunney Act places before the

5   Court, as this Court has already properly recognized. *See* Dkt. No. 350 at 4–5 and n.2.

6       In the absence of indications that the States will focus an evidentiary hearing on relevant

7   issues, and with the benefit of extensive written submissions, the Court should decline to hold an

8   evidentiary hearing that would inconvenience witnesses, consume party and judicial resources,

9   and undermine the Tunney Act's goal of promoting the continued use of consent judgments as a

10  tool of antitrust enforcement. [2] *See* 119 Cong. Rec. 24,598 (1973) (stmt. of Sen. Tunney) ("The

11  court is nowhere compelled to go to trial or to engage in extended proceedings which might have

12  the effect of vitiating the benefits of prompt and less costly settlement through the consent

13  [judgment] process.").

14  **V.    CONCLUSION**

15      For the reasons set forth in this Motion and Memorandum, the Competitive Impact

16  Statement, and the Response to Public Comments, the United States respectfully requests that the

17  Court find that the amended proposed Final Judgment is in the public interest and enter the

18  amended proposed Final Judgment.

19

20

21

22

23

24

25

26

---

27  [2] While the United States maintains that an evidentiary hearing is not necessary, should the Court

28  decide to hold one, the United States requests that the Court conduct any questioning to ensure that the hearing remains focused on the competitive impact of the amended proposed Final Judgment.

Dated: January 5, 2026

*/s/ Henry C. Su*
HENRY C. SU (CA Bar # 211202)
Senior Litigation Counsel
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (212) 213-2774
Fax: (202) 514-5847
henry.su@usdoj.gov

ELIZABETH S. JENSEN (CA Bar # 302355)
Assistant Civil Chief, San Francisco Office

JEREMY M. GOLDSTEIN (CA Bar # 324422)
MICHAEL G. LEPAGE (DC Bar # 1618918)
Trial Attorneys
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 229-2934
Email: Jeremy.Goldstein@usdoj.gov

*Attorney for Plaintiff*
UNITED STATES OF AMERICA

1

**ATTORNEY ATTESTATION**

2

      I, Jeremy M. Goldstein, am the ECF user whose identification and password are being used

3

to file the United States' Notice of Motion and Motion for Entry of Final Judgment.  In compliance

4

with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

5

6

                           */s/  Jeremy M. Goldstein*
                           Jeremy M. Goldstein

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28