1  SAMUEL G. LIVERSIDGE (Bar No. 180578)
2  ERIC VANDEVELDE (Bar No. 240699)
   DANIEL NOWICKI (Bar No. 304716)
3  **GIBSON, DUNN & CRUTCHER LLP**
   333 South Grand Avenue
4  Los Angeles, California 90071
   Telephone: (213) 229-7000
5  SLiversidge@gibsondunn.com
   EVandevelde@gibsondunn.com
6  DNowicki@gibsondunn.com

7

8  JULIE S. ELMER (*pro hac vice*)
   JENNIFER MELLOTT (*pro hac vice*)
9  **FRESHFIELDS US LLP**
   700 13th St NW
10 Washington, DC 20005
   Telephone: (202) 777-4500
11 julie.elmer@freshfields.com
   jennifer.mellott@freshfields.com
12

13

14 *Attorneys for Defendant*
   HEWLETT PACKARD ENTERPRISE CO.
15
   [Additional counsel listed on signature
16 page]

17

18            **UNITED STATES DISTRICT COURT**

19            **NORTHERN DISTRICT OF CALIFORNIA**

20                  **SAN JOSE DIVISION**

21 UNITED STATES OF AMERICA,              CASE NO. 5:25-cv-00951-PCP

22              *Plaintiff,*

23          v.                             **HEWLETT PACKARD ENTERPRISE
                                           CO.'S STATEMENT IN SUPPORT OF
24 HEWLETT PACKARD ENTERPRISE CO.          THE MOTION FOR ENTRY OF FINAL
   and JUNIPER NETWORKS, INC.,             JUDGMENT**
25
               *Defendants.*
26                                         Judge:        P. Casey Pitts
                                           Action Filed: January 30, 2025
27
            ___***PUBLIC REDACTED VERSION SOUGHT TO BE SEALED***___
28

---

1

2

## **TABLE OF CONTENTS**

3

I.     INTRODUCTION ................................................................................................1

4

II.    BACKGROUND ................................................................................................3

5

       A.     HPE and Juniper Announce Merger to Combine Complementary Offerings .........3

6

       B.     DOJ Sues Over WLAN Market, But Evidence Shows Extensive Competition ......4

7

       C.     Parties Settle on Terms Directly Addressing the Complaint's Allegations .............5

8

       D.     The States Parrot the Innuendo of a Disgruntled Former DOJ Appointee .............5

9

       E.     The DOJ Addresses the Few Comments It Did Receive .........................................6

10

III.   ARGUMENT ................................................................................................8

11

       A.     The Scope of The Tunney Act Inquiry .....................................................................8

12

       B.     The Remedies Are More Than Sufficient, Given The Lack of Harm to

13              Competition .............................................................................................................11

14

              1.     The Merger Is Procompetitive and Did Not Harm Competition ...............11

15

              2.     The Remedies Address the DOJ's Antitrust Concerns .............................15

16

              3.     The Tunney Act Factors All Support Approval of the Settlement And
                     APFJ .........................................................................................................19

17

       C.     The Settlement Benefits the Public Interest By Strengthening National

18              Security ....................................................................................................................20

19

       D.     The Settlement Negotiations Are Irrelevant, and Were Proper in Any Event .......22

20

              1.     The Negotiations Are Irrelevant ...............................................................22

21

              2.     The Negotiation Process Was Completely Appropriate ...........................23

22

       E.     An Evidentiary Hearing Is Not Necessary or Appropriate. ...................................25

23

IV.    CONCLUSION ................................................................................................25

24

25

26

27

28

1

## TABLE OF AUTHORITIES
### Cases

2

3
*FCC v. Consumers' Rsch.*,
   606 U.S. 656 (2025)........................................................................................ 8

4
*FTC v. IQVIA Holdings Inc.*,
   710 F. Supp. 3d 329 (S.D.N.Y. 2024)........................................................... 14
5

6
*FTC v. Qualcomm*,
   No. 19-16122 (9th Cir.), ECF 86 ................................................................ 21

7
*FTC v. Tenet Health Care Corp.*,
   186 F.3d 1045 (8th Cir. 1999) ..................................................................... 14
8

9
*NAACP v. FPC*,
   425 U.S. 662 (1976)......................................................................................... 8

10
*S.E.C. v. Randolph*,
   736 F.2d 525 (9th Cir. 1984) ....................................................................... 10
11

12
*United States v. Abitibi-Consol. Inc.*,
   584 F. Supp. 2d 162 (D.D.C. 2008) ............................................................... 9

13
*United States v. Enova Corp.*,
   107 F. Supp. 2d 10 (D.D.C. 2000) ................................................................. 9
14

15
*United States v. Philadelphia National Bank*,
   374 U.S. 321 (1963)................................................................................... 1, 4

16
*United States v. Republic Servs., Inc.*,
   723 F. Supp. 2d 157 (D.D.C. 2010) ............................................................... 9
17

18
*US v. Armour & Co.*,
   402 U.S. 673 (1971)......................................................................................... 9

19
*US v. AT&T.*,
   552 F. Supp. 131 (D.D.C. 1982) ........................................................ 10, 21, 23
20

21
*US v. Bechtel Corp.*,
   648 F.2d 660 (9th Cir. 1981) ...................................................... 8, 10, 11, 23

22
*US v. City of Miami*,
   664 F.2d 435 (5th Cir. 1981) ....................................................................... 10
23

24
*US v. Gillette Co.*,
   406 F. Supp. 713 (D. Mass. 1975) ............................................................... 10

25
*US v. Iron Mountain, Inc.*,
   217 F. Supp. 3d 146 (D.D.C. 2016) ............................................................. 10
26

27
*US v. Microsoft*,
   56 F.3d 1448 (D.C. Cir. 1995) ..................................................................... 10

28

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

*US v. National Broadcasting Co.,*
    449 F. Supp. 1127 (C.D. Cal. 1978) ............................................................. 8, 10, 11

*US v. SBC Commc'ns, Inc.,*
    489 F. Supp. 2d 1 (D.D.C. 2007) ..................................................................... 9, 10

*US v. State of Or.,*
    913 F.2d 576 (9th Cir. 1990) ................................................................................ 10

*US v. Syufy Enters.,*
    903 F.2d 659 (9th Cir. 1990) ................................................................................ 14

*US v. US Airways Grp., Inc.,*
    38 F. Supp. 3d 69 (D.D.C. 2014) ............................................................. 9, 10, 23

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ..................................................................................................... 21

**Statutes**

15 U.S.C. § 16 ................................................................................................. 8, 19, 22

**Other Authorities**

119 Cong. Rec. 24,598 (1973) ................................................................................ 25

H.R.Rep. No. 93–1463 .......................................................................................... 9, 10

S.Rep. No. 93–298 ............................................................................................ 9, 10, 25

**Regulations**

90 Fed. Reg. 30685 (July 10, 2025) .......................................................................... 5

iv

I.     **INTRODUCTION**

Two years ago, Hewlett Packard Enterprise Co. and Juniper Networks agreed to merge to create a world-class networking company capable of competing across the entire networking industry. HPE and Juniper had traditionally specialized in different but complementary areas of technology, with HPE focusing on infrastructure, such as servers and storage devices, while Juniper excelled in routers and data center switches. By uniting HPE and Juniper's diverse and complementary product portfolios, the deal was intended to deliver a wider range of products to more customers at lower cost, supercharge innovation by combining HPE and Juniper's R&D capabilities, and challenge the entrenched networking market leader, Cisco. Cisco has used its broad product portfolio—which offers solutions across the whole networking "stack"—to dominate the networking industry for years, and the merger offered a powerful new alternative to Cisco for customers looking for products that meet all their needs. Similarly, on a global scale, the combination of HPE and Juniper would increase competition with Huawei—a company subsidized and compromised by the Chinese government that uses its full stack offerings to take over data centers of important U.S. international partners.

Participants in the networking business—customers, competitors, and commentators— welcomed the merger, and were excited about the prospect of a more powerful competitor to Cisco (and Huawei). Regulators across the globe unanimously approved the merger, recognizing its procompetitive nature. But in the U.S., after a prolonged investigation, the DOJ, under the new administration, chose to sue. The DOJ's lawsuit was fundamentally flawed from the get-go—it ignored the merger's procompetitive benefits, and the robust competition in the enterprise WLAN market, the single market the DOJ focused on. HPE and Juniper, together, had only a 25% market share in the enterprise WLAN market (compared to Cisco's ~50%, and under the 30% threshold set by the Supreme Court in *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963); the enterprise WLAN market has at least eight other substantial competitive players (several with market caps many times the size of the combined HPE-Juniper); and there was no indication that the fierce competition in the market would decrease because HPE and Juniper were combining.

HPE vigorously contested the DOJ's case—pointing out both the lack of competitive harm and the abundant benefits to competition that the merger would offer, particularly by weakening the

1

1   power of Cisco as the entrenched monopolist.  HPE also explained to the DOJ the importance of the

2   transaction to U.S. national security interests, given that the deal would strengthen HPE's ability to

3   provide innovative products to the U.S. Government and compete with Huawei globally.  As a result

4   of negotiations between HPE and the DOJ that spanned several months, and after completion of

5   discovery and pre-trial filings, the parties entered into a settlement agreement to resolve the DOJ's

6   concerns.  HPE agreed to remedies that directly addressed the DOJ's allegations, agreeing to: (1)

7   license the source code for Juniper's AIOps software for WLAN to at least one, and potentially two,

8   competitors (removing the concern that HPE was acquiring Juniper's AIOps WLAN technology so

9   it would not have to compete with it); and (2) divest its Instant On networking business, which

10   includes enterprise WLAN solutions and software (effectively handing a competitor or new entrant

11   an entire business unit with which to compete in enterprise WLAN, and networking more broadly).

12       On June 30, 2025, with the Court's approval, the transaction closed, and HPE moved forward

13   with integrating the two companies.  The comment period under the Tunney Act is now closed as

14   well, and *not a single* customer, competitor, or partner has objected to the deal.  The lack of

15   opposition to the settlement demonstrates both the efficacy of the proposed remedies and the lack of

16   competitive harm from the transaction.  The collective silence speaks volumes.  What's more, many

17   companies have expressed interest in the AIOps license and Instant On business—the auction is still

18   open, but already five bidders have placed bids for Instant On, and three bidders have made bids for

19   the AIOps license.  The bidders include a WLAN competitor and companies in adjacent markets

20   who plan to use Instant On and the AIOps technology to enter or improve offerings in the enterprise

21   WLAN market.  The considerable interest these assets have generated—from companies that plan to

22   use them to compete in enterprise WLAN—further demonstrates the value of the settlement remedies.

23       In contrast to the overwhelming evidence supporting HPE's defenses to the DOJ's claims

24   and the effectiveness of the agreed remedies, to date, the intervening States have offered nothing

25   relevant to the analysis under the Tunney Act, let alone anything suggesting the settlement is not in

26   the public interest.  Since the States did not investigate the transaction (despite having the power to

27   do so) and never bothered to contact HPE or Juniper about the DOJ's lawsuit or the settlement prior

28   to filing their objection, they have nothing of substance to contribute to the analysis of the DOJ's

legal claims or the agreed-upon remedies.  Indeed, as of now, the States have simply parroted the allegations in the DOJ's complaint (which are not evidence) and made the conclusory statement that the remedies are somehow not enough (despite admitting to this Court in their efforts to intervene that the AI Ops source code license would have a material competitive effect in the market).

In reality, the States interest in this settlement is, and has only ever been, about one thing— amplifying the vague and inaccurate accusations of a former DOJ attorney that the settlement involved "lobbyists" and "undue influence."  The States do not provide any details whatsoever to support these accusations.  The truth is that nothing untoward occurred in the settlement negotiations—the entirety of the agreement between HPE and DOJ is reflected in the document before this Court and that agreement was negotiated exclusively by attorneys for HPE and attorneys for DOJ.  Moreover, there is no legal support for the States' position that settlement negotiations are relevant to the Tunney Act, given the Act's focus on the substance of the settlement terms themselves.

It is time for the settlement and accompanying Amended Proposed Final Judgment (APFJ) to be approved.  There was never any harm to competition to begin with from the merger, which is why numerous regulators approved it and no customers, competitors, or partners have objected to the settlement.  And even though the DOJ's case was weak, it managed to obtain more than any other regulator could—meaningful remedial concessions from HPE that more than address any purported anticompetitive harm.  The States' objections to the settlement should therefore be overruled.

## II.     <u>BACKGROUND</u>

### A.     HPE and Juniper Announce Merger to Combine Complementary Offerings

On January 9, 2024, HPE announced an agreement to acquire Juniper.  ECF 222 at 10.  The goal was to combine HPE's and Juniper's highly complementary product portfolios:  HPE's traditional strength in storage and servers, and Juniper's in data center switches and routers.  *Id.* at 1, 9-10.  Combining HPE's and Juniper's offerings would create a company to compete across the "full stack" of networking products.  *Id.* at 1, 3, 10; ECF 201-1 ¶ 78.  Cisco dominated the networking industry for years, allowing customers to use Cisco as a "one stop shop" for all networking needs.  ECF 222 at 3, 7, 24; ECF 201-1 ¶ 94.  The combined HPE/Juniper entity provides a strong alternative to Cisco, increasing customer choice and competition.  ECF 222 at 3-4, 24; ECF 201-1 ¶¶ 96-98.

3

**B.     DOJ Sues Over WLAN Market, But Evidence Shows Extensive Competition**

Thirteen jurisdictions reviewed the transaction, including the European Commission and the UK Competition and Markets Authority, and *none* opposed the transaction.  ECF 222 at 10; ECF 201-1 ¶ 104.  Nevertheless, the DOJ sued to block the merger.  ECF 222 at 10.

Ignoring the broader rationale for the deal, the DOJ's Complaint focused on a single market, enterprise WLAN, alleging the merger may lessen competition for enterprise-grade WLAN solutions.  Compl. ¶¶ 34, 40.  In the Complaint, "enterprise-grade" WLAN solutions refers to WLAN solutions sold to companies or organizations (of any size, big or small), rather than to individuals. Compl. ¶¶ 1, 5.[1]  Small companies are thus part of the relevant market, as defined in the Complaint. *See id.*  The Complaint focuses on Juniper's "AIOps", a suite of tools for managing enterprise WLAN products.  *Id.* ¶ 6.  The Complaint alleges that HPE's acquisition of Juniper's AIOps would decrease HPE's incentive "to innovate [its own] network management software."  *Id.* ¶ 47.

The DOJ's evidence of market concentration was uncharacteristically weak.  The vast majority of litigated DOJ and FTC horizontal merger cases involve a combined entity that would have more than 30% market share, a threshold the Supreme Court has held presumptively anticompetitive.  *See Phila. Nat'l Bank*, 374 U.S. at 363.  But the combined share of the HPE/Juniper entity is 25%.  ECF 222 at 13.[2]  Despite this, the DOJ pushed forward toward trial.  HPE and Juniper jointly filed a comprehensive pretrial brief (ECF 200-1) and 100+ pages of proposed findings of fact and conclusions of law (ECF 201-1).  Although the Parties produced more than 800,000 documents and sat through depositions of 21 company witnesses and 25 third-party witnesses, the Government could not identify a *single* WLAN market participant willing to say the transaction would harm competition.  ECF 222 at 1-2, 10.[3]  The evidence, in fact, shows there are at least eight other competitors in the enterprise-grade WLAN market in addition to HPE and Juniper.  *Id.* at 7. Moreover, barriers to expansion in the enterprise-grade WLAN market are low and new entrants are

---

[1] In internal documents, HPE sometimes uses the term "enterprise" to refer to businesses of a particular size.  But the DOJ's Complaint uses "enterprise" to refer to *any* organization, big or small.
[2] In at least the last twenty years, the government had not challenged *any* merger with less than 30% resulting market share (until this one).
[3] The DOJ's investigative file did not include a *single* customer declaration or deposition testimony opposing the merger, which made the DOJ's decision to sue all the more perplexing.

1  common.  *Id.* at 22-23.  There was no evidence that WLAN competitors would stop competing after

2  the merger.  ████████████████████████████████

3  ████████████████████████████████████████

4  ████████████████████████████████████████

5  **C.    Parties Settle on Terms Directly Addressing the Complaint's Allegations**

6        The Parties reached a settlement on June 27, 2025—more than 18 months after the merger

7  was first announced, and approximately two weeks before trial.  That same day, the Parties filed a

8  Stipulation that publicly disclosed all terms of the settlement.  ECF 217.  First, the settlement required

9  HPE to divest its "Instant On" networking and WLAN business.  ECF 217-1 at 3-5.  Second, it

10 required HPE to license Juniper's AIOps for WLAN source code to at least one competitor and

11 transfer personnel to that competitor to support the software's continued development, use, and sale.

12 *Id.* at 10-13.  The Stipulation requires HPE to hold the Instant On assets separate and move promptly

13 to sell those assets and license the AIOps for WLAN technology.  ECF 217 at 6-9.  The settlement

14 terms filed with the Court are the only terms HPE and Juniper agreed to with the Government; there

15 is no other, undisclosed side deal.  Neri Decl. ¶ 3, ECF 298-1; Schultz Decl. ¶ 12, ECF 298-2.

16       On June 30, 2025, the Court approved the Stipulation, allowing the transaction to close.  ECF

17 220 at 5; ECF 217-2.  And on July 10, 2025, the DOJ published the Proposed Final Judgment and

18 the Competitive Impact Statement in the Federal Register, thereby commencing a 60-day comment

19 period under the Tunney Act.  90 Fed. Reg. 30685 (July 10, 2025).

20 **D.    The States Parrot the Innuendo of a Disgruntled Former DOJ Appointee**

21       On August 18, 2025, Roger Alford—a former DOJ appointee—gave a speech at a think-tank

22 event.  In it, he referenced what he called "the HPE/Juniper merger scandal"—without further

23 explanation—and assailed more broadly what he viewed as an intra-party political rift between

24 "genuine MAGA reformers" (like him) and "MAGA-In-Name-Only-Lobbyists."  ECF 280-2 at 1.

25 While Alford's speech was heavy on opinions and innuendo, it was entirely devoid of any facts about

26 what made the merger a "scandal", and it did not identify any issue with the settlement.  Nevertheless,

27 on September 5, 2025, the States submitted a public comment opposing the settlement, which quoted

28 Alford's speech and claimed that it showed that the settlement was the product of "undue influence"

5

1  by "lobbyists."  ECF 236-2.  Before commenting, the States did not contact HPE or use any

2  investigative tools to examine the merger or settlement.  The States' comment did not address HPE's

3  arguments in the lawsuit regarding the lack of competitive harm, and only briefly claimed the

4  remedies were inadequate.  Instead, the States focused their comment on Alford's vague claims.  *Id.*

5  **E.     The DOJ Addresses the Few Comments It Did Receive**

6          The period for submitting Tunney Act comments closed in mid-September.  Goldstein Decl.

7  ¶ 8, ECF 311-1.  Not a single customer, competitor, partner, or other industry participant—not *one*—

8  objected to the settlement, further confirming that industry participants do not see any harm.

9          Only twelve comments were submitted regarding the settlement.  Three were emails from

10  members of the public (ECF 311-7 at 3; ECF 311-5); two comments were from small groups of

11  Democratic Congresspeople (ECF 311-6, ECF 311-14); four were from advocacy organizations (the

12  Dekleptocracy Project, ECF 311-8, American Antitrust Institute, ECF 311-10, American Economic

13  Liberties Project, ECF 311-11, and Protect Democracy Project, ECF 311-13); one was from the

14  States (ECF 311-9); one was from a group of former DOJ attorneys (ECF 311-12); and the last was

15  from researchers at George Mason University, who did not oppose the settlement and argued the

16  DOJ should not have brought the lawsuit (ECF 311-15).

17          Aside from the comment by the university researchers opposing the lawsuit, the other eleven

18  comments all raised generally similar complaints.  These commenters were predominantly concerned

19  with repeating (and quoting) Alford's vague claim that the settlement was influenced by "lobbyists,"

20  rather than commenting on the adequacy of the remedies.  ECF 311 at 13.  To the extent they did

21  comment on the remedies, the commenters did not put forward *any* evidence of harm to any customer

22  or competitor, but rather argued that (1) Instant On was not relevant, because HPE marketed Instant

23  On to primarily  "small-to-medium sized businesses" (or SMBs) and (2) the AI Ops for Mist license

24  was insufficient, either because it was allegedly not clear what code was required to be licensed or,

25  according to the States, the Mist license was insignificant to competition.  *Id.* at 14-17.

26          The DOJ filed a robust response to the few comments it received.  *See* ECF 311.  In its

27  response, the DOJ explained that vague complaints about negotiations were irrelevant to the Tunney

28  Act.  *Id.* at 19-22.  The DOJ also explained that the APFJ embodies the entire agreement between

1   HPE and the Government.  *Id.* at 13; Neri Decl. ¶ 3, ECF 298-1; Schultz Decl. ¶ 12, ECF 298-2.

2          The DOJ also explained the value of the Instant On divestiture and Mist AI Ops license.  With

3   respect to Instant On, the DOJ corrected the misimpression of some commenters that the market in

4   this case involved only "larger" companies—and thus does not include the SMBs that often use

5   Instant On—explaining the product market in this case includes WLAN solutions for *all* enterprises,

6   no matter their size.  ECF 311 at 15 (citing Compl. ¶¶ 34-38).  And the DOJ explained that the

7   purchaser of the Instant On business will acquire valuable additional features that are available in the

8   Instant On code but not currently activated—such as location services, automatic quality of service,

9   and firewall capabilities—which, if activated, would make Instant On more attractive to larger

10  enterprises.  *Id.* (citing ECF 298-3 ¶¶ 7-9).  The DOJ also explained that WLAN vendors—such as

11  Ubiquiti and Cisco—have successfully used solutions that target SMBs as an entry point into the

12  enterprise WLAN market, and, after establishing their SMB WLAN business, have expanded to serve

13  larger customers.  *Id.* at 15-16.  Finally, the DOJ explained that some large enterprise customers use

14  simpler solutions—so Instant On is always a competitive option for those larger customers.  *Id.* at

15  16.  Further, the DOJ responded to concerns raised by the former DOJ professionals by amending

16  the PFJ to specify that the acquiror of Instant On must intend to, be capable of, and satisfy the DOJ

17  that it can use Instant On to "compete effectively" in the enterprise WLAN market.  *Id.*

18         As for the Mist AI Ops license, the DOJ explained that its Complaint alleged that Mist's AI

19  Ops capabilities competitively differentiated Juniper's enterprise-grade WLAN solutions—to the

20  point that customers identified Juniper's WLAN solutions with Mist's AI Ops capabilities—and that

21  requiring HPE to license this "key ingredient of Juniper's competitive success" in WLAN would

22  "increase competition and innovation" in the market.  *Id.* at 7 (citing Compl. ¶¶ 6-11).  And the DOJ

23  explained that many different potential licensees had expressed interest in the source code—

24  demonstrating its value.  *Id.* at 17.  In addition, the DOJ amended the provisions of the PFJ relating

25  to the Mist AI Ops license to make clear that any licensee must satisfy the DOJ that "they will use

26  the source code to compete in the enterprise-grade WLAN market."  *Id.*  The DOJ also amended the

27  PFJ to specify that the primary licensee may obtain an additional six months of transition services

28  (in addition to the year of transition services already provided for by the original PFJ).  *Id.*

1   The DOJ went on to respond to complaints that the timeline for divestiture of Instant On and

2   license of Mist AI Ops may take too long by explaining that HPE must show, through monthly

3   affidavits, that it is working to effectuate the divestiture and license remedies. *Id.* at 18. Further, the

4   DOJ amended the PFJ to provide that HPE must use "best efforts" to close the divestiture and license,

5   and is subject to contempt sanctions if it violates these requirements. *Id.*

6   The auction process for Instant On and the Mist AI Ops for WLAN license is confidential

7   and still ongoing, but already several companies have submitted bids—five for Instant On, and three

8   for the Mist AI Ops license. Ex. A, Sturz Decl. ¶¶ 2-4. These bidders include a direct competitor in

9   the enterprise WLAN market, as well as companies in adjacent markets who plan to use the auctioned

10  assets to enter and compete in the enterprise WLAN space. *Id.* ¶ 4.

## III.    ARGUMENT

### A.    The Scope of The Tunney Act Inquiry

13  The Tunney Act focuses on whether there is a reasonable basis for concluding the proposed

14  settlement remedies address the alleged harms, while taking due consideration of the fact that the

15  settlement is a compromise and the product of negotiation. The Tunney Act asks "not whether a

16  particular decree is the one that will best serve society, but whether the settlement is 'within the

17  reaches of the public interest.'" *US v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981) (quoting *US*

18  *v. National Broadcasting Co.*, 449 F. Supp. 1127, 1143 (C.D. Cal. 1978)).

19  While the Tunney Act does not define "public interest," the Supreme Court has made clear

20  "that 'the words "public interest" in a regulatory statute' do not encompass 'the general public

21  welfare' but rather 'take meaning from the purposes of the regulatory legislation.'" *FCC v.*

22  *Consumers' Rsch.*, 606 U.S. 656, 2507 (2025) (quoting *NAACP v. FPC*, 425 U.S. 662, 669 (1976)).

23  Courts interpreting the meaning of the term "public interest" thus "look[] to the broader statutory

24  contexts[]" to understand the meaning of the term. *Id.* at 684. Here, the Tunney Act provides

25  "context[]" to the meaning of the term "public interest" by setting out specific factors that a "court

26  shall consider" when determining whether the public interest test is satisfied, 15 U.S.C. § 16(e)(1)—

27  and those factors demonstrate that the "public interest" test is aimed at analyzing the impact of the

28  consent decree on the competitive harm alleged in the case. The very first Tunney Act factor is "the

8

competitive impact of such judgment, including termination of alleged violations," *id.*—i.e., the impact of the settlement on the alleged harm. The Tunney Act also explicitly directs courts to consider the relationship between the settlement and alleged harm to competition when requiring courts to evaluate "any other competitive considerations bearing upon the adequacy of [the] judgment," the "anticipated effects of alternative remedies actually considered," and the "impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint." *Id.* The other factors examine whether the consent decree is clear and enforceable (requiring consideration of, e.g., the "provisions for enforcement and modification," and "whether its terms are ambiguous"). *Id.*

The Tunney Act's statutory context thus makes clear that the "public interest" analysis is concerned with whether the decree provides an enforceable means of addressing harms alleged in the complaint. This does not mean that the court should treat the complaint's allegations of harm as if they were proven or engage in a *de novo* review to determine whether the consent decree provides the "best" remedies for the alleged anticompetitive harm. A court does not "engage in an unrestricted evaluation of what relief would best serve the public." *Id.*; *see also US v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (court cannot reject settlement "merely because the court believes other remedies are preferable." (quoting *US v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007)).[4] The consent decree is a compromise arrangement, representing what each side believed it could get given its bargaining position. "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and the elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *US v. Armour & Co.*, 402 U.S. 673, 681 (1971). Congress intended to preserve the use of negotiated consent decrees as a tool for resolving antitrust cases. S.Rep. No. 93–298; H.R.Rep. No. 93–1463. "If courts acting under the Tunney Act disapproved proposed consent decrees merely because they did not contain the exact

---

[4] The Tunney Act caselaw *uniformly* holds that a court may not reject the settlement under the Tunney Act on the grounds that other remedies are preferable: "[A] court may not reject a remedy simply because it may not be, in the court's view, the 'best' remedy available." *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (quoting *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000)); *United States v. Abitibi-Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) ("The Court 'is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable.'" (quoting *SBC Commc'ns*, 489 F. Supp. 2d at 15)).

9

1    relief which the court would have imposed after a finding of liability, defendants would have no

2    incentive to consent to judgment and this element of compromise would be destroyed." *US v. AT&T.*,

3    552 F. Supp. 131, 151 (D.D.C. 1982). "The consent decree would thus as a practical matter be

4    eliminated as an antitrust enforcement tool, despite Congress' directive that it be preserved." *Id.*

5    (citing S.Rep. No. 93–298; H.R.Rep. No. 93–1463); *Bechtel*, 648 F.2d at 666 ("More elaborate

6    requirements might undermine the effectiveness of antitrust enforcement by consent decree.").

7    "Remedies which appear less than vigorous may well reflect an underlying weakness in the

8    government's case, and for the district judge to assume that the allegations in the complaint have

9    been formally made out is quite unwarranted." *US v. Microsoft*, 56 F.3d 1448, 1461 (D.C. Cir. 1995).

10            As a result of these considerations, the Tunney Act review is necessarily deferential. "The

11   balancing of competing social and political interests affected by a proposed antitrust consent decree

12   must be left, in the first instance, to the discretion of the Attorney General." *Bechtel*, 648 F.2d at

13   666. A court reviewing a consent decree under the Tunney Act must simply determine that there is

14   a factual basis for the DOJ's conclusion that the agreed-upon remedy addresses the harms alleged in

15   the Complaint. *See, e.g.*, *SBC*, 489 F. Supp. 2d at 15–16 ("the relevant inquiry is whether there is a

16   factual foundation for the government's decisions such that its conclusions regarding the proposed

17   settlements are reasonable" (citing *Microsoft*, 56 F.3d at 1461)); *US Airways*, 38 F. Supp. 3d at 75

18   (same). "It is not the court's duty to determine whether this is the best possible settlement that could

19   have been obtained if, say, the government had bargained a little harder." *US v. NBC*, 449 F. Supp.

20   1127, 1143 (C.D. Cal. 1978) (quoting *US v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).

21   The court's role when evaluating whether a consent decree is in the "public interest" is simply to

22   "ensure[] that the proposed judgment is reasonable." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th

23   Cir. 1984).[5] This means that "[t]he court need only be satisfied that the decree represents a

24   'reasonable factual and legal determination.'" *US v. State of Or.*, 913 F.2d 576, 581 (9th Cir. 1990)

25   (quoting *US v. City of Miami*, 664 F.2d 435, 439, 441 (5th Cir. 1981) (Rubin, J., concurring)); *US v.*

26

_____

27   [5] While *Randolph* involved a case brought under the securities laws, it addressed a district court's
     understanding of the meaning of the term "public interest" under the Tunney Act (since the district
28   court had looked to the Tunney Act as guidance for how it should approach evaluation of a consent
     decree in a government enforcement action). *See Randolph*, 736 F.2d at 529.

1  *Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (applying analogous standard in

2  Tunney Act context that government "need only provide a factual basis for concluding that the

3  settlements are reasonably adequate remedies for the alleged harms" (quoting *U.S. v. Newpage*

4  *Holdings, Inc.*, 2015 WL 9982691, at *7 (D.D.C. Dec. 11, 2015))).

5  **B.    The Remedies Are More Than Sufficient, Given The Lack of Harm to Competition**

6          Here, the proposed decree is well within the "reaches" of the public interest.  *Bechtel*, 648

7  F.2d at 666 (quoting *NBC*, 449 F. Supp. at 1143).  The DOJ's case was focused on a single market,

8  and even within that market, it was extremely weak.  Numerous other antitrust enforcers around the

9  globe considered the deal and did not challenge it.  Through the decree, the DOJ obtained far more

10  than any other regulator.  And the decree directly addresses the issues raised by the DOJ's complaint.

11          **1.    The Merger Is Procompetitive and Did Not Harm Competition**

12                  **a.    The Merger Increases Competition**

13          The HPE-Juniper merger is procompetitive, by breaking the lock Cisco—and internationally,

14  Huawei—has on the networking industry.  Cisco has come to dominate the networking industry by

15  offering products across the "full stack" of networking products—from routers to wireless access

16  points to switches.  ECF 222 at 4, 7; ECF 201-1 ¶ 48.  Similarly, Huawei, backed by the Chinese

17  government, offers a suite of "full stack" products to companies and governments outside of the U.S.

18  (because Huawei is compromised by the Chinese state, it cannot sell networking products in the

19  U.S.).  ECF 222 at 5; ECF 201-1 ¶ 94.  Cisco markets itself as a "one stop shop" that can meet all

20  networking needs.  ECF 222 at 4-5, 7, 24-25; ECF 201-1 ¶¶ 18, 94.  And Cisco has used its "full

21  stack" offering to acquire a 50% or more share in many networking markets—effectively becoming

22  an entrenched monopolist in the networking space.  ECF 222 at 7; ECF 201-1 ¶ 96.

23          HPE and Juniper aimed to change that by bringing together HPE's and Juniper's

24  complementary offerings.  For HPE, that meant incorporating Juniper's strengths in routing,

25  switching, and firewalls, which together comprised around $3.5 billion in revenue in 2023.  ███

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ███████████████████████████████████████████████, as well as expanding

1  its sales reach via HPE's larger channel partner network. ████████████████

2  ████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████

5  ████████████████████████. By bringing their offerings and expertise together, HPE and Juniper

6  could fiercely compete with Cisco domestically and Cisco and Huawei internationally.

7       Recognizing the merger was procompetitive, both industry participants and regulators

8  welcomed it. Over a dozen regulatory agencies reviewed the transaction and declined to challenge

9  it without a second look. The European Commission concluded that, in the enterprise WLAN

10 market, the merged entity "would continue to face competition from a wide range of competitors,

11 including strong and established players"; "HPE and Juniper are not each other's closest

12 competitors"; and customers' "countervailing buyer power" would constrain price increases. *See*

13 EC Press Release, https://ec.europa.eu/commission/presscorner/detail/en/ip_24_4101. Thirteen

14 other regulators, including the United Kingdom CMA, followed suit. Competition and Markets

15 Authority, ME/7088/24, HPE/Juniper, Decision on relevant merger situation (Jun. 19, 2024), Full

16 text decision; ECF 222 at 10. And industry participants overwhelmingly supported it. Commentators

17 explained how it would strengthen competition with Cisco. ECF 222 at 10; ECF 201-1 ¶ 106. During

18 this litigation, industry participants—including competitors, channel partners, and customers—

19 supported the merger and said it was pro-competitive. ████████████████████

20 ████████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████.

23           **b.    The DOJ's Suit Was Extremely Weak**

24        ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████

26 ¶ 9. The DOJ alleged the merger caused anticompetitive effects in a single market—the market for

27 enterprise WLAN products—where HPE and Juniper competed.

28        Even in that single market, the DOJ's case was extremely weak. The combined enterprise

12

WLAN market share of HPE and Juniper is only 25% (Ex. C, Hill Decl. ¶ 8), easily below the 30% threshold adopted by the Supreme Court as creating a rebuttable presumption of harm to competition. And HPE's evidence showed there was no harm to competition at all.  Ex. F, Bailey Decl. ¶ 13.  As HPE explained in its filings, beyond HPE and Juniper, at least *eight* other players—Cisco, Arista, Ruckus, Extreme, Fortinet, Meter, Nile and Ubiquiti—routinely compete for, and win, major enterprise WLAN customers in the United States.  ECF 222 at 7.  And between 2021 and 2023, three competitors—Arista, Extreme, and Ubiquiti—all grew their WLAN businesses at a faster rate than the average of HPE and Juniper.  ECF 222 at 18; Ex. 65 to Defs' Pretrial Brief, Hill Rep. Fig. 16, ECF 200-9.

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

1 ████████████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3      In addition, barriers to entry are low—at least five different players (aside from HPE and

4 Juniper) have entered and rapidly expanded in the enterprise WLAN space in the last ten years,

5 further proving the case was meritless.  *See US v. Syufy Enters.*, 903 F.2d 659, 671 n.21 (9th Cir.

6 1990) ("the lack of entry barriers prevents the government from prevailing."); ECF 222 at 22-24;

7 ECF 201-1 ¶¶ 33-34, 49, 174. ████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████

9      In addition, enterprise-grade WLAN customers are "power buyers," who use their resources,

10 sophistication and bidding processes to play competitors off one another and exercise market power.[6]

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████████████

21 ████████████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████

24

25 [6] As explained in *United States v. Oracle Corp.*, power buyers are typically "sophisticated and knowledgeable and engage in extensive and intensive one-on-one negotiations with vendors." 331 F. Supp. 2d 1098, 1171–73 (N.D. Cal. 2004).  And these "power buyers" can "constrain the ability of

26 the merging parties to raise prices." *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 395 (S.D.N.Y. 2024); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) (noting that

27 "large, sophisticated third-party buyers can and do resist price increases"); *Oracle*, 331 F. Supp. 2d at 1131 (finding "a group of extremely sophisticated buyers and users of information technology"

28 could "resist anticompetitive price increases").

**1** ███████████████████████████████████████████████████

**2** ███████████████████████████████████████████

**3**     Simply put, competition in the enterprise WLAN market was and is extremely robust, and

**4** the HPE-Juniper merger did not pose any threat to competition whatsoever.

**5**         **2.      The Remedies Address the DOJ's Antitrust Concerns**

**6**     While the DOJ did not show any anticompetitive harm flowing from the merger, the remedies

**7** HPE agreed to address the DOJ's allegations and further eliminate any *possibility* of harm in the

**8** enterprise WLAN market.  The DOJ's Complaint alleged Juniper was a particularly innovative player

**9** in the enterprise WLAN market, especially because of its AIOps tools.  Compl. ¶¶ 6–7, 47.  But the

**10** agreed-on remedies directly address these allegations, as HPE must: (1) license the source code for

**11** Juniper's AIOps for WLAN to at least one competitor and provide personnel to that competitor to

**12** continue the software's development and use, and (2) divest its Instant On business, which currently

**13** provides enterprise-grade WLAN solutions for small-to-medium sized companies, and which

**14** includes additional features that are attractive to larger companies as well.  *See* ECF 220.

**15**         **a.      The Source Code License Directly Addresses the DOJ's Allegations**

**16**     A central piece of the DOJ's case was its allegation that Juniper was so uniquely innovative

**17** in the "AI Ops" WLAN space that it drove other players—like HPE—to innovate.  As the DOJ

**18** explained, "AIOps" are "artificial intelligence and machine learning tools ... to streamline network

**19** operations and improve the experience for network operators and users."  Compl. ¶ 6.  And the DOJ

**20** alleged the AIOps tools Juniper provided with its "Mist" enterprise WLAN solutions were so

**21** innovative that Juniper "capitalized on and helped accelerate the industry's burgeoning focus on

**22** AIOps" and that "[c]ustomers acquainted with Juniper's AIOps have demanded other vendors

**23** provide them as well."  *Id.* ¶ 7. ███████████████████████

**24** ███████████████████████████████████████████

**25** ███████████████████████████████████████████

**26** ███████████████████████████████████████████

**27** ███████████████████████████████████████████

**28** ███████████████████████████████████████████

1  ███████████████████████████████████████████████████████

2          The settlement directly addresses these allegations by requiring HPE to hold an auction for a

3  worldwide license to the AI Ops for WLAN Mist Source Code. Ex. F, Bailey Decl. ¶ 6.[7]  In addition,

4  HPE must support the licensee by providing transition services for up to 18 months, including

5  knowledge transfer assistance, software updates, and engineering support.  APFJ, Section V.1.B.4

6  and V.1.B.5, ECF 351-1.  And if the licensee requests, HPE must introduce it to Juniper's original

7  design manufacturers, distributors, and channel partners for Juniper's WLAN hardware—so the

8  licensee has an available network to market solutions that use the AI Ops for WLAN technology.  *Id.*

9  at V.1.B.6.  The licensee can also demand that HPE transfer up to 30 Juniper engineers familiar with

10 the Mist AIOps for WLAN source code and up to 25 Juniper sales personnel experienced in selling

11 Mist.  *Id.* at V.1.B.5.  The licensee must intend to and be capable of competing in enterprise WLAN—

12 and must satisfy the DOJ they will use the code to compete in that market.  *Id.* at VI.B.

13         The license remedy thus requires HPE to provide at least one competitor in the enterprise

14 WLAN market with the very AI Ops tools that the DOJ alleged were uniquely innovative.  To the

15 extent that the DOJ's thesis was correct—i.e., to the extent that it was right in arguing that Mist's AI

16 Ops were uniquely innovative and a competitive differentiator—the license will empower an

17 enterprise WLAN competitor or new market entrant with a powerful competitive tool and force other

18 competitors (including HPE) to innovate to compete with it.

19         The States have argued that the AI Ops license is not significant, both because the minimum

20 required bid for the license ($8 million) is much smaller than the $14 billion that HPE paid to acquire

21 all of Juniper, and because many players in the enterprise WLAN space already have their own AI

22 Ops solutions.  ECF 317 at 4-5.  ██████████████████████████████████

23 ████████████████████████████████████████████████████████

24 ██████████████████████████████; HPE paid $14 billion to acquire *all* of

25 Juniper's businesses, Schultz Decl. ¶ 3, ECF 298-2.  Juniper's alleged advantage in AIOps was

26 central to the DOJ's theory, Compl. at ¶¶ 6-7, and the license thus resolves a key aspect of the DOJ's

27 ───────────────────
[7] If there are multiple bids above $8 million, the APFJ requires HPE to license the Mist source code
28 to a second Licensee, but without the support and transition services provided to the first licensee.
   APFJ, Section V.1.C.4, ECF 351-1.

1   alleged competitive harm.[8]  The States recognized the importance of the AIOps for WLAN license

2   at the intervention hearing, where they argued the license is so competitively important, they had to

3   stop it—saying the license is "the thing that really impairs our interest if we were to stand Juniper

4   back up as an independent competitor." Mot. to Intervene H'rg Tr. 19:11-13, Nov. 18, 2025.  In

5   addition, the value of the AI Ops license WLAN is demonstrated by the interest it has attracted—

6   three bidders have already bid for the license with plans to use the assets to compete in the WLAN

7   market.  Ex. A, Sturz Decl. ¶ 4.  This shows other players  believe the license has competitive value.

8          In short, the DOJ made the Mist AI Ops technology a key part of its case—and the license

9   removes any possibility for harm by handing the technology over to a competitor.

10                 **b.     The Instant On Divestiture Provides a Competitor with a Ready-Made**

11                        **Business to Use to Compete in The Enterprise-WLAN Space**

12         In addition to the license, the APFJ requires HPE to divest "Instant On", a networking

13   business that includes enterprise WLAN access points—as well as switches and gateways—and is

14   primarily targeted at SMBs.  APFJ, Sections II.J., IV.1, ECF 351-1; Hughes Decl. ¶ 4, ECF 298-3.

15   The APFJ obligates HPE to sell the Instant On business—including its assets, contracts, and customer

16   relationships—to an acquiror that will compete in enterprise WLAN and that satisfies the DOJ that

17   it will use Instant On to compete in that market.  APFJ, Section VI.C, ECF 351-1.

18         The Instant On divestiture enhances competition by providing a competitor or new entrant in

19   the enterprise WLAN market with a ready-made enterprise grade networking business with which to

20   compete.  This addresses the harm alleged by the DOJ by immediately injecting new competition

21   into the enterprise WLAN market.  And while HPE chose to market Instant On to SMBs, this does

22   not mean its competitive impact is small.  Instant On has a strong reputation for offering robust, easy-

23   to-use features that can be easily and affordably deployed by businesses.  Hughes Decl. ¶ 4, ECF

24   298-3.  And larger enterprise businesses use Instant On too, attracted by its ease of use.  *Id.* ¶ 6.

25         Further, the acquiror of the divested Instant On business will have the ability to enable

26   advanced features that are attractive to large businesses with sophisticated enterprise WLAN needs.

27   _____

28   [8] The States also assume the merger would harm competition, which is wrong.  *Supra* III.B.1; Hill Decl. ¶ 6, ECF 338-1.

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

1  The AOS8 operating system for the Instant On access points is based on the same operating system

2  that is used with HPE's Aruba-branded access points, except that some features for those access

3  points are disabled (such as location services, automatic quality of service, and firewall capabilities).

4  Hughes Decl. ¶ 7, ECF 298-3.  The purchaser of the Instant On business will receive a license to full

5  AOS8 code base for WLAN and there will have the ability to enable those features—strengthening

6  the purchaser's ability to target larger and more complex enterprise customers.  *Id.* ¶ 8.  With those

7  features enabled, Instant On WLAN access points will have an even greater ability to compete

8  directly against HPE's Aruba offering—further strengthening competition.  *Id.*

9      The States and some commenters have argued that Instant On is irrelevant to this case because

10  it targets SMBs.  But this misunderstands the relevant market in this case, which is for *all* enterprise

11  WLAN products—whether they are sold to smaller enterprises or larger ones.  Compl. ¶¶ 34–38.

12  The alleged product market only distinguishes between enterprise- and *consumer*-grade WLAN

13  solutions.  *Id.* ¶ 38.  Indeed, because Instant On access points are part of the enterprise WLAN market,

14  they were discussed at multiple points during the investigation and this case. █████████████

15  ████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████

20  ███████████████████████████████████████████████████████.

21      In addition, Instant On's scalability—including the ability to enable additional features—

22  makes it an ideal business for a competitor looking to gain a foothold in the enterprise WLAN space

23  with smaller businesses and then compete upmarket.  Other enterprise WLAN competitors have

24  followed this strategy; using offerings aimed at SMBs to enter the market and then successfully

25  expanding to win larger customers.   For example, before being purchased by Cisco, Meraki was a

26  SMB-focused WLAN provider; but after the acquisition, Cisco repositioned Meraki as a top provider

27  of WLAN solutions to the largest enterprises in the world (while also serving SMBs).  Hughes Decl.

28  ¶ 10, ECF 298-3.  Similarly, Ubiquiti entered the enterprise WLAN market as a provider of solutions

1   to SMBs—but has since marketed products to large enterprise customers, winning business from

2   Cisco, HPE, and others. *Id.* The acquiror of Instant On will be uniquely situated to follow this

3   strategy, given the ability to add more sophisticated features to the Instant On access points.

4          Instant On's value has also been validated by the interest it has garnered during the ongoing

5   auction process. There are currently five bidders for Instant On, and the bidders include a WLAN

6   Competitor and companies in adjacent markets who plan to use the Instant On assets to enter the

7   enterprise WLAN market. Ex. A, Sturz Decl. ¶¶ 4, 9; *see also* Hughes Decl. ¶ 11, ECF 298-3.

8          **3.    The Tunney Act Factors All Support Approval of the Settlement And APFJ**

9          Given the merger's procompetitive nature, the lack of competitive harm from the merger, *and*

10  the procompetitive value of the remedies, the APFJ easily satisfies the Tunney Act "public interest"

11  analysis. All the Tunney Act factors point towards approval. *See* 15 U.S.C. § 16(e)(1).

12         ***The "competitive impact of such judgment," and "any other competitive considerations***

13  ***bearing upon the adequacy of such judgment that the court deems necessary."*** Even without any

14  remedies, the merger would not have harmed competition. *Supra* III.B.I. In any event, the remedies

15  directly address the DOJ's allegations of harm by providing competitors with the AI Ops technology

16  the DOJ believed was critical to innovation, and by providing a competitor with a ready-made and

17  easily scalable networking business with which to compete. *Supra* III.B.2.

18         ***"Provisions for enforcement and modification & duration of relief sought" and "whether***

19  ***its terms are ambiguous."*** The APFJ's terms are clear and unambiguous, and it has robust provisions

20  for implementation, enforcement, and modification. Indeed, in response to public comments, the

21  United States clarified the scope of the licensing and divestiture and enhanced the implementation

22  and enforcement provisions. *See* APFJ Sections II, VI, XI, ECF 351-1. The APFJ requires HPE to

23  use its best efforts to effectuate the licensing and divestiture and to refrain from doing anything that

24  would hamper or interfere with a licensee or divestiture buyer's ability to compete effectively. *Id.*

25  at Section VI. The DOJ may seek an extension of the judgment, contempt sanctions, and attorney's

26  fees and other expenses for any violation of the APFJ. *Id.* at Section XI. And the APFJ is in force

27  for 10 years, providing ample time to ensure the remedies are effective. *Id.* at Section XII.

28         ***The "anticipated effects of alternative remedies actually considered."*** As the DOJ has

19

explained, there were only two potential alternatives available here: the parties could either agree to the APFJ, or go to trial.  *See* ECF 351 at 8.  The parties could not reach agreement on an alternative remedy.  *See infra* III.D.2. (explaining negotiation history).  The settlement serves the public interest by providing certain remedies, whereas if the DOJ had proceeded to trial, HPE believes it would have lost and obtained nothing.  Indeed, no other antitrust regulator sought or obtained any remedy relating to the merger—by choosing to settle, the DOJ obtained more than anyone else.

*The "impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint."*  The APFJ adds competition-enhancing remedies to a transaction that was already procompetitive.  *Supra* III.B.2.  No "individuals" are "alleging specific injury from the violations" in the Complaint—and not a single competitor or customer has complained about the settlement.  *Supra* III.A.  The Tunney Act test is satisfied, and the APFJ should be approved.

## C.    The Settlement Benefits the Public Interest By Strengthening National Security

In addition to strengthening competition at home by creating a full-stack competitor to Cisco, approving the APFJ will also advance U.S. national security interests by (1) combining two complementary U.S. companies that are key providers of core technologies to the U.S. government, and (2) enhancing HPE's ability to win international customers away from Huawei.

HPE and Juniper are significant providers of important technologies to the U.S. defense and intelligence communities.

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

1 ████████████████████████████████████████████████████████

2 ████████  Ex. B, Schultz Decl. ¶ 19.  The settlement allowed HPE to blunt the threat of an activist

3 that would have crippled HPE's ability to provide advanced technology to the U.S. government.

4 ████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████

6 ████████████████████████████████████  The HPE-Juniper

7 merger creates a new, American option for international customers.  *Id.*  Removing the uncertainty

8 created by this case will strengthen HPE's ability to win international customers away from Huawei

9 and reduce the threat it poses to allies and national security.

10       Whether the transaction benefits national security is relevant to whether a settlement and

11 underlying transaction is in the public interest.  There is a strong "public interest in national defense."

12 *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  And the Antitrust Division has itself

13 recognized that this interest is relevant to antitrust.  In *FTC v. Qualcomm*, the Antitrust Division filed

14 an *amicus* brief in support of the defendant, which specifically noted that determining whether an

15 antitrust injunction is in the "public interest"—a prerequisite for injunctive relief—takes into account

16 national security concerns.  *See* Brief for USA as Amicus Curiae at 32, *FTC v. Qualcomm*, No. 19-

17 16122 (9th Cir.), ECF 86 ("the public interest also takes account of national security concerns").

18 And courts have considered this interest in the Tunney Act context as well.  For example, in *AT&T*,

19 the court considered the national security benefits of the settlement when it concluded that the

20 settlement remedy—which involved splitting up the various regional telephone companies (or "baby

21 bells")—was superior to the remedy the DOJ had sought at trial, which would have involved forcing

22 AT&T to divest its R&D subsidiary, Bell Laboratories.  While the DOJ brought the suit to effectuate

23 such a divestiture, the court found Bell Labs played a "central role" in "industrial research," including

24 the creation of technologies for "national defense."  *AT&T*, 552 F. Supp. at 167 & n.152.  The court

25 also concluded that divesting Bell Labs could seriously impair its ability to continue its

26 groundbreaking research.  *See id.* at 167.  The court concluded this supported approval of the consent

27 decree, because the negotiated remedies would not cause the same negative impacts—and preserved

28 Bell Lab's value as an R&D hub, including for defense technology.  *See id.*

1   Similarly, here, if the DOJ had obtained the relief it sought at trial—and stopped the merger—
2   HPE and Juniper would not have been able to form a "full stack" company that could provide
3   innovative and cutting-edge defense technology to government agencies, and that could compete
4   with Huawei internationally.  Approving the settlement will ensure those national security benefits
5   are realized—and allow HPE to push Huawei out of the sensitive businesses and government offices
6   of international partners.  That is yet another reason that the settlement should be approved.

7   **D.    The Settlement Negotiations Are Irrelevant, and Were Proper in Any Event**

8       **1.    The Negotiations Are Irrelevant**

9   The States have repeatedly asserted that the settlement should be rejected because it "was
10  reportedly the product of undue influence by well-connected lobbyists."  ECF 236 at 1.  This
11  argument has no legal or factual basis.  The States have never explained what "undue influence"
12  means, who qualifies as a "lobbyist," or what, exactly, "lobbyists" are prohibited from doing.[9]  The
13  Tunney Act says nothing about "lobbyists."  The Tunney Act does not provide any requirements for
14  how settlement negotiations should be conducted or offer any standard by which the Court would
15  judge whether a negotiation was "good" or "bad."  The Tunney Act looks to the terms of the
16  settlement itself—if there were "undue influence," it will be readily apparent from the terms of the
17  settlement.  But there has been no collective outrage regarding the settlement and the remedies
18  provided; indeed, *not a single customer or competitor* has bothered to comment, let alone complain
19  that this settlement was a "sweetheart deal" for HPE.  This silence reflects what those in the
20  networking industry have long known:  this is a lawsuit that never should have been brought and the
21  remedies go far beyond what is even arguably necessary to protect competition.

22  The States have suggested that the Tunney Act's direction to consider "anticipated effects of
23  alternative remedies actually considered" means that the negotiating process is somehow relevant to
24  the Act's inquiry.  Mot. to Intervene H'rg Tr. 9:7-21, Nov. 18, 2025; 15 U.S.C. § 16 (e)(1)(A).  But

25  ---
    [9] In discovery, the States have identified three of HPE's representatives—William Levi, Mike Davis,
26  and Arthur Schwartz—as "lobbyists."  But again, the States do not explain what they think that term
    means, or why these particular individuals are "lobbyists" (as opposed to other HPE representatives,
27  who the States apparently do not consider to be "lobbyists").  Levi and Davis are attorneys who were
    engaged to represent HPE in settlement negotiations with the DOJ, as part of its counsel team.  And
28  Schwartz was not involved in settlement negotiations at all; he discussed the national security
    benefits of the merger with representatives of the defense and intelligence communities.

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

1    evaluating the "anticipated effects of alternative remedies" involves looking at the "effects" of

2    remedies on competition—the process of negotiation has nothing to do with the remedies' "effects."

3    And while the States suggest that "alternative remedies actually considered" includes any remedy

4    ever proposed during settlement negotiations, that cannot be what the statute is referring to.

5        Whether an alternative remedy was "actually considered" must mean more than just that it

6    happened to be raised by one party during negotiations. The negotiation process necessarily involves

7    both sides making demands that are unacceptable to the other side; the DOJ will demand more drastic

8    remedies and the defendant will demand less. If the Tunney Act required courts to select the most

9    demanding remedy the DOJ ever proposed during negotiations, then the consent decree process

10   would be destroyed—there would be no reason for a defendant to negotiate and agree if any

11   negotiated remedy would be thrown out in favor of the most drastic remedy the DOJ demanded.

12   *Supra* III.A. Tunney Act review does *not* involve selecting the "best" remedy. *Bechtel*, 648 F.2d at

13   666 (Tunney Act does not consider "whether a particular decree is the one that will best serve

14   society"). But if a court were to compare any demand the DOJ made with the ultimate agreement to

15   determine which terms it considered to be best, it would be engaging in just such a review.

16       In order for the Tunney Act review to make sense—and not involve a *de novo* review of

17   which remedies the court prefers—its reference to whether an alternative was "actually considered"

18   must mean the alternative was a remedy that *both sides* "considered" and were willing to agree to.

19   In most cases, this boils down to two options: the remedy in the proposed judgment, or going to

20   trial—and in nearly every case, this is what courts view as the two remedies "actually considered."

21   *See e.g.*, *Newpage Holdings Inc.*, 2015 WL 9982691, at *6; *US Airways*, 38 F. Supp. 3d at 80.[10]

22       In sum, nothing in the Tunney Act involves examining the negotiation history of the

23   settlement. And the States have not even explained what it means for a settlement to be the result of

24   "undue influence," much less pointed to any authority that authorizes them to challenge a settlement

25   on that basis. What matters to the Tunney Act are the remedies, not the negotiation process.

26       **2.    The Negotiation Process Was Completely Appropriate**

27   ───────────────

[10] In *AT&T*, the court considered several alternative remedies, but these were either remedies the
28   parties agreed to (although they ultimately abandoned agreement to all except the remedy in the
     consent decree) or remedies sought in the complaint. 552 F. Supp. at 166 ns. 144-146.

1    Even if the negotiation process could somehow be relevant to the analysis—and again, it is

2    not—the States have not identified anything inappropriate about the negotiation process here.  HPE

3    first engaged with the DOJ immediately after the merger was announced in January 2024, and

4    submitted voluminous material to the DOJ during 2024.  ████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████

8    ███████████████████████████████████████████

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████

13   There was nothing improper about this negotiation process.  The States do not—and cannot—

14   claim an undisclosed side agreement or quid pro quo exists.  They do not contest that the only

15   agreement is the settlement presented to the Court.  ECF 298-1 ¶ 3, ECF 298-2 ¶ 12.  They do not

16   claim anyone participated in the negotiations without authority or received some personal benefit

17   from the settlement.  They have not presented any evidence of any impropriety at all—because there

18   was none.  Lawyers representing HPE negotiated in good faith with lawyers for the DOJ, and where

19   HPE agreed to provide meaningful remedies—even though there was no harm to competition, and

20   even though many other antitrust regulators approved the deal without obtaining any remedy at all.

21   Strangely, the States try to suggest there was something suspicious about HPE and the DOJ

22   reaching a settlement a week or so before trial was set to begin.  But settlements are often reached

23   shortly before trial begins (or even during the pendency of a trial) because that is when the parties

24   are best able to evaluate the strength of their case and the merits of a settlement.  The States also

25   suggest that something improper must have occurred because senior DOJ officials above the

26   Antitrust Division participated in the settlement negotiations.  This is also a bizarre suggestion.  HPE

27   engaged with the Antitrust Division from the day after it announced the merger in 2024, through the

28   conclusion of the settlement negotiations, and up and through today.  The fact that senior DOJ

24

1   officials were also involved in resolving a case *brought by the DOJ* is thoroughly unremarkable.

2   Indeed, the States do not explain why the involvement of higher-level DOJ officials would undercut

3   the adequacy of the proposed remedies or a determination that the settlement is in the public interest.

4   The settlement is more than adequate, particularly considering the utter absence of any competitive

5   harm, and nothing about the negotiation of the settlement detracts from the value of the remedies.

6   **E.    An Evidentiary Hearing Is Not Necessary or Appropriate.**

7          The Court should decline the States' invitation to hold an evidentiary hearing.  The Court has

8   an extraordinarily robust record—including not only a full pretrial record, but also a record

9   developed after Tunney Act discovery, which has never before been ordered—on which to base its

10  decision.  An evidentiary hearing would not serve any purpose.  Indeed, the only basis the States

11  have suggested for a hearing is for the Court to observe the demeanor and credibility of individuals

12  involved in the settlement negotiations.  But those negotiations are utterly irrelevant to the Tunney

13  Act analysis.  And even setting that aside, the States have not presented any evidence that anything

14  improper happened during the settlement negotiations, so there is no credibility issue to resolve.

15         Congress made clear that evidentiary hearings should be a last resort, held only if absolutely

16  necessary.  "Where the public interest can be meaningfully evaluated simply on the basis of briefs

17  and oral arguments, ***this is the approach that should be utilized***. Only where it is imperative that the

18  court should resort to calling witnesses for the purpose of eliciting additional facts should it do so."

19  S. Rep. No. 93–298, at 6 (1973) (emphasis added).  Here, there is no "imperative" need to hold a

20  hearing.  *Id.*  The States may present any argument in their briefs—and if they have evidence relevant

21  to the Tunney Act, they can present that with their briefs.  There is no need for a pointless evidentiary

22  hearing, which would only serve to further multiply the burden and expense of this Tunney Act

23  proceeding—and further undermine the policy of promoting consent decrees as a less costly means

24  of resolving antitrust cases.  119 Cong. Rec. 24,598 (1973) (stmt. of Sen. Tunney) ("The court is

25  nowhere compelled to go to trial or to engage in extended proceedings which might have the effect

26  of vitiating the benefits of prompt and less costly settlement through the consent process.").

27                                   **IV.    <u>CONCLUSION</u>**

28         The Amended Proposed Final Judgment should be entered.

HEWLETT PACKARD ENTERPRISE CO.'S BRIEF IN SUPPORT OF THE MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

Dated: February 2, 2026

By: */s/ Samuel Liversidge*
Samuel G. Liversidge
*Attorney for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

Samuel G. Liversidge (Bar No. 180578)
Eric Vandevelde (Bar No. 240699)
Daniel Nowicki (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Michael J. Perry (Bar No. 255411)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
SWeissman@gibsondunn.com
MJPerry@gibsondunn.com
KLimarzi@gibsondunn.com

Julie S. Elmer (*pro hac vice*)
Jennifer Mellott (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
eric.mahr@freshfields.com
jennifer.mellott@freshfields.com

Justina K. Sessions (Bar No.  270914)
**FRESHFIELDS US LLP**
855 Main St
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

*Attorneys for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

26