# EXHIBIT F

SAMUEL G. LIVERSIDGE (Bar No. 180578)
ERIC VANDEVELDE (Bar No. 240699)
DANIEL NOWICKI (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

JULIE S. ELMER (*pro hac vice*)
JENNIFER MELLOTT (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
jennifer.mellott@freshfields.com

*Attorneys for Defendant*
HEWLETT PACKARD ENTERPRISE CO.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff,*<br><br>v.<br><br>HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC,<br><br>*Defendants.* | Case No. 5:25-cv-00951-PCP<br><br>**DECLARATION OF DR. ELIZABETH M. BAILEY**<br><br>Judge:            P. Casey Pitts<br>Action Filed:  January 30, 2025 |

1

DECLARATION OF DR. ELIZABETH M. BAILEY, Case No. 5:25-cv-00951-PCP

I, Elizabeth M. Bailey, declare as follows:

1. I am a Vice President at Charles River Associates. I have personal knowledge of the facts set forth below and, if called as a witness, I could and would testify to each of them under oath.

2. For over 20 years, I have applied economic principles to antitrust cases involving mergers, acquisitions, and joint ventures. My industry experience includes software, signals intelligence and other matters involving national security, video gaming, retail industries such as supermarkets and sporting goods stores, consumer product goods, transportation, electricity, and healthcare. Prior to Charles River Associates, I was an instructor at the University of Pennsylvania's Wharton School of Business and a lecturer at the University of California – Berkeley's Haas School of Business.

3. I was retained by counsel for Hewlett Packard Enterprise Co. ("HPE") and counsel for Juniper Networks, Inc. ("Juniper") to evaluate, as a matter of economics, the opinions in Dr. Marc Remer's Expert Report dated April 28, 2025 and Dr. Remer's Corrected Expert Report dated May 12, 2025 related to coordinated effects and unilateral innovation effects arising from HPE's proposed acquisition of Juniper. I also evaluated Dr. Remer's opinions provided in his June 4, 2025 Expert Reply Report. My expert report ("Bailey Report") was served on May 19, 2025, I was deposed in this litigation on June 8, 2025, and I provided a surrebuttal expert report on June 17, 2025.

4. In reaching my conclusions I reviewed a wide range of materials including data and documents from HPE and Juniper, data and documents produced by third parties during the litigation and during the DOJ's investigation of the merger, deposition transcripts taken during the litigation and during the DOJ's investigation of the merger along with the associated exhibits, the pleadings and other legal filings in this Action, academic articles, and other publicly available information. A complete list of materials I relied upon is available as Appendix 2 of my report.

5. In my report I conclude that the evidence in this matter shows that the merger is (1) unlikely to reduce innovation competition and, moreover, unlikely to reduce innovation competition such that the proposed transaction would result in a substantial lessening of competition in a relevant antitrust market for enterprise-grade WLAN solutions; and (2) unlikely to increase the risk of coordinated effects and, moreover, unlikely to increase the risk of coordinated effects such that the

proposed transaction would result in a substantial lessening of competition in a relevant antitrust market for enterprise-grade WLAN solutions.

6. In the remainder of this declaration, I discuss my conclusions related to the effects of the merger on innovation competition and specifically innovation competition related to AIOps. AIOps refers to artificial intelligence capabilities integrated into network management systems, including WLAN, in order to streamline, automate, and optimize network operations and IT resources. I also discuss the "AI Ops for Mist Source Code License," as defined in the Amended Proposed Final Judgement ("APFJ"), and its potential impact on innovation competition.[1] In particular, I explain that to the extent any concerns remain, the AI Ops for Mist Source Code License described in the APFJ addresses those remaining concerns over ongoing enterprise-grade WLAN innovation competition in the United States.

7. As an initial matter, peer-reviewed economic literature shows that mergers may lead to more innovation, especially when they lead to the elimination of duplicative efforts and more effective allocation of research and development ("R&D") resources. Furthermore, mergers may lead to more innovation when merging firms share innovative knowledge and the merger enlarges the base of application for innovations, thereby increasing the incentive to invest in innovation post-transaction.

8. Second, I concluded the relevant geographic market for innovation in enterprise-grade WLAN solutions is broader than the United States. My analyses showed that WLAN providers operate their businesses globally. In addition, WLAN providers keep abreast of innovations developed by competitors around the world including those by Huawei, which does not offer WLAN solutions in the United States. Moreover, innovations undertaken in response to foreign competitors outside the United States redound to American consumers because market participants sell the same products outside the United States as they sell within the United States.

9. Third, I found that many firms are a source of innovation in the WLAN industry. My analysis of WLAN-related US patent filings over the past twenty years demonstrates that many firms engage in innovation activity. My report shows that many firms including Huawei, Cisco,

---

[1] https://www.justice.gov/atr/media/1417776/dl?inline (hereinafter APFJ) at Section V.

CommScope, Extreme, and Fortinet hold as many or more WLAN-related patents compared to HPE and/or Juniper (Exhibit 26 Bailey Report). Furthermore, patent data show that many firms including Nile, Arista, CommScope, Huawei, and Cisco have increased their count of WLAN-related patents over the past five years by more than HPE and/or Juniper (Exhibit 27 Bailey Report).

10.     In addition, publicly available information shows that many firms have won or have been shortlisted for one or more of several third-party industry innovation awards related to WLAN innovation such as the CRN Tech Innovators Award, the Wireless Broadband Alliance Industry Awards, and the Wireless LAN Professionals Conference "WiFi Awards." Firms winning these awards for WLAN innovations include large firms such as Cisco and emerging technological innovators such as Nile. Other companies that won or were shortlisted for these awards for WLAN innovation include CommScope, Extreme, Fortinet, and Arista (Exhibits 28-30 Bailey Report).

11.     Fourth, my analyses showed that many firms have R&D expenditures that are or could be available for WLAN innovation. In 2024, Huawei and Cisco had the largest total R&D spending among the firms active in the enterprise-grade WLAN industry, and other companies such as Arista and Fortinet had total R&D spending greater than half a billion dollars (Exhibit 31 Bailey Report). R&D spending is informative as to the ability to engage in, as well as expand, WLAN innovation even when firms offer products other than WLAN.

12.     Fifth, publicly available information shows that AIOps innovation is an industry-wide innovation effort, not an innovation unique to Juniper. Similar to Juniper, many WLAN vendors developed AIOps capabilities and today offer AIOps features that are comparable to those of Juniper's Mist AIOps. My report shows that many firms added AIOps features at the same time as Juniper's AIOps features, Mist, was being integrated in Juniper's WLAN offering in 2019. Moreover, my report shows that by 2025, AIOps was widely available as part of many competitors' WLAN products. As of the date of my report, WLAN companies with AIOps features, inclusive of those investing in AIOps features, include Arista, Cambium, Cisco, CommScope, Extreme, Fortinet, HPE, and Juniper. Analyses provided in my report at Exhibit 34 show that each of Arista, Fortinet, CommScope, and Extreme as well as Cisco introduced AIOps-related innovations in nearly every year from 2019 through 2025.

13. In my report, I concluded that there would be no substantial lessening of competition in a relevant market for WLAN innovation even without remedies. In assessing a remedy in this type of case, the baseline assumption is therefore that the proposed licensing remedy, so long as it does not itself reduce competition, will provide a further assurance that the merger will not result in a substantial lessening of competition. Nevertheless, as the remedies have been questioned by the States, in the following paragraphs I walk through an analysis of the license remedy proposed in this action.

14. The APFJ requires HPE to hold an auction for a one-time, perpetual, irrevocable, non-exclusive, worldwide license to the AI Ops for Mist Source Code.[2] The APFJ also requires HPE to provide the purchaser of the license (the "Licensee") transition services such as knowledge transfer assistance, software updates, and engineering support for ordinary course maintenance and bug fixes as well as support for integrating the Mist AIOps source code into the Licensee's software for a period of up to 18 months.[3] In addition, at the option of the Licensee, the APFJ requires HPE to provide the Licensee "with relevant contact information for and facilitate introductions to" Juniper's original design manufacturers ("ODM") for Juniper's WLAN hardware as well as Juniper's WLAN distributors and channel partners in the United States.[4] Also at the option of the Licensee, the APFJ requires HPE to transfer to the Licensee up to 30 Juniper engineers familiar with the Mist AIOps source code and up to 25 Juniper sales personnel experienced in selling Mist.[5]

15. The terms for the proposed AI Ops for Mist Source Code License in the APFJ are consistent with the guideposts provided in the 2020 DOJ Merger Remedies Manual ("DOJ Remedies Manual").[6] **First**, consistent with the DOJ Remedies Manual which recommends a license be "fully

---

[2] APFJ, Section V.1.B ("The AI Ops for Mist Source Code License shall consist of a one-time, perpetual, worldwide, non-exclusive license to the AI Ops for Mist Source Code…").
[3] APFJ, Section V.1.B.4 and V.1.B.5.
[4] APFJ, Section V.1.B.6. In case of multiple bids above $8 million, the APFJ requires HPE to license the Mist source code to a second Licensee without technical support, the transfer of employees, or introduction to Juniper's suppliers, distributors, and channel partners (APFJ, Section V.1.C.4).
[5] APFJ, Section V.1.B.5. The APFJ also requires HPE to provide financial incentives to encourage personnel transfer as well as a non-solicit provision preventing HPE from rehiring any personnel transferred for up to 12 months (APFJ, Section V.1.B.5).
[6] https://www.justice.gov/atr/page/file/1312416/dl. Although DOJ withdrew the 2020 Merger Remedies Manual in 2022, it nevertheless provides a useful framework to understand how the DOJ assesses remedies in merger cases.

paid-up"[7] (i.e., not subject to continuing license or royalty fees), the proposed license for the Mist software code is a one-time, perpetual license, i.e., it is fully paid upfront.[8] **Second**, consistent with the DOJ Remedies Manual's recommendation of a non-exclusive license "when the merged firm needs to retain rights to the intangible assets to achieve demonstrable efficiencies",[9] as is the case in this matter, the proposed AI Ops for Mist Source Code License identified in the APFJ is a non-exclusive license. **Third**, consistent with the DOJ Remedies Manual, which recommends a license enable the divestiture buyer to "compete quickly and effectively"[10] as a long-term competitor that continues to innovate,[11] the proposed license for the Mist source code is irrevocable, i.e., it cannot be clawed back or reversed. In addition, the Licensee has the right to further modify the licensed source code. Such modification would be exclusively owned by the Licensee, which incentivizes ongoing innovation by the Licensee in enterprise-grade WLAN.[12] **Fourth**, so as to establish a competitor that can compete quickly and effectively, the proposed license includes transition services for up to 18 months and the transfer of sales and engineering personnel to help the buyer integrate the AI Ops for Mist Source Code in its own software. Consistent with the DOJ Remedies Manual,[13] the APFJ includes a temporary non-solicitation provision to limit HPE's ability to re-hire employees transferred to the Licensee.[14] As well, the APFJ provides the Licensee access to the contact information for Juniper's WLAN ODMs, distributors, and channel partners.[15] **Fifth**, consistent with my analysis that the relevant geographic market for innovation is broader than the United States, the proposed license is for worldwide use.[16] **Sixth**, consistent with the DOJ Remedies Manual which recommends a divesture should be to "an

---

[7] DOJ Remedies Manual, Section 3.A, page 7.
[8] APFJ, Section V.1.B.
[9] DOJ Remedies Manual, Section 3.A, page 13.
[10] DOJ Remedies Manual, Section 3.A, page 7.
[11] DOJ Remedies Manual, see Section 3.A generally.
[12] APFJ, Section V.1.D.2.
[13] DOJ Remedies Manual, Section 3.B, page 14 ("Similarly, divestitures normally involve the transfer of personnel, and *temporary* limits on the merged firm's ability to re-hire these employees may be necessary.")
[14] APFJ, Section V.1.B.5.
[15] APFJ, Section V.1.B.6.
[16] APFJ, Section V.1.B ("The AI Ops for Mist Source Code License shall consist of a one-time, perpetual, worldwide, …")

acceptable buyer,"[17] the APFJ specifies that the Licensee must be "acceptable to the United States".[18] HPE is subject to the DOJ's "sole discretion" in its approval of the Licensee and the applicable license terms.[19] Among other requirements enumerated in the APFJ, HPE must "satisfy the United States, in its sole discretion, . . . that the AI Ops for Mist Source Code can and will be used by Licensee(s) to compete in the market for the provision of enterprise-grade WLAN solutions in the United States."[20] To obtain the DOJ's approval of the Licensee, HPE is required to provide monthly status reports to the DOJ in the form of affidavits from counsel describing "the efforts Defendants have undertaken to . . . conduct the AI Ops for Mist Source Code Auction."[21]

16. For a divestiture to preserve or restore competition, the divestiture buyer need not replicate the size or scope of either of the parties to the proposed transaction. In addition, "a successful divestiture does not depend on the price paid for the divestiture assets" nor whether "the price paid for the divestiture assets is 'too low' or 'too high.'"[22] Rather, from an economic perspective, the question is whether the divestiture buyer will have the ability and incentive to compete such that there will not be a substantial lessening of competition.

17. With respect to the proposed AI Ops for Mist Source Code License, many potential bidders are likely to have the ability and incentive to compete, especially to the extent they have existing business in adjacent or complementary areas of networking software. As I showed in my report, firms offering enterprise-grade WLAN also have many non-WLAN software and hardware offerings such as data center switching, campus switching, SD-WAN, network access control, and network security. It makes economic sense, therefore, that other firms whether nascent or not yet active in enterprise-grade WLAN are incentivized to enter or expand their presence using the AI Ops for Mist Source Code. This is consistent with the DOJ Remedies Manual, which identifies the potential divestiture buyer's "status

---

[17] DOJ Remedies Manual, Section 4.A, page 22.
[18] APFJ, Section V.1.A and V.1.C.2.
[19] APFJ, Section V.1.A
[20] APFJ, Section VI.B.
[21] APFJ, Section VII.A.
[22] DOJ Remedies Manual, Section 5.A, page 25.

as a significant producer of a complementary product" as evidence of "the purchaser's intention to compete in the relevant market."[23]

18.     In summary, my analyses show that the transaction was unlikely to reduce innovation competition and, moreover, unlikely to reduce innovation competition such that the proposed transaction would result in a substantial lessening of competition in a relevant antitrust market. Nevertheless, to the extent any concerns remain, the AI Ops for Mist Source Code License described in the APFJ would address any remaining concerns over ongoing enterprise-grade WLAN innovation competition in the United States.

19.     I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 2, 2026

_____
Dr. Elizabeth M. Bailey
Vice President
Charles River Associates

---

[23] DOJ Remedies Manual, Section 4.B, page 23.