1  PHILIP J. WEISER
   Attorney General
2  ARTHUR BILLER (*pro hac vice*)
   Senior Assistant Attorney General
3  BRYN A. WILLIAMS
   First Assistant Attorney General (SBN 301699)
4  1300 Broadway, 10th Floor
   Denver, CO 80203
5  Telephone: (720)508-6000
6  Email: Arthur.Biller@coag.gov
          Bryn.Williams@coag.gov
7
   *Attorneys for Intervenors*
8
   [Additional counsel listed on signature page]
9
                    **UNITED STATES DISTRICT COURT**
10
                    **NORTHERN DISTRICT OF CALIFORNIA**
11
                    **SAN JOSE DIVISION**
12
13  UNITED STATES OF AMERICA,          )  CASE NO. 5:25-cv-00951-PCP
                                       )
14              *Plaintiff,*           )  **INTERVENORS' OPPOSITION TO**
                                       )  **MOTION FOR ENTRY OF FINAL**
15         vs.                         )  **JUDGMENT**
                                       )
16  HEWLETT PACKARD ENTERPRISE CO.     )  **REDACTED VERSION**
    and JUNIPER NETWORKS, INC.         )
17                                     )
                *Defendants.*          )  Judge: P. Casey Pitts
18                                     )  Action Filed: January 30, 2025
                                       )  Hearing: March 23, 2026 at 10:00 am
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

I.    The Enterprise-Grade WLAN Solutions Market. ..................................... 3

II.   Competitors.............................................................................................. 6

III.  Juniper Was A Maverick. ......................................................................... 6

IV.  HPE And Juniper Had Significant Head-To-Head Competition............... 9

V.   The United States Is The Relevant Geographic Market. ........................ 12

VI.  From Enforcement On The Merits To Meritless Settlement. .................. 12

      A.   HPE Hires Mike Davis, Will Levi, and Arthur Schwartz to Lobby DOJ... 12

      B.   Mr. Davis and Mr. Levi Lobby the ATR Front Office, and Mr. Assefi Entertains ███████████ Proposals. ....................... 13

      C.   Mr. Schwartz and HPE Lobby Defense and Intelligence Agencies. .......... 14

      D.   ATR Leadership Raise Concerns with HPE's Proposals, and Mr. Davis Responds by Threatening Ms. Slater. ........................................................ 15

      E.   ATR Leadership Demand ████████████████ ███████ and Reject Lobbyist Involvement................................. 16

      F.   HPE Abandons Discussions with ATR in June and Presses Mizelle Directly, While Conflict Within the DOJ Continued………………………..17

      G.   Mr. Woodward Takes Over Settlement Negotiations and Mr. Schultz Negotiates Directly with Him Without ATR Involvement. ....................... 18

      H.   ATR Is Looped in Just Hours Before Filing................................................. 19

      I.   Mr. Alford Witnessed ████████████ and Misconduct………..20

VII.  Aftermath of the Settlement.................................................................... 20

      A.   Mr. Alford and Mr. Rinner are Terminated as Punishment........................ 21

- i -

B.     Mr. Alford Blows the Whistle on Settlement. ............................................ 21

C.     Mr. Davis Sends Vicious Text Messages to Ms. Slater and Mr. Alford. ... 22

D.     Mr. Davis Lobbies the President, and Ms. Slater Is Ousted February 2026…………………………………………………………………22

E.     Mr. Alford Identifies Substantive and Process Concerns for the Court. .... 23

ARGUMENT.............................................................................................................23

I.      The Tunney Act. .................................................................................23

II.     The US Failed To Meet Its Procedural And Disclosure Obligations. ......................26

III.    HPE Failed To Meet Its Disclosure Obligations. ......................................27

IV.    The US Abdicated Its Role And Is Not Entitled To Any Deference. ......................28

V.     The Settlement Violates The Public Interest. ...........................................31

     A.     Competition Analysis Demonstrates the US Had a Very Strong Case. ..... 31

         1.     The United States Had Established a Prima Facie Case. ........... 32

         2.     The Merger Will Harm Innovation. ............................................ 33

         3.     The Merger Threatens Harm From Coordinated Effects….34

         4.     The Merger Threatens Harm From Unilateral Price Effects…………………………………………………………………36

     B.     HPE Has Not Rebutted This Strong Showing. ........................................... 37

     C.     The Settlement Fails To Address Competitive Harms And Is Far Weaker Than Alternative Remedies Actually Considered. ..................................... 39

         1.     Alternative Remedies Actually Considered Demonstrate that the US Had Ways to Protect Competition—and Rejected Them. ... 40

         2.     Instant On Divestiture Will Not Restore Competition. .............. 41

         3.     Mist AI Ops License Will Not Restore Competition. ................ 44

     D.     The Settlement Cannot Be Justified Based on Risk of Trial. .................... 46

     E.     The Settlement Fails on the Mandatory Tunney Act Factors. .................... 47

     F.     National Security Arguments Are Irrelevant and Unsubstantiated. ........... 48

VI.    The Court Should Hold An Evidentiary Hearing. .......................................................50

CONCLUSION........................................................................................................................50

Intervenors' Opposition to Motion for Entry of Final Judgment –
Case No. 5:25-cv-00951-PCP

# TABLE OF AUTHORITIES

## Cases

*FTC v. Kroger Co.*,
  No. 3:24-cv-347, 2024 WL 5053016 (D. Or. Dec. 10, 2024) ...................................... 32
*FTC v. Sanford Health*,
  926 F.3d 959 (8th Cir. 2019) ................................................................................... 39
*Procter & Gamble Co.*,
  386 U.S. 568 (1967)................................................................................................ 37
*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) ............................................................................. passim
*United States v. Aetna Inc.*,
  240 F. Supp. 3d 1 (D.D.C. 2017)............................................................................. 46
*United States v. Airline Tariff Publ'g Co.*,
  836 F. Supp. 9 (D.D.C. 1993) ................................................................................. 24
*United States v. Am. Tel. & Tel. Co.*,
  552 F. Supp. 131 (D.D.C. 1982) ........................................................................ 24, 28
*United States v. Baker Hughes*,
  908 F.2d 981 (D.C. Cir. 1990) .......................................................................... 31, 39
*United States v. Bazaarvoice, Inc.*,
  No. 13-cv-00133, 2014 WL 203966 (N.D. Cal. 2014) ........................................ 36, 39
*United States v. Bechtel Corp.*,
  648 F.2d 660 (9th Cir. 1981) ............................................................................ 25, 48
*United States v. CVS Health Corp.*,
  407 F. Supp. 3d 45 (D.D.C. 2019) ........................................................................... 24
*United States v. H & R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011)....................................................................... 36, 42
*United States v. JetBlue Airways Corp.*,
  712 F. Supp. 3d 109 (D. Mass. 2024)............................................................ 37, 39, 41
*United States v. Microsoft Corp.*,
  215 F. Supp. 2d 1 (D.D.C. 2002) ....................................................................... 24, 25
*United States v. Microsoft,*
  *Corp.*, 231 F. Supp. 2d 144 (D.D.C. 2002)............................................................... 24
*United States v. Philadelphia Nat. Bank*,
  374 U.S. 321 (1963)............................................................................................ 32, 49

## Statutes

15 U.S.C. § 16.................................................................................................... passim
15 U.S.C. § 18.................................................................................................... 37, 38

## Other Authorities

119 Cong. Rec. 24597 ............................................................................................. 24
119 Cong. Rec. 24598 ............................................................................................. 23
Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*,
  77 Antitrust L.J. 49 (2010) ..................................................................................... 33

1

FTC, A Guide for Respondents: What to Expect During the Divestiture Process (June 2019)........ 24

2

FTC, Negotiating Merger Remedies, Statement of the Bureau of Competition of the FTC (Jan. 2012) ........................................................................................................................................ 24

3

FTC, Statement of the Federal Trade Commission's Bureau of Competition on Negotiating Merger Remedies (2026) ...................................................................................................................... 40

4

H. Rep. No. 93-1463 ........................................................................................................................ 24

Herbert Hovenkamp & Carl Shapiro, *Horiztonal Mergers, Market Structure, and Burdens of Proof*, 127 Yale L. J. 1996 (2018) ............................................................................................ 34

5

S. Rep. No. 93-298 .................................................................................................................... 24, 28

6

U.S. Dep't of Just. & FTC, Merger Guidelines (2023) ........................................................... passim

U.S. Dep't of Just., Antitrust Division Policy Guide to Merger Remedies (2011) .......................... 24

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

1       The United States ("US") had a great case and gave it away at the eleventh hour in a startling

2 display of patronage.  That patronage ignored the role of the Antitrust Division, ignored the merits,

3 and ignored the public interest.  On the merits, there was no dispute that the relevant market through

4 which to analyze the merger was enterprise-grade WLAN solutions in the US.  There was also no

5 dispute that the merger was presumptively anticompetitive based on well-established, generally-

6 accepted measures of market concentration, known as a structural presumption.  That presumption

7 established a prima facie case for the US.  But the US had more.

8       There was no real dispute that Juniper was a maverick—a disruptive force that was highly

9 innovative and aggressively discounted its pricing to win business from incumbent suppliers.  This

10 was great for the market.  Competitors, especially HPE, had to improve their products to keep up

11 with Juniper and lower their prices to stay competitive, all to the benefit of customers.  Elimination

12 of Juniper from the market will harm this innovation.

13       There could also be no dispute that HPE and Juniper engaged in significant head-to-head

14 competition.  As Juniper grew, it began to encroach on one of HPE"s most important set of

15 customers—higher education institutions—and was able to steal business away from HPE.  In

16 response, HPE launched an initiative called Project Gravity aimed at improving and updating its

17 Aruba Central platform to better compete with Juniper's Mist.  HPE also started a "Beat Mist" sales

18 campaign to train HPE's sales staff on how to compete against Juniper, and connect the sales staff

19 with engineers so that HPE could better respond to Juniper in the field. This merger will harm

20 customers who have benefited from head-to-head competition between HPE and Juniper.

21       The US also would have been able to show that the merger increased the risk of coordinated

22 effects.  In addition to creating a highly concentrated market, the merger would result in two firms—

23 Cisco and HPE—controlling roughly █████ of the market.  That significantly raises the risk of HPE

24 and Cisco effectively pulling punches against each other, to the detriment of customers.

25       Armed with a strong case, the DOJ's Antitrust Division ("ATR") took an appropriate stance

26 in settlement negotiations, insisting that HPE divest ████████████████████████████████

27 █████████████████████████.  HPE refused.  But instead of defending the merger on the merits in

1    this Court, they engaged a group of well-connected lobbyists to go over the heads of ATR and strike

2    a sweetheart deal on terms that ███████████████ by ATR.  The series of events that led to

3    the Settlement[1] are unprecedented and should shock the conscience.  This is exactly the kind of case

4    the Tunney Act is meant to prevent and it is why Congress empowered this Court to reject the

5    settlement as against the public interest.

6         Threats were made against the head of ATR and her top deputies; ATR was totally sidelined

7    from the decisive round of negotiations and told █████████████████████████

8    ████  that a settlement had been reached; HPE █████████████████████████

9    despite the fact that is the responsibility of the DOJ; HPE and the DOJ considered subverting the

10   Tunney Act entirely in favor of ██████████████████████████; and the US

11   and HPE withheld information from their statutorily-required disclosures about the alternative

12   remedies actually considered and the full extent of HPE's lobbying of the Executive Branch.  The

13   way the Settlement was reached and the US failure to comply with its statutory requirements under

14   the Tunney Act warrants rejection of the Settlement, but at a minimum it requires that the Court

15   afford no deference to the US.

16        The result of this corrupted process is a Settlement that fails to address the merger's harms

17   at all.  The divestiture of Instant On fails to move the needle—it is a product that has ██% market

18   share, so its divestiture does not in any way eliminate the structural presumption of competitive

19   harm from the merger.  And Juniper did not compete against Instant On, so this divestiture fails to

20   address any of the anticompetitive harms of the merger.  The source code license, for its part, fails

21   to live up to its billing—it is only a fraction of Mist's capabilities, ██████████████████

22   ████████████████████████.  It is also the kind of remedy historically disfavored

23   by antitrust enforcers as unlikely to restore the competition lost through elimination of Juniper.

24        This Settlement violates the public interest.  It violates the public interest because of the

25   corrupt process that led to the settlement; because the US has failed to comply with the requirements

26   of the Tunney Act; and perhaps most critically, it violates the public interest because it does not

27

28   _____

[1] The "Settlement" is the agreement between the US and HPE to resolve this litigation, including as reflected in the Proposed Final Judgment (Dkt. 217-1) and as amended (Dkt. 311-2).

1  address the competitive concerns that animated this investigation  and litigation.  It must be rejected.

2  **BACKGROUND**

3  **I.     The Enterprise-Grade WLAN Solutions Market.**

4  There was no dispute between the US and Defendants that the relevant market through which

5  to analyze the merger of HPE and Juniper was the market for enterprise-grade Wireless Local Area

6  Network ("WLAN") solutions in the US.  *See* Ex. 24 (Hill Rpt.) ¶¶ 95-96.

7  Broadly, enterprise networking solutions involve a set of hardware and software that

8  combine to provide internet access through either wired or wireless connections across a specified

9  geographic space.  Ex. 22 (Remer Rpt.) ¶¶ 9, 36-39.  The space could range from a small company

10  office to large universities, healthcare companies, and Fortune 500 companies.  *Id.* ¶¶ 9, 141.  A

11  Local Area Network ("LAN") is a network of user devices—e.g., laptops, smartphones, and

12  tablets—that is managed through wired or wireless connections.  Ex. 22 (Remer Rpt.) ¶¶ 31-34.

13  Wireless LAN ("WLAN") refers to a group of devices that form a network based on radio

14  transmissions.  Ex. 22 (Remer Rpt.) ¶¶ 31-32.  WLANs connect devices to each other and to the

15  broader LAN.  Ex. 191 (PX0837) at -005; Ex. 190 (PX0835) at -989.

16  Enterprise-grade WLAN systems are primarily sold to businesses and other institutions such

17  as retail stores, hospitals, universities, school districts, and federal, state, and local governments with

18  high performance and high-agility networking needs.  Ex. 187 (PX0781) at -531.  Different

19  customers have different needs depending on the physical size of their location and the number of

20  devices to be covered, among other things. Ex. 22 (Remer Rpt.) ¶¶ 68-73.  Larger customers

21  typically require more sophisticated networking solutions, often purchase multiple components, and

22  require more support services.  Ex. 2 (Carpentier Dep.) at 36:10-37:18, 61:19-63:13.  For example,

23  ████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████

25  ████████████████████████." Ex. 158 (PX0248) at -456.

26  The US challenge to the merger focused on the competitive overlap between the two

27  companies in the product of enterprise-grade WLAN solutions.  *See generally*, Dkt. 1.  Enterprise-

28  grade WLAN solutions typically consist of high-performance wireless access points ("APs"),

controllers, network management software, and related support services.

**Wireless access points** ("APs") are the hardware components that allow user devices to connect to a wireless network and receive and transmit data. Ex. 117 (DOJ_ER_001463) at 486. They connect user devices to each other and other applications and resources. Ex. 190 (PX0835) at -989–90. APs transmit a WiFi signal over a specified physical area, which could be indoors or outdoors. *Id.* Enterprise-grade access points can handle many simultaneous connections, *id.*, and are designed for use in systems with multiple access points, Ex. 141 (JNPR-2R-00980355) at -358. They are managed centrally through a cloud-based or on-premises control system; support higher data throughput and have lower latency; and include hardware, like specialized radio antennas, that enable advanced applications, including traffic prioritization and analytics. Ex. 190 (PX0835) at -990. Enterprise-grade access points are connected to hardware devices called campus switches using Ethernet cables. Switches send and receive data using a wired connection and physically link access points to other networking equipment. Ex. 193 (PX0851) at -385, -387.

**Controllers** are specialized networking devices or applications that manage and monitor multiple APs. *See* Ex. 195 (PX0862). Wireless access points can be centrally managed either through on-premises (sometimes called "on-prem") controllers or through virtual, cloud-based controllers. Ex. 190 (PX0835) at -990; Ex. 20 (Wilburn Dep.) at 13:17-21, 25:4-26:17. Cloud-based controllers run on remote servers and perform management functions through the internet. Ex. 22 (Remer Rpt.) ¶ 37. Customers have been increasingly moving to the cloud in recent years (more on that below). Ex. 176 (PX0559) at -616; Ex. 20 (Wilburn Dep.) at 64:22-66:4, 68:4-8.

**Network management software** broadly refers to software tools or platforms that monitor, manage, and control networks, helping to automate networking operations and reduce maintenance cost. Ex. 194 (PX0853) at -440. This can include artificial intelligence, called AI Ops, which can automate the process of detecting problems and solving them. AI Ops are designed to help network administrators and other information technology ("IT") professionals streamline network operations and more quickly remediate network failures, for example by proactively testing network connections and providing remediation steps to quickly resolve the issue. Ex. 189 (PX0816) at -447-50.

1    **Related support services.**  Suppliers of enterprise-grade WLAN solutions also offer service

2    and support for the software and hardware products.  This support can include software updates and

3    patches, technical assistance, and training. Ex. 16 (Ramaswamy Dep.) at 186:3-187:13; Ex. 22

4    (Remer Rpt.) ¶ 39.

5        HPE offers its enterprise-grade WLAN solutions through its legacy network management

6    solution, Airwave, and its Aruba line of products, which includes Aruba Central and, more recently,

7    Aruba CNX (sometimes referred to as Central Next-Generation or Central Next-Gen). Ex. 194

8    (PX0853) at -440; Ex. 159 (PX0252) at -222; Ex. 8 (Hughes Dep.) at 36:13-22, 43:7-23.  Aruba is

9    designed specifically for enterprise customers, Ex. 2 (Carpentier Dep.) at 208:25-209:18, and offers

10   both on-prem and cloud-based options, Ex. 8 (Hughes Dep.) at 37:9-19.

11       HPE also offers a product called Instant On "specifically designed to serve the small and

12   medium business segment ("SMB"), particularly the 'S[mall]' in SMB," according to the HPE

13   CEO.[2]  Ex. 2 (Carpentier Dep.) at 210:11-20.  The HPE website and internal documents indicate

14   Instant On is suitable for small businesses and entities with no IT staff.[3]  *See* Ex. 163 (PX0382) at -

15   582–583; Ex. 42 (Schultz Ex. 7).  Instant On generated around $███████ in WLAN revenue in

16   North America in 2024.  Shapiro Decl. at ¶ 99.

17       Juniper offers its enterprise-grade WLAN solutions through its Mist line of products.  Mist

18   is entirely a cloud-based product.  Ex. 135 (HPEUS-006558115) at -139; Ex. 20 (Wilburn Dep.) at

19   25:4-11.  At the time of the acquisition, Mist Systems had the networking industry's sole AI-

20   powered virtual networking assistant, Marvis.  Ex. 192 (PX0840) at -396; Ex. 187 (PX0781) at -

21   525, -527-528.

22       HPE has determined that Mist will be its go-forward cloud-based offering, and Aruba will

23   be its go-forward on-prem offering.  Ex. 47 (HPE Resp. to Intervenors' Second Interrog.) No. 6.

24

25

26   [2] *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, The Capitol Forum (July 24, 2025) (quoting HPE CEO comments on a July 10, 2025 call with investors), https://thecapitolforum.com/hpe-juniper-as-fight-between-doj-leadership-and-antitrust-division-broils/ .

27

28   [3] Instant On: Small Business Wi-Fi That Works As Hard As You Do," https://www.hpe.com/us/en/instant-on/small-business.html (last visited Mar. 7, 2026).

## II.    Competitors.

There is no dispute that the largest competitor in the relevant market is Cisco, which had over ▮% market share in 2024.  Ex. 23 (Remer Reply Rpt.) ¶¶ 101-102.  HPE was the second largest competitor, at ▮%.[4]  *Id.*  Juniper was third at ▮%.  *Id.*  All other competitors were much smaller by comparison.  The next largest were Ubiquiti at ▮% and Ruckus at ▮%; all others were below ▮ share.  *See id.*

Having a combined share of over ▮, Cisco, HPE, and Juniper recognized that they were in a class of their own.  HPE referred to this trio as "Tier 1" suppliers.  Ex. 22 (Remer Rpt.) ¶¶ 60, 109-111; Ex. 120 HPE-LIT-004181747 at -751.  The reason was that only these three companies were capable of regularly competing for large enterprise customers such as universities, healthcare facilities, and big corporations with complex needs.  Ex. 22 (Remer Rpt.) ¶¶ 109-119.  Although the smaller competitors do compete for these accounts at times, they cannot do so at the same scale that Cisco, HPE, and Juniper did.  Ex. 22 (Remer Rpt.) ¶¶ 120-140.

## III.    Juniper Was A Maverick.

In 2019, Juniper acquired a WLAN startup called Mist Systems, founded by former Cisco executives Sujai Hajela and Bob Friday.  Ex. 192 (PX0840) at -396; Ex. 20 (Wilburn Dep.) at 14:17-15:1, 21:4-23:20, 24:23-25:3.  Mist established itself as a leader in cloud-managed wireless networking by designing its platform around user experience and by integrating advanced artificial intelligence and machine-learning tools to automate troubleshooting and accelerate network-failure remediation.  Ex. 20 (Wilburn Dep.) at 25:4-30:16.  Its cloud-management platform—also called Mist—incorporated Marvis, the industry's only AI-powered virtual network assistant at the time of the acquisition.  Ex. 192 (PX0840) at -396; Ex. 20 (Wilburn Dep.) at 25:4-25:18. These innovative capabilities uniquely positioned Mist to modernize enterprise WLAN operations and provided the technological foundation Juniper sought to expand its cloud-managed networking portfolio.

Juniper's 2019 acquisition of Mist was like "▮▮▮▮▮" for Juniper and fundamentally

---

[4] Although there was some dispute between the US and HPE over market shares, that dispute is ultimately immaterial to the bottom line conclusions, as explained more below and in the Declaration of Carl Shapiro ("Shapiro Decl."), submitted herewith.  *See* Shapiro Decl. ¶ 16.

altered its competitive trajectory in the enterprise-grade WLAN market. Ex. 103 (JNPR-2R-00829436) at 9441; Ex. 14 (Rahim 4/17/2025 Dep.) at 31:13-32:25, 47:24-48:9. Following the acquisition, Juniper's revenue from enterprise-grade WLAN solutions increased from $█████ in 2019 to $█████ in 2024—more than a twenty-fold expansion. Ex. 22 (Remer Rpt.) at ¶¶ 75-76. From 2021 through 2024, Juniper's market share grew from ███ to ███; no other firm grew its share by more 0.5% over that same time. Shapiro Decl. ¶ 23. Juniper was by far the fastest-growing supplier in the market.

Mist's product is exclusively cloud-based, which Juniper recognized as the fastest growing and most strategically important portion of the market. Ex. 182 (PX0638); Ex. 20 (Wilburn Dep.) at 109:4–111:9; Ex. 19 (Wilburn IH) at 34:22-35:16. HPE similarly recognized, "████████████ █████████████" segment of the market. Ex. 161 (PX0289) at -139. By the end of 2023, Mist had leveraged its cloud-native architecture to ████████████████████████ ████████████████. Ex. 172 (PX0539) at -053.

Mist's rapid expansion was driven by aggressive pricing strategies and concrete, customer-facing innovations that improved network performance and usability. These advances forced competitors to react. Indeed, HPE identified Juniper as the ███████ competitor in the market. Ex. 8 (Hughes Dep.) at 267:16–268:13; Ex. 102 (HPEUS-002451468) at -73.

A major source of Mist's disruptive force was its leadership in AI. Mist was not only an early adopter of AI, but it pioneered practical applications that competitors lacked. Ex. 20 (Wilburn Dep.) at 25:4–26:19, 28:21–30:21; Ex. 182 (PX0638). Mist's AI technology introduced the first and only "self-driving" AI that could both diagnose and automatically fix network problems, and its virtual network assistant, Marvis, provided administrators with intuitive, real-time support. Ex. 20 (Wilburn Dep.) at 28:21- 30:21, 52:9-53:12. These capabilities created a user experience that customers ████████████████████. HPE received frequent feedback that the Aruba Central user interface was ████████████████████ than Mist's. Ex. 8 (Hughes Dep.) at 102:9–102:16. Mist's design strength was so clear that HPE ███████████████ ████████████████████████████████. Ex. 8 (Hughes Dep.) at 131:4–131:7.

1    The practical impact of Mist's technology was evident across a range of customers.  For

2  example, in a public LinkedIn post, Sudheer Matta, Juniper's Senior Vice President for Product

3  Management, highlighted UMass Amherst's experience reducing helpdesk tickets by 99% after

4  deploying Mist's AI automated troubleshooting.  Ex. 170 (PX0510) at –193. UMass Amherst

5  reported that Mist's AI platform was "simple to deploy and operate," did not "require expert

6  engineers," and freed its IT staff to focus on higher value tasks.  *Id.* at –193.  Other documented

7  examples  include  ███████████  deploying  1,500  access  points  in  a  single  day,  ████

8  reducing onsite troubleshooting visits by 85%, and ████ "███████████████████████████

9  ████████████████."  Ex. 173 (PX0541) at –087; Ex. 174 (PX0549) at –191.

10    Juniper's growth was also propelled by a deliberate strategy of targeting large enterprises

11  with aggressive pricing, which HPE recognized as a serious competitive threat.  Ex. 146 (PX0052)

12  at –113, –115 (Juniper was "████████████████████████" and its pricing "██████████████

13  ████████████████").  One focus of this strategy was higher education institutions—a segment

14  where HPE's Aruba historically dominated.  Ex. 146 (PX0052) at –120–21; Ex. 22 (Remer Rpt.) ¶¶

15  82-88.  Juniper expressly identified ███████████████████ as a priority and developed

16  targeted campaigns aimed at key universities, describing its plan as "███████████."  Ex. 178

17  (PX0569) at –675-76, –680.  Juniper simultaneously pursued other large enterprises, including

18  ████████████████████████.  Ex. 22 (Remer Rpt.) ¶¶ 82, 89-91.

19    A central feature of Juniper's pricing strategy was its "AI on Us" promotion, first launched

20  in 2021.  The program offered steep discounts to customers operating 1,000 or more APs from rival

21  WLAN providers, effectively lowering switching costs for precisely the large enterprises Juniper

22  sought to win.  Ex. 175 (PX0550) at –116; Ex. 20 (Wilburn Dep.) at 44:24-45:7.  Juniper viewed

23  "AI on Us" as a critical engine of growth, calling it the ██████████████████████████████████

24  ██████████" and "████████████████████████████."  Ex. 179 (PX0574) at –861; Ex. 177

25  (PX0568) at –731.  In 2022, Juniper noted that it converted ███ customers to Mist through the

26  program.  Ex. 140 (JNPR-2R-00423604) at -605.

27    Juniper's disruptive strategy translated into concrete competitive success, enabling it to win

28  major accounts long held by incumbent vendors.  In May 2022, for example, HPE competed against

- 8 -

Mist for a sale to George Washington University. Ex. 124 (HPEUS-001161115) at -120. HPE's own personnel emphasized the scale of the threat, noting that Juniper's pricing advantage amounted to a $██████ difference in list price. Ex. 124 (HPEUS-001161115) at -116. Juniper ultimately won the opportunity. Ex. 22 (Remer Rpt.) ¶ 201.

Juniper continued winning high-value opportunities across core verticals. In 2023, it won the University of Washington account despite the university having been a "██████████████████" of HPE, with HPE internally acknowledging that Mist prevailed in part because of "████████ ███████." Ex. 123 (HPEUS-001071689) at –689. Juniper also displaced █████ at the Department of Veterans Affairs, winning a contract worth over $████████ to serve what Juniper described as the "████████████████████." Ex. 139 (JNPR-2R-00171805) at –808; Ex. 14 (Rahim 4/17/2025 Dep.) at 86:17–87:17. After losing the contract, HPE's Antonio Neri said "█████████ ██████████████████████████████████████████████████████████." Ex. 131 (HPEUS-003822220) at -222. Rami Rahim, Juniper's former CEO, noted the VA contract helped Juniper win other bids because it gave Juniper credibility with other customers. Ex. 14 (Rahim 4/17/2025 Dep.) at 86:17-87:17. Results like these confirmed that Juniper was not only an emerging competitor but one fully capable of displacing entrenched vendors in the largest and most sophisticated verticals.

Juniper's momentum was matched by strong expectations for continued growth. In 2023, Juniper projected that its WLAN sales would grow at an annual rate of ██ percent from 2022 to 2026. Ex. 169 (PX0498) at –739. Market analysts agreed: JP Morgan concluded in June 2023 that Juniper's "████████████████" positioned it to "███████████████████████████ ███." Ex. 160 (PX0271) at –145. Consistent with those external assessments, Juniper's corporate representative testified that the company had strong standalone prospects and ███████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████. Ex. 14 (Rahim 4/17/2025 Dep.) at 122:13–126:24.

## IV.    HPE And Juniper Had Significant Head-To-Head Competition.

HPE and Juniper engaged in significant head-to-head competition that benefited customers in the form of lower prices and higher quality. And as mentioned above, Juniper began encroaching

1   on HPE's most important verticals, such as higher education.  In fact, HPE's CEO considered

2   Juniper to be HPE's "biggest threat."  Ex. 155 (PX0183) at -218.  HPE was forced to respond to

3   Juniper's aggressive pricing and fast-paced innovation by lowering its own prices, making product

4   improvements, and increasing its investment in research and development.

5          One way in which HPE responded to Juniper was through its "Project Gravity" initiative.

6   Project Gravity was a multi-year research and development effort aimed at improving its AI and

7   machine learning offerings and its user interface by introducing its next generation of Aruba Central,

8   sometimes referred to as Aruba CNX.  *See* Ex. 8 (Hughes Dep.) at 101:1-15, 101:18-102:16; Ex.

9   129 (HPEUS-003609053) at -053 ("█████████████████████████████████

10  █████████████████████████████").  Project Gravity was targeted at better

11  competing against, and beating, Mist. Ex. 130 (HPEUS-003617173) at -173 ("I (we) fully recognize

12  the MIST threat for Aruba WW and have done so for a long time. . . . ████████████████

13  █████████████████████████████ . . . [w]e need to put CNX in the hands

14  of the customers NOW."); Ex. 136 (HPEUS-006664298) at –298 (a "████████████████

15  █████████████████████████████████████████████████

16  ██████" which is "██████" to succeed against "████████████████████"); Ex. 122

17  (HPEUS-000777971) at -972-73 (describing Project Gravity as "Beat Mist" initiative); Ex. 125

18  (HPEUS-001242220) at -223 (same).

19         Project Gravity was a roughly three-year long effort.  *See* Ex. 138 (HPJUN-RAM-0000007);

20  Ex. 16 (Ramaswamy Dep.) at 64:4-67:6, 106:5-108:4; Ex. 118 (HPE-LIT-000668048); Ex. 136

21  (HPEUS-006664298) at -298; Ex. 127 (HPEUS-001264023) (March 2021 presentation referring to

22  Project Gravity as a top priority).[5]  On average, HPE had ██████ people working on Project Gravity

23  at any given time. Ex. 5 (Chowdappa Dep.) at 128:22-130:18.

24         Another way that HPE responded directly to Juniper is through its "Beat Mist" sales

25  campaign, which came down from the ██████████████ of the company. Ex. 165 (PX0411) (Beat

26  Mist was strategy of ████████████████).  Beat Mist sought to provide the HPE sales team with

27

28  _____
    [5] As these documents show, Project Gravity started sometime in 2021, and Aruba CNX began rolling out to customers sometime in 2024.

resources to help them win business when competing head-to-head against Juniper.  Ex. 145 (PX0050) at -254 (Beat Mist created because "███████████████████████████████████ ██████████████████").  It included a "mandatory" six-hour training program for solution engineers and territory managers to learn about Mist's technology and sales strategy, as well as talking points to counter Mist's narrative to customers and promote Aruba's strengths.  *Id.* at -254, -256.  HPE also created a "Beat_Mist" email listserve to connect sales teams competing against Mist with HPE engineers, so that the salespeople could get quick and tailored responses to questions as they came up in interactions with prospective customers, and for all involved to share competitive intelligence about Juniper to better compete in the future.  Ex. 2 (Carpentier Dep.) at 154:15-156:20; Ex. 186 (PX0742) at 52 ("████████████████████████████████████████████████████████████ ██████████████████████").

"Beat Mist" also became a battle cry for HPE, sometimes used interchangeably with "Kill Mist"; or as one executive put it, "KILL MIST !!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!!"  Ex. 156 (PX0218) at -762; *see also* Ex. 149 (PX0116) at -271 (email with "████████" in subject line describing how to "████████████████"); Ex. 166 (PX0416) at -159; Ex. 8 (Hughes Dep.) at 127:8-129:21.  Due to the fierce competition from Juniper, HPE understood that it had to "████ ████████████████████████████████████."  Ex. 134 (HPEUS-005168335).

HPE and Juniper were especially close competitors for the segment of customers seeking alternatives to Cisco—often described internally as "████████████████████" or customers suffering from "Cisco fatigue."  Ex. 22 (Remer Rpt.) ¶¶ 189, 196, 279-291.  Although Cisco holds the dominant market position, many of its past and current customers have expressed dissatisfaction with its products and business practices, creating an important competitive opportunity for rival vendors.  *Id.* at ¶ 281.  HPE recognized that Juniper was its principal rival for these customers, noting in November 2024 that both firms "████████████████████████████████████████████████ ████."  Ex. 133 (HPEUS-003842980) at -980.

After the merger was announced, HPE expressed relief that pricing pressure in the market would be reduced after the transaction closed, because HPE and Juniper were each other's "main competitor."  Ex. 148 (PX0113) at -745.  Indeed, HPE acknowledged that it was better for "████

1    ██████████████████████████████████████." Ex. 185 (PX0726) at 16.

2    **V.    The United States Is The Relevant Geographic Market.**

3        There was no dispute between the parties that the relevant geographic market is the United

4    States.  *See* Ex. 24 (Hill Rpt.) ¶ 95.

5    **VI.    From Enforcement On The Merits To Meritless Settlement.**

6        On January 30, 2025, the United States ("US") sued to block HPE from acquiring Juniper

7    because the merger would eliminate a disruptive competitor, leading to reduced innovation, higher

8    prices, and less competition.  The merger was presumptively anticompetitive—even by HPE's own

9    expert's estimation—and would result in two firms holding over ███ of the market.  But instead of

10   trying to defend its acquisition on the merits, HPE hired lobbyists who used their political

11   connections to push aside the Antitrust Division and pressure the DOJ to accept a meager settlement

12   that addressed none of concerns expressed by the professional antitrust enforcers.

13       **A.  HPE Hires Mike Davis, Will Levi, and Arthur Schwartz to Lobby DOJ.**

14       Aside from their counsel of record, HPE retained three others focused on inducing a

15   settlement.  To engage directly with the DOJ, HPE hired Will Levi and Mike Davis.  Ex. 6 (Davis

16   Dep.) at 10:14-17, 56:2-4, 99:22-100:2, 172:19-173:4; Ex. 10 (Levi Dep.) at 42:15-44:2.  HPE

17   retained Mr. Levi in ████████.  Ex. 10 (Levi Dep.) at 42:15-17.  Mr. Levi is a current Partner at

18   Sidley Austin who was Chief of Staff to the Attorney General during President Trump's first term.

19   Ex. 10 (Levi Dep.) at 32:10-24.  After President Trump was re-elected, Mr. Levi was the transition

20   lead responsible for DOJ, where he identified and recommended slates of candidates for key DOJ

21   positions.  Ex. 10 (Levi Dep.) at 38:6-39:19.  Mr. Levi testified that he ████████████████

22   those holding current or recent roles at the DOJ: ████████████████████████████

23   ██████████████████████████████████████████████████████

24   ██████████████████████████████████████████████████████

25   ████████████████████████████.  *See* Ex. 10 (Levi Dep.) at 39:2-41:17.

26   Mr. Levi knew Mr. Assefi and Mr. Mizelle from the first Trump administration and considers them

27   friends.  Ex. 10 (Levi Dep.) at 35:24-36:15.

28       Mr. Davis  has  deep  connections  with  senior  DOJ  officials,  including  ████████████

████████████████████████████████████████████████████████████

████████████. Ex. 1 (Alford Dep.) at 36:2-37:18.  He also leads the Article III Project, ████

████████████████████████████████████████████████████████████

████████████████████████████. Ex. 1 (Alford Dep.) at 36:2-37:2; *see also*

https://www.article3project.org/about.  Mr. Davis was a long-time friend of Ms. Slater and

supported her nomination and confirmation to Assistant Attorney General.  Ex. 6 (Davis Dep.) at

80:10-13, 135:11-13; *see also* Ex. 28 (Davis Ex. 12), Ex. 29 (Davis Ex. 13).  On the day this lawsuit

was filed, Mr. Davis appeared supportive, posting to X "Amen. The Trump 47 Justice Department's

Antitrust Division is already off to a strong start. 3 into 2? You must sue."  Ex. 30 (Davis Ex. 14).

        HPE also hired Arthur Schwartz, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████. Ex. 18 (Schultz Dep.) at 80:2-12; Ex. 1 (Alford Dep.) at 37:20-38:13.  HPE did not

disclose Mr. Schwartz in its Tunney Act disclosures.

### B.  Mr. Davis and Mr. Levi Lobby the ATR Front Office, and Mr. Assefi Entertains ████████████████████████ Proposals.

        Mr. Davis and Mr. Levi lobbied Ms. Slater and Mr. Assefi first.  Mr. Davis began

communicating about the HPE/Juniper matter with Ms. Slater once she was confirmed in March

2025 and Mr. Assefi who, after Ms. Slater's confirmation, became the Deputy Assistant Attorney

General focused on criminal enforcement, and the three of them met in person on April 15, 2025.

Ex. 6 (Davis Dep.) at 43:17-44:8, 81:16-82:7; Ex. 18 (Schultz Dep.) at 27:16-28:3.  The potential

settlement components discussed during the initial phase of communications, which Mr. Assefi

primarily handled, involved ████████████████████████████████████████

████. *See* Ex. 18 (Schultz Dep.) at 27:16-28:23; Ex. 10 (Levi Dep.) at 68:10-68:19; Ex. 1 (Alford

Dep.) at 73:20-74:6.

        Mr. Levi also began communicating with Mr. Assefi in April, and on April 18th, Mr. Levi

sent Mr. Assefi a draft Proposed Final Judgment contemplating a ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. Ex. 10 (Levi Dep.) at

- 13 -

58:25-59:9; Ex. 76 (HPE-TUNNEY-0041833).  Mr. Levi revised ███████████

██████████████ a few days later.  Ex. 32 (DOJ-TUNNEY-00001694).

On the morning of April 30, 2025, Mr. Davis, Mr. Levi, and two representatives from HPE, John Schultz (HPE's Chief Operating & Legal Officer) and Gregg Melinson, met with Mr. Assefi at the Metropolitan Club in Washington, DC.  Ex. 6 (Davis Dep.) at 94:16-95:14; Ex. 10 (Levi Dep.) at 63:22-64:16; Ex. 18 (Schultz Dep.) at 28:24-29:7; Dkt. 369-3 ¶ 1.  Mr. Levi and Mr. Schultz recalled that Mr. Assefi ███████████████████████████████████████████

████████████████████████████████████████████.  Ex. 10 (Levi Dep.) 83:20-86:6; Ex. 18 (Schultz Dep.) at 28:24-29:7, 53:1-54:7.  After the April 30 meeting, HPE's counsel of record began communicating with ATR staff and leadership.

Internal DOJ communications[6] concerning settlement increased after the April 30 meeting. In mid-May, ATR leadership circulated memoranda concerning the deal.  On May 12, Mr. Assefi sent Ms. Slater emails with the subject line "Close Hold," attaching a "HPE-Juniper Summary" document. *See* Ex. 48 (DOJ Priv Log) at DOJ_TUNNEY_TEMP_00058066, -00058067, -00058063, -00058064.  The next day, Mr. Assefi shared a final version of the document with Mr. Mizelle and Mr. Woodward.  *Id.* at DOJ_TUNNEY_TEMP2_000032, -000033, -000675, -000676.

### C.  Mr. Schwartz and HPE Lobby Defense and Intelligence Agencies.

While Mr. Davis, Mr. Levi, and others pressed ATR, Mr. Schwartz and Mr. Schultz met with members of the CIA and Department of Defense.  Ex. 6 (Davis Dep.) at 117:25-118:8; Ex. 18 (Schultz Dep.) at 84:9-85:9.  In May 2025, Mr. Schwartz and Mr. Schultz met with CIA Deputy Director Michael Ellis and Under Secretary of Defense for Policy Elbridge Colby.  Ex. 75 (HPE-TUNNEY-0041829), Ex. 77 (HPE-TUNNEY-0041978); Ex. 18 (Schultz Dep.) at 84:9-85:4.  Mr. Schwartz also had a follow-up conversation with CIA Director Ratcliffe.  Ex. 75 (HPE-TUNNEY-0041829) at -32; Ex. 18 (Schultz Dep.) at 84:9-85:4.  Mr. Schultz testified that he and other HPE individuals briefed members and staffers of the NSA and NSC about the deal.  Ex. 18 (Schultz Dep.)

---

[6] The States intend to raise several concerns about the US privilege log, document production, and instructions given to Mr. Alford to not answer questions at his deposition.  Should additional discovery arise from those efforts, the States will address it in their sur-reply.

1  at 85:10-86:13.  Mr. Schwartz also apparently communicated with Mr. Mizelle and Mr. Woodward.[7]

2  Ex. 1 (Alford Dep.) 39:15-22, 41:14-24; Ex. 18 (Schultz Dep.) at 86:14-21.

### D.  ATR Leadership Raise Concerns with HPE's Proposals, and Mr. Davis Responds by Threatening Ms. Slater.

5  In the days after the April 30 meeting, Jenn Mellott, a lawyer from the Freshfields firm

6  representing HPE shared further refined versions of Mr. Levi's proposal with ATR staff and

7  leadership, including Deputy Assistant Attorneys General Mark Hamer and Bill Rinner.  Ex. 38

8  (Schultz Ex. 3), Ex. 33 (Levi Exs. 11-14).  Mr. Rinner served as the Head of Merger Enforcement

9  and was responsible for ███████████████████.  Ex. 17 (Rinner Dep.) at

10  14:22-15:8; Ex. 1 (Alford Dep.) at 23:9-14.  Mr. Hamer ran point on ███████████████

11  ██████████████.  Ex. 1 (Alford Dep.) at 25:8-18, 26:2-16; Ex. 17 (Rinner Dep.) at

12  14:8-14:21.  HPE and ATR discussed proposed terms over multiple video calls, one of which Mr.

13  Levi also participated in. Ex. 10 (Levi. Dep.) at 88:1-90:2.  During those calls, ATR raised concerns

14  that the proposed ██████████████ was an inadequate remedy and brought up divesting

15  ███████████████████████.  Ex. 1 (Alford Dep.) at 108:8-

16  25; Ex. 18 (Schultz Dep.) at 59:18-61:24; Ex. 35 (Rinner Ex. 2), Ex. 68 (HPE-TUNNEY-0040852);

17  *see also* Ex. 10 (Levi Dep.) at 89:17-90:2).  HPE rejected any such divestiture, telling ATR on May

18  14, 2025 that "████████████████████████████████

19  ██████████."  Ex. 68 (HPE-TUNNEY-0040852).

20  ATR also criticized the proposed ██████████████.  Ms. Slater and Mr. Rinner objected

21  to █████ because it did not address any competitive concerns.  Ex. 1 (Alford Dep.) at 75:12-24;

22  83:20-84:21, 105:15-106:5; Ex. 17 (Rinner Dep.) at 43:18-44:22.  ATR's criticism enraged Mr.

23  Davis, prompting a falling out with Ms. Slater in mid-May.  Ex. 1 (Alford Dep.) at 81:14-22.  Around

24  that time, Mr. Davis had intense verbal and text exchanges with Ms. Slater.  Ex. 1 (Alford Dep.) at

25  76:2-77:8; Ex. 6 (Davis Dep.) at 127:3-129:22, 131:8-132:8.  According to Mr. Davis, he responded

26  with "████████████████" to Ms. Slater's criticism that HPE's proposed settlement ██████

_____

[7] Mr. Mizelle is being deposed the same day this brief is due, March 9, 2025.  Mr. Schwartz is set to be deposed on March 10, 2026.  The States may include any relevant testimony in their sur-reply.

1  "███████." Ex. 6 (Davis Dep.) at 129:12-22, 131:8-132:8.  Ms. Slater showed Mr. Alford text

2  threads where Ms. Slater expressed to Mr. Davis ███████████████████████

3  and he responded with anger.  Ex. 1 (Alford Dep.) at 81:14-82:13.  Mr. Alford testified that Mr.

4  Davis ultimately told Ms. Slater: "███████████████████████████████

5  ███████████████" Ex. 1 (Alford Dep.) at 76:2-77:8.[8]

6  **E.  ATR Leadership Demand ███████████████████**

7  **███ and Reject Lobbyist Involvement.**

8  Throughout May and June 2025, ATR reiterated two themes.  First, ATR demanded

9  ███████████████ in any settlement proposal, which HPE's initial settlement proposals did

10  not include.  And second, ATR condemned lobbyist involvement in negotiations.

11  On May 16, 2025, ATR made an offer to HPE that would require HPE to completely divest

12  ███████████████.  Ex. 39 (Schultz Ex. 4).  ATR relayed during a follow-up meeting on

13  May 27, 2025 and in an email from Mr. Rinner on June 2, 2025 that HPE's earlier submitted

14  proposals were unsatisfactory.  Ex. 71 (HPE-TUNNEY-0041445); Ex. 40 (Schultz Ex. 5).  To

15  reinforce the point, Mr. Rinner sent Ms. Mellott a ███████████████████████

16  ███████████████████████.  Ex. 67 (HPE-TUNNEY-0040798).

17  Mr. Rinner also pushed back on HPE's lobbyist involvement and emphasized ATR's

18  preference to deal with counsel of record.  On June 2, 2025 he sought another meeting with HPE,

19  this time with (1) only "███████████████" and (2) ███████████████████

20  ███████.  Ex. 40 (Schultz Ex. 5).  Two days later, on June 4, Mr. Rinner gave a speech in his

21  official capacity at George Washington University where he emphasized ATR's neutrality and

22  rejected notions of patronage. Ex. 1 (Alford Dep.) at 121:21-122:13.  He stated: "let me underscore:

23  we care about the quality and professional integrity of the lawyers and economists that appear before

24  us, not their stature in the antitrust bar or their political affiliation or background. We do not plan to

25  hash out merger settlements over martinis."[9] Ex. 27 (Alford Ex. 6).

26  

27  [8] Neither Mr. Davis nor the US have produced any text messages between Mr. Davis and Ms. Slater, despite being called for by the States' discovery requests.

28  [9] The martini reference was ███████████████████████████████. Ex. 1 (Alford Dep.) at 129:4-23.

1    Also on June 4, the day before HPE and the DOJ were set to meet again, HPE sent ATR a

2    new proposal that included an offer to ████████████████████████████████████. Ex.

3    41 (Schultz Ex. 6).  On June 5, the parties met in person at the DOJ.  In the meeting, the DOJ

4    reiterated that any settlement needed to have ████████████████, given that this was a ██████

5    ████████████████████████████████████████████, and expressed concern

6    that ████████████████████████ was inadequate.  *See, e.g.*, Ex. 1 (Alford. Dep.) at

7    139:24-141:13.  Mr. Alford described HPE's offer to ██████████████ as a "██████████

8    ████████████████████."  Ex. 1 (Alford. Dep.) at 137:24-25.  Ms. Slater relayed that

9    ATR would not ████████████████████████████████████████████.  Ex. 18

10   (Schultz Dep.) at 98:3-102:14; Ex. 1 (Alford Dep.) at 142:12-23.  She also made clear that ATR

11   would not ████████████████.[10]  Ex. 1 (Alford Dep.) at 139:24-140:16; Ex. 17 (Rinner Dep.)

12   at 84:24-85:3.  And she condemned HPE's use of lobbyists.  Ex. 1 (Alford Dep.) at 142:9-12.  Mr.

13   Alford echoed Ms. Slater's concerns about HPE's use of lobbyists, and at the close of the meeting

14   shook every person's hand, looked them in the eye, and said "████████████████."  Ex. 1 (Alford

15   Dep.) at 145:19-147:9.

16       The next week, Mr. Rinner sent HPE a revised term sheet requiring complete divestiture █

17   ████████████████████████████████████████████████████████████

18   ████████.  Ex. 36 (Rinner Ex. 9).  The record does not include any response from HPE regarding

19   the term sheet.  After that term sheet was sent, no ATR staff appear on any emails with HPE until

20   hours before the settlement is filed with the Court.

21       **F.  HPE Abandons Discussions with ATR in June and Presses Mizelle**

22           **Directly, While Conflict Within the DOJ Continued.**

23       After the June 5 meeting with ATR,[11] HPE escalated to Mr. Mizelle.  HPE asked Mr. Levi—

24   who was leading lobbying efforts with the DOJ at that point—to reach out to Mr. Mizelle, and they

25

26   [10] Although not all participants recall exactly what Ms. Slater said, Mr. Alford testified that she told
     HPE that ATR ████████████████████████."  Ex. 1 (Alford Dep.) at 142:14-142:7.  Ms.

27   Slater has made that remark publicly in describing her views on merger enforcement.  *See id.*

28   [11] Though the testimony emphasized HPE's "████████" after June 5, Mr. Mizelle's assistant ████
     ████████████████████████████.  Ex. 53 (DOJ-TUNNEY-
     00001387).

1   spoke several times.  Ex. 18 (Schultz Dep.) at 106:19-108:7; Ex. 1 (Alford Dep.) at 35:9-15; Ex. 10

2   (Levi Dep.) at 106:23-108:4.  Mr. Mizelle sought an in-person meeting and, on June 18, 2025, Mr.

3   Mizelle, Mr. Schultz, and Mr. Levi met at the DOJ; HPE's counsel of record did not attend.  Ex. 18

4   (Schultz Dep.) at 108:8-109:3; Ex. 72 (Schultz Ex. 8).  They discussed, among other things, the

5   ████████████████████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████.  Ex. 18 (Schultz Dep.) at 110:6-114:23.

7       The DOJ's privilege log reflects internal activity after the June 18 meeting.  On June 23

8   and/or June 24, it appears there was an internal DOJ meeting involving some or all the following

9   invitees: Mr. Woodward, Ms. Slater, Ms. Matar, and Micah Fielden with the office of the Associate

10  Solicitor General, Ms. Bondoc, and Mr. Sanghvi.  *See, e.g.*, Ex. 48 (DOJ Priv Log) at

11  DOJ_TUNNEY_TEMP2_002210, DOJ_TUNNEY_TEMP2_002222.  The DOJ's privilege log also

12  reflects a call from Beth Wilkinson, counsel for HPE.  Ex. 48 (DOJ Priv Log) at ATR-Email-

13  00009324.  Mr. Alford testified that Ms. Wilkinson ████████████████████████

14  ████████████████████████████████████████████████.  Ex. 1 (Alford Dep.) at 95:22-96:11,

15  155:20-24.  Mr. Rinner also recalled ████████████████████████████████████████

16  ████████████████████████████████████████████████████████████████████████████████

17  ██████.  Ex. 17 (Rinner Dep.) at 100:24-101:13.  Mr. Rinner—the head of merger enforcement

18  for ATR—testified that ████████████████████████████████████████████████

19  ████.  Ex. 17 (Rinner Dep.) at 100:10-100:16

20      **G.  Mr. Woodward Takes Over Settlement Negotiations and Mr. Schultz**

21      **Negotiates Directly with Him Without ATR Involvement.**

22      Mr. Mizelle later communicated to Mr. Levi that Mr. Woodward would be handling

23  settlement negotiations.  Ex. 18 (Schultz Dep.) at 115:9-17.  Neither Mr. Mizelle nor Mr. Woodward

24  have antitrust experience.  Ex. 1 (Alford Dep.) at 101:6-17.  Mr. Woodward ████████████

25  ████████████████████████████████████████████████.  Ex. 1 (Alford Dep.) at 159:2-10.

26  Nevertheless, Mr. Schultz, Mr. Woodward, and Mr. Woodward's Assistant Ashley Bondoc then

27  spoke on June 25th.  Ex. 73 (HPE-TUNNEY-0041823); Ex. 18 (Schultz Dep.) at 116:1-6.  The next

28  day, Mr. Schultz shared a revised settlement proposal that included a ████████████████████

1      ██████████████████████████████████████████████████████.  Ex. 43

2   (Schultz Ex. 9).

3          In an effort to ████████████████████████████████████,

4   Mr. Schultz emphasized ████████████████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ████████████████████████████.″  Ex. 43 (Schultz Ex. 9).  Separately, because the DOJ

9   evidently entertained the possibility of ████████████████████████

10  █████████████████████,  Mr. Schultz invited the DOJ to ████████████

11  ████████████████████████████████████████████████████████████

12  █████████████████″ which would avoid any judicial scrutiny.  Ex. 43 (Schultz Ex. 9); Ex. 18

13  (Schultz Dep.) at 121:6-25, 124:11-16.

14         Mr. Schultz and Mr. Woodward discussed the proposal that evening and, past midnight ET

15  on the 27th, Mr. Schultz sent a revised proposal to Mr. Woodward.  This proposal included ██████

16  ████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████″ Ex. 44 (Schultz Ex.

18  10).  Although the ████████████████ is referenced in the email and is attached, the draft

19  Proposed Final Judgment does not mention it.  Ex. 44 (Schultz Ex. 10).  Mr. Schultz follows up the

20  afternoon of the 27th and shares a ████████████████████████████, acknowledging that

21  it ″████████████████████.″  Ex. 46 (Schultz Ex. 12).  When asked about whether national

22  security was addressed in the CIS, Mr. Schultz testified that ″████████████████████████

23  ████████████████████████████████″ Ex. 18 (Schultz Dep.) at 138:11-14.

### H. ATR Is Looped in Just Hours Before Filing.

25         After receiving Mr. Schultz's proposals and draft CIS on July 27, the DOJ held an internal

26  meeting at 6:15 pm ET.  Ex. 48 (DOJ Priv Log) at ATR-Email-00009596.  The invitees included

27  Ms. Slater, Mr. Hamer, Mr. Sanghvi, Mr. Rinner, Mr. Alford, and Ms. Matar.  *Id.*  At 7:00 pm ET,

28  Mr. Rinner—who had not been involved in any settlement communications for weeks and ████████

1  ███████████████████████████████—emailed Ms. Mellott requesting a call, noting that he

2  is "█████████" and ████████████████████. Ex. 50 (DOJ-TUNNEY-00000418).  Shortly

3  thereafter, Mr. Schultz texted Mr. Woodward to ███████████████████████████████

4  ███████████████████████████████████████."  Ex. 45 (Schultz Ex. 11).

5         At 9:58 pm ET, Mr. Rinner sent a package of draft settlement documents, including the PFJ

6  and CIS █████████████, to Ms. Mellot.  Ex. 37 (Rinner Ex. 13); Ex. 17 (Rinner Dep.) at 107:3-

7  107:8.  █████████████████████, ATR had made no substantive changes.  Ex. 17 (Rinner

8  Dep.) at 109:4-109:13; Ex. 1 (Alford Dep.) at 157:13-158:10, 164:23-165:6.  The PFJ and CIS no

9  longer included █████████████████, but the substance was otherwise the same as what ended

10 up being filed with the Court.  HPE ultimately filed the settlement after 11 pm PT on June 27, 2025/1

11 am ET on June 28th.

12         **I.  Mr. Alford Witnessed ███████████████████ and Misconduct.**

13        Though constrained in part by the US's improper privilege objections and other

14 instructions,[12] Mr. Alford's deposition testimony reveals that he witnessed DOJ wrongdoing.  He

15 testified that ███████████████████████████████████████████████████████████

16 ███████████████████████████."  *See* Ex. 1 (Alford Dep.) at 17:8-19:11, 31:14-32:25;

17 *see also* Ex. 25 (Alford Ex. 1) (citing DOJ Justice Manual, §§ 1-8.100 & 1-8.600).  This echoes his

18 prior public statements, including his "opinion that in the HPE/Juniper merger scandal, Chad Mizelle

19 and Stanley Woodward perverted justice and acted inconsistent with the rule of law."  Ex. 26 (Alford

20 Ex. 3), Ex. 1 (Alford Dep.) at 49:23-50:4, 51:11-52:3.

21     **VII.    Aftermath of the Settlement.**

22        In the wake of the Settlement nearly every ATR front office attorney involved with HPE-

23 Juniper left—willingly or otherwise—in the following eight months.  The DOJ promptly terminated

24 Mr. Alford and Mr. Rinner.  Ms. Slater was ousted in February 2026, and Mr. Hamer resigned only

25

26 ─────────────────────

27 [12] The US made several attorney-client, work product, and deliberative process objections during
   Mr. Alford's deposition, several of which were in response to questions seeking, for example, facts
   concerning the existence of conversations, identities of persons involved in a situation, or

28 information concerning misconduct.  The US also lodged so-called "internal personal matter"
   objections.  The States intend to raise these issues with the Court alongside other privilege disputes.

a few weeks earlier.[13]  Only Mr. Assefi—who liaised with Mr. Davis and Mr. Levi and entertained HPE's initial proposals—remains.  He is now the Acting Assistant Attorney General.[14]

### A.  Mr. Alford and Mr. Rinner are Terminated as Punishment.

After the settlement, Mr. Alford and Mr. Rinner were placed on administrative leave and reportedly fired for insubordination.  Ex. 1 (Alford Dep.) at 180:9-13, 181:11-13; Ex. 17 (Rinner Dep.) at 115:13-116:6; *see also* Rabinowitz & Goldman.  In his deposition, Mr. Alford was instructed not to provide the information he had regarding the reason for his termination based on an improper purported "internal personal matter" instruction.  Ex. 1 (Alford Dep.) at 182:16-20.  Mr. Alford testified that "████████████████████████████████████████████████████████████████████████████████████████████."  Ex. 1 (Alford Dep.) at 90:4-7.  When asked about internal threats, the US instructed Mr. Alford not to answer.  Ex. 1 (Alford Dep.) at 90:8-95:5.  And a well-sourced journalist told him ████████████████████████████ ████████████████████████████████."  Ex. 1 (Alford Dep.) at 183:24-184:12.  Mr. Alford also testified that Mr. Davis ████████████████████████████████████████ in a group Signal chat, which was not produced by HPE or Mr. Davis either.  *Id.* at 92:10-16.

### B.  Mr. Alford Blows the Whistle on Settlement.[15]

After the Settlement, public reporting emerged that Ms. Slater and ATR were opposed to the Settlement—indeed, the record here shows ██████████████████████████████████.[16]  Public reporting also referred to literal "backroom boozy" dealmaking, which aligns with Mr. Rinner's public retort that ATR would not make deals over "martinis."  Dkt. 236-2 at 6-7.  Mr.

[13] Hannah Rabinowitz & David Goldman, *Justice Department fires two antitrust attorneys, alleging insubordination*, CNN (July 29, 2025), https://www.cnn.com/2025/07/29/politics/justice-department-fires-two-senior-antitrust-attorneys ("Rabinowitz & Goldman"); Katherine Long & Aaron Mak, *A sudden DOJ departure is stoking fear that Trump's populist antitrust movement is dead,* Politico (Feb. 12, 2026), https://www.politico.com/news/2026/02/12/trump-promised-to-rein-in-corporate-power-the-woman-he-picked-to-do-it-just-left-00779772; Kaitlan Collins, *Justice Department's antitrust chief has been fired, sources say*, CNN (Feb. 12, 2026), https://www.cnn.com/2026/02/12/politics/doj-antitrust-chief-fired.

[14] DOJ Staff Profile: Acting Assistant Attorney General Omeed A. Assefi, https://www.justice.gov/atr/staff-profile/deputy-assistant-attorney-general-omeed-assefi.

[15] ████████████████████████████████████████████████████████████████████████████.  Ex. 1 (Alford Dep.) at 260:1-14.

[16] Relevant news reports are set forth in the States' public comment.  *See* Dkt. 236-2 at 6-7.

1    Alford then publicly rang the alarm bell, stating that Mr. Mizelle and Mr. Woodward had perverted

2    justice, and that the Court should "clarify the substance and the process by which the settlement was

3    reached." Dkt. 236-2 at 7-8.

4            **C.  Mr. Davis Sends Vicious Text Messages to Ms. Slater and Mr. Alford.**

5            In September 2025, after Mr. Alford spoke publicly about the merger, Mr. Davis asked Ms.

6    Slater to be put in touch with him. Ex. 1 (Alford Dep.) at 78:24-79:2; Ex. 59 (HPE-ALFORD-

7    0000084); Ex. 60 (HPE-ALFORD-0000110). In a text thread among them, Mr. Davis said "█████

8    ███████████████████████████████████████████████." Ex. 60 (HPE-ALFORD-0000110) at

9    -111.  Mr. Alford "███████████████████████████" but ultimately ███████████████

10   █████████████████████████████████████████████████." *Id.*; Ex.

11   1 (Alford Dep.) at 79:8-12.  Mr. Davis fired back, saying, "███████████████████████████

12   ██████████████████████████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████." Ex. 60 (HPE-

15   ALFORD-0000110) at -111; Ex. 1 (Alford Dep.) at 79:24-80:2, 5-7.  He added: "████████████

16   ██████████████████████████████████████████████████████████████████████████████

17   ██████████████████████" Ex. 60 (HPE-ALFORD-0000110) at -111; Ex. 1 (Alford Dep.) at 80:12-

18   18.  Ms. Slater replied, expressing that she was "████████████████████." Ex. 60 (HPE-

19   ALFORD-0000110) at -111; Ex. 1 (Alford Dep.) at 80:23-81:1.  She explained that, "████████

20   ██████████████████████████████████████████████████████████████████████████████

21   █████████████████" she would not respond to Mr. Davis's attacks, and asked him to "████." Ex.

22   60 (HPE-ALFORD-0000110) at -111; Ex. 1 (Alford Dep.) at 81:1-4.  She concluded with the

23   message, "██████████████████████████████████." Ex. 60 (HPE-ALFORD-0000110) at -111;

24   Ex. 1 (Alford Dep.) at 81:5-7.

25           **D.  Mr. Davis Lobbies the President, and Ms. Slater Is Ousted February 2026.**

26           Following Ms. Slater's departure, Mr. Davis boasted: "I've done more than anyone here on

27   the big tech antitrust fight.  Gail was a disaster.  I recommended her hiring.  And her firing." Ex. 31

28   (Davis Ex. 26). Indeed, Mr. Davis recommended her firing to "████████████████████," including

1    ████████████████████████████████████████████████████████████████████

2    ████████████████████████. Ex. 6 (Davis Dep.) at 224:8-226:5. Mr. Alford learned from

3    conversations with journalists and public statements that Mr. Davis ███████████████

4    ██████, and that he "████████████████████████████████████████████████████

5    ███████████████████████████████." Ex. 1 (Alford Dep.) at 188:16-20, 189:4-10.

6    Public reporting corroborates Mr. Davis's efforts and influence. *Id.* at 189:25-190:3.[17]

7           **E.  Mr. Alford Identifies Substantive and Process Concerns for the Court.**

8           In public statements and deposition testimony, Mr. Alford raised both substantive and

9    procedural concerns for the Court's consideration. On substance, Mr. Alford said his concern is

10   whether the PFJ "████████████████████████████████████████████████████,"

11   and whether the PFJ reflects the "██████████████████████████████. Ex. 1

12   (Alford Dep.) at 54:15-55:5. On the process, Mr. Alford listed several concerns based on his

13   knowledge of that process: (1) ██████████████████████████████; (2) █████

14   ████████████████████████████████████████████; (3) █████

15   ██████████████████████████; and (4) ███████████████████

16   ████████████████████████████████████████████████████████."

17   Ex. 1 (Alford Dep.) at 88:8-23, 89:6-9, 89:15-90:7.

18                                **ARGUMENT**

19   **I.    The Tunney Act.**

20          The Tunney Act is a Watergate era law passed in the wake of a history of the DOJ

21   succumbing to political pressure and entering into weak and ineffective settlements. *See* 119 Cong.

22   Rec. 24598 (1973) (Senator Tunney referring to cases). The last straw was the so-called ITT Affair,

23   in which ITT pledged $400,000 for the 1972 Republican National Convention, and President Nixon

24

25

26   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27   [17] *See* Leah Nylen & Josh Sisco, 'Good Riddance': How a MAGA Acolyte Helped Oust Antitrust
     Chief, Bloomberg News (Feb. 13, 2026), https://news.bloomberglaw.com/antitrust/good-riddance-
     how-a-maga-acolyte-helped-oust-antitrust-chief (Davis "started a campaign to undermine" Slater

28   and "addressed his criticism . . . directly with Trump in a recent meeting, which accelerated her
     removal").

1    then ordered the DOJ to "stay the hell out of" a series of ITT merger transactions.  *See id.*[18]

2          Courts have thus recognized that in passing the Tunney Act, Congress was "[c]oncerned

3    with the appearance of impropriety engendered by the secrecy of consent decree negotiations in

4    antitrust cases, in addition to exposing to 'sunlight' the process by which such consent decrees are

5    negotiated."  *United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 151-52 (D.D.C. 2002) (citing

6    119 Cong. Rec. at 24599); *see also* H. Rep. No. 93-1463 (1974), *as reprinted in* 1974 U.S.C.C.A.N.

7    6535, 6536 ("it is imperative that the integrity of and public confidence in procedures relating to

8    settlements via consent decree procedures be assured").  Congress was acutely aware that antitrust

9    violators may "wield great influence and economic power" and "often bring significant pressure to

10   bear on government."  119 Cong. Rec. 24597 (1973). Accordingly, Congress sought to "ensure[]

11   that the economic power and political influence of antitrust violators do not unduly influence the

12   government into entering into consent decrees that do not effectively remedy antitrust violations."

13   *United States v. CVS Health Corp.*, 407 F. Supp. 3d 45, 54 (D.D.C. 2019) (quoting *United States v.*

14   *Airline Tariff Publ'g Co.*, 836 F. Supp. 9, 11 (D.D.C. 1993)); *see also United States v. Am. Tel. &*

15   *Tel. Co.*, 552 F. Supp. 131, 148-49 (D.D.C. 1982) ("Congress sought to ensure that the [DOJ]'s use

16   of consent decrees in antitrust cases would fully promote the goals of the antitrust laws and foster

17   public confidence in their fair enforcement.").

18         Congress determined that the judiciary must not merely "rubber stamp" proposed consent

19   decrees in antitrust cases, but instead must "make an independent determination as to whether or not

20   entry of a proposed consent decree is in the public interest."  S. Rep. No. 93-298 at 5 (1973).

21         The Tunney Act has procedural and substantive components—both must be satisfied for

22   approval.  *United States v. Microsoft Corp.*, 215 F. Supp. 2d 1, 2 (D.D.C. 2002) ("the Court is

23   obliged to examine whether the provisions of the Tunney Act have, in fact, been satisfied").  As to

24   procedural requirements, the US must solicit public comments and make certain disclosures to

25   enable the public to do so, and meet the statute's goal of transparency.  Critically here, "the United

26

27   _____

28   [18] *See also* Ciara Torres-Spelliscy, *The I.T.T. Affair and Why Public Financing Matters for Political Conventions*, Brennan Center for Justice (Mar. 19, 2014), https://www.brennancenter.org/our-work/analysis-opinion/itt-affair-and-why-public-financing-matters-political-conventions.

States shall file with the district court . . . a competitive impact statement," which must include, among other things, "any unusual circumstances giving rise to" the proposed settlement, "the anticipated effects on competition of such relief," and "a description and evaluation of alternatives to such proposal actually considered by the United States." 15 U.S.C. § 16(b)(3), (6).

Defendants must disclose "a description of any and all written or oral communications by or on behalf of such defendant," whether through any "officer, director, employee, or agent of such defendant, or other person, with any officer or employee of the United States concerning or relevant to such proposal." *Id.* § 16(g). Communications exclusively between defendants' counsel of record alone with the DOJ alone are excluded. *Id.* The reference to the United States has been construed to apply to the entirety of the Executive Branch, although Senator Tunney has made clear it was intended to apply to all three branches of the federal government. *See Microsoft*, 215 F. Supp. 2d at 19-21; Ex. 49 (Tunney Aff.)[19] ¶ 6.

As to the substance of a proposal, the Court must "determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e). In doing so, the Court must consider:

> **(A)** the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
> **(B)** the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1).

As the Ninth Circuit has held, the "statute suggests that a court may, and perhaps should, look beyond the strict relationship between complaint and remedy in evaluating the public interest." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). Critically, the Court's role is to ensure "that the government has not breached its duty to the public." *Id.*

---

[19] Available at https://www.justice.gov/sites/default/files/atr/legacy/2007/09/10/mtc-00032065.pdf.

1

**II.      The US Failed To Meet Its Procedural And Disclosure Obligations.**

2

The statute is clear that the "United States shall file" the CIS.  15 U.S.C. § 16.  Here, the

3

United States neither wrote the CIS, nor filed it.  *See* Dkt. 217 (HPE filed CIS).  This was a failure

4

to follow the Tunney Act's requirements and warrants denial of the US motion; but there is more.

5

The United States was required to provide in its CIS "a description and evaluation of

6

alternatives to [the Settlement] actually considered by the United States."  15 U.S.C. § 16(b)(6).

7

This is a critical requirement because it provides the public with transparency about what else the

8

US considered, and it provides the Court with the information needed to evaluate, as it must, the

9

"anticipated effects of alternative remedies actually considered."  *Id.* § 16(e)(1)(A).  The US failed

10

to do so here.

11

The CIS states that the only alternative here was trial.  Dkt. 217 at 12.  False.  As explained

12

above, the DOJ considered many alternatives.  Critically, the DOJ made two settlement demands

13

that were worlds apart from what was ultimately agreed upon.  The US was required to disclose that

14

it actually considered a full divestiture ███████████████████████████████████████

15

███████████████████████, as well as such a divestiture ████████████████████████

16

████████████.  Ex. 39 (Schultz Ex. 4) (5/16/25 US Offer); Ex. 36 (Rinner Ex. 9) (6/10/25 US Offer).

17

The US also actually considered various alternatives proposed by HPE, including ██████████

18

█████████████████████████.  *See* Background § VI.  If that were not self-evident from

19

the documents, Mr. Alford confirms that the DOJ ████████████████████.  Ex. 1 (Alford Dep.)

20

71:24-72:4, 107:23-108:6.

21

The US had an obligation to disclose all these alternatives and explain why they were

22

rejected.  The US argument that the term "alternative remedies" only encompasses available

23

alternatives right at the moment the Settlement was signed is non-sensical and has properly been

24

rejected by the Court.  2/2/26 Tr., Dkt. 366 at 32:22-33:14; Dkt. 378 at 3.  HPE's argument that

25

"alternative remedies" means a remedy "that *both sides* 'considered' and were willing to agree to"

26

fares even worse.  Dkt. 369 at 23.  If Congress had intended such a meaning, it would have wrote

27

"actually considered by the parties"; but the statute says only "actually considered by the United

28

States."  15 U.S.C. § 16(b)(6).  The bottom line is the public had a right to know about these

1  alternatives, as did the Court—and were it not for the States' intervention, nobody would have ever

2  known.  The disclosure failure is grounds itself to reject the Settlement.

3  **III.    HPE Failed To Meet Its Disclosure Obligations.**

4      HPE's § 16(g) disclosure likewise failed to make the required disclosures.  First, HPE did

5  not disclose several national security-related contacts.  HPE hired Arthur Schwartz to "████████

6  ████████████████████████████████████████████████████████████████████████████

7  ████████████"  Dkt. 369-3 (Schultz Decl.) ¶ 18; Ex. 18 (Schultz Dep.) at 80:2-12.  Mr. Schwartz

8  and Mr. Schultz had in-person meetings with CIA Deputy Director Michael Ellis and Under

9  Secretary of Defense for Policy Elbridge Colby on May 21, 2025.  Ex. 18 (Schultz Dep.) at 84:9-

10  20; Ex. 75 (HPE-TUNNEY-0041829); Ex. 77 (HPE-TUNNEY-0041978).  Mr. Schwartz also met

11  with CIA Director John Ratcliffe.  Ex. 18 (Schultz Dep.) at 84:9-85:4.  HPE also testified that Mr.

12  Schwartz subsequently contacted either Mr. Mizelle or Mr. Woodward regarding the national

13  security issues.  Ex. 18 (Schultz Dep.) at 86:14-21.  HPE also had communications and meetings

14  with the national security community without Mr. Schwartz.  Ex. 18 (Schultz Dep.) at 85:10-86:13.

15      HPE failed to disclose any of this—there is no mention of Mr. Schwartz or any of the national

16  security agency personnel that he or HPE communicated with.  That was a failure to meet its

17  disclosure obligations.  As HPE admitted, its engagement with the national security agencies,

18  including through Mr. Schwartz, was "████████████████████."  Ex. 18 (Schultz Dep.) at

19  83:8-23 (it was HPE's "████████████████████████████████████),

20  138:10-13.  And HPE's disclosure likewise concedes the connection between its national security

21  argument and its effort to settle the case, as it wrote that there were "communications about the

22  national security interests favoring consensual resolution of the action."  Dkt. 228 at 2.

23      Second, HPE failed to disclose all of its in-person meetings.  The disclosure lists five in-

24  person meetings, but testimony from HPE's lobbyists reveal that there were many others.  Mr. Davis,

25  for example, believes he met with Mr. Assefi alone about ten times.  Ex. 6 (Davis Dep.) at 96:4-

26  97:7. Mr. Davis also testified that he had at least one in-person meeting with Mr. Mizelle, which

27  was not disclosed either.  *Id.* at 154:23-155:21.  And DOJ records also indicate that Mr. Levi and

28  Mr. Schultz ████████████████████████████████████████████████████

1    ███—but HPE did not disclose any such meeting either.  Ex. 53 (DOJ-TUNNEY-00001387).

2    Failure to make a full disclosure violates the Tunney Act.  As Senator Tunney put it, "The

3    disclosure provisions were designed to help ensure that no defendant can ever achieve through

4    political activities what it cannot obtain through the legal process.  Failure to comply with these

5    provisions raises an inference or, at a minimum, an appearance of impropriety."  Ex. 49 (Tunney

6    Aff.) ¶ 7.

7    **IV.    The US Abdicated Its Role And Is Not Entitled To Any Deference.**

8    Unfortunately, the US completely abdicated its role as a principled defender of the antitrust

9    laws, and through the corrupt lobbying process has abandoned any semblance of a reasoned and

10   principled decision-making process.  Their decision to settle was not reached "through a considered

11   and fair evaluation of the relevant factors."  Dkt. 350 at 5 n.3.  It was the product of political

12   influence, and the result is a Settlement that the experts at ATR ████████████████

13   ████████████████████.  Congress understood that "all but a few of the

14   communications between Antitrust defendants and the government are perfectly proper," but it is

15   the "few" improper ones that "cast doubt on the entire enforcement process."  S. Rep. No. 93-298,

16   at 7.  Here, there is a litany of improper behavior that taints the entire Settlement and warrants

17   rejection.  Because of this tainted process, at a minimum, the Court should be highly skeptical of the

18   fruits of this poisoned deal-making.  *See Am. Tel. & Tel.*, 552 F. Supp. at 152-53 (concluding that,

19   due to the settlement's "unfortunate history," the court would not leave "assessment of the settlement

20   and its implications . . . entirely to AT&T and the Department of Justice," but would instead give

21   the consent decree "closer scrutiny").

22   Soon after the new administration arrived in 2025, HPE began a campaign of influence-

23   peddling.  And they hired just the right people, starting with Mr. Levi, who was responsible for

24   ████████████████████████████████.  And

25   backing up Mr. Levi was Mr. Davis, another power broker with professed influence over ████

26   ████████████████████.  Mr. Woodward and Mr. Mizelle would no doubt

27   have understood that the power to give also included the power to take away.

28   That is precisely the threat that ████████████████████

- 28 -

1    ███████████████████████.  That power proved to be real, not just theoretical.  First Ms.

2    Slater's top two deputies were fired, and just eight months later, so was she, with Mr. Davis gloating

3    that it was his handiwork.  Mr. Woodward, on the other hand—whose nomination was still pending

4    when the settlement was reached—chose a different path, and kept his job.

5        It is also clear that HPE's political pressure poisoned the outcome.  ATR was steadfast during

6    negotiations that ████████████████████ and twice demanded a divestiture ████████

7    ████████████.  That made sense, because the competitive overlap here was between HPE's Aruba

8    and Juniper's Mist—HPE could not keep both.

9        That is also why ATR ██████████████████████████████████████

10    ██████████████████.  Participants in the subsequent June 5th meeting understood that ATR

11    ██████████████████████████████████.  Ex. 1 (Alford Dep.) at 139:14-

12    140:16; Ex. 17 (Rinner Dep.) at 84:24-85:3; Ex. 18 (Schultz Dep.) at 98:2-102:5.  And five days

13    after that meeting, ATR continued to insist on a divestiture ████████████████████.  Yet, the

14    ████████████████████████████████████████████████████████████

15    ██████████.  There is no rational explanation for why that deal ████████████████

16    to suddenly "eliminating the alleged anticompetitive effects of the acquisition."  Ex. 1 (Alford Dep.)

17    at 172:13-17, 173:19-174:9; Dkt. 217-2, at 2.  Indeed, the Head of Merger Enforcement—who had

18    been the lead in settlement negotiations—has no clue how the Settlement came to pass.  The fact is,

19    there is no merits-based explanation—the deal was purely the result of political pressure.

20        Despite HPE's story that they had "████████" to Mr. Mizelle only after the June 10th

21    settlement demand from ATR, the evidence tells a different story.  Mr. Levi and Mr. Schultz were

22    ████████████████████████████████████████.  Ex. 53 (DOJ-TUNNEY-

23    00001387).  And the threats against ████████████████████████ had already been

24    made by that point.  HPE had already laid the groundwork to push their settlement through if ATR

25    was not willing to accept it.

26        HPE's attempts to frame the settlement process as above-board are further belied by the fact

27    that their lobbyists took pains to leave no written record of their backroom dealing.  Mr. Davis

28    ████████████████████████████████████████████████████████████

Intervenors' Opposition to Motion for Entry of Final Judgment –
Case No. 5:25-cv-00951-PCP

█████████████. Ex. 6 (Davis Dep.) at 112:10-12 ("████████████████████

████████████████████"), 161:9-11 ("████████████████████████

███████████."), 142:11-20 ("████████████████████████████

████████████    ████████████████████████████████████)"; 159:6-20 (counsel's

representation that "████████████████████████████████████

███████"). And both Mr. Davis and Mr. Levi use ███████████ to further cover their

tracks.[20] *See, e.g.*, Ex. 6 (Davis Dep.) 181:14-21; Ex. 10 (Levi Dep.) 20:6-9.

And so, it happened—ATR was sidelined from the negotiations after June 10th, ███████

████████████████████████████████. DOJ's total abdication of its

responsibility to serve the public interest became complete when it allowed HPE to ███████

and file it, making no substantive changes other than to remove an outdated term (███████

███████). Ex. 1 (Alford Dep.) at 88:15-23; Ex. 17 (Rinner Dep.) at 107:6-8, 128:13-21, 109:4-

13, 131:2-4. Allowing a defendant to ███████ is patently improper—the CIS "must reflect the

views of the United States" and third parties should never be allowed to draft it. *See* Decl. of William

Baer ("Baer Decl.") ¶ 21. And in this instance, allowing HPE to ███████ resulted in a document

filled with nothing but boilerplate and conclusory assertions devoid of any economic or legal

reasoning as to how the proposed remedies address the harm.

This whole sequence of events is unprecedented, stunning, and an affront to the rule of law

and our democratic norms. As Mr. Baer sets forth in his declaration, he has never seen ATR be

excluded from settlement discussions, and although parties may sometimes try to appeal to the

Associate Attorney General, the proper protocol is to direct them back to ATR. Baer Decl. ¶¶ 15-

18. And this is for good reason:

> "[A]ntitrust decisions should not turn on political or other outside influences. Our
> antitrust laws demand that companies compete on the merits and that enforcement
> decisions be based on the merits, not on political influence or partisan affiliation. That
> approach both supports well-functioning markets and builds the credibility of antitrust
> enforcement, which in turn aids its success in deterring future violations by companies
> that might otherwise believe they can avoid legal sanction through the purchase and
> use of political influence."

---

[20] This is despite both individuals purportedly being retained as lawyers, with a duty to preserve their client's file.

1    *Id.* ¶ 9.  These principles are also embedded in the DOJ's Justice Manual.  *See id.* ¶ 8.

2           The US has earned the deference that it is typically afforded because it has historically acted

3    in the public interest and upheld the rule of law.  But it failed to uphold those values here, and, as

4    such, deserves no deference here.

5           **V.    The Settlement Violates The Public Interest.**

6           The way the Settlement was reached demonstrates that the Settlement is not in the public

7    interest.  The unprecedented exclusion of ATR from the decisive negotiations led to a Settlement

8    that bears no relation to the merger's harms.  The following sections lay out what that corrupted

9    process ignored.  The US had established a presumption that the merger was anticompetitive, which

10   was strengthened by additional evidence of harm to innovation, heightened risk of coordinated

11   effects, and harm from unilateral price effects.  HPE could not rebut the US case.

12           **A.  Competition Analysis Demonstrates the US Had a Very Strong Case.**

13          Mergers are analyzed under a burden-shifting framework, pursuant to which the government

14   bears the initial burden to show a "prima facie case that a merger is anticompetitive."  *St. Alphonsus*

15   *Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 783 (9th Cir. 2015); *see also*

16   *United States v. Baker Hughes*, 908 F.2d 981, 982 (D.C. Cir. 1990) (government establishes prima

17   facie case by showing "a transaction will lead to undue concentration in the market for a particular

18   product in a particular geographic area").  The government can establish a prima facie case through

19   the so-called structural presumption, which examines changes in market shares and concentration to

20   demonstrate that a "merger will probably lead to anticompetitive effects in [the relevant] market."

21   *St. Alphonsus*, 778 F.3d at 785; U.S. Dep't of Just. & F.T.C.,  Merger Guidelines § 2.1 (2023) (the

22   "2023 Merger Guidelines").  The Herfindahl–Hirschman Index ("HHI") is the well-established and

23   generally  accepted  method  for  measuring  market  concentration  to  establish  the  structural

24   presumption.  *See St. Alphonsus*, 778 F.3d at 786.

25          If the government establishes a prima facie case, then the burden shifts to defendants.  *Id.* at

26   783.  If defendants cannot rebut the prima facie case, the government wins.  *Id.* at 783 & n.8; *see*

27   *Baker Hughes*, 908 F.2d at 982 (explaining the burden-shifting framework).   If  defendants

28   successfully rebut the presumption, the burden then shifts back to the government to produce

additional evidence of anticompetitive effects.  *St. Alphonsus*, 778 F.3d at 783.  Here, in addition to undisputed evidence that the merger was presumptively anticompetitive, the US had additional evidence that the merger would harm innovation, increase the likelihood of coordinated effects, and raise prices, thus making a very strong prima facie case.

### 1. The United States Had Established a Prima Facie Case.

There was no dispute that the merger was presumptively anticompetitive based on the so-called "structural presumption," as measured by the Herfindahl–Hirschman Index ("HHI").[21]  The HHI is a well-established and commonly used method by which to measure market concentration. *St. Alphonsus*, 778 F.3d at 786.  HHI is calculated by summing the squares of each individual firm's market share.  *Id*.  Accordingly, HHI scores range from 0 in markets with no concentration to a high of 10,000 in markets where one firm has a 100% market share.[22]

Courts examine the post-merger HHI of the relevant market, as well as the change in HHI from pre- to post-merger to determine whether the government has established a prima facie case of competitive harm.  *Id*. (citing cases using HHI analysis and the then-operative 2010 Horizontal Merger Guidelines as means of establishing a prima facie case).  In doing so, courts look to the DOJ and FTC's merger guidelines as "persuasive authority" as to where to draw the line for a structural presumption.  *Id*. at 784 n.9.  Under the current guidelines, if the post-merger HHI would be more than 1,800, and the merger would increase the HHI by more than 100 points, then the merger is presumptively anticompetitive.  2023 Merger Guidelines § 2.1.[23]

As Professor Shapiro demonstrates, the HPE/Juniper merger is presumptively

---

[21] HPE argues that the US would have failed to establish the structural presumption because HPE and Juniper have a combined market share of under 30%.  Dkt. 369 at 4-5. But that is irrelevant; the presumption resting on a post-merger market share of 30% or more is simply another way to measure whether a merger is presumptively anticompetitive; and there is no safe harbor for mergers that do not cross the 30% threshold.  *United States v. Philadelphia Nat. Bank*, 374 U.S. 321, 364 n. 41 (1963) ("the fact that a merger results in a less-than-30% market share . . . does not raise an inference that the merger is not violative of s 7").

[22] For example, a market with two firms who each have 50% share would have an HHI of 5,000 ($50^2 + 50^2 = 5,000$).

[23] Courts have widely accepted and relied on the 2023 Merger Guidelines since their publication. *See, e.g.*, *FTC v. Kroger Co.*, No. 3:24-cv-347, 2024 WL 5053016, at *16 (D. Or. Dec. 10, 2024) (citing cases).

1  anticompetitive, regardless whether one uses the US or HPE economist's market share calculations.

2  Shapiro Decl. ¶¶ 16-18.  HPE's economist, Dr. Hill, tries to wiggle out of this conclusion by arguing

3  that ████████████████ even though his own calculations, based on his US-based shares, show

4  that the merger increases HHI by ██ and results in a post-merger HHI of ██.  Shapiro Decl. ¶ 17.

5  On its face, that is hard logic to follow, as the change in HHI is more than three times the presumptive

6  level, and the post-merger HHI is nearly twice the defined level of a highly-concentrated market.[24]

7  As Professor Shapiro explains, "there is a relatively strong presumption of harm to competition in

8  this case, given the HHI metrics just reported and given that Cisco and HPE will have a combined

9  post-merger market share of roughly ██."  Shapiro Decl. ¶ 21. Indeed, the structural presumption

10  is strengthened because Juniper was the fastest-growing firm in the market, and evidence suggests

11  that Juniper's share would have continued to increase without the merger.  *See* Shapiro Decl. ¶ 23.

12      A high HHI on its own establishes a prima facie case.  *St. Alphonsus*, 778 F.3d at 788.

13  Beyond establishing a structural presumption, however, the US showed additional evidence of

14  anticompetitive harm, which further strengthened its case.  *St. Alphonsus*, 778 F.3d at 786 (citing

15  Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years*, 77

16  Antitrust L.J. 49, 50–60 (2010)).  Here, evidence supports harms in the form of the loss of innovation

17  from the elimination of Juniper as a maverick; coordinated effects; and unilateral effects stemming

18  from the elimination of head-to-head competition between Juniper and HPE.

19          **2.  The Merger Will Harm Innovation.**

20      A maverick is a company with significant incentive and ability to attack the status quo.

21  Juniper was a maverick—and dangerous competitive threat—because it combined innovation with

22  aggressive pricing to attract customers.  Shapiro Decl. § 4.  HPE itself viewed Juniper as ████████

23  ████████████████████████.  *See* Ex. 8 (Hughes Dep.) at 267:16-268:13; Ex.

24  102 (HPEUS-002451468); Shapiro Decl. ¶ 35-36.  Juniper's innovation helped it win customers and

25  pushed HPE to improve its own product, thus spurring competition.  Shapiro Decl. § 5.B.

26      Juniper also took advantage of the trend among enterprise customers to move data into the

27

28  _____

[24] Dr. Remer's calculations, on which Professor Shapiro relies, are slightly higher: a change of 343 resulting in an HHI of 3874.

1   cloud.  Ex. 176 (PX0559) at -616.  As an HPE ███████ in 2024 concluded, Aruba Central

2   "██████████████████████," but "████████████████████████" because

3   of its "██████████████" and "██████████████████████."  Ex. 152 (PX0149) at -

4   412, 424.  Over several years, Gartner, an industry analyst firm, ranked Juniper ███████

5   ████████  for "██████████████████████" and "████████████████" in the Enterprise Wired and

6   Wireless LAN Infrastructure segment.  *See* Shapiro Decl. ¶ 32.

7       HPE was forced to respond to the considerable pressure Juniper's innovation was putting on

8   its business.  *See* Shapiro Decl. ¶¶ 51-55; Ex. 22 (Remer Rpt.) ¶ 214 ("████████████████

9   █████████████████████████████████████████████████████████████

10  █████████████████████████").  HPE mounted Project Gravity expressly to counter Juniper.

11  *See* Background § IV, *supra*.  HPE highlighted Project Gravity as "████████████████████."

12  Ex. 150 (PX0119) at -922.  HPE even launched a sales campaign whose name reveals its focus on

13  winning head-to-head bids against Juniper: "Beat Mist."  Background § IV, *supra*.

14      On January 9, 2024, HPE announced its proposed acquisition of Juniper.  About a month

15  later, HPE authored a █████████████████████████████████.  Ex. 152 (PX0149).

16  As HPE put it, they determined to ███████████████████████.  Ex. 185 (PX0726) at 16.

17      It is no answer to say that HPE will be more innovative because it has Juniper.  As Professor

18  Shapiro explains, smaller non-incumbents are incentivized to keep innovating to "steal" business

19  from incumbents, Shapiro Decl. ¶ 39, and, as the Nobel-winning economist Kenneth Arrow

20  explained, a disruptive firm has a greater incentive to innovate than an incumbent monopolist.

21  Shapiro Decl. ¶¶ 40-43.  Thus, HPE, protected from the competitive pressure of a dynamic maverick,

22  will have less incentive to innovate after the merger than before.

23      ### 3.  The Merger Threatens Harm From Coordinated Effects.

24      The fewer the number of firms in a market, the greater is the likelihood from coordinated

25  effects.  *See* Herbert Hovenkamp & Carl Shapiro, *Horizontal Mergers, Market Structure, and*

26  *Burdens of Proof*, 127 Yale L. J. 1996, 2000 (2018) ("In cases in which the government alleges

27  coordinated effects, the role of…concentration measures such as the HHI is… fundamental.").  That

28  is because coordination is easier when there are fewer firms whose behavior must be accounted for,

1  and it is especially true where, as here, a maverick has been removed from the equation.  By contrast,

2  where two firms control a combined ███ of the market and the remaining firms lack any track

3  record of sustained and successful gains in market share, then coordinated effects are ripe for the

4  picking.  *See* Shapiro Decl. ¶¶  10, 59. That can occur through tacit coordination. Shapiro Decl. ¶ 64

5  (quoting 2023 Merger Guidelines at 8).

6        Professor Shapiro explains that "The HPE/Juniper merger will materially increase the risk

7  that Cisco and HPE will pull their competitive punches in some manner, such as by competing less

8  vigorously for each other's customers."  Shapiro Decl. ¶ 66.  Such tacit "no poaching" could be both

9  profitable and sustainable because of the new market structure, the natural disinclination of

10  customers to incur the switching costs of moving to a new supplier, the ability of HPE and Cisco to

11  track whether the other is attacking its own customers, and the ability of each company, through the

12  use of large-customer specific discounts, to court the customers of the other smaller suppliers even

13  as they leave each other alone.  Shapiro Decl. ¶ 67.

14        By contrast, Juniper was aggressively competing to win customers from both HPE and Cisco.

15  As one of its employees noted, "████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████."  Ex.

19  180, (PX0588) at -906; *see* Shapiro Decl. ¶ 33.

20        Against this, HPE's expert Dr. Elizabeth Bailey opined that there would be: "No Increased

21  Risk of Coordinated Effects," but nothing she says engages or contradicts the principle that changes

22  in market concentration, as reflected by HHI analysis, establishes a structural presumption that

23  speaks directly to the increased risk of coordinated effects.  2023 Merger Guidelines at 8 ("This

24  harmful behavior is more common the more concentrated markets become, as it is easier to predict

25  the reactions of rivals when there are fewer of them.").  For example, Dr. Bailey emphasizes the

26  lack of price transparency in the market.  But tacit coordination does not require HPE and Cisco to

27  know the exact price and terms of the winning bid; all they need to know is if the other one steals

28  their client, and they can monitor that.  Shapiro Decl. ¶ 67.  Nor is the lack of past coordination a

1  requirement—the structural presumption is forward-looking and, in this case, particularly important

2  because it aids understanding in how the marketplace will operate with the removal of a maverick.

3  *See* Ex. 151 (PX0132) at -192 (what Juniper had done was "███████████" and that HPE would

4  be "██████████████████████████████████████████████████████████").

5  Indeed, the merger's end to the role that Juniper played as a "particularly aggressive competitor in

6  a highly concentrated market," heightens the cause for concern.  *See United States v. H & R Block,*

7  *Inc.*, 833 F. Supp. 2d 36, 79 (D.D.C. 2011) (quotation omitted).

8  **4. The Merger Threatens Harm From Unilateral Price Effects.**

9  Anticompetitive unilateral effects arise from the loss of head-to-head competition between

10  the merging firms.  *United States v. Bazaarvoice, Inc.*, No. 13-cv-00133, 2014 WL 203966, at *54

11  (N.D. Cal. 2014) (citing testimony of Professor Shapiro).  The loss of head-to-head competition

12  tends to increase prices in the absence of any cognizable efficiencies passed on to customers to

13  counteract the price effect.  *See* Shapiro Decl. ¶ 69; *H&R Block*, 833 F. Supp. 2d at 81-82 (describing

14  unilateral effects).

15  The increase in HHI above the presumptive level itself "indicate[s] that a merger's effect

16  may be to eliminate substantial competition between the merging parties."  2023 Merger Guidelines

17  § 2.1.  Professor Shapiro examines whether the diversion ratio between HPE and Juniper—the share

18  of business lost by HPE to Juniper if HPE raises its prices, and vice versa—is higher or lower than

19  what one would expect in light of increase in HHI.  Shapiro Decl. ¶¶ 71-73.  If the actual diversion

20  were lower, that would tend to show that the structural presumption overstates potential harm from

21  unilateral effects.

22  Professor Shapiro explains that the structural presumption is strengthened, not weakened,

23  because the evidence suggests HPE and Juniper were closer competitors than their market shares

24  would otherwise suggest.  *Id.* ¶¶ 74-76.  Even the calculations of HPE's economist, Dr. Hill, show

25  that the diversion ratios are higher than expected based on the HHI increase.  *Id.* ¶¶ 75, 77.  Instead,

26  HPE's Dr. Hill ignores the merger guidelines and argues for a non-existent safe harbor.  *See id.* ¶

27  78.  The strength of the structural presumption is further strengthened by HPE and Juniper's large

28  price/cost margins (HPE ███%, Juniper ███%), because higher margins are associated with higher

1    post-merger price increases.  *Id.* ¶¶ 79-80.

2        This economic analysis is buttressed by the strong evidence of head-to-head competition that

3    played out between HPE and Juniper.  Juniper combined higher quality with aggressive pricing,

4    enough to win important education and enterprise accounts, and HPE was forced to respond.  *See*

5    Shapiro Decl. §§ 4, 5.B; Background §§ III-IV, *supra*.

6        Attempts to downplay the competition between HPE and Juniper are unconvincing.  The fact

7    that HPE and Juniper also competed with other suppliers in the relevant market does not erase the

8    fact that they also competed fiercely head-to-head, that direct competition is the issue, and that

9    eliminating this dynamic is likely to substantially lessen competition.  *See United States v. JetBlue*

10   *Airways Corp.*, 712 F. Supp. 3d 109, 151 (D. Mass. 2024) ("The extent of direct competition

11   between the products sold by the merging parties is central to the evaluation of unilateral effects.")

12   (cleaned up).  Here, evidence above shows that Juniper was competing in HPE's most important

13   verticals, including higher education; that the two companies were engaged in aggressive price

14   discounting between each other; and HPE considered Juniper to be its "biggest threat."  Ex. 155

15   (PX0183) at -218; Background §§ III-IV, *supra*.  This is precisely the kind of merger that the

16   antitrust laws are meant to prevent.

17       **B.  HPE Has Not Rebutted This Strong Showing.**

18       The Supreme Court has never approved of efficiencies as a defense to an otherwise

19   anticompetitive merger.  *See FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580 (1967) ("Possible

20   economies cannot be used as a defense to illegality.").  "The status of the defense in this circuit

21   remains uncertain," although the Ninth Circuit has expressed skepticism about the defense.  *St.*

22   *Alphonsus*, 778 F.3d at 789-90.  Nonetheless, in *St. Alphonsus*, the Ninth Circuit assumed for the

23   purpose of that case that  "because § 7 of the Clayton Act only prohibits those mergers whose effect

24   'may be substantially to lessen competition,' 15 U.S.C. § 18, a defendant can rebut a prima facie

25   case with evidence that the proposed merger will create a more efficient combined entity and thus

26   increase competition."  *Id.* at 790.  The 2023 Merger Guidelines discuss what must be demonstrated

27   on efficiencies.  2023 Merger Guidelines § 3.3 ("merging parties must demonstrate through credible

28   evidence that, within a short period of time, the benefits will prevent the risk of a substantial

- 37 -

1    lessening of competition in the relevant market.").

2         To the extent efficiencies can be considered, the proposed efficiencies must not only be

3    timely and large enough to offset harm, they must "produce substantial competitive benefits that

4    could not be achieved without the merger under review." *Id.*  The efficiencies must directly benefit

5    customers, such as when lower production costs lead to lower prices for consumers, rather than

6    simply increasing the profits of the newly-merged company. *See St. Alphonsus*, 778 F.3d at 791.

7    This is necessary because "[t]he Clayton Act focuses on competition, and the claimed efficiencies

8    therefore must show that the prediction of anticompetitive effects from the prima facie case is

9    inaccurate." *Id.*; *see also* 2023 Merger Guidelines § 3.3 ("To the extent efficiencies merely benefit

10   the merging firms, they are not cognizable.").

11        Professor Shapiro has demonstrated that the proffered efficiencies are neither merger-

12   specific nor pass through benefits to consumers.  First, HPE has not shown that HPE could not make

13   itself into a more effective competitor without the merger as it was structured.   HPE was an

14   experienced company working hard to "Beat Mist" in the marketplace. *See* Background § 4.  And,

15   as Professor Shapiro explains, HPE has not shown that any of its purported synergies "could not be

16   achieved by 'a partial merger involving only those assets that give rise to the procompetitive

17   efficiencies.'"   Shapiro Decl. ¶ 84 (quoting 2023 Merger Guidelines at 32).   Indeed, the final

18   settlement proposal made by ATR on June 10, 2025 ███████████████████████

19   ████████████████████████████████████████████████████

20   ███. Ex. 36 (Rinner Ex. 9).

21        Second, HPE offered no evidence to suggest that cost savings from efficiencies would be

22   passed through in the form of lower prices to customers.  Indeed, HPE's efficiencies expert was not

23   even asked to opine on the question.  Failure to provide evidence of pass-through is fatal. *See*

24   Shapiro Decl. ¶¶ 86-87.

25        Third, even if HPE had produced some cognizable efficiencies—which Professor Shapiro

26   shows is not the case—it has offered no reason to believe that the efficiencies were sufficiently large

27   to negate any anticompetitive harm from the merger.

28        Another means of rebuttal permits merging parties to demonstrate that entry could replace

1   lost competition. *See* 2023 Merger Guidelines § 3.2. But that requires defendants to show that entry

2   would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract

3   the competitive effects of concern." *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019)

4   (quoted in 2023 Merger Guidelines § 3.2 n.66). After all, "[a]s a matter of economic reality,

5   companies do not simply enter any market they can." *Bazaarvoice*, 2014 WL 203966, at *71.

6   Importantly, entry must "replicate the competitive intensity of the acquired firm." *JetBlue Airways*

7   *Corp.*, 712 F. Supp. 3d at 158.

8          Here, "███████████████████████████████████████." Ex. 9 (Kovler Dep.) at 84:2-

9   86:11. HPE has failed to demonstrate the existence of any other firm able in a timely manner to

10  replicate Juniper's competitive intensity. The best evidence comes from HPE itself, which invested

11  three years and between ██████ people in Project Gravity, *see* Background § 4 *supra* (describing

12  the time and effort put into Project Gravity), and it still had a ways to go when it abandoned that

13  effort in favor of consolidation, not competition. *See* Ex. 152 (PX0149) (████████). The US, in

14  its pretrial brief authoritatively answered the point: "The relevant question, and the one the Court

15  should focus on, is whether those vendors can expand in a timely, likely, and sufficient manner to

16  counteract the merger's anticompetitive effects. The evidence will show that they cannot." Dkt.

17  202-1 at 13-15 (describing individual companies).

18         Because the evidence of harm is strong and HPE's rebuttal is weak, this Court can rightly

19  conclude that the US would have demonstrated a prima facie case and that, given the additional

20  evidence of harm to innovation, coordinated effects, and unilateral price increases, any attempted

21  rebuttal by HPE would have failed. *See Baker Hughes*, 908 F.2d at 991 ("The more compelling the

22  prima facie case, the more evidence the defendant must present to rebut it successfully.").

23  **C.  The Settlement Fails To Address Competitive Harms And Is Far Weaker Than**

24  **Alternative Remedies Actually Considered.**

25         The Settlement does nothing to ameliorate the anticompetitive effects of the merger set forth

26  above. And alternative remedies actually considered were far superior.

27

28

**1. Alternative Remedies Actually Considered Demonstrate that the US Had Ways to Protect Competition—and Rejected Them.**

Where two firms with overlapping lines of business seek to merge, divestiture of the overlapping business is standard practice. *See* Statement of the Federal Trade Commission's Bureau of Competition on Negotiating Merger Remedies, https://www.ftc.gov/advice-guidance/competition-guidance/negotiating-merger-remedies (2026) ("Anticompetitive horizontal mergers are most often remedied by a divestiture; a proposal to divest one party's demonstrably autonomous, on-going business unit will usually expedite settlement."). This is because: (1) the overlap is where competition is decreased and competitive pressure on the buyer removed, and (2) divestiture "of an ongoing business [has been viewed] as the most effective means of maintaining the premerger state of competition."[25] *See* Shapiro Decl. ¶ 94.

Not surprisingly, therefore, the demands made by ATR required a divestiture ███████████████. *See* Ex. 39 (Schultz Ex. 4); Ex. 36 (Rinner Ex. 9). To the extent HPE valued certain Mist software code, ATR revised its proposal to ███████████████████████████. This was a reasonable approach, requiring divestiture ████████████████████████████████████.

The actual settlement falls far short of that. At one point, the proposed settlement contained ████████████████. Although the impact of such a ███████████████████████, the rationale for the ███████ was telling. The ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." Ex. 46 (Schultz Ex. 12) at -676. In other words, there was recognition of the risk of non-competitive pricing following the merger. That reaffirms the wisdom of a divestiture of an overlapping business line, which would alleviate the risk of increased pricing the right way: ████████████████████████████████████████████████

---

[25] *See* "A Guide for Respondents: What to Expect During the Divestiture Process," Federal Trade Commission (June 2019), https://www.ftc.gov/system/files/attachments/merger-review/a_guide_for_respondents.pdf ("Guide for Respondents"). The FTC came to the conclusion after the study of the effectiveness of merger remedies. *See* Shapiro Decl. ¶ 94.

1     ███████████████.  *See* Shapiro Decl. ¶¶ 27-30 (detailing aggressive price cutting).

2              **2.  Instant On Divestiture Will Not Restore Competition.**

3          The US and HPE pat themselves on the back for the Instant On divestiture being a form of

4    "structural relief," but Instant On has nothing to do with the anticompetitive effects alleged in the

5    Complaint.  *See* Ex. 17 (Rinner Dep.) at 124:13-125:23; Ex. 69 (HPE-TUNNEY-0040926) at -938.

6    HPE asserts that the Instant On divestiture "addresses the harm alleged by the DOJ by immediately

7    injecting new competition into the enterprise WLAN market."  Dkt. 200-1 at 17. There is simply no

8    factual basis for the notion that the Instant On divestiture will "replicate the competitive intensity of

9    the acquired firm."  *JetBlue Airways Corp.*, 712 F. Supp. 3d at 158.  To the contrary, Instant On is

10   "███████████████."  Ex. 1 (Alford Dep.) at 137:11-138:1.

11         First, Instant On has an almost undetectable presence in the relevant market.  Its market share

12   is only ███%, and its divestiture therefore makes no change to the post-merger HHI calculations.

13   Shapiro Decl. ¶¶ 99-100.  That is, the merger remains presumptively anticompetitive after an Instant

14   On divestiture.  *Id.* ¶ 101.  Instant On is so insignificant that it was not even mentioned by HPE's

15   experts Dr. Hill and Dr. Bailey in their analyses of the competitive effects of the merger, and was

16   only referenced twice by Professor Remer in passing.  *Id.* ¶ 104.

17         Second, the divestiture of Instant On does not address the competitive overlap between HPE

18   and Juniper.  The record clearly shows that the head-to-head competition at issue was between

19   HPE's Aruba and Juniper's Mist offerings.  *See* Background § IV, *supra.* Project Gravity was not

20   about improving Instant On.  The Beat Mist campaign was not about training the Instant On sales

21   staff.  Instant On is a product directed at the small end of the SMB segment.  *See* Background § I,

22   *supra.*  Instant On was created to "███████████████."  Ex. 164 (PX0388)

23   at -444.  Juniper did not compete against Instant On; ███████████████

24   ███████████████.  Ex. 15 (Rahim 2/26/2026 Dep.) at

25   84:2-7.

26         Third, barriers to expansion make it unlikely that someone could take Instant On, even with

27   the latent features enabled, and replace the competitive intensity that Juniper provided.  *See* Dkt.

28   369 at 17-19.  The U.S. correctly explained in its pretrial brief that "entry barriers preclude fringe

competitors from expanding 'to fill the competitive void that will result' from the proposed acquisition." Dkt. 202-1 at 13 (quoting *H&R Block*, 833 F. Supp. 2d at 73).  Switching costs are high and customers in this market will tend to stick with their current supplier if it is "███████." *See* Shapiro Decl. ¶ 67; Ex. 61 (HPE-TUNNEY-0000734) at -761 ("███████████████████████████████████████████████████████████████ ███████████████"); Dkt. 202-1 at 13.  The hesitancy of larger enterprise customers "to roll the dice with a system that has not been thoroughly vetted by the marketplace makes it less likely that smaller WLAN vendors, or vendors like Ubiquiti with a reputation for catering to the lower end of the WLAN market, will succeed." Dkt. 202-1 at 13; Ex. 164 (PX0388) at -444 (███████ ████████████████████████████).[26]    As Professor Shapiro explains, there is no reason to believe that a buyer of Instant On could match the momentum, innovation, or competitive intensity of Juniper.  Shapiro Decl. ¶¶ 103-105.

HPE's own experience reinforces the point.  Project Gravity, HPE's effort to update Aruba Central, took three years just to update an existing platform to better compete with Juniper. Background § IV, *supra*.  And a new entrant, Nile Secure, "██████████████████████." Ex. 9 (Kovler Dep.) at 84:2-15.  There is no way that a smaller competitor could use Instant On to build itself up into a "Tier 1" competitor in less or equal that amount of time.  *See* 2023 Merger Guidelines, Section 3.2, p. 31 (The DOJ and the FTC "assess whether entry induced by the merger would be 'timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.'"); Background § II, *supra* (HPE referred to Cisco, HPE, and Juniper as "Tier 1" suppliers.).

Fourth, contrary to HPE's assertions, the auction process for Instant On confirms that the proposed divestiture cannot restore the competition the merger would eliminate.  *See* Dkt. 369 at 19. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████. Ex. 55 (DOJ-TUNNEY-00001533) at 535-41; Ex. 56 (DOJ-TUNNEY-00001544) at -545-50; Ex.

---

[26] *See* Ex. 21 (Mojaddidi Dep.) at 13:13-16:19 (Ubiquiti has a small, non-traditional sales force).

1   93 (HPE-TUNNEY-0044562) at -563-65; Ex. 18 (Schultz Dep.) at 138:19-139:20. ████████

2   ████████████████████████████████████████████████████████████████████████████

3   ████. Shapiro Decl. ¶ 106. ████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████████████

5   ████████████████████████████████████████████████████████████████████████████

6   ████████████. Ex. 90 (HPE-TUNNEY-0044310) at 310. ██████████████████████

7   ████████████████████████████████████████████████████████████████████████████.

8   Shapiro Decl. at 106; Ex. 18 (Schultz Dep.) at 139:18-143:20.

9   ████████████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████████

11  "████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████████

14  ████████████████████████

15  Ex. 89 (HPE-TUNNEY-0044283; HPE-TUNNEY-0044285; HPE-TUNNEY-0044289) at -283.

16  ████████████████████████████████████████████████████████████████████████

17  ████████████████████████████████████ and "████████████████████████████."

18  *Id.* at -283-84.   Importantly, HPE's Mr. Schultz testified that ████████████████

19  ████████████████████████████," Ex. 18 (Schultz Dep.) at 142:23–143:9,

20  ████████████████████████████████████████.

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████ "████████████████████████████████

23  ████████████████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████████████

28  ████████████████████. Ex. 87 (HPE-TUNNEY-0044090).

### 3. Mist AI Ops License Will Not Restore Competition.

The AI Ops for Mist Source Code License, by itself, has minimal value to competitors in the market for enterprise-grade WLAN solutions. Indeed, the US recognized this deficiency when Mr. Rinner informed HPE representatives that ████████████████████████████████████████ ████████████████████████████████████████.” *See* Ex. 40 (Schultz Ex. 5).

Preliminarily, the licensee will not receive the same exclusive access to the AI Ops for Mist Source Code that Juniper had; the AI Ops for Mist Source Code License is “non-exclusive,” which makes it inherently less valuable. Dkt. 217-1 at 10. Additionally, the non-exclusive nature of the license reduces the licensee’s incentives to make investments that rely on the licensed software. Shapiro Decl. ¶ 112.

More importantly, however, the AI Ops for Mist Source Code is only a single piece of the broader AI platform that made Mist competitive. Mist’s customer-facing innovations, including its ████████████████ and ████████████████, attracted Mist’s customers—and threatened its competitors. *See* Ex. 8 (Hughes Dep.) at 102:8-16; Ex. 20 (Wilburn Dep.) at 25:4-30:16; *see* Background § III. The AI Ops for Mist Source Code License, however, ████ ████████████████████████████. Decl. of Aanjhan Ranganathan (“Ranganathan Decl.”) ¶¶ 19-20, 23-24, 33, 38, 42, 58, 62; Ex. 78 (HPE-TUNNEY-0042022) at -028 (████████ ████████████████); Ex. 15 (Rahim 2/26/2026 Dep.) at 122:11-123:14. ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████. Ranganathan Decl. ¶¶ 19, 33-34, 38, 43, 58; Ex. 47 (HPE Resp. to Intervenors’ Second Interrog.), No. 5.

Moreover, the AI Ops for Mist Source Code License does not ████████████████████ ████████████████████████████████████████████████████████████████████ ████. Ranganathan Decl. ¶¶ 17, 22, 31, 38, 42, 44, 48-57. ████████████████████ ████████████████████████████████████████████████████████████████████ ████████████. Ranganathan Decl. ¶¶ 29, 48-57. Indeed, established WLAN suppliers have AI models that reflect the suppliers’ ████████████████████████████████████████████

- 44 -



1   ███████████████████████████████████████████████████████

2   ███████████████████. Ranganathan Decl. ¶¶ 48-57, 59-62.  The AI

3   Ops for Mist Source Code License does not ██████████████████████

4   ████████████████████████████. Ranganathan Decl. ¶¶ 16-18, 20, 48-

5   57, 59-62.

6   ███████████████████████████████████████████████████

7   ███████████████████████████████████████████████████

8   ███████.  *See generally* Ex. 55 (DOJ-TUNNEY-00001533) at -535-40; Ex. 58 (DOJ-TUNNEY-

9   00001575) at -578-84; Ex. 57 (DOJ-TUNNEY-00001564) at -567-68; *see also* Ex. 93 (HPE-

10  TUNNEY-0044562) at -562-63. ███████████████████████████████

11  ███████████████████████████████████████████████████████

12  ███████████████████.” *See* Ex. 83 (HPE-TUNNEY-0043756) (████████████

13  ███████████████████); Ex. 84 (HPE-TUNNEY-0043768).

14  ████████████████████████████████████████████████████

15  ███████████████████████████████████████████████████████

16  ████████████████████████████████████. Ex. 94 (HPE-TUNNEY-0044612)

17  at -214-215; Ex. 93 (HPE-TUNNEY-0044562) at -562-63; Ex. 81 (HPE-TUNNEY-0043739); Ex.

18  92 (HPE-TUNNEY-0044555); Ex. 85 (HPE-TUNNEY-0043789); Dkt. 369 at 17, 19.  Notably,

19  ███████████████████████████████████████████████████████,

20  ██████████████████████████████. Ex. 81 (HPE-TUNNEY-0043739). ████████

21  ███████████████████████████████████████████████████████

22  ███████████████████████████████████████████████████” given

23  that “[███████████████████████████,” the “████████████████████

24  █████████████,” and it “███████████████████████████████████

25  ███”  Ex. 88 (HPE-TUNNEY-0044113). ███████████████████████

26  ███████████████████████████████████████████████████████

27  ███████████████████████████████████████████████████████

28  █████████████. Ex. 86 (HPE-TUNNEY-0043900).

1       Apart from the license's minimal value, this kind of licensing as part a remedial measure is

2  disfavored.  First, structural remedies should include divestitures of complete business lines, rather

3  than bits and pieces of a business.  Longstanding federal government policy has recognized this, as

4  has the case law.  *See* Shapiro Decl. ¶¶ 92-95; *see also United States v. Aetna Inc.*, 240 F. Supp. 3d

5  1, 60 (D.D.C. 2017) (noting divestiture of an existing business might be more likely to preserve

6  competition lost through merger) (citing U.S. Dep't of Just., Antitrust Division Policy Guide to

7  Merger Remedies 8-9 (2011)).  In 2019, the FTC stated that it "prefers the divestiture of an ongoing

8  business as the most effective means of maintaining the premerger state of competition."  Guide for

9  Respondents, *supra*.  This is why during negotiations between ATR and HPE, Mr. Rinner sent HPE

10 ████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

12 ██████████████████████████, and Mr. Rinner wanted HPE to know ████████████████████

13 ██████████████████████████.  Ex. 67 (HPE-TUNNEY-0040798).

14      Second, when dealing with intellectual property ("IP"), the preferred approach is to divest

15 the IP with a potential license back to the merged entity.  *See* Negotiating Merger Remedies,

16 Statement of the Bureau of Competition of the FTC, at 9 (Jan. 2012).[27]  That approach puts the

17 divestiture buyer in a better position to deploy the IP in an effective manner, unencumbered by

18 limitations on its use.  *Id.*  That is exactly why ████████████████████████████████

19 ████████████████████████████████████████████████████████████████████

20 ████████████████████."  Ex. 36 (Rinner Ex. 9) at -122.

21      Allowing HPE to keep the entirety of the Mist business fails to alleviate the loss of

22 competition between HPE and Juniper.  HPE gets to keep not just the AI Ops for Mist Source Code,

23 but the ██████████ and everything else that made Mist successful.

**D.  The Settlement Cannot Be Justified Based on Risk of Trial.**

25      As a final gasp, the US argues that "the settlement embodies a prudent compromise that

26 accounts for litigation risk."  Dkt. 311 at 3.  For multiple reasons, invocation of litigation risk

27

28 ---

[27]  Available at https://www.ftc.gov/system/files/attachments/negotiating-merger-remedies/merger-remediesstmt.pdf.

presents no basis for the Court to accept this settlement.

First, as Professor Shapiro has explained, any consideration of litigation risk would have to compare the extent to which competitive harm would be avoided by trial (based on the US's chance of winning) against the extent to which the Settlement would reduce harm.  *See* Shapiro Decl. ¶¶ 114-20.  However, the US has not presented any substantive analysis of litigation risk and without it, there is no basis on which to conduct the necessary analysis.

Second, actually going through that exercise shows that this Settlement could not be justified based on litigation risk.  As Professor Shapiro demonstrates, the US had established a structural presumption and additional competitive harm, like the loss of significant head-to-head competition between HPE and Juniper, elimination of Juniper as a maverick, and the harm to innovation.  And HPE failed to demonstrate any cognizable efficiencies to offset any such harm.  In other words, the US had a very strong case and thus a high likelihood of winning at trial.

Compare that to the Settlement, which "will do very little to eliminate the harm to customers caused by the merger."  Shapiro Decl. ¶ 122.  As a result, "rejecting the Amended Proposed Final Judgment will very likely leave customers in the market for enterprise-grade WLAN solutions in the United States better off."  *Id.* ¶ 123.  The US claim of some unspecified amount of litigation risk cannot justify a settlement that, as shown above, does nothing to address the competitive harms.

## E.  The Settlement Fails on the Mandatory Tunney Act Factors.

The mandatory public interest factors in § 16(e)(1) all favor rejection of the Settlement.  The "competitive impact of such judgment" is negative.  As explained above and in the Shapiro Declaration, the merger is likely anticompetitive, and the Settlement does nothing to address it.  Shapiro Decl. ¶ 122.  The alternative remedies that ATR sought, and failed to disclose—in the form of real structural relief that would have addressed the competitive overlap between the companies— were far superior, as was the alternative of going to trial, which the US had a high likelihood of success.  The impact on competition in the relevant market is likewise negative—innovation will suffer, the likelihood of coordinated effects will increase, and consumers will pay higher prices.

The impact on the public generally is likewise negative.  Ineffectual settlements by the federal government, especially ones reached through political influence and with no support on the

1   merits, weaken the public's faith in government. As the DOJ acknowledges, the public's trust must

2   be earned every day—in their work on this Settlement, they have breached the public's trust. *See*

3   *Bechtel Corp.*, 648 F.2d at 666.

### F. National Security Arguments Are Irrelevant and Unsubstantiated.

5   HPE tries to distract the Court by invoking the specter of "national security" to support its

6   merger. Dkt. 369 at 20–22. HPE's post-hoc national security arguments are irrelevant to a Tunney

7   Act analysis. But even if the arguments were examined, they do not support approval of the

8   Settlement.

9   Most importantly, there is no national security justification in the CIS, despite the fact that

10  ████████████. If HPE or the US truly thought the Settlement was necessary for our nation's

11  security, it should have, and would have, been put in the CIS. It was not, and that ends the argument.

12  Moreover, if HPE's national security argument had legs, the Court might expect a robust

13  defense of those arguments from the United States. But the United States conspicuously offers none.

14  Instead, the United States acknowledges that HPE's purported "national security" arguments are

15  irrelevant to this proceeding: "The Tunney Act requires the Court to consider whether entry of the

16  proposed Final Judgment is in the public interest based on its competitive impact, not national

17  security or other justifications." Dkt. 311 at 19.[28] In fact, in evaluating the transaction, the United

18  States rejected HPE's "national security" arguments. *See* Ex. 18 (Schultz Dep.) at 42:20–43:10,

19  100:5–101:5 (HPE was told "████████████████████████████████████

20  ████████████████████████████████████"); Ex. 1 (Alford Dep.) 142:14–18

21  ("████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████."). HPE likewise admits that

24  national security is "████████████████████." Ex. 18 (Schultz Dep.) at 138:10-17. The

25  States agree with the United States that "the Court should not conduct an extra-statutory national

26

---

27  [28] To the extent that national security or similar matters played a role in a decision to resolve a case
    through settlement, that would need to be disclosed in the CIS, which requires "an explanation of
28  any unusual circumstances giving rise to [the settlement] or any provision contained therein." 15
    U.S.C. § 16(b)(3). But national security considerations are entirely absent from the CIS.

1   security analysis of the merger."  Dkt. 311 at 21-22 n.7.

2           Finally, the national security argument deeply and fundamentally contradicts antitrust law.

3   First, to the extent HPE argues that the merger allows them to better compete with Huawei abroad,

4   that argument fails.  *See* Dkt. 369 at 20-22.   A fundamental principle of antitrust law is that

5   "anticompetitive effects in one market [cannot] be justified by procompetitive consequences in

6   another."  *Philadelphia Nat'l Bank*, 374 U.S. at 370 ("If anticompetitive effects in one market could

7   be justified by procompetitive consequences in another, the logical upshot would be that every firm

8   in an industry could, without violating s 7, embark on a series of mergers that would make it in the

9   end as large as the industry leader.").

10          Second, to the extent HPE argues that the merger allows them to better serve their national

11  security agency customers, that too fails.  Juniper was emerging as a "███████████████████████

12  ████████████████.  *See* Ex. 157 (PX0234) at -037, -039; Ex. 144 (PX0021) at -963 ("██████

13  ███████████████████████████████████.").  Elimination of Juniper as a choice for

14  national security agencies hurts those agencies, just as it hurts any other customer in the relevant

15  market, particularly because there are "[███████████████████" to working with ██████.

16  *Id.* at -954.  The Court should reject HPE's argument that it has somehow benefited the national

17  security community by depriving it of a dynamic and innovative competitive choice.

18          Third, the DOJ has been consistent through administrations that the US does not pick

19  "national champions":

20          [W]e should reject the suggestion that the only path to our economic security is to turn
            a critical market over to a monopolistic corporation.  National champions are too often
21          national chokepoints.  ***The path to our national security and global technology***
            ***leadership depends on competitive markets that allow for the growth of new cutting-***
22          ***edge U.S. technologies.***[29]

23

24  [29] Assistant Attorney General Abigail Slater, "Unleashing Innovation the American Way: Through
    Free  Market  Competition"  (Sept.  16,  2025),  *available  at*  https://www.justice.gov/opa/-
25  speech/assistant-attorney-general-gail-slater-delivers-keynote-address-2025-georgetown-law
    (emphasis added).  Former AAG Slater is not alone in rejecting the use of antitrust laws to promote
26  national champions.   It is a fundamental American economic principle, embraced across
    administrations.  *See* FTC Chair Lina Khan, "Carnegie Endowment for International Peace" (Mar.
27  13,  2024),  *available  at*  https://www.ftc.gov/system/files/ftc_gov/pdf/2024.03.13-chair-khan-
    remarks-at-the-carnegie-endowment-for-intl-peace.pdf ("To stay ahead globally, we don't need to
28  protect our monopolies from innovation—we need to protect innovation from our monopolies. We

1    Put differently, our national security apparatus—like other consumers—benefits from robust

2    competition between innovative competitors, and national security is served by protecting, not

3    eliminating, that competition.

4    **VI.    The Court Should Hold An Evidentiary Hearing.**

5           The evidence set forth here conclusively establishes that the Settlement violates the public

6    interest and should be rejected.  However, the Court may benefit from hearing from Professor

7    Shapiro, who can further elucidate the economic analysis as to why this Settlement fails to remedy

8    the harms of the merger.  Professor Shapiro was cited by both US and HPE experts and is a renowned

9    economist with extensive experience analyzing mergers.  He has volunteered his time pro bono.

10          The Court may also benefit from hearing from Mr. Alford regarding the process by which

11   the Settlement was reached, particularly if Mr. Alford is allowed to testify more completely than at

12   his deposition as to the internal threats that were made within DOJ and the misconduct that he is

13   aware of.  The issue of the misconduct Mr. Alford witnessed has become even more significant in

14   the wake of Ms. Slater's termination.

15          Finally, if the Court has questions about the technical aspects of the source code license—

16   which is woefully inadequate to ameliorate the harms of this merger—the States would make

17   available Dr. Ranganathan to testify.[30]

18                                        **CONCLUSION**

19          For the foregoing reasons, the Court should deny the Motion for Entry of Final Judgment.

20

21   Dated: March 9, 2026

22                                        PHILIP J. WEISER
                                          Attorney General

23

24   _____

25   need to choose competition over national champions."); "US Antitrust Policy: A Discussion with
     Assistant    Attorney    General    Makan    Delrahim"    (Dec.    18,    2019),    *available    at*
26   https://www.hudson.org/economics/transcript-us-antitrust-policy-a-discussion-with-assistant-
     attorney-general-makan-delrahim ("So an anti-competitive merger or otherwise should be approved
27   if it creates a French or a German or a European champion.  I wholeheartedly reject that.  I think
     that's a bad idea.").

28   [30] The States may supplement this in the event that additional discovery reveals additional witnesses
     or issues that may be appropriate for a hearing.

1

/s/ Arthur Biller
ARTHUR BILLER (*Admitted Pro Hac Vice*)

2

Senior Assistant Attorney General
BRYN A. WILLIAMS

3

First Assistant Attorney General (SBN 301699)
JONATHAN B. SALLET (*Admitted Pro Hac Vice*)

4

Special Assistant Attorney General
ROBIN ALEXANDER (*Admitted Pro Hac Vice*)

5

Assistant Attorney General
1300 Broadway, 10th Floor

6

Denver, CO 80203
Telephone: (720)508-6000

7

Email: Arthur.Biller@coag.gov

8

Bryn.Williams@coag.gov

9

Jon.Sallet@coag.gov
Robin.Alexander@coag.gov

10

11

*Attorneys for the State of Colorado*

12

ROB BONTA
Attorney General of California

13

14

/s/ Brian D. Wang
PAULA L. BLIZZARD, Senior Assistant Attorney

15

General (SBN 207920)
MICHAEL W. JORGENSON, Supervising Deputy

16

Attorney General (SBN 201145)
BRIAN D. WANG, Deputy Attorney General (SBN

17

284490)
Office of the Attorney General

18

California Department of Justice
455 Golden Gate Avenue, Suite 11000

19

San Francisco, California 94102
(415) 510-4400

20

Brian.Wang@doj.ca.gov

21

22

*Attorneys for the State of California*

23

24

WILLIAM TONG
ATTORNEY GENERAL

25

26

/s/ Nicole Demers
Nicole Demers (*pro hac vice application forthcoming*)

27

Deputy Associate Attorney General
Antitrust Section

28

Connecticut Office of the Attorney General
165 Capitol Ave.

- 51 -

Hartford, CT 06106
Tel.: (860) 808-5030
nicole.demers@ct.gov

*Attorneys for the State of Connecticut*

BRIAN SCHWALB
Attorney General of the District of Columbia

*/s/ Coty Montag*
Coty Montag (SBN 255703)
Deputy Attorney General, Public Advocacy Division
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 417-5402
Coty.Montag@dc.gov

*Attorneys for the District of Columbia*

ANNE E. LOPEZ
Attorney General

*/s/ Rodney I. Kimura*
RODNEY I. KIMURA *(Admitted Pro Hac Vice)*
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii. 96813
Telephone:  (808) 586-1180
Email:  Rodney.i.kimura@hawaii.gov

*Attorneys for State of Hawaii*

KWAME RAOUL
Attorney General of Illinois

*/s/ Paul J. Harper*
*(Admitted Pro Hac Vice)*

ELIZABETH L. MAXEINER
*(Admitted Pro Hac Vice)*
Chief, Antitrust Bureau
PAUL J. HARPER

- 52 -

Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street, 35th Floor
Chicago, Illinois 60603
773-590-7935 | elizabeth.maxeiner@ilag.gov
773-590-6837 | paul.harper@ilag.gov

*Attorneys for State of Illinois*


COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

*/s/ Anthony W. Mariano*
Anthony W. Mariano *(Admitted Pro Hac Vice)*
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(781) 835-7990
Anthony.Mariano@mass.gov

*Attorneys for*
*Commonwealth of Massachusetts*


KEITH ELLISON
Attorney General

*/s/ Jon M. Woodruff*
*(Admitted Pro Hac Vice)*

ELIZABETH ODETTE *(Admitted Pro Hac Vice)*
Manager, Assistant Attorney General
Antitrust Division

JON M. WOODRUFF
Assistant Attorney General
Antitrust Division

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7425
elizabeth.odette@ag.state.mn.us
jon.woodruff@ag.state.mn.us

*Attorneys for State of Minnesota*

1

2  LETITIA JAMES
   Attorney General of the State of New York
3

4  CHRISTOPHER D'ANGELO
   Chief Deputy Attorney General
5  Economic Justice Division

6  */s/ Elinor Hoffmann*
   *(Admitted Pro Hac Vice)*
7

8  ELINOR R. HOFFMANN
   Chief, Antitrust Bureau
9  AMY McFARLANE
   *(Admitted Pro Hac Vice)*
10 Deputy Bureau Chief, Antitrust Bureau
   MICHAEL SCHWARTZ
11 *(Admitted Pro Hac Vice)*
   Senior Enforcement Counsel, Antitrust Bureau
12

13 New York State Office of the Attorney General
   28 Liberty Street
14 New York, NY 10005
   Phone: (212) 416-8269
15 Email: Elinor.Hoffmann@ag.ny.gov

16 *Attorneys for State of New York*

17

18 JEFF JACKSON
   Attorney General of North Carolina
19

20 */s/ Kunal J. Choksi*
   *(Admitted Pro Hac Vice)*
21

22 Kunal Janak Choksi
   Senior Deputy Attorney General
   North Carolina Department of Justice
23 114 W. Edenton St.
   Raleigh, NC 27603
24 Telephone: (919) 716-6032
   E-Mail: kchoksi@ncdoj.gov
25

26 *Attorneys for State of North Carolina*

27

28 Dan Rayfield

- 54 -

Attorney General of Oregon

*/s/ Rachel K. Sowray*
Rachel K. Sowray *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
Timothy D. Smith *(Admitted Pro Hac Vice)*
Attorney-in-Charge
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR 97201
503.689.0249 | Rachel.Sowray@doj.oregon.gov
503.798.3297 | tim.smith@doj.oregon.gov

*Attorneys for State of Oregon*


NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Amy N. L. Hanson*
*(Admitted Pro Hac Vice)*

JONATHAN A. MARK *(Admitted Pro Hac Vice)*
Antitrust Division Chief
AMY N.L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
Email: jonathan.mark@atg.wa.gov
Email: amy.hanson@atg.wa.gov
Tel: 206-389-3806 (Mark)
Tel: 206-464-5419 (Hanson)

*Attorneys for State of Washington*


JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/Caitlin M. Madden*
Caitlin M. Madden *(Admitted Pro Hac Vice)*

Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857

(608) 267-1311
caitlin.madden@wisdoj.gov

*Attorneys for State of Wisconsin*

1

## E-FILING ATTESTATION

2

3   I, Arthur Biller, am the ECF user whose identification and password are being used to file the

4   Intervenors' Opposition to Motion for Entry of Final Judgment.  In compliance with Civil Local

5   Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

6

7                                                        _s/ Arthur Biller_

8                                                         Arthur Biller

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Intervenors' Opposition to Motion for Entry of Final Judgment –
Case No. 5:25-cv-00951-PCP