**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

---

**UNITED STATES OF AMERICA,**

**Plaintiff,**

v.

**HEWLETT PACKARD**
**ENTERPRISE, CO. and**
**JUNIPER NETWORKS, INC.**

**Defendants.**

---

**Civil Case No. 5:25-cv-00951-PCP**

# DECLARATION OF CARL SHAPIRO

**6 March 2026**

# Table of Contents

1.  Qualifications and Assignment ........................................................................1

2.  Summary of Opinions ...................................................................................2

3.  Market Concentration and the Structural Presumption ..............................4

4.  Juniper Was a Disruptive & Innovative Force Prior to its Acquisition ......7

5.  Loss of Innovation in Enterprise-Grade WLAN Solutions.........................10
    A.  Mergers, Innovation, and "Business Stealing" ................................. 11
    B.  Application to the HPE/Juniper Merger ............................................ 13

6.  Increased Danger of Coordinated Anticompetitive Effects .......................16

7.  Unilateral Anticompetitive Price Effects ....................................................21

8.  HPE Has Not Established Substantial, Cognizable Efficiencies ...............24

9.  The Amended Proposed Final Judgment is Poorly Structured..................26

10.  Market Concentration Metrics After the Divestiture of Instant On ......28

11.  The AI Ops for Mist Source Code License...............................................31

12.  The Amended Proposed Final Judgment Does Not Protect Customers 33

Appendix A: Curriculum Vitae ...........................................................................35

Appendix B: Testimony in the Past Four Years ................................................47

Appendix C: Materials Relied Upon ..................................................................48

# 1. Qualifications and Assignment

1. I am Carl Shapiro, Distinguished Professor of the Graduate School at the University of California at Berkeley. I have been studying antitrust, innovation, and competitive strategy for forty-five years. My curriculum vitae is provided in Appendix A.

2. I have considerable experience with the application of economics for the purpose of enforcing the antitrust laws. I served from 1995 to 1996 and again from 2009 to 2011 as the Deputy Assistant Attorney General for Economics in the Antitrust Division of the U.S. Department of Justice ("DOJ"). In this role, I supervised the economists analyzing the cases that came before the Antitrust Division. I also led the working group responsible for developing the 2010 Horizontal Merger Guidelines. In addition, I have served in numerous mergers as an expert witness or consultant to the DOJ, the FTC, state attorneys general, and private parties.

3. From 2011 to 2012, I had the honor of serving as a Senate-confirmed Member of the President's Council of Economic Advisers ("CEA"). The CEA, an agency within the Executive Office of the President, is charged with offering the President objective economic advice on the formulation of economic policy. The CEA bases its recommendations and analyses on economic research and empirical evidence, using the best data available to support the President in setting our nation's economic policy.

4. I have been asked by the states of Colorado, California, Connecticut, Hawai'i, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington, Wisconsin, and the District of Columbia (collectively "Intervenor States") to assess the strength of the DOJ's challenge to HPE's acquisition of Juniper and the efficacy of the Amended Proposed Final Judgment ("APFJ").

5. I have had access to the evidentiary record that was made available to the Intervenor States. Regarding the likely competitive effects of HPE's acquisition of Juniper, I refer below to the Corrected Expert Report of Marc Remer Ph.D. ("Remer Report"), the Expert Reply Report of Marc Remer Ph.D. ("Remer Reply Report"), the Expert Report of Nicholas Hill ("Hill Report"), the February 2, 2026 Declaration of Dr. Nicholas Hill

("Hill Declaration"), the Expert Report of Elizabeth M. Bailey Ph.D. ("Baily Report"), and the February 2, 2026 Declaration of Dr. Elizabeth M. Bailey ("Bailey Declaration"). Regarding the efficiencies asserted by HPE, I refer below to the Expert Report of Mark Zmijewski, Ph.D. ("Zmijewski Report") and the Expert Reply Report of Mark Zmijewski, Ph.D. ("Zmijewski Reply Report").

6.  My published articles were cited by Professor Remer, Dr. Hill, and Dr. Bailey in their reports. Below, I respond to their use and characterization of my work.

7.  Appendix B lists my testimony in the past four years.

8.  Appendix C lists the materials I have relied upon.

9.  My work on this case is being done on a *pro bono* basis.

## 2. Summary of Opinions

10. The DOJ's challenge to HPE's acquisition of Juniper is strong. This conclusion is based on extensive evidence that, without some remedy, HPE's acquisition of Juniper is likely to significantly lessen competition and harm customers in the market for enterprise-grade WLAN solutions in the United States. My analysis of the evidence is organized using the following categories.

    i.  **Structural Presumption**: The merger substantially increased concentration in a market that was already highly concentrated. The concentration metrics associated with the merger are far above the thresholds in the 2023 Merger Guidelines that trigger the structural presumption. This is true whether one uses the market shares put forward by Professor Remer on behalf of the DOJ or those put forward by Dr. Hill on behalf of HPE. Moreover, the structural presumption is stronger than implied by these HHI metrics because Juniper's market share has been growing and will likely grow further in the absence of the merger. See Section 3.

    ii.  **Juniper Was a Disruptive & Innovative Force Prior to its Acquisition**: There is clear evidence that Juniper was a disruptive and innovative force in the market for enterprise-grade WLAN solutions in the United States before it was acquired by HPE. Juniper's market share was growing, Juniper was well placed to take advantage of the ongoing shift toward cloud-based solutions, and HPE recognized Juniper as a major competitive threat. See Section 4.

iii. **Loss of Innovation in Enterprise-Grade WLAN Solutions**: Eliminating Juniper as a disruptive, independent competitor is likely to slow the pace at which new and improved enterprise-grade WLAN solutions are developed. See Section 5.

iv. **Increased Danger of Coordinated Anticompetitive Effects**: After the merger, Cisco and HPE will have a combined market share of roughly ▮%. This very high level of concentration increases the risk that Cisco and HPE will accommodate each other in some way, such as by bidding less aggressively to win each other's customers. See Section 6.

v. **Unilateral Anticompetitive Effects**: Prior to the merger, HPE and Juniper frequently engaged in head-to-head competition. By eliminating this competition, the merger is likely to harm customers in the market for enterprise-grade WLAN solutions in the United States. See Section 7.

vi. **HPE Has Not Established Substantial, Cognizable Efficiencies**: HPE has not demonstrated that their claimed cost efficiencies will be merger-specific or that they will pass along any cost savings to customers. Therefore, following the 2023 Merger Guidelines, they are not cognizable as merger efficiencies. See Section 8.

11. The APFJ put forward by the DOJ would have only a *de minimis* effect in promoting competition in the market for enterprise-grade WLAN solutions in the United States.

i. **Divestiture is Limited in Scope**: The APFJ calls for the divestiture of the "HPE Instant on Business" and an "AI Ops for Mist Source Code License." Merger remedies like this one, which do not involve the divestiture of one firm's entire line of business in the relevant market, tend to be less effective. The risk that the APFJ will fail to protect competition is borne by customers, while the merged firm will *benefit* if the APFJ proves ineffective. See Section 9.

ii. **Instant On Has a Tiny Market Share**: The market share of the divested product, Instant On, is only about ▮▮. Therefore, its divestiture would have only a tiny effect on the concentration metrics associated with the merger. Even after accounting for the divestiture of Instant On, those metrics remain far above the thresholds found in the 2023 Merger Guidelines. See Section 10.

iii. **Limited Effects of AI Ops for Mist Source Code License**: HPE has not established that the AI Ops for Mist Source Code License (the "License") will have a material effect on lowering the barriers to entry and expansion in the market for enterprise-grade WLAN solutions in the United States. See Section 11.

12. The merger together with the APFJ is likely to significantly lessen competition in the market for enterprise-grade WLAN solutions in the United States and thus leave customers in that market worse off than they would be if the merger were enjoined. This conclusion follows from my analysis in Sections 3-11.

13.    Given the strength of the DOJ's merger challenge and the weakness of the APFJ, the merger together with APFJ is likely to leave customers in the market for enterprise-grade WLAN solutions in the United States worse off than they would be if the APFJ were rejected and the DOJ's merger challenge were litigated. See Section 12.

## 3.  Market Concentration and the Structural Presumption

14.    There is no dispute that the relevant market in which this merger should be evaluated is for enterprise-grade wireless local area network ("WLAN") solutions in the United States.[1]

15.    According to Professor Remer, in 2024 HPE's market share was ███ and Juniper's market share was ███.[2] Figure 38 in the Hill Report reports HPE's market share as ███ and Juniper's market share as ███.[3]

16.    The strength of the structural presumption does not hinge on whether one uses Professor Remer's or Dr. Hill's market shares. However, I consider Professor Remer's estimated market shares to be more reliable because most of his data come directly from the suppliers themselves. Moreover, among the market share estimates provided by Dr. Hill, I consider the shares in the lower part of his Figure 38 to be superior to his "baseline" shares because they are for the United States, the geographic market in this case.[4]

17.    Using Professor Remer's market shares, the increase in the Herfindahl-Hirschman Index ("HHI") is 343 and the post-merger HHI is 3874.[5] Using Dr. Hill's shares in the United States gives an increase in the HHI of 331 with a post-merger HHI of 3364.[6]

---

[1] "I concur with Dr. Remer that enterprise-grade WLAN is a relevant product market. I concur with Dr. Remer that the United States is a reasonable geographic market." Hill Report, ¶95.

[2] Remer Reply Report, Figure V.4, "Updated Market Shares."

[3] Dr. Hill's "baseline" market shares are a bit lower, ███ for HPE and ███ for Juniper, but they are measured in North America, not the United States. *See* the Hill Report, Figure 10 and backup materials.

[4] In addition, Dr. Hill's "baseline" shares in North America are based on data from ████████ rather than data from ████, both of which give higher market shares in North America for both HPE and Juniper. *See* Figures 10, 36, 37, and 38 in the Hill Report.

[5] Remer Reply Report, Figure V.7, ████████

[6] Hill Report, Figure 38 and backup materials.

18. Under Section 2.1 of the Merger Guidelines, a merger is presumed to substantially lessen competition if it increases the HHI by at least 100 and leads to a post-merger HHI of at least 1800.[7] Both the increase in the HHI and the post-merger HHI associated with the HPE/Juniper merger are far above those thresholds, regardless of which set of market shares one uses. Both HHI metrics associated with the HPE/Juniper merger are also well above the thresholds used in the 2010 Horizontal Merger Guidelines, which were 200 and 2500 respectively.[8]

19. The Hill Report gives a misleading impression of these HHI metrics, in two ways: (i) the Hill Report never actually reports the change in the HHI or the post-merger HHI associated with the HPE/Juniper merger; and (ii) the scale used in Figure 13 of the Hill Report gives the misleading visual impression that both the level and increase in the HHI are near the threshold levels in the Merger Guidelines.

20. Building on the omitted HHI numbers and that misleading visual impression, Dr. Hill states: "███████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████ █████████████████████████████."[9] But Dr. Hill's statement here is simply not true: a post-merger HHI of 3648 does not exceed the 1800 threshold by ██████████ and the threshold of 100 for an increase in the HHI is not ██████████ by an increase of 271.[10]

---

[7] "Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, December 18, 2023, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

[8] "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, available at https://www.justice.gov/atr/file/810276/dl?inline. For clarity, I refer to the 2023 Merger Guidelines as the "Merger Guidelines" and the earlier iteration as the "2010 Horizontal Merger Guidelines."

[9] Hill Report, ¶117-118.

[10] The HHI metrics I use here are the ones that Dr. Hill prefers, based on data from ██████████, but the same statement applies to the other two dots shown in his Figure 13, which use data from ██████████. *See* Hill backup materials.

21.  For these reasons, I strongly disagree with Dr. Hill's assertion that  If anything, the *opposite* is true. In my opinion, and based on my experience, there is a relatively *strong* presumption of harm to competition in this case, given the HHI metrics just reported and given that Cisco and HPE will have a combined post-merger market share of roughly ██%.[11]

22.  The Hill Report (¶14) further states:  His Figure 2, which makes this point, relies entirely on two papers of mine.[12] While I appreciate the citations, Dr. Hill neglects to point out that the *averages* reported in my papers reflect considerable variation across litigated mergers, some of which involve HHI metrics similar to or below those associated with the HPE/Juniper merger.

23.  Moreover, the structural presumption based on 2024 market shares is significantly strengthened when one looks at *trends* in market shares. Figure V.4 of the Remer Reply Report,  indicates that Juniper's market share grew from ████ in 2021 to ████ in 2024. Other than HPE, no other firm grew its market share by more than ██ percentage points, and no firm other than Cisco, HPE, and Juniper achieved a market share of more than ████. Reflecting these trends, Figure III.12 in the Remer Reply Report, "████████████████████," shows that Juniper's growth from 2019 through 2024 far outpaced the growth of all of the smaller suppliers in the market.[13] Plus, Juniper is well-placed to continue to grow as customers shift toward cloud-based solutions.

---

[11] Figure 10 in the Hill Report gives a combined share for Cisco and HPE of ██%. Figure V.4 in the Remer Reply Report gives a combined share of ██%.

[12] Carl Shapiro and Howard Shelanski, "Judicial Response to the 2010 Horizontal Merger Guidelines," *Antitrust Law Journal* 78, no. 1 (2021): 39-54; and Carl Shapiro, "Evolution of the Merger Guidelines: Is This Fox Too Clever by Half?" *Antitrust Law Journal* 39, no. 1 (2024): 59-80.

[13] Dr. Hill recently reported some partial data on market shares in 2025, stating: "Specifically, I found that aside from the combination of HPE and legacy Juniper into a single entity, as of Q3 2025 (the latest period available) U.S.

24.   Whichever market share estimates one chooses to use, those numbers should be interpreted in the context of Juniper's growing market share prior to its acquisition. After all, in merger analysis a firm's current market share is only serving as a proxy for its future competitive significance.

## 4. Juniper Was a Disruptive & Innovative Force Prior to its Acquisition

25.   There is compelling evidence that Juniper was a disruptive and innovative force in the market for enterprise-grade WLAN solutions prior to its acquisition by HPE. This section recounts some of that evidence, which serves as a foundation for the analysis that follows.

26.   Section III of the Remer Report presents evidence showing that



[14]

27.   I consider it significant that HPE viewed Juniper as successfully executing a strategy of winning new customers and growing its market share through aggressive pricing and innovation. HPE was especially aware of Juniper's aggressive and successful efforts to win HPE's large customers and its customers in higher education. For example, Jeff Dolce, Vice President & General Manager for the Americas at HPE, wrote: "Juniper is my biggest concern. They are coming after our higher Ed and successfully taking us out in some of the longest standing accounts. They are telling pur [sic] partners that they will do it at any price. Very aggressive."[15]

---

WLAN market shares have not changed materially. HPE and Juniper have a combined share of ███ percent per the Dell'Oro North American WLAN revenue data for Q1–Q3 2025. Compared to 2024, the merged firm's share increased from ███ percent to ███ percent." *See* Hill Declaration, ¶¶7-8 (footnote omitted).

[14] Remer Report, ¶74.

[15] HPEUS-003842980, at -980 (11/27/2023). Mr. Dolce further emphasized Juniper's aggressive pricing in an email with the subject line "████████████████████████████████████." While discussing

28.  Juniper's pricing model put pressure on HPE's higher education discounting structure. In an email requesting approval for a large discount to compete for t█████████████████, an HPE employee explained, ████████████████████████████████████████████████████████████████████████████"[16]

29.  Juniper's aggressive pricing strategy was not confined to higher education. The impact of Juniper's aggressive "AI on Us" promotion[17] was widely recognized by HPE. In an email to his colleagues, Alain Carpentier, chief of Aruba sales worldwide, and Phil Mottram, president of Aruba networks, Jeff Dolce noted that HPE ████████████████████ ███████████████████████ Mr. Dolce continued, █████████████████ ███████████████████████████████[18]

30.  Juniper's aggressive pricing triggered a response by HPE. After learning that Juniper's pricing would require HPE to offer a sizable discount on an opportunity with ████████, Aruba's Chief Financial Officer and Senior Vice President Andrew Schultz wrote in an email that he was ████████████████████████████████ ████████████████████████████████████████████████ ████████"[19] Here, HPE was ███████████████████████████ ████████. Below, I discuss such post-merger coordination between HPE and Cisco.

31.  Along with its aggressive pricing, Juniper was a technology leader within the movement to cloud-based solutions and through its early use of artificial intelligence. Starting in



█████████████████████████, he noted that this competition "███████████████████ ████████████████████████████████ HPEUS-003835680, at -682 (04/06/2023).

[16] HPE-LIT-001465838, at -839 (05/30/2023). Similarly, while preparing to compete against Mist for a contract with George Washington University, an account manager inquired, ████████████████████████████ ████████████ HPEUS-001161115, at -115 (6/5/2023).

[17] JNPR-2R-01208041, at -96 (12/2021).

[18] HPEUS-003857724, at -725 (03/29/2024) [PX0112].

[19] HPEUS-004782565, at -65 (3/29/2024).

2014, Mist had developed ███████████████████████[20] By 2021, HPE noted that "████████████████████████."[21]

32.  Dell'Oro, a market analytics firm, highlighted Juniper's strength in the cloud-based



segment, stating that in "███████████████████████████████ ████████████████████████████████████████ ████.[22] Evercore ISI, an investment bank and research firm, emphasized Juniper's strong position stating that "████████████████████ ██████████████████████████████████████ ████"[23] The Magic Quadrant, an industry benchmark published by Gartner, a research and advisory firm, ranked Juniper ██████████████ for several years in terms of ████████████████ and ████████████ in the Enterprise Wired and Wireless LAN Infrastructure segment.[24]

33.  Juniper itself stated that it ████████████████████████



███████████████████████████████████████ noting that ██████████████ ████████████████████████████████████ ██████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████[25]

34.  HPE recognized Juniper Mist's leadership in AI integration. After learning that Mist had integrated ChatGPT into Juniper's Marvis AI offering in May 2023, David Hughes, Aruba's chief product and technology officer, shared with several HPE executive that based on HPE's initial research ████████████████████████████████████

---

[20] JNPR-LIT-00310441, at -447 (11/06/2024).

[21] HPEUS-001261902, at -02 (11/24/2021).

[22] DELLO-HPEJ-000001171, at -181 (3/13/2025).

[23] HPE-VRL000353, at -391 (03/30/2023).

[24] HPE-TUNNEY-0029844, at -847 (11/15/2021). Gartner_000001, at -4 (12/21/2022). Gartner_000034, at -38 (03/06/2024).

[25] JNPR-2R-00121906, at -06 (09/21/2023) [PX0588].



35.  Cisco also viewed Juniper as an aggressive and disruptive competitor. In an internal presentation ███████████████, Cisco stated: ██████████████████ ██████████████████[27] In ██████████████████, Cisco highlighted that ██████████████████ ██████████████████[28]

36.  In 2022 Cisco ████████████ ████████████████ ██████████████████████ ██████████████[29]

37.  Stan Kovler, the vice president of corporate development & investor relations at Extreme, one of the smaller WLAN providers, provided some useful specifics when he was asked what had allowed Juniper to grow: "██████████████ ██████████████ ██████████████ ██████████[30]

## 5. Loss of Innovation in Enterprise-Grade WLAN Solutions

38.  In this section I explain why there is a substantial risk that HPE's acquisition of Juniper will slow down innovation in enterprise-grade WLAN solutions.

---

[26] HPEUS-002779190, at -192 (06/19/2023) [PX0132].

[27] CISCO-HPEJ-00001609, at -612 (06/28/2021) [PX0662].

[28] CISCO-HPEJ-00004245, at -250 (07/05/2022).

[29] CISCO-HPEJ-00004245 ,at -259 (07/05/2022).

[30] Deposition of Stan Kovler (Extreme), October 15, 2024, 68:15−69:3. *See also* ¶74 of the Remer Report.

## A.    Mergers, Innovation, and "Business Stealing"

39.    As a general principle, when a large incumbent acquires a smaller rival that has been disruptive and innovative, the danger is high that innovation will be adversely affected. The basic economics underlying this principle are well understood: the smaller firm has a powerful incentive to keep innovating so it can "steal" business from larger incumbents, while they have an incentive to preserve the threatened status quo. Professor Remer ██████████████████████████ which Dr. Bailey does not dispute.

40.    Nobel Laureate Ken Arrow published a seminal paper in 1962 in which he demonstrated theoretically how and why competition spurs innovation.[31] Here is how I described Arrow's insight in my own 2012 paper, which was published in celebration of the 50th anniversary of the volume in which Arrow's paper appeared.[32]

> "Arrow (1962) famously argued that a monopolist's incentive to innovate is less than that of a competitive firm, due to the monopolist's financial interest in the status quo. This fundamental idea comports with common sense: a firm earning substantial profits has an interest in protecting the status quo and is thus less likely to be the instigator of disruptive new technology. In Arrow's words: 'The preinvention monopoly power acts as a strong disincentive to further innovation.'" (citing Arrow (1962) at p. 620)

The core idea is that an incumbent firm has less of an incentive to disrupt the status quo by incurring the costs and effort needed to develop a new product than does an aggressive newcomer with little to lose and far more to gain. Over the past 30 years, this insight has been directly translated into the way that horizontal mergers are analyzed not only in the United States but around the world. Merger enforcement has increasingly been about protecting innovation, not just keeping prices from going up.

41.    When I was the chief economist at the Antitrust Division, I led the team that developed the 2010 Horizontal Merger Guidelines. These guidelines applied Arrow's basic idea in a new section that explained how horizontal mergers can lessen innovation:

---

[31] Kenneth Arrow, "Economic Welfare and the Allocation of Resources to Invention," in *The Rate and Direction of Inventive Activity: Economic and Social Factors*, National Bureau of Economic Research, (1962): 609-626.

[32] Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?" in *The Rate & Direction of Inventive Activity Revisited,* Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, 2012.

"Competition often spurs firms to innovate. The Agencies may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger. That curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products.

The first of these effects is most likely to occur *if at least one of the merging firms is engaging in efforts to introduce new products that would capture substantial revenues from the other merging firm.* The second, longer-run effect is most likely to occur if at least one of the merging firms has capabilities that are likely to lead it to develop new products in the future that would capture substantial revenues from the other merging firm." (Section 6.4, "Innovation and Product Variety," emphasis added, footnote omitted)

42. Here is how the 2023 Merger Guidelines explain their application of Arrow's basic idea:

"When a firm introduces a new product or improves a product's features, some of the sales it gains may be at the expense of its rivals, including rivals that are competing to develop similar products and features. As a result, competition between firms may lead them to make greater efforts to offer a variety of products and features than would be the case if the firms were jointly owned, for example, if they merged. The merged firm may have a reduced incentive to continue or initiate development of new products that would have competed with the other merging party, but post-merger would 'cannibalize' what would be its own sales."[33]

43. In 2019 I published an article with two co-authors that delved more deeply into how to assess the danger that a horizontal merger will lessen innovation.[34] The animating idea behind that paper, again based on Arrow (1962), is explained in the executive summary: "A merger between rivals internalizes business-stealing effects arising from their parallel innovation efforts and thus tends to depress innovation incentives."

44. The Remer Report (¶213) states: ████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ The Remer Report (¶217) then cites my 2019

---

[33] Section 4.2.E, "Consideration for Innovation and Product Variety Competition," p. 39.

[34] Giulio Federico, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," in *Innovation Policy and the Economy*, National Bureau of Economic Research, 2019. This article illustrates how concerns about a loss of innovation arose and were handled in a number of merger cases in the United States and Europe.

paper in support of his conclusion that "███████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████ I very much agree
with Professor Remer on these key points.

45. Dr. Bailey acknowledges, as she must, ███████████████
████████████████████████████████████
████████████████████████████████████
████████████[35] However, she does not claim, much less show, that such synergies
are present in the current case. I address merger efficiencies in Section 8.

46. In summary, the danger that a merger will harm innovation is driven by how much each
merging firm captures profitable business from the other when it innovates, because the
merger eliminates the prospect that one of the merging firms will steal business from the
other. The fact that the merging firms also compete with other firms is of secondary
importance in assessing the competitive effects of the merger because the merger does
not directly alter that competition.

### B.    Application to the HPE/Juniper Merger

47. Based on these well-established economic principles, the effect of HPE's acquisition of
Juniper on innovation hinges on the answer to two factual questions:

(1) Does innovation by Juniper play an important role in enabling Juniper to win
business from HPE?

(2) Has HPE responded to Juniper Mist by investing more to improve its own WLAN
solutions?



[35] The Bailey Report (¶81) cites my 2019 paper in a misleading manner. She claims that a citation to my paper
"████████" that "█████████████████████████████" is appropriate. This
is flatly incorrect, and indeed the *opposite* of the central point of my paper.

48.  The remainder of this section explains why the answer to both of these questions is "yes." Therefore, the merged HPE/Juniper is likely to innovate more slowly than would HPE and Juniper as independent firms, so the merger is likely to slow down the pace of innovation in the market for enterprise-grade WLAN solutions. Moreover, the harm to innovation from the merger will tend to be exacerbated as Cisco in turn feels less pressure to innovate.

49.  On the first key factual question, there is ample evidence that Juniper frequently engages in head-to-head competition with HPE; see Sections VI.A and VI.B and Appendix E of the Remer Report. Moreover, as one would expect in a market that involves high-tech products, Juniper's innovative features played a significant role in enabling Juniper to win customers away from HPE. The Remer Report states: ████████████ ███████████████████████████████████████████████████ ███████████████████████████ (¶214, footnote with citations omitted)

50.  The U.S. Department of Veterans Affairs (VA) illustrates how Juniper was able to win the business of a very large customer on the strength of its innovative products. ██████ ██████████████████████████████████████████, explained that ████████████████████████████████████████████████ ██████████████[36] Mr. ████████ stated that █████████████████████████ ███████████████████[37]

51.  On the second key factual question, there is clear evidence that HPE responded to the threat from Juniper by investing more to improve its own WLAN solutions. See Sections VI.A and VI.B of the Remer Report. Professor Remer explains:



---

[36] Deposition of Daniel Mesimer (U.S. Department of Veterans Affairs), May 27, 2025, 101:22-23.

[37] Deposition of Daniel Mesimer (U.S. Department of Veterans Affairs), May 27, 2025, 158:9-11.

52. David Hughes, Aruba's chief product and technology officer, identified Project Gravity in a 2021 presentation as ███████████████████ highlighting that it is ████ ████████████████████████ and that it █████████████ ██████████████████████ He added: ████████ ████████████████████████████[38]

53.   In May 2023, HPE expressed serious concerns about Mist's advantage over Aruba with respect to integrating generative AI. David Hughes, in an email to other top HPE executives with the subject line ██████████████████████████████wrote: ████████████████████████████████████████ ████████████████████████████████ █████████████████████████████ ████████████████████████████[39]

54. Shortly after that, in June 2023, an HPE Aruba networking presentation listed two initiatives related to Project Gravity, ██████████████████████and ██████████████████The listed goal was to ████████████████[40]

55. Lastly, in February 2024, HPE conducted a ████████████████in which ████ ███████████████████[41] A draft version of the document ████████████████████████████████████████ ██████████████HPE indicated that several of those gaps █████████████████or are █████████████████[42] The analysis concluded by stating that ████████████ ████████████████████[43]



[38] HPEUS-006743916, at -922 (8/10/2021) [PX0119].

[39] HPEUS-002779190, at -192 (05/19/2023) [PX0132].

[40] HPEUS-002760008, at -67 (06/07/2023).

[41] HPE-LIT-005979411, at -412 (02/20/2024).

[42] HPE-LIT-005979418, at -420, -422, -423.

[43] HPE-LIT-005979418 at -424.

## 6. Increased Danger of Coordinated Anticompetitive Effects

56.  For more than fifty years, antitrust enforcers have been concerned that horizontal mergers will increase the danger of coordinated anticompetitive effects. The 2010 Horizontal Merger Guidelines describe coordinated anticompetitive effects this way:

"A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others." (Section 7, p. 24)

57.  Antitrust economists have recognized for decades that coordinated anticompetitive effects are more likely to arise in more concentrated markets. The level of the HHI is commonly used as a measure of concentration for this purpose.

58.  The HPE/Juniper merger inherently increases the risk of coordinated anticompetitive effects because it raises the HHI from 3531 to 3874.[44] These HHI metrics easily trigger the structural presumption in the market for enterprise-grade WLAN solutions in the United States.[45]

59.  The increased risk of anticompetitive coordination involving Cisco and HPE is especially high because these two suppliers will have a combined market share of roughly ██% after

---

[44] Here I am using Professor Remer's market shares. Using Dr. Hill's market shares would give somewhat smaller HHI figures but would not affect my point.

[45] Defendants' Pre-Trial Brief (p. 14) cites a paper of mine on the use of HHI metrics, stating: "Cisco's dominance thus distorts the HHI analysis and curtails its usefulness in predicting the merged entity's market power. See Shapiro, Antitrust: What Went Wrong and How to Fix It, 35 ANTITRUST 33, 45 n.59 (2021) ('The problem with the level of the HHI is that it can be driven by how the market is divided among non-merging firms')." This passage gives the misleading impression that my analysis supports the conclusion that HHIs are not useful when a non-merging firm has a large market share. This is false. The cited passage is incomplete in two respects: (a) the citation omits the second half of the sentence, and (b) the citation is from a footnote, and Defendant's Pre-Trial Brief does not include the text to which the cited footnote is attached. Here is the *full sentence* containing the passage cited in Defendants' Pre-Trial Brief, with the omitted part italicized: "The problem with the level of the HHI is that it can be driven by how the market is divided among non-merging firms, *which is of secondary significance in cases involving unilateral effects*." And here is the sentence in the text of my article to which the cited passage is attached in a footnote: "The structural presumption based on the level of the HHI is well suited for mergers involving coordinated effects; the change in HHI and upward pricing pressure are well suited for mergers involving unilateral effects." Contrary to Defendants' Pre-Trial Brief, my article flatly does *not* support their assertion that Cisco's high market share "distorts the HHI analysis and curtails its usefulness in predicting the merged entity's market power."

the merger and because Juniper, with a ██% and growing market share, played a disruptive role by pricing aggressively prior to its acquisition by HPE.

60. I now ask whether HPE has rebutted the structural presumption by showing that the conditions in the relevant market in this case are especially unfavorable to coordination. HPE has not made such a showing.

61. Section 2 in the Bailey Report, "No Increased Risk of Coordinated Effects," offers five arguments in support of her conclusion that "the proposed transaction is unlikely to increase the risk of coordinated effects."[46] But none of them, even if accepted, would establish that the relevant market in this case is especially unfavorable to coordination.

   i.   Section 2.3 is entitled "No Coordination or Attempted Coordination in the WLAN Industry." But the economics underlying the structural presumption applies in markets without known prior coordination. What Dr. Bailey is pointing out here is the absence of a major "plus factor" regarding the risk of coordination.

   ii.  Section 2.4 is entitled "Products in the WLAN Industry Are Not Homogeneous." This proposition is no doubt true, but product differentiation is the norm in modern markets. Indeed, most merger challenges for decades have involved markets with differentiated products. The structural presumption is by no means confined to markets with homogenous goods.

   iii. Section 2.5 is entitled "Information Is Not Transparent Nor Readily Observable in the WLAN Industry." Much of this section seeks to establish that *prices and terms* are not transparent. But suppliers in business-to-business markets typically do not observe their rivals' prices and terms, so this feature too is unexceptional. Below, I discuss how post-merger coordination might arise in this case without price transparency.

---

[46] Bailey Report, ¶5.

iv. Section 2.6 is entitled "WLAN Vendors Do Not Have Aligned Incentives." But this feature also is common and does not give a reason to ignore the HHI metrics.

v. Section 2.7 is entitled, ████████████████████████████████ As explained above, this claim by Dr. Bailey is factually suspect and at odds with trends in market shares. But even if it were true, it would not give a basis for rebutting the structural presumption. At most, it would provide an argument for not *increasing* Juniper's ████ share (based on Juniper's disruptive and growing presence in the market) and thus applying an even stronger structural presumption than implied by the HHI metrics reported above.

62. The rest of this section explains why the merger of HPE and Juniper will increase the danger of coordinated anticompetitive effects in the market for enterprise-grade WLAN solutions in the United States. As usual, we are talking about a *danger*, not a certainty.

63. Professor Remer explains the basic economics of how coordinated anticompetitive effects can arise following a horizontal merger (Remer Report ¶298):



64. The Merger Guidelines (p.8) explains how coordinated anticompetitive effects can arise without any explicit agreement:

"Tacit coordination can lessen competition even when it does not rise to the level of an agreement and would not itself violate the law. For example, in a concentrated market a firm may forego or soften an aggressive competitive action because it anticipates rivals responding in kind. This harmful behavior is more common the more concentrated markets become, as it is easier to predict the reactions of rivals when there are fewer of them."

65. The Remer Report identifies one form of coordinated effects that can arise after a merger:

███████████████████████████████████████

███████████████████████████████████████

██████████ (¶308-309, footnote omitted)

66. The HPE/Juniper merger will materially increase the risk that Cisco and HPE will pull their competitive punches in some manner, such as by competing less vigorously for each other's customers.[47] That species of anticompetitive behavior, which can be called "no poaching," need not involve any agreement between Cisco and HPE. For example, it could take root if Cisco were to compete less aggressively for HPE's customers and if HPE were then to reciprocate. This "no poaching" mode of conduct by Cisco and HPE is more likely to be profitable and sustainable in the absence of Juniper as an independent competitive force.[48]

67. Such behavior could well be profitable and sustainable for Cisco and HPE even if the other smaller vendors did not reciprocate, for four reasons.

   i. Cisco and HPE will have over ██% of the market. The small and relatively unchanging market shares of the other vendors indicate that their ability to gain market share is limited. Put differently, there are meaningful barriers to expansion in this market.[49]

---

[47] I say "in some manner" because antitrust economists are not able to predict precisely how anticompetitive coordination will arise and persist, even in cases where a merger materially increases the risk of such coordination.

[48] I am not asserting that this particular mode of conduct will *necessarily* arise after the merger. Rather, I am explaining why it is more likely to arise. Other forms of coordinated anticompetitive conduct also might arise.

[49] Stan Kovler, vice president of corporate development & investor relations at Extreme, describes a number of significant barriers to entry and expansion in the relevant market. Deposition of Stan Kovler (Extreme), October 15, 2024, 84-86.

ii.    Customers are inertial and tend to stick with their current supplier.[50] This gives incumbent suppliers a natural advantage and reduces the profitability of Cisco or HPE bidding to "steal" a customer that is currently using the other.

iii.    Cisco and HPE will each have information to help it monitor and verify that the other is reciprocating. Specifically, they often learn who is competing for their current customers,[51] and when they do lose a customer they often learn the identity of the supplier that "stole" that customer.[52] Moreover, many public entities are required to disclose the identity of the winning firm.[53]

iv.    Cisco and HPE can continue to compete for the customers of other suppliers even if they pull their competitive punches with each other. This helps make "no poaching" coordinated behavior profitable for Cisco and HPE even if other suppliers do not reciprocate. The key fact here is that Cisco and HPE regularly offer large, *customer-specific* discounts. Dr. Bailey ▮▮▮▮▮▮▮▮▮▮[54]

68.    Lastly, HPE recently argued that some competitors have testified in support of HPE's acquisition of Juniper.[55] As a general principle, competitors benefit from a merger that



[50] *See* Gartner (2024), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Gartner_000034, at -61 (03/06/2024)).

[51] The Remer Report (p. 129) states: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ See the Remer Report ¶204, which includes a citation to an HPE document stating: ▮▮▮▮▮ PE-LIT-004182165, at -188 (3/2024) [PX0449].

[52] HPEUS-003842980 refers to a study HPE did of the opportunities it lost. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[53] For example, the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Remer Report, p. 39.

[54] The Bailey Report (¶41) states: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

[55] HPE's Statement in Support of the Motion for Entry of Final Judgment, February 2, 2026, p. 5.

*reduces* competition. In this case, coordination between Cisco and HPE would benefit their smaller rivals in the relevant market, regardless of whether they reciprocate.

## 7. Unilateral Anticompetitive Price Effects

69.   HPE's acquisition of Juniper will eliminate bidding competition between them. This elimination of competition will tend to increase prices in the absence of any cognizable efficiencies. These price increases are called unilateral anticompetitive price effects.

70.   Antitrust economists use the increase in the HHI associated with a merger as a metric for assessing the significance of unilateral anticompetitive price effects. In the current case, the increase in the HHI is 343, which is far above the threshold of 100 found in the Merger Guidelines.[56] Moreover, because the 343 figure is based on Juniper's historical market share, while Juniper's market share has been growing, the 343 figure tends to underestimate the unilateral anticompetitive price effects of the HPE/Juniper merger.

71.   I now ask whether HPE has rebutted the structural presumption related to anticompetitive unilateral price effects by showing that HPE's and Juniper's market shares overstate the extent to which they would compete head-to-head in the future if Juniper remained independent. HPE has made no such showing.

72.   The structural presumption based on the increase in the HHI can be rebutted if the products sold by the merging firms are more distant substitutes than is implied solely by their market shares. For this purpose, antitrust economists use the *diversion ratios* between the products sold by the merging firms to measure how closely they compete. The diversion ratio from HPE to Juniper is defined as the share of the business lost by HPE, if HPE raises its price, that shifts to Juniper. The structural presumption can be rebutted if the actual diversion ratios are sufficiently lower than the default diversion ratios, which are calculated purely based on HPE's and Juniper's market shares.

---

[56] This figure also is well above the 200 threshold in the 2010 Horizontal Merger Guidelines. The same is true of the 331 increase in HHI calculated using Dr. Hill's market shares for the United States. *See* "Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, available at https://www.justice.gov/atr/file/810276/dl?inline.

73. The default diversion ratio from Juniper to HPE is calculated by assuming that Juniper's chance of being the runner-up for a customer that selects HPE is equal to Juniper's share of all customers not won by HPE. The default diversion ratio from HPE to Juniper is equal to ██████ divided by ████, which equals ██████ Here, the numerator of ████ is Juniper's market share and the denominator of ████ is the share of the market not won by HPE. Likewise, the default diversion ratio from Juniper to HPE is equal to ████ divided by ████, which equals ██████. Here, the numerator of ████ is HPE's market share and the denominator of ██████ is the share of the market not won by Juniper.

74. The Remer Report (¶263) states:



75. Data presented by Dr. Hill *supports* Dr. Remer's conclusion on this point. In particular, Figure 24 in the Hill Report, which is based on data from the E-Rate program, shows a diversion ratio from Juniper to HPE of ████, which is higher than the default diversion ratio of ██████. Likewise, Figure 24 in the Hill Report shows a diversion from HPE to Juniper of ████, which is higher than the default diversion ratio of ██████.[57]

76. If one accepts Professor Remer's conclusion that ████████████████████████ ████████████████████████, then the presumption that the merger will lead to higher prices is *stronger* than it would be just based on the 343 increase in the HHI. The structural presumption is strengthened, not rebutted.

77. Dr. Hill ████████████████████████████████████████ ██████████████████ Section 7 of the Hill Report opens this way: ██████ 

---

[57] Having said this, I would not put too much weight on data from the E-Rate program because it only accounted for about ████ of HPE's and Juniper's WLAN revenue in 2024. See Figure 22 from the Hill Report.

████████████████████████████████████████████████████████████████

(Hill Report ¶137, footnote omitted) Note that Dr. Hill's assertion here is not directly responsive to Professor Remer's claim. Dr. Hill appears to concede the central point.

78.  In Section 7.3, Dr. Hill reveals just how far he departs from the Merger Guidelines. He calculates that HPE and Juniper would be the top two choices in only about ████ of bidding opportunities if the diversion ratios between them are proportional to their market shares.[58] Based on that calculation, he concludes (¶157) ████████████████████ ██████████████████████████ In reaching this conclusion, which is based solely on ██████████████████████ Dr. Hill is flatly rejecting the structural presumption in the Merger Guidelines, which apply to a merger that increases the HHI by at least 100 points. Indeed, he goes quite a bit further, ████████████████████████████████ ████████████████████████████████ 271 ██████.[59]

79.  In addition to the diversion ratios, the price/cost margins of the merging firms play an important role in determining the magnitude of unilateral anticompetitive price effects. All else equal, higher margins are associated with higher post-merger price increases. Professor Remer and Dr. Hill agree on this basic point.[60]

80.  HPE's and Juniper's price/cost margins for their enterprise-grade WLAN solutions are sizeable. Professor Remer estimates that HPE's price/cost margin is ██████ and that Juniper's price/cost margin is ██████[61] These relatively large price/cost margins further

---

[58] Using the default diversion ratios based on Dr. Remer's data, HPE would be the top choice for ████ of customers, and Juniper would be the second choice for ████ of those customers, so ████ of all customers ████████████ would rank HPE as their top choice and Juniper as their second choice. Likewise, Juniper would be the top choice for ████ of customers, and HPE would be the second choice for ████ of those customers, so ████ of all customers ██████████ would rank HPE as their top choice and Juniper as their second choice. Adding up these two groups, HPE and Juniper would be the top two choices for ████ of all customers.

[59] Dr. Hill's "baseline" market shares are ████ for HPE and ████ for Juniper. These shares give an increase in the HHI of 271. See Hill Report, Figure 10 and backup materials.

[60] The Gross Upward Pricing Pressure Index ("GUPPI") used by both Professor Remer and Dr. Hill is the multiplicative product of a diversion ratio and a price/cost margin. *See* Sonia Jaffe and E. Glen Weyl, "The First-Order Approach to Merger Analysis," *American Economic Journal: Microeconomics*, 2013, 5(4), 188-218.

[61] Remer Report ¶270. Dr. Hill ████████████████████████████ which come from HPE's and Juniper's own financial reports.

strengthen the structural presumption of unilateral anticompetitive price effects based on the HHI increasing by 343 points.

81.   Lastly, HPE has not rebutted the structural presumption of unilateral anticompetitive price effects by showing that the barriers to entry or expansion in the relevant market are low.[62] The fact that only HPE and Juniper were able to grow their market share by more than 0.5 percentage points from 2021 to 2024 suggests the contrary.

## 8. HPE Has Not Established Substantial, Cognizable Efficiencies

82.   So far as I can tell at this time, HPE has not established that its acquisition of Juniper will generate substantial, cognizable efficiencies. I use the term "cognizable efficiencies" in the manner typically used by antitrust economists, as explained in the Merger Guidelines (p. 32-33): efficiencies that are (1) verified, (2) passed through to customers, (3) merger specific, and (4) not anticompetitive.[63]  My focus is on elements (2) and (3).

83.   HPE recently explained to the Court that its primary goal in acquiring Juniper was to combine the complementary offerings of the two companies:

> "The goal was to combine HPE's and Juniper's highly complementary product portfolios: HPE's traditional strength in storage and servers, and Juniper's in data center switches and routers. Combining HPE's and Juniper's offerings would create a company to compete across the 'full stack' of networking products."[64] (citations omitted)

84.   So far as I can determine, HPE has not demonstrated that combining HPE's and Juniper's complementary product portfolios is merger-specific. In particular, HPE has not demonstrated that these claimed synergies could not be achieved by "a partial merger involving only those assets that give rise to the procompetitive efficiencies," as required

---

[62] Section VII of the Remer Report, ███████████████ provides evidence in support of his conclusion that ███████████████████████████ (p.8)

[63] The Zmijewski Rebuttal Report states: ████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████ Of course, if the merger is litigated, the determination of whether HPE's claimed efficiencies are cognizable will be made by the court. As always, I offer my analysis to assist the court, in this case by examining two of the *elements* that are necessary for efficiencies to be cognizable: pass-through and merger-specificity. My approach here is no different from that taken by ███████████████████████████████████████.

[64] HPE's Statement in Support of the Motion for Entry of Final Judgment, February 2, 2026, p. 3.

under the Merger Guidelines (p. 32). Indeed, in May 2025 the Antitrust Division of the DOJ proposed that HPE ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████.″[65]

85.    HPE also asserts that its acquisition of Juniper will enable substantial cost savings. Professor Zmijewski was ████████████████████████████████████████ ███████████████████████████████████″[66] I offer no opinion on whether HPE's claimed cost efficiencies are verified. In what follows, I assume that they are.

86.    The Merger Guidelines state: "To the extent efficiencies merely benefit the merging firms, they are not cognizable. The merging parties must demonstrate through credible evidence that, within a short period of time, the benefits will prevent the risk of a substantial lessening of competition in the relevant market." (p. 33). The 2010 Horizontal Merger Guidelines explain how to make this operational: "the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price increases in that market." (p. 31-32, footnote omitted).

87.    So far as I can determine, HPE has not demonstrated that the cost savings studied by Professor Zmijewski would be passed through sufficiently to customers in the market for enterprise-grade WLAN solutions in the United States to leave those customers better off with the merger than they would be without the merger. This is not a criticism of Professor Zmijewski, ██████████████████████████████. Still, lacking this required element, HPE has not demonstrated that the cost savings studied by Professor Zmijewski are cognizable, even if they are verified.

88.    Professor Zmijewski also was ████████████████████████████████ ████████████████████████████████████████████████

---

[65] *See* ████████ HPE-TUNNEY-0040969, (05/16/2025).

[66] Zmijewski Report, ¶5.



.[67] He concludes that

[68]

89.    I respectfully disagree with Professor Zmijewski regarding the merger-specificity of the cost savings he has studied. Why? Because those cost savings are based on economies of scale from combining the two companies rather than synergies that arise from combining the specialized assets and capabilities of the two companies. Economies of scale could be achieved over time through internal growth, while synergies could not.[69] Section 3.3 of the Merger Guidelines explicitly states that merger efficiencies are not merger-specific if they could be achieved through "organic growth." Professor Zmijewski has not demonstrated that the claimed cost savings could not be achieved in time by HPE alone.

90.    The two elements of cognizability that HPE has failed to demonstrate – pass-through and merger-specificity – interact. Specifically, the process by which firms compete to expand output and thus achieve economies of scale benefits customers because it drives firms to offer lower prices. Short-circuiting that process through a merger may well allow the merged firm to achieve those scale economies more rapidly, and thus boost its profits, but at the expense of customers who are deprived of the benefits of competition.

## 9.    The Amended Proposed Final Judgment is Poorly Structured

91.    Having explained why the government's challenge to the HPE/Juniper merger is strong, I now turn to the APFJ that the DOJ has put forward to the court. The central question is

---

[67] Zmijewski Report, ¶5.

[68] Zmijewski Report ¶56.

[69] *See* Joseph Farrell and Carl Shapiro, "Scale Economies and Synergies in Horizontal Merger Analysis," *Antitrust Law Journal* 68, no. 3 (2001): 685-710 for an early and more complete development of these ideas.

whether the APFJ will prevent the harm to competition that would result from the merger with no remedy.

92. This section explains that the APFJ suffers from inherent, structural weaknesses that would force customers to bear a substantial risk that it will not be effective. Section 10 addresses the divestiture of HPE's Instant On Business, and Section 11 addresses the License. My opinions regarding the efficacy of the APFJ do not hinge on whether the same firm acquires Instant On and the License.

93. The APFJ does not involve the divestiture of either firm's entire line of business in the relevant market. Instead, it involves the divestiture of the assets associated with HPE's Instant On, a product that accounts less than 1% HPE's revenues in the relevant market, and the licensing of certain software associated with Juniper's Mist product line.

94. For years, the Federal Trade Commission has been highly skeptical of divestitures in horizontal merger cases that do not involve an ongoing line of business in the relevant market. In 2017 the FTC reported on a broad study of all of its merger orders from 2006 through 2012.[70] This report included an examination of 50 of the Commission's orders using a case study method. For each of these 50 orders, the Commission asked whether the order was successful in maintaining or restoring competition in the relevant market. For mergers involving divestitures of an ongoing business, all of the remedial orders were successful. However, about 30% of the orders involving divestitures of limited packages of assets failed. Reflecting this, in 2019 the FTC stated: "The Commission prefers the divestiture of an ongoing business as the most effective means of maintaining the premerger state of competition."[71]

95. In my experience, the DOJ also has long been skeptical of divestitures that do not involve an ongoing business. In 2023, Assistant Attorney General Jonathan Kanter said this:

---

[70] "The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics," Trade Commission, (January 2017), available at https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

[71] *See* "A Guide for Respondents: What to Expect During the Divestiture Process," Federal Trade Commission, (June 2019), available at https://www.ftc.gov/system/files/attachments/merger-review/a_guide_for_respondents.pdf.

"That also means that in many instances we cannot map competition with enough precision to engage in reconstructive surgery to restore competition. As many of you know, for nearly two years, the Antitrust Division has been careful not to pursue incomplete or uncertain remedies that ask the public to shoulder the risk of failure. Patchwork quilts of carve-out divestitures, complex merger consent decrees involving extensive entanglements and ongoing dependence between the merged firm and the divestiture buyer often fail to protect the harm to competition from an otherwise anticompetitive merger."[72]

96.    There are good reasons for this skepticism. First, it is typically quite hard to predict whether the entity purchasing the divested assets will be able to integrate them effectively with its own operations. Second, there is a very real danger that important assets or capabilities will not be included in the divestiture package. Third, the merging firms inevitably have greater familiarity with the specific assets being divested than do the competition authorities or the courts, and they will prefer not to offer their most valuable assets or personnel. Fourth, the merging firms have an incentive for the divestiture to *fail* to effectively promote competition. I believe that these reasons collectively explain why AAG Kanter likened incomplete or uncertain remedies to "reconstructive surgery."

97.    Consistent with how both the FTC and the DOJ have long approached remedies, in this case the DOJ initially proposed that HPE divest ███████████████████████ ████████████████████████████████████████████████[73]

## 10.  Market Concentration Metrics After the Divestiture of Instant On

98.    This section discusses the proposed divestiture of HPE's Instant On Business.

---

[72] Remarks by Assistant Attorney General Jonathan Kanter, Georgetown Antitrust Law Symposium, (September 2023), available at https://www.justice.gov/archives/opa/speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-2023-georgetown-antitrust.  In 2018, Assistant Attorney General Makan Delrahim made similar arguments about the importance of robust divestitures of overlapping business lines in anticompetitive transactions. "Congress recognized that a risk of harm is what renders a transaction unlawful—or, as courts say, a "reasonable probability" of anticompetitive effects. Where such a risk exists, the role of enforcers or a court should be to eliminate the risk entirely or place that risk on the parties—not to design elaborate remedies that purport to reduce that risk while still permitting the merged company to retain control over the source of harm. Divestiture of the source of anticompetitive harm substantially eliminates the risk of harm." *See* Assistant Attorney General Makan Delrahim Delivers Remarks at the Antitrust Division's Second Roundtable on Competition and Deregulation (April 2018), available at https://www.justice.gov/archives/opa/speech/assistant-attorney-general-makan-delrahim-delivers-antitrust-divisions-second.

[73] *See* ████████████████████████████████████████████████████████
███████ HPE-TUNNEY-0040969, (05/16/2025)..

99.   The most straightforward way to assess the competitive significance of HPE's Instant On Business is to measure the market share accounted for by Instant On. In 2024, HPE's WLAN revenue in North America from Instant On was around ███████.[74] This is less than 1% of HPE's WLAN 2024 revenue in the United States, which was ███████.[75]

100.  Total revenue in the market for enterprise-grade wireless local area WLAN solutions in the United States in 2024 was ███████.[76] Instant On's market share was therefore roughly ██%.

101.  Because Instant On's market share is so tiny, divesting Instant On would not cause a meaningful change in the HHI metrics for the HPE/Juniper merger reported above: an increase in the HHI of 343 to a post-merger level of 3874. Therefore, the strength of the structural presumption that applies to the merger together with the proposed divestiture of Instant On is essentially the same as the one that applies to the original merger.

102.  As always when using market shares, it is useful to look beyond Instant On's market share to examine trends over time to understand its role in the relevant market. Instant On's revenue in the relevant market ███████ from 2023 to 2024.[77] HPE projects a ██ annual growth rate over the next several years,[78] but even if that growth is realized, it would not significantly change Instant On's market share.

103.  Moreover, Instant On is poorly positioned to replace Juniper Mist as a competitor, because Instant On is best suited for small and medium businesses ("SMB") while Juniper Mist is primarily used by large enterprises. According to William Choe, VP of Products and Global Operations at HPE, ███████████████████████

---

[74] HPE-TUNNEY-0042061, at -065, reports that Instant On's worldwide wireless revenue in 2024 was ███████. HPE-TUNNEY-0042061, at -064 indicates that in 2024 ███ of Instant On's worldwide revenue was earned in North America. Multiplying ███████ gives a figure of ███████.

[75] This figure is taken from Figure V.3 of the Remer Reply Report.

[76] This figure is taken from Figure V.3 of the Remer Reply Report.

[77] HPE-TUNNEY-0042061, at -065 ███████████████████████████ ██.

[78] HPE-TUNNEY-0042061, at -065 projects a ██ annual growth rate for Instant On from 2024 to 2028.

 .[79] An HPE document shows that its Aruba products

.[80]

104. I find it notable that Instant On is not mentioned by Professor Remer, Dr. Hill, or Dr. Bailey in their analyses of the competitive effects of the merger. The Remer Report mentions Instant On twice, in passing.[81] Neither the Remer Reply Report nor the Hill Report mention Instant On at all. The main text of the Bailey Report also does not mention Instant On.

105. I am aware that HPE is now arguing that Instant On can be used as a base to build a product suitable for larger customers. Even if that is true, Instant On's market share of the relevant market of ███ % is so small that its market share will pale compared with that of Juniper, even if a new owner of Instant On is able to grow Instant On's market share rapidly for a number of years.

106. We can gain further insight into the likely effect of the divestiture of Instant On by looking at the companies actively interested in purchasing Instant On. 



_____

[79] ████████████████ Deposition of William Choe (HPE), October 16, 2024, at128:8-18.

[80] See HPE-LIT-004189668, at -673.. ████████████ [PX0158].

[81] The first is in ¶73:

## 11. The AI Ops for Mist Source Code License

107. The DOJ asserts that "The proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation."[82] Given the tiny market share of HPE's Instant On product, and given that Instant On is best suited for small and medium businesses, this statement could only be valid if the License in the APFJ would enable the licensee to promptly and reliably replace Juniper as a disruptive and innovative force in the market for enterprise-grade WLAN solutions in the United States. In this section, I explain why that seems very unlikely to be true.

108. As I emphasized in Section 9, divestitures of assets that do not constitute an ongoing business are risky, and the risk that they will fail falls on customers, not the merged firm. The License in the APFJ clearly is not an ongoing business. The APFJ proposes that HPE offer a non-exclusive software license, some transitional services, and some unspecified personnel. At the very least, this seems highly risky – a risk borne by customers, and certainly not HPE. Indeed, if the license fails to replace the lost competition, HPE will benefit from the diminished competition.

109. Consistent with FTC and DOJ experience and practice, the Antitrust Division of the DOJ ████████████████████████████████, stating that "████████████████████████ ██████████████████████████████████████."[83]

110. The central economic question is whether HPE has demonstrated that the License, together with the related transition services and personnel specified in the APFJ, will be sufficient to enable the licensee(s) to promptly replace the competition from Juniper lost due to the merger.

111. As a threshold factual issue, the DOJ and HPE do not appear to have demonstrated that the License will be of significant value to any supplier in the relevant market. As emphasized by Dr. Bailey, ████████████████████████████████████████

---

[82] Competitive Impact Statement, p. 13, June 27, 2025.
[83] HPE-TUNNEY-0041137 (06/02/2026).





██████.[84] For example, Stan Kovler, the vice president of corporate development & investor relations at Extreme, testified that "████████████████████████ ████████████████████████████████████████ ██████████████"[85] So far as I am aware, the DOJ and HPE have not even shown that HPE's rivals in the relevant market could usefully integrate the licensed code into their existing offerings, much less that it would materially strengthen them as competitors in the relevant market.

112.  ████████████████████████████████████ ████████████████████████████████████████ ████████████████████ Under the Merger Guidelines, the DOJ and the FTC "assess whether entry induced by the merger would be 'timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.'"[87] ████████████████ ████████████████████████████████████ ██████████ n the Merger Guidelines: "Entry must at least replicate the scale, strength, and durability of one of the merging parties to be considered sufficient."[88] ████

---

[84] The Bailey Declaration (¶12) ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

[85] Deposition of Stan Kovler (Extreme), October 15, 2024, 72:18-21.

[86] I have seen documents indicating that ████████████████████ *See* HPE-TUNNEY-0043752, HPE-TUNNEY-0044555, HPE-TUNNEY-0044528.

[87] Merger Guidelines, Section 3.2, p. 31, case citation omitted.

[88] Merger Guidelines, Section 3.2, p. 32.

## 12.  The Amended Proposed Final Judgment Does Not Protect Customers

113.  Antitrust economists routinely use the well-being of customers as a proxy for competition. The underlying idea is straightforward: if a merger reduces competition, that will likely cause prices to increase, which harms customers. This approach is commonly described as using the "consumer welfare standard." I am confident that Professor Remer, Dr. Hill, and Dr. Bailey all agree with me that antitrust economics routinely use this methodology when assessing horizontal mergers.

114.  This section applies the consumer welfare standard by asking whether accepting the APFJ will benefit or harm customers in the market for enterprise-grade WLAN solutions in the United States.

115.  Let me illustrate the central conceptual point with a numerical example. Suppose a merger will harm customers by $100 million due to diminished competition if there is no remedy. Now suppose that the DOJ and the merging parties reach a settlement that will enhance competition and thereby save customers $40 million, so the remaining harm is $60 million. Defining the "strength of the settlement" as the share of the harm to customers that the settlement prevents, the strength of this settlement is 40%.

116.  Are customers better off if that settlement is accepted or if the merger is litigated to a decision by the court? Well, that depends on the strength of the DOJ's merger challenge, which is defined as probability that the DOJ will win if the merger is litigated.

117.  Suppose that the DOJ's chance of winning is 70%. In that case, litigating the merger will save customers $100 million with probability 70%. On average litigating the merger will save customers $70 million: $100 million times 70%.[89]

118.  In this example, customers are better off if the merger is litigated than they would be under the settlement, because litigation saves them $70 million (on average) while the settlement saves them only $40 million.

---

[89] Here $70 million is the "expected value" corresponding to $100 million with probability 70%. The concept of "expected value" is fundamental to probability and statistics and is routinely used by economists.

119. The opposite conclusion would be reached if the DOJ's chance of winning were only 30%. In that case, customers would be better off under the settlement because litigation saves them only $30 million (on average) while the settlement saves them $40 million.

120. Hopefully the general principle is now clear: litigating the merger is better for customers than a proposed settlement if the strength of the DOJ's case is greater than the strength of the settlement.

121. Applying this principle to the HPE/Juniper merger, litigating the merger is better for competition and customers if the probability that the DOJ would win the merger challenge is larger than the share of the harm to customers eliminated by the APFJ.

122. For the reasons given in Sections 3-8, I consider the DOJ's challenge to the HPE/Juniper merger to be strong. I therefore consider the probability that the DOJ would win the merger challenge to be sizeable. Conversely, for the reasons given in Sections 9-11, I believe that the APFJ will do very little to eliminate the harm to customers caused by the merger. I therefore consider the share of harm to customers eliminated by the APFJ to be quite small.

123. Putting the pieces together, rejecting the Amended Proposed Final Judgment will very likely leave customers in the market for enterprise-grade WLAN solutions in the United States better off.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 6th day of March, 2026, at Berkeley, California.

*Carl Shapiro*

_____

Carl Shapiro

# Appendix A: Curriculum Vitae

# CARL SHAPIRO

Haas School of Business
University of California
Berkeley, CA 94720

email: cshapiro@berkeley.edu
website: http://faculty.haas.berkeley.edu/shapiro

## Professional Positions

**Distinguished Professor of the Graduate School**
Haas School of Business and Department of Economics
University of California at Berkeley, 2018 - present

**Senior Consultant**

Charles River Associates, 1998 – 2009 and 2012 – present

**Transamerica Professor of Business Strategy**
Haas School of Business
University of California at Berkeley, 1994 - 2017

**Professor of Business and Economics**
Haas School of Business and Department of Economics
University of California at Berkeley, 1990 - 2017

**Senate-Confirmed Member of the President's Council of Economic Advisers**
Executive Office of the President, The White House, 2011-12

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 2009 - 2011

**Director of the Institute of Business and Economic Research**
University of California at Berkeley, 1998 - 2008

**Principal and Co-Founder, The Tilden Group, LLC**, 1996 – 1998

**Deputy Assistant Attorney General for Economics**
Antitrust Division, U.S. Department of Justice, 1995 - 1996

**Chair, Economic Analysis and Policy Group**
Haas School of Business
University of California at Berkeley, 1991 - 1993

**Professor of Economics and Public Affairs**
Woodrow Wilson School of Public and International Affairs and
Department of Economics, Princeton University, 1987 - 1990

**Research Fellow**
> Center for Advanced Study in the Behavioral Sciences
> Stanford University, 1989 - 1990

**Visiting Scholar**
> Stanford Law School, Stanford University, 1989 - 1990

**Assistant Professor of Economics and Public Affairs**
> Woodrow Wilson School of Public and International Affairs and
> Department of Economics, Princeton University, 1980 - 1987

**Visiting Fellow**
> Institute for International Economic Studies, University of Stockholm, 1986

**Visiting Assistant Professor of Economics and Public Policy**
> Graduate School of Business, Stanford University, 1982 - 1983.

**Economist**
> Bureau of Economics, Federal Trade Commission, Summer 1980

# Education

Ph.D.   Economics, M.I.T., 1981

M.A.    Mathematics, University of California at Berkeley, 1977

B.S.    Economics, M.I.T., 1976

B.S.    Mathematics, M.I.T., 1976

# Publications

Trends in Competition in the United States: What Does the Evidence Show?, with Ali
> Yurukoglu, *Journal of Political Economics Microeconomics*, 2026.

Acquisitions to Enter New Markets, *Journal of Economic Perspectives,* 2025.

The FTC is Threatening Free Speech, with Aaron Edlin, Promarket, May 2025.

Evolution of the Merger Guidelines: Is This Fox Too Clever By Half?, *Review of Industrial
> Organization*, 2024.

Single-Firm Conduct Working Group Report, California Law Review Commission Study of
Antitrust Law, with Aaron Edlin, Doug Melamed, Sam Miller, and Fiona Scott Morton, January
2024.

Recommended Revisions to the Draft Merger Guidelines, Submission to the Department of
> Justice and the Federal Trade Commission, September 2023.

How Would These Draft Guidelines Work in Practice?, Promarket, September 2023.

Why Dropping Market Power from the Merger Guidelines Matters, Promarket, August 2023.

Using and Misusing Microeconomics: *Federal Trade Commission vs. Qualcomm*, with Keith
Waehrer, in *Antitrust Economics at a Time of Upheaval: Competition Policy Cases on
Two Continents*, John Kwoka, Tommaso Valletti, and Larry White, eds., 2023.

What Next for the Horizontal Merger Guidelines? with Nancy Rose, *Antitrust Magazine*, 2022.

Antitrust: What Went Wrong and How To Fix It, *Antitrust Magazine*, 2021.

How Will the FTC Evaluate Vertical Mergers? with Herbert Hovenkamp, ProMarket, September
2021.

Vertical Mergers and Input Foreclosure: Lessons from the AT&T/Time Warner Case, *Review of
Industrial Organization*, 2021.

Judicial Response to the 2010 Horizontal Merger Guidelines, with Howard Shelanski, *Review of
Industrial Organization*, 2021.

The 2010 Horizontal Merger Guidelines After 10 Years, with Joseph Farrell, *Review of
Industrial Organization*, 2021.

Restoring Competition in the United States: A Vision for Antitrust Enforcement for the Next
Administration and Congress, with Bill Baer, Jonathan B. Baker, Michael Kades, Fiona
Scott Morton, Nancy L. Rose, and Tim Wu, Washington Center for Equitable Growth,
November 2020.

The Role of Antitrust in Preventing Patent Holdup, with Mark A. Lemley, *University of
Pennsylvania Law Review,* 2020.

Protecting Competition in the American Economy: Merger Control, Tech Titans, Labor Markets,
*Journal of Economic Perspectives,* 2019.

Antitrust and Innovation: Welcoming and Protecting Disruption, with Giulio Federico and Fiona
Scott Morton, *Innovation Policy and the Economy*, National Bureau of Economic
Research, 2019.

Antitrust in a Time of Populism, *International Journal of Industrial Organization*, 2018.

Horizontal Mergers, Market Structure, and Burdens of Proof, with Herbert Hovenkamp, *Yale
Law Journal*, 2018.

How Antitrust Law Can Make FRAND Commitments More Effective, with A. Douglas
Melamed, *Yale Law Journal*, 2018.

Whither Antitrust in the Trump Administration?, with Steven Salop, *Antitrust Source*, 2017.

Patent Remedies, *American Economic Review Papers & Proceedings*, 2016.

Patent Assertions: Are We Any Closer to Aligning Rewards to Contribution?, with Fiona Scott
Morton, *Innovation Policy and the Economy*, National Bureau of Economic Research,
2016.

The Actavis Inference: Theory and Practice, with Aaron Edlin, Scott Hemphill, and Herbert
Hovenkamp, *Rutgers University Law Review*, 2015.

Jean Tirole's Nobel Prize in Economics: The Rigorous Foundations of Post-Chicago Antitrust
Economics, with Steven Salop, *Antitrust*, 2015.

Actavis and Error Costs: A Reply to Critics, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Antitrust Source*, 2014.

Strategic Patent Acquisitions, with Fiona Scott Morton, *Antitrust Law Journal*, 2014.

A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents, with Mark Lemley, *Berkeley Technology Law Journal,* 2013.

Activating *Actavis*, with Aaron Edlin, Scott Hemphill, and Herbert Hovenkamp, *Antitrust*, 2013.

Competition and Innovation: Did Arrow Hit the Bull's Eye?, in *The Rate & Direction of Inventive Activity Revisited*, Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, University of Chicago Press, 2012.

The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years, *Antitrust Law Journal*, 2010.

Injunctions, Hold-Up, and Patent Royalties, *American Law and Economics Review*, 2010.

The Year in Review: Economics at the Antitrust Division: 2009-2010, with Ken Heyer, *Review of Industrial Organization*, 2010.

Recapture, Pass-Through, and Market Definition, with Joseph Farrell, *Antitrust Law Journal*, 2010.

Antitrust Evaluation of Horizontal Mergers: An Economic Alternative to Market Definition, with Joseph Farrell, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

Upward Pricing Pressure in Horizontal Merger Analysis: Reply to Epstein and Rubinfeld, *BE Journal of Theoretical Economics: Policies and Perspectives*, 2010.

Upward Pricing Pressure and Critical Loss Analysis, with Joseph Farrell, *Global Competition Review*, 2010.

Competition Policy in Distressed Industries, in *Competition as Public Policy,* American Bar Association, 2010.

The Year in Review: Economics at the Antitrust Division: 2008-2009, with Ken Heyer, *Review of Industrial Organization*, 2010.

A Tribute to Oliver Williamson: Antitrust Economics, *California Management Review*, 2010.

Updating the Merger Guidelines: Issues for the Upcoming Workshops, Antitrust Division, U.S. Department of Justice, November 2009.

Microsoft: Remedial Failure, *Antitrust Law Journal*, 2009.

How Strong Are Weak Patents? with Joseph Farrell, *American Economic Review*, 2008.

Detecting and Reversing the Decline in Horizontal Merger Enforcement, with Jonathan Baker, *Antitrust*, Summer 2008.

Reinvigorating Horizontal Merger Enforcement, with Jonathan Baker, in *Where the Chicago School Overshot the Mark: The Effect of Conservative Economic Analysis on Antitrust*, Robert Pitofsky, ed., Oxford University Press, 2008.

Merger to Monopoly to Serve a Single Buyer: Comment, with Jonathan Baker and Joseph Farrell, *Antitrust Law Journal*, 2008.

Improving Critical Loss, with Joseph Farrell, *Antitrust Source,* February 2008.

Patent Reform: Aligning Reward and Contribution, *Innovation Policy and the Economy,* Adam Jaffe, Josh Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 8, pp. 111-156, 2007.

Standard Setting, Patents and Hold-Up, with Joseph Farrell, John Hayes and Theresa Sullivan, *Antitrust Law Journal*, 74, 2007.

Antitrust, with Louis Kaplow, in *Handbook of Law and Economics, Volume 2,* A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, pp. 1073-1225, 2007.

Patent Hold-Up and Royalty Stacking, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 1991-2049, June 2007.

Patent Hold-Up and Royalty Stacking: Reply, with Mark A. Lemley, *Texas Law Review*, vol. 85, no. 7, pp. 2163-2173, June 2007.

Market Definition in Crude Oil: Estimating the Effects of the BP/ARCO Merger, with John Hayes and Robert Town, *Antitrust Bulletin*, Summer 2007.

Prior User Rights, *American Economic Review Papers & Proceedings*, May 2006.

Probabilistic Patents, with Mark A. Lemley, *Journal of Economic Perspectives*, Spring 2005.

Patent System Reform: Economic Analysis and Critique, *Berkeley Technology Law Journal*, vol. 19, no. 3, pp. 1017-1047, 2004.

*The Economics of Information Technology,* with Hal R. Varian and Joseph Farrell, Cambridge University Press, 2004.

Further Thoughts on Critical Loss, with Michael L. Katz, *Antitrust Source*, March 2004.

Antitrust Limits to Patent Settlements, *Rand Journal of Economics*, vol. 34, no. 2, pp. 391-411, Summer 2003.

Antitrust Analysis of Patent Settlements Between Rivals, *Antitrust Magazine*, pp. 70-77, Summer 2003.

Critical Loss: Let's Tell the Whole Story, with Michael L. Katz, *Antitrust Magazine*, *pp. 49-56,* Spring 2003.

The FTC's Challenge to Intel's Licensing Practices, in *The Antitrust Revolution: Economics, Competition, and Policy, 4th Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

The British Petroleum/ARCO Merger: Alaskan Crude Oil, with Jeremy Bulow, in *The Antitrust Revolution: Economics, Competition, and Policy, 4th Edition,* John E. Kwoka, Jr. and Lawrence J. White, eds., Oxford University Press, 2003.

Antitrust Policy in the Clinton Administration, with Robert E. Litan, in *American Economic Policy in the 1990s*, Jeffrey Frankel and Peter Orszag, eds., Center for Business and Government, John F. Kennedy School of Government, Harvard University, 2002.

Trans-Atlantic Divergence in *GE/Honeywell:* Causes and Lessons, with Donna E. Patterson, *Antitrust Magazine,* Fall 2001.

Scale Economies and Synergies  in Horizontal Merger Analysis, with Joseph Farrell, *Antitrust Law Journal*, vol. 68, no. 3, 2001.

Navigating the Patent Thicket: Cross Licenses, Patent Pools and Standard Setting, in *Innovation Policy and the Economy*, Adam Jaffe, Joshua Lerner, and Scott Stern, eds., National Bureau of Economic Research, vol. 1, pp. 1190-150, 2000.

Setting Compatibility Standards: Cooperation or Collusion?, in *Expanding the Bounds of Intellectual Property*, Rochelle Dreyfuss, Diane Zimmerman, and Harry First, eds., 2001, Oxford University Press.

Simulating Partial Asset Divestitures to 'Fix' Mergers, with Jith Jayaratne, *International Journal of the Economics of Business*, 2000.

Competition Policy: A Century of Economic and Legal Thinking, with William Kovacic, *Journal of Economic Perspectives*, Winter 2000.

Competition Policy in the Information Economy, in *Competition Policy Analysis*, Einar Hope, ed., 2000, Routledge Studies in the Modern World Economy.

*Information Rules:  A Strategic Guide to the Network Economy,* with Hal R. Varian, Harvard Business School Press, 1999.

Exclusivity in Network Industries, *George Mason Law Review*, Spring 1999.

The Art of Standards Wars, with Hal R. Varian, *California Management Review*, Winter 1999.

Antitrust in Software Markets, with Michael L. Katz, in *Competition, Innovation and the Microsoft Monopoly: Antitrust in the Digital Marketplace*, Jeffrey A. Eisenbach and Thomas M. Lenard, eds., 1999, Kluwer Academic Publishers.

Versioning: The Smart Way to Sell Information, with Hal R. Varian, *Harvard Business Review*, November-December 1998.

Unilateral Refusals to License Intellectual Property and International Competition Policy, with Richard J. Gilbert, in *Competition and Trade Policies*, Einar Hope and Per Maeleng, eds., 1998, Routledge.

Antitrust Issues in the Licensing of Intellectual Property: The Nine No-No's Meet the Nineties, with Richard J. Gilbert, *Brookings Papers on Economics: Microeconomics*, 1997.

Crown-Jewel Provisions in Merger Consent Decrees, with Michael Sohn, *Antitrust Magazine*, 1997.

Privacy, Self-Regulation, and Antitrust, with Joseph Kattan, in *Privacy and Self-Regulation in the Information Age*, National Telecommunications and Information Administration, U.S. Department of Commerce, 1997.

Antitrust Policy: Towards a Post-Chicago Synthesis, *Jobs & Capital*, Winter 1997.

An Economic Analysis of Unilateral Refusals to License Intellectual Property, with Richard J. Gilbert, *Proceedings of the National Academy of Sciences*, November 12, 1996.

Re-Examining Dominance and Unlawful Exclusion Rules, *Antitrust Conference Report*, The Conference Board, 1996.

Antitrust in Network Industries,  Antitrust Division, U.S. Department of Justice, March 1996.

Mergers with Differentiated Products, *Antitrust*, Spring 1996.  See also
http://www.usdoj.gov/atr/public/speeches/shapiro.spc.htm.

Aftermarkets and Consumer Welfare: Making Sense of *Kodak*, *Antitrust Law Journal*, Spring 1995.

Systems Competition and Network Effects, with Michael L. Katz, *Journal of Economic Perspectives*, Spring 1994.

Systems Competition and Aftermarkets: An Economic Analysis of *Kodak*, with David J. Teece, *Antitrust Bulletin*, Spring 1994.

The Dynamics of Bandwagons, with Joseph Farrell, in *Problems of Coordination in Economic Activity*, James W. Friedman, ed., Kluwer Press, 1993.

Standard Setting in High Definition Television, with Joseph Farrell, *Brookings Papers on Economic Activity: Microeconomics*, 1992.

Product Introduction with Network Externalities, with Michael L. Katz, *Journal of Industrial Economics*, March 1992.

Horizontal Mergers: Reply, with Joseph Farrell, *American Economic Review*, September 1991.

Introduction to Liability Symposium, *Journal of Economic Perspectives*, Summer 1991.

Economic Rationales for the Scope of Privatization, with Robert D. Willig, in *The Political Economy of Public Sector Reform and Privatization*, Ezra N. Suleiman and John Waterbury, eds., Westview Press, San Francisco, CA, 1990.

On the Antitrust Treatment of Production Joint Ventures, with Robert D. Willig, *Journal of Economic Perspectives*, Summer 1990.

Asset Ownership and Market Structure in Oligopoly, with Joseph Farrell, *Rand Journal of Economics*, Summer 1990.

Optimal Patent Length and Breadth, with Richard Gilbert, *Rand Journal of Economics*, Spring 1990.

Horizontal Mergers: An Equilibrium Analysis, with Joseph Farrell, *American Economic Review*, March 1990.

Theories of Oligopoly Behavior, in *The Handbook of Industrial Organization*, R. Schmalensee and R.D. Willig (eds.), 1989.

Market Power and Mergers in Durable Goods Industries: Comment, *Journal of Law and Economics*, 1989

The Theory of Business Strategy, *Rand Journal of Economics*, Spring 1989.

Optimal Contracts with Lock-In, with Joseph Farrell, *American Economic Review*, March 1989.

Dynamic Competition with Switching Costs, with Joseph Farrell, *Rand Journal of Economics*, Spring 1988.

Counterfeit-Product Trade, with Gene. M. Grossman, *American Economic Review*, March 1988.

Foreign Counterfeiting of Status Goods, with Gene. M. Grossman, *Quarterly Journal of Economics*, February 1988.

Dynamic R&D Competition, with Gene M. Grossman, *Economic Journal*, June 1987.

R&D Rivalry with Licensing or Imitation, with Michael L. Katz, *American Economic Review*, June 1987.

Optimal Dynamic R&D Programs, with Gene M. Grossman, *Rand Journal of Economics*, Winter 1986.

Product Compatibility Choice in a Market with Technological Progress, with Michael L. Katz, *Oxford Economic Papers*, Special Issue on the New Industrial Economics, November 1986.

Investment, Moral Hazard, and Occupational Licensing, *Review of Economic Studies*, October 1986.

How to License Intangible Property, with Michael L. Katz, *Quarterly Journal of Economics*, August 1986.

Research Joint Ventures: An Antitrust Analysis, with Gene M. Grossman, *Journal of Law Economics and Organization*, Fall 1986.

Consumer Shopping Behavior in the Retail Coffee Market, with Michael L. Katz, in *Empirical Approaches to Consumer Protection*, Pauline M. Ippolito and David T. Scheffman, eds., Federal Trade Commission, 1986.

Technology Adoption in the Presence of Network Externalities, with Michael L. Katz, *Journal of Political Economy*, August 1986.

Entry Dynamics with Mixed Strategies, with Avinash K. Dixit, in *The Economics of Strategic Planning*, L.G. Thomas, ed., Lexington Press, 1986.

Exchange of Cost Information in Oligopoly, *Review of Economic Studies*, July 1986.

InterLATA Capacity Growth and Market Competition, with Robert D. Willig, in *Telecommunications and Equity: Policy Research Issues*, Proceedings of the Thirteenth Annual Telecommunications Policy Research Conference, James Miller, ed., North Holland, 1986.

Can Unemployment be Involuntary? Reply, with Joseph E. Stiglitz, *American Economic Review*, December 1985.

On the Licensing of Innovations, with Michael L. Katz, *Rand Journal of Economics*, Winter 1985.

Normative Issues Raised by International Trade in Technology Services, with Gene M. Grossman, in *Trade and Investment in Service: Canada/U.S. Perspectives*, R.M. Stern (ed.), Ontario Economic Council, 1985.

Equilibrium Unemployment as a Worker Discipline Device: Reply, with Joseph E. Stiglitz, *American Economic Review*, September 1985.

Advances in Supervision Technology and Economic Welfare: A General Equilibrium Analysis, with Janusz Ordover, *Journal of Public Economics*, December 1984.

The General Motors-Toyota Joint Venture: An Economic Assessment, with Janusz A. Ordover, *Wayne Law Journal*, Summer 1985.

Network Externalities, Competition, and Compatibility, with Michael L. Katz, *American Economic Review*, June 1985.

Patent  Licensing and R&D Rivalry, *American Economic Review Papers and Proceedings*, May 1985.

Equilibrium Unemployment as a Worker Discipline Device, with Joseph E. Stiglitz, *American Economic Review*, June 1984.

Informative Advertising with Differentiated Products, with Gene M. Grossman, *Review of Economic Studies*, January 1984.

Premiums for High Quality Products as Returns to Reputation, *Quarterly Journal of Economics*, November 1983.

Consumer Protection in the United States, *Zeitschrift für die gesamte Staatswissenschaft*, *Journal of Institutional and Theoretical Economics*, October 1983.

A Theory of Factor Mobility, with Gene M. Grossman, *Journal of Political Economy*, October 1982.

Optimal Pricing of Experience Goods, *Bell Journal of Economics*, Autumn 1983.

Consumer Information, Product Quality, and Seller Reputation, *Bell Journal of Economics*, Spring 1982.

Advertising and Welfare: Comment, *Bell Journal of Economics*, Autumn 1980.


## Working Papers, Research Memoranda, Work in Progress

Property Rules vs. Liability Rules for Patent Infringement, January 2017.

Unilateral Effects Analysis After *Oracle,*  Roundtable Discussion (multiple participants), *Antitrust Magazine*, Spring 2005.

The Role of Innovation in Competitive Analysis, Chair's Showcase Program (multiple participants), *Antitrust Source,* July 2005.

Linux Adoption in the Public Sector: An Economic Analysis, 2003, with Hal R. Varian.

Competition Policy and Innovation, Prepared for the Directorate for Science, Technology, and Industry, OECD, STI Working Paper No. 2002/11, April 2002, www.oecd.org/sti.

U.S. Government Information Policy, with Hal R. Varian, prepared for the Office of the Assistant Secretary of Defense (Command, Control, Communications and Intelligence), U.S. Department of Defense, August 1997.

Economic Models of Counterfeiting, with Gene M. Grossman, Report to the U.S. Department of Labor, International Labor Affairs Bureau, January 1988.

## Book Reviews

Review of Rethinking Merger Analysis by Louis Kaplow in the *Journal of Economic Literature*, 2024.

Review of *Bandwagon Effects in High-Technology Industries* by Jeffrey H. Rohlfs, in the *Journal of Economics*, 2003.

Review of *Will E-Commerce Erode Liberty? Review of Code and Other Laws of Cyberspace*, by Lawrence Lessig, in *Harvard Business Review*, May/June 2000.

Review of *Sunk Costs and Market Structure: Price Competition, Advertising, and the Evolution of Concentration*, by John Sutton, in the Journal of Economic Literature, 1993.

Review of *Controlling Industrial Pollution: The Economics and Politics of Clean Air*, by Robert W. Crandall, in the *Journal of Economic Literature*, June 1984, pp. 625-627.

## Other Professional Activities

Member, Single-Firm Conduct Working Group, California Law Review Commission Study of Antitrust Law, 2023-2024.

Member, MIT Economics Department Visiting Committee, 2020 – present.

Member, Long Range Planning Committee, Antitrust Section, American Bar Association, 2015-2016.

Member, Foreign Investment, Sectoral Review, and Trade Policy Task Force, Antitrust Section, American Bar Association, 2013- 2015.

Member, Academic Research Council, Housing Finance Center, Urban Institute, 2013 – 2018.

Member, Budget and Interdepartmental Relations Committee, Berkeley Division of the Academic Senate, University of California, 2004-2007.

Member, University of California, Committee on Academic Personnel, 2006-2008.

Member, Economic Evidence Task Force, Antitrust Section, American Bar Association, 2005-2006.

Member, Program Committee, American Economic Association Annual Meetings, 2006.

Member, Market Surveillance Committee, California Independent System Operator, 1997-2000, see http://www.caiso.com/.

Member, Advisory Board, *Journal of Economic Perspectives*, 1999-2002.

Member, Advisory Board, *Antitrust and Regulation Abstracts*, 1998-2002.

Member, Advisory Board, *Journal of Network Industries*, 1999-2001.

Vice-Chair, Economics Committee, Antitrust Section, American Bar Association, 1995 - 1998.

Editor, *Journal of Economic Perspectives*, 1993 - 1995.

President, Industrial Organization Society, 1995 - 1996.

Member, Defense Science Board Task Force on Antitrust Aspects of Defense Industry Consolidation, U.S. Department of Defense, 1993 - 1994.

Co-Editor, *Journal of Economic Perspectives*, 1986 - 1993.

Associate Editor, *Quarterly Journal of Economics*, 1984 - 1987.

Associate Editor *Rand Journal of Economics*, 1984 - 1986.

Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1988 - 1989.

Associate Director, John M. Olin Program for the Study of Economic Organization and Public Policy, Princeton University, 1987 - 1988.


## Honors, Fellowships, and Research Grants

Fellow of the Econometric Society, 2020

Economist of the Year, Global Competition Review, 2017

Susan Bies Lecture on Economics and Public Policy, Northwestern University, 2015.

Distinguished Fellow, Industrial Organization Society, 2013.

National Science Foundation Graduate Research Fellowship Program, 60th Anniversary Awardee (one of 60 Awardees selected from over 45,000 Fellows)

Runner-Up, Teaching Prize, MBA Program, Haas School of Business, U.C. Berkeley, 1999-2000.

National Science Foundation Research Grant #SES-9209509, Technology Transitions with Network Externalities, 1992-1994, (with Joseph Farrell).

National Science Foundation Research Grant #SES-8821529, The Evolution of Network Industries, 1989-1991, (with Joseph Farrell).

Center for Advanced Study in the Behavioral Sciences, Stanford California, Research Fellowship, 1989-1990.

National Science Foundation Research Grant #SES-8606336, Issues of Industrial Organization in International Trade, 1986-1988, (with Gene M. Grossman).

Alfred P. Sloan Foundation Research Fellowship, 1985-1987.

National Science Foundation Research Grant #SES-8408622, Technological Competition and International Trade, 1984-1986, (with Gene M. Grossman).

National Science Foundation Research Grant #SES-8207337, Signals of Product Quality, 1982-1984.

National Science Foundation Graduate Fellowship, 1977-1980.

University of California Fellowship, 1976-1977.

Phi Beta Kappa and Sigma Xi, M.I.T., 1976.

## Affiliations

American Bar Association

American Economic Association

## Consulting Activities

Extensive experience working with private parties and government agencies on matters involving antitrust, regulation, and intellectual property.

# Appendix B: Testimony in the Past Four Years

## November 2024

### Steves and Sons, Inc. v. JELD-WEN, Inc.

Case No. 3:16-CV-545-REP
Eastern District of Virginia
Testified in deposition on behalf of Steves and Sons.

# Appendix C: Materials Relied Upon

## Academic Articles

Kenneth Arrow, "Economic Welfare and the Allocation of Resources to Invention," in The Rate and Direction of Inventive Activity: Economic and Social Factors, National Bureau of Economic Research, (1962):609-626.

Joseph Farrell and Carl Shapiro, "Scale Economies and Synergies in Horizontal Merger Analysis," Antitrust Law Journal 68, no. 3 (2001): 685-710.

Giulio Federico, Fiona Scott Morton, and Carl Shapiro, "Antitrust and Innovation: Welcoming and Protecting Disruption," in Innovation Policy and the Economy, National Bureau of Economic Research, 2019.

Sonia Jaffe and E. Glen Weyl, "The First-Order Approach to Merger Analysis," *American Economic Journal: Microeconomics*, 2013, 5(4), 188-218.

Carl Shapiro, "Evolution of the Merger Guidelines: Is This Fox Too Clever by Half?" Antitrust Law Journal 39, no. 1 (2024): 59-80.

Carl Shapiro, "Antitrust: What Went Wrong and How to Fix It." Antitrust 35, no. 3 (2021): 33–45.

Carl Shapiro and Howard Shelanski, "Judicial Response to the 2010 Horizontal Merger Guidelines," Antitrust Law Journal 78, no. 1 (2021): 39-54.

Carl Shapiro, "Competition and Innovation: Did Arrow Hit the Bull's Eye?" in The Rate & Direction of Inventive Activity Revisited, Josh Lerner and Scott Stern, eds., National Bureau of Economic Research, 2012.

## Bates-Stamped Documents

CISCO-HPEJ-00001609 [PX0662]

CISCO-HPEJ-00004245

DELLO-HPEJ-000001171

Gartner_000001

Gartner_000034

HPE-LIT-001465838

HPE-LIT-004182165 [PX0449]

HPE-LIT-005979411

HPE-LIT-005979418

HPE-LIT-004189668 [PX0158]

HPE-TUNNEY-0029844

HPE-TUNNEY-0040969

HPE-TUNNEY-0041137

HPE-TUNNEY-0042064

HPE-TUNNEY-0042061

HPE-TUNNEY-0043752

HPE-TUNNEY-0044528

HPE-TUNNEY-0044555

HPEUS-001161115

HPEUS-001261902

HPEUS-002760008

HPEUS-002779190 [PX0132]

HPEUS-003835680

HPEUS-003842980

HPEUS-003857724 [PX0112]

HPEUS-004782565

HPEUS-006743916 [PX0119]

HPE-VRL000353

JNPR-2R-00121906 [PX0588]

JNPR-2R-01208041

JNPR-LIT-00310441

## Depositions

Deposition of Daniel Mesimer (U.S. Department of Veterans Affairs), May 27, 2025

Deposition of William Choe (HPE), October 16, 2024

Deposition of Stan Kovler (Extreme), October 15, 2024


## Legal Documents

Amended Proposed Final Judgement, November 14, 2025

Competitive Impact Statement, June 27, 2025

Corrected Expert Report of Marc Remer, Ph.D., May 12, 2025

Declaration of Dr. Elizabeth M. Bailey, February 2, 2026

Declaration of Dr. Nicholas Hill, February 2, 2026

Defendants' Pretrial Brief, July 1, 2025

Expert Reply Report of Mark E. Zmijewski, Ph.D., June 4, 2025

Expert Reply Report of Mark Remer, Ph.D., June 4, 2025

Expert Report of Adoria Lim, May 19, 2025

Expert Report of Elizabeth M. Bailey, Ph.D., May 19, 2025

Expert Report of Mark E. Zmijewski, Ph.D., April 28, 2025

Expert Report of Nicholas Hill, May 19, 2025

Hewlett Packard Enterprise Co.'s Statement in Support of the Motion for Entry of Final Judgment, February 2, 2026

## Websites and Publicly Available Reports

"The FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics," Federal Trade Commission, January 2017, available at https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

"Horizontal Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, August 19, 2010, available at https://www.justice.gov/atr/file/810276/dl?inline

"Merger Guidelines," U.S. Department of Justice and the Federal Trade Commission, December 18, 2023, available at https://www.justice.gov/d9/2023-12/2023%20Merger%20Guidelines.pdf.

"A Guide for Respondents: What to Expect During the Divestiture Process," Federal Trade Commission, (June 2019), available at https://www.ftc.gov/system/files/attachments/merger-review/a_guide_for_respondents.pdf.

Remarks by Assistant Attorney General Jonathan Kanter, Georgetown Antitrust Law Symposium, (September 2023), available at https://www.justice.gov/archives/opa/speech/assistant-attorney-general-jonathan-kanter-delivers-remarks-2023-georgetown-antitrust.

Remarks by Assistant Attorney General Makan Delrahim, Antitrust Division's Second Roundtable on Competition and Deregulation, (April 2018), available at https://www.justice.gov/archives/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-divisions-second.