UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>vs.<br><br>HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC.<br><br>*Defendants*. | CASE NO. 5:25-cv-00951-PCP<br><br>**DECLARATION OF WILLIAM BAER IN SUPPORT OF INTERVENORS' OPPOSITION TO MOTION FOR ENTRY OF FINAL JUDGMENT**<br><br>Judge: P. Casey Pitts<br>Action Filed: January 30, 2025 |

I, William Baer, declare as follows:

1. I am currently a Visiting Fellow in Governance Studies at a well-known Washington, D.C. think tank. I have personal knowledge of the facts set forth below, and, if called as a witness, I could and would testify to each of them under oath.

2. My professional career includes significant experience at the U.S. Department of Justice ("DOJ") and the Federal Trade Commission ("FTC"). I am the only person to have led antitrust enforcement at both U.S. antitrust agencies, serving as Assistant Attorney General of the U.S. Department of Justice's Antitrust Division from 2013 to 2016 and as Director of the Bureau of Competition at the Federal Trade Commission from 1995 to 1999. In addition, from April 2016 until late January 2017, I served as Acting Associate Attorney General, the third highest-ranking position in the U.S. Department of Justice, overseeing the Antitrust, Civil, Civil Rights, Tax, Environmental and Natural Resources Divisions, among other components. Earlier in my career, from 1975 to 1980, I served in a number of roles at the Federal Trade Commission, including trial attorney, Attorney Advisor to the Chairman, and Assistant General Counsel.

3. When not in public service, I worked at Arnold & Porter between 1981-1995, 1999-2012, and 2017-2021, heading the firm's antitrust practice for roughly 12 years. While there I represented many clients in antitrust matters—both civil and criminal—before DOJ and FTC.

4. During my service as the senior antitrust official at DOJ and FTC, I actively supervised investigations into hundreds of mergers and acquisitions.

5. In this declaration I explain my experience, in and out of government, with the standard practices of DOJ's Antitrust Division, and, to the extent relevant, at FTC, in the investigation, litigation, and settlement of mergers over the course of multiple administrations, both Republican and Democratic.

6. Where appropriate, I opine on whether the publicly available evidence and the information plaintiffs obtained in discovery pertaining to the HPE/Juniper merger deviate from those standard practices.

*Background on the U.S. Department of Justice and the Antitrust Division*

7. The U.S. Department of Justice is led by three presidentially appointed and Senate confirmed officials: the Attorney General, the Deputy Attorney General, and the Associate Attorney General (together, "DOJ Leadership"). DOJ Leadership also has the benefit of staff; the Chief-of-Staff to the Attorney General is one such position. Some components of DOJ report directly to the Deputy Attorney General; others, including the Antitrust Division (the "Division") report to the Associate Attorney General. The Division is led by an Assistant Attorney General ("AAG"), who also is Senate confirmed. As a matter of current DOJ policy, "the Assistant Attorney General for the Antitrust Division is responsible for supervising all federal antitrust investigations and proceedings." Justice Manual at 7-1.200. The AAG typically is supported by a Principal Deputy Assistant Attorney General and several other Deputy Assistant Attorneys General. These senior officials consist of both career and political appointees and, as a group, are referred to as the "front office."

8. With specific reference to the Antitrust Division, the Justice Manual also provides that "[t]o ensure a consistent national, Department-wide policy on antitrust questions and consistent enforcement of federal antitrust laws, the Assistant Attorney General for the Antitrust Division is responsible for supervising all federal antitrust investigations and proceedings." Justice Manual at 7-1.2000. "It is a fundamental duty of every employee of the Department to ensure that these principles are upheld in all of the Department's legal endeavors." *See* Justice Manual at 1-8.100. The Department also requires that the Division and other DOJ law enforcement components be insulated from political or other outside influences, emphasizing the need "to protect our criminal and civil law enforcement decisions, and our legal judgments, from partisan or other inappropriate influences, whether real or perceived, direct or indirect." *See* Justice Manual at 1-8.600. My experience as AAG and as an advocate before DOJ is that attorneys in the Division, whether career or political, followed these Justice Manual mandates.

9. In my experience, these principles further the administration of justice. They recognize that antitrust decisions should not turn on political or other outside influences. Our antitrust laws demand that companies compete on the merits and that enforcement decisions be

based on the merits, not on political influence or partisan affiliation. That approach both supports well-functioning markets and builds the credibility of antitrust enforcement, which in turn aids its success in deterring future violations by companies that might otherwise believe they can avoid legal sanction through the purchase and use of political influence.

*Merger Review and Settlement Negotiations at the Antitrust Division*

10. Under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), mergers and other transactions above a certain dollar threshold must be reported to DOJ and FTC before a merger can be closed. 15 U.S.C. § 18a. The most significant current threshold now requires transactions to be reported where the acquisition is valued above $133.9 million.[1] These "HSR filings" disclose information to DOJ and FTC to allow for substantive investigations into potential anticompetitive effects of the proposed merger. The HSR Act also provides for a "waiting period"—a period of time for DOJ and FTC to investigate—during which the parties may not consummate the transaction.

11. HSR filings are plentiful, for example for FY 2024, there were more than 2,000.[2] Given the number, the HSR filings are initially reviewed by career professionals. Where transactions do not raise competitive concerns, the waiting period is allowed to expire, or the HSR process terminated early to allow the parties to consummate the transaction.

12. The Division in its discretion designates a relatively small number of filings for further investigation (a "Second Request") pursuant to its HSR authority. For example, in FY 24 only 3% of HSR filings resulted in a Second Request—a thorough investigation conducted under the parameters established by the DOJ and FTC's Merger Guidelines.[3] I understand that the parties to the HPE/Juniper proposed merger received a Second Request. A Second Request investigation typically includes demands from the parties for detailed data, documents, and information to facilitate a more in-depth review. Given their significance, they involve oversight by both career

---

[1] https://www.ftc.gov/enforcement/competition-matters/2026/01/new-hsr-thresholds-filing-fees-2026.
[2] https://www.ftc.gov/system/files/ftc_gov/pdf/FY24-HSR-ANNUAL-REPORT-FOR-TRANSMITTAL-TO-CONGRESS.pdf.
[3] The current Merger Guidelines were issued in 2023 by the FTC and the Division.

supervisors and the front office, including the Assistant Attorney General and Deputy Assistant Attorneys General. The Second Request investigation typically takes several months, involving not only civil investigative demands to the merging parties, but also third-party discovery, voluntary interviews, and depositions. These investigations routinely involve meetings between the merging parties and the Division, including opportunities for the merging parties to make substantive arguments, through white papers and presentations, on their positions with respect to the competitive effects of the transaction.

13. The Antitrust Division has several choices to make at the conclusion of an investigation. It has the discretion to allow a merger to close without objection. In other investigations, where the Antitrust Division has serious competitive concerns with the transaction, a dialogue typically ensues. Sometimes, the merging parties will offer to modify a deal in order to avoid litigation—for example by the divestiture of one of two overlapping business units. At the end of the day, though, the Division has the discretion to reject any settlement offer and file a lawsuit under Section 7 of the Clayton Act alleging that the effects of the consummated merger "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

14. Before the Division makes a final decision to file a lawsuit in federal district court, counsel for the merging parties typically will meet with the investigating team on one or more occasions to present the parties' defenses. Prior to the filing of a lawsuit, counsel typically are afforded at least one meeting with the Antitrust Division front office to discuss the potential lawsuit and possible settlement. It is not uncommon for multiple such meetings to occur, particularly if settlement negotiations are ongoing. Career Division staff assigned to the matter are regular participants in these meetings because of their deep knowledge of facts and their involvement in the analysis of the competitive effects of the merger. As a private antitrust practitioner representing a merging party, I participated in many such meetings—both with the staff and with the front office and the staff. As AAG, I chaired many such meetings. In these meetings, parties sometimes offered to restructure the transaction to address the Division concerns, including through divestiture of overlapping lines of business. Such restructuring is especially common in the case of horizontal

1  transactions that would result in a substantial increase in concentration in an already concentrated
2  market.

### Involvement of the Associate Attorney General

15. The appointed leadership of the Division regularly briefs DOJ Leadership on significant matters. When I was the Assistant Attorney General, I met with the Associate Attorney General weekly or bi-weekly regarding significant matters within the Division. On some matters, my team and I would also brief the Attorney General and the Deputy Attorney General.

16. During my four plus years at DOJ, to my knowledge, DOJ Leadership did not meet with counsel of record or other party representatives who sought to defend a merger or opposed a decision I had made to reject a settlement offer and authorize litigation. I am aware that on occasion parties dissatisfied with my decision to litigate or to not accept a settlement did seek meetings with DOJ Leadership. Those requests, however infrequent, were routinely denied and the parties instructed to deal directly with me and my team. After I was promoted to Acting Associate General Counsel supervising the Antitrust Division, I followed that same protocol with companies seeking to overturn a decision by my acting successor as AAG to initiate litigation.

17. With respect to the matter pending before this Court, my understanding is that, although the Antitrust Division initially was involved in settlement discussions with the merging parties, a time came in June 2025 when the DOJ Leadership held settlement discussions without the participation of anyone at Antitrust Division, including the front office. Based on my review of the evidence, the Division was not involved in both face-to-face and other communications where an executive from Hewlett Packard Enterprise Co. ("HPE") and a representative of HPE who was not counsel of record met with and otherwise communicated directly with the then-Chief of Staff for the Department of Justice Chad Mizelle and then-Acting Associate Attorney General Stanley Woodward, regarding settling the pending litigation: (i) a meeting occurred on June 18 among Mr. Mizelle, an HPE executive, and a representative of HPE who was not counsel of record, *see* HPE-TUNNEY-0041821; (ii) a follow up meeting occurred on June 25 with Mr. Woodward, an Assistant to Mr. Woodward, and the same HPE executive, *see* HPE-TUNNEY-0041823, DOJ-TUNNEY-00001415; and (iii) on June 26 and 27, that same HPE executive shared draft settlement terms with

1  Mr. Woodward directly and directly communicated to him orally and by text message, *see* DOJ-
2  TUNNEY-00001383, HPE-TUNNEY-0041826, HPE-TUNNEY-0041639, HPE-TUNNEY-
3  0041685, HPE-TUNNEY-0042010.

4      18.    In my experience, in and out of government, that pattern of behavior is
5  unprecedented. I recognize that the Attorney General has the final say on law enforcement
6  decisions. But, based on my experience, any meetings or communications with outside parties
7  would invariably involve the leadership of the Antitrust Division. At the FTC, I am similarly
8  unaware of any meeting or communications with the Chair of the FTC or Commissioners to discuss
9  a settlement without the participation of leadership from the Bureau of Competition. This standard
10  practice seems to me to be consistent with the current guidance provided by the Justice Manual
11  quoted above, namely that the AAG of the Division has the primary responsibility for the oversight
12  of antitrust matters.

13      *The Competitive Impact Statement*

14      19.    When a proposed resolution in an antitrust matter is agreed upon, pursuant to the
15  procedures of the Tunney Act, 15 U.S.C. § 16, the Division must make certain filings with the
16  relevant court, including a competitive impact statement ("CIS"). 15 U.S.C. § 16(b). The CIS is
17  offered on behalf of the United States and, to that end, includes "a description and evaluation of
18  alternatives to [the settlement] actually considered by the United States." 15 U.S.C. § 16(b)(6). In
19  my experience, the CIS is drafted by the investigating staff with review by the senior leadership of
20  the Division. I have never observed a CIS drafted by any outside party.

21      20.    The Tunney Act requires the United States to disclose in a CIS "an explanation of
22  the proposal for a consent judgment" and "a description and evaluation of alternatives to such
23  proposal actually considered by the United States." 15 U.S.C. § 16(b)(3), (6). These provisions
24  require that the United States disclose all material terms of the settlement reached, as well as
25  alternatives considered and rejected. That is in aid of a court's consideration of the competitive
26  impact of the judgment, including "the impact of entry of such judgment upon competition in the
27  relevant market or markets." 15 U.S.C. § 16(e)(1)(B).
28

- 7 -

21. I have reviewed documents reflecting that, on June 27, 2025, the same day the proposed final judgment was first filed, a senior executive at HPE ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to Mr. Woodward, Mr. Woodward's Assistant, and Mr. Mizelle's Assistant—but he did not send it to anyone at the Antitrust Division. HPE-TUNNEY-0041662; *see also* DOJ-TUNNEY-00001352. The Tunney Act requires that the CIS reflect the views of the United States. I would never have permitted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ because the CIS is a description of what DOJ concluded and only DOJ can state that with full accuracy. Had I been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, I would not have relied on it. The sole role of the defendants in these Tunney Act filings is to make the required disclosure of contacts with DOJ, and nothing else. 15 U.S.C. § 16(g).

22. I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 7, 2026          *Bill Baer*

In Big Sky, Montana                                William Baer