SAMUEL G. LIVERSIDGE (Bar No. 180578)
ERIC VANDEVELDE (Bar No. 240699)
DANIEL NOWICKI (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

JULIE S. ELMER (*pro hac vice*)
JENNIFER MELLOTT (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
jennifer.mellott@freshfields.com

*Attorneys for Defendant*
HEWLETT PACKARD ENTERPRISE CO.

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff*, | |
| v. | **HEWLETT PACKARD ENTERPRISE CO.'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT** |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC., | |
| *Defendants*. | Judge:    P. Casey Pitts<br>Action Filed:  January 30, 2025 |
| | **FILED UNDER SEAL** |

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     ARGUMENT .................................................................................................................8

        A.      The Evidence Shows How HPE Reached A Settlement Agreement With The
                DOJ ..................................................................................................................8

                1.      HPE Engages With The DOJ Immediately After The Merger, And
                        Antitrust Division Staff Suggest No Litigation Will Be Brought................9

                2.      President Trump's New Acting Head Of The Antitrust Division
                        Brings Suit, And Then Tells HPE That A Settlement Is All But Final .....10

                3.      The Antitrust Division Again Reverses Course, And With Time
                        Running Out To Complete A Settlement, HPE Appeals To Senior
                        DOJ Officials ...........................................................................................15

        B.      The States' Attacks On The Process Are Meritless ................................................19

        C.      The States' Reliance On Alford Is Misplaced ........................................................25

        D.      The Settlement Meets The Tunney Act's Deferential Standard Of Review..........29

                1.      The States Ask The Court To Apply The Wrong Legal Standards. ..........29

                2.      The States' Claim That The Court Owes No Deference To The DOJ
                        Is Wrong...................................................................................................31

                3.      Applying The Proper Analysis, The Remedies Satisfy The Tunney
                        Act..............................................................................................................34

                4.      The States Ignore Serious Flaws In The DOJ's Case ..............................42

IV.     CONCLUSION..............................................................................................................50

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*FTC v. Qualcomm,*
No. 19-16122 (9th Cir.), Dkt. 25-1 ............................................................... 34

*Heckler v. Chaney,*
470 U.S. 821 (1986) ...................................................................................... 34

*Maryland v. United States,*
460 U.S. 1001 (1983) (Rehnquist, J., dissenting) ....................................... 34

*Massachusetts v. Microsoft Corp.,*
373 F.3d 1199 (D.C. Cir. 2004) .......................................................... 23, 24, 34

*Olin Corp. v. F.T.C.,*
986 F.2d 1295 (9th Cir. 1993) ...................................................................... 45

*S.E.C. v. Randolph,*
736 F.2d 525 (9th Cir. 1984) .............................................................. 7, 31, 43

*United States v. Abitibi-Consol. Inc.,*
584 F. Supp. 2d 162 (D.D.C. 2008) ........................................................... 7, 30

*United States v. Aetna, Inc.,*
240 F. Supp. 3d 1 (D.D.C. 2017) .................................................................. 31

*United States v. Armour & Co.,*
402 U.S. 673 (1971) ...................................................................................... 29

*United States v. AT&T,*
552 F. Supp. 131 (D.D.C. 1982) ................................................................... 29

*United States v. Bechtel Corp.,*
648 F.2d 660 (9th Cir. 1981) ............................................ 7, 24, 25, 29, 30, 33, 42

*United States v. Biden,*
728 F. Supp. 3d 1054 (C.D. Cal. 2024) ........................................................ 21

*United States v. Central Contracting Co.,*
527 F. Supp. 1101 (E.D. Va. 1981) .............................................................. 24

*United States v. Enova Corp.,*
107 F. Supp. 2d 10 (D.D.C. 2000) ............................................................. 7, 30

*United States v. Fokker Servs. B.V.,*
818 F.3d 733 (D.C. Cir. 2016) ...................................................................... 34

*United States v. JetBlue Airways Corp.,*
712 F. Supp. 3d 109 (D. Mass. 2024) ...................................................... 31, 46

*United States v. Microsoft,*
56 F.3d 1448 (D.C. Cir. 1995) ...................................................................... 29

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

*United States v. Morgan Stanley*,
    881 F. Supp. 2d 563 (S.D.N.Y. 2012)..........................................................................32

*United States v. Republic Servs., Inc.*,
    723 F. Supp. 2d 157 (D.D.C. 2010) .......................................................................7, 30

*United States v. Syufy*,
    903 F.2d 659 (9th Cir. 1990) ....................................................................................45

*United States v. Texas*,
    599 U.S. 670 (2023)...........................................................................................33, 34

*United States v. Waste Mgmt., Inc.*,
    743 F.2d 976 (2d Cir. 1984)......................................................................................39

*US v. City of Miami*,
    664 F.2d 435 (5th Cir. 1981) ................................................................................7, 31

*US v. Gillette Co.*,
    406 F. Supp. 713 (D. Mass. 1975) .......................................................................7, 30

*US v. Iron Mountain, Inc.*,
    217 F. Supp. 3d 146 (D.D.C. 2016) .....................................................................7, 31

*US v. NBC*,
    449 F. Supp. 1127 (C.D. Cal. 1978) ...............................................................7, 30, 33

*US v. SBC Commc'ns, Inc.*,
    489 F. Supp. 2d 1 (D.D.C. 2007) ....................................................................7, 30, 32

*US v. State of Or.*,
    913 F.2d 576 (9th Cir. 1990) .....................................................................7, 29, 31, 35, 42

*US v. US Airways Grp., Inc.*,
    38 F. Supp. 3d 69 (D.D.C. 2014)....................................................................7, 30, 32

**Statutes**

15 U.S.C. § 16......................................................................................................22, 23, 33

28 U.S.C. § 509...............................................................................................................21

28 U.S.C. § 510...............................................................................................................21

**Regulations**

28 C.F.R. § 0.5 ................................................................................................................21

iv

## I.    **INTRODUCTION**

On June 27, 2025, HPE entered into a settlement agreement to resolve the DOJ's lawsuit challenging HPE's acquisition of Juniper Networks. As part of the settlement, HPE agreed to license the Mist AI Ops for WLAN source code and divest its Instant On networking business, both of which may be used by an existing or new competitor to increase and expand their WLAN market presence. These concessions were more than any other enforcement agency in the world sought or obtained. The reaction to the settlement from those most impacted by the acquisition was not one of dismay or concern: indeed, *not a single customer, competitor or other industry participant objected*, which remains true today, nearly nine months later. Whether the reaction of these industry participants is viewed as mildly-interested-acceptance or relief that the DOJ's attempt to thwart the creation of a viable competitor to Cisco and Huawei had ended, it is indisputable that the only complaints regarding the settlement were made by those with political incentives to lodge them.

On cue, the States—who had expressed no interest whatsoever in the merger before the settlement and made no effort to conduct even a modicum of investigation—objected and intervened, embarking on a months' long campaign to try to uncover some evidence of "corruption" in the process. They have come up empty. Multiple days of depositions and the production of thousands of pages of communications have proven exactly what HPE said from the beginning—there was nothing improper about the settlement negotiations in this case. To the contrary, the evidence shows that HPE and the DOJ engaged in a robust, arms-length negotiation process that resulted in an appropriate compromise with meaningful remedies. The States' misguided efforts to disparage these remedies are premised on a misunderstanding of the technology that renders their complaints generally wrong and almost always non-substantive.

At the end of the day, whether there could have been a "better" settlement is not the test. And in fact, there was no "better" settlement available—the only options available were this deal or trial. Given the weakness of this case and all the other factors that go into a decision to settle a litigation, the DOJ was well within the bounds of "reasonableness" to decide to settle this case for the remedies it obtained. The States's opposition offers nothing to suggest otherwise.

\*    \*    \*

1

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

The States claim at the outset of their brief that the DOJ had "a great case." No one agrees with this claim. The staff lawyers of the Antitrust Division who were responsible for investigating this merger certainly did not; they opposed bringing this action in the first place but were overruled by a political appointee of the new administration, Omeed Assefi. Fourteen competition enforcement agencies around world looked at the merger, and none brought an action. And after the DOJ's lawsuit was announced, the unanimous reaction was puzzlement, because the only beneficiary of blocking the deal would be the entrenched monopolist, Cisco (and, internationally, Huawei).

The DOJ's lawsuit—brought over the staff's recommendation—ignored all this. The suit also ignored the extraordinary level of competition in the enterprise WLAN market—which the DOJ staff who recommended against filing this suit knew about from their year-long investigation. Apart from HPE and Juniper, there are at least *eight* other viable competitors in the market, and the evidence shows these competitors can and do routinely win business from customers of all sizes and of all kinds. The States ignore *all* this evidence as well. They have nothing to say about these competitors or the testimony from customers favoring the merger. Instead, they regurgitate arguments from the DOJ's pre-trial filings and claim that the case was strong. The States' merits-based arguments miss the mark in the context of the Tunney Act. Turning the Court's Tunney Act review into a merits determination runs contrary to law and would render settlements meaningless—why would any defendant settle if they would then be forced to litigate the merits anyway?

In any event, the States' warmed-over merits claims do not withstand scrutiny. Their expert, Dr. Carl Shapiro—who is politically aligned and has longstanding relationships with the States— simply repeats the assertions of the DOJ's trial expert, Dr. Remer. Dr. Shapiro does no independent analysis of his own—he merely claims that Dr. Remer *must* have been right to believe there was competitive harm, because the merger exceeds an arbitrary market concentration threshold unilaterally set by the DOJ. But what Dr. Shapiro fails to mention is that his *own articles* show that the small increase in market concentration at issue in this case is far below the norm for cases brought by the DOJ—and that the government regularly *loses* merger cases involving far *greater* increases in concentration. In short, Dr. Shapiro's own research shows that this was an extremely weak statistical case—even *before* considering all the evidence of real competition in the WLAN market.

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

The States' focus on the settlement negotiation process fares no better. The States make the remarkable and dramatic claim that the settlement that HPE reached with senior leadership of the DOJ was not "merits-based" but was "purely the result of political pressure." Opp. at 29. But the States cite *absolutely nothing* in support of this claim, because there is nothing. There is zero evidence of "political pressure" influencing the settlement.

To the contrary, the evidence shows what HPE has said all along—it vigorously negotiated with DOJ personnel, in good faith, for months. After the acting head of the Antitrust Division, Assefi, overruled division staff and filed suit, HPE proceeded to negotiate with him for a month and believed it had reached an agreement in principle to settle the case. Then, in May-June 2025, the then-head of the Antitrust Division, Abigail Slater, and other political appointees within the Division seemingly disagreed with Assefi (despite Slater previously appearing to agree with the deal he was negotiating) and demanded the divestiture of Juniper's entire Campus and Branch business, a business that involves far more than enterprise WLAN market—the only market relevant to the DOJ's complaint. When HPE pushed back on the divestiture demand—explaining that it was unreasonable and technologically, operationally, and commercially unworkable—Slater and her deputies responded by making the same demand. They also refused to consider the national security implications of the merger and the criticality of the work that HPE performs for the U.S. defense and intelligence communities, issues that HPE had encouraged the DOJ to look into since before the suit was filed.

Faced with this impasse, and after receiving conflicting messages about what would be required to settle the case and confronting significant disagreement and dysfunction within the Antitrust Division, HPE appealed to the Acting Associate Attorney General, Chad Mizelle, who oversaw the Antitrust Division. There was nothing odd about this appeal, much less improper— practically any defendant would appeal to senior DOJ leadership if it believed the lower-level appointees with whom it was dealing were being unreasonable and inconsistent. HPE proceeded to negotiate directly with Mizelle and the incoming Associate Attorney General, Stanley Woodward, who secured additional settlement concessions from HPE and ultimately resolved the case.

At bottom, the States' primary objection to the settlement is that HPE, having exhausted discussions with the political appointees in the Antitrust Division, approached senior DOJ leadership

3

to negotiate a settlement. The States seem to be of the view that a few select members of the Antitrust Division should be the sole arbiters of any antitrust settlement, and that it was an affront to the "rule of law" (as Roger Alford said in a speech) for their superiors to have their own view of how the policy initiatives of the DOJ and the current administration should be implemented in an antitrust settlement. This is absurd. To state the obvious, the Antitrust Division is not an independent branch of government—it is just one *part* of the DOJ and is *subordinate to* senior DOJ leadership. The Assistant Attorney General in charge of the Antitrust Division reports to the Associate Attorney General of the DOJ, who reports to the Attorney General of the United States. Senior DOJ officials overrule more junior officials *every day*—as they do in any government agency, law firm, business, or organization with layers of management. The States effectively claim that the political appointees of a subordinate department in an agency (like the Antitrust Division within the DOJ) cannot be overruled by those above them. But the DOJ is not structured as an inverted pyramid—if it were, this case would never have been filed. Moreover, antitrust enforcement policy does not operate separate and apart from the broader set of the policy initiatives of the DOJ and the administration. The Executive Branch must balance the overall priorities and goals of the administration, including on issues like foreign policy and national security, in exercising its enforcement discretion. As former Antitrust Division DAAG William Rinner testified, the DOJ exercises its merger enforcement discretion "as part of the broader context of the overall priorities, [and] policy goals of an administration in which the Antitrust Division serves as part of the unitary executive," while also considering resource allocation and staffing priorities.

In an attempt to rest their challenge on something *other* than the mere fact that senior officials overruled junior ones, the States have gone to great lengths to try to show that there was something nefarious about the settlement process. They again cite Alford's speech, in which he asserted, without any explanation or evidence, that the senior DOJ officials who approved the settlement "perverted justice and acted inconsistent with the rule of law." To this day, Alford still has not provided any evidence to support this inflammatory claim. Indeed, nearly six months after his speech, Alford's accusations remain as vacuous and baseless as when they were delivered. This should come as no surprise; Alford had nothing to do with the settlement negotiations. Alford attended only one

4

settlement meeting with HPE, said nothing of substance, and admitted he did not even bother to read the detailed briefing document on the merits and national security implications that HPE sent to the DOJ in advance of the meeting.

The States have also tried repeatedly, with numerous different witnesses, to establish that there was some sort of "side deal" that was not reported to the Court, wherein HPE secretly agreed to make investments in American infrastructure. They even had Alford testify that he thinks there might have been such a separate agreement—solely because he had a conversation with a *reporter* who supposedly told him such a thing. This is beyond ridiculous, and the fact that the States advanced this baseless argument to prolong this proceeding is irresponsible. To be clear, there is no side deal—while the DOJ (per Assefi) had proposed that HPE *publicly* agree, as part of the *public* settlement agreement, to make investments in American jobs and infrastructure, the DOJ (per Woodward) ultimately decided not to include that term, and no such deal was reached. Indeed, it would be bizarre for HPE to *secretly* promise to invest in America. Numerous witnesses have now repeatedly confirmed there was no side deal under oath, including HPE's Chief Executive Officer, HPE's Chief Legal and Operating Officer, and William Rinner, the Deputy Assistant Attorney General in the Antitrust Division during the negotiation and filing of the settlement, who testified that the settlement filed with the Court was the "entire settlement agreement" and there are no other "settlement terms" or "side agreements."

Ultimately, the settlement that was reached provides meaningful remedies that are of real interest to real companies. The source code for Mist AI Ops for WLAN is the "secret sauce" that powers Mist's AI Ops WLAN technology—the very technology that, according to the DOJ's complaint, made Juniper an innovative maverick in the WLAN space. (Indeed, the States previously told this Court that the Mist AI Ops source code was so critical to competition that they needed to intervene to prevent the code from being licensed.) Any licensee will be able to create a powerful AI Ops tool, which can identify and diagnose issues in a WLAN network. Similarly, Instant On is a complete, enterprise-grade networking business with WLAN products and a powerful software stack, which any buyer could use to immediately enter and expand in the enterprise WLAN market.

The States have very little of substance to say about these remedies. For AI Ops, the States

5

offer Dr. Ranganathan, a cybersecurity professional who claims that the licensed source code is somehow incomplete, because it supposedly will not tell the licensee what devices failed and why. This is false—indeed, it is not an exaggeration to say that almost every factual claim Dr. Ranganathan makes in his report is wrong.  He lacks the necessary credentials to opine in this space and simply does not know what the Mist AI Ops for WLAN tools are or how they work; his report is composed almost entirely of him misreading and misunderstanding information about Mist.  And for Instant On, the States simply repeat the criticism from their comment that the business is targeted at small-to-medium-sized businesses (or SMBs) and thus is not relevant to the market.  Yet it is undisputed that SMBs are a part of the enterprise WLAN market at issue in this case, and prominent enterprise WLAN competitors have entered the market with SMB-targeted products and then expanded to serving larger enterprises.  Ubiquiti followed exactly this model, beginning with an SMB-focused offering before penetrating throughout the whole market.  Meraki was also an SMB WLAN offering before it was acquired and then repositioned by Cisco.  And the buyer of Instant On will be more than capable of taking this step, because Instant On products contain software features designed for larger enterprises, but which are turned off for the purpose of marketing to and simplified use by SMBs.  The buyer will be able to turn those features on and offer WLAN products and features that appeal to large enterprises, as well as smaller ones.  Conversely, a company that already markets WLAN solutions to larger enterprises—███████████████████—can use Instant On's features to expand its presence in the smaller business segment and further shore up its competitive position.

The States insist that the DOJ should have forced HPE to agree to divest Juniper's "WLAN business" instead of the remedies it agreed to.  This was an impossibility from all perspectives. Juniper had no stand-alone "WLAN business"; its WLAN products were part of a larger, integrated networking business that included many other products (e.g., switching, SD-WAN, SASE), and those products all relied on the same IP, were supported by the same engineering teams, were sold by the same sales teams, and were managed by the same operational, legal, and finance tea Because no "WLAN business" existed, HPE would have had to first create one to divest it—splitting up and destroying the cross-product teams that already existed into smaller teams, for WLAN and other

6

products, that would not be able to function properly.  HPE made clear that it could not agree to that as part of any settlement.  Even aside from the technical, operational, and financial infeasibility of a "WLAN divestiture," the State's assertion suffers from a more fundamental flaw: HPE was never agreeing to that or anything like it.  With the pre-trial conference scheduled for the next business day and trial itself twelve days away, HPE's position was clear: if a "WLAN divestiture" or its equivalent was the demand for settlement, there would be a trial on the merits imminently.  The States' attempt to second-guess the DOJ's decision-making process based on the premise that the States, presumably, would have negotiated "harder" under those circumstances is inappropriate and presumptuous.

Even if the States could identify some other *possible* remedy—and they do not—they cannot oppose the settlement on the grounds that they think a different settlement would have been "better." This is the unanimous holding of literally every court to evaluate a settlement under the Tunney Act: A court cannot "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981).[1]

Here, given all of the factors, the DOJ was well within the bounds of "reasonableness" to decide to settle this case with the remedies it obtained.  The remedies directly address what the DOJ believed was the source of Juniper's innovative power—its AI Ops capabilities—and provide powerful tools for an existing competitor or new entrant to penetrate and more vigorously compete in the enterprise WLAN market.  There was never any harm to competition to begin with from the

---

[1] *See also US v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 75 (D.D.C. 2014) (court cannot reject settlement "merely because the court believes other remedies are preferable." (quoting *US v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007)); *United States v. Abitibi-Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) (same); *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) ("[A] court may not reject a remedy simply because it may not be, in the court's view, the 'best' remedy available." (quoting *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000)).  "It is not the court's duty to determine whether this is the best possible settlement that could have been obtained if, say, the government had bargained a little harder." *US v. NBC*, 449 F. Supp. 1127, 1143 (C.D. Cal. 1978) (quoting *US v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)).  The court's role is simply to "ensure[] that the proposed judgment is reasonable." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  This means that "[t]he court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" *US v. State of Or.*, 913 F.2d 576, 581 (9th Cir. 1990) (quoting *US v. City of Miami*, 664 F.2d 435, 439, 441 (5th Cir. 1981) (Rubin, J., concurring)); *US v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (applying analogous standard in Tunney Act context that government "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms" (quoting *United States v. Newpage Holdings, Inc.*, 2015 WL 9982691, at *7 (D.D.C. Dec. 11, 2015))).

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

merger, which is why numerous regulators approved it and no customers, competitors, or partners have objected to the settlement. And even though the DOJ's case was weak, it managed to obtain more than any other regulator did—meaningful remedial concessions from HPE that more than address any purported anticompetitive harm. It is time for the Proposed Final Judgment to be approved.

## II.     ARGUMENT

### A.     The Evidence Shows How HPE Reached A Settlement Agreement With The DOJ

The States have taken many hours of depositions and received thousands of documents regarding the settlement negotiations between HPE and the DOJ, all as part of some effort to find evidence of "corruption." They have found absolutely nothing, because there is nothing.

Although HPE does not believe the negotiations are relevant, it has detailed those negotiations here to demonstrate that the States' (and Alford's) vague complaints about the negotiations are baseless. Indeed, the details of the back-and-forth negotiations over the course of many months reveal an arms-length, hard-fought settlement process that resulted in a settlement that achieved far more than the DOJ was likely to achieve at trial and far more than any other enforcement agency in the world achieved. This was confirmed by the testimony of every percipient witness to the settlement negotiations, including William Rinner (DAAG in the DOJ Antitrust Division at the time of the settlement); Chad Mizelle (acting Associate Attorney with oversight over the Antitrust Division at the time of the settlement); John Schultz (COO and CLO of HPE); William Levi (Sidley Austin partner and counsel to HPE); and Mike Davis (partner at MRD Law and counsel to HPE).[2]

---

[2] Throughout this proceeding, the States have misleadingly called Levi and Davis (and also Arthur Schwartz) "lobbyists." None are. Levi and Davis are highly qualified lawyers who advocated on behalf of HPE (and Schwartz is a consultant who advised HPE's lawyers on national security-related issues). That is what lawyers do, and it is entirely appropriate, normal, expected, and required of them to zealously advocate on behalf of their clients. Levi and Davis both have deep experience in and out of government, including, among other things, clerking on the Supreme Court and Courts of Appeal, and serving within the DOJ. Indeed, Levi previously served as Chief of Staff and Senior Counselor to the Attorney General, as well as Staff Director of the Senate Subcommittee on Antitrust. They also know and have experience with some of the DOJ lawyers involved in the HPE matter, including Assefi, Slater, and Mizelle. The States try to cast those relationships as somehow nefarious, suggesting it is part of a "startling display of patronage." Opp. at 1. That is wrong and, frankly, silly. There is zero evidence of any quid pro quo or other misconduct, and personally knowing and having experience working with (or against) one's negotiation or litigation counterparts (e.g., knowing their priorities, knowing how they will react to arguments, etc.), is not "patronage."

By contrast, Alford, the States' star witness, conceded he did not have any firsthand knowledge of anything in the negotiations—aside from attending a single meeting he could not be bothered to prepare for—and could not identify any actual impropriety in the negotiation process.

**1.    HPE Engages With The DOJ Immediately After The Merger, And Antitrust Division Staff Suggest No Litigation Will Be Brought**

HPE first engaged with the DOJ immediately after announcing the merger on January 9, 2024, and communicated extensively with DOJ attorneys about the deal throughout 2024.  On November 6 and 15, 2024, HPE met with Antitrust Division officials, including, in the second meeting, then-Assistant Attorney General (AAG) Jonathan Kanter.  At those meetings, HPE discussed the procompetitive nature of the transaction, the fact that other regulators had chosen not to challenge it, and explained the national security benefits of the transaction—specifically, that (1) combining HPE's and Juniper's complementary infrastructure, computing, storage and networking technology offerings would empower HPE to provide government agencies new and innovative computing and networking solutions, and (2) the merger would create a company that could compete with Huawei to provide critical networking infrastructure to international partners.[3]

Following the November 2024 election, Kanter made it clear that he wished to defer any decision regarding the merger to the next administration.[4]  HPE and Juniper agreed.  Their timing agreement with the government provided that if, following inauguration, the new acting AAG was considering any action other than allowing the transaction to close, HPE could meet with the acting AAG to discuss the transaction.[5]

President Trump was inaugurated on January 20, 2025, and then named Omeed Assefi as the Acting AAG of the Antitrust Division.  Assefi was not well known to the antitrust bar; although HPE's and Juniper's counsel included many experienced antitrust lawyers (many of whom had government backgrounds), none had ever worked with Assefi.  On January 21, HPE's counsel spoke with Ryan Danks (the director of civil enforcement for the DOJ Antitrust Division) and Jeremy

---

[3] Ex. 1 (Schultz Tr.) 41:9–22; ECF No. 370-4 (Schultz Decl.) ¶ 4.

[4] ECF No. 370-4 (Schultz Decl.) ¶ 5; Ex. 1 (Schultz Tr.) 43:16–24 ("it became obvious immediately after the 15th meeting that the focus of Mr. Kanter and his team was to defer having any decision made on this to the next administration").

[5] ECF No. 370-4 (Schultz Decl.) ¶ 5.

Goldstein (a longtime Antitrust Division trial attorney) regarding the posture of the case and timeline for briefing Acting AAG Assefi. Danks conveyed that the staff had not yet briefed AAG Assefi on the transaction, but he did *not* expect that HPE would need to meet with AAG Assefi. Given that the timing agreement specifically provided that HPE *would* meet with the AAG only if he were considering challenging the transaction, HPE understood Danks's comment to mean that the Antitrust Division staff was not recommending filing a suit.

**2.      President Trump's New Acting Head Of The Antitrust Division Brings Suit, And Then Tells HPE That A Settlement Is All But Final**

In fact, the career Antitrust Division staff *recommended against* bringing a lawsuit challenging the deal, but AAG Assefi overruled the staff—a fact he confirmed in a recent speech.[6] Despite the staff's opposition to a suit, on January 23, 2025, Danks told HPE's counsel that AAG Assefi wanted to meet with HPE (a reversal from Danks' prediction that no such meeting would be necessary). HPE then engaged William Levi, a Sidley Austin partner with substantial DOJ experience, including with AAG Assefi, to represent it in its continued interactions with the DOJ.[7]

HPE submitted a letter to AAG Assefi on January 27 that again discussed the competitive benefits of the deal, the lack of competitive harm that it would cause, and the importance of the deal to national security.[8] And on January 28, HPE's and Juniper's CEOs met with AAG Assefi and Antitrust Division front office staff.[9] On January 28, Representative Scott Fitzgerald of Wisconsin sent a letter to the DOJ on behalf of the House Judiciary Committee requesting a briefing on the transaction, including with respect to "the potential harm to national security from blocking the transaction, the benefits to Huawei from blocking the transaction, and the loss of efficiencies that will come from blocking a transaction that would combine two complementary products."[10] And on January 29, Senator James Risch (of Idaho), a member of the Senate Foreign Relations Committee, sent a letter to the Antitrust Division, "urg[ing] the Department of Justice to take into account the

---

[6] Ex. 2 ("Assefi asks staff to 'empty the clip,'" *Global Competition Review*, February 17, 2026) (in a speech to the Antitrust Division staff, Assefi said that "[t]he last civil enforcement case" (meaning the HPE-Juniper challenge) "is one I brought and even then, I had to overrule you to bring it").
[7] Ex. 3 (Levi Tr.) 42:15–43:21.
[8] ECF No. 370-4 (Schultz Decl.) ¶ 7 & Ex. 1.
[9] *Id.* ¶ 7.
[10] *Id.* ¶ 8 & Ex. 3.

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

important national security implications of the transaction," and explaining the benefits of the deal from a national security perspective.[11]

Despite the Congressional support for the deal and its national security implications (and the Antitrust Division staff's opposition to filing suit), on January 30, Acting AAG Assefi directed staff to file the complaint.

Gail Slater was confirmed as the permanent AAG for the Antitrust Division on March 12, 2025. After Slater was confirmed, HPE was told that it should engage primarily with then-DAAG Assefi if it sought to negotiate a settlement, because he had made the decision to file the lawsuit.[12] HPE proposed a license of the Mist AI Ops source code, a direct response to the DOJ's theory that Juniper's success was attributable to its AI Ops tools. DAAG Assefi, with AAG Slater's support, countered by asking that HPE also commit to make investments in American jobs, infrastructure, and education.[13] HPE was amenable to doing so agreed. And during meetings with DAAG Assefi and AAG Slater, the two of them expressed support for a settlement with those two elements—i.e., (1) the Mist AI Ops source code license, and (2) a commitment by HPE to make investments in America.[14] By April 30, DAAG Assefi indicated there was nothing left to negotiate, and on May 1, HPE delivered a settlement proposal to DAAG Assefi with the two elements he requested.[15] HPE understood, based on DAAG Assefi's representations that there was nothing left to negotiate, that it had reached "an agreement on those terms," subject to final approvals.[16] Assefi told HPE to convey

---

[11] *Id.* ¶ 8 & Ex. 4.

[12] *Id.* ¶ 12.

[13] Ex. 1 (Schultz Tr.) 25:2–26:4 (explaining DAAG Assefi raised the idea of an Invest in America provision); Ex. 4 (Davis Tr.) 121:15–21 ("one of the big things that Gail and Omeed were pushing was this America First jobs program and America First education program that they wanted HPE to include in any settlements, where they were creating American jobs and they were giving money to colleges to support American students going into the engineering field"); *id.* at 166:25–167:3 ("Omeed Assefi and Gail Slater ... wanted the American jobs and American education piece").

[14] Ex. 1 (Schultz Tr.) 79:4–13 (explaining that, at the meeting on April 15, 2025 in which the source code license and an Invest for America plan were discussed, "there was general support from Mr. Assefi and Ms. Slater for the structure of such settlement, which then prompted us to put that together and send an initial draft and then negotiate for an additional two weeks").

[15] *Id.* at 55:9–56:18.

[16] *Id.* at 53:17–54:7 ("[R]eally the two things happened kind of together, which is the April 30 meeting in person where there's a discussion of whether there's anything left to negotiate on those two terms, and the indication is that there is not and that at this point it's about the settlement process; and then the communication from Mr. Assefi directing that the settlements be sent to Mr. Goldstein

*(cont'd)*

11

the proposal to DOJ staff attorney Jeremy Goldstein.[17]

But after HPE passed the proposal on to Goldstein, DAAG Assefi stopped communicating with HPE about the settlement. And despite AAG Slater's apparent support for the settlement DAAG Assefi had negotiated, she and others in the Antitrust Division suddenly reversed course. On May 8 and 13, HPE's counsel met with other Antitrust Division lawyers, including DAAG Mark Hamer and DAAG Bill Rinner, to discuss the settlement proposal HPE had negotiated with DAAG Assefi.[18] In a reversal from DAAG Assefi's position, these Antitrust Division lawyers expressed disinterest in the existing proposal and suggested that they were more interested in a divestiture.[19]

On May 16, the DOJ sent HPE a term sheet proposing a divestiture of Juniper's entire "campus and branch" networking business.[20] But the campus and branch business involved *all* of Juniper's solutions for connecting devices across centralized, multi-building locations (campus) and distributed, remote satellite sites (branches)—i.e., the business involved far more than just enterprise WLAN products. As a result, HPE pushed back on this proposal, explaining that it would involve a divestiture of a business that was involved in far more than the allegedly affected market, and, as a result was neither a subject of discovery in the underlying litigation nor relevant to the impending

---

to then move through the staff for purpose of finalization. So it's sort of the combination of those two events, but sort of being told to send the settlement to the staff and that there was nothing else left to negotiate on the two core terms is what signaled to us that, you know, we had an agreement on those terms."); *id.* at 56:16–18 (concerning the AI Ops for Mist source code license and Invest in America Proposal: "at the April 30 meeting Mr. Assefi had indicated that nothing else was left to negotiate on those terms"); *id.* at 76:13–20 ("[W]e had negotiated for 30 days with the person who had brought the case and had been indicated to be the person we should communicate with … who believed, at least in those negotiations, that it was an appropriate remedy.· And that had even been discussed at a meeting between Mr. Davis, Mr. Assefi, and Ms. Slater."); Ex. 3 (Levi Tr.) 83:20–84:6 (following the April 30 meeting with Assefi, "I left with the understanding that any settlement agreement would require a series of additional approvals by the department, as is customary").

[17] ECF No. 370-4 (Schultz Decl.) ¶ 14.

[18] *Id.* ¶ 15.

[19] Ex. 1 (Schultz Tr.) 76:21–25 ("We then had a second phase with Mr. Hamer and Mr. Rinner in which they were indicating they didn't believe it was appropriate.· And so it was very clear at that point to us that there were some split in the Antitrust Division around the approach."); Ex. 4 (Davis Tr.) 169:15–21 ("Okay.· So when you do go to Ms. Slater, was she supportive of settling on the terms that HPE was then offering? A.· ·She -- she was for several weeks, and then suddenly she wasn't."); ECF No. 370-4 (Schultz Decl.) ¶ 15 ("Despite the fact that DAAG Assefi had conveyed to HPE on April 30 that the proposal was acceptable to the Antitrust Division, in a reversal of this position, DAAGs Hamer and Rinner expressed disinterest in the settlement and stated they would send a new offer. The DOJ did not explain why it was reneging on the settlement that HPE had negotiated with DOJ for more than a month.").

[20] ECF No. 370-4 (Schultz Decl.) ¶ 16.

12

trial.[21]  In addition, HPE explained why divesting a WLAN-only business was infeasible, because Juniper and HPE do not have a WLAN-only business—they have networking businesses, with integrated product lines, including campus and branch switching, SD-WAN, SASE, and WLAN.[22] The networking business is supported by integrated teams, who handle the finance, sales, and legal functions of the entire business.[23]  Divesting a "WLAN-only" business would have required *creating* such a business, by splitting apart the networking business and destroying the integrated teams within that business, and would have left customers who use Juniper products with a disjointed system.[24]

On June 4, 2025, HPE provided an updated proposal to the Antitrust Division that expanded on the initial proposal agreed with DAAG Assefi by (1) adding sales employees, engineers, and a transitional services agreement to the AI Ops for Mist Source Code License; and, given the DOJ's expressed interest in divestiture of an enterprise WLAN-related business, (2) adding the divestiture of the Instant On business globally.  HPE sent a letter to AAG Slater on the same date outlining the proposal and explaining why a divestiture of Juniper's full compass and branch business was not feasible or appropriate—and again urged the DOJ to consider both the lack of evidence supporting

---

[21] *Id.*

[22] Ex. 1 (Schultz Tr.) 48:7–49:19 ("Juniper was, like most tech companies, an integrated engineering company.· So they had various product lines, but those products and product lines share lots of common engineering software, hardware, and the like. So contrary to how the Department of Justice was thinking about it, and it was obvious from the conversations with certain folks, there was no wireless LAN business inside Juniper.· There is a set of products that are wireless LAN solutions, and they leverage the same code, they leverage the same engineering, they leverage the same ASICs processes, et cetera.· They rely on pre-sales and the like, IP that is shared across campus and branch switching, SD-WAN, SASE.  […]For example, the AI Ops -- excuse me, the Mist source code runs on wireless LAN, it runs on campus and branch switching, it was being migrated across to the data center switching. I believe it was starting to or may have already formed the underpinning of their SD-WAN, I don't know, probably SASE as well and the like. So you don't have the ability to pull that apart without technically damaging one product, multiple products, or potentially all of the products.· So that's why it was infeasible from a technical perspective.").

[23] *Id.* at 50:7–19 ("Again, there isn't really a standalone wireless LAN business. So if you think about a company from the top to the bottom, you think about finance, you think about sales, you think about IT, you think about legal. Those are all shared resources. There was integration I believe sort of at the supply chain level, you know, accounts receivable, accounts payable. Take all of your core operations. Right? So this is not a scenario in which what you had was standalone businesses that sat sort of in a portfolio structure under a holding company. This was an integrated business.").

[24] *Id.* at 51:2–11 ("So putting aside the technical side, you have a tremendous operational challenge if you were trying to sort of, quote, carve out something that looked like a business. You know, I always say to folks, you know, it's like taking a single sports team and telling someone go make three sports teams that are of equal or better competitive capability out of one team. It's not actually achievable. What you'll do is just end up with two weak, if at all functioning, organizations.").

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

its case and the national security benefits of the transaction.[25]

The same day (June 4), representatives of the intelligence community contacted HPE to express concerns about the possibility that the merger might not be approved.[26] HPE provides mission-critical technology to U.S. intelligence agencies, and these representatives expressed concern that the availability of this technology could be threatened if the merger were blocked and HPE suffered severe consequences as a result. The intelligence community representatives also agreed with HPE that creating an alternative to Huawei would provide national security benefits by allowing HPE to push Huawei out of the data centers of important international partners.[27]

On June 5, HPE met with AAG Slater and all Antitrust Division DAAGs except DAAG Assefi (i.e., DAAGs Rinner, Hamer, Sanghvi, and Alford), as well as other DOJ personnel. During the meeting, the Antitrust Division representatives indicated they saw the June 4 proposal as an improvement, but they were not prepared to agree.[28] AAG Slater also said that she would not consider national security as part of the settlement negotiations.[29] Although Alford attended the June 5 meeting (the only meeting regarding the settlement that he did attend), he was not involved in any substantive discussions. He also admitted at his deposition that he did not even *look* at the briefing document that HPE sent to the Antitrust Division before the meeting, which addressed HPE's arguments regarding the merger's procompetitive effects, the lack of any competitive harm, the national security benefits of the deal, and the national security risks of blocking the merger.[30] And following the meeting (and before it), DAAG Alford did not have any discussions with HPE

---

[25] Ex. 5 (HPE-TUNNEY-0040926) at -927; ECF No. 370-4 (Schultz Decl.) ¶ 17 ("HPE sent a letter to AAG Slater on [June 4, 2025] outlining the proposal and again conveying the lack of evidence supporting the DOJ's complaint and urging the DOJ to consider the national security benefits of the transaction.").

[26] ECF No. 370-4 (Schultz Decl.) ¶ 19.

[27] *Id.*

[28] *Id.* ¶ 20.

[29] Ex. 1 (Schultz Tr.) 100:12–25("she was not willing to have a discussion about the national security points that we had raised in our letter ... and was not interested in having a conversation about what we do for the US government. I remember taking a second run at the same issue and being told in no uncertain terms that that was not something that the Department was interested or would consider.").

[30] Ex. 6 (Alford Tr.) 247:24–248:21.

14

regarding the merger or litigation.[31]

### 3. The Antitrust Division Again Reverses Course, And With Time Running Out To Complete A Settlement, HPE Appeals To Senior DOJ Officials

Despite the Antitrust Division's apparent openness to HPE's settlement proposal at the June 5 meeting, on June 10, DAAG Rinner sent a revised term sheet to HPE that again reflected a full divestiture of Juniper's campus and branch business.[32]  HPE was frustrated and confused by the settlement negotiations—first DAAG Assefi had claimed the parties had effectively reached agreement, with the apparent support of AAG Slater, only for AAG Slater and other Antitrust Division officials to contradict DAAG Assefi's position; then AAG Slater and those other officials expressed apparent interest in HPE's revised proposal, only for them to reverse course and revert to their prior divestiture demands.  HPE was also concerned that the Antitrust Division was not taking the national security benefits of the transaction seriously.

With trial fast approaching (and scheduled to begin on July 9), HPE decided to appeal to senior DOJ leadership.  It is certainly not uncommon for private parties who disagree with the decisions of a division of the DOJ to appeal that decision to senior DOJ officials.[33]  HPE took the appropriate route of appeal, reaching out to the Acting Associate Attorney General for the DOJ, Chad Mizelle, who was overseeing the Antitrust Division.[34]

---

[31] ECF No. 370-4 (Schultz Decl.) ¶ 21 ("The June 5, 2025 meeting was the only meeting, call, or email with HPE relating to the DOJ's investigation, litigation, or settlement that DAAG Alford attended.  Following the meeting (and before it), DAAG Alford did not have any discussions with HPE regarding the merger or the litigation."); Ex. 6 (Alford Tr.) 196:15–21 (Apart from the June 5, 2025 meeting, Alford does not have firsthand knowledge of other settlement negotiation meetings; "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████."); *id.* at 196:23–198-9 (Alford does not believe he participated in any other meetings).

[32] ECF No. 370-4 (Schultz Decl.) ¶ 22 ("On June 10, 2025, DAAG Rinner sent a revised term sheet to HPE that reflected substantially the same full divestiture of Juniper's campus and branch business as was included in the DOJ's term sheet of May 13, with minor modifications.").

[33] Ex. 3 (Levi Tr.) 126:8–19 (Levi notes that when he was counselor to the Attorney General and Chief of Staff to the Attorney General in the first Trump administration, the Attorney General heard appeals from decisions of various Department of Justice components, including the Antitrust Division.); *id.* at 126:22–25 ("there is an appeal path that can be pursued -- that is pursued, and that on occasion all levels of senior leadership, those appeals are sometimes entertained and sometimes granted").

[34] *Id.* at 107:5–10 ("I don't recall exactly when I first spoke with the Acting Associate Attorney General about this matter. But when I did, it would have been to give him a heads up that we were

*(cont'd)*

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

On June 18, Mizelle and HPE had an in-person discussion regarding the case and a potential settlement.  The discussion was detailed and substantial; the parties discussed the merits, with HPE emphasizing the minimal harm that the DOJ's own expert had purported to find, and the lack of head-to-head competition between HPE's and Juniper's WLAN products[35]; they discussed the national security benefits of the merger and HPE's work with intelligence agencies, as well as the threat to national security posed by the DOJ's challenge, which had engendered an activist investor to threaten to break up the company[36]; and they discussed the potential remedies.[37]  Mizelle asked questions about competition in the WLAN market and the remedies HPE proposed—and asked HPE for further settlement commitments, such as including an additional license for the Mist AI Ops source code and additional engineering and sales support for the licensee.[38]

potentially going to appeal a decision by the Antitrust Division."); Ex. 3 (Levi Tr.) 107:20–108:4 ("After we had what we understood to be a decision from the Antitrust Division and our settlement proposal was not acceptable to them, I had a number, I don't recall how many discussions, with the Acting Associate Attorney General, who is the leadership official who is responsible for overseeing the Antitrust Division and to whom appeals for the Antitrust Division are directed, and I had a number of discussions with Chad Mizelle about that.").

[35] Ex. 1 (Schultz Tr.) 112:9–21 ("We would have talked about the merits, so we would have talked about what the competitive environment was, we would have talked about our view as to what the situation was between Juniper and HPE. I specifically recall discussing with Mr. Mizelle both what our expert had found and in fact what the DOJ's own expert had found. I believe I indicated at the time that I believe the DOJ's expert had found, even under a theory of the case that is not a generally recognized theory, something like $80 million of competitive harm in a 4 or $5 billion market and that his number was actually closer to 50."); id. at 113:8–19 ("I think I also explained to Mr. Mizelle that fundamentally the Aruba business and the Juniper business compete with different technologies. The Juniper business and wireless LAN is a hundred percent in the cloud and has no on-prem offerings. More than 60 percent of the Aruba business is on-prem, so the DOJ had fundamentally misunderstood the market and the products, believing them to have this significant overlap, when in reality for more than 60-some percent of the business there's absolutely no overlap because Aruba is primarily on-prem and Juniper is exclusively in the cloud.").

[36] Ex. 1 (Schultz Tr.) 110:9–13 ("[W]e spent a fair bit more time talking about national defense issues in particular.· We also talked about -- in detail about the health of the business and the activist investor threat").

[37] Id. at 111:3–15 ("He asked about the remedies, he was focused on whether we were willing to grant more than one source code license and said there was a pretty active discussion around whether we would lead to a second source code license. My recollection is that I did not agree to that in the meeting, but it was clearly something he was focused on. We talked about engineering support and sales support and he was very interested in the extension of those items, meaning adding more to the settlement with respect to both engineering support and sales support.").

[38] Id.; Ex. 3 (Levi Tr.) 108:7–11, 17–25 ("[w]e discussed potential resolutions, the remedies that were on the table, including the licensing of the Mist technology, the potential divestiture of the Instant On business, and probably the Invest in America piece…. we would have discussed the licensing remedy, whether it was a license that would be of interest to competitors, who the competitors were, what the market share of the relevant entities in the market is, are. And the Acting

*(cont'd)*

16

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

Mizelle then directed HPE to continue the settlement discussions with Stanley Woodward, who was awaiting confirmation as the Associate Attorney General who would oversee the Antitrust Division.[39] HPE also raised the national security implications of the deal to Woodward, as it had to Mizelle, and evidence suggests that DOJ leadership considered national security as a factor in making the decision to settle, including through discussions with members of the intelligence community.[40] For example, the head of the CIA reportedly expressed opposition to the lawsuit and support for the deal, given its importance to national security.[41] The intelligence community had independently expressed support for the deal directly to HPE.[42]

Associate Attorney General, as you would expect, had -- was appropriately skeptical and had a lot of questions about the transaction and proposed remedies. "); *id.* at 109:2–10 ("[Mizelle] had a lot of questions about the adequacy of competitors to Juniper, their market shares, their market caps, how a license would work, who would facilitate the license, whether engineers would be associated with the license, whether salespeople would be similarly with respect to the Instant On divestiture, whether that was a business that would be of interest to competitors, how it could be used by competitors and the like."); Ex. 1 (Schultz Tr.) 111:3–15 ("He asked about the remedies, he was focused on whether we were willing to grant more than one source code license and said there was a pretty active discussion around whether we would lead to a second source code license. My recollection is that I did not agree to that in the meeting, but it was clearly something he was focused on. We talked about engineering support and sales support and he was very interested in the extension of those items, meaning adding more to the settlement with respect to both engineering support and sales support."); ECF No. 370-4 (Schultz Decl.) ¶ 24 ("Mizelle asked whether HPE would be willing to offer the license to two licensees instead of one and increase the sales and engineering support available to the licensee(s).").

[39] Ex. 1 (Schultz Tr.) 115:12–19 ("At some point following the meeting, and it was I think, you know, a number of days later, Mr. Mizelle communicated to us, I think probably through Mr. Levi, that Mr. Woodward would be handling the settlement negotiations from this point. And so I had an initial call with Mr. Woodward and I believe an attorney from his office by the name of Ashleigh Bondoc."); ECF No. 370-4 (Schultz Decl.) ¶ 25 ("Mr. Mizelle referred HPE to Stanley Woodward, who was then working as counsel in the Office of the Attorney General (and is now Associate Attorney General), and explained that Mr. Woodward would be responsible for settlement negotiations with HPE going forward.").

[40] Ex. 4 (Davis Tr.) 174:11–15 ("[T]he ·national security argument really got [Mizelle's] attention. The fact that the -- Gail Slater didn't want to consider the national security implications of this·deal was very troubling to Chad.").

[41] Ex. 7 ("US antitrust chief Gail Slater ousted from Trump justice department," *The Guardian*, February 12, 2026) ("Slater claimed to Bondi that the US intelligence community had not raised any national security concerns about blocking the merger – a consideration that provides a legitimate basis for allowing a deal to proceed. That prompted a scramble inside the justice department when the CIA director, John Ratcliffe, said blocking the merger would in fact pose national security risks and questioned why he was never consulted.").

[42] Ex. 1 (Schultz Tr.) 84:15–20 ("Mr. Schwartz and I met with Bridge Colby, who is the director of strategy or policy at the Department of Defense in connection with their oversight of the NSA.  And Mr. Schwartz and I met with the deputy director of the CIA, Mr. Ellis, and one of his colleagues."); *id.* at 85:22–25 ("Myself and the CEO of the company had a conversation with the CIO of the NSA; my colleague, Mr. Antczak, and one of our public sector business leaders had conversations with

*(cont'd)*

17

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

Through June 26 and June 27, several drafts of the settlement documents were exchanged, with various provisions added (like Instant On) or dropped from the documents (like the proposal for HPE to commit to making additional American investments, and a proposal that HPE make a pricing commitment).[43] DAAG Rinner of the Antitrust Division was also included in these discussions and contacted HPE's counsel to finalize and file the settlement documents.[44] HPE agreed to the changes the DOJ proposed, and the settlement was finally signed and filed late on the night of June 27.[45] Because of the time crunch—with trial scheduled to start in a little over a week—and because DAAG Rinner did not have ECF filing credentials, HPE helped draft and file the final documentation (all of which was reviewed and approved by DAAG Rinner and the DOJ).[46] AAG Slater, along with other DOJ officials, signed the settlement agreement. All the witnesses actually involved in finalizing the settlement confirmed that the settlement agreement filed with the Court

---

members of the NSA"); *id.* at 87:1–8 ("We see the reporting of communicate – that indicates that Mr. Ratcliffe, director of the CIA, spoke with members of the DOJ, which would be consistent with our understanding of the meetings that we had first with Mr. Ellis -- Deputy Director Ellis and then with the operational level of the CIA, which was all as we understood it to provide a briefing to Director Ratcliffe"); *see also* ECF No. 370-4 (Schultz Decl.) ¶ 19.

[43] Ex. 1 (Schultz Tr.) 117:9–13 ("at least I think at some point in one of these sessions, maybe it's this one, Mr. Woodward had discussed pricing and the concept of a price commitment, and so I believe we put something together and include that in the draft"); *id.* at 127:3–14 (on June 27th, Woodward discussed "[t]he settlement terms and specifically the desire to have Instant On added back into the settlement agreement as one of the remedies, the desire to have a penalty provision to make sure that it aligned to the pricing commitment that we had offered in response to their request, and the requested increase in university investments as part of the Invest for America element of the settlement"); *id.* at 125:11–14 ("ultimately the pricing commitment was pulled out and was not part of the final agreement for reasons you'd have to ask the DOJ").

[44] Ex. 8 (Rinner Tr.) 102:14–104:2– (discussing Rinner's involvement in finalizing the settlement proposal); Ex. 1 (Schultz Tr.) 161:14–20 (same); ECF No. 370-4 (Schultz Decl.) ¶ 24 (Following the June 18, 2025 meeting with Mizelle, HPE "began direct settlement negotiations with Woodward, who was supported by DAAG Rinner and Ashleigh Bondoc.").

[45] Ex. 1 (Schultz Tr.) 117:16–18 ("Frankly, those [settlement] negotiations were ongoing until the settlement was finalized in the communications between Rinner and Mellott" the night of June 27).

[46] Ex 8 (Rinner Tr.) 128:15–21 ("I remember discussing with HPE's counsel mechanics of ECF credentials, which I did not possess any in order to effectuate the filing. Which as you can see from the timing on this, was late in the evening and requested that general or someone on her team get them on file because of our technical inability to do so ourselves."); *id.* at 108:7–15 ("Settlements during litigation often take different form in a number of ways which tend to be by-product of party's resources, the timing, and the -- you know, the posture of the case. I've been involved in discussions regarding settlements in the midst of litigation on mergers -- on merger litigations in which it was a frequent source of conversation who would take the pen in drafting the documents which would ultimately be submitted to the Court.").

18

includes all the terms of the agreement.[47]

                            *        *        *

This is not a case involving quid pro quos or secret side deals.  This is a case where HPE negotiated extensively and in good faith—even after the DOJ reversed course several times—and agreed to meaningful remedies with the DOJ, even though there was no harm to competition, and even though numerous other antitrust regulators approved the deal without any remedy at all.

**B.      The States' Attacks On The Process Are Meritless**

The States say the settlement "was the product of political influence, and the result is a Settlement that the experts at ATR had previously rejected as nowhere near sufficient to address the merger's harms."  Opp. at 28.  Like so many of the States' assertions, this empty conclusory statement is made with no evidentiary support (*see id.*).  As best as HPE can tell, the States' arguments are that (1) the Antitrust Division held a uniform view about how the case should be settled; (2) it was improper for senior DOJ officials with oversight over the Antitrust Division to settle the case; (3) HPE should not have prepared a draft of the Competitive Impact Statement ("CIS"); and (4) the parties' Tunney Act disclosures were inadequate because HPE did not list Arthur Schwartz as an individual who negotiated the settlement, and the DOJ did not list in the CIS every settlement proposal it made as an "alternative remedy" it "actually considered."   None of these claims have merit.

First, the States' argument presumes that the Antitrust Division is a monolithic entity that unanimously opposed the settlement, ignoring (1) that Antitrust Division staff opposed bringing suit

---

[47] ECF No. 370-4 (Schultz Decl.) ¶ 27 ("The settlement before this Court represents the entirety of the agreement between HPE and the DOJ."); Ex. 3 (Levi Tr.) 127:2–6 ("Q. … is it your understanding that the proposed final judgment signed by HPE and the Department of Justice contains all terms related to the settlement? A. That's my understanding."); Ex. 9 (Mizelle Tr.) 114:20–115:2 ("Q. Is there a side deal for Invest In America between the Department of Justice and HPE? … A. There are no side deals or anything of the sort."); Ex. 1 (Schultz Tr.) 161:12-21 ("Q. Was a commitment to Invest in America part of the final settlement agreement reached between HPE and the Department of Justice? A. It was not."); Ex. 8 (Rinner Tr.) 130:7–10 ("And do the attachments to Ms. Mellott's E-mail [i.e., the filed settlement documents] reflect the entire settlement agreement between DOJ and HPE? A. That's my understanding."); ECF No. 298-1(Neri Decl.) ¶ 3 ("I reviewed and approved the Proposed Final Judgment, which contains all of the terms of the settlement of this litigation among the United States Department of Justice, HPE and Juniper.  There is no agreement between HPE and the DOJ or the U.S. Government to settle this litigation outside of the Proposed Final Judgment.").

19

*in the first place*, and (2) HPE negotiated an agreement with Assefi, the *very Antitrust Division official who brought the case*, before other Antitrust Division political appointees reversed course.

The States suggest that "the new administration" settled a case that the Antitrust Division thought was strong, but this is exactly backward. The career staff of the Antitrust Division *opposed* bringing any case at all—and it was Assefi, a political appointee of the "new administration," who overruled the Antitrust Division staff and brought the suit. The States do not mention anywhere that the Antitrust Division career staff who actually investigated the merger opposed this lawsuit.

The States also act as if Assefi was not a member of the Antitrust Division, even going so far as to claim (incorrectly) that HPE did not speak with the Antitrust Division until *after* negotiations with Assefi concluded around April 30. *See* Opp. at 14 ("After the April 30 meeting, HPE's counsel of record began communicating with ATR staff and leadership."). But Assefi *was* (and *is*) part of the Antitrust Division and indeed was its *acting head* when he brought the case (and is again now). What's more, Slater—who was appointed head of the Antitrust Division in March 2025—told HPE that Assefi was the proper Antitrust Division official to negotiate with (because he brought the case), and expressed support for the deal that Assefi negotiated in April 2025, before she suddenly reversed course and demanded a different deal in May. *Supra* Section II.A.2.

This is not to say that Assefi acted improperly by overruling Antitrust Division staff to bring the case, or that Slater acted improperly by changing her mind and rejecting the settlement Assefi had negotiated. Senior DOJ officials overrule subordinate ones *all the time*. But this demonstrates the logical inconsistency inherent to the States' theory of impropriety: they claim that once Slater opposed the settlement in June 2025, no one above them in the DOJ hierarchy could overrule them, while conveniently ignoring that the lawsuit only *existed* because the Antitrust Division staff who opposed it were overruled, and that the June 2025 negotiations occurred after Slater overruled Assefi (and apparently changed her own mind about the deal Assefi negotiated).

Second, the States say that Mizelle and Woodward could not overrule Slater and settle the case without violating the Justice Manual. This is absurd. The States cannot dispute that Mizelle and Woodward were senior to Slater and were responsible for oversight of the Antitrust Division (and were thus her bosses). And the Justice Manual does not say anywhere that the head of a

20

subordinate division of the DOJ (like the Antitrust Division) cannot be overruled by superiors in the Attorney General's office.  The single section of the Justice Manual that the States rely on merely states that "the Assistant Attorney General for the Antitrust Division is responsible for supervising all federal antitrust investigations and proceedings."  Justice Manual § 7-1.2000.  But this obviously does not say that the AAG for the Antitrust Division is not subject to supervision herself by superior officials in the Attorney General's office.  To the contrary, the Justice Manual and the DOJ's governing regulations state that the Attorney General has absolute and total authority to oversee the DOJ and all its divisions, and that she can exercise and delegate this authority as she sees fit.  *See id.* § 4-1.100; 28 C.F.R. § 0.5 ("The Attorney General shall: (a) Supervise and direct the administration and operation of the Department of Justice ....").  This is so obvious that it should not need to be said. By statute, "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General" (28 U.S.C. § 509), and she may delegate those functions to any other DOJ officer in her sole discretion (28 U.S.C. § 510).  *See United States v. Biden*, 728 F. Supp. 3d 1054, 1078 (C.D. Cal. 2024) ("Title 28 clearly vests the Attorney General with the functions of the DOJ, 28 U.S.C. § 509, and permits the Attorney General to delegate those functions to any other officer of the DOJ, 28 U.S.C. § 510; *see also id.* §§ 515, 533; *United States v. Nixon*, 418 U.S. 683, 694, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).").

Aside from misciting the Justice Manual, the States rely on the declaration of William Baer, a former DOJ official under the Obama administration.  Baer Decl. ¶¶ 2–3.  Baer says he "recognize[s] that the Attorney General has the final say on law enforcement decisions," but claims that, when he was at the DOJ, "any meetings or communications with outside parties would invariably involve the leadership of the Antitrust Division," so the fact that Woodward and Mizelle—the senior DOJ officials responsible for overseeing the Antitrust Division—met with HPE without Slater is, according to Baer, "unprecedented."  *Id.* ¶ 18.  But there is no requirement in the Justice Manual (or anywhere else) that a party appealing up the DOJ "chain of command" must include the lower-level officials whose decisions are being appealed, and Baer's views are irrelevant in any event.  Nor is it surprising that a political appointee from the Obama administration would profess disagreement with how the DOJ under the Trump administration handles cases.  While he seems to believe that Slater,

21

as the head of the Antitrust Division, should not have been overruled by senior DOJ officials, he cannot cite anything supporting this belief—because nothing exists.

Third, the States say it was "patently improper" for HPE's counsel to prepare a draft CIS for the DOJ to review. Opp. at 30. The States cite nothing to support this claim other than the personal opinion of Baer. *See id.* Nothing prohibits the DOJ from reviewing and approving a draft CIS (or any other document) provided by a settling defendant. And given that this case settled on the eve of trial—and the DOJ had little time to draft documents—it was not out of the ordinary or improper for HPE's counsel to assist by preparing a draft. Ex. 8 (Rinner Tr.) 108:7–20. Regardless of who creates a draft, all that matters is that the DOJ reviews, approves, and adopts it—as happened here. *Id.* at 110:23–111:18.[48]

Fourth, the States argue that HPE's Tunney Act disclosures are inadequate, which they say warrants rejecting the settlement. Opp. at 24–25, 27–28. This is meritless. As the States acknowledge, the Tunney Act requires defendants to file a description of all communications on behalf of the defendant with the United States "concerning or relevant to that proposal," meaning the "proposal for a consent judgment." 15 U.S.C. § 16(g). The States claim HPE's disclosures are insufficient because it did not disclose "several national security-related contacts," including between HPE's consultant, Arthur Schwartz, and individuals at the Department of Defense and CIA. But Schwartz and those individuals were not disclosed because they did not negotiate or have any discussions *about the settlement*. And after months of discovery, that remains unchanged. Schwartz testified that he "never had any meetings about the final judgment" and doesn't "know what the final judgment was." Ex. 10 (Schwartz Tr.) 54:21–24; *see also id.* 63:19–23 ("Q.·Mr. Schwartz, are you aware that the terms of HPE and DOJ's settlement regarding the HPE/Juniper merger are contained in a proposed final judgment? A.· No."); *id.* at 53:10–12 ("I don't even know what the final judgment was so I certainly didn't have any meetings about the final judgment."); *id.* at 53:17–20 ("I never had any conversations with anyone about the final judgment because I don't know what it was, I don't know what it was proposed to be. I was not involved in that aspect of this case at all."). In

---

[48] Indeed the draft CIS contained significant portions taken directly from the Complaint, with which HPE and its counsel obviously did not agree.

fact, when the States asked Schwartz if "the meetings [he] had with executive branch officials on behalf of HPE were intended to permit [the] merger to occur," he responded, "No," and explained that the "purpose of [his] meetings was to brief the intelligence community on HPE's national security arguments." *Id.* at 58:19–22. The record is uncontested that Schwartz had no conversations about the settlement, or even knew its terms. Accordingly, it would have been improper to (inaccurately) disclose him as someone who had conversations with the government on behalf of HPE "concerning" the "proposal for a consent judgment."[49]

Nor was the DOJ required to disclose every proposal it made during settlement negotiations. The CIS must include "a description and evaluation of alternatives to such proposal [i.e., the consent decree] actually considered by the United States." 15 U.S.C. § 16(b)(6). But the mere fact that the DOJ made a settlement *demand* does not mean it was an "alternative[]" to the consent decree "actually considered by the United States." While there is virtually no caselaw on what constitutes an "alternative[]" "actually considered" by the DOJ, what little there is explains that the CIS is intended to "set out ... all the realistic options [the DOJ] had in determining whether to enter into the consent decree." *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1248 (D.C. Cir. 2004).

Here, the DOJ only had two "realistic options": (1) agree to the settlement it agreed to, or (2) take the case to trial. The CIS disclosed both options. The States fault the DOJ for not listing as "alternative" remedies the "full divestiture of Juniper's Campus and Branch business segment, including the WLAN and Mist businesses, as well as such a divestiture with an option for HPE to license back Mist software," because the DOJ proposed these potential terms at various times during negotiations. Opp. at 26. But these were not "alternatives" at all—because HPE made absolutely

---

[49] The States also try to twist the Rule 30(b)(6) testimony of Schultz into evidence of insufficient disclosures, arguing that HPE's "engagement with the national security agencies, including through Mr. Schwartz, was 'obviously a factor in settlement.'" Opp. at 27. But just because national security issues may have been a "factor" in the ultimate settlement does not mean that Schwartz's conversations about those issues were in the context of settlement discussions. They were not. Moreover, the States misquote Schultz's testimony. Schultz testified that "national security is obviously a factor in the settlement." Ex. 1 (Schultz Tr.) 138:11–14. But he did not qualify that statement with "including through Mr. Schwartz." And as was revealed in discovery, HPE, its counsel of record, and others of its outside counsel that were disclosed in HPE's §16(g) disclosures had conversations with DOJ officials themselves about the national security concerns of the merger. *See e.g.,* Ex. 5 (HPE-TUNNEY-0040926); Ex. 3 (Levi Tr.) 111:14–112:9; Ex. 9 (Mizelle Tr.) 70:1–6; Ex. 4 (Davis Tr.) 174:10–15.

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

clear that it would not agree to them.  Juniper's "campus and branch" business includes numerous product lines outside of WLAN (e.g., switching, SD-WAN, and SASE), and HPE told the DOJ it would not agree to divest such a business that went far beyond even the DOJ's own allegations of harm.  *Supra* Section II.A.  Likewise, the DOJ was not obligated to disclose the proposal that HPE believed it had negotiated with Assefi (i.e., the Mist license paired with an "invest in America" plan), because the DOJ later decided to reverse course on it.  The DOJ had no obligation to disclose terms that were not "realistic options" because they would never have been agreed to by HPE or the DOJ.  *Microsoft*, 373 F.3d at 1248.

Even if HPE somehow should have disclosed more than it did, that would not warrant finding that the settlement is not in the public interest.[50]  The States seem to suggest that the settlement should be rejected because an inadequate disclosure "violates the Tunney Act" (Opp. at 28), yet they do not cite a single case that holds as such.  To the contrary, the Ninth Circuit has held that "strict technical compliance with the APPA" is *not* "a condition to final entry of the decree."  *Bechtel*, 648 F.2d at 664.  Only one case has ever held the parties' Tunney Act disclosures to be inadequate: *United States v. Central Contracting Co.*, 527 F. Supp. 1101, 1103 (E.D. Va. 1981).  In that case, the Government failed to publish the CIS or proposed judgment *at all*, and the defendant failed to disclose its settlement contacts until long after the required 10-day statutory deadline.  *See id.* at 1103–05.  Yet the court did not say that even this required rejecting the settlement; rather, the court simply "stayed" its public interest determination until after the parties had complied with the disclosure requirements.  *Id.* at 1105.  This case is nothing like *Central Contracting*.  And even if more disclosure of the negotiations had been required—and again, it was not—the parties have turned over *all* their settlement communications, and their negotiators have been deposed at length about their negotiations.  Given the extensive disclosure, there can now be no question that anything

---

[50] The States also claim that HPE's disclosures were inadequate because HPE allegedly "failed to disclose all of its in-person meetings," including meetings between Davis and Assefi and an alleged June 3 meeting between Levi, Schultz, and Mizelle.  Opp. at 27.  Again, the States selectively quote from and distort the testimony *they* solicited.  Davis's testimony about his meetings with Assefi was uncertain, and he expressly stated, "I don't remember how many times we met at -- maybe less than ten times, but at -- at -- at DOJ it may have been just a handful of times. I'm not sure."  Ex. 4 (Davis Tr.) 96:15–21.  And with respect to the June 3 meeting, Levi testified that that meeting did not take place, and no witness testified that it did.  Ex. 3 (Levi Tr.) 63:1–15.

24

relevant to the Tunney Act determination has now been disclosed and there is no reason to delay approval of the settlement. *See Bechtel*, 648 F.2d at 664 (strict technical compliance is unnecessary when disclosure has been made).

## C.   The States' Reliance On Alford Is Misplaced

Beyond the issues raised above, the States go to great lengths to try to color the settlement with some form of impropriety based on the vague and unsupported claims of Roger Alford. They cite him nearly a hundred times in their brief, including for practically every description of the negotiation process. But Alford has no evidence of any impropriety, and other than attending one meeting, he was not a witness to any negotiations with HPE. Not only has discovery confirmed that Alford, in fact, has no evidence to back up his claims of corruption, it has laid bare his lack of knowledge, his vindictive personal motivations, his self-aggrandizement, his willingness to spread rumors and falsehoods, and his gamesmanship in discovery.

***Alford has virtually no direct knowledge.*** Despite being the central (and only) pillar of the States' attack on the settlement "process," Alford had virtually no direct knowledge of anything. Aside from a single meeting on June 5, 2025, Alford admitted that he did not participate in any of the numerous meetings, calls, or video calls between HPE and DOJ representatives, which spanned from late 2024 through June 2025. Ex. 6 (Alford Tr.) at 196:23–198:9. He admitted he was not involved in any settlement discussions between HPE and the Antitrust Division official who filed the lawsuit (Assefi). *Id.* at 239:14–240:13, 205:8–18. In fact, even with respect to the one June 5 meeting he did attend, Alford admitted he did not review HPE's lengthy pre-meeting written submission regarding why its merits arguments were strong, why divestiture of its campus and branch business was inappropriate and infeasible, why the remedies proposed by HPE were significant, and the national security implications of the deal. *Id.* at 247:24–248:16. Simply put, Alford did not care to educate himself about HPE's arguments or positions and was largely uninvolved in the case.

***Alford spread unsubstantiated (and false) rumors about a supposed side agreement.*** Alford has falsely suggested that HPE made a commitment to invest in American jobs that was not reflected in the final settlement filed with the Court—but he admitted this was based on third-hand information

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

from a reporter's unnamed sources. *Id.* at 209:3–25. Not only is this claim nonsensical (why would HPE make a *secret* commitment to invest in jobs?), it has been refuted by the sworn testimony and declarations of every other relevant participant, including the DOJ officials who actually negotiated the settlement, as well as HPE's Chief Operating & Legal Officer, and HPE's CEO. Ex. 8 (Rinner Tr.) 42:4–6; Ex. 9 (Mizelle Tr.) 112:13–25; ECF No. 370-4 (Schultz Decl.) ¶ 13; ECF No. 298-1 (Neri Decl.) ¶ 3.

*Alford provided false testimony to Congress.* On December 16, 2025, before a Senate Subcommittee on the Administrative State, Regulatory Reform, and Antitrust, Alford testified that the national security implications of the HPE/Juniper merger were "never presented to the Antitrust Division as a serious argument." *Anti-American Antitrust: How Foreign Governments Target U.S. Businesses: Hearing Before the Subcomm. on the Admin. State, Regul. Reform & Antitrust of the H. Comm. on the Judiciary*, 119th Cong. (Dec. 16, 2025), https://www.youtube.com/watch?v=gnm3CJWsl0c (video at 1:26:32). . That was false. In numerous HPE letters, presentations, and meetings with DOJ officials, HPE strenuously urged the DOJ to take into account national security considerations. *Supra*, Section II.A. Indeed, Congress urged the same. ECF No. 370-4 (Schultz Decl.) ¶ 8 & Ex. 4 (Jan. 29, 2025 Ltr. from Sen. Risch to DOJ: "I urge the Department of Justice to take into account the important national security implications of this transaction."); ECF No. 370-4 (Schultz Decl.) ¶ 8 & Ex. 5 (Jan. 29, 2025 Ltr. from Rep. Turner to DOJ: "[W]e have an oversight obligation to ensure that the national security implications related to the merger are taken into consideration."). Alford knew his testimony to the Senate Subcommittee was false because several months earlier, on October 7, 2025, in one of many private exchanges with reporters, he wrote: "███████████████████████████████ ███████████████████████████████████████████." Ex. 11 (HPE-ALFORD-0000499) (emphasis added).

*Alford misrepresented the facts in his deposition.* At his deposition, Alford was asked whether he had any conversations with the States that intervened in this action. Alford said that prior to his August 18 speech, he briefly spoke with Phil Weiser, Attorney General for Colorado—but said the entire substance of the conversation was "literally pleasantries," with no substantive discussion.

Ex. 6 (Alford Tr.) 232:11–14 (“████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████”). But Alford's documents, finally produced on the Friday before this brief was due (March 13), revealed this was false: Alford told others that, on August 18, he and “████████████████████████ ████████████████████████████████” Ex. 12 (HPE-ALFORD-0001709) (emphasis added).

*Alford's privately stated goal was to push out Woodward and Mizelle.* After his termination, Alford admitted ████████████████████████████████████████████████ ███████████████████████████████████████████████—i.e., he wanted to derail the careers of the senior DOJ officials who overruled him on the settlement—and to instead “████████████████████████████████.” Ex. 13 (HPE-ALFORD-0000482) at -483. In fact, his emails reveal an apparent effort to pressure Attorney General Pam Bondi at a Congressional hearing, with Alford preparing a document entitled "Bondi Hearing.docx" that contained questions for Bondi that attacked █████████████████████████ ███████████████ for their roles in the HPE/Juniper merger. Ex. 14 (HPE-ALFORD-0001356).

*Alford cozied up to numerous reporters.* Alford's texts and emails reveal him obsequiously soliciting press coverage. *See, e.g.,* Ex. 15 (HPE-ALFORD-0001701) (████████ ████████████████████████████████████████████████████████████████ ████████████████████████████); Ex. 16 (HPE-ALFORD-0000598) (████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████); Ex. 11 (HPE-ALFORD-0000499); Ex. 6 (Alford Tr.) 208:6-209:11 (████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████). Notably, one reporter (who is a friend of Alford) pushed back on his fact-less innuendo about Davis and Schwartz, noting that Alford “████ 

27

█████████████████████████████████████ "███████████████" and warns him that while that "████████████████████████," such baseless accusations might violate UK libel law.  Ex. 17 (HPE-ALFORD-0001514).

***Alford has played games in discovery to avoid scrutiny.***  Alford refused to produce *any* materials in response to document subpoenas until nearly two weeks *after* his deposition (although just in time for the States to use in their opposition brief).  It was clear gamesmanship.  Alford essentially memorized the single document he liked the day before his deposition, provided oral testimony about it, but then never had to be cross-examined about any of the many other documents he later produced.  Ex. 6 (Alford Tr.) 77:24–81:13, 206:11–25.  He also refused to produce documents on the grounds they did not "concern" the HPE settlement or merger when they obviously did.  These included communications where he sent drafts of his speech to numerous different people for input and comment.  *Id.* at 232:15–236:18.

***Alford used Signal and did not retain communications.***  Alford acknowledged using Signal (the end-to-end encrypted communications app) to communicate with Slater and others, including regarding the HPE matter.  *Id.* at 219:4–221:10.  Those communications, however, no longer exist because they were set to auto-delete.  *Id.* at 220:13–15.

***Alford's documents undermine his claim of an alleged "threat" against Slater.***  When Alford finally did produce documents, not a single one (out of more than 1,800 pages) corroborated his deposition testimony about how he heard, second-hand of a supposed "threat" made on a call between Davis and Slater where Davis supposedly threatened to "destroy" Slater.  Indeed, Alford's documents show he texted with Slater (and other DOJ officials) about various gossip and other internal DOJ politics, and not once did Slater (or anyone else) mention any alleged "threat."  If something so dramatic had happened, it would be reflected *somewhere* in the numerous contemporary texts and emails Alford was sending to anyone who would listen.  Alford did not even participate in the conversation where he claims the alleged threat occurred.  *Id.* at 205:19–206:9 ("█ ████████████████████████████████████████ ███████████████████").  And there is no other evidence of the supposed threat.  Indeed, Rinner, the former head of merger enforcement who worked closely with Slater on the HPE case,

testified that had never heard of any such threat. Ex. 8 (Rinner Tr.) 34:21–35:10. In any event, neither Alford nor the States explain how the purported "threat" has any relevance to anything in this Tunney Act proceeding.

**D.      The Settlement Meets The Tunney Act's Deferential Standard Of Review.**

**1.      The States Ask The Court To Apply The Wrong Legal Standards.**

HPE's settlement with the DOJ is well "within the reaches of the public interest." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981) (quotation omitted). This is all the Court needs to consider. The States' Opposition improperly asks the Court to engage in *de novo* scrutiny of the merits, and whether the remedies perfectly address any alleged harm. *See* Opp. at 31−46. This undermines the entire purpose of a settlement and contravenes settled law.

The purpose of a settlement is to avoid the burden and risk of litigating a case to a final determination on the merits. A consent decree "is not a decision on the merits or the achievement of the optimal outcome for all parties but is the product of negotiation and compromise." *United States v. State of Or.*, 913 F.2d 576, 580 (9th Cir. 1990). "Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and the elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). For that reason, a court evaluating a consent decree under the Tunney Act is *not* called upon to reach an ultimate determination of the merits and order the relief it would have ordered if the DOJ had proven its case at trial: "We cannot agree that a district court should engage in an unrestricted evaluation of what relief would best serve the public." *Bechtel*, 648 F.2d at 666. "If courts acting under the Tunney Act disapproved proposed consent decrees merely because they did not contain the exact relief which the court would have imposed after a finding of liability, defendants would have no incentive to consent to judgment and this element of compromise would be destroyed." *United States v. AT&T*, 552 F. Supp. 131, 151 (D.D.C. 1982). "Remedies which appear less than vigorous may well reflect an underlying weakness in the government's case, and for the district judge to assume that the allegations in the complaint have been formally made out is quite unwarranted." *United States v. Microsoft*, 56 F.3d 1448, 1461 (D.C. Cir. 1995).

29

Similarly, a court cannot engage in its own inquiry into what would constitute the "best" settlement. *Bechtel*, 648 F.2d at 666. "It is not the court's duty to determine whether this is the best possible settlement that could have been obtained if, say, the government had bargained a little harder." *United States v. NBC*, 449 F. Supp. 1127, 1143 (C.D. Cal. 1978) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)). The Tunney Act caselaw *uniformly* holds that a court may not reject a settlement under the Tunney Act on the grounds that other remedies are preferable: "[A] court may not reject a remedy simply because it may not be, in the court's view, the 'best' remedy available." *United States v. Republic Servs., Inc.*, 723 F. Supp. 2d 157, 160 (D.D.C. 2010) (quoting *United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000)); *United States v. Abitibi-Consol. Inc.*, 584 F. Supp. 2d 162, 165 (D.D.C. 2008) ("The Court 'is not permitted to reject the proposed remedies merely because the court believes other remedies are preferable.'" (quoting *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 15 (D.D.C. 2007)). For example, the American Airlines/U.S. Airways merger settlement (agreed upon within two weeks of trial) did not resolve the DOJ's claim that the merger reduced the number of "legacy" airlines from four to three. *United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76−77 (D,D,C, 2014).[51]  Instead, the settlement only "mitigate[d]" the alleged anticompetitive effects by requiring divestitures of a limited number of slots at seven key airports to smaller carriers—out of hundreds of routes that the DOJ alleged in its complaint would be harmed as a result of the merger. *Id*. at 79.  The settlement did not "create a new independent competitor," "replicate American's capacity expansion plans," or "affirmatively preserve the Advantage Fares program," a key feature of the DOJ's Complaint. *Id.* at 78.  The court rejected arguments that the remedy was too limited, emphasizing the need to defer to the DOJ's predictions about the efficacy of its proposed remedies. *See id.* at 81.

Rather than evaluate the merits or attempt to craft the "best" settlement, the court's role when evaluating whether a consent decree is in the "public interest" is simply to "ensure[] that the proposed

---

[51] Notably, Bill Baer, the States' declarant, would have presided over this settlement during his 2013-16 tenure as Antitrust Division AAG, *see* Baer Decl. ¶ 2, and spoke publicly in favor of the settlement, *see* Ex. 18 ("Assistant Attorney General Bill Baer Delivers Remarks at the Conference Call Regarding the Justice Department's Proposed Settlement with US Airways and American Airlines"). Yet here, the States and Baer claim that anything less than a settlement that accepts the Complaint's allegations as true and completely remedies any possible harm in the Complaint is unacceptable.

30

judgment is reasonable." *S.E.C. v. Randolph*, 736 F.2d 525, 529 (9th Cir. 1984).  This means that "[t]he court need only be satisfied that the decree represents a 'reasonable factual and legal determination.'" *Or.*, 913 F.2d at 581 (quoting *United States v. City of Miami*, 664 F.2d 435, 439, 441 (5th Cir. 1981) (Rubin, J., concurring)); *United States v. Iron Mountain, Inc.*, 217 F. Supp. 3d 146, 152–53 (D.D.C. 2016) (applying analogous standard in Tunney Act context that government "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms" (quoting *U.S. v. Newpage Holdings, Inc.*, 2015 WL 9982691, at *7 (D.D.C. Dec. 11, 2015))).

The States run headlong into these principles.  Parroting the DOJ's Pretrial Briefing, they assert that, at trial, the DOJ would have prevailed, *see* Opp. at 32−39, and the settlement does not fully remedy the alleged harms they presume the DOJ would have proven, *id.* at 41−46.  And the States rely on two Clayton Act cases (*United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 158 (D. Mass. 2024) and *United States v. Aetna, Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017)), that involved a *trial on the merits*, where the courts considered—as part of the *merits* determination—whether a remedy proffered by the merging parties was sufficient to "restore the competition" lost as a result of the merger.  Opp. at 41–42, 46.  But this is a Tunney Act proceeding reviewing a consent decree, not a trial on the merits.  And when reviewing a consent decree, a court must "defer[] to the agency's decision that the decree is appropriate and simply ensure[] that the proposed judgment is reasonable." *Randolph*, 736 F.2d at 529.  The Court should thus reject the States' gambit of seeking a back-door Clayton Act merits determination, premised on an unwarranted assumption that the DOJ's arguments were right and HPE's arguments were wrong.

### 2.    The States' Claim That The Court Owes No Deference To The DOJ Is Wrong

The States raise a series of arguments about why, in their view, the Court should not give any deference to the Attorney General's decision to settle and should instead review the merits and settlement *de novo*.  All their arguments fail.

First, the States assert that deference to Executive Branch's ultimate decision evaporates because certain Antitrust Division employees disagreed with the settlement HPE negotiated with the Attorney General's office.  *See* Opp. at 28–31, 40.  The States cite nothing for this illogical claim.

31

The Antitrust Division is not an independent agency and there is nothing improper or even unusual about senior DOJ officials overruling officials in a subordinate Division. *Supra* Section II.B. Rejection of the settlement on this basis would be tantamount to binding the DOJ to the views of a handful of Antitrust Division political appointees who had limited involvement with the case. That would be especially nonsensical here where the Antitrust Division staff lawyers who handled the pre-merger investigation recommended not bringing the case *at all. See supra* Section II.A.1-2.

Next, the States next argue, without citation to legal authority, that the DOJ cannot cite litigation risk as a basis to settle without "present[ing] a[] substantive analysis of litigation risk" that "compare[s] the extent to which competitive harm would be avoided by trial . . . against the extent to which the Settlement would reduce harm." Opp. at 47. The States do not provide *any* example of a court requiring such an elaborate litigation risk analysis as part of the Tunney Act process; instead, courts recognize the self-evident proposition that "[s]uccess at trial [is] surely not assured, so pursuit of that alternative may [] result[] in no remedy at all." *US Airways*, 38 F. Supp. 3d at 80 (quoting *SBC Commc'ns,* 489 F. Supp. 2d at 23); *see also United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 567−68 (S.D.N.Y. 2012) (approving, under Tunney Act, the "relatively mild sanction" of disgorgement of less than a quarter of the value of damages consumers allegedly sustained).

The States also argue that the settlement is insufficient compared to the "alternative remedy" of a structural divestiture of Juniper's enterprise-grade WLAN business. Opp. at 40. But, as explained, HPE definitively rejected this proposal as infeasible, particularly given that Juniper had *no such thing* as a "WLAN business." *Supra* Section II.A.2. The States cite nothing suggesting that the mere fact that the DOJ made an aggressive—and in this case, infeasible—demand somehow means that the parties were barred from agreeing to a different remedy. Indeed, if that were the case, then no defendant would ever have any incentive to bargain with the DOJ, because it would be forced to accept the most onerous proposal the DOJ made.[52] That is not how the Tunney Act works. Again, "[i]t is not the court's duty to determine whether this is the best possible settlement that could have

---

[52] *See* Ex. 8 (Rinner Tr.) 47:24−48:6 (testifying how, in merger settlement negotiations, "Sometimes you throw around ideas, sometimes they -- you negotiate, you posture, you say no, and then determine whether those proposals might be acceptable later.· In the context of settlement negotiation, a lot of ideas get thrown around with respect to what would go into a consent decree.").

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

been obtained if, say, the government had bargained a little harder." *NBC*, 449 F. Supp. at 1143.

Finally, the States suggest that the settlement was improper because HPE and members of the national security community—including the Director of the CIA—argued that the merger would create national security benefits. Opp. at 48–50. But this is backwards: the national security interests forwarded by the merger *support* approval of the settlement.

The settlement is fully justified and reasonable even without considering national security interests, as explained below. *See infra* Section II.D.3. Moreover, there is nothing wrong or unreasonable about the DOJ considering national security interests in its enforcement decisions. DOJ, as part of the Executive Branch, must balance various policy priorities in exercising its enforcement discretion. *See Bechtel*, 648 F.2d at 666. As former DAAG William Rinner testified, the DOJ exercises its merger enforcement discretion "as part of the broader context of the overall priorities, [and] policy goals of an administration in which the Antitrust Division serves as part of the unitary executive," while also considering resource allocation and staffing priorities. *See* Ex. 8 (Rinner Tr.) 76:7−12.

Foreign policy is a central Executive Branch concern that is relevant in exercising prosecutorial discretion. *See United States v. Texas*, 599 U.S. 670, 679−80 (2023) (concluding courts lack authority to review Executive Branch's immigration enforcement decisions, which implicate foreign policy objectives). Although the States' assertion that national security considerations are not cognizable here, Opp. at 49, this is incorrect. The Tunney Act requires consideration of a proposed consent decree's impact "upon the public generally." 15 U.S.C. § 16(e)(1)(B). It is difficult to envision a scenario in which national security concerns have no impact on the public generally. Indeed, the Ninth Circuit has confirmed that national security impacts the public interest inquiry: in the antitrust case *FTC v. Qualcomm*, the Ninth Circuit held that a stay of an antitrust injunction against Qualcomm was warranted in part because the DOD argued the injunction "threaten[ed] national security" and thus harmed the public interest. 935 F.3d 752, 756 (9th Cir. 2019) (stay was warranted, because, *inter alia*, "the Department of Defense and Department of Energy aver that the injunction threatens national security"). The national security interests there were strikingly similar to those here: maintaining an American company's global prominence

33

compared to Huawei.  *See* United States' Statement of Interest at 16, *FTC v. Qualcomm*, No. 19-16122 (9th Cir.), Dkt. 25-1.  Far from being some sort of impermissible consideration, the national security interests at stake here independently support approval of the settlement.  *See* ECF No. 369 at 20–22.

Ultimately, the failure to give deference to the determination of the Attorney General to settle this case would violate the Constitution.  Courts have long recognized the "the constitutional difficulties that inhere" in the Tunney Act, *Microsoft*, 56 F.3d at 389, which is why the standard of review is so deferential, *see United States v. Fokker Servs. B.V.*, 818 F.3d 733, 743 (D.C. Cir. 2016), and why Justice Rehnquist (joined by Chief Justice Burger and Justice White) concluded that the Act violates the Constitution.  *See Maryland v. United States*, 460 U.S. 1001, 1004 (1983) (Rehnquist, J., dissenting).  "Under Article II, the Executive Branch possesses authority to decide how to prioritize *and how aggressively to pursue* legal actions against defendants who violate the law." *Texas*, 599 U.S. at 679 (quotation omitted) (emphasis added).  For that reason, the Supreme Court "has consistently recognized that federal courts are generally not the proper forum for resolving claims that the Executive Branch should make more arrests or bring more prosecutions." *Id.* at 680; *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1986) ("This Court has recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."). Consistent with these concerns, the States do not cite, and HPE is not aware of, any case where a district court outright refused to enter a consent decree under the Tunney Act and was upheld on appeal.  "The upshot is that the 'public interest' language in the Tunney Act ... confers no new power in the courts to scrutinize and countermand the prosecution's exercise of its traditional authority over charging and enforcement decisions." *Fokker Servs.*, 818 F.3d at 743.  Reviewing the settlement *de novo*, and failing to give deference to the DOJ's decision to settle, would be unconstitutional.

**3.    Applying The Proper Analysis, The Remedies Satisfy The Tunney Act**

The DOJ's decision to settle and accept meaningful structural relief—in the form of the license of the key source code that underlie Mist's AI Ops, and divestiture of a complete networking business, complete with WLAN products—was more than reasonable.  Both remedies directly relate

34

to the harm alleged by the DOJ.  Its case was premised on the notion that Juniper's AI Ops for WLAN features were so innovative that they drove competition and innovation in the market—so licensing the source code that contains those AI Ops features to a current or new WLAN entrant ensures that someone else will be able to use those features to compete.  And Instant On includes a full, ready-to-use networking business—with over $130 million in annual revenue—including WLAN products, salespeople, and support staff, that can be immediately used by a competitor to expand their WLAN market presence.  Both remedies address the DOJ's alleged harm, which even according to its own expert's flawed models, was already minimal to begin with, at only $63 million.  The DOJ's decision to settle on these terms is "reasonable."  *Or.*, 913 F.2d at 581.

a.    **The AI Ops License Directly Addresses The Alleged Harm**

A central piece of the DOJ's case was its allegation that Juniper's AI Ops for WLAN were so uniquely innovative that they drove other players—like HPE—to innovate.  Compl. ¶¶ 6–7.  And the DOJ alleged the AI Ops tools Juniper provided with its "Mist" enterprise WLAN solutions were the key element of Juniper's WLAN offering that fueled its growth by allowing Juniper to "capitalize[] on and help[] accelerate the industry's burgeoning focus on AI Ops."  *Id.* ¶ 7.  Much of the DOJ's Complaint and pre-trial submissions centered on Project Gravity, which the DOJ claimed was HPE's initiative to replicate the AI Ops features that Juniper offered through Mist.  *See, e.g.*, *id.* ¶ 47; ECF No. 202-2 (Pl.'s Pre-Trial Proposed Findings of Fact and Conclusions of Law) ¶ 100, .

The settlement directly addresses the alleged harms. It requires HPE to run an auction for a worldwide license to the Mist AI Ops for WLAN source code, along with transition services for up to eighteen months and, at the option of the licensee, the transfer of up to 30 Juniper engineers familiar with the Mist AI Ops for WLAN source code and up to 25 Juniper sales personnel experienced in selling Mist.[53]  ECF No. 351-1 (APFJ) § V.B.5.; ECF No. 369-7 (Bailey Decl.) ¶ 14 .  The source code provides the licensee with the ability to measure end-user experiences and accurately pinpoint the cause of quality issues in a customer's wireless network.  In short, the license

---

[53] And if the licensee requests, HPE must introduce it to Juniper's original design manufacturers, distributors, and channel partners for Juniper's WLAN hardware—so the licensee has an available network to market solutions that use the AI Ops for WLAN technology.  ECF No. 351-1 (APFJ) § V.1.B.6.  The licensee must be capable of competing in enterprise WLAN—and must satisfy the DOJ they will use the code to compete in that market.  *Id.* § VI.B.

35

gives the acquirer Mist's "secret sauce."  Ex. 19 (Rahim Tr.) at 23:24–24:15.  This secret sauce is embedded in six Service Level Expectations ("SLEs") that are evaluated by the AI Ops tool (time to connect, connection success, coverage, capacity, throughput, and roaming), as well as the data ingestion pipeline that feeds telemetry from access points into the SLE models—and all of this is included in the license.  Friday Decl. ¶¶ 7, 10.

That access will increase competition in enterprise WLAN by enabling one or more firms to use the same AI Ops capabilities that the DOJ claimed made Juniper uniquely innovative.  Indeed, as described by Rami Rahim, the former CEO of Juniper, developing a WLAN solution and competing in WLAN is fairly straightforward, given that WLAN hardware is readily available from original design manufacturers, so the key differentiator are features like AI Ops—i.e., if a firm wants a solution that "has very differentiated AI Ops, having access to the [licensed] source code would significantly by years accelerate their ability to go and enter this market with a differentiated product."  Ex. 19 (Rahim Tr.) 72:2−7.

The States hired Aanjhan Ranganathan, whose only apparent work or experience is in cybersecurity and who has never worked in the networking industry, to try to nitpick claimed defects in the source code.  But Dr. Ranganathan lacks a basic grasp of wireless networks, AI Ops functionality, and the Mist platform, and his report reflects this—it is riddled with factual errors and virtually every assertion he makes in it is wrong.  *See generally* Friday Decl.

36

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Aside from misstating the content of the license, the States say that Mist AI Ops license is inferior to divesting a standalone "Juniper WLAN" business. Opp. at 46. But as Defendants repeatedly told the DOJ, no such standalone business existed. Juniper's WLAN offerings were deeply integrated across its broader networking business—relying on shared IP, engineering teams, sales organizations, and operational support. Ex. 1 (Schultz Tr.) 47:20−51:11. Creating a new, artificially severed "WLAN business" solely for divestiture would have required dismantling cross-functional teams and reorganizing shared infrastructure in ways that would render the resulting business nonviable. HPE made clear to the DOJ in settlement discussions that it would not agree to such a remedy and the States' post-hoc re-writing of those discussions fantastically presumes HPE's position would have changed if it were the States that made the demand (or perhaps the States believe that HPE would have cowered in the face of a propitiously-timed self-serving press release, such as the one the Colorado Attorney General issued earlier today in advance of the filing of this brief). *Supra* Section II.A.[54] And even if that were not true, the caselaw is unanimous that a remedy cannot be rejected under the Tunney Act merely because some other remedy is purportedly "better." *Supra* Section II.D.1. The only question is whether the remedies are "reasonable" in light of the alleged harms (*supra* Section II.D.1), and licensing the secret sauce that the Complaint claimed was the key to Juniper's competitive success is clearly a reasonable remedy.

---

[54] The States' continued efforts to litigate this proceeding in the press are disappointing, but confirm that they are simply engaged in political theater, hoping to use this proceeding as a means to advance a political agenda and score points against the administration, their political rivals.

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

**b.**      **The Divestiture Of Instant On Will Enhance Competition In The Market**

The settlement requires HPE to divest its Instant On business—including its assets, contracts, and customer relationships—to an acquiror that will compete in enterprise WLAN and that satisfies the DOJ that it will use Instant On to compete in that market.   ECF No. 351-1 (APFJ) § VI.C.  Instant On is a complete campus and branch networking business, with WLAN, switching, and gateways products, over $140 million in annual revenue globally, and over 100 employees (who can join the acquirer) in engineering, sales, marketing, and other support functions. Ex. 20 (HPE-TUNNEY-0044312) at 7–8.  The Instant On divestiture increases competition by providing a competitor or new entrant in the enterprise WLAN market with a ready-made enterprise grade networking business with which to compete.   It addresses the harm alleged by the DOJ by immediately injecting new competition into the market.

The States repeat the complaint from their comment that Instant On is targeted at SMBs and thus is not relevant to the market.  Opp. at 5, 41.  But as described by DOJ in its Response to Public Comment, the relevant market in this case is for *all* enterprise-grade WLAN—whether they are sold to smaller enterprises or larger ones.  ECF No. 311 (Response of United States to Public Comments on the Proposed Final Judgment) at 5 (citing Compl. ¶¶ 34–38).  Instant On is part of that market.

The States' contention that Instant On is inadequate because it is "targeted at SMB customers" also rests on a fundamental confusion between marketing focus and functional capability. Opp. at 41.  While the Instant On business is marketed primarily to small and medium enterprise customers, ECF 298-3 (Hughes Decl.) ¶ 4, that is not because it cannot meet the needs of large enterprise customers.  Rather, HPE made a commercial decision to market the Instant On solution to small and medium enterprise customers, highlighting its ease of setup and relatively low price point. *Id.* ¶¶ 4–6.  But the platform itself is capable of serving larger enterprises—and some large enterprise customers, including retail and hospitality companies operating thousands of locations, already use Instant On today.  *Id.* ¶ 6.  Instant On's existing wired and wireless customers include customers of all sizes and industries, such as ███████████████████████████████ ████. Opp. Ex. 79 at -063.

Further, Instant On's operating system, AOS8, is the same operating system used in the vast majority of HPE's Aruba-branded access points deployed today, except that some features for those access points are disabled (such as location services, automatic quality of service, and firewall capabilities) to make the product more user-friendly for SMB customers.  ECF 298-3 (Hughes Decl.) ¶¶ 7–8.  The purchaser of the Instant On business will receive a license to the full AOS8 code base for WLAN and can *turn those features on*—enabling them to immediately offer WLAN products and features that appeal to large enterprises.  *Id.* ¶ 8; Ex. 19 (Rahim Tr.) 101:11−23.  With those features enabled, Instant On WLAN access points will have an even greater ability to compete directly against HPE's Aruba offering—further strengthening competition.  ECF 298-3 (Hughes Decl.) ¶¶ 8–9.

The States nevertheless assert that, even with enterprise features enabled, entry barriers and switching costs would prevent the divestiture buyer from serving large customers, Opp. at 41–42, despite the fact that Instant On is already used by some large enterprises today.  They provide meager support for this claim, consisting of DOJ's unproven allegations in its pretrial brief, a handful of cherry-picked statements about "incumbent" advantage in the market, and the testimony of their expert, Dr. Shapiro, who simply regurgitates the claim of DOJ's trial expert, Dr. Remer, that barriers to entry are supposedly high.  *Id.*  The States ignore the substantial contrary evidence—including testimony from industry analysts, customers, and market participants—showing that entry and expansion in WLAN is not only feasible but frequent.  Opp. Ex. 24 (Hill Rep.) ¶¶ 208–16.  Since 2015, at least five new players have entered the market—three through acquisition (Arista, Extreme, CommScope/Ruckus) and two through organic entry (Nile and Meter).[55]  *See id.*  That alone is enough to establish low entry barriers.  *See United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 982−84 (2d Cir. 1984) (prior entry and expansion shows barriers are low).

Existing WLAN suppliers recognized this dynamic.  HPE identified Nile as a direct and growing threat, predicting that Nile would "progress from engaging with small organizations to large

---

[55] Indeed, industry participants are shifting focus to innovative delivery models, i.e., networking as a service ("NaaS"), as the next frontier of innovation, which has supported new entry into the WLAN space in the last several years. *See* ███████████████████████████ *see also* Defs. FOF/COL ¶¶ 76−77.

39

enterprises, including the Aruba installed base." ECF No. 200-3 (Ex. 10 to Defs. Pretrial Br.) at -300-01.[56] ████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 24 (HPE-TUNNEY-0001018) at -044; *see* ECF No. 201-1 (Defs. Pretrial FOF/COL) ¶ 77.  Nile has, in fact, expanded rapidly, adding channel partners and landing major customers such as ████████ and the University of Denver.  *See* ECF No. 201-8 ████████████████████████████████████████; ECF No. 200-9 ████████████ ██████████████████████████████ Ubiquiti—which began by targeting SMBs—quickly penetrated up-market to larger enterprises ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████; *see also* Ex. 1 (Schultz Tr.) 140:19−141:2 (explaining that Ubiquiti started with SMB customers then expanded to larger ones); ECF No. 369-4 (Hill Decl.) ¶ 14.

The States also argue that Instant On's WLAN share is currently small, so the remedies must be rejected.  Opp. at 41.  But Instant On's current market share says nothing about its competitive potential; it reflects only that the product is relatively new and has been deliberately positioned by HPE as a SMB-focused offering.  A divestiture buyer will not be bound by those constraints and, once the product's latent enterprise-grade features are activated, will have an even greater ability to compete against Aruba's offering.  Further, while Instant On's WLAN annual revenue is roughly $30 million (out of a total annual revenue of over $130 million), the States ignore that even the DOJ's own trial expert found a mere $63 million in anticompetitive harm (an inflated number based on unsupported assumptions)—so the size of Instant On's presence (even now, with the larger enterprise-features disabled) is comparable to the small harm at issue.

### c.    The States Mischaracterize The Auction Process

████████████████ have expressed interest in the AI Ops license and Instant On business ████ ████████████████████████████████████████████████████████████████ ECF No. 369-2 (Sturz Decl.) ¶ 4. ████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[56] Reference to "Defs. Pretrial Br. Ex." and exhibit numbers that follow refer to the previously submitted exhibits to the Defendants' Pretrial Brief by the exhibit numbers used therein.  *See* ECF No. 200; *see also* Decl. of Beth Wilkinson in Support of Defendants' Pre-Trial Brief.

40



████████████████████████████████████████. *Id.* The ████████████████████████████
████████████████████████████████████████—further demonstrates the value of the settlement remedies.[57]

The States try to recast ordinary and expected features of a competitive auction into evidence that the remedies are inadequate. ████████████████████████████████████
████████████████████████████████ Opp. at 42–43, 45. That is pure conjecture. In any commercial sales process, the pool of parties that enters into NDAs is far larger than the group that ultimately submits a bid; parties routinely decline to bid for reasons that have nothing to do with the assets' competitive value. Receiving a *single* bid for an asset is a significant accomplishment in an auction process; ████████████████████████████████████████.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Nor is there any merit to the States' suggestion that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 19 (Rahim Tr.) 75:4−8 ████████████████████████

---

[57] In any event, ████████████████████████████████—which it does not, as discussed below—any lack of value in Mist AI Ops would cut the heart out of DOJ's merits theory that Mist AI Ops drove Juniper's growth, *see* Compl. ¶¶ 6−7, and not change the fact that the remedies reasonably address the Complaint's allegations.

41

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ Opp. at 45.  That ignores the competitive dynamics of the networking industry, where leveraging an established position in adjacent segments to expand into WLAN is a well-tested and successful strategy.  *See* ████████████████████ ██████  Arista and Fortinet are prime examples: they used their strong positions in datacenter switching and network security, respectively, to enter the WLAN market and cross-sell WLAN to existing customers, rapidly gaining traction across diverse verticals including higher education, hospitality, healthcare, banking, retail, and insurance.  *See* Ex. 25 (HPE-TUNNEY-0031771) -781, -783; ██████████████████████████████  ██████████████████  ██ ████████████████████.  As Rahim testified, the AI Ops license would give any acquirer a powerful head start in building an enterprise WLAN portfolio, accelerating the same kind of successful adjacencies-based market entry that has occurred in this industry.  Ex. 19 (Rahim Tr.) at 70:22–71:2; ECF No. 369-4 (Hill Decl.) ¶ 14.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

**4.      The States Ignore Serious Flaws In The DOJ's Case**

It is axiomatic that the review of a consent decree is "not a decision on the merits."  *Or.*, 913 F.2d at 580; *Bechtel*, 648 F.2d at 663 ("the rule against reviewing the merits of consent decrees" precludes review of the merits in a review of a consent decree).  The very purpose of the parties'

settlement was to avoid a trial on the merits, and the States cannot ask the Court to make such a merits' determination based on declarations submitted in advance of a Tunney Act hearing. *Supra* Section II.D.1. This, however, is precisely what the States have asked this Court to do. While the Court should resist the State's invitation to engage in such a merits analysis, HPE is confident that any review of the merits will lead to the same conclusion reached by the DOJ staff that investigated this transaction for over a year: this is a case that should not have been filed.

The DOJ's case was not, as the States baldly state, "very strong." The overwhelming evidence developed before and during the litigation show that it was more likely than not that the DOJ would lose if the case proceeded to trial. At a minimum, the serious weaknesses in the DOJ's case—and serious defenses raised by HPE—show it was more than "reasonable" for the DOJ to settle. *See Randolph*, 736 F.2d at 529 (court's role is simply to "ensure[] that the proposed judgment is reasonable"). And the decision of antitrust regulators around the world further confirms the reasonableness of the DOJ's decision. Every other antitrust authority that reviewed the transaction approved it or allowed their waiting periods to expire without taking action. ECF No. 369 at 12.

The States simply ignore the innumerable flaws that created serious litigation risk for the DOJ. This section sets out those shortcomings and shows that neither the States' brief nor Dr. Shapiro's declaration add any substantive analysis.

### a.   States' Selective Presentation Of Evidence Is Misleading

Parroting the DOJ's anecdote-driven theory from the litigation, the States assert that the DOJ could have established at trial that "HPE and Juniper were closer competitors than their market shares suggest." Opp. at 36. But DOJ would have faced serious difficulty proving that quantitative data supported enjoining the merger. The data showed HPE and Juniper were not one another's closest competitors, nor were they more focused on one another than other competitors. Hill Decl. ¶¶ 14−22. In fact, their WLAN offerings were differentiated and supported different groups of customers, *Id.* ¶¶ 14−16; a small fraction of customers ranked HPE and Juniper as first and second choices, *id.* ¶¶ 21−22; and customers infrequently switched from one to another, *id.* ¶¶ 17−20. HPE did not discount more when facing Juniper versus other competitors, nor were its margins higher when facing Juniper as compared to other competitors. Bailey Decl. ¶¶ 33−36. The data simply does not show HPE and

Juniper competed more closely with one another than anyone else.

The States ignore this data, and instead highlight two categories of documents that were previously cited by the DOJ: (1) emails from a "Beat Mist" mailing list that they claim proves unique head-to-head price competition and pricing maverick behavior by Juniper, and (2) documents related to Project Gravity, which the States argue is evidence that Juniper was an innovation maverick due to its allegedly market-defining use of AI and other cutting-edge features. Opp. at 10–11. As HPE has explained throughout this litigation, the "Beat Mist" documents are not unique. *See* ECF No. 200-1 (Defs. Pretrial Br.) at 17. There are numerous documents from HPE and competitors discussing "beating," "taking out," or even "killing" all of the competitors that the States argue are irrelevant: Ruckus, Fortinet, Arista, Ubiquiti, and Extreme. *See, e.g.*, ECF No. 200-1 (Ex. 1 to Defs. Pretrial Br.)at -857, -878, -906; ECF No. 200-7 (Ex. 46 to Defs. Pretrial Br.) at -766; ECF No. 200-4 (Ex. 11 to Defs. Pretrial Br.) at -819–20; ECF No. 200-3 (Ex. 4 to Defs. Pretrial Br.) at -181; ECF No. 200-3 (Ex. 8 to Defs. Pretrial Br.) at -504; ECF No. 200-5 (Ex. 24 to Defs. Pretrial Br.) at -674. And HPE R&D utilization data shows that Project Gravity was not directed at Juniper or any specific Juniper capability, used only a small share of HPE's WLAN R&D resources, and was part of a wider industry trend toward automation. Bailey Decl. ¶¶ 50−56. Dr. Shapiro does not address these findings.

Enterprise-grade WLAN is a dynamic, rapidly changing technology market with eight or more fierce competitors that consistently battle for share against one another and, most often, against Cisco. Several of these competitors are networking industry giants with market capitalizations comparable to or even well above even post-merger HPE, with the financial wherewithal to continue investing and fiercely competing for WLAN customers. ECF 200-1 (Defs.' Pretrial Br.) at 7−9.[58] Moreover, low entry barriers in the enterprise-grade WLAN market cause market shares to *understate* the competitive intensity of the industry. Multiple players focused on a network-as-a-service ("NaaS") business model have recently entered the market, including Nile, Meter, and Join

---

[58] The States assert that HPE only considered Cisco, Juniper, and itself "tier 1" WLAN competitors, *see* Opp. at 6, but omit that by January 2025, HPE's internal competitive team considered Extreme and Fortinet as tier 1 WLAN competitors, *see* Ex. 27 (HPE-TUNNEY-0035054) at -084 (Extreme is tier 1 WLAN competitor); Ex. 28 (HPE-TUNNEY-0038149) at -170 (Fortinet is tier 1 WLAN competitor).

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

Digital, among others.  *See* ████████████████████████████████████████████ ████████████████████████████████████████  ██████████████████████████████████; *see also* ECF No. 200-9 ██████████████████████████████ ████████████████████████████████.  Others are interested in using the auction process resulting from the settlement as a lever to enter WLAN.  ECF No. 369 at 2.  The fact that barriers to entry and expansion are low is itself enough to show that the DOJ's case was meritless.  *See United States v. Syufy*, 903 F.2d 659, 671 n.21 (9th Cir. 1990) ("lack of entry barriers prevents the government from prevailing.").

### b.    Dr. Shapiro's Declaration Adds No Substance

Dr. Shapiro purports to "assess the strength of the DOJ's challenge to [the merger]."  Shapiro Decl. ¶ 4.  But Dr. Shapiro has not conducted an analysis of his own.  Instead, he incorrectly asserts that the fact that the merger results in an HHI increase that exceeds the Government's "Merger Guidelines" creates a practically irrebuttable presumption of competitive harm, and offers a perfunctory comparison of Dr. Remer's report to the first reports from Drs. Bailey and Hill.  He also completely ignores the surrebuttal reports of Drs. Bailey and Hill.  Taking Dr. Remer's assumptions and conclusions as established facts, Dr. Shapiro simply agrees with Dr. Remer, disagrees with Drs. Hill and Bailey at a conceptual level, and moves on.  At no point does Dr. Shapiro demonstrate that he pressure-tested, verified, or re-ran any quantitative analyses conducted by Dr. Remer, Dr. Bailey, or Dr. Hill.  And Dr. Shapiro commits several analytical errors.

***Misleading overreliance on HHIs.***  Recognizing that the case lacks the typical hallmarks of a successful horizontal merger challenge—high combined market shares, a small number of competitors, and customer complaints—Dr. Shapiro instead places significant weight on the importance of the merger exceeding the HHI threshold in the 2023 Merger Guidelines, Shapiro Decl. ¶¶ 14–18, and says this means the DOJ would have achieved a presumption of harm that would have virtually guaranteed victory at trial, *see id.* ¶¶ 10.i, 12–13.

This misstates the law and the facts of the case.  The HHI thresholds in the Merger Guidelines are not law—they are not binding even on the DOJ, as evidenced by the fact that the HHI thresholds themselves have changed over time as policy preferences change.  *See Olin Corp. v. F.T.C.*, 986 F.2d

1295, 1299 (9th Cir. 1993) (HHI thresholds in DOJ guidelines "are not binding on the Courts"); *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 151 (D. Mass. 2024) (exceeding Guidelines' thresholds "does not, on its own, sustain a prima facie case"). The HHI thresholds are merely an initial screen used by agencies as a starting point when analyzing mergers, not irrefutable proof of harm. Hill Decl. ¶ 30; Bailey Decl. ¶¶ 15–16.

The only threshold with legal significance is the 30% market share threshold established by the Supreme Court, which creates a rebuttable presumption of competitive harm. *See Phila. Nat'l Bank*, 374 U.S. at 363. All the economic experts agree that, prior to the merger, the combined share of HPE and Juniper was below the 30% threshold. And according to Dr. Shapiro's own research, nearly all successful DOJ- and FTC litigated merger challenges over the last 25 years have involved a combined share of more than 30 percent. *See* Hill Decl. ¶¶ 34–37. Yet Dr. Shapiro and the States say the 30% market share threshold doesn't matter, and double down on the non-binding HHI thresholds. Opp. at 32−33; Shapiro Decl. ¶ 18.

But not only are the HHI thresholds not law, Dr. Shapiro's own academic work shows that the DOJ has often lost cases involving *far* more significant increases in HHI than in this case. In a 2024 article, Dr. Shapiro assessed the DOJ's and FTC's combined litigation win rate in merger cases brought by the Biden administration. His own finding was that, even in cases where the HHIs far exceed those thresholds—and far exceed the HHI levels associated with *this* merger—the FTC and DOJ were successful in challenging only three out of six cases that went to trial. Hill Decl. at ¶ 36. Dr. Hill presented an analysis showing that the change in concentration in this merger is more than 1,000 points below the average HHI increment in litigated merger challenges between 2000 and 2024, which he calculated *using Dr. Shapiro's published research*. Hill Decl. ¶¶ 10−13. Dr. Shapiro's academic research shows that, between 2010 and 2020, the average post-merger HHI in litigated mergers was 5,805, and the average increase in HHI was 1,983. Hill Decl. ¶ 35. Dr. Shapiro nevertheless suggests in this *case* that there is a "relatively strong presumption of harm" where Dr. Remer had calculated the post-merger HHI as only 3,874 (largely driven by Cisco's size) and the HHI increase as merely 343. Shapiro Decl. ¶¶ 17, 21. Dr. Shapiro does not explain how this assertion aligns with his research showing that (1) litigated merger cases involve HHI increases that are several

46

times the increase in *this* case and (2) even in those cases with far greater HHI increases, the Biden DOJ only won at trial 50% of the time.

***No correction of Dr. Remer's errors.*** Dr. Shapiro fails to engage with the many shortcomings in Dr. Remer's analyses, including basic calculation and mathematical errors, brought to light in rebuttal reports from Drs. Hill and Bailey and during his deposition. *See, e.g.*, Hill Rep. ¶¶ 124–125 (correcting Dr. Remer's market share calculations for several market participants); *id.* ¶¶ 126–136 (addressing analytical errors in Dr. Remer's "projected growth" market shares); Bailey Report ¶¶ 16–18, 80–90 (showing that Dr. Remer failed to use quantitative methods of assessing coordinated effects and harm to innovation); Remer Dep. 64:11–68:10 (Dr. Remer's failure to assess most current data in the litigation, leading to issuance of an errata report, was "an oversight"). These errors would have caused the DOJ serious difficulty at trial, as they suggest a lack of rigor in his analysis that undermines his conclusions.

Dr. Shapiro also fails to address the fact that Dr. Remer intentionally omitted analyses that he ran that supported Dr. Bailey's conclusion that Juniper was not a particularly aggressive competitor. *See* Bailey Decl. ¶ 5; Bailey Surrebuttal Report ¶ 1–5. Specifically, Dr. Remer's analysis of discounts that HPE offered when facing Juniper versus other competitors showed that HPE did not offer larger discounts when facing Juniper as compared to the discounts it offered when facing other competitors. Bailey Surrebuttal Report ¶ 5. When confronted with this concealment during his deposition, Dr. Remer falsely claimed that the code he removed from his report was Dr. Bailey's code. *Id.* ¶¶ 6–9; Remer Dep. 418:5–420:21.

Dr. Shapiro also does not consider Dr. Remer's incorrect application of assumptions to his economic models that are not standard in merger analysis and inconsistent with the competitive dynamics in this market, points that were also raised in Dr. Remer's deposition. Most notably, in his first-score GUPPI model, Dr. Remer assumes that firms pass through 100 percent of cost increases down to customers. Remer Tr. 313:12–13. This assumption is contrary to Dr. Remer's own academic work, which states that a "precise" pass-through rate must be calculated to achieve an accurate result from an economic model. *Id.* 318:17–319:14. When confronted with this at his deposition, Dr. Remer repeatedly refused to specify whether he had calculated a pass-through rate.

47

*Id.* 313:11–331:16. Even using nonstandard assumptions to weight his models entirely in the DOJ's favor, Remer's model that most resembles competition for enterprise-grade WLAN—his second score auction model—predicted a price increase so small that it would also be consistent with the merger resulting in no harm to customers. If the model were more neutrally weighted, this finding of harm would be eliminated or, at the least, further reduced. *Id.* 331:4−331:16.

Finally, Dr. Shapiro reiterates Dr. Remer's reliance on documents cherry-picked to show HPE and Juniper were particularly close competitors. *See* Shapiro Decl. ¶¶ 27−37, 47−55. By completely ignoring the many documents that show that HPE also competes with many other players, Drs. Shapiro and Remer draw an unsupportable conclusion that HPE and Juniper did not compete with any company beyond each other. To the contrary, the record is replete with evidence that HPE and Juniper competed, and HPE today competes ferociously with a litany of other competitors. Defs. Pretrial Br. at 10; Hill Decl. ¶¶ 17−20. Data confirm this, showing HPE does not discount more or achieve lower margins when competing against Juniper. Bailey Decl. ¶¶ 32−37. Cisco is HPE's most significant rival: Cisco is identified in HPE's sales tracking data as its primary competitor in at least 80% of WLAN opportunities, measured by opportunity value, while Juniper is HPE's primary competitor in only a single percentage of opportunities. Hill Rep. ¶¶ 218−20, Fig. 34.

***Dr. Shapiro's innovation analysis is deeply flawed.*** Dr. Shapiro claims the DOJ would have succeeded in showing that the transaction would reduce innovation by taking an overly narrow view of what constitutes innovation competition in the WLAN industry and innovation incentives arising from mergers. Shapiro Decl. ¶¶ 38–55. First, he ignores economic literature showing that mergers that deduplicate R&D efforts in fact tend to *increase* innovative efforts by the merged firm— including his own writing on the subject. Bailey Decl. ¶¶ 39–41. Second, Dr. Shapiro and the States completely discount the innovative activity of other firms in the WLAN and adjacent markets. Dr. Bailey shows that these efforts are real, numerous, and highly relevant to market-level initiatives in WLAN innovation. *Id.* ¶¶ 42–48. In response to Dr. Shapiro's and the States' suggestion that Project Gravity was aimed only at Juniper, Shapiro Decl. ¶ 51; Opp. at 10, Dr. Bailey details the AI Ops-related R&D efforts throughout the WLAN industry, including by HPE, Bailey Decl. ¶¶ 49–56. Project Gravity and other AI Ops innovation projects account for a small share of HPE's Aruba

48

Networking's overall R&D headcount. Bailey Decl. ¶¶ 49–56. In sum, Dr. Shapiro and the States offer nothing new to dispute Dr. Bailey's original rebuttal report regarding innovation effects.

***Overly simplistic coordinated effects standard.*** Dr. Shapiro relies on little more than HHI-concentration levels to argue the merger will enhance the risk of coordinated behavior. Shapiro Decl. ¶¶ 56–68; Opp. at 34–36. Curiously, Dr. Shapiro approaches coordinated effects through the lens of a structural presumption, asserting that HPE has some obligation to show that "conditions in the relevant market . . . are especially unfavorable to coordination." Shapiro Decl. ¶ 60. But again, the mere fact that the merger barely exceeds HHI thresholds in the Merger Guidelines does not create any legal presumption at all. *Supra* Section II.D.b. In any event, HPE presented a robust analysis demonstrating the enterprise-grade WLAN market does not exhibit *any* of the typical risk factors for coordination. Bailey Decl. ¶¶ 16–31. There have been no instances of prior coordination or attempts to coordinate, enterprise-grade WLAN products are differentiated, competitive information is not transparent nor readily observable, and WLAN vendors have different incentives based on varying product portfolio mix and product specialization. *Id.* As with the innovation theories, Dr. Shapiro's coordinated effects analysis simply parrots Dr. Remer's analysis, declines to grapple with any of the evidence presented by HPE or its experts to the contrary, and concludes that coordinated effects are likely.

***Shapiro's settlement analysis framework is completely invented and untethered to the Tunney Act.*** Shapiro also proposes a framework under which a court should reject a settlement whenever "the probability that DOJ would win the merger challenge is larger than the share of the harm to customers eliminated." Shapiro Decl. ¶ 121. Unsurprisingly, he cites no case law supporting this framework—because none exists. His proposal is both practically unworkable and directly contrary to the limited public interest review mandated by the Tunney Act. If adopted, it would require the Court to undertake the impossible task of quantifying the DOJ's likelihood of success in a hypothetical merits trial that never occurred, as well as quantifying the exact amount of "harm" avoided by the settlement. This approach flies in the face of the Tunney Act caselaw establishing that the Tunney Act is not a vehicle for adjudicating the merits, and that a settlement cannot be rejected based on the conclusion that some other settlement would have been "better." *Supra* Section

49

II.D.1. Further, Dr. Shapiro has not attempted to show, and cannot show that his made-up standard supports rejecting the settlement in this case. The DOJ was more likely to lose than win, Dr. Shapiro's criticisms of the agreed remedies are ill-supported, and Dr. Shapiro has failed to quantify any economic harm of the merger and the value of the agreed remedies.

### IV.     CONCLUSION

The Amended Proposed Final Judgment should be entered.

HPE'S REPLY IN SUPPORT OF MOTION FOR ENTRY OF FINAL JUDGMENT
CASE NO. 5:25-cv-00951

Dated: March 16, 2026

By: */s/ Samuel Liversidge*

Samuel G. Liversidge (Bar No. 180578)
Eric Vandevelde (Bar No. 240699)
Daniel Nowicki (Bar No. 304716)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
SLiversidge@gibsondunn.com
EVandevelde@gibsondunn.com
DNowicki@gibsondunn.com

Stephen Weissman (*pro hac vice*)
Michael J. Perry (Bar No. 255411)
Kristen C. Limarzi (*pro hac vice*)
**GIBSON, DUNN & CRUTCHER LLP**
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
SWeissman@gibsondunn.com
MJPerry@gibsondunn.com
KLimarzi@gibsondunn.com

Julie S. Elmer (*pro hac vice*)
Jennifer Mellott (*pro hac vice*)
**FRESHFIELDS US LLP**
700 13th St NW
Washington, DC 20005
Telephone: (202) 777-4500
julie.elmer@freshfields.com
eric.mahr@freshfields.com
jennifer.mellott@freshfields.com

Justina K. Sessions (Bar No.  270914)
**FRESHFIELDS US LLP**
855 Main St
Redwood City, CA 94063
Telephone: (650) 618-9250
justina.sessions@freshfields.com

*Attorneys for Defendant*
*HEWLETT PACKARD ENTERPRISE CO.*

51