PHILIP J. WEISER
Attorney General
ARTHUR BILLER (*pro hac vice*)
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
         Bryn.Williams@coag.gov

*Attorneys for Intervenors*

[Additional counsel listed on signature page]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. 5:25-cv-00951-PCP |
| *Plaintiff,* | ) **INTERVENORS' SURREPPLY IN OPPOSITION TO MOTION FOR ENTRY OF FINAL JUDGMENT** |
| vs. | ) |
| HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC. | ) **REDACTED VERSION** |
| *Defendants.* | ) Judge: P. Casey Pitts<br>) Action Filed: January 30, 2025<br>) Hearing: March 23, 2026 at 10:00 am |

**TABLE OF CONTENTS**

ARGUMENT ..................................................................................................................... 1

    I.     Additional Evidence Further Shows the DOJ Is Not Entitled to Deference .............. 1

    II.    HPE Is Wrong About the Structural Presumption. ...................................................... 4

    III.   The US and HPE Fail to Show the Competitive Impact of the Settlement. .............. 5

         A.    The AIOps for Mist Source Code License. ................................................. 6

             1.     HPE Fundamentally Mischaracterizes the Issue .......................... 6

             2.     The License Does Not Include Key Mist Features. ..................... 7

             3.     The Settlement Is Ambiguous ................................................... 10

             4.     The License Is Not "Comprehensive Structural Relief." ........... 10

         B.    There Is No Reason to Believe the Settlement Aids Competition. ............ 11

CONCLUSION ............................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.D.C. 2001) .................................................................................................. 4
*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .............................................................................................. 12
*St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) .................................................................................... 4, 5, 11
*United States Sugar Corp.*,
  C.A. No. 21-1644 (MN), 2022 WL 4544025 (D. Del. Sept. 28, 2022) ............................. 5
*United States v. Bazaarvoice, Inc.*,
  No. 13-cv-00133-WHO, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ............................... 12
*United States v. Booz Allen Hamilton Inc.*,
  No. CCB-22-1603, 2022 WL 9976035 (D. Md. Oct. 17, 2022) ......................................... 5
*United States v. UnitedHealth Grp., Inc.*,
  630 F. Supp. 3d 118 (D.D.C. 2022) ................................................................................... 5

**Statutes**

15 U.S.C. § 16 .......................................................................................................................... 6, 10

**Other Authorities**

U.S. Dep't of Just. & FTC, Merger Guidelines (2023) ............................................................... 7

The HPE and US replies are heavy with strawman arguments and ad hominem attacks, but light on the merits. This is because the merits are clear: The Settlement does not address the very real anticompetitive impacts of this merger. The States here submit certain additional evidence from discovery conducted shortly before or after the States' opposition, and respond to certain new information or arguments in the replies, which tend to misstate the record and the law.[1]

## ARGUMENT

### I.    Additional Evidence Further Shows the DOJ Is Not Entitled to Deference.

Mr. Alford produced documents shortly before, and after, the States' opposition was due. Those documents further illustrate that the decisive round of settlement negotiations and the DOJ's decision to accept the Settlement were devoid of the kind of principled and fair evaluation of the merits that would warrant the kind of deference that the DOJ had earned over the course of decades.

**Typical Appeal Processes Do Not Prompt Retaliatory Firings**. The record is replete with evidence that political influence corrupted the settlement process, despite HPE and the US's contentions otherwise. This was not run of the mill aggressive lawyering through ordinary appeal channels. Messrs. Levi, Davis, and Schwartz's considerable political pressure to cut ATR out of the process reoriented settlement negotiations around considerations and terms that do not address competitive concerns.

On the evening of July 24, Mr. Alford told family members that he was ███████ ██████████████████████████████████ ███████████████████████████ Ex. 205 (HPE-ALFORD-0000151). The next day, he messaged the Dean of Notre Dame Law School, where he had worked before re-joining the DOJ in 2025. He told the Dean: ████████████████ ██████████████████████████ Ex. 207 (HPE-ALFORD-0001674). He explained: ███████████████████ ████████████████████████████████

---

[1] The States will not endeavor here to respond to every piece of misinformation by HPE and the US, particularly as to the settlement process. The contemporaneous documentary evidence largely speaks for itself.



██████████████████████████ *Id.* He described the situation as ████████████ ████████████████████████ *Id.* This communication echoed others where Mr. Alford recounted the same chain of events. For example, he explained: ████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ Ex. 209 (HPE-ALFORD-0001701). He told friends: ██ ████████████████████████████████████████ Ex. 202 (HPE-ALFORD-0000035).

On July 26, Chetan Sanghvi texted Ms. Slater, Mr. Alford, Mr. Rinner, and Mr. Hamer. Alford said to the group ████████████████████████████████████ ████████████████████████████████████████████ Ex. 203 (HPE-ALFORD-0000076). He relayed that he and Mr. Rinner had calls with Chief of Staff and Acting Associate Attorney General Chad Mizelle on Monday afternoon, which was July 28.

On July 28, Alford informed the Tech Policy Institute, where he had been scheduled to speak in his official capacity, that ████████████████████████████████ ████████████████████████████ Ex. 206 (HPE-ALFORD-0001140). He explained that he would not be able to speak as a DOJ official but may do so as a Notre Dame professor. *Id.* They welcomed him to speak in any capacity. *Id.*

Zealous advocacy through typical channels does not generally prompt firing front office leadership and the total exclusion of subject matter experts—facts that both HPE and the US conveniently ignore.

**Threats and "Boozy Meetings" Fueled HPE's Settlement Efforts**. Neither the US nor HPE disproves the threats to Ms. Slater and her deputies. The US is silent, and HPE simply claims that Mr. Alford would have produced documents about it if it had occurred. *See* Dkt. 436 at 28. But Mr. Alford testified that Ms. Slater showed him the threatening text messages that HPE's Mr. Davis

sent to her, and Mr. Davis later took credit for Ms. Slater, Mr. Rinner, and Mr. Alford's firing. *See* Dkt. 417 at 21-22, 27. And Mr. Davis is not shy about advertising his influence. After the Settlement, Mr. Davis posted on X: "I'm a (very) effective attorney for my clients. One of the best in DC. You may have read about that in the paper lately. When the losing attorneys (anonymously) cry to reporters."[2] Ms. Slater shared the post with Mr. Alford and Mr. Rinner, noting ███████

██████████████ Ex. 200 (HPE-ALFORD-0000011). Mr. Rinner commented that Mr. Davis is ████████████████████████████████████████████████████

████████████████████████ *Id.*

As for Mr. Levi, his influence over DOJ leadership appointments gave him considerable leverage over the DOJ officials before which he appeared. And Mr. Alford's recent production suggests they wielded that power at ███████████████████ Ex. 204 (HPE-ALFORD-0000079). Mr. Davis and Mr. Levi held unique power over the continued employment of ATR and DOJ leadership that counsel for dissatisfied litigants in the ordinary course typically do not, and then exercised that power.[3]

**ATR Was in the Dark Until Filing**. Contemporaneous communications in Mr. Alford's production makes clear that ATR did not know a settlement was reached until hours before filing. The morning of June 27, Mr. Rinner texted Mr. Alford asking for any updates, which he did not have. Ex. 199 (HPE-ALFORD-0000001). After settlement, Mr. Rinner and Mr. Alford discussed press coverage regarding unusual trading activity surrounding it, and Mr. Rinner confirmed that ██ ████████████████████ Ex. 207 (HPE-ALFORD-0001647).

**National Security Concerns Did Not Impede the Lawsuit.** HPE places significant emphasis on national security concerns, even though the US has disclaimed that there is any national security justification at issue here. *See* Dkt. 311 at 19. HPE also failed to put any national security justification into the CIS, which they drafted. And there is zero evidence that anyone at the DOJ ever held a classified briefing to even discuss potential national security issues, nor is there any

---

[2] Mike Davis (@mrddmia), X (Aug. 8, 2025 7:04 pm), https://x.com/mrddmia/status/1953260938695721232?s=10.

[3] It is unclear what kind of zealous advocacy HPE expected Mr. Davis to provide in light of his lack of antitrust experience. Ex. 196 (Davis Dep.) at 46:20-47:5 (did not know what HHI means).

evidence that the decision to settle was based on national security concerns.  Mr. Alford's recent production also shows that there were no national security concerns: ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████ Ex. 201 (HPE-ALFORD-0000021).  The States do not argue that the DOJ could not, in theory, consider national security in settling a case, but that *in this case*, the US has not claimed any national security justification and there is no evidence that the decision to settle was due to any national security concern.

**A Corrupt Process Produced a Deficient Result.** Cutting ATR out of settlement negotiations meant that DOJ representatives were not equipped to reach a settlement with meaningful competitive impact.  Mr. Mizelle, for example, testified that he did not know about the CIS or why it was filed.  Ex. 197 (Mizelle Dep.) at 58:2-59:3, 61:22-62:19.  So when Mr. Alford reported that Mr. Mizelle had ███████████████████████████████ ███████████████████████ he was lamenting a settlement that was driven by things other than competition analysis, and that ATR knew it.  *See* Ex. 207 (HPE-ALFORD-0001674).

To be clear, the issue here is not simply that superiors overruled ATR.  It is that ATR was totally excluded from the decisive round of negotiations; DOJ leadership who have no antitrust experience made the decision to settle either without ATR's involvement, or against their advice; the Settlement entered into was one that had previously (and rightly) been rejected as insufficient; HPE drafted the CIS, with no substantive edits from DOJ, and it was filed mere hours after the DOJ received it; threats were made to AAG Slater, her top deputies were fired, and eventually so was she, with HPE's lobbyist gloating that he was responsible for it.  None of that is normal, and it is disturbing for anyone to suggest otherwise.  There can be no deference under these circumstances.

**II.    HPE Is Wrong About the Structural Presumption.**

The Ninth Circuit is clear: "Sufficiently large HHI figures establish the [government's] prima facie case that a merger is anti-competitive." *St. Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th Cir. 2015) (citing *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.D.C. 2001)).  The Ninth Circuit unequivocally relied on the Merger Guidelines (at that time,

the 2010 iteration), to state that "Mergers that increase the HHI more than 200 points and result in highly concentrated markets are 'presumed to be likely to enhance market power.'" *Id.* (citing 2010 Merger Guidelines § 5.3). Even Dr. Hill's analysis shows that this merger exceeds the threshold for the structural presumption and that, pursuant to binding Ninth Circuit law, there could be no dispute that the US had established a prima facie case. Dkt. 417-1 (Shapiro Decl.) ¶¶ 17-18.

HPE's assertion that Professor Shapiro's academic work shows the government "has often lost cases involving *far* more significant increases in HHI than in this case" is flat wrong. *See* Dkt. 436 at 46. HPE points to three cases the government lost as support for that assertion. *See* Dkt. 436-2 (Hill Decl.) ¶ 36 & Fig. 10. But those losses were not the result of a court finding that higher HHIs than those here failed to establish a structural presumption; indeed, in no case in which the government's proposed market was accepted did a court find that the government failed to establish the structural presumption. Rather: in the United/Change merger, the court determined that a complete divestiture of the overlapping business line, offered by the merging parties, resolved the anticompetitive concerns of the merger, *United States v. UnitedHealth Grp., Inc.*, 630 F. Supp. 3d 118, 135-140 (D.D.C. 2022); in the US Sugar/Imperial Sugar merger, the court found the "Government has failed to identify the proper relevant market because its product market and geographic markets ignore the commercial realities," so there was no discussion of HHIs, *United States v. United States Sugar Corp.*, C.A. No. 21-1644 (MN), 2022 WL 4544025, at *19 (D. Del. Sept. 28, 2022); and in the Booz Allen/EverWatch merger, the court likewise ruled that the government had failed to establish a relevant market, so there was no discussion of HHIs, *United States v. Booz Allen Hamilton Inc.*, No. CCB-22-1603, 2022 WL 9976035, at *9-13 (D. Md. Oct. 17, 2022). Two of these cases therefore failed on market definition, and the other involved a divestiture that remedied the problem. These cases do not show that the HHIs here are somehow too low to establish a presumption that the HPE/Juniper merger is anticompetitive. *See also* Shapiro Reply Decl.

**III.    The US and HPE Fail to Show the Competitive Impact of the Settlement.**

For all the talk the US and HPE do about the need to evaluate the Settlement pursuant to the mandatory Tunney Act factors, they fail to provide any such analysis for the Court. The Court must

consider "the competitive impact of such judgment, including termination of alleged violations," and "the impact of entry of such judgment upon competition in the relevant market." 15 U.S.C. § 16(e)(1). As there is no dispute the merger exceeds the structural presumption, HPE and the US must show that the Settlement will benefit competition in *some way*, even if it does not entirely remedy the merger's harms. But they fail to do so.

### A.  The AIOps for Mist Source Code License.

### 1.  HPE Fundamentally Mischaracterizes the Issue

A license of limited portions of Mist AIOps fails to move the needle on the competitive harm of this merger. HPE's argument to the contrary rests on a fundamental mischaracterization. It treats the AI Ops Mist Source Code License as if it were the sole concern in the Complaint. But the Complaint alleges a relevant market for enterprise-grade WLAN solutions, not a relevant market for the AI Ops Mist Source Code License. Nothing in the Complaint suggests that licensing Mist's AIOps Source Code would remedy the merger's harms. Rather, the Complaint highlights AIOps as one example of Juniper's innovation leadership as a maverick that helped shift the industry toward automated, AI-driven network management.

The Complaint is explicit on this point. It explains that

> [w]ith improvements in data collection and analysis, networking vendors like HPE and Juniper have introduced increasingly advanced features in their software solutions. Some of these features use artificial intelligence and machine learning to provide network administrators with greater insight into network performance and the causes of network failures. Others can automate functions traditionally performed by network administrators to meet customers' rising demand for tools that control management costs.

Dkt. 1 ¶ 17. The Complaint further explains that Juniper Mist users "have access to the Marvis Virtual Network Assistant, an interface that displays information in response to plain-language queries, and Marvis Minis, a tool that proactively searches for network misconfigurations and other potential issues, allowing network administrators to pinpoint and resolve connectivity issues before they impact users." *Id*. Critically, Mr. Friday confirms that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Friday Decl. ¶¶ 16–21.

- 6 -

Consistent with that understanding, the record confirms that the ███████ does not represent Juniper's current competitive edge today. As Mr. Friday acknowledges, the ███████ covers ███ six wireless SLEs that date back nearly a decade to 2016. Friday Decl. ¶¶ 7–9. During that time, competing WLAN vendors have developed their own advanced AIOps suites. *Id.* at ¶ 9. Cisco offers Meraki and Catalyst; Arista offers CloudVision; and Extreme offers ExtremeCloud IQ. *Id.* "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████." *Id.*

Market behavior confirms the ████████████████ ██████████████████████████.[4] The ████████████████ underscores what the record already shows—████████████████████████████████████████████████████████████

HPE and the US argue the Court should not ████████████████████████████████████████████████████████████ Dkt. 436 at 41–42; Dkt. 438-3 at 20-21. That may be so, but it fails to explain why the ████████████████████████████████████████████████████████████

Moreover, HPE and the US's assertions that the ████████████████████████████████████████████ does not address the relevant question: whether, and how quickly, ████████████████████████ could become a competitive constraint on Cisco and HPE in the relevant market. *See* Dkt. 436 at 42; Dkt. 438-3 at 18-19. As the Merger Guidelines instruct: "Entry must at least replicate the scale, strength, and durability of one of the merging parties to be considered sufficient." U.S. Dep't of Just. & FTC, Merger Guidelines § 3.2 (2023). HPE and the US do not even attempt to address this question.

### 2. The License Does Not Include Key Mist Features.

HPE defends the contents of the License based on ████████████████████████ ████████████████████████████████████████████████ But that is not the issue. The

---

[4] The US argues that bidder ████████████████ ██████████████████████████ Dkt. 438-3 at 21. But when asked if Juniper ████████████████████████████████████ when it was an independent company, Mr. Rahim confirmed "████████████████████████████████████████████████████████████████████." Ex. 198 (Rahim 2/26/2026 Dep.) at 69:11-24.

question is what is actually being licensed and whether that will mitigate the anticompetitive effects of the merger. HPE's attempt to confuse the issues harms rather than helps its case.

Notably, HPE's own corporate representative was not familiar with the contents of the AIOps for Mist Source Code License. HPE designated Juniper's former CEO, Rami Rahim, to testify regarding the technical aspects of the License. Ex. 198 (Rahim 2/26/2026 Dep.) at 14:1-7. In their reply briefs, HPE and the US both cite Mr. Rahim's testimony that the AIOps for Mist Source Code "is really the secret sauce of the Mist capability." *See* Dkt. 436 at 35-36; Dkt. 438-3 at 18; Ex. 198 (Rahim 2/26/2026 Dep.) at 23:1-3. However, Mr. Rahim "did not spend much time understanding what is in the license or not," and thus repeatedly testified that he was not sure of its contents. Ex. 198 (Rahim 2/26/2026 Dep.) at 130:8-12; *see, e.g., id.* 21:14-16 ("I don't know if the ███████ is specifically in the source code."); 22:9-15 ("I'm not 100 percent sure" if the license includes source code for the ████████████ ); 26:22-25 ("I'm not 100 percent sure" if it includes source code for █████████ ); 30:25-31:3 ("I don't know if it specifically includes ███ ."); 43:4-6 ("I don't know" if it includes the source code for █████████ ). Mr. Rahim also appeared unfamiliar with some aspects of the technology underlying Mist's WLAN capabilities, including ████████████████████████████████████████████████ ████████████████████████████████████████

Given the deficiencies in Mr. Rahim's testimony, it is unsurprising that HPE had to find someone else, Bob Friday, to respond to Dr. Ranganathan's observations regarding the AIOps for Mist Source Code License. But Mr. Friday's declaration is riddled with strawman arguments and hyperbole—an apparent effort by HPE to distract from the accuracy of Dr. Ranganathan's analysis and the many facts on which he and Mr. Friday agree.

Indeed, Dr. Ranganathan and Mr. Friday agree that the AIOps for Mist Source Code License includes ████████████████████████████████████ Dkt. 436-1 (Friday Decl.) ¶ 10; Dkt. 417-3 (Ranganathan Decl.) ¶¶ 24-25, 33. And, although HPE would have this Court believe otherwise, Dr. Ranganathan and Mr. Friday agree that the ████████████████ ████████████████████████████████████ Dkt. 436-1 (Friday Decl.) ¶ 12; *see* Dkt. 436 at 36. Dr. Ranganathan expressly states that "SLE metrics are computed through threshold-

based classification rules, not machine learning or artificial intelligence." Dkt. 417-3 (Ranganathan Decl.) ¶ 26. He is clear that the "data accumulation requirements" he describes—and which HPE mischaracterizes—"apply to the trained [machine learning] models . . . not to the SLE thresholds." Dkt. 417-3 (Ranganathan Decl.) ¶ 48. The machine learning models used to create and power Mist's ████████████████—the technology that differentiates Mist today—████████████ ████ Dkt. 417-3 (Ranganathan Decl.) ¶¶ 47-48 & Figure 2; Dkt. 417-24 (Ex. 20 (Wilburn 6/17/2025 Dep.)) at 28:21-29:25 (Juniper announced "self- driving" in 2025 before any other competitor).

Dr. Ranganathan and Mr. Friday also agree that the AIOps for Mist Source Code can perform basic levels of ████████████████████ Dkt. 436-1 (Friday Decl. ¶¶ 22-24); Dkt. 417-3 (Ranganathan Decl.) ¶¶ 25-27, 36-37. With respect to ██████████, Dr. Ranganathan states that the ██████ included in the License ████████████ ████████████████████████ Dkt. 417-3 (Ranganathan Decl.) ¶ 27. The "Affected Items" described by Mr. Friday is simply a list of hardware devices that ████████████████████ ██████ Ranganathan Reply Decl. ¶¶ 7-9.

What Mr. Friday refers to as ██████████████████ that Dr. Ranganathan describes in his declaration. *See* Dkt. 417-3 (Ranganathan Decl.) ¶¶ 25-27, 36; Ranganathan Reply Decl. ¶¶ 15-16. As Dr. Ranganathan explains, the "SLE metrics are computed through threshold-based classification rules"; each SLE produces a numeric score indicating whether performance falls below a customer-set standard. Dkt. 417-3 (Ranganathan Decl.) ¶¶ 26-27. Both Dr. Ranganathan and Mr. Friday agree that ████████████████████ ████████████████████ ████ [5] Dkt. 417-3 (Ranganathan Decl.) ¶¶ 25-27, 36-37 & nn. 56-58; Dkt. 436-1 (Friday Decl.)

---

[5] *See* Juniper Networks, "Potential Anomalies Detected by Marvis," https://www.juniper.net/documentation/us/en/software/mist/mist-aiops/topics/ref/marvis-detected-anomalies.html ("Marvis continuously monitors and analyzes data and events generated by APs, switches, and WAN Edges in real time. Marvis leverages information from device telemetry, system logs, and performance metrics to intelligently surface events that signal user-impacting issues across

¶¶ 16-20; Ranganathan Reply Decl. ¶¶ 6 n. 8, 12-14.  Indeed, they agree that the AIOps for Mist Source Code License excludes ██████████ such as the ████████████████████ ██████████████. *See, e.g.*, Dkt. 417-3 (Ranganathan. Decl.) ¶¶ 38-39; Dkt. 436-1 (Friday Decl.) ¶¶ 16-20; Ranganathan Reply Decl. ¶¶ 12-14.

### 3.    The Settlement Is Ambiguous

The Court must consider whether the Settlement's "terms are ambiguous."  15 U.S.C. § 16(e)(1)(A).  Besides the semantics described above, HPE has created so much confusion over what the License includes that the Settlement is void for ambiguity.

HPE has failed to provide █████████████. For instance, when ████████ ████████████████████████ ██████████████████████████ ████████ ██████████████████ ████████ ██████████████████████ ████████████████ Dkt. 425-12 (Ex. 83).

HPE's own executives have also contradicted each other about what is in the License.  Indeed, relying on Mr. Rahim's testimony, the US asserts that "the license includes source code for ██████████████." Dkt. 438-3 at 18 (citing Rahim 2/26/2026 Dep. 22:16-23:21, 31:24-32:18, 63:24-65:1); *see also* Ex. 198 (Rahim 2/26/2026 Dep.) at 27:19-21 ("The license includes the source code for █████████████████████.").  However, according to Mr. Friday, ████ is not included; he says ████ ████████████████████████████ █████████████████████████████████████████████████ ████" Dkt. 436-1 (Friday Decl.) ¶¶ 16-17.  HPE has thus confused the issue so much that the US apparently does not even understand what it agreed to in this Settlement and the parties may not even have a meeting of the minds.  The end result is HPE muddles what the License includes, and the Settlement must be rejected due to ambiguity.

### 4.    The License Is Not "Comprehensive Structural Relief."

Last, the US attempt to rebrand the AIOps Mist Source Code License as "comprehensive

your network. These events are flagged as potential anomalies and are displayed on the Insights page in the Juniper Mist portal. For every potential anomaly detected, Marvis also provides a recommended remediation step that you can follow to resolve the issue.").

- 10 -

structural relief" cannot be squared with either its own prior statements or settled antitrust policy. Throughout negotiations, DOJ insisted that the Mist AIOps License is not meaningful structural relief in a three to two horizontal merger with major HHI increases and risk of price effects. *See* Dkt. 417 at 17. DOJ's litigation pivot—claiming that the same narrow license now qualifies both as a "comprehensive structural remedy" and "effectuates a divestiture"—is irreconcilable with the law and its own record. *See* Dkt. 438-3 at 21.

Courts and the DOJ have classified mandatory licensing as a conduct remedy. The Ninth Circuit, citing DOJ's Policy Guide, lists "mandatory licensing" alongside firewalls, non-discrimination rules, and other behavioral constraints that regulate the merged firm rather than restructure the market. *St. Alphonsus*, 778 F.3d at 793 n.16 (quoting U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies § II.B (2011)).

But far more important than the semantics of how to classify the License is the fact that it does not address the merger's harms—it is a non-exclusive license for a portion of software code, and not the kind of divestiture of an overlapping business line that ATR had insisted on in negotiations, and that has a better track record of success. The DOJ has long taken this view. As then AAG Delrahim explained, where a merger presents a reasonable probability of anticompetitive harm, "the role of enforcers or a court should be to eliminate the risk entirely or place that risk on the parties—not to design elaborate remedies that purport to reduce that risk while still permitting the merged company to retain control over the source of harm."[6] That is precisely the flaw here. The License leaves HPE in control of the entire combined enterprise-grade WLAN business while offering only a thin slice of intellectual property to a third party.

### B. There Is No Reason to Believe the Settlement Aids Competition.

There is no economic analysis from HPE or the US about how Instant On or the License will impact competition—just lawyer argument that, trust us, it will. This is especially concerning in light of the high barriers to entry and expansion in the relevant market. Although HPE points to a

---

[6] Assistant Attorney General Makan Delrahim Delivers Remarks at the Antitrust Division's Second Roundtable on Competition and Deregulation (April 26, 2018), https://www.justice.gov/archives/opa/speech/assistant-attorney-general-makan-delrahim-delivers-remarks-antitrust-divisions-second.

number of new entrants in the past several years, Dkt. 346 at 39, over the timeframe of 2021-2024, no firm other than HPE and Juniper grew their market share by more than 0.5%, and none of the new entrants have been able to crack 5% market share.  Dkt. 417-1 (Shapiro Decl.) at ¶ 23; *see also United States v. Bazaarvoice, Inc.*, No. 13-cv-00133-WHO, 2014 WL 203966, at *72 (N.D. Cal. Jan. 8, 2014) (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1441 (9th Cir. 1995)) (entry of small rivals does not negate high barriers to entry).  Since 2019, only Juniper was able to break through.  There is no evidence or analysis offered by HPE or the US that any new entrant or existing competitor will be able to take Instant On or the license and break through in a way that is "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."  *Bazaarvoice*, 2014 WL 203966, at *71 (citing 2010 Merger Guidelines § 9).

**CONCLUSION**

The Court should deny the Motion for Entry of Final Judgment.

Dated: March 20, 2026

PHILIP J. WEISER
Attorney General

*/s/ Arthur Biller*
ARTHUR BILLER *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
BRYN A. WILLIAMS
First Assistant Attorney General (SBN 301699)
JONATHAN B. SALLET *(Admitted Pro Hac Vice)*
Special Assistant Attorney General
ROBIN ALEXANDER *(Admitted Pro Hac Vice)*
Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
Telephone: (720)508-6000
Email: Arthur.Biller@coag.gov
          Bryn.Williams@coag.gov
          Jon.Sallet@coag.gov
          Robin.Alexander@coag.gov

*Attorneys for the State of Colorado*

ROB BONTA
Attorney General of California

*/s/ Brian D. Wang*
PAULA L. BLIZZARD, Senior Assistant Attorney
General (SBN 207920)
MICHAEL W. JORGENSON, Supervising Deputy
Attorney General (SBN 201145)
BRIAN D. WANG, Deputy Attorney General (SBN
284490)
Office of the Attorney General
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, California 94102
(415) 510-4400
Brian.Wang@doj.ca.gov

*Attorneys for the State of California*

WILLIAM TONG
ATTORNEY GENERAL

*/s/ Nicole Demers*
Nicole Demers (*pro hac vice application forthcoming*)
Deputy Associate Attorney General
Antitrust Section
Connecticut Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel.: (860) 808-5030
nicole.demers@ct.gov

*Attorneys for the State of Connecticut*

BRIAN SCHWALB
Attorney General of the District of Columbia

*/s/ Coty Montag*
Coty Montag (SBN 255703)
Deputy Attorney General, Public Advocacy Division
Office of the Attorney General for the District of
Columbia
400 6th Street NW
Washington, DC 20001
Telephone: (202) 417-5402
Coty.Montag@dc.gov

- 13 -

*Attorneys for the District of Columbia*


ANNE E. LOPEZ
Attorney General

*/s/ Rodney I. Kimura*
RODNEY I. KIMURA *(Admitted Pro Hac Vice)*
Deputy Attorney General
Department of the Attorney General
425 Queen Street
Honolulu, Hawaii. 96813
Telephone:  (808) 586-1180
Email:  Rodney.i.kimura@hawaii.gov

*Attorneys for State of Hawaii*


KWAME RAOUL
Attorney General of Illinois

*/s/ Paul J. Harper*
*(Admitted Pro Hac Vice)*

ELIZABETH L. MAXEINER
*(Admitted Pro Hac Vice)*
Chief, Antitrust Bureau
PAUL J. HARPER
Assistant Attorney General, Antitrust Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street, 35th Floor
Chicago, Illinois 60603
773-590-7935 | elizabeth.maxeiner@ilag.gov
773-590-6837 | paul.harper@ilag.gov

*Attorneys for State of Illinois*


COMMONWEALTH OF MASSACHUSETTS
ANDREA JOY CAMPBELL
Attorney General

*/s/ Anthony W. Mariano*
Anthony W. Mariano *(Admitted Pro Hac Vice)*
Chief, Antitrust Division
Office of the Massachusetts Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108

- 14 -

(781) 835-7990
Anthony.Mariano@mass.gov

*Attorneys for*
*Commonwealth of Massachusetts*


KEITH ELLISON
Attorney General

*/s/ Jon M. Woodruff*
*(Admitted Pro Hac Vice)*

ELIZABETH ODETTE *(Admitted Pro Hac Vice)*
Manager, Assistant Attorney General
Antitrust Division

JON M. WOODRUFF
Assistant Attorney General
Antitrust Division

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Telephone: (651) 300-7425
elizabeth.odette@ag.state.mn.us
jon.woodruff@ag.state.mn.us

*Attorneys for State of Minnesota*


LETITIA JAMES
Attorney General of the State of New York

CHRISTOPHER D'ANGELO
Chief Deputy Attorney General
Economic Justice Division

*/s/ Elinor Hoffmann*
*(Admitted Pro Hac Vice)*

ELINOR R. HOFFMANN
Chief, Antitrust Bureau
AMY McFARLANE
*(Admitted Pro Hac Vice)*
Deputy Bureau Chief, Antitrust Bureau
MICHAEL SCHWARTZ
*(Admitted Pro Hac Vice)*
Senior Enforcement Counsel, Antitrust Bureau

- 15 -

New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8269
Email: Elinor.Hoffmann@ag.ny.gov

*Attorneys for State of New York*


JEFF JACKSON
Attorney General of North Carolina

*/s/ Kunal J. Choksi*
*(Admitted Pro Hac Vice)*

Kunal Janak Choksi
Senior Deputy Attorney General
North Carolina Department of Justice
114 W. Edenton St.
Raleigh, NC 27603
Telephone: (919) 716-6032
E-Mail: kchoksi@ncdoj.gov

*Attorneys for State of North Carolina*




Dan Rayfield
Attorney General of Oregon

*/s/ Rachel K. Sowray*
Rachel K. Sowray *(Admitted Pro Hac Vice)*
Senior Assistant Attorney General
Timothy D. Smith *(Admitted Pro Hac Vice)*
Attorney-in-Charge
Economic Justice Section
Oregon Department of Justice
100 SW Market St, Portland OR  97201
503.689.0249 | Rachel.Sowray@doj.oregon.gov
503.798.3297 | tim.smith@doj.oregon.gov

*Attorneys for State of Oregon*


NICHOLAS W. BROWN
Attorney General of Washington

*/s/ Amy N. L. Hanson*

- 16 -

*(Admitted Pro Hac Vice)*

JONATHAN A. MARK *(Admitted Pro Hac Vice)*
Antitrust Division Chief
AMY N.L. HANSON
Senior Managing Assistant Attorney General
Antitrust Division
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA  98104
Email: jonathan.mark@atg.wa.gov
Email: amy.hanson@atg.wa.gov
Tel: 206-389-3806 (Mark)
Tel: 206-464-5419 (Hanson)

*Attorneys for State of Washington*

JOSHUA L. KAUL
ATTORNEY GENERAL

*/s/Caitlin M. Madden*
Caitlin M. Madden *(Admitted Pro Hac Vice)*

Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, WI 53707-7857
(608) 267-1311
caitlin.madden@wisdoj.gov

*Attorneys for State of Wisconsin*

- 17 -

**E-FILING ATTESTATION**

I, Arthur Biller, am the ECF user whose identification and password are being used to file the Intervenors' Surreply in Opposition to Motion for Entry of Final Judgment.  In compliance with Civil Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

_s/ Arthur Biller_

Arthur Biller

Intervenors' Surreply in Opposition to Motion for Entry of Final Judgment –
Case No. 5:25-cv-00951-PCP