United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 25-cv-00951-PCP |
| Plaintiff, | |
| v. | **ORDER GRANTING MOTION FOR ENTRY OF FINAL JUDGMENT** |
| HEWLETT PACKARD ENTERPRISE CO., et al., | Re: Dkt. Nos. 351, 453 |
| Defendants. | |

At the start of 2025, the United States sued to enjoin Hewlett Packard Enterprise's (HPE) acquisition of Juniper Networks. The United States alleged that the acquisition would violate Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18, which prohibits transactions whose effect may be to substantially lessen competition in a relevant market. In the United States's view, the proposed acquisition would lessen competition in the nationwide market for enterprise-grade wireless local area networking (WLAN) solutions—the wireless networking technology that allows enterprises to access their own networks and the internet. In June 2025, just days before the scheduled start of a bench trial on the United States's claim, the parties informed the Court that they had reached agreement upon the terms of a settlement and proposed consent decree. After news reports of deals in Washington, D.C., bars, retaliatory firings, and outside lobbyists circumventing typical settlement procedures emerged in the following weeks, a group of states intervened and asked the Court to conclude that the proposed consent decree would not serve the public interest and therefore should not be approved.

The states thereafter conducted discovery to produce a fuller picture of how the settlement came to be. During initial settlement discussions following the filing of DOJ's lawsuit, attorneys within the Department of Justice's Antitrust Division rejected HPE's settlement proposals to

remedy the projected harm because they included insufficient structural remedies. Having failed to convince Antitrust Division attorneys to accept its terms, HPE approached the DOJ Chief of Staff and the Associate Attorney General, who soon agreed to settle on terms that included both structural and behavioral elements, though not of the type that the Antitrust Division attorneys had previously sought.

The agreed-upon settlement has two main parts. First, HPE agreed to divest or sell off its "Instant On" business. That business includes "campus and branch" customers—those who need devices to connect "across centralized, multi-building locations (campus) and distributed, remote satellite sites (branches)." Hewlett Packard Enterprise Co.'s Reply in Support of Motion for Entry of Final Judgment at 12, Dkt. No. 436 (HPE Reply). Second, HPE agreed to license the "AI Ops for Mist Source Code" which, the settlement explains, is "the source code for Juniper's AI Ops for Mist software used in Juniper's WLAN products." Amended Proposed Final Judgment at 3, Dkt. No. 351-1.

Pursuant to the Antitrust Procedures and Penalties Act (which is also known as the Tunney Act), the United States moved for entry of the amended proposed final judgment on January 5, 2026. *See* Dkt. No. 351. The Court heard the United States's motion for entry of the amended proposed final judgment on March 23, 2026. Dkt. No. 456.

For the reasons set forth herein, the Court grants the United States's motion. While the states have performed an invaluable public service in bringing to light additional details about the machinations at the DOJ that led to the settlement, they have not shown that entry of the amended proposed final judgment would not be in the public interest. Under the Tunney Act, it is not the Court's role to opine on the ultimate merits of the DOJ's original challenge to the merger under the Clayton Act; the Court can only determine whether entry of the proposed consent decree would serve the public interest. Given the risks that the United States would have faced at trial due to the relatively low market shares of HPE and Juniper, the fact that the proposed consent decree requires HPE to divest assets that others may be able to use to compete with HPE in the enterprise-grade WLAN solutions market, and the possibility that the United States could choose to walk away entirely from its challenge to the proposed acquisition if the settlement is not

approved, entry of the proposed settlement serves the public interest.

## BACKGROUND

**I.      The United States's Complaint and the U.S. Enterprise-Grade WLAN Solutions Market**

In its original complaint, the United States contended that HPE and Juniper's proposed merger would unlawfully reduce competition in the national market for "enterprise-grade wireless networking solutions." Complaint, Dkt. No. 1 ¶¶ 34–39. Enterprise-grade WLAN solutions are different from consumer-grade WLAN solutions because the former can manage large numbers of access points in a single network location whereas the latter generally cannot. Complaint ¶¶ 34, 36. Wireless solutions are also distinct from physically wired solutions, the United States alleged, "because wired connections do not permit users freedom of movement." Complaint ¶ 36. Buyers of enterprise-grade WLAN solutions generally cannot separate out their purchase of network management software from their purchase of the hardware required to connect to networks, called wireless access points. Complaint ¶ 36.

The United States explained that WLAN solutions allow people to wirelessly access the internet and internal servers through those wireless access points, which in turn connects to "switches" that relay data throughout that network. Enterprises such as businesses, governments, and non-profit organizations need "enterprise-grade" solutions that can serve many users at the same time. Complaint ¶¶ 4, 13. The recent trend has been for wireless networking companies to move increasingly to cloud-based management, with online interfaces allowing network administrators to monitor wireless access points. States Exh. 20, Wilburn Dep., Dkt. No. 417-24, at 64:22–66:4; 68:4–8. Wireless networking companies have also incorporated features based on artificial intelligence and machine learning tools into their products.

As the United States explained in its complaint (and as the parties do not dispute), at the time of the proposed acquisition "HPE and Juniper [were] the second- and third-largest providers of commercial or 'enterprise' wireless networking solutions, respectively, in the United States." Complaint ¶ 1. HPE, Juniper, and Cisco—the market leader—together controlled over 70 percent of the U.S. enterprise-grade WLAN solutions market. Complaint ¶ 1. Cisco and HPE "[b]oth have

United States District Court
Northern District of California

well-regarded portfolios of wireless access points and [cloud] network management solutions" as well as "experienced sales forces, technical support organizations, and well-developed distribution channels, and … track records for working with large, sophisticated enterprises." Complaint ¶ 27. Though Cisco and HPE had maintained "relatively stable" positions as the top two market leaders for enterprise-grade WLAN in the years prior to the proposed merger, Juniper had since 2019 emerged as an aggressive third competitor in the market. Complaint ¶¶ 5–6.

After Juniper acquired a startup called Mist Systems in 2019, Juniper made use of Mist's assets to increase its North American market share from 1.7 percent in 2019 to 10.7 percent in 2024. Complaint ¶ 6; Declaration of Carl Shapiro, Dkt. No. 417-1 ¶ 23.[1] Juniper took advantage of Mist's cloud management technology, as well as artificial intelligence and machine learning tools known as AI Ops, to compete with HPE and Cisco. *See* States Exh. 189, Dkt. No. 426-72. HPE and Juniper competed directly with one another for customers who experienced what the two companies called "Cisco fatigue" or "Anybody But Cisco" and were dissatisfied with Cisco's offering and looking for alternatives. States Exh. 22, Corrected Expert Report of Marc Remer, Ph.D., Dkt. No. 418-1 ¶¶ 189, 279–291. The United States alleged that HPE understood Juniper to be a threat to its competitor network management product, Aruba Central, and consequently worked to improve Aruba Central's user interface and features. Complaint ¶¶ 9, 11.  In response to Juniper's "maverick" status, HPE started two internal initiatives: Project Gravity and Beat Mist. Complaint ¶¶ 9–10. Project Gravity was a multiyear attempt to improve HPE's AI and machine learning functions in response to Mist's "threat" to HPE's Aruba product. *See* States Exh. 130, Dkt. No. 423-8. Beat Mist denoted HPE's attempt to train its employees about Mist and to better inform consumers as to why HPE's Aruba might be better. *See* States Exh. 165, Dkt. No. 426-47; States Exh. 145, Dkt. No. 426-24. HPE CEO Antonio Neri told Phil Mottram, HPE's head of its WLAN business line Aruba, that he considered Mist to be "your biggest threat." States Exh. 155, Dkt. No. 426-34.

---

[1] The United States's motion to exclude the declarations of the states' expert witnesses is denied.

United States District Court
Northern District of California

United States District Court
Northern District of California

## II.    Procedural History

On January 29, 2024, HPE agreed to acquire Juniper for $14 billion. Competitive Impact Statement, Dkt. No. 217-2, at 1. After investigating the deal throughout 2024 (during which time staff in DOJ's Antitrust Division apparently may have recommended against bringing a challenge), the United States sued to block the acquisition in January 2025. Citing the DOJ and Federal Trade Commission's joint 2023 "Merger Guidelines," the United States alleged that HPE's acquisition of Juniper was "presumptively unlawful" because it would eliminate rivalry between two direct competitors, thus increasing market concentration in an already "highly concentrated" market, and because it would facilitate improper coordination among remaining providers, both of which threatened to "[i]ncreas[e] prices" and "decrease [] quality, service, and innovation." Complaint ¶¶ 41–51, 62.

After the United States filed its complaint in January 2025, the parties engaged in discovery throughout the first half of 2025. On June 27, 2025, three days before the pretrial conference and less than two weeks before the scheduled start of a bench trial on the United States's claim, the parties filed a joint submission containing a proposed final judgment, a competitive impact statement explaining the proposed final judgment, and a stipulation to hold separate defendants' assets until entry of that proposed final judgment. *See* Asset Preservation and Hold Separate Stipulation and Order, Dkt. No. 217; Proposed Final Judgment, Dkt. No. 217-1; Competitive Impact Statement, Dkt. No. 217-2; *see also* Dkt. No. 104. The proposed final judgment required HPE to divest HPE's Instant On business line and to license Juniper's AI Ops for Mist Source Code to a licensee to be approved by the United States. Dkt. No. 217-1, at 3–18. The next day, the parties requested entry of the asset preservation and hold separate stipulation and order. Joint Submission Regarding Settlement, Dkt. No. 218. Given the parties' proposed final judgment, the Court vacated the pretrial conference and approved the asset preservation and hold separate stipulation and order. Dkt. Nos. 219, 220.

On July 7, 2025, HPE and Juniper disclosed written or oral communications on behalf of HPE or Juniper with officers or employees of the Executive Branch, as required by 15 U.S.C. § 16(g). Description and Certification of Written or Oral Communications by Hewlett Packard

Enterprise Co. and Juniper Networks Concerning the Proposed Final Judgment, Dkt. No. 228. The combining parties reported that, between March 25, 2025, and June 27, 2025, HPE officials, as well as outside advisors William Levi and Michael Davis, met with various DOJ officials on April 3, April 15, April 30, June 5, and June 18, 2025. *Id.* at 2–3. The DOJ officials included Assistant Attorney General for Antitrust Abigail Slater, Principal Deputy Assistant Attorney General for Antitrust Roger Alford, Deputy Assistant Attorney General William Rinner, DOJ Chief of Staff and Acting Associate Attorney General Chad Mizelle, and Counselor to the U.S. Attorney General Stanley Woodward. *Id.* at 3. HPE and Juniper's counsel certified that, "[t]o the best of Defendants' knowledge, after appropriate inquiry, there have been no other written or oral communication by or on behalf of Defendants with any officer or employee of the Executive Branch of the United States concerning or relevant to the proposed Final Judgment except for communications between counsel of record for Defendants and the Department of Justice." *Id.* at 3.

### III.    The Tunney Act Review Process

In the weeks after the announced settlement, news outlets reported on purported machinations within DOJ surrounding the settlement. It was reported that then-Assistant Attorney General Slater opposed settling DOJ's challenge to HPE's acquisition "but senior DOJ officials, including Acting Associate Attorney General Chad Mizelle, overruled her." *HPE/Juniper: As Fight Between DOJ Leadership and Antitrust Division Broils, Tunney Act Proceeding Looms*, CAP. F. (July 24, 2025), https://thecapitolforum.com/hpe-juniper-as-fight-between-doj-leadership-and-antitrust-division-broils. *The Capitol Forum* reported that HPE had "hired multiple lobbyists close to the White House, including Arthur Schwartz, a close confidante of Vice President JD Vance," to lobby the White House in favor of HPE's acquisition. *Id.* HPE and Juniper's certification of communications between them and the Executive Branch did not list Mr. Schwartz. After the submission of the proposed settlement, Principal Deputy Assistant Attorney General Alford and Deputy Assistant Attorney General Rinner were reportedly placed on administrative leave by Mizelle and then terminated from their DOJ roles. *See* Khushita Vasant, *Antitrust Enforcers Alford, Rinner Fired by US DOJ*, MLEX (July 29, 2025, 5:25 PM GMT), https://www.mlex.com/mlex/articles/2370717/ antitrust-enforcers-alford-rinner-fired-by-us-doj.

After the United States provided notice of the proposed settlement pursuant to the Tunney Act's notice-and-comment provisions, various comments submitted to the DOJ expressed deep concern with the settlement process. Commenters included members of Congress, 20 states or territorial attorneys general, former employees of the DOJ's Antitrust Division, the American Antitrust Institute, the American Economic Liberties Project, the Protect Democracy Project, and individual members of the public. *See* Response of United States to Public Comments on the Proposed Final Judgment, Dkt. No. 311, at 12. Many of these comments criticized the remedies in the proposed final judgment and the process that led to that proposal's formation. *See id.*

Senators Elizabeth Warren, Amy Klobuchar, Cory Booker, and Richard Blumenthal encouraged "additional sunlight" into the proposed final judgment. Letter from Senators Warren, Klobuchar, Booker & Blumenthal, Dkt. No. 311-6, at 6. The senators cited reporting on DOJ's settlement process, stating that the reports "raise concerns regarding whether the settlement advances the interests of the public or a well-connected, well-paid group of insiders." The senators also questioned the perceived disconnect between DOJ's complaint, which concerned the harms to large enterprises resulting from the proposed merger, and the DOJ's settlement remedies, particularly the divestiture of Instant On, which was "designed for small businesses" and purportedly not a realistic option for large enterprise consumers. Representatives Jamie Raskin and Jerrold Nadler wrote a separate letter to criticize the settlement negotiation process and recommend a series of questions for the Tunney Act proceedings. Letter from Representatives Jamie Raskin & Jerrold Nadler, Dkt. No. 311-14.

Antimonopoly advocacy groups expressed similar concerns with the settlement. The American Economic Liberties Project (Economic Liberties) criticized the settlement process and the remedies, arguing that the settlement suffered for failing to identify an "upfront buyer" for HPE's Instant On assets before allowing HPE to close its acquisition with Juniper. Letter from American Economic Liberties Project, Dkt. No. 311-11, at 11–12. Economic Liberties also argued that the licensing provision, because it was a license rather than a transfer of ownership, "gives competitors a time-limited starting kit rather than a self-sustaining innovation engine…." *Id.* at 13. And in response to reports that DOJ entertained arguments that the merger would promote

7

United States District Court
Northern District of California

national security, Economic Liberties observed that a combined HPE-Juniper, by reducing the number of competitors in the U.S. enterprise-grade WLAN solutions market, would "concentrat[e] … technology supply in fewer hands." *Id.* at 14. The American Antitrust Institute raised concerns with the settlement process and similar criticisms of the proposed settlement, while also noting *Axios*'s reporting that the U.S. intelligence community had pressured DOJ to settle. Letter from the American Antitrust Institute, Dkt. No. 311-10, at 6.

Former DOJ officials expressed alarm at the DOJ's conduct, concluding that there was "no basis for a finding that the proposed Final Judgment … is in the public interest." Comments of Former Professional Employees of the Antitrust Division Regarding the Proposed Final Judgment in US v HPE and Juniper Networks, Inc., Dkt. No. 311-12, at 1. The officials argued that the defendants failed to comply with their mandatory Tunney Act disclosures and called the settlement process "highly unusual." *Id.* at 3. And the officials said that the settlement does not address the harms identified in the complaint because Instant On does not compete in the U.S. enterprise-grade WLAN solutions market and the source code license was of doubtful significance. *Id.* at 7.

Multiple other commenters, such as the Protect Democracy Project, urged more transparency into the settlement negotiation process. Letter from Protect Democracy Project, Dkt. No. 311-13. Others also criticized the settlement process and the perceived mismatch between DOJ's complaint and the settlement's terms. *See* Letter from Dekleptocracy, Dkt. No. 311-8. One commenter argued that the DOJ should not have brought its challenge in the first place. Dkt. No. 311-15.

The Attorneys General of Colorado, Arizona, California, Connecticut, Delaware, Hawai'i, Illinois, Maine, Massachusetts, Maryland, Michigan, Nevada, New Mexico, New York, North Carolina, Oregon, Rhode Island, Washington, Wisconsin, and the District of Columbia also submitted a comment opposing the proposed final judgment. *See* Dkt. No. 236-2; Dkt. No. 311-9. The states cited the public reporting that HPE had hired outside lobbyists Mike Davis and Arthur Schwartz to pressure the government to settle its suit in "literal 'boozy backroom meetings' with DOJ officials at a Washington, DC 'private city club.'" Dkt. No. 311-9, at 5–6. The states quoted

former Antitrust Division leader Roger Alford's statement that DOJ leadership "Chad Mizelle and Stanley Woodward perverted justice and acted inconsistent with the rule of law." *Id.* at 7. Alford described an internal DOJ culture that considered some parties and lawyers to be "worthy of special solicitude" and others "enemies" who "merit particular disfavor." *Id.* at 8. According to Alford, "cases are being resolved based on political connections, not the legal merits." *Id.* The states also argued that the proposed final judgment did not address the antitrust harms alleged in the United States's complaint, calling the Instant On divestiture "totally irrelevant to this case" and the source code licensing a "minimal concession." *Id.* at 9–10. The states concluded, "No court hearing a Tunney Act proceeding has ever been confronted with such explosive and dangerous accusations." *Id.* at 13.

In response to the public comments, the United States and HPE amended their proposed final judgment. The amended proposed final judgment clarifies the scope of the Instant On divestiture and AI Ops licensing as well as the responsibility and tenure of the trustees tasked with selling Instant On and auctioning the AI Ops for Mist source code. Amended Proposed Final Judgment, Dkt. No. 311-3, at 6–8, 14–17. The amended proposed final judgment requires HPE, when licensing AI Ops to a third party, to give that third party the option of entering into reasonable contract extensions and removes a no-poach clause that would have prevented the eventual third-party licensee from trying to hire away more than a specified number of Juniper employees. *Id.* at 11. The amended judgment requires HPE's "best efforts" to divest Instant On and license the AI Ops for Mist source code. *Id.* at 18. Any divestiture and license must cover all of the delineated assets and be used to support a competitor in the U.S. enterprise-grade WLAN solutions market who can, in the judgment of the United States, "compete effectively" in that market. *Id.* at 19. The divestiture and licensing must not be financed by defendants and must be done in a way to prevent HPE from being able to "unreasonably" raise the divestiture buyer or licensee's costs, lower their efficiency, or "otherwise interfere in the ability … to compete effectively" in the U.S. enterprise-grade WLAN solutions market. *Id.* at 19–20. The amended judgment also provides that if a term in the divestiture or license conflicts with the amended final judgment, the final judgment will control. *Id.* at 19–20. Defendants may not re-acquire the

divested assets for a specified period unless the United States provides written authorization. *Id.* at 20. And as defendants implement the terms of the final judgment, defendants must provide the United States with monthly affidavits detailing compliance. *Id.* at 20. Finally, the amended final judgment provides remedies for any violation of its terms. *Id.* at 23–24.

### IV.   The States' Intervention

On October 14, 2025, the attorneys general for Colorado, California, Connecticut, Hawai'i, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington, Wisconsin, and the District of Columbia moved to intervene in these proceedings. *See* Motion for Intervention, Dkt. No. 236, at 1.[2] After a hearing on November 18, 2025, the Court granted the motion. *See* Dkt. No. 314; *United States v. Hewlett Packard Enter. Co.*, 826 F. Supp. 3d 1110 (N.D. Cal. 2025). The Court concluded that the states were not entitled to intervene as of right under Federal Rule of Civil Procedure 24(a) but granted permissive intervention under Rule 24(b)(1) because the states had claims that shared common questions of law and fact with the United States. *Id.* at 1119–20. The Court granted the states' motion to intervene "as parties in the Court's Tunney Act review proceedings" because their participation would "assist the Court in evaluating whether the proposed Final Judgment serves the public interest." *Id.* at 1121. The Court cautioned, however, that "[s]hould the states wish to pursue an independent challenge to the merger in these proceedings, they must file a separate motion to intervene for that purpose." *Id.*

On December 16, 2025, the Court explained in a further status conference how it would structure the inquiry into the sole question at issue in the pending proceedings, which was whether entry of the proposed consent judgment is in the public interest. Dkt. No. 342; *see also United States v. Hewlett Packard Enter. Co.*, 826 F. Supp. 3d 1175 (N.D. Cal. 2025). The Court set a hearing and briefing schedule and ruled that discovery could encompass evidence relating to both

---

[2] Shortly before the states moved to intervene, the federal government entered into a lapse in appropriations that lasted until November 12, 2025. *See* LIDA R. WEINSTOCK & MARC LABONTE, CONG. RSCH. SERV., R48832, THE 2025 (FY2026) GOVERNMENT SHUTDOWN: ECONOMIC EFFECTS (JAN. 29, 2026). The United States and defendants stipulated to stay the case pending an end to the lapse. *See* Dkt. No. 235. The Court granted the request except with respect to the states' motion to intervene. Dkt. No. 237.

the consequences of the proposed settlement and the decision-making process that led to the proposed settlement "to the extent that process bears upon the adequacy of the proposed judgment." *Id.* at 1181.

On January 5, 2026, the United States moved for entry of the final judgment. United States' Notice of Motion and Motion for Entry of Final Judgment, Dkt. No. 351. On January 8, 2026, the Court denied the states' motion for a hold separate order that would have required HPE and Juniper to cease further integration efforts until the conclusion of the Tunney Act proceedings. *See United States v. Hewlett Packard Enter. Co.*, 826 F. Supp. 3d 1196 (N.D. Cal. 2026).

## V.    The Facts Revealed Through the States' Discovery

After almost three months of discovery, the states filed their opposition to the United States's motion for entry of final judgment. Intervenors' Opposition to Motion for Entry of Final Judgment, Dkt. No. 417 (Opposition); *see also* Dkt. Nos. 417–426. The states' discovery efforts revealed more about the settlement process and decision to settle than defendants or HPE had previously disclosed, and the states produced a detailed narrative of the settlement process that the United States and defendants do not meaningfully contest.

In January 2025, HPE hired William Levi, Mike Davis, and Arthur Schwartz to lobby the Trump administration in support of the acquisition. States Exh. 6, Davis Dep., at 99:22–100:2, 173:2–4; States Exh. 10, Levi Dep., at 42:15–44:2. Each had connections to or influence over certain administration officials.

William Levi was formerly chief counsel to Senator Mike Lee, the chair of the U.S. Senate Judiciary Subcommittee on Antitrust, Competition Policy, and Consumer Rights; was a special assistant to President Trump during his first term; and was counselor and then Chief of Staff to the Attorney General during President Trump's first term. States Exh. 10, Levi Dep., 32:1–33:1. After President Trump's re-election, Levi was in charge of identifying people for jobs in DOJ, with Levi saying that he recommended "slates of candidates" for various leadership positions, which "would certainly have" included now-former Attorney General Pam Bondi and "probably" included then-Deputy Attorney General Todd Blanche, Associate Attorney General Stanley Woodward, now-former DOJ Chief of Staff Chad Mizelle, now-former Assistant Attorney General Gail Slater,

11

Acting Assistant Attorney General Omeed Assefi, and Antitrust Division Chief of Staff Sarah Matar. *Id.* at 38:11–19, 39:2–41:17.

Mike Davis had connections to senior officials in the Trump administration as well. Davis had been friends with Assistant Attorney General Slater for at least eight years. States Exh. 6, Davis Dep., 135:11–13. Though eventually lobbying on HPE's behalf, Davis's initial reaction to the United States's filing of its suit in January 2025 was to post on X, "Amen. The Trump 47 Justice Department's Antitrust Division is already off to a strong start. 3 into 2? You must sue." States Exh. 30, Davis Exh. 14, Dkt. No. 418-9.

Similarly, Arthur Schwartz is a lobbyist who reportedly had connections to the Vice President and the CIA Director. States Exh. 1, Alford Dep, Dkt. No. 417-5, at 38:5–10. Schwartz advised HPE executives on the national security aspects of the merger and communicated with the DOJ. States Exh. 18, Schultz Dep., Dkt. No. 417-22, at 80:2–12; States Exh. 1, Alford Dep., at 39:15–41:24.

Around April 15, 2025, Davis met in person with Assistant Attorney General Slater, who had just been confirmed to lead the Antitrust Division, and Assefi, a newly elevated appointee within the Antitrust Division under Slater. States Exh. 18, Schultz Dep., at 27:19–28:3. The three discussed a potential settlement that would include an agreement to license AI Ops and promises to invest in the United States. *Id.*; States Exh. 10, Levi Dep., at 68:17–19. Days later, on April 18, Levi sent Assefi a proposed final judgment containing the AI Ops licensing settlement and offering an "HPE Invest in America Plan." States Exh. 76, Dkt. No. 420-15. The "Invest in American Plan" included promises to "invest more than $70 billion in the United States over the next five years," to expand a manufacturing facility in Chippewa Falls, Wisconsin, to rely more on U.S.-based manufacturing partners, particularly in Texas, and to invest $50 million in networking engineering programs at U.S. higher education institutions. Four days after that, on April 22, 2025, Levi sent Assefi an updated draft of HPE's "Invest in America" plan. States Exh. 32, Dkt. No. 418-11.

On April 30, Davis, Levi, and two people from HPE, including Chief Operating and Legal Officer John Schultz, met with Assefi at the Metropolitan Club in Washington, D.C. States Exh.

10, Levi Dep., 63:19–64:16; States Exh. 18, Schultz Dep., 28:24–29:7. After the April meeting, Schultz thought that Assefi had agreed to settle the lawsuit on behalf of the United States. *See* States Exh. 18, Schultz Dep., 53:11–54:7; HPE Reply at 11. In early May, Antitrust Division attorneys discussed settling the lawsuit internally within the DOJ, including with Chad Mizelle and Stanley Woodward. *See* States Exh. 48, U.S. Privilege Log, Dkt. No. 419-7, at *30, 35 (describing privileged internal emails generally).

Schwartz also talked with DOJ officials Mizelle and Woodward. *See* States Exh. 1, Alford Dep., 39:15–41:24. But Schwartz was primarily focused on making HPE's case with the Central Intelligence Agency and Department of Defense. On May 21, 2025, Schwartz, along with HPE's Schultz, met with CIA Deputy Director Michael Ellis and then Defense Under Secretary of Defense for Policy Elbridge Colby. States Exh. 75, Dkt. No. 420-14; States Exh. 77, Dkt. No. 420-16. Schwartz later also talked to CIA Director John Ratcliffe. States Exh. 18, Schultz Dep., 84:23–85:4. Schultz said that he and HPE's CEO also talked to the Chief Information Officer of the National Security Agency and that others at HPE talked to individuals connected to the National Security Council. States Exh. 18, Schultz Dep. 85:22–86:13.

The day after HPE's April 30 meeting with Assefi, HPE's outside counsel Jennifer Mellott emailed DOJ a settlement proposal containing a licensing agreement and the outlines of HPE's "Invest in America Plan" where, in addition to making many of the same promises as before, HPE "acknowledge[d] and agree[d] that its commitments set forth [] regarding H1-B visas, educational grants and the maintenance of a specified level of U.S.-based employment following the closing of the transaction constitute material terms of the settlement of the litigation between HPE and the United States relating to HPE's proposed acquisition of Juniper Networks." States Exh. 38, Dkt. No. 418-17. HPE said that under its plan its "commitments are intended to be legally binding and enforceable obligations…" enforceable "at law or in equity." *Id.*

Antitrust Division officials rejected HPE's proposal over the course of several meetings with HPE in May and June 2025. The states' discovery revealed that Antitrust Division officials in May and June 2025 thought that any settlement that did not require HPE to divest its WLAN business would be inadequate. Nonetheless, HPE's proposed settlement—the licensing of the AI

United States District Court
Northern District of California

Ops for Mist source code—involved no change in a combined HPE-Juniper's market share in the U.S. enterprise-grade WLAN solutions market. Alford explained that in May or June, the Antitrust Division "told HPE that a license was completely inadequate and that we needed structural relief to address concerns regarding competition in the market." States Exh. 1, Alford Dep., 108:15–25.[3] Instead the United States considered and pushed for an alternative remedy: divestiture of the entirety of Juniper's campus and branch business line, which the United States understood to include Juniper's WLAN business. *See* States Exh. 39, Dkt. No. 418-18.

On May 8, 2025, Antitrust Division officials met with HPE to discuss HPE's proposed settlement. *See* States Exh. 33, Dkt. No. 418-12. During that meeting and another virtual meeting between DOJ and HPE on May 13, 2025, Deputy Assistant Attorney Generals Rinner and Mark Hamer "expressed disinterest" in HPE's proposed settlement, according to HPE's Schultz, and said that they would send a counteroffer. States Exh. 18, Schultz Dep., 59:18–60:4; States Exh. 35, Dkt. No. 418-14. After the meeting, HPE's Levi understood that "as a general matter, a divestiture would be the preferred settlement for the Antitrust Division as they were going to look at the settlement draft." States Exh. 10, Levi Dep., 86:21–89:9. HPE's Schultz was surprised by Antitrust Division officials' resistance to the licensing remedy because Schultz had understood Assefi and Slater to be supportive of the settlement based on Assefi and Slater's April 15 meeting with Mike Davis. States Exh. 18, Schultz Dep., 78:8–79:15.

On May 14, HPE's counsel Mellott emailed Rinner and other DOJ officials, stating that

---

[3] A structural remedy generally involves requiring merging companies to divest or sell parts of their companies to prevent the excessive consolidation that would otherwise result from the transaction. The structural remedy's purpose is to preserve the structure of the relevant market in order to stave off potential harms such as higher prices. *But see* John E. Kwoka, Jr., *Does Merger Control Work? A Retrospective on U.S. Enforcement Actions and Merger Outcomes*, 78 ANTITRUST L.J. 619, 621 (2013) ("[T]he studied remedies imposed on problematic mergers do not appear generally effective in preventing post-merger price increases, with non-structural remedies substantially less effective than divestitures."). The other main remedy antitrust enforcers may pursue is a "behavioral" or "conduct" remedy, which allows the market consolidation resulting from a transaction but requires defendants to do, or not do, some action. Antitrust enforcers in the last three administrations have generally declared a preference for structural remedies and to limit the use of behavioral remedies, with enforcers bemoaning behavioral remedies' resemblance to regulation or criticizing their complexity, administrability, lack of impact on market structure itself, and inefficacy.

United States District Court
Northern District of California

"any settlement proposal that involves a divestiture of the Juniper or [HPE's] Aruba WLAN business will not be acceptable to HPE." States Exh. 68, Dkt. No. 420-7. Given that trial was less than two months away, HPE asked for a "high-level description" by the end of the next day. *Id.*

As this was occurring, Antitrust Division head Slater faced increasing pressure from Davis. Assefi, one of Slater's deputies, had told Davis in early May that the Antitrust Division would consider HPE's "Invest in America" plan in settlement negotiations. States Exh. 1, Alford Dep. 72:22–74:6. Slater, however, told Davis that she "objected vehemently to the inclusion of something like this in the merger settlement," according to another of her deputies, Roger Alford. *Id.* at 75:21–24. Alford describes the ensuing phone conversation between Slater and Davis as "intense, heated, [and] difficult" and stated that Slater told him that Davis threatened, "If you don't approve this settlement, I will destroy you. I will destroy your job at the DOJ," which she was "extremely shooken up by." *Id.* at 76:20–24, 77:5–8.

On May 16, 2025, DOJ attorneys made a counteroffer, sending HPE a "term sheet proposing a divestiture of Juniper assets." States Exh. 39, Dkt. No. 418-18. The United States proposed that the merged entity divest all assets relating to Juniper's campus and branch business line and its entire Mist business. *Id.* The United States acknowledged that the precise assets needed to adequately remedy HPE-Juniper's harm to the U.S. enterprise-grade WLAN solutions market "could vary depending on the buyer" so offered to "consider narrowing the scope of the divestiture if a specific buyer could replace the lost competition with fewer divested assets." *Id.* HPE disagreed with the proposal and argued that divesting the campus and branch networking would require untangling multiple overlapping lines of business. HPE Reply at 12–13.

On May 27, 2025, HPE and DOJ met again to discuss the United States's divestiture counterproposal. States Exh. 71, Dkt. No. 420-10. Six days later, on June 2, Rinner and other DOJ officials told HPE's and Juniper's counsel in an email that "we did not find last week's meeting productive." States Exh. 40, Dkt. No. 418-19. Rinner proposed another meeting that could include Assistant Attorney General Slater, who had not yet attended formal settlement negotiations between DOJ staff and HPE or Juniper representatives. Slater was "prepared to attend this meeting," Rinner explained, so long as the only HPE-Juniper representatives were "counsel of

record" and a senior HPE official "decisionmaker with authority," such as Schultz. *Id.* Rinner concluded, "Please note that, as we conveyed last week, the defendants' previously submitted proposals are not the appropriate starting place for a constructive discussion." *Id.* Later that evening, Rinner sent HPE's counsel a DOJ press release touting a "substantial divestiture package" to settle a different merger case "as a helpful data point in where we're coming from, if it's not already understood." States Exh. 67, Dkt. No. 420-6.

Two days later, on June 4, 2025, Rinner made a public speech on behalf of the DOJ explaining how the administration would approach merger policy. *See* States Exh. 1, Alford Dep., 121:21–122:13. Rinner's speech made several points, including promising that the Antitrust Division "will not leverage the threat of law enforcement to accomplish policy objectives that are clearly beyond the law." States Exh. 27, Dkt. No. 418-6, at *6. He stated, "We will not negotiate 'relief' off-the-books that cannot be justified in federal court." *Id.* Rinner wanted to "underscore" that the Antitrust Division leaders "care about the quality and professional integrity of the lawyers and economists that appear before us, not their stature in the antitrust bar or their political affiliation or background," and stated, "We do not plan to hash out merger settlements over martinis." *Id.* at *7. Rinner went on to affirm that, in considering remedies to otherwise illegal mergers, "structural relief is preferred." *Id*. at *8.

That same day, HPE sent another settlement proposal to DOJ in advance of a June 5 meeting. States Exh. 41, Dkt. No. 418-20. To address "DOJ's expressed interest in divestiture of an enterprise WLAN-related business," HPE explained, its revised settlement offer for the first time proposed divestiture of HPE's Instant On business line in addition to requiring licensing of AI Ops for Mist. *See* HPE Reply at 13.

The next day, on June 5, HPE met with Slater, Alford, and Rinner, as well as other Antitrust Division staff. Rinner told HPE that the divestiture of Instant On alone was, in Alford's words, "inadequate, to say the least," because it would not meaningfully address the increases in concentration resulting from the merger. States Exh. 1, Alford Dep., 139:24–141:13. Alford quotes Slater as saying that the DOJ did not want "bullshit settlements." *Id.* at 142:4–5. Slater also expressed disagreement with HPE's contention that consolidation and the formation of domestic

United States District Court
Northern District of California

so-called national champions, even in response to an activist investor takeover threat, would advance U.S. national security goals. *Id.* at 142:12–20; States Exh. 18, Schultz Dep., at 100:11–21. Finally, Slater said that she did not want to interact with HPE lobbyists going forward, which Alford emphasized after the meeting concluded by shaking every meeting participant's hand and saying each time, "No more lobbyists. I'm serious." States Exh. 1, Alford Dep., at 145:21–147:9. HPE characterizes the meeting differently, reporting that "Antitrust Division representatives indicated they saw the June 4 proposal as an improvement, but they were not prepared to agree." HPE Reply at 14.

Five days later, on June 10, 2025, Rinner sent another revised settlement proposal to HPE, continuing to propose divestiture of Juniper's campus and branch line of business, including its entire WLAN business, and also continuing to require a divestiture of Mist, with the new proposal clarifying that any settlement would need to divest a combined HPE-Juniper of "the Mist source code." States Exh. 36, Dkt. No. 418-15. HPE would maintain the ability to negotiate for a license from whatever third party acquires the divested Mist source code. *Id.*

After June 10, Antitrust Division staff appear to not have been involved in any further settlement negotiations with HPE and were preparing for trial until at least June 25, when trial counsel for HPE informed the Antitrust Division that the United States and HPE had reached a settlement. States Exh. 1, Alford Dep., at 154:21–155:4; *but see* Plaintiff United States' Reply in Further Support of Entry of Final Judgment, Dkt. No. 438-3, at 6 (US Reply) ("Between June 10 and June 26, 2025, Mr. Woodward and the Antitrust Division discussed the matter.").

From HPE's perspective, the Antitrust Division's vacillation between accepting a settlement without a divestiture and insisting on one left the company "frustrated and confused," and it was "concerned that the Antitrust Division was not taking the national security benefits of the transaction seriously." HPE Reply at 15. Accordingly, HPE "decided to appeal to senior DOJ leadership." HPE Reply at 15. Accordingly, from June 10 through June 25, HPE had discussions with higher-up DOJ officials—specifically, Chief of Staff Chad Mizelle and Acting Associate Attorney General Stanley Woodward. Soon after HPE's June 4 meeting with Antitrust Division leadership, HPE asked Levi to discuss the case with Mizelle. States Exh. 18, Schultz Dep.,

United States District Court
Northern District of California

17

106:21–107:14. On June 18, Mizelle met Levi and HPE's Schultz in person. *Id.* at 106:9–109:23; States Exh. 72, Dkt. No. 420-11; HPE Reply at 16. At the meeting, Mizelle, Schultz, and Levi talked about national security, the perceived risk of an activist investor to HPE, and the antitrust suit the parties would be trying before this Court in less than a month. States Exh. 18, Schultz Dep., at 110:6–113:19. Mizelle then passed the settlement talks to then-Acting Associate Attorney General Woodward. HPE Exh. 1, Schultz Dep., Dkt. No. 436-5, at 115:12–19. Within a week, around June 23 or June 24, DOJ leadership including then-Acting Associate Attorney General Stanley Woodward and Slater met internally to discuss the suit. States Exh. 48, Dkt. No. 419-7, at *38. Around this time, the CIA Director and various other intelligence officials expressed support for HPE. *See* Hugo Lowell, *US Antitrust Chief Gail Slater Ousted From Trump Justice Department*, GUARDIAN (Feb. 12, 2026, 5:57 PM EST), https://www.theguardian.com/us-news/2026/feb/12/us-antitrust-gail-slater-ousted-trump-administration.

Around June 25, 2025, Chief of Staff Mizelle conveyed to HPE that Woodward would be taking over the settlement negotiations for the United States. States Exh. 18, Schultz Dep., 115:12–21. Woodward and HPE eventually reached agreement on the terms of the settlement that the United States and HPE filed before this Court on June 27. States Exh. 1, Alford Dep., 159:2–10. In a June 26 proposal, HPE promised to license its AI Ops for Mist source code and a new behavioral remedy: a promise not to raise prices for 12 months except as necessary to account for inflation. States Exh. 43, Dkt. No. 419-2. After Schultz talked with Woodward and Woodward's advisor Ashleigh Bondoc about the settlement, HPE sent another revised proposed final judgment to DOJ on June 27 at 4:54 a.m., which re-added the Instant On divestiture, included a fine of $70 million for breaking the promise not to raise prices, and increased HPE's "Invest in America" commitments to higher education engineering programs to $75 million. States Exh. 44, Dkt. No. 419-3. That evening, at 6:15 p.m., DOJ had an internal meeting. *See* States Exh. 48, Dkt. No. 418-7, ATR-Email-00009596. Less than an hour later, at 7:08 p.m., HPE's Schultz sent Woodward a draft competitive impact statement, writing, "We recognize that this document is typically prepared by the DOJ but thought we would share this draft in case it was at [all] useful to you." States Exh. 46, Dkt. No. 419-5. At 9:58 p.m., Rinner sent HPE counsel Jennifer Mellott updated

18

settlement documents for HPE to review. States Exh. 37, Dkt. No. 418-16. According to Rinner, aside from removing HPE's commitment to maintain current prices, DOJ did not make any significant changes to the draft competitive impact statement HPE had provided. States Exh. 17, Rinner Dep., Dkt. No. 417-21, at 109:4–13.

On June 28, 2025, in the early morning (Eastern time) and the next afternoon, HPE filed the parties' joint stipulation and proposed judgment. Dkt. Nos. 217, 218. Rinner has since explained that HPE filed the competitive impact statement and the proposed final judgment because he did not have appropriate technical credentials to file through the Court's ECF system. HPE Exh. 8, Rinner Dep., Dkt. No. 436-12, at 128:15–21. The proposed judgment included the Instant On divestiture and AI Ops for Mist source code licensing requirements but not the pricing or Invest in America commitments, which the United States appears to have removed in the final exchange of settlement drafts. *See* HPE Exh. 1, Schultz Dep., Dkt. No. 436-5, at 125:11–16 ("And I think as you know, ultimately the pricing commitment was pulled out and was not part of the final agreement for reasons you'd have to ask the DOJ. But based on the communications I was a part of, I assumed it was because they decided they didn't want to set the precedent.").

Since the filing of the proposed settlement, many notable leaders of the Antitrust Division have left or been terminated from their employment. Alford and Rinner were both put on administrative leave and then terminated for "insubordination," according to the DOJ. *See* Hannah Rabinowitz & David Goldman, *Justice Department Fires Two Senior Antitrust Attorneys, Alleging Insubordination*, CNN (July 29, 2025), https://www.cnn.com/2025/07/29/politics/justice-department-fires-two-senior-antitrust-attorneys; *see also* States Exh. 1, Alford Dep., at 180:9–184:15 ("I was informed that—this is after my termination—that following the HPE-Juniper settlement, the plan was for me to be fired and Bill [Rinner] to be fired as punishment for objecting to the settlement."); States Exh. 17, Rinner Dep., at 115:13–116:6. Alford heard secondhand from Slater that Davis "took credit" for Alford's and Rinner's firing. States Exh. 1, Alford Dep., at 92:10–16. After his firing, Alford criticized DOJ's handling of the case in public speeches and testimony to Congress.

Less than five months later, Slater resigned from the Antitrust Division days after her

primary deputy Mark Hamer had resigned. Aaron Mak & Nate Robson, *Gail Slater Steps Down as DOJ's Antitrust Chief*, POLITICO (Feb. 12, 2026 11:54 AM EST), https://www.politico.com/news/2026/02/12/gail-slater-steps-down-as-dojs-antitrust-chief-00778156. According to Alford, Signal chats purportedly from Davis, and public reporting, Davis had lobbied President Trump and DOJ leadership to fire Slater. States Exh. 1, Alford Dep., at 189:4–10; Leah Nylen & Josh Sisco, *'Good Riddance': How a MAGA Acolyte Helped Oust Antitrust Chief*, BLOOMBERG LAW (Feb. 13, 2026, 8:33 AM PST), https://news.bloomberglaw.com/antitrust/good-riddance-how-a-maga-acolyte-helped-oust-antitrust-chief.

**LEGAL STANDARD**

The Tunney Act requires that "[a]ny proposal for a consent judgment submitted by the United States for entry in any proceeding brought by or on behalf of the United States under the antitrust laws shall be filed with the district court before which such proceeding is pending…." 15 U.S.C. § 16(b). Congress passed the Tunney Act in 1974 after its main sponsor, Senator John Tunney, "became concerned with the apparent weaknesses of the consent decree process." 120 CONG. REC. 38583, 38585 (1974). In particular, Senator Tunney, other members of Congress, and the public were concerned about the Nixon administration's settlement of ITT's acquisition of the Hartford Fire Insurance Company in 1971. *See id.*; Note, *The* ITT *Dividend: Reform of Department of Justice Consent Decree Procedures*, 73 COLUM. L. REV. 594, 603–04 (1973). The United States had allowed ITT to acquire Hartford on the condition that the combined entity "divest[] itself of several smaller subsidiaries." *Id.* During his 1972 Senate confirmation hearings, Attorney General nominee Richard Kleindienst, who was involved in the litigation as Deputy Attorney General, was questioned about the settlement. *See* John J. Flynn & Darren Bush, *The Misuse and Abuse of the Tunney Act: The Adverse Consequences of the "Microsoft Fallacies,"* 34 LOY. U. CHI. L.J. 749, 756 (2003). The confirmation hearings included accusations that, although the Nixon-era DOJ was motivated to settle in part due to traditional considerations of litigation risk and reward, ITT had supposedly also "offered to help finance the 1972 Republican National Convention" in exchange for a settlement, and DOJ officials had reportedly expressed concern that divestiture would present a "hardship" to ITT and its shareholders. Lloyd C. Anderson, United

States v. Microsoft, *Antitrust Consent Decrees, and the Need for a Proper Scope of Judicial Review*, 65 ANTITRUST L.J. 1, 7–8 (1996).

In response to the ITT controversy, Senator Tunney's proposed law would, in his view, "bring the consent decree process into the full light of day …." *The Antitrust Procedures and Penalties Act: Hearings Before the Subcomm. On Antitrust & Monopoly of the S. Comm. On the Judiciary*, 93d Cong. 1 (1973) (statement of Sen. John Tunney). The law's goal, he suggested, was "to throw open" the "closed doors" behind which government agencies deal with corporations and "give the public information and a voice in the mergers and other actions that so directly affect the quality and the cost of what we buy." *Id.* The hearings and other parts of the legislative history repeatedly emphasized that the Tunney Act's purpose was to "make our courts an independent force rather than a rubber stamp in reviewing consent decrees." *Id.*; *see also, e.g.*, H.R. REP. NO. 93-1463, at 8 (1974) ("One of the abuses sought to be remedied by the bill has been called 'judicial rubber stamping' by district courts of proposals submitted by the Justice Department."); 119 CONG. REC. 3449, 3452 (1973) (statement of Sens. John Tunney and Edward Gurney).

In 2004, Congress amended the Tunney Act to require the reviewing court to consider several features of any proposed settlement and to clarify that courts are not limited to rejecting only those settlements that make a "mockery of the judicial function." *See* Antitrust Criminal Penalty Enhancement and Reform Act of 2004, Pub. L. No. 108-237, § 221, 118 Stat. 661, 668–69 (2004); *United States v. Microsoft Corp.*, 56 F.3d 1448, 1462 (D.C. Cir. 1995).

The Act establishes both procedural and substantive requirements for antitrust consent decrees.

Procedurally, the statute requires the parties to disclose certain information about the settlement and solicit public comment. To enable public consideration of the settlement's merit, the United States must publish the proposed consent judgment "in the Federal Register at least 60 days prior to the effective date of such judgment." 15 U.S.C. § 16(b). "Simultaneously with the filing of such proposal, … the United States shall file with the district court, publish in the Federal Register, and thereafter furnish to any person upon request, a competitive impact statement which shall recite [] (1) the nature and purpose of the proceeding; (2) a description of the practices or

21

United States District Court
Northern District of California

events giving rise to the alleged violation of the antitrust laws; (3) an explanation of the proposal for a consent judgment, including an explanation of any unusual circumstances giving rise to such proposal or any provision contained therein, relief to be obtained thereby, and the anticipated effects on competition of such relief; (4) the remedies available to potential private plaintiffs damaged by the alleged violation in the event that such proposal for the consent judgment is entered in such proceeding; (5) a description of the procedures available for modification of such proposal; and (6) a description and evaluation of alternatives to such proposal actually considered by the United States." *Id.* The United States must also publish in newspapers a summary of the proposed judgment, a summary of the competitive impact statement, and determinative materials, and where one can publicly inspect relevant materials and documents. *Id.* § 15(c). Members of the public who wish to comment on a consent judgment have sixty days from submission of the proposed consent judgment to provide such comments. *See id.* §§ 16(b), (d). After the end of the sixty-day comment period, the DOJ must publish those comments, as well as a response to the comments, in the *Federal Register*, and must file the comments and that response before the presiding district court. *Id.* § 16(d).

As an additional procedural requirement, the Tunney Act requires settling defendants to "file with the district court a description of any and all written or oral communications by or on behalf of such defendant, including any and all written or oral communications by or on behalf of such defendant by any officer, director, employee, or agent of such defendant, or other person, with any officer or employee of the United States concerning or relevant to such proposal, except that any such communications made by counsel of record alone with the Attorney General or the employees of the Department of Justice alone shall be excluded from the requirements of this subsection." *Id.* § 16(g).

Substantively, the Tunney Act requires the district court to "determine that the entry of such judgment is in the public interest." *Id.* § 16(e)(1). "For the purpose of such determination, the court shall consider [] (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous,

22

and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial." *Id.* §§ 16(e)(1)(A)–(B). To aid in its review, the court can accept live testimony, appoint a special master, grant participation by amici curiae or third-party intervenors or other appropriate entities, review comments and objections, and "take such other action in the public interest as the court may deem appropriate." *Id.* §§ 16(f)(1)–(5). *But see id.* § 16(e)(2) ("Nothing in this section shall be construed to require the court to conduct an evidentiary hearing or to require the court to permit anyone to intervene.").

**ANALYSIS**

### I.    The parties' failure to comply with certain procedural requirements does not require rejection of the settlement.

In accordance with the procedural requirements noted above, the United States published the proposed consent judgment in the *Federal Register* on July 10, 2025, and made available upon request the complaint, proposed final judgment, and competitive impact statement by referring interested parties to the Justice Department's website. *See* United States v. Hewlett Packard Enterprise Co., et al.; Proposed Final Judgment and Competitive Impact Statement, 90 Fed. Reg. 30685, 30685 (July 10, 2025). The competitive impact statement explained the nature and purpose of the proceeding, the alleged conduct that gave rise to the complaint, what the consent judgment would entail and how it would affect competition, what remedies remain potentially available to private plaintiffs, and how those seeking to modify the proposed final judgment might do so. *See id.* at 30696–99. The United States also published a summary of the proposed final judgment and the competitive impact statement, with instructions on how to comment on the settlement, in *The Washington Post* and *The Mercury News* for seven days starting on July 9, 2025. Dkt. No. 351, at 2. The following month, HPE and Juniper submitted their "description and certification of all written and oral communications by, or on behalf of, HPE and Juniper with any officer or

23

employee of the Executive Branch of the United States concerning or relevant to the Proposed Final Judgment filed … on June 27, 2025." Dkt. No. 228, at 2. At the close of the sixty-day comment period, the DOJ published its response to the comments in the *Federal Register* and explained that the comments were available on the Department of Justice's website. Dkt. Nos. 234, 351; *see* United States v. Hewlett Packard Enterprise Co. and Juniper Networks, Inc.; Response of the United States to Public Comments on the Proposed Final Judgments, 90 Fed. Reg. 52097, 52097 (Nov. 19, 2025).

There are at least two ways in which the United States and defendants failed to comply with the Tunney Act's procedural requirements.

First, in HPE and Juniper's filing detailing their communications "with any officer or employee of the Executive Branch of the United States concerning or relevant to the Proposed Final Judgment," they reported several meetings with DOJ and HPE executives or advisors, including William Levi and Michael Davis. Dkt. No. 228. Defendants failed to disclose, however, that Arthur Schwartz had spoken on their behalf with DOJ officials Mizelle and Woodward, that Schwartz and Schultz had met with CIA Deputy Director Michael Ellis and Defense Under Secretary of Defense for Policy Elbridge Colby, and that Schultz had talked to the CIO of the National Security Agency and to individuals connected to the National Security Council. Dkt. No. 228; States Exh. 1, Alford Dep., 39:15–41:24; States Exh. 75, Dkt. No. 420-14; States Exh. 77, Dkt. No. 420-16; States Exh. 18, Schultz Dep., at 85:22–86:13. HPE argues that it did not need to disclose Schwartz's contacts with CIA and Defense Department officials because the discussions were not "*about the settlement*." HPE Reply at 22. But the Tunney Act requires disclosure of all communications "concerning or relevant to such proposal," not simply those *about* the settlement. 15 U.S.C. § 16(g). HPE's undisclosed contacts with national security officials should have been disclosed.

Second, although the Tunney Act required the United States to provide the public with a competitive impact statement that includes "a description and evaluation of alternatives to such proposal actually considered by the United States," *Id.* § 16(b)(6), it did not disclose a complete list of alternative remedies it actually considered. In its competitive impact statement, the United

24

States said the only alternative considered was "a full trial on the merits against the Defendants." Dkt. No. 217-2, at 12. But the states' discovery revealed that, at various stages of the litigation and settlement negotiation processes, the federal government also considered a settlement that would have included broader divestitures of HPE and Juniper's campus and branch or WLAN businesses, procuring an Invest in America commitment, or a commitment not to raise prices.

The parties argue that an alternative remedy does not need to be disclosed unless both parties were ready to agree to it. The United States asserts that "alternatives to such proposal actually considered," 15 U.S.C. § 16(b)(6), refers to "the final options the [United States] could choose from at the time of settlement" in "*their final form*." US Reply at 25. HPE maintains that the statute requires disclosure of the "realistic options" DOJ had and that the only "realistic options" here were to either "(1) agree to the settlement it agreed to, or (2) take the case to trial." HPE Reply at 23 (quoting *Massachusetts v. Microsoft Corp.*, 373 F.3d 1199, 1248 (D.C. Cir. 2004)).

The parties' interpretation is incorrect for several reasons. The parties' statutory interpretation of the Tunney Act would unnecessarily limit the Act's text because the text requires disclosure of "alternatives" that were "actually considered *by the United States*." 15 U.S.C. § 16(b)(6) (emphasis added). The text does not limit its application to the narrower set of proposals that the United States actually considered *and* that the defendant was prepared to accept. Opposition at 26. The plain text of the Tunney Act thus requires disclosure of remedies that the United States considered.

Even under a narrower standard, which would require disclosure only of remedies the United States actually *proposed*, the states' discovery reveals that the parties considered and exchanged draft proposals that included the various divestiture proposals, the Invest in America plans, and the pricing commitments. The United States's and HPE's own proposed standards—which would require disclosure only of any alternative that was among the set of "the final options the [United States] could choose from at the time of settlement" or among the United States's "realistic options"—the United States should have disclosed the Invest in America plan and the promise not to raise prices because HPE itself proposed those remedies at a late stage in the

25

settlement process, even including them in the draft proposed final judgment it sent to the United States for filing at 4:54 a.m. on June 27, 2025, less than 24 hours before filing the proposed final judgment without that plan and promise. *See* States Exh. 44, Dkt. No. 419-3. HPE's Schultz himself explained that the *United States* declined to include HPE's promise not to raise prices in the proposed settlement. *See* HPE Exh. 1, Schultz Dep., Dkt. No. 436-5, at 125:11–16. Thus, under any standard, the United States should have disclosed the Invest in America proposal and promise not to raise prices as alternative remedies that the United States was realistically considering at the time it filed its settlement.

The Tunney Act is unclear about the consequence of such procedural violations, and the Ninth Circuit has addressed the issue only once. In *United States v. Bechtel Corp.*, 648 F.2d 660 (9th Cir. 1981), the government failed to file its responses to public comments within the sixty-day period required by the Tunney Act. *Id.* at 664. The Ninth Circuit concluded that even though the government should have filed its responses on time, "the government's failure strictly to comply with the [Tunney Act] time requirements [did] not entitle [one of the settling parties] to relief from its consent." *Id.* While "[c]ompletion of [Tunney Act] procedures was required before the judgment could be entered, … strict technical compliance" is not "a condition to final entry of the decree," *id.*, especially where prejudice had not been shown and where "the public benefit from entry of the decree far outweigh[ed] any detriment from the appearance of sanctioning a wrong," *id.* at 666–67.

Because the nondisclosures here limited the public's ability to evaluate the settlement's merit and the process that resulted in the settlement, the procedural violations here created a greater risk of prejudice than the government's delayed filing of its responses in *Bechtel*. Thanks to the states' intervention, however, that risk has not been realized. Instead, the public now has a greater understanding of both who participated in discussions with the government regarding the lawsuit on HPE's behalf and the various potential remedies that the government considered during those discussions. For example, several commenters expressed concern that HPE had reached an undisclosed "side deal" with the United States not described in the proposed final judgment. *See* Letter from Am. Econ. Liberties Proj., Dkt. No. 311-11, at 16; Letter from Reps. Raskin & Nadler,

26

Dkt. No. 311-14, at *7; HPE Reply at 5. Now HPE unequivocally states that "there is no side deal" to invest in American jobs in exchange for settling the merger challenge. HPE Reply at 6. If not for the states' intervention, the public may never have learned about the extent of defendants' lobbying and DOJ's internal consideration and evaluation of the risks of HPE's acquisition of Juniper. Because the parties' failure to comply perfectly with the Tunney Act's procedural requirements did not result in prejudice, those procedural defects do not on their own bar entry of the proposed final judgment.

## II.    Entrance of the proposed settlement serves the public interest.

"Before entering any consent judgment proposed by the United States [in a Clayton Act case], the court shall determine that the entry of such judgment is in the public interest." 15 U.S.C. § 16(e)(1). To make that determination, "the court shall consider":

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

*Id.* "In order to prevent 'judicial rubber stamping' district courts are required to make an independent evaluation of proposed decrees." *United States v. BNS Inc.*, 858 F.2d 456, 459 (9th Cir. 1988) (quoting 15 U.S.C. § 16(e)) (cleaned up). As this Court has previously explained, the Tunney Act's provisions "suggest that the Court's Tunney Act review focuses primarily on the proposed judgment's competitive effect, including whether the proposed judgment adequately addresses the concerns about lessening of competition that gave rise to the United States's lawsuit and whether it will have other effects on competition resulting in harm or benefit to specific individuals or entities or to the public generally." *See Hewlett Packard Enter. Co.*, 826 F. Supp. 3d

27

at 1180.

A district court reviewing a proposed settlement is not limited to the harms articulated in the complaint. While the reviewing court should focus primarily on the relevant market alleged in the United States's complaint, *see BNS*, 858 F.2d at 462–63, the Act also "suggests that a court may, and perhaps should, look beyond the strict relationship between complaint and remedy in evaluating the public interest," *Bechtel*, 648 F.2d at 666. But the Tunney Act does not allow a court to "engage in an unrestricted evaluation of what relief would best serve the public." *Id.* The Court may not deny entry of the amended proposed final judgment "*solely* on the basis of concerns about the process that led to the parties' settlement without any consideration of the proposed judgment's adequacy or competitive effect…." *Hewlett Packard Enter.*, 826 F. Supp. 3d at 1180. To the extent that the states or others allege wrongdoing by the government or defendants, the proper channel and remedy for that concern is independent legal or political action.

The Court's review of the amended proposed final judgment will therefore focus on whether the proposal is "within the reaches of the public interest." *Bechtel*, 648 F.2d at 666. The United States and HPE argue that the Court should grant significant deference to the United States's decision to settle its lawsuit and its view of the public interest. *See* Competitive Impact Statement, Dkt. No. 217-2, at 15; HPE Reply at 31–33. The Executive Branch certainly has the prerogative to choose whether and how to prosecute any particular case. But the Executive does not have the authority under the Tunney Act to enter judicial orders with the binding force of law. Instead, both the Tunney Act and the nature of the parties' request that the Court to exercise its own powers require that the Court exercise independent judgment about whether to do so. The Court will accordingly give the United States's view of the public interest the deference appropriate to an experienced agency and to a party's view of what actions best advance its interests.[4]

---

[4] A number of commentators have criticized courts' deference to the Executive when entering consent decrees that constitute acts of the courts' own judicial power. *See, e.g.*, Note, *The Scope of Judicial Review of Consent Decrees Under the Antitrust Procedures and Penalties Act of 1974*, 82 MICH. L. REV. 153, 165–170, 168 nn. 98, 99 (1983); Note, *The ITT Dividend: Reform of Department of Justice Consent Decree Procedures*, 73 COLUM. L. REV. 594, 632–33 (1973); John

United States District Court
Northern District of California

Conversely, the Court disagrees with the states that the proposed settlement must "replicate the competitive intensity of the acquired firm." Opposition at 39. The states quote the District of Massachusetts's decision enjoining JetBlue's acquisition of Spirit Airlines, but the court's statement was made in concluding that JetBlue had not rebutted the United States's prima facie showing that the acquisition violated Section 7 of the Clayton Act. *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 158 (D. Mass. 2024). The showing required to overcome a prima facie showing of a Section 7 violation differs from, and is significantly more demanding, than the showing required to approve a proposed settlement. Because enforcement by consent decree is an alternative to enforcement by trial or abandonment of the litigation altogether and often reflects the United States's assessment of litigation risk, a proposed settlement does not need to replicate the full relief that United States sought in its complaint. Instead, the Court must assess whether the proposed settlement serves the public interest with reference to the possibility that, if the Court declines to enter the settlement, the government will obtain no relief at all either because the government decides to abandon its case or because the government loses at trial.

After considering the statutorily mandated factors, the Court concludes that entry of the proposed final judgment is in the public interest.

### A. The Competitive Impact of the Proposed Final Judgment

The Court will consider together the Tunney Act's requirement that the Court consider "the competitive impact of such judgment, including termination of alleged violations" and "the impact of entry of such judgment upon competition in the relevant market or markets." *See* 15 U.S.C. § 16(e)(1). In considering the proposed judgment's competitive impact in this case, the Court must compare the impact of permitting HPE's acquisition of Juniper to proceed under the conditions set forth in the proposed consent decree with the impact of denying approval and

---

J. Flynn & Darren Bush, *The Misuse and Abuse of the Tunney Act: The Adverse Consequences of the "Microsoft Fallacies"*, 34 LOY. U. CHI. L.J. 749, 788–91 (2003); Alexandra P. Clark, Note, *Leaving Judicial Review with the Judiciary: The Misplaced Role of Agency Deference in Tunney Act Public Interest Review*, 78 WASH. & LEE L. REV. 925 (2021); *see also Kisor v. Wilkie*, 588 U.S. 558, 606–07 (2019) (Gorsuch, J., concurring) ("If a court thought the proposed judgment harmful to the public but decided to defer to the government's 'reasonable' contrary view anyway, would anyone suggest the court had complied with Congress's instruction?").

United States District Court<br>Northern District of California

requiring the United States to choose either to proceed to trial on its claims or walk away from the lawsuit.

In the states' view, the approval of the proposed judgment will substantially lessen competition in the market for enterprise-grade WLAN solutions by eliminating that market's third-largest competitor. They base that claim on the assumption that, absent approval of the proposed judgment, the United States would have likely succeeded at trial in establishing the Section 7 violation alleged in its complaint. *See* Opposition at 31 ("[T]he US Had a Very Strong Case."). The states' argument thus requires some analysis of the United States's underlying Section 7 claim.

"Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 788 (9th Cir. 2015) (quoting *Hosp. Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986)). Courts have formulated a burden-shifting process for evaluating a Section 7 merger challenge. First, the challenger has the burden to make a prima facie case that the merger is illegal, often by showing changes in market share. *See id.* at 783. If that showing is made, the defendants have the burden to rebut that case. *See id.* If the defendants successfully do so, then the burden of producing evidence of illegality shifts back to the challengers. *See id.* A merger that produces a company with a market share of 30 percent or higher is generally presumed illegal under Section 7. *See United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963).

The parties here do not contest the relevant market and estimated market shares provided by the experts. The states use the market share figures provided by HPE's and the United States's experts and conclude that, using either set, HPE's acquisition of Juniper is presumptively illegal. Opposition at 32–33. Using the figures of the United States's expert, HPE's market share after acquiring Juniper would be 26.7 percent while, using the figures of HPE's expert, HPE's post-merger market share would be 27.1 percent. Declaration of Carl Shapiro, Dkt. No. 417-1 ¶ 15. The United States's expert found that a combined HPE-Juniper would increase the Herfindahl-Hirschman Index (HHI) of the U.S. enterprise-grade WLAN solutions market by 343 and result in

a post-merger HHI of 3874, while HPE's expert found an increase of 331 and post-merger HHI of 3364. *Id.* ¶ 17.[5] Thus, while the increase in market concentration resulting from the merger does not trigger *Philadelphia National Bank*'s structural presumption of illegality, the HHI increase of 331 is greater than the federal antitrust enforcers' guidelines' threshold of 100, and the post-merger HHI of 3364 is greater than the guidelines' threshold of 1800. Notably, these figures also exceed the higher thresholds established in the 2010 Horizontal Merger Guidelines. U.S. DEP'T OF JUST. & FED. TRADE COMM'N, HORIZONTAL MERGER GUIDELINES (2010).

The states argue that, in addition to triggering a structural presumption of illegality based on changes in HHI, HPE's acquisition of Juniper threatens specific forms of competitive harm. Opposition at 33. First, the loss of Juniper as an independent competitor poses risks of "unilateral effects," putting an upward pressure on prices. Opposition at 36. Second, the loss of Juniper from the relevant market increases the risk of harmful "coordinated effects." Opposition at 34. The risk of coordinated effects need not be explicit; as Shapiro explains, the relevant risk is "that Cisco and HPE will pull their competitive punches in some manner, such as by competing less vigorously for each other's customers." Declaration of Carl Shapiro ¶ 66. Finally, the loss of Juniper would result in the loss of a "maverick" competitor encouraging beneficial innovation. Opposition at 33–34. Cisco understood Juniper as a threat to larger, enterprise customers, and HPE strategized internally over how to "Beat [Juniper's] Mist" and noted that Mist's "cloud only approach and … laser focus

---

[5] The federal antitrust agencies have issued guidelines explaining when, in their view, changes in market thresholds are sufficient to trigger a prima facie presumption of liability under Section 7 of the Clayton Act. The guidelines use a measure called the Herfindahl-Hirschman Index (HHI), which is the sum of the squares of competitors' market shares. *See* U.S. DEP'T OF JUST. & FED. TRADE COMM'N, MERGER GUIDELINES (2023), at 5. For example, a market with ten participants each possessing a ten-percent market share has an HHI of 1,000 (10 x 10 $\times 10^2$). The federal guidelines designate a market with an HHI above 1,800 as "highly concentrated" and a change of 100 points or more because of a merger within such a market as a "significant increase." *Id.* If a merger or acquisition increases a market's HHI by more than 100 points in a market with an HHI of 1800 or more, the antitrust agencies "presume[]" that the combination will "substantially lessen competition or tend to create a monopoly" in violation of Section 7 of the Clayton Act. *Id.* at 5–6. Though not carrying the force of law, federal courts, including the Ninth Circuit, have noted that the guidelines "are often used as persuasive authority." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 n.9 (9th Cir. 2015) (quoting *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431 n.11 (5th Cir. 2008)); *FTC v. Kroger Co.*, 2024 WL 5053016, at *16 (D. Or. Dec. 10, 2024).

31

on greenfield deployments" made "Mist feel[] like a more cohesive solution." States Exh. 152, Dkt. No. 426-31, at HPE-LIT-005979424; Declaration of Carl Shapiro ¶ 35.

The two major provisions of the proposed settlement—the divestiture of Instant On and the licensing of the AI Ops for Mist source code—are designed to address the competitive harms alleged in DOJ's complaint to at least some extent. The states contend, however, that they are woefully insufficient.

The states argue that the proposed divestiture of Instant On is insufficient given that product's small market share. Shapiro, relying on the United States's expert's estimates, reports that Instant On's market share was 0.1 percent of the U.S. enterprise-grade WLAN solutions market in 2024, which suggests that its divestiture would not meaningfully affect the relevant market. Declaration of Carl Shapiro ¶¶ 99–100. Shapiro and the states also thought "it notable" that Instant On had not been mentioned by previous expert witnesses. *See id.* ¶ 104. The states argue that Instant On did not actually compete with either HPE's Aruba or Juniper's Mist for U.S. enterprise-grade WLAN solutions customers. Opposition at 41. Instead, Instant On is a business line aimed at smaller businesses. States Exh. 164, Dkt. No. 426-46 (internal HPE email distinguishing between Instant On's focus on "Small and Medium Business" customers and Aruba's focus on "Enterprise" customers). And even though HPE argues that a third-party competitor's acquisition of Instant On could help that competitor grow and enter (or threaten to enter) the enterprise-grade WLAN solutions market, the states argue that high barriers to entry, such as high costs to switch between WLAN solutions providers, make that prospect less likely. Opposition at 41–42. Finally, the states point out that only a limited number of companies have bid for Instant On and only one has any market share in enterprise-grade WLAN solutions at all. Opposition at 42–43; Declaration of Carl Shapiro ¶ 106. Selling Instant On to one of those competitors would not, the states argue, meaningfully affect or constrain the harms arising out of the resulting unilateral effects, coordinated effects, and innovation harms of HPE buying Juniper.

Despite some of the flaws identified by the states, the Court concludes that HPE's divestiture of the Instant On business could nonetheless promote competition in the market to some extent. HPE explains that Instant On is "*marketed* primarily to small and medium enterprise

United States District Court
Northern District of California

32

customers" but that it can still serve larger enterprise customers. HPE Reply at 38 (emphasis added). In fact, Instant On already serves larger enterprise customers "of all sizes and industries, such as Domino's Pizza, Radisson, Gleneagle Hospitals, Tim Hortons, and T-Mobile." *Id.* (citing States Exh. 79, Dkt. No. 420-18). HPE also points out that several smaller WLAN solutions providers have developed market presences by building up their reach from small and medium-sized businesses to increasingly larger enterprise clients. HPE Reply at 40. Considering Instant On's reach along with the fact that newer entrants such have had some success in attracting business away from the market leaders, Instant On does, as HPE puts it, have "competitive potential." HPE Reply at 40.

Though HPE divesting itself of its WLAN business might have more directly addressed the harms alleged in the government's complaint, the divestiture also presented a significant technical consideration given how interconnected those assets are with the rest of HPE. In HPE's last meeting with Antitrust Division staff before taking their case to DOJ leadership, HPE explained to DOJ official Chetan Sanghvi, who asked why HPE could not "divest the entirety of [its] campus and branch" business line, that a broader divestiture "wasn't feasible" for "technical, operational, and financial reasons." States Exh. 18, Schultz Dep., Dkt. No. 417-22, 99:3–10; *see also id.* at 50:4–52:6. Even acknowledging that HPE had an interest in getting DOJ leadership to think that divestiture of WLAN assets was technically infeasible, the Court observes that the states do not meaningfully contest HPE's claim. Nor do they contest that enterprise-grade WLAN solutions are a fraction of HPE's and Juniper's total business and that HPE sought to buy Juniper to acquire its other lines of business as well. *See Hewlett Packard Enter.*, 826 F. Supp. 3d at 1200. And although these concerns might not be particularly relevant in a fully litigated challenge to the proposed merger under Section 7 of the Clayton Act, they might nonetheless shape the manner in which the United States would choose to exercise its prosecutorial discretion.

Here, it is clear both that the divestiture will not comprehensively remedy the concentration of power in the U.S. enterprise-grade WLAN solutions market resulting from HPE's acquisition of Juniper, and that HPE's divestiture of a standalone business will increase, to at least some small extent, the probability that an upstart competitor could use Instant On to gain a toehold

33

United States District Court
Northern District of California

in the enterprise-grade WLAN solutions market and eventually challenge Cisco and HPE as Juniper previously did.

The parties argue that the competitive impact of allowing the acquisition to move forward will be further reduced by HPE's licensing of the AI Ops for Mist source code. The amended proposed final judgment provides that HPE will auction off an irrevocable (absent malfeasance), "one-time, perpetual, worldwide, non-exclusive license" to that source code. Amended Proposed Final Judgment, Dkt. No. 351-1, at 10. The licensing provision provides for HPE and Juniper to transfer up to 30 Juniper engineers and up to 25 Juniper sales personnel to the licensee. *Id.* at 11. If the licensee chooses, HPE will introduce the licensee to Juniper's suppliers, distributors, and other "channel partners." *Id.* at 12.

In the parties' view, the licensee will possess the very technology that made Juniper a maverick competitor, thus remedying the competitive harm resulting from Juniper's absence in the market. Dkt. No. 351, at 4. As the states point out, however, members of the Antitrust Division, particularly head of merger enforcement Rinner, repeatedly criticized HPE's offer to license the AI Ops for Mist source code as a nonstarter. *See* Opposition at 46; States Exh. 40, Dkt. No. 418-19. The states argue that any party that receives the license for AI Ops for Mist will not replicate Juniper's market presence, nor have the motivation to do so, because that licensee "will not receive the same exclusive access to the AI Ops for Mist Source Code that Juniper had." Opposition at 44. But, as discussed earlier, the proposed settlement does not need to replicate Juniper's market presence. The United States's initial complaint identified AI Ops as a key tool from Juniper's previous acquisition of Mist Systems that Mist "had already [used to] differentiate[] itself." Complaint ¶ 6.

The states raise other concerns. The states criticize the fact that the license would be non-exclusive, "which makes it inherently less valuable." Opposition at 44. The states also argue that the licensing arrangement should work in reverse: Instead of HPE licensing the AI Ops source code to a third-party licensee, HPE should sell the source code to a third-party buyer and *HPE* should be allowed to license AI Ops from that buyer. Opposition at 46. The states also say that the license would not include Mist's user-friendly interface, auto-remediation capabilities, or Marvis

34

United States District Court
Northern District of California

Virtual Network Assistant, the interface that users engage with to interact with Juniper's AI capabilities. Opposition at 44; Declaration of Aanjhan Ranganathan, Dkt. No. 417-3 ¶ 38. Finally, on behalf of the states, Professor Aanjhan Ranganathan declares that the license is deficient because it would not provide historical data dating back 12 to 24 months, which Ranganathan says is necessary to "produce reliable AI-driven analysis." *Id.* ¶ 17.[6]

Even though the antitrust agencies may generally prefer a license-back behavioral remedy when addressing intellectual property, the proposed judgment's approach would nonetheless provide AI Ops for Mist to an independent entity who could use it to compete against HPE. And while a licensee may prefer to have the same user interface or auto-remediation capabilities as Juniper, the proposed license still entitles the licensee to the capability to "measure end-user experiences and accurately pinpoint the cause of quality issues in a customer's wireless network," as HPE put it, which Ranganathan does not meaningfully contest. HPE Reply at 35; *see also* Declaration of Aanjhan Ranganathan ¶¶ 24–25. Similarly, HPE clarifies that "'Marvis' is merely a marketing label for disparate functionalities that are either (1) unrelated to AI Ops for WLAN, (2) already captured within the SLEs included in the license, or (3) widely available tools that licensees likely already possess." HPE Reply at 36; *see also* Declaration of Bob Friday, Dkt. No. 436-1 ¶¶ 16–21. The United States further confirms that the license provision "includes source code for … Marvis[] and other features that identify issues in the network that degrade user experience and their causes." US Reply at 18. In a declaration in support of HPE's reply, HPE's Chief AI Officer Bob Friday explains that the settlement's licensing provisions includes the functions relevant to AI Ops that "are the core of the WLAN AI Ops functionalities within Mist." Declaration of Bob Friday ¶ 10. Thus, the AI Ops for Mist source code includes functions that would be helpful to the eventual licensee. Finally, Friday further explains that Mist's functions

---

[6] The states also argue that bidding data indicates the disutility of the license. *See* Opposition at 45–46. Because the Court concludes that the bidding information does not clearly change whether entry of the amended proposed final judgment is in the public interest, and because the probity of such information is tempered by the adversarial position of those bidders, the Court declines to weigh the bidding data for or against entry or rejection of the settlement. To the extent that the states raise concerns about the strength of the auctioning process for the source code license, the Court and DOJ have an ongoing ability to monitor that process.

only need one to four weeks of data to produce sufficient results, not 12 to 24 months, *id.* ¶ 14, and that the proposed license includes all the relevant functions required for the AI Ops product line, *id.* ¶¶ 10–24.

Taken together, the evidence before the Court suggests that HPE's acquisition of Jupiter may concentrate market power to an extent sufficient to establish a prima facie Section 7 violation, while the remedies provided in the proposed judgment may ameliorate the reduction in competition, albeit to a somewhat limited extent.

If the Court were comparing the competitive impact of entering the proposed final judgment against the competitive impact of prohibiting HPE's acquisition of Juniper altogether, it is clear that entry of the proposed final judgment would more negatively impact competition. That is not the appropriate comparison, however, because the Court cannot presume that the United States would succeed in establishing a Section 7 violation at trial.

First, it is possible that the United States would proceed to trial and lose. *See United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 23 (D.D.C. 2007). As noted above, while HPE's acquisition of Juniper is presumptively anticompetitive under both the current merger guidelines and their predecessor, it falls below the threshold identified in *Philadelphia National Bank*.[7] In addition, the primary Ninth Circuit authority cited by the states involved a post-merger HHI of 6,219 and an increase of 1,607—numbers far greater than those presented here and in other successful merger challenges. *See Saint Alphonsus Med. Ctr.-Nampa*, 778 F.3d at 786.

HPE also argued in advance of trial that the market here is unique as compared to those involved in prior merger challenges because the market is dominated by a third party (Cisco) that is overwhelmingly dominant. In HPE's view, its acquisition of Juniper will promote competition

---

[7] To be certain, *Philadelphia National Bank* cautioned that the 30-percent threshold was not a safe harbor from liability either and instead resulted from the fact that the specific merger at issue there would have resulted in a bank with a market share above 30 percent. *Phil. Nat'l Bank*, 374 U.S. at 364 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat."); *see also id.* at 364 n.41 (noting academic commentators suggested that a post-acquisition market share of 20 percent should trigger a presumption of illegality, that a 20-percent threshold is "more rigorous than is required to dispose of the instant case," and cautioning that, "[n]eedless to say, the fact that a market results in a less-than-30% market share, or in a less substantial increase in concentration than in the instant case, does not raise an inference that the merger is not violative of s 7").

United States District Court
Northern District of California

by better enabling it to compete against Cisco. Whether or not the Court would have ultimately accepted that argument, *see FTC v. Kroger Co.*, 2024 WL 5053016, at *39 (D. Or. Dec. 10, 2024) ("The overarching goals of antitrust law are not met, however, by permitting an otherwise unlawful merger in order to permit firms to compete with an industry giant."); *RSR Corp. v. FTC*, 602 F.2d 1317, 1325 (9th Cir. 1979) (rejecting a merging company's argument that the "enlarged [company] will be better able to compete with the industry giant"); MERGER GUIDELINES (2023), at 3 ("When an Industry Undergoes a Trend Toward Consolidation, the Agencies Consider Whether It Increases the Risk a Merger May Substantially Lessen Competition or Tend to Create a Monopoly."); Lina M. Khan, *The Ideological Roots of America's Market Power Problem*, 127 YALE L.J.F. 960, 962 (June 4, 2018) ("Concentration begets concentration."), the argument presented additional grounds for HPE to attempt to show a lack of harm to competition resulting from the merger, and could have affected the United States's own exercise of its prosecutorial discretion.

Crucially, the risk of the merger moving forward without any remedial measures would also be realized if the United States were to simply dismiss this lawsuit following the proposed judgment's non-approval. Although the Tunney Act requires the Court to approve any proposed consent decree, it does not limit the parties' ability to dismiss the case altogether. *See* FED. R. CIV. P. 41(a)(1)(A)(ii); *cf.* FED. R. CRIM. P. 48(a) (permitting government's dismissal of a criminal indictment, information, or complaint only "with leave of court"). Given the differences between this merger challenge and prior successful merger challenges noted above, there is at least a reasonable chance that the United States would choose this path.

Under these circumstances, approval of the amended proposed final judgment will have a less significant negative impact on competition than permitting the acquisition to move forward without any conditions, but a more significant negative impact on competition than preventing the acquisition altogether. The last outcome, however, is one this Court cannot independently order.[8]

---

[8] As the Court has previously noted, the states are free to pursue such a remedy in their own challenge to the acquisition should they choose to file such a lawsuit.

**B.  Enforcement and Modification Provisions**

The amended proposed final judgment provides that, if defendants do not divest HPE's Instant On business within five days after notice of entry of final judgment, defendants shall notify the United States in writing. Dkt. No. 351-1, at 6. The United States will then apply for the Court to approve a trustee, chosen by the United States, to conduct the sale. *Id.* The trustee will be able to hire professionals at defendants' expense. *Id.* The trustee will file monthly reports to the United States and the Court. *Id.* at 7–8. The amended proposed final judgment establishes similar procedures and backstops for the license of the AI Ops for Mist source code. *See id.* at 10–18. For four years after the expiration of the final judgment, if the United States has evidence of a violation of the final judgment before its expiration, the United States can request an order to compel defendants to comply with the final judgment, to issue contempt remedies, to order additional relief needed to secure compliance, and to recover fees or expenses. *Id.* at 23. The Court "retains jurisdiction" to issue "further orders and directions as may be necessary or appropriate to carry out or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to punish violations of its provisions." *Id.* at 22.

The Court concludes that these provisions are adequate to ensure compliance and implementation of the proposed judgment.

**C.  Duration of Relief Sought**

The proposed final judgment expires ten years from the date of its entry. Dkt. No. 351, at 8; Dkt. No. 351-1, at 23–24. The duration is reasonable in light of the judgment's requirements.

**D.  The Anticipated Effects of Alternative Remedies Actually Considered**

The states' discovery revealed three alternative remedies actually considered by the United States: broader divestitures, including a full divestiture of the campus and branch business line; an "HPE Invest in America Plan"; and a commitment not to raise prices for 12 months.

For the reasons noted above, a broader divestiture remedy likely would be more effective in preventing a loss of competition. But given HPE's unwillingness to accept such a remedy (in part because of its purported infeasibility), that remedy would only be available if the United States were to succeed at trial in blocking the merger. The Court's analysis of that alternative

remedy's anticipated effects thus mirrors its analysis of the proposed judgment's competitive impact.

The Invest in America Plan bears no connection to the enterprise-grade WLAN solutions market and as a result its anticipated effects are irrelevant to the public interest inquiry here.

Finally, the deletion of the pricing commitment from the proposed judgment does not reveal that the settlement is not in the public interest. The commitment's inclusion in the near-final settlement drafts might signal, as the states argue, that "there was recognition of the risk of non-competitive pricing following the merger." Opposition at 40. Indeed, HPE's Schultz understood the commitment's deletion to be the result of DOJ officials' worries about "set[ting] the precedent," rather than a reflection of its substantive merits. At the same time, its removal could also suggest that the United States did not consider it necessary or was skeptical about the benefits provided by such commitments. Given the time-limited nature of the commitment and the criticism that such commitments are ineffective in remedying the harms resulting from market consolidation, *see supra* note 3, the Court cannot conclude that the anticipated effects of the proposed pricing commitment were so great as to preclude the Court from approving a proposed judgment lacking that commitment.

### E.  Whether Terms are Ambiguous

None of the terms of the proposed judgment are problematically ambiguous. If the parties seek an interpretation of the final judgment, they may do so according to the interpretive rules laid out in the judgment. *See* Dkt. No. 351-1, at 22–23.

### F.  The Impact of Entry on the Public Generally and Individuals

Finally, the Court must "consider … the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint…." 15 U.S.C. § 16(e)(1)(B). To the extent this factor relates to the competitive impact on the public of the proposed final judgment, the Court considered that impact above. The record before the Court includes no evidence regarding other impacts on the public generally beyond the concerns about good governance and backroom dealmaking asserted by the states. But as noted already, concerns about the United

United States District Court
Northern District of California

States's settlement negotiation process are not properly considered under this factor.

Finally, the proposed judgment would have only a minimal impact on "individuals alleging specific injury from the violations set forth in the complaint" because those individuals retain all rights and privileges they had before entry of this settlement. In particular, the proposed settlement would have no preclusive effect on any other action, including any action the states might choose to pursue. *See* 15 U.S.C. § 16(a).[9]

*        *        *

Having considered each of the factors set forth in the Tunney Act, the Court concludes that entry of the amended proposed final judgment is in the public interest. There is little doubt that permitting HPE's acquisition of Juniper to go forward may lessen competition within the U.S. enterprise-grade WLAN solutions market by eliminating one of the three primary competitors within that market. At the same time, however, the Court lacks the independent power to prevent that outcome, and the conditions imposed by the proposed final judgment may help ameliorate the impact of the acquisition to at least a limited extent. Given the possibility that the acquisition might take place without any divestiture of assets or licensing of source code, entering a final judgment requiring such remedies, while preserving the right of other parties, including the states, to seek further relief, serves the public interest.

## CONCLUSION

There is no question that the states' participation in these Tunney Act proceedings advanced the public interest in transparency. Their discovery efforts and briefing to the Court have helped the public understand how federal officials exercised their enforcement discretion and conducted litigation and settlement negotiations on behalf of the United States. If the states had never stepped in, the public would never have known that DOJ leadership overrode the opinions of the Antitrust Division staff, nor that the United States considered and ultimately rejected

---

[9] The Tunney Act also requires the Court to consider "the public benefit, if any, to be derived from a determination of the issues at trial." 15 U.S.C. § 16(e)(1)(B). Here, there is no obvious public benefit from a determination of the issues at trial separate and apart from the possibility that the trial would result in the finding of a Section 7 violation. The Court considered that issue above and will not do so again here.

alternative settlement proposals. The skillful advocacy of the state enforcers pressure tested the United States's settlement. The states may still bring their own challenge to the merger. Even short of such an independent challenge, the states' efforts may help inform the political process and future engagement with the Executive Branch in matters relating to antitrust enforcement.

Nonetheless, based on the record before the Court, the Court concludes that the proposed final judgment is in the public interest. The United States's motion for entry of final judgment is therefore granted.

The pending motions to seal are denied to the extent that they seek to seal anything cited in this order.

**IT IS SO ORDERED.**

Dated: August 12, 2026

P. Casey Pitts
United States District Judge