HENRY C. SU (CA BAR 221202)
JEREMY M. GOLDSTEIN (CA Bar 324422)
MICHAEL G. LEPAGE (DC Bar 1618918)
United States Department of Justice, Antitrust Division
450 Golden Gate Ave., Room 10-0101
San Francisco, CA 94102
henry.su@usdoj.gov
jeremy.goldstein@usdoj.gov
michael.lepage@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

[Additional counsel listed on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

HEWLETT PACKARD ENTERPRISE CO. and JUNIPER NETWORKS, INC.

*Defendants.*

Case No. 5:25-CV-00951-PCP

**PLAINTIFF UNITED STATES' REPLY IN FURTHER SUPPORT OF ENTRY OF FINAL JUDGMENT**

Judge: Hon. P. Casey Pitts

Hearing: March 23, 2026

# TABLE OF CONTENTS


INTRODUCTION ..... 1

STATEMENT OF RELEVANT FACTS ..... 3

I. The United States Brought This Action to Protect Competition in the Market for Enterprise-Grade Wireless Local Area Networks in the United States, and No State Elected to Join the Action ..... 4

II. After Extensive Negotiations and Multiple Exchanges of Proposals, the Parties Reached a Settlement on the Eve of Trial ..... 5

III. The United States Has Obtained a Settlement That Squarely Addresses the Alleged Competitive Harms in the Complaint ..... 7

A. The Settlement Requires HPE to Divest Its Instant On Solution ..... 7

B. HPE Must License Mist's AIOps Source Code ..... 8

C. The Amended Proposed Final Judgment Includes Other Terms to Protect Competition ..... 9

IV. The United States Has Complied Fully with the Tunney Act Process, Including Amending the Proposed Final Judgment in Response to Public Comments ..... 9

V. Several States Were Allowed to Intervene as Parties for the Sole Purpose of Participating in the Tunney Act Review Proceedings ..... 10

ARGUMENT ..... 11

I. Entry of the Proposed Final Judgment Is in the Public Interest ..... 12

A. The Amended Proposed Final Judgment Satisfies the Tunney Act ..... 12

1. An Antitrust Settlement Should Be Approved If It Is "Within the Reaches of the Public Interest" ..... 13

2. Entry of the Proposed Final Judgment Is in the Public Interest ..... 15

a. The Divestiture of Instant On Addresses Competitive Concerns ..... 15

b. Licensing the Mist AIOps Source Code Lowers Entry Barriers ..... 17

c. Dr. Shapiro Does Not Aid the Court's Public Interest Determination ..... 22

B. The United States Has Fully Complied with the Tunney Act Procedures ..... 24

II. The States' Process Claims Are Unfounded and Irrelevant ..... 27

A. The Settlement Negotiations Were Appropriate Arms-Length Negotiations ..... 27

B. There Are No "Side Deals" ..... 31

C. Internal Disagreements Are Not a Basis for Rejecting the Settlement ..... 31

D. Intense Advocacy Alone Does Not Provide a Basis for Rejecting the Settlement ..... 33

CONCLUSION ..... 34

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*In re AMR Corp.*,
No. 22-901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023) ........ 34

*In re Rich Global, LLC*,
No. 16-cv-00217-ABJ, 2018 WL 11536422 (D. Wyo. Nov. 30, 2018) ........ 22

*United States v. Alex. Brown & Sons, Inc.*,
963 F. Supp. 235 (S.D.N.Y. 1997) ........ 22

*United States v. AT&T Co.*,
552 F. Supp. 131 (D.D.C. 1982) ........ 29

*United States v. Armour & Co.*,
402 U.S. 673 (1971) ........ 27

*United States v. Assa Abloy AB,*
No. 1:22-cv-02791-ACR (D.D.C.) ........ 15

*United States v. Bechtel Corp.*,
648 F.2d 660 (9th Cir. 1981) ........ passim

*United States v. BNS Inc.*,
858 F.2d 456, (9th Cir. 1988) ........ 13

*United States v. CBS Corp.*,
No. 1:99-cv-03212, 2000 WL 33115902 (D.D.C. June 6, 2000) ........ 27

*United States v. Deutsche Telekom AG*,
No. 1:19-cv-02232-TJK, 2020 WL 1873555 (D.D.C. Apr. 14, 2020) ........ 14, 17, 19

*United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*,
228 F. Supp. 483 (S.D.N.Y. 1964) ........ 33

United States v. *JDS Uniphase Corp.*,
No. 3:00-cv-02227-TEH, 2000 WL 33115892 (N.D. Cal. Oct. 3, 2000) ........ 13

*United States v. JetBlue Airways Corp.*,
No. 1:23-cv-10511 (D. Mass) ........ 4

*United States v. Keysight Techs., Inc.*,
No. 1:25-cv-01734-CJN (D.D.C.) ........ 8, 30

*United States v. Microsoft Corp.*,
231 F. Supp. 2d 144 (D.D.C. 2002) ........ 30

United States v. *Microsoft Corp.*,
*56* F.3d 1448 (D.C. Cir. 1995) ........ 13, 24

*United States v. Microsoft Corp.*,
No. 94-cv-01564, 1995 WL 121107 (D.D.C. Mar. 14, 1995) ........ 24

*United States v. Safran, S.A.*,
No. 1:25-cv-01897-CRC (D.D.C.) ........ 30

*United States v. SBC Commc'ns, Inc.*,
489 F. Supp. 2d 1 (D.D.C. 2007) ........ 14, 16, 19

*United States v. US Airways Group, Inc.*,
*38* F. Supp. 3d 69 (D.D.C. 2014) ........ 14, 34

*United States v. United Health Grp. Inc.*,
No. 1:24-cv-3267-JKB (D. Md.) ........ 4, 8, 30

*United States v. UnitedHealth Grp. Inc.*,
No. 1:22-cv-00481 (D.D.C.) ........ 4

**Statutes**

15 U.S.C. § 16(b) ........ 9, 25
15 U.S.C. § 16(d) ........ 9
15 U.S.C. § 16(e)(1) ........ 13, 25, 30
15 U.S.C. § 16(e)(1)(A) & (B) ........ 1, 3, 13, 31
15 U.S.C. § 18 ........ 4

**Rules**

Fed. R. Civ. P. 26(a)(2)(A) ........ 37
Fed. R. Civ. P. 26(a)(2)(C) ........ 36
Fed. R. Civ. P. 37(c)(1) ........ 37
Fed. R. Evid. 702(a) ........ 22

**Regulations**

28 C.F.R. § 0.19(a) ........ 32

**Other Authorities**

119 Cong. Rec. 24,598 (daily ed. July 18, 1973) ........ 14, 29
90 Fed. Reg. 30,685 (July 10, 2025) ........ 9
90 Fed. Reg. 52,097 (Nov. 19, 2025) ........ 10
H.R. Rep. No. 93-1463 (1974) ........ 27, 29
S. Rep. 93-298 (1973) ........ 14, 25, 26, 29

## INTRODUCTION

The States—all of which are led by Democratic State Attorneys General—promised a scandal. But after an unprecedented Tunney Act process in which eight executives, agents, and officials were deposed and 29,000 documents produced, the States' opposition brief asks this Court to draw a host of groundless inferences and cast the ordinary course settlement discussions as somehow nefarious. As the evidentiary record, however, makes plain, there is not a scintilla of evidence suggesting a scandal. The United States respectfully requests that this Court enter the amended proposed Final Judgment, close this matter, and bring the States' politically motivated farce to an end.

The question before the Court is whether the amended proposed Final Judgment is "within the reaches of the public interest." *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981). The specific "public interest" factors set forth in the Tunney Act focus on the competitive impact of the proposed judgment and its impact on competition in the relevant market and on the public. *See* 15 U.S.C. § 16(e)(1)(A) & (B). The amended proposed Final Judgment readily satisfies the Tunney Act: it directly remedies the competitive harms alleged in the Complaint through a targeted divestiture and licensing requirements that promote competition in the relevant market. Specifically, HPE must divest its "Instant On" enterprise-grade WLAN business, which operates in the relevant market alleged in the Complaint and may create or strengthen an independent competitor. Additionally, HPE must license the source code for Juniper's Mist AIOps technology—features of Mist's innovative network management solution that the Complaint credits with enabling Juniper's rapid growth and disruptive competitive impact in the market—allowing other firms to access valuable technology and, with the help of transitional services also provided by HPE, compete more effectively.

Pursuant to the Tunney Act, the United States invited public comment over a 60-day period. Not a single comment opposing the settlement came from those with the most direct interest in its competitive effects: customers of enterprise-grade WLAN solutions, who would bear the brunt of any anticompetitive harm unaddressed by the settlement, and competitors in the relevant market, who would be best positioned to identify shortcomings in the remedies. This absence of concern from market participants speaks volumes about the settlement's adequacy in protecting competition.

The States, however, baselessly claim the existence of a scandal: "But public reporting has now

shed light on the events that led to the Settlement; and if it is true that lobbying pressure and secret side arrangements substituted for antitrust legal analysis in reaching this outcome, then high-level political appointees at the DOJ breached the public trust and the Settlement violates the Tunney Act." Dkt. 311-9, at 5. Responding to the States' accusations, the Court permitted unprecedented discovery for a Tunney Act proceeding, including depositions of officials as senior as the former Chief of Staff to the Attorney General of the United States. And for all this effort, what did the States find? Nothing. The settlement was reached after back-and-forth negotiations and exchanged proposals between the Department of Justice and HPE. The result was, like most settlements, a compromise. There is no side deal. The amended proposed Final Judgment is the one and only settlement proposal before the Court. The States' claims of scandal continue to be based only on unconfirmed hearsay and rumors from the press and pundits seeking to sensationalize the mundane—the settlement of a case in which each side faced litigation risk, and for which settlement brings finality and avoid protracted litigation. To be clear, notwithstanding the unsupported innuendo, the States do not—as they cannot—refer this Court to a shred of admissible evidence that remotely suggests impropriety on the part of the Department of Justice.

The States, plainly motivated by nothing more than political calculation, now argue that the United States had a strong case and should not have settled. But the Tunney Act does not allow them to second-guess the Department's judgment and exercise of prosecutorial discretion. *See Bechtel Corp.*, 648 F.2d at 666 ("The balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General."). Tellingly, if the States were truly interested in challenging the merger, they could have and would have joined the United States' complaint as co-plaintiffs. But none of them did. Nor has any State filed its own action challenging the merger.

Fully aware that the evidentiary record does not support their application, the States desperately resort to submitting a declaration from an Obama Administration official who lacks any personal knowledge of this case. Tellingly, the States' declarant fails to disclose that while he served as Assistant Attorney General for the Antitrust Division, he oversaw an eve-of-trial settlement of the Department's

challenge to the merger of American Airlines and US Airways that was approved under the Tunney Act, despite it being widely criticized at the time as substantively insufficient and politically motivated. The omission underscores the insufficiency of the States' intervention application: allegations of political motivations or a disagreement with the terms of a settlement approved by the Department does not constitute a basis for challenging the settlement under the Tunney Act.

The time has now come for the States' political charade to end, the Court to enter the amended proposed Final Judgment, and customers and consumers in the enterprise-grade WLAN market to begin enjoying the benefits of added competition from the divestiture of Instant On and the licensing of Mist AIOps. It has been almost nine months since the United States and HPE filed their settlement papers with this Court—several months longer than the Court allowed the Parties to prepare for trial. The clock is ticking.

The Court should enter the amended Proposed Final Judgment forthwith.

## STATEMENT OF RELEVANT FACTS

The States' opposition brief includes a 20-page statement of facts, nearly all of which is irrelevant to the narrow question before this Court: namely, whether the amended proposed Final Judgment satisfies the specific "public interest" criteria set forth in the Tunney Act, 15 U.S.C. § 16(e)(1)(A) & (B), and thus should be entered by this Court. The key facts relevant to the Court's Tunney Act analysis are these: (1) the United States brought this action to protect competition in the market for enterprise-grade wireless local area network ("WLAN") solutions in the United States, and no State elected to join the United States' action; (2) the United States engaged in arms-length, contentious settlement negotiations with the Defendants; (3) the United States obtained a settlement that promotes competition in the relevant market; and (4) the United States provided public notice and took additional steps in full compliance with the Tunney Act. After the States intervened in this action, the Court made clear that "*the sole issue before the Court at this time* is whether entry of the proposed final judgment is in the public interest as that term is used in the Tunney Act." Dkt. 350, at 3 (emphasis added).

## I. The United States Brought This Action to Protect Competition in the Market for Enterprise-Grade Wireless Local Area Networks in the United States, and No State Elected to Join the Action

On January 30, 2025, the United States sued to enjoin the proposed acquisition of Juniper by HPE. The Complaint alleged that the acquisition likely would substantially lessen competition in the United States market for enterprise-grade WLAN solutions in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. Dkt. 1. The Complaint defined enterprise-grade WLAN solutions as wireless access points, the separate network-management hardware or software systems to monitor or manage them, and related logistical support. *Id.* ¶ 5.

HPE and Juniper were the second- and third-largest enterprise-grade WLAN solutions providers in the United States, behind market leader Cisco. Dkt. 1, ¶ 5. The Complaint alleged that Juniper utilized its innovative network management software platform, Mist, to grow rapidly in the enterprise-grade WLAN market and spurred both price and product innovation competition with HPE. *Id.* ¶¶ 6–11, 44–48. The Complaint further alleged that Mist's artificial intelligence and machine learning tools (known as "AIOps") were a critical component of Mist's appeal to customers, as these tools can proactively identify, diagnose, and resolve technical issues before they cause network outages, thereby increasing the productivity of network administrators. *Id.* ¶¶ 6–7.

The Complaint alleged a single relevant market for enterprise-grade WLAN solutions, as opposed to discrete submarkets for small-, medium-, or large-sized enterprises. *See* Dkt. 1, ¶¶ 34–38. The Complaint alleged that the geographic scope of this market was national. *Id.* ¶ 39.

Although states, including those intervening here, routinely join the United States in merger challenges and other antitrust enforcement actions,[1] not a single state joined this action as a plaintiff at the time the Complaint was filed or any time thereafter. Nor has any state brought any action in another venue seeking to block HPE's acquisition of Juniper.

[1] *See, e.g.*, *United States v. UnitedHealth Grp. Inc.*, No. 1:24-cv-3267-JKB (D. Md.) (the United States joined by Intervenors Illinois and New York, along with two others); *United States v. JetBlue Airways Corp.*, No. 1:23-cv-10511 (D. Mass) (the United States joined by Intervenors District of Columbia and New York, along with one other); *United States v. UnitedHealth Grp. Inc.*, No. 1:22-cv-00481 (D.D.C.) (the United States joined by Intervenors Minnesota and New York).

## II. After Extensive Negotiations and Multiple Exchanges of Proposals, the Parties Reached a Settlement on the Eve of Trial

As is often the case, lawyers for the United States and the Defendants engaged in settlement discussions while they prepared for trial. After the Complaint was filed, the Defendants, with HPE taking the lead, first made a settlement proposal to the United States on April 18, 2025, which they revised on April 22, May 1, and May 9, 2025. States Ex. 76 (HPE-TUNNEY-0041833); States Ex. 32 (DOJ-TUNNEY-00001694); States Ex. 38 (HPE-TUNNEY-0040906); States Ex. 33 (DOJ-TUNNEY-00000042). These initial offers featured two primary components: the licensing of Juniper's Mist AIOps source code to one or more companies, and a pledge by HPE to make certain investments in the United States. Ex. 1 (DOJ-TUNNEY-00001155) at -158; Ex. 2 (DOJ-TUNNEY-00001153).

The United States responded with an aggressive counterproposal on May 16, 2025. States Ex. 39 (HPE-TUNNEY-0040968) at -969. The counterproposal would have required the merged company to divest Juniper's entire Campus and Branch business segment, including the WLAN and Mist businesses of Juniper. *Id.* The Defendants responded on June 4, 2025, by further revising their proposal. States Ex. 41 (HPE-TUNNEY-0040964). This iteration retained the Mist AIOps source code license and added another structural remedy: the divestiture of HPE's Instant On business, which includes an enterprise-grade WLAN solution. Ex. 4 (DOJ-TUNNEY-00000115). After an in-person meeting with HPE's representatives on June 5, 2025, the United States countered again on June 10, 2025. States Ex. 36 (HPE-TUNNEY-0041120). Like the United States' earlier demand, this revised counterproposal would have required the divestiture of Juniper's Campus and Branch business segment. Ex.5 (DOJ-TUNNEY-00000414) at -414. However, to address concerns raised by the Defendants, the counterproposal would have allowed the merged company to license back the source code for Juniper's Mist network management software for up to 7 years. *Id.* at -415.

Throughout these negotiations, HPE maintained that divestiture of either the Juniper or Aruba WLAN business would be unacceptable. *See* States Ex. 68 (HPE-TUNNEY-0040852); Ex. 6 (Rinner Dep.) at 89:13–90:3 (stating that HPE communicated it was unwilling to go beyond its existing offer at that time). HPE contacted then-Acting Associate Attorney General Chad Mizelle, who supervised the

Antitrust Division among other Department of Justice components. Ex. 7 (Schultz Dep.) at 106:19–107:22; Ex. 8 (Levi Dep.) at 106:23–108:4; Ex. 9 (Mizelle Dep.) at 69:22–71:12. Mr. Mizelle asked HPE's representatives probing questions about the merger and the proposed remedies. Ex. 7 (Schultz Dep.) at 110:4–112:5; Ex. 8 (Levi Dep.) at 108:12–109:10; Ex. 9 (Mizelle Dep.) at 69:22–71:15, 79:3–80:13, 88:2–89:19. Mr. Mizelle delegated responsibility of this matter to Stanley Woodward, then counselor to the Attorney General. *See* Dkt. 369-3, ¶ 25 (stating that Mr. Mizelle referred HPE's chief legal officer to Mr. Woodward for settlement negotiations). Between June 10 and June 26, 2025, Mr. Woodward and the Antitrust Division discussed the matter. *See, e.g.*, States Ex. 48 (Pl.'s Priv. Log, Bates No. DOJ_TUNNEY_TEMP_00057623) (June 25, 2026 internal communication between Mr. Woodward and the Antitrust Division).

HPE responded with a new proposal on June 26, 2025, that combined two of its earlier concepts (the source code licensing and proposed U.S. investments) with a new proposed behavioral remedy of limited duration—a twelve-month limit on price increases for WLAN products. *See* States Ex. 43 (HPE-TUNNEY-0041639); Ex. 10 (DOJ-TUNNEY-00001856) at -862–63.

Working together, the Acting Associate Attorney General and the Antitrust Division finalized a compromise that replaced price regulation with the Instant On divestiture and did not include the proposed U.S. investments. *See* Dkt. 217-1, at 5; Ex. 7 (Schultz Dep.) at 161:12–21 (stating that then-Deputy Assistant Attorney General William Rinner of the Antitrust Division informed HPE that the United States did not wish to include the investment provisions in the settlement); Ex. 6 (Rinner Dep.) at 43:18–45:8 (stating that he informed counsel for HPE that the Department did not consider the investment provisions to be part of the settlement proposal). The proposed Final Judgment was filed with the Court on June 27, 2025. Dkt. 217-1. The related stipulations and other documents were signed by officials with supervisory authority over the Antitrust Division, including the Acting Associate Attorney General, the Assistant Attorney General for Antitrust, and four Deputy Assistant Attorneys General from the Antitrust Division. Dkt. 217, at 17; Dkt. 218, at 3.

## III. The United States Has Obtained a Settlement That Squarely Addresses the Alleged Competitive Harms in the Complaint

The amended proposed Final Judgment[2] remedies competitive harms identified in the United States' Complaint by requiring HPE to divest Instant On—a fully operational enterprise-grade WLAN business, including hardware, software, customer relationships, and intellectual property—and license the source code for Juniper's Mist AIOps technology, with transitional services if requested.

### A. The Settlement Requires HPE to Divest Its Instant On Solution

The amended proposed Final Judgment requires HPE to divest its worldwide Instant On Campus and Branch business within 180 calendar days after the filing of the amended proposed Final Judgment, or five days after the entry of the Final Judgment, whichever is later. Dkt. 311-2, at 5. The Instant On business operates in the United States market for enterprise-grade WLAN solutions alleged in the Complaint. *See* Dkt. 1, ¶¶ 34–39; Dkt. 298, at 13.

The divestiture terms include provisions designed to make the divestiture commercially effective, which the United States commonly includes in its proposed antitrust judgments. Specifically, the divestiture must include all tangible and intangible assets related to or used in connection with this business, including all contracts, agreements, and customer relationships included in the business. Dkt. 311-2, at 5. HPE must use best efforts to accomplish the assignment or transfer of any contract or agreement that requires the consent of another party. *Id.* at 5. Should HPE be unable to divest Instant On within the required time frame, the amended proposed Final Judgment permits the Court to appoint a Divestiture Trustee selected by the United States to sell the business. *Id.* at 6. HPE would be required to pay all costs and expenses related to the Trustee, and it could not object to a sale consummated by the Trustee except on grounds of malfeasance. *Id.* at 6–7.

The United States has sole discretion on whether to accept any divestiture acquirer. Dkt. 311-2, at 5. This provision is also consistent with the United States' other proposed antitrust judgments,

[2] The proposed Final Judgment filed on June 27, 2025, was amended on November 14, 2025, in response to public comments. Dkt. 311. *See infra*, Section IV. Consequently, the amended proposed Final Judgment is now the operative document awaiting entry by the Court. In discussing the settlement terms in this Reply, the United States refers to and cites the amended proposed Final Judgment even though those terms, unless specifically called out, *see* Dkt. 311 at 9 (describing the amendments), were also present in the proposed Final Judgment originally filed in June 2025.

allowing the Antitrust Division to screen proposed acquirers and reject any that lacks the means and incentive to compete effectively. *See, e.g.,* Final Judgment, at 11–12, *United States v. UnitedHealth Grp., Inc.*, No. 1:24-cv-03267-JKB (D. Md. filed Dec. 9, 2025), ECF 249; Final Judgment, at 9, *United States v. Keysight Techs., Inc.*, No. 1:25-cv-01734-CJN (D.D.C. filed Sept. 15, 2025), ECF 24.

**B. HPE Must License Mist's AIOps Source Code**

The amended proposed Final Judgment requires HPE to issue one or more perpetual, worldwide, non-exclusive licenses for the Mist AIOps source code to competitors. Dkt. 311-2, at 10. HPE is to hold an auction for the license within 180 calendar days of the filing of the amended proposed Final Judgment, or five days after the entry of the Final Judgment, whichever is later. *Id*.

Under the terms of the auction, HPE must issue two licenses if more than one bid exceeds $8 million. Dkt. 311-2, at 12–13. This requirement will ensure that a robust market response to this competitive opportunity is accommodated. Both licensees would have the right to utilize and further develop the licensed source code for their networking products, and any further improvements developed after the license date will be owned by the licensee—a term that will encourage further innovation in the market. *Id.* at 13. One of the licensees, designated as the primary licensee, will also have the right to contract with HPE for 12 months of support services, including the transfer of up to 30 engineers familiar with the source code and up to 25 sales personnel experienced in selling Mist. *Id.* at 11. HPE must also facilitate introductions for the primary licensee to: (1) Juniper's original design manufacturer suppliers for WLAN hardware; (2) Juniper's distributors for WLAN in the United States; and (3) channel partners that worked with Juniper to sell WLAN in the United States. *Id.* at 12. These transitional services will provide the primary licensee with the expertise and support needed to fully integrate the Mist AIOps source code into its product lines and develop new business opportunities.

The amended proposed Final Judgment also provides for the appointment of a Trustee should HPE not license the source code in a timely manner. Dkt. 311-2, at 13–17. In addition, the United States has sole discretion on whether to accept any proposed licensee. *Id.* at 10. Like the parallel provision for potential acquirers of the Instant On business, this provision allows the Antitrust Division to screen proposed licensees and reject any that lacks the means and incentive to compete effectively.

### C. The Amended Proposed Final Judgment Includes Other Terms to Protect Competition

The amended proposed Final Judgment also contains other standard terms, commonly included in Antitrust Division judgments, intended to ensure the success of its remedies. In addition to specifying detailed terms and procedures for executing the Instant On divestiture and source code licensing, the amended proposed Final Judgment requires HPE to submit affidavits to the United States every 30 days documenting the company's efforts to sell the divestiture assets and conduct the source code auction. Dkt. 311-2, at 20. HPE has been submitting these affidavits on a timely basis.

The amended proposed Final Judgment also provides a mechanism for the United States to inspect HPE's records and operations to ensure compliance with the terms of the judgment. Dkt. 311-2, at 20–22. Specifically, the United States can require HPE to: (1) produce copies of books, records, data, and documents related to any matters contained in the judgment; (2) make officers, employees, and agents of the company available for interview by the United States about such matters; and (3) submit written reports about such matters. *Id.*

## IV. The United States Has Complied Fully with the Tunney Act Process, Including Amending the Proposed Final Judgment in Response to Public Comments

In compliance with the Tunney Act, the United States published the proposed Final Judgment and the Competitive Impact Statement in the *Federal Register* on July 10, 2025, *see* 90 Fed. Reg. 30,685 (July 10, 2025), and caused a summary of the terms of the proposed Final Judgment and the Competitive Impact Statement, along with directions for the submission of written comments, to be published in *The Washington Post* and *The Mercury News* for seven days over a two-week period, beginning on July 9, 2025. During the Tunney Act's 60-day public comment period, *see* 15 U.S.C. § 16(b), the United States received 12 public comments. *See* Dkt. 311-5 to 311-15. Pursuant to 15 U.S.C. § 16(d), on November 14, 2025, the United States filed with the Court its response to the public comments, while also submitting an amended proposed Final Judgment that incorporates changes the United States made in response to the comments. *See* Dkt. 311; Dkt. 311-2; Dkt. 311-3; Dkt 311-4 (summarizing the amendments and the comments to which they pertain). As required by statute and the Court's order, the United States also published the response to comments in the *Federal Register*, along with basic

information about the comments received. *See* 90 Fed. Reg. 52,097 (Nov. 19, 2025).

The United States and HPE responded to the public comments by agreeing to make several changes to the proposed Final Judgment. Among other things, the amendments require HPE to use best efforts to divest Instant On and license the Mist AIOps source code as expeditiously as possible, Dkt. 311-2, at 18, and, if a Trustee is appointed, for the Trustee to sell Instant On and/or license the source code as quickly as possible, *id.* at 6, 14. The amendments also make clear that the divestiture and license(s) must be accomplished in such a way as to satisfy the United States, in its sole judgment, that Instant On and the Mist AIOps source code can and will be used by the acquirer and licensee(s) to compete in the United States market for enterprise-grade WLAN solutions. *Id.* at 18–19. The amendments add a provision by which the transitional services for the source code may be extended by an additional 6 months at the request of the primary licensee and with the approval of the United States. *Id.* at 11. Finally, the amended proposed Final Judgment includes enhanced enforcement provisions beyond those in the original proposed Final Judgment. *Id.* at 22–23.

## V. Several States Were Allowed to Intervene as Parties for the Sole Purpose of Participating in the Tunney Act Review Proceedings

On October 14, 2025, during the pendency of the Tunney Act process, the Attorneys General for the States of Colorado, California, Connecticut, Hawaii, Illinois, Massachusetts, Minnesota, North Carolina, New York, Oregon, Washington, and Wisconsin, as well as the District of Columbia, moved to intervene in this action. Dkt. 236. On December 1, 2025, this Court granted the States' motion, making clear that they are solely "participat[ing] as parties in the Court's Tunney Act review proceedings," and not for any other purpose like pursuing an independent challenge to the merger. Dkt. 332, at 12.

On December 31, 2025, the Court entered an order allowing the States, as intervening parties, to pursue discovery in connection with the Tunney Act review proceedings. The Court made clear, however, that any discovery by the States "must [] be targeted to the issues that are pending before the Court," and "*the sole issue before the Court at this time* is whether entry of the proposed final judgment is in the public interest as that term is used in the Tunney Act." Dkt. 350, at 3 (emphasis added). The

Court added that the States' discovery requests must be focused on the adequacy and competitive effect of the proposed Final Judgment and, accordingly, "discovery requests that are targeted solely at the Department of Justice's internal decision-making process and that lack any connection to the adequacy of the proposed final judgment would likely be improper." *Id.* at 6.

## ARGUMENT

The Court should enter the amended proposed Final Judgment because it is within the reaches of the public interest, based on the considerations described in the Tunney Act. This is all that Ninth Circuit precedent requires. *See Bechtel Corp.*, 648 F.2d at 666 ("The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is within the reaches of the public interest") (internal quotation omitted). Courts routinely apply the Tunney Act by entering consent judgments even when those judgments are criticized, fairly or unfairly, for being imperfect solutions to the competitive harms alleged in the underlying complaints. This is consistent with the Tunney Act's pragmatic approach—while it mandates certain disclosures and process, it preserves the United States' right to compromise claims, obtaining the certainty of settlement when it is preferred to the uncertainty of litigation risk, among other prudential considerations.

Here, the amended proposed Final Judgment readily satisfies the Tunney Act standard because it contains two complementary structural remedies designed to strengthen competition in the market where the HPE–Juniper transaction would have allegedly harmed competition, according to the Complaint. The amended proposed Final Judgment also contains other provisions, commonly found in antitrust settlements, that will protect the efficacy of these remedies. These provisions will benefit the marketplace and address the harms alleged in the United States' Complaint.

The States quibble with these remedies and argue that they are less than what the United States might have sought or won at trial. That may be true, but it was not at all assured when the case was settled, particularly given the dynamic character of the market at issue, and notwithstanding the United States' zealous pre-trial advocacy. Further, these same prescient States chose not to join the United States in challenging the underlying merger. Although they could have, they sought no remedies at all. The States also seek to raise the bar above the Tunney Act's practical requirements. Their misguided

framework would not only misapply the law here but also discourage other reasonable settlements and weaken future antitrust enforcement.

The States also quibble with the United States' compliance with Tunney Act's requirement to file a Competitive Impact Statement. They are wrong—the United States substantially complied with the Tunney Act's procedural requirements, which is all Ninth Circuit precedent requires.

With no substantial argument against the amended proposed Final Judgment, the States focus much of their brief on salacious characterizations of the settlement negotiations. In doing so, they color beyond the lines of the Tunney Act, which focuses on the terms and impact of the amended proposed Final Judgment, not the settlement process or the Department of Justice's internal deliberations. Even so, the evidence shows an arms-length settlement process, in which each side compromised some of what it sought for the sake of certainty. When they sought to intervene, the States hypothesized that they would uncover a scandal. They completely failed. There is no scandal, no side deal, and despite hearsay and the breathless speculation of journalists, nothing improper occurred. The evidence merely shows that senior Department lawyers exercised their authority to direct the Department on its position. A lower-level official (or an official from a prior administration) may not have liked it, but that does not render it a scandal. Nor is there anything wrong, much less relevant to these proceedings, about HPE's representatives having vigorously sought a settlement.

For these reasons, as described in more detail below, the Court should enter the amended proposed Final Judgment.

## I. Entry of the Proposed Final Judgment Is in the Public Interest

### A. The Amended Proposed Final Judgment Satisfies the Tunney Act

The settlement's substantive terms readily satisfy the Tunney Act's "public interest" standard by creating relief for the competitive harms identified by the United States in its Complaint. The divestiture of Instant On—a fully operational enterprise-grade WLAN business—will create or strengthen an independent competitor in the relevant market, and the mandatory licensing of Mist AIOps source code will provide competitor access to the technology that enabled Juniper to "spur both price and product innovation" in that market. Dkt. 1, ¶¶ 6–11, 44–48. Accordingly, the Court should enter the amended

proposed Final Judgment without further ado.

### 1. An Antitrust Settlement Should Be Approved If It Is "Within the Reaches of the Public Interest"

The Tunney Act requires a court to determine whether entry of a civil antitrust settlement negotiated by the United States "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, a court "shall consider":

> (A) the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and
>
> (B) the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).

Consistent with these statutory factors, courts, including those in this Circuit, look to the terms of the proposed judgment and consider, among other things, the relationship between the remedy secured and the specific allegations in the government's complaint, whether the proposed judgment is sufficiently clear, whether its enforcement mechanisms are sufficient, and whether its entry may harm third parties. *United States v. JDS Uniphase Corp.*, No. 3:00-cv-02227-TEH, 2000 WL 33115892, at *11 (N.D. Cal. Oct. 3, 2000) (citing *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461–62 (D.C. Cir. 1995)).

When evaluating the adequacy of the relief secured by a proposed judgment, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (quoting *Bechtel Corp.*, 648 F.2d at 666). Instead, the court must merely determine "whether the settlement is '*within the reaches of the public interest*.'" *Bechtel Corp.*, 648 F.2d at 666 (emphasis added) (citations omitted). The Tunney Act requires no more because "[m]ore elaborate requirements might undermine the effectiveness of antitrust enforcement by consent [judgment]." *Id.*

The States attempt to raise the bar for satisfying the Tunney Act's public-interest standard by incorrectly asserting that the amended proposed Final Judgment cannot pass muster unless it fully replaces competition lost by Juniper's exit from the market. *See, e.g.*, Dkt. 417 (hereinafter, "States' Br."), at 41–42 (faulting the amended Proposed Final Judgment for not immediately creating a competitor that can "match the momentum, innovation, or competitive intensity of Juniper"). This has never been the Tunney Act's standard for evaluating consent judgments.

The Tunney Act seeks practicality, not perfection. It does not require "remedies [to] perfectly match the alleged violations" because settlements often "reflect underlying weakness in the government's case or concessions made during negotiation." *United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1, 17 (D.D.C. 2007); *see also United States v. US Airways Group, Inc.*, 38 F. Supp. 3d 69, 75–76 (D.D.C. 2014) (holding that a court cannot reject the proposed remedies because it believes others are preferable and that "room must be made for the government to grant concessions in the negotiation process for settlements"). A strict rule requiring proposed consent judgments to fully replicate competitive conditions—as the States insist—is not only contrary to the Tunney Act's plain language and case law, it would all but foreclose pre-trial settlements and undercut the Tunney Act's policy of encouraging reasonable resolutions in antitrust cases. *See*, *e.g.*, 119 Cong. Rec. 24,598 (daily ed. July 18, 1973) (statement of Sen. Tunney) ("[I]t is most important that the consent [judgment] be preserved as a viable settlement option."); S. Rep. 93-298, at 7 (1973) ("[T]he [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool.").

Moreover, courts routinely approve settlements that ameliorate but do not replicate lost competition as it existed before the transaction and settlement. For instance, in *United States v. Deutsche Telekom AG*, the district court approved a settlement despite concern that it did not "fully restore any competition lost as a result of the merger" because "the Court's task is not to assess whether the proposed Final Judgment is perfect." No. 1:19-cv-02232-TJK, 2020 WL 1873555, at *7 (D.D.C. Apr. 14, 2020). The district court further observed that the "entire competitive impact may not be replaced as quickly as commenters—or even the Court—would like. But that does not render the proposed Final Judgment unreasonable or inconsistent with the public interest." *Id.* at *6. Similarly, in *United States v.*

*Assa Abloy AB*, the district court approved a settlement that the United States conceded would not fully address competitive concerns:

> The United States does not contend that the relief obtained by the proposed Final Judgment will fully eliminate the risks to competition alleged in the Complaint. … Based on the totality of circumstances and risks associated with this litigation, however, the United States has agreed to the proposed Final Judgment, which includes additional provisions and protections to address some of the concerns identified above. The United States believes the Court will conclude the proposed Final Judgment is in the public interest under the Tunney Act.

Competitive Impact Statement, at 7, *United States v. Assa Abloy AB*, No. 1:22-cv-02791-ACR (D.D.C. filed May 5, 2023), ECF 129; *see also* Order Granting Unopposed Mot. for Entry of Final Judgment, *United States v. Assa Abloy AB*, No. 1:22-cv-02791-ACR (D.D.C. filed Sept. 13, 2023), ECF 143. Under the States' erroneous standard, these and other settlements would have been rejected.

**2. Entry of the Proposed Final Judgment Is in the Public Interest**

**a. The Divestiture of Instant On Addresses Competitive Concerns**

Instant On's divestiture will create opportunities for growth, product innovation, and increased competition in the enterprise-grade WLAN market. As David Hughes, HPE's Senior Vice President in charge of the Instant On business, explains, the company that buys the Instant On assets can add functionality that makes Instant On more competitive for large enterprise customers or integrate components of Instant On into its existing products for such customers. *See* Dkt. 298-3, ¶¶ 7–9.[3] The buyer could also market Instant On as it exists today to large, distributed enterprises that require less sophisticated, feature-rich WLAN solutions in their buildings or offices, *see id.* ¶ 6. And even if the buyer continues to market Instant On as a small-business solution, it could eventually move upmarket, just as competitors like Ubiquiti have attempted to do in recent years. *See* Ex. 7 (Schultz Dep.) at 95:20–97:9. Surprisingly, the States entirely ignore any of these possibilities.

Deposition testimony taken by the States further supports the United States' judgment that the divestiture will be beneficial to its eventual buyer and to competition in the broader enterprise-grade

[3] HPE provided the declaration from Mr. Hughes in support of its opposition to the States' motion for intervention, rebutting the States' argument that the Instant On is "irrelevant" in the relevant market for enterprise-grade WLAN solutions. *See* Dkt. 298, at 7.

WLAN market. The divestiture not only awards the buyer a scaled business with over $100 million in annual revenue, but it also includes a license for AOS-8, the operating system used by the majority of Aruba WLAN customers today. Ex. 7 (Schultz Dep.) at 143:10–20; Ex. 11 (Rahim Dep.) at 91:15–92:5, 101:7–23. Although HPE currently limits features that the operating system will support when it is running Instant On hardware, AOS-8 is the same operating system used with some of the largest WLAN deployments today. According to Rami Rahim, Executive Vice President and General Manager of HPE Networking, AOS-8 is a "powerful" and "capable" technology that includes source code for functionalities, like location services, quality services, and firewall capabilities, that are attractive to larger enterprises. Ex. 11 (Rahim Dep.) at 96:12–20, 101:7–23, 113:7–25. For instance, HPE currently artificially caps the number of network components that Instant On can support, so that it can market the solution to small- and medium-sized businesses without cannibalizing sales of its other products to larger enterprises. Ex. 11 (Rahim Dep.) at 101:24–102:16. But "it would be relatively straightforward for an engineer that had access to the source code to overcome any artificial limits that are imposed in the software that . . . have targeted this particular solution to the small and medium business." *Id.* at 103:14–104:3. While repositioning Instant On would require some additional work, the divestiture buyer would have "a huge head start on the software required" to market a competitive WLAN solution. *Id.* at 114:25–115:16.

Notably, the States do not dispute that the Instant On assets, once divested, will make it easier for the buyer to enter, expand, or reposition within the relevant market. The States correctly state that Instant On is a small portion of the enterprise-grade WLAN market today—but that does not mean it has no utility to potential buyers, or that it could not and would not grow as a portion of the relevant market in another firm's hands. *See* States' Br. at 41. The States also argue that the divestiture does not address the competitive overlap between HPE and Juniper since Juniper did not have a product tailored to small businesses, or "replace the competitive intensity that Juniper provided" because of entry barriers identified by the United States in its pre-trial brief. *See id.* at 41–42. However, the Tunney Act does not require a settlement to replace lost competition perfectly. *See SBC Communications*, 489 F. Supp. 2d at 22 ("Because the proposed final judgments need not be perfect remedies, the entry algorithm can be a

reasonable instead of perfect prediction of entry…. Because the entry formula is a reasonable, if not perfect, prediction of likely entry, the proposed settlements are within the reaches of the public interest."); *Deutsche Telekom*, 2020 WL 1873555, at *7 ("It is possible, in the end, that the United States may wind up being wrong and its critics right that the proposed remedies do not fully restore any competition lost as a result of the merger. But the Court's task is not to assess whether the proposed Final Judgment is perfect.").

As a last resort, the States attack the businesses bidding on the Instant On assets. The States' mischaracterizations are well off base. [redacted] Ex. 12 (HPE-LIT-004190222); Ex. 13 (Hinsz Dep.) at 161:15–18; 148:9–22. The States acknowledge none of this.

Instead, the States fall prey to a standard negotiating tactic in which [redacted]. *See* Ex. 7 (Schultz Dep.) at 152:3–12. The States also ignore [redacted] Ex. 14 (DOJ_HPE_TUNNEY_00000755). [redacted]

**b. Licensing the Mist AIOps Source Code Lowers Entry Barriers**

As the United States explained in its opening brief, forcing HPE to license a key ingredient of Juniper's competitive success to one or more companies that compete or will compete in the enterprise-grade WLAN market will ameliorate the competitive harms alleged in the Complaint. Developing network management software requires WLAN providers to expend significant resources and time. *See* Dkt. 351, at 5 (discussing HPE's investment of engineering resources on Project Gravity). A Mist AIOps license allows one or more firms to bring to market a competitive network management solution without expending the time and resources required to develop related artificial intelligence and machine learning

tools from scratch. *Id*. Licensing Mist AIOps also encourages follow-on innovation, given that licensees have the right to further modify and expand the licensed source code for their networking products, and they will own any improvements and derivative functionality that they develop.

Discovery taken by the States during these proceedings only confirms that licensing Mist AIOps to potential competitors improves competitive conditions by reducing the cost of entry, expansion, or repositioning within the market for enterprise-grade WLAN. Mr. Rahim, who had been designated as a 30(b)(6) corporate representative for HPE, testified that the AIOps source code license contains the "secret sauce" of Juniper Mist's capabilities: a set of algorithms developed over years that enable real-time network monitoring and advanced root cause analysis. *See* Ex. 11 (Rahim Dep.) at 22:16–23:21, 31:24–32:18, 63:24–65:1. [redacted]. *Id.* at 22:16–25. Because "[t]here are countless ways for a network to fail or for a network to degrade the experience of users," the "hard part" of remediating network failures for network administrators is "identifying the issue itself." *Id.* at 52:2–23, 53:8–15. For instance, capabilities supported by source code in the license might identify a DHPC server error (i.e., a failure to assign an IP address) as the reason a user's connection fails, which a network operator could then address. *Id.* at 22:25–23:21. The license also includes source code for functionality that configures, improves, and monitors the networks on its own and, in some cases, address and correct anomalies. *Id.* at 28:2–13. That and other functionality enabled by the AIOps source code license was "a big differentiator for the overarching Mist business" and one reason Juniper experienced significant growth in WLAN between 2019 and 2025. *Id.* at 23:22–24:9.

As Mr. Rahim explains, a company that licenses the Mist AIOps source code would "have a "significant headstart" developing a competitive, differentiated network management solution for WLAN. Ex. 11 (Rahim Dep.) at 66:9–18. While "other products might have an understanding of whether a network element like an access point is . . . working or not," "understand[ing] if you are delivering an exceptional experience" requires a WLAN provider to "collect service types of data" and "train the algorithms that will start to predict when experience is met and when it is not." *Id.* at 63:24–

64:19. The source code identifies for a licensee what data needs to be collected and then provides the algorithms for using the data to predict when the customer experience is optimized or degraded. *Id.* at 64:20–65:1. "[A]nybody who would get access to the source code would immediately gain years of insight into what data [collected by wireless access points] matters, and can train the model fairly easily with that understanding." *Id.* at 61:17–62:5. The license "would give any bidder that does not have AIOps or doesn't have significant AIOps a massive head start as compared to what they would need to do if they were starting from scratch." *Id.* at 70:17–71:7.

This headstart would be especially valuable for a new entrant. As Mr. Rahim explained, "if a bidder just wants to build any wireless LAN solution, it's fairly straight forward." Ex. 11 (Rahim Dep.) at 71:23–72:18. Because wireless access points are readily available from third-party Original Device Manufacturers, hardware is "not really a big barrier to entry." *Id.* "The bigger barrier to entry would be in developing AIOps capabilities," which is "something that [a new entrant] can now purchase" from HPE. *Id.* Having access to the Mist AIOps source code "would significantly by years accelerate" a company's "ability to go and enter this market with a differentiated product." *Id.*

The States do not seriously dispute that access to Mist AIOps could help competitors enter, expand, or reposition within the market. Instead, they argue that the anticipated procompetitive benefits of the Mist AIOps license are more muted than they seem. The States' argument is unpersuasive. The States first claim that the non-exclusive license to source code will be less valuable than it was to Juniper when it was an independent company and had exclusive access to the technology. *See* States' Br. at 44. The only support offered for that assertion is the opinion of Dr. Carl Shapiro, who neither has industry expertise nor relies on any views from consumers, competitors, or distributors on the matter. *See id.* at 32. Crucially, Dr. Shapiro does not opine that the license has *no* value—merely that a license would be *more* valuable if it were exclusive. *See id.* Even assuming this were true, the Tunney Act does not require a perfect remedy. *See SBC Communications*, 489 F. Supp. 2d at 22 (rejecting requirement that settlement perfectly replace lost competition); *Deutsche Telekom*, 2020 WL 1873555, at *7 (same).

The States next argue that Mist AIOps "is only a single piece of the broader AI platform that made Mist competitive" and that the license lacks source code for some features of the Mist solution.

States' Br. at 44. [redacted] *See* Ex. 11 (Rahim Dep.) at 121:5–122:9 [redacted] But because wireless access points are readily available from third-party Original Device Manufacturers, hardware is "not really a big barrier to entry." *Id.* at 71:23–72:18.

Moreover, the States' focus on individual capabilities not included in the license misses the forest for the trees. As Mr. Rahim explained, the portion of Mist AIOps that conducts root cause analysis is the "secret sauce" that differentiated Juniper's products from competitors; in contrast, remediation is often far easier. *See* Ex. 11 (Rahim Dep.) at 121:5–122:9 (explaining that "network operators spend the most amount of time pulling their hair out trying to understand" errors and, once the solution is identified, "it's relatively straightforward" for the network administrator to offer a fix). Other aspects of the Mist WLAN solution, including an accessible user interface and hardware, can be developed in-house or easily obtained from third-party ODMs. *Id.* at 72:8–11.

[redacted] States' Br. at 45–46. [redacted] Ex. 11 (Rahim Dep.) at 32:25–36:18. Also, the licensed source code informs the buyer of what user data it needs to collect for effective root cause analysis and other advanced features. *Id.* at 61:17–62:5. That information—which took Juniper years to compile—could save competitors significant time in bringing a competitive product to market. *Id.*

[redacted] States' Br. at 45, [redacted]

[redacted] *See* Ex. 11 (Rahim Dep.) at 74:16–75:12. [redacted] *See* Ex. 7 (Schultz Dep.) at 152:3–12.

[redacted], States' Br. at 45, [redacted] *See* States Ex. 22 (Remer Rpt.) ¶¶ 31–35. [redacted] States Ex. 86. [redacted] *See* States Ex. 22 (Remer Rpt.) ¶ 38.

Finally, the States incorrectly imply that the license is an incomplete remedial measure that is "disfavored" by government enforcers. States' Br. at 46. The license is a comprehensive structural remedy, given that it is perpetual and largely irrevocable, and grants broad usage and property rights in the source code to the licensee. *See* Dkt. 311-2, at 10–13. In other words, the license effectuates a divestiture of an intangible asset, source code, along with the related intellectual property. Moreover, the remedy comes with at least 12 months of transitional services, including the transfer of up to 30 Juniper engineers familiar with the Mist AIOps source code, and up to 25 Juniper sales personnel experienced in selling Mist. *Id.* at 11.

At bottom, regardless of the preference that the States may claim to have for a particular remedy, or the policy positions that antitrust enforcers have expressed in other different contexts, the Tunney Act does not require a particular remedy. Rather, it directs the court to answer the narrower question of whether the United States' settled-upon remedy is in the public interest. *Bechtel Corp.*, 648 F.2d at 666. If the States prefer a different type of remedy, they could have challenged the merger. They chose instead to remain on the sidelines. But the sidelines don't make headlines, so the States pervert this Tunney Act proceeding into a Monday morning quarterbacking session designed to garner media sound bites rather than the pursuit of bona fide antitrust enforcement.

**c. Dr. Shapiro Does Not Aid the Court's Public Interest Determination**

In support of their Opposition, the States submitted a declaration from Carl Shapiro, a professor of economics. Dr. Shapiro's opinions are unhelpful to the Court in its public interest determination. The Court should therefore not give any weight to Dr. Shapiro's declaration and does not need his testimony.

The States offer Dr. Shapiro as an economic expert. Rule 702 of the Federal Rules of Evidence places the burden on the States to demonstrate to the Court "that it is more likely than not that … [Dr. Shapiro's] scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Even in a bench hearing, Dr. Shapiro's opinions should still meet this threshold requirement of relevance. *See In re Rich Global*, *LLC*, No. 16-cv-00217-ABJ, 2018 WL 11536422, at *3 (D. Wyo. Nov. 30, 2018) (in a bench trial "[t]he Court still must ensure, though, that the expert's testimony will be helpful to the trier of fact"). The States fail to satisfy this threshold requirement.

The first opinion that the States proffer from Dr. Shapiro is his view that "[t]he DOJ's challenge to HPE's acquisition of Juniper is strong." Dkt. 417-1, ¶ 10; *see also id.* ¶ 122 ("I therefore consider the probability that the DOJ would win the merger challenge to be sizeable."). But Dr. Shapiro's opinion about the strength of the United States' case is not relevant to the public interest determination and should be excluded as a result. The requirements under the Tunney Act are meant "to enable a court to determine whether a proposed consent decree is in the 'public interest,' … *not to evaluate the strength of the Government's case*." *United States v. Alex. Brown & Sons, Inc.*, 963 F. Supp. 235, 239

(S.D.N.Y. 1997) (citation omitted) (emphasis added). Even if it were relevant, an assessment of the strength of the United States' case is ultimately an analysis to be made by the Department's leadership in its prosecutorial discretion, while also accounting for a multitude of other considerations and factors not limited to economic analysis. Dr. Shapiro is unqualified and lacks a factual foundation to offer a legal opinion on the strength of the case, the likelihood that the United States would prevail in court, or the factors the Department appropriately considered here in exercising its prosecutorial discretion.

The second opinion that the States proffer from Dr. Shapiro is his view that the amended proposed Final Judgment "would have only a *de minimis* effect in promoting competition in the market for enterprise-grade WLAN solutions in the United States." Dkt. 417-1, ¶ 11; *see also id.* ¶ 122 ("I therefore consider the share of harm to customers eliminated by the APFJ to be quite small."). The Court should exclude this opinion because Dr. Shapiro has not conducted an independent analysis of the proposed remedies, as contemplated by Rule 702(b)–(d) of the Federal Rules of Evidence. Rather, he selectively parrots arguments made by the United States' expert that were meant for a trial on the merits in evaluating the competitive impact of the proposed Instant On divestiture and Mist AIOps license. The Court should therefore give no weight to Dr. Shapiro's opinion in this regard.

The third and final opinion that the States proffer from Dr. Shapiro is his view that "the merger together with APFJ is likely to leave customers in the market for enterprise-grade WLAN solutions in the United States worse off than they would be if the APFJ were rejected and the DOJ's merger challenge were litigated." Dkt. 417-1, ¶ 13; *see also id.* ¶ 123 ("Putting the pieces together, rejecting the Amended Proposed Final Judgment will very likely leave customers in the market for enterprise-grade WLAN solutions in the United States better off."). That opinion is not only premised on the first two opinions, which are flawed as explained above, but it also poses and answers the wrong question for the Court—would customers in the relevant market be better off if the amended proposed Final Judgment were rejected and the United States' merger challenge were litigated? The Tunney Act empowers the Court to approve or reject the amended proposed Final Judgment, but it does not authorize the Court to compel the United States to litigate its case against the merger. The decision to litigate remains the exclusive province of the Department's prosecutorial discretion. *United States v. Microsoft Corp.*,

No. 94-cv-01564, 1995 WL 121107, at *3 (D.D.C. Mar. 14, 1995) (confirming that the rejection of the proposed consent judgment leaves "the Government's prosecutorial discretion intact," "to come forth with information to meet the Court's concern, or renegotiate a new decree with Microsoft, or try the case on the complaint it had filed, or drop the case"). Dr. Shapiro's opinion wrongly assumes that, as a matter of law, the United States will have no choice but to litigate the case if this Court rejects the settlement.

Dr. Shapiro's opinion also irreconcilably conflicts with the Ninth Circuit's standard that the amended proposed Final Judgment does not have to be "one that will best serve society," but needs only to be "within the reaches of the public interest." *Bechtel Corp.*, 648 F.2d at 666. In concluding that the customers would be better off if the United States' merger challenge were litigated, Dr. Shapiro is evaluating the proposed settlement against what could be obtained as relief if the United States were to prevail at trial. That is an improper analysis under the Tunney Act, as the D.C. Circuit explained in *United States v. Microsoft Corp.*: "It is … inappropriate for the judge to measure the remedies in the decree as if they were fashioned after trial." 56 F.3d 1448, 1461 (D.C. Cir. 1995).

For all these reasons, Dr. Shapiro's opinions do not answer the questions that the Court faces in its public interest determination. His opinions are therefore unhelpful to the Court and should be excluded or given no weight.

**B. The United States Has Fully Complied with the Tunney Act Procedures**

In attacking the United States's compliance with the Tunney Act, the States resort to nitpicking the Competitive Impact Statement. But none of their asserted purported deficiencies in the Competitive Impact Statement is a basis to reject the amended proposed Final Judgment because the Ninth Circuit has "decline[d]" to "mak[e] strict technical compliance with the [Tunney Act] a condition to final entry of the decree" in an antitrust case. *Bechtel Corp.*, 648 F.2d at 664.

Moreover, the States' particular criticisms of the Competitive Impact Statement lack merit. First, it is irrelevant that an earlier version was drafted by HPE's counsel. What matters is that the contents of the Competitive Impact Statement were fully reviewed, edited, and adopted by the Department of Justice before filing with the Court. As former Deputy Assistant Attorney General William Rinner testified, settlements reached in the middle of litigation, particularly on the eve of trial, may involve a last-minute

scramble by both the United States and the defendants to put together and file the required paperwork due to resources and timing. *See* Ex. 6 (Rinner Dep.) at 107:9–108:20. As filed, the Competitive Impact Statement accurately reflects the views of the United States, and no more is required.

Second, the United States provided a full "description and evaluation of alternatives to [the settlement] actually considered by the United States." 15 U.S.C. § 16(b)(6). This section of the Competitive Impact Statement, *see* Dkt. 217-2 at 12–13, is consistent with the Department of Justice's longstanding interpretation of the law that such "alternatives" consist of the final options the Department could choose from at the time of settlement. This interpretation is also supported by legislative history. While drafting the Tunney Act, the Senate Judiciary Committee added the words "actually considered" to "alternatives to such proposal" and "alternative remedies" in section 16(b)(6) and section 16(e)(1), respectively. S. Rep. 93-298, at 1 & 2 (1973) (Amendments Nos. 4 & 10). The Senate Report provided the following explanation of the amendments:

> Amendments 4 and 10 were added to clarify the extent to which alternative remedies are to be included in the public impact statement and to be considered in determining whether or not entry of the proposed consent judgment is in the public interest. The Committee does not wish to impinge upon the free exchange of information among the staff of the Antitrust Division with respect to suggested remedies. On the other hand, where the relief proposed is of a lesser degree than that contained in the complaint, the public and the court should have access to the meaningful alternatives from which the Division made its choice. *In order for the court to make a judgment as to whether or not the proposed relief is sufficient with respect to the conduct alleged in the complaint, it must have access to that which the Division considered in final form. The Committee recognizes, however, that in many instances an alternative may not have been actually considered.*

*Id.* at 3 (emphasis added). The legislative history makes clear that "alternative remedies actually considered" refers only to remedies considered *in their final form* as alternatives to the proposed final judgment that was filed with the court. An alternative proposal that was subject to negotiation and not in final form for consideration would not fall within the scope of the statute. Nor would non-final, earlier variations of what ultimately became the proposed final judgment. Indeed, the Senate Judiciary Committee contemplated that "in many instances an alternative may not have been actually considered." *Id.* at 3. Such hypothetical alternatives also fall outside the statute's scope.

Accordingly, under section 16(b)(6), in this case the only available alternative to accepting a

settlement embodied in the amended proposed Final Judgment was proceeding to trial. The Competitive Impact Statement and other filings by the United States in this proceeding explain why the United States chose to settle rather than proceed to trial. The alternatives required to be disclosed under section 16(b)(6) do not include *non-final* settlement proposals that were exchanged during the United States' negotiations with the Defendants because such proposals were never agreed upon by both sides and thus could not have been actually considered by the United States as alternatives to the *final* proposal that was accepted and filed with the Court. Stated differently, if the United States had not chosen to move forward with the final proposal with HPE on June 27, 2025, the only alternative that it had actually considered at that point would have been to proceed with the upcoming trial.

The Court's decision to allow discovery by the States into nonfinal settlement proposals that were exchanged between the United States and HPE during settlement negotiations does not somehow undermine the validity of the Competitive Impact Statement. The United States has complied with the Court's order to produce all non-privileged documents relating to the settlement process, which include the various term sheets exchanged by the United States and the Defendants over three months of negotiations. As explained in this brief, these non-final proposals were ultimately rejected in favor of the settlement that is now embodied in the amended proposed Final Judgment. *See supra* at 5–6; *infra* at 27–29.

The States' argument that the United States must still describe in the Competitive Impact Statement every settlement idea put forward during the negotiations, even if categorically rejected by HPE, strains any reading of the statute. For example, the divestiture of Juniper's Campus and Branch business segment proposed by the United States was unequivocally rejected by HPE. *See* Ex. 7 (Schultz Dep.) at 64:23–65:5. It therefore could not have been "actually considered by the United States" as an alternative to the settlement set forth in the amended proposed Final Judgment. Its disclosure in the Competitive Impact Statement would serve no practical purpose and indeed would vitiate the deliberative process privilege that attaches to the United States' deliberations over settlement proposals prior to its decision to accept a particular set of remedies agreed upon with HPE. *Cf.* S. Rep. 93-298, at 3 ("The Committee does not wish to impinge upon the free exchange of information among the staff of the

Antitrust Division with respect to suggested remedies.”). Accordingly, the United States has substantially complied with its obligations under this section, which is all that Ninth Circuit precedent requires. *See Bechtel Corp.*, 648 F.2d at 663–64 (rejecting strict technical compliance with the Tunney Act’s procedural requirements as a condition to final entry of consent judgment).

## II. The States’ Process Claims Are Unfounded and Irrelevant

### A. The Settlement Negotiations Were Appropriate Arms-Length Negotiations

The exhaustive, hard-fought settlement negotiations between the United States and the Defendants in this case were nothing out of the ordinary. A successfully consummated settlement is naturally a compromise in which “the parties each give up something they might have won had they proceeded with the litigation.” *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *see also* H.R. Rep. No. 93-1463, at 11–12 (1974) (endorsing *Armour*’s reasoning in the Tunney Act context); *United States v. CBS Corp.*, No. 1:99-cv-03212, 2000 WL 33115902, at *18 (D.D.C. June 6, 2000) (“A proposed consent decree is an agreement between the parties which is reached after exhaustive negotiations and discussions.”). As former Deputy Assistant Attorney General William Rinner testified, settlement negotiations frequently begin with the parties relatively far apart and involve throwing lots of ideas around to move the discussion forward. *See* Ex. 6 (Rinner Dep.) at 47:24–48:6 (“Sometimes you throw around ideas, sometimes they—you negotiate, you posture, you say no, and then determine whether those proposals might be acceptable later. In the context of a settlement negotiation, a lot of ideas get thrown around with respect to what would go into a consent decree.”).

Here, the final settlement bears all the hallmarks of a compromise. The United States pressed the Defendants for a structural remedy to address competitive harms resulting from the merger. *See* Ex. 3 (DOJ-TUNNEY-00001141); Ex. 5 (DOJ-TUNNEY-00000414); Ex. 6 (Rinner Dep.) at 65:4–66:17 (explaining that the United States emphasized to HPE the importance of a structural remedy). After the Defendants objected to the structural remedy that the United States initially demanded, the parties discussed various alternatives and ultimately agreed on a settlement involving two complementary structural remedies—the divestiture of Instant On, an HPE product line in the enterprise-grade WLAN market, and the licensing of the Mist AIOps source code. *See* Dkt. 311-2, at 5, 10. Notably, the licensing

of the source code was a textbook example of compromise: the United States initially sought a remedy that would disperse Juniper's innovative Mist AIOps capabilities to another company through divestiture. *See* Ex. 3 (DOJ-TUNNEY-00001141); Ex. 5 (DOJ-TUNNEY-00000414). After HPE and Juniper objected to a full divestiture of Juniper's Campus and Branch business segment because they contended it might cause unintended consequences, the parties agreed instead to the licensing of the Mist AIOps source code, achieving much of the United States' goal through a different vehicle to which the Defendants were willing to agree. *See* Dkt. 311-2, at 10.

In addition, the United States determined that this combination of the two structural remedies included in the amended proposed Final Judgment was preferable to other proposals put forward by HPE. For example, the United States chose a permanent structural remedy—the divestiture of Instant On—over the limited-duration behavioral remedy proposed by HPE—[redacted] *See* Ex. 10 (DOJ-TUNNEY-00001856) at 7–8. Across administrations, the United States has generally preferred structural remedies over behavioral remedies because they tend to be more successful in fostering competition. *See* Ex. 16 (Alford Dep.) at 125:23–126:9 ("So if it's simply about promises that the parties to the settlement will make, it's much more difficult to police those or to have any confidence that they will be successful; but if there is a structural relief to a new potential competitor, then the likelihood of success with respect to that remedy is much greater."); Ex. 17, Ass't Att'y Gen. Jonathan Kanter, Remarks to the New York State Bar Association Antitrust Section (Jan. 24, 2022) ("Experience shows that it is often impossible to craft behavioral remedies that anticipate the complex incentives that drive corporate decision-making. . . . [T]o restore competition in markets that have been harmed by antitrust violations, we will pursue structural remedies in our conduct cases whenever possible."), *available at* https://www.justice.gov/archives/opa/speech/assistant-attorney-general-jonathan-kanter-antitrust-division-delivers-remarks-new-york; Ex. 18, Ass't Att'y Gen. Makan Delrahim, Keynote Address at American Bar Association's Antitrust Fall Forum (Nov. 16, 2017) ("As we reduce regulation across the government, I expect to cut back on the number of long-term consent decrees we have in place and to return to the preferred focus on structural relief to remedy mergers that violate the law and harm the American consumer."), *available at* https://www.justice.gov/archives/

opa/speech/assistant-attorney-general-makan-delrahim-delivers-keynote-address-american-bar.

Finally, the United States determined that the guaranteed remedies in the amended proposed Final Judgment were preferable to a trial on the merits with an uncertain outcome. While the United States advocated zealously and outlined a strong case-in-chief in its pre-trial briefing, *see* Dkt. 202, and believed the facts it could prove at trial would support the Complaint's request to enjoin the merger, there was no guarantee that the Court would agree. The Defendants likewise outlined a substantial defense in their pre-trial filings, *see* Dkt. 200–201, and if this Court or the Ninth Circuit (after an appeal further protracting any final resolution) were to agree with the Defendants' position after trial and rule in their favor, then there would be no remedy at all for the alleged competitive harm of the merger. In such scenarios, settlements serve the public interest by securing tangible protections rather than gambling on an all-or-nothing trial that could leave consumers with no relief. Requiring the United States to reject reasonable settlements and litigate every case to the bitter end—even where success is uncertain—would waste scarce government and private resources, delay benefits to consumers, and create perverse incentives that discourage challenges to mergers presenting complicated legal and factual issues. *See United States v. AT&T Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) ("If courts acting under the Tunney Act disapproved proposed consent decrees merely because they did not contain the exact relief which the court would have imposed after a finding of liability, defendants would have no incentive to consent to judgment and this element of compromise would be destroyed.").

Doing so would also contravene the Tunney Act's express goal of encouraging reasonable resolutions that restore competition more promptly and with greater certainty. *See*, *e.g.*, 119 Cong. Rec. 24,598 (daily ed. July 18, 1973) (statement of Sen. Tunney) ("[I]t is most important that the consent [judgment] be preserved as a viable settlement option. This is the Government's philosophy and this remains the philosophy of our bill."); S. Rep. 93-298, at 7 (1973) ("[T]he [Senate Judiciary] Committee wishes to retain the consent judgment as a substantial antitrust enforcement tool."); H.R. Rep. No. 93-1463, at 6, 8 (1974) (expressing intent to preserve the policy of encouraging settlement by consent judgment). In the more than half-century since the Tunney Act was enacted, courts have followed Congress's direction and approved dozens of consent judgments in merger cases. Indeed, since

the filing of the proposed Final Judgment last June, courts have given final Tunney Act approval to three merger consent judgments negotiated by this administration. *See United States v. UnitedHealth Grp., Inc.*, No. 1:24-cv-03267-JKB (D. Md. filed Dec. 9, 2025), ECF 249; *United States v. Safran, S.A.*, No. 1:25-cv-01897-CRC (D.D.C. filed Nov. 25, 2025), ECF 14; *United States v. Keysight Techs., Inc.*, No. 1:25-cv-01734-CJN (D.D.C. filed Sept. 15, 2025), ECF 24.

Finally, the States' assertion that the United States must conduct a specific type of litigation risk assessment to satisfy the Tunney Act, *see* States' Br. at 47, lacks a basis in either the statute or related case law. The Tunney Act includes several specific factors for a court to consider, but no requirement for any specific form of litigation risk assessment (or any such assessment at all). 15 U.S.C. § 16(e)(1). *See United States v. Microsoft Corp.*, 231 F. Supp. 2d 144, 174 (D.D.C. 2002) ("The risks inherent in litigation are likely to be reflected in some portion of the proposed decree, and these risks are appropriately weighed by the government, rather than the Court, in the first instance."). Furthermore, weighing the benefits and risks of proceeding to trial versus entering into a settlement cannot be reduced to a simple, much less purely quantitative, decision-making model. Dr. Shapiro offers only a vastly simplified calculation to illustrate how he believes the expected value to customers of a settlement should be compared to the expected value to customers of litigating the merger. Dkt. 417-1, ¶¶ 113–23. But his calculation ignores important factors that weigh significantly in the decisions of the Department of Justice.

The Department of Justice typically considers a variety of qualitative factors in its assessment of litigation risk, including the strength of documentary evidence, the quality of likely witness testimony, legal uncertainty, and the broader programmatic implications of a possible trial loss that might produce precedent harmful to future enforcement efforts. This case was no different. The Department also properly exercises prosecutorial discretion, making pragmatic determinations about how best to apply the finite resources available for antitrust enforcement with the understanding that significant resources spent on one case mean fewer resources available for the many other matters before the Antitrust Division. These types of complex considerations, including the harm that a litigation loss in a single case can cause to antitrust enforcement more broadly, demonstrate the incorrectness of Dr. Shapiro's baseline

assumption of risk neutrality in his calculation. This fallacy alone renders his simple balancing model inapplicable to the complex decisions the Department actually faces. Here, the United States properly determined that entering into the settlement embodied in the amended proposed Final Judgment was preferable to proceeding with a trial on the merits.

**B. There Are No "Side Deals"**

From the outset of this proceeding, the States have insinuated that the amended proposed Final Judgment before the Court does not reflect the entirety of the settlement between the United States and HPE, and that certain "side deals" exist. *See, e.g.*, Dkt. 236-2, at 6–7. Discovery in this Tunney Act proceeding has demonstrated that claim to be false—so much so that the States implicitly abandon this argument by failing even to mention it in their opposition brief. As multiple witnesses have confirmed, the amended proposed Final Judgment before the Court fully embodies the entire settlement between the United States and HPE. *See* Ex. 7 (Schultz Dep.) at 161:12–21 (confirming that the "Invest in America" proposal is not part of the agreement with the United States); Ex. 6 (Rinner Dep.) at 130:11–131:10 (stating that the proposed judgment before the Court is the entire settlement); Ex. 8 (Levi Dep.) at 127:1–15 (same); *see also* Dkt. 298-1, ¶ 3 (declaration of HPE Chief Executive Officer Antonio Neri confirming no side deals); Dkt. 298-2, ¶ 12 (declaration of HPE Chief Operating Officer John Schultz confirming no side deals). Simply put, there is no "side deal" that was thrown in as part of the settlement but not disclosed to the Court and the public.

**C. Internal Disagreements Are Not a Basis for Rejecting the Settlement**

The details of the settlement process are not relevant to the Court's public interest determination. As the United States has previously shown, the factors in 15 U.S.C. § 16(e)(1)(A) and (B) direct the Court to consider the terms and competitive impact of the amended proposed Final Judgment, not the settlement process and internal deliberations of the Department of Justice. *See* Dkt. 299, at 8–12; Dkt. 311, at 19–22, 26–31; Dkt. 351, at 11–12. Furthermore, as this Court has explained, the public interest determination turns on "whether the proposed judgment adequately addresses the concerns about lessening of competition that gave rise to the United States's lawsuit and whether it will have other effects on competition resulting in harm or benefit to specific individuals or entities or to the public

generally." Dkt. 350, at 3–4.

Instead of following the Court's guidance, the States have strayed well beyond relevant issues by devoting page after page of their 50-page brief to attacking the process that led to the settlement. Some of these attacks are based purely on hearsay, including news reports. *See, e.g.*, States' Br. at 23 (quoting allegations made by Roger Alford that he claimed to learn from journalists). Others are factually misleading. For example, the States selectively cite Roger Alford's opinion that a certain line in a speech given by William Rinner was a veiled reference to this case, *see* States' Br. at 16 n.9, when in fact Mr. Rinner gave the States his own sworn explanation (which the States hide from the Court) that he was making a different point unrelated to this case. *See* Ex. 6 (Rinner Depo.) at 72:9–73:16.

Nonetheless, even if process were somehow relevant and hearsay and opinions could masquerade as facts in this proceeding, the States have failed to adduce *any evidence whatsoever* of corruption or malfeasance by the Department of Justice. Instead, the States' grievance about the process centers on the fact that HPE chose to escalate the settlement discussions and negotiations to the Acting Associate Attorney General, who is responsible for supervising the Antitrust Division. 28 C.F.R. § 0.19(a) (describing the duties of the Associate Attorney General to include "provid[ing] overall supervision and direction to organizational units as assigned"). The Assistant Attorney General for Antitrust reports to the Associate Attorney General, who in turn reports to the Deputy Attorney General and the Attorney General of the United States. *See* Ex. 25, *Agencies: Grid/Map View*, U.S. DEP'T OF JUSTICE, available at https://www.justice.gov/agencies/chart/map (last visited March 12, 2026).

While one may understand why then-Principal Deputy Assistant Attorney General Roger Alford might have chafed at HPE reaching out to his boss's boss, it was hardly improper for Acting Associate Attorney General Chad Mizelle to exercise his independent judgment regarding the settlement of this case. Whether previous Associate Attorneys General regularly exercised this power or not, *see* Dkt. 417-2, ¶ 16, it is not improper for the Associate Attorney General or other senior officials to do so. *See* Ex. 8 (Levi Dep.) at 126:6–25 (noting that in his prior role as Chief of Staff to the Attorney General, the Attorney General and other senior officials would consider appeals of decisions made by Department of Justice components); Ex. 9 (Mizelle Dep.) at 70:7–25 (explaining that "in the typical course usually

individuals are asked to follow the chain of command when it comes to meetings," culminating with a request, depending on the division in question, to meet with the Deputy Attorney General or the Associate Attorney General). The States' declarant, William Baer, who served as both Assistant Attorney General for Antitrust and Acting Associate Attorney General in the Obama Administration, concedes that the Antitrust Division reports to the Associate Attorney General and "that the Attorney General has the final say on law enforcement decisions." Dkt. 417-2, ¶¶ 7, 18; *see also United States v. Greater Blouse, Skirt & Neckwear Contractors Ass'n*, 228 F. Supp. 483, 486 (S.D.N.Y. 1964) (noting that the Attorney General "has the authority and the duty to exercise control and supervision of all … civil suits to which the United States is a party," including cases involving enforcement of the antitrust laws). Just as private lawyers have clients, government lawyers have superiors who are authorized and entitled to direct their work. Whether Mr. Alford and Mr. Baer—who has no firsthand knowledge of the present organization of the Department or the circumstances of this case—think those superiors should not exercise such authority, or did not exercise it wisely here, is beside the point.

### D. Intense Advocacy Alone Does Not Provide a Basis for Rejecting the Settlement

The fact that HPE's representatives pressed Department of Justice officials for a settlement is neither illegal nor unprecedented. Indeed, while the States' declarant Mr. Baer served as Assistant Attorney General for Antitrust, the Department of Justice settled a challenge to the merger of American Airlines and US Airways less than two weeks before trial following an aggressive lobbying effort by the two airlines, airline unions, and public officials. *See* Ex. 20, Justin Elliott, *The American Way*, PROPUBLICA (Oct. 11, 2016), *available at* https://www.propublica.org/article/airline-consolidation-democratic-lobbying-antitrust. According to public reporting, the airlines hired a personal friend of the then-Deputy Attorney General to lobby him in support of the merger. *Id.* To the reported dismay of the Justice Department's career staff attorneys who worked on the case, the lobbyist purportedly communicated five times with the Deputy Attorney General during a two-month period around the time of the settlement. *Id.* In addition, according to contemporaneous reporting, then-Chicago Mayor and former White House Chief of Staff Rahm Emanuel lobbied his former colleagues in the Obama Administration, up to and likely including President Obama, in support of the merger. *Id.*

As for Mr. Baer, when the complaint in the American Airlines–US Airways case was initially filed, he reportedly dismissed as insufficient any outcome short of enjoining the merger. Ex. 20, Elliott, *The American Way*. Yet in a move that *The New York Times* reported "left many antitrust experts scratching their heads," Mr. Baer ultimately agreed to a settlement with terms that one expert stated were "hard to square with the original complaint." Ex. 21, James B. Stewart, *Baffling About-Face in American-US Airways Merger*, N.Y. TIMES (Nov. 15, 2013), *available at* https://www.nytimes.com/2013/11/16/business/baffling-about-face-in-american-us-airways-merger.html. Mr. Baer nonetheless defended the merits of the settlement, and his allies portrayed it as a reasonable compromise. *Id.* (quoting Professor Herbert Hovenkamp: "Is it a perfect settlement? No, but settlements are never perfect. . . . They're a compromise. The government got the best deal it could given that it might have lost at trial."). Additionally, in the subsequent Tunney Act proceeding, the court rejected requests from *amici* and public commenters to consider the alleged lobbying and instead properly focused its public interest analysis on what the Tunney Act directed it to consider: the substance and competitive impact of the proposed consent judgment. *See United States v. US Airways Grp., Inc.*, 38 F. Supp. 3d 69, 76–85 (D.D.C. 2014).[4]

The same considerations should apply to this case. Notwithstanding any advocacy efforts, the settlement here, like the one Mr. Baer negotiated in *US Airways*, is a reasonable compromise that meets the Tunney Act's public interest standard. And, as in *US Airways*, the Court should limit its review to the substance and competitive impact of the amended proposed Final Judgment.

## **CONCLUSION**

For the reasons set forth in the United States' motion for entry of final judgment, the Competitive Impact Statement, the United States' response to public comments, and this reply brief, the United States respectfully requests that the Court find that the settlement is in the public interest, enter the amended proposed Final Judgment, and bring this Tunney Act proceeding—and the case—to a close.

[4] Underscoring the litigation risk inherent in merger cases, a private challenge by consumers to the American Airlines–US Airways merger was later unsuccessful at trial. The airline's victory was affirmed on appeal. *See In re AMR Corp.*, No. 22-901, 2023 WL 2563897, at *3 (2d Cir. Mar. 20, 2023).

Dated: March 16, 2026

*/s/ Henry C. Su*
HENRY C. SU (CA Bar # 211202)
Senior Litigation Counsel
U.S. Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC 20530
Telephone: (202) 705-6338
Email: henry.su@usdoj.gov

ELIZABETH S. JENSEN (CA Bar # 302355)
Assistant Civil Chief, San Francisco Office

JEREMY M. GOLDSTEIN (CA Bar # 324422)
MICHAEL G. LEPAGE (DC Bar # 1618918)
Trial Attorneys
U.S. Department of Justice, Antitrust Division
450 Golden Gate Ave, Room 10-0101
San Francisco, CA 94102
Telephone: (415) 229-2934
Email: jeremy.goldstein@usdoj.gov

*Attorneys for Plaintiff*
UNITED STATES OF AMERICA

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)**

I, Jeremy Goldstien, am the ECF user whose identification and password are being used to file Plaintiff United States' Reply in Further Support of Entry of Final Judgment. In compliance with Local Rule 5-1(i)(3), I hereby attest that all signatories hereto concur in this filing.

Dated: March 16, 2026

*/s/ Jeremy M. Goldstein*
Jeremy M. Goldstein
U.S. Department of Justice
Antitrust Division
450 Golden Gate Ave., Room 10-0101
San Francisco, CA 94102-3478
Telephone: (415) 818-4752
Email: Jeremy.Goldstein@usdoj.gov

*Counsel for Plaintiff United States of America*