# EXHIBIT 1
# REDACTED

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA, :

Plaintiff, :

vs. : Civil Action No: 5:25-cv-0951-PCP

HEWLETT PACKARD ENTERPRISE CO., and :
JUNIPER NETWORKS, INC., :

Defendants. :

----------------------------

VIDEOTAPED DEPOSITION OF JOHN FRANCIS SCHULTZ

APPEARING REMOTELY FROM

WASHINGTON, DC

February 25, 2026

10:03 a.m.

REPORTED BY:
JENNIFER D'ANGELO, RPR, CCR-NJ
APPEARING REMOTELY FROM MONTGOMERY COUNTY, PENNSYLVANIA

** HIGHLY CONFIDENTIAL **

and I don't recall if it was a day later or a couple of days later -- that Mr. Assefi indicates that there is interest in the possibility of an AI Op source code license as an element of the settlement, but that something more would likely be needed.

I believe there was a break in the settlement conversations around that time as I think Mr. Assefi was either on vacation or he might have even been on his honeymoon. But ultimately there was a follow-up conversation in which Mr. Assefi indicates kind of what more is needed. I think that involves sort of wanting to get more details on the software license we were offering, but broached this idea of HPE making a commitment to invest in American infrastructure and the like, which I think at the time in the news media the administration was kind of branding as an Invest for America.

A number of companies -- tech companies and non-tech companies had been appearing with the President and I think they had been calling them Invest for America plans. I don't know if Mr. Assefi actually used those words, but the thrust of it, as we understood it, was a request for HPE to put together an Invest for America plan.

Q. And so just to clarify, is it HPE's

understanding that Mr. Assefi was the first one to raise the idea of some kind of investment in America?
A. Absolutely.
Q. Okay. And did Mr. Davis communicate anything to Mr. Assefi about the concept of an investment in America?
A. I don't believe so, because we had never discussed it and he had -- so he was clearly unauthorized to communicate anything so we were obviously surprised by the request. But I would say the flip side is not shocked, as I mentioned.
You know, separately, not related to the lawsuit, we were obviously watching what our peer companies were doing and the number of companies that were announcing, you know, Invest for America plans. My recollection is at that point in time I think Apple had announced a plan, IBM, I think maybe TSMC, I think there were auto makers, et cetera. It was almost like a daily occurrence.
So while we had never contemplated it in the context of this case and hadn't discussed it with Mr. Davis, certainly hadn't authorized anything, like I said I would say we were surprised but not shocked given what seemed to be the policy focus of

Q. Sure.

A. Yes. Yeah. It's a summary of the discussion, correct.

Q. Is -- was that November 15th, 2024, meeting the first time that HPE raised an argument about national security benefits of the merger to the Department of Justice?

A. No, I don't believe so.

Q. What was the first time that HPE raised an argument about national security benefits of the merger to the Department of Justice?

A. I wouldn't view it as an argument. I would view it as presenting the facts as to what the national security aspects of the transaction were. I don't know if that got discussed at the investigation level, but I believe it's raised in the discussion with Mr. Forman earlier, which was our first meeting with anyone from, you know, main justice, and then in the second meetings.

So in the two meetings we had with main justice during this phase of the process, we raised it in both meetings.

Q. Okay. And so is HPE aware of raising any sort of national security issue with respect to the merger to the Department of Justice prior to the

focused on, and I think that became clear kind of after the November 15th meeting.

Q. And what was -- what was the reaction of the Department of Justice to the national security issue at the November 15th, 2024, meeting?

A. Similar. I think Mr. Kanter listened to what we discussed. Again, I think there may have been a generalized question or two, but definitely didn't seem to be the thrust of what he and the team we met with were focused on.

Q. At any point during the tenure of the Biden Administration, did HPE have any communications about the merger with any of AAG Kanter's superiors?

A. I don't believe so. As I was indicating or alluding to I think in this paragraph, or maybe it's in a subsequent paragraph, it became obvious immediately after the 15th meeting that the focus of Mr. Kanter and his team was to defer having any decision made on this to the next administration. In fact, I believe Mr. Forman called our outside counsel on a Saturday to raise the question, which was quite unusual per Counsel's view, and specifically raised this idea that it should be pushed until the new administration.

So it became very clear that the -- that the

There's a sentence in the middle of paragraph 12, starts on line 5, that begins with the words, In late March. Do you see that?

A. Yes.

Q. Okay. And it says, In late March 2025, HPE verbally proposed through its advisors to resolve the litigation by licensing the Mist AI Ops source code.

Do you see that?

A. I do.

Q. Who are the advisors that you're referring to there?

A. I think, from the testimony that I mentioned previously, I believe that was Mr. Davis. It's possible it was also Mr. Levi.

Q. Then in the last sentence of paragraph 12, which starts on line 7, the sentence starts with the words, HPE also explained. Do you see that?

A. I do.

Q. So it reads, HPE also explained that a divestiture remedy of the Juniper's or HPE's WLAN business would be technically, operationally, and commercially infeasible.

Do you see that?

A. I do.

Q. When you wrote that HPE also explained, who are you referring to on behalf of HPE?
A. Mr. Davis and/or Mr. Levi.
Q. What is your understanding about why a divestiture remedy of Juniper's or HPE's WLAN business would be technically infeasible?
A. So there is -- Juniper was, like most tech companies, an integrated engineering company. So they had various product lines, but those products and product lines share lots of common engineering software, hardware, and the like.
So contrary to how the Department of Justice was thinking about it, and it was obvious from the conversations with certain folks, there was no wireless LAN business inside Juniper. There is a set of products that are wireless LAN solutions, and they leverage the same code, they leverage the same engineering, they leverage the same ASICs processes, et cetera. They rely on pre-sales and the like, IP that is shared across campus and branch switching, SD-WAN, SASE.
In many instances, even though the solutions are quite different they may pull from the same shared engineering resources, the same ASICs teams and the like that support both the routing business

and the data center business. That's how you scale technology, that's how you provide a consistent customer experience, and it's how you do innovation in the most effective way.

So these are not siloed products, they're not siloed organizations. Some folks will be dedicated in one space versus another, but there's a lot of commonality across. For example, the AI Ops -- excuse me, the Mist source code runs on wireless LAN, it runs on campus and branch switching, it was being migrated across to the data center switching. I believe it was starting to or may have already formed the underpinning of their SD-WAN, I don't know, probably SASE as well and the like.

So you don't have the ability to pull that apart without technically damaging one product, multiple products, or potentially all of the products. So that's why it was infeasible from a technical perspective. And as the head of integration and the person doing the integration, planning and the like, my role was to understand all that because ultimately that's relevant to the integration.

I doubt Mr. Davis explained it at that level of detail or Mr. Levi explained it at that level of

detail, but they understood this so they would have imparted some pared down version of that in their conversations.

Q. Sure. Why, in HPE's view, would a divestiture remedy of the Juniper or HPE WLAN business be operationally infeasible?

A. Again, there isn't really a standalone wireless LAN business. So if you think about a company from the top to the bottom, you think about finance, you think about sales, you think about IT, you think about legal. Those are all shared resources. There was integration I believe sort of at the supply chain level, you know, accounts receivable, accounts payable. Take all of your core operations. Right?

So this is not a scenario in which what you had was standalone businesses that sat sort of in a portfolio structure under a holding company. This was an integrated business. Right? So the sales leader for Juniper was responsible for selling all the products in the portfolio. And even though there might have been teams that focused on one versus another, you're still going to have teams that run across, whether it's your channel program, and most of this business is done through channel

selling and the like.

So putting aside the technical side, you have a tremendous operational challenge if you were trying to sort of, quote, carve out something that looked like a business. You know, I always say to folks, you know, it's like taking a single sports team and telling someone go make three sports teams that are of equal or better competitive capability out of one team. It's not actually achievable. What you'll do is just end up with two weak, if at all functioning, organizations.

Q. Why would a divestiture remedy of Juniper's or HPE's WLAN business be commercially infeasible?

A. This was a public tender. So we had made a tender for the stock that the shareholders had voted and agreed on, and that price, you know, wouldn't be supportable from the perspective of the HPE shareholder perspective if you attempted to sort of dismantle part of the company.

And that's -- you know, even if you somehow could technically and operationally do it without damaging everything, on a standalone basis it wouldn't have worked commercially given the construct of the deal and the fact that it was a public tender.

Q. Okay. Mr. Schultz, let's continue with your declaration, which is Exhibit-2. I want to now look at paragraph 14.

In the first sentence of paragraph 14, you wrote, On May 1, DAAG -- and that's D-A-A-G -- DAAG Assefi told HPE that a settlement proposal with these two elements would be acceptable to the Antitrust Division.

Do you see that?

A. I do.

Q. Who did Mr. Assefi tell that to?

A. That would have been the result of the conversation I think I testified earlier in which Mr. Assefi indicated I believe to Mr. Davis and/or Mr. Levi that we should send the draft settlement to Mr. Goldstein.

And as I indicated, the -- really the two things happened kind of together, which is the April 30 meeting in person where there's a discussion of whether there's anything left to negotiate on those two terms, and the indication is that there is not and that at this point it's about the settlement process; and then the communication from Mr. Assefi directing that the settlements be sent to Mr. Goldstein to then move through the staff

for purpose of finalization.

So it's sort of the combination of those two events, but sort of being told to send the settlement to the staff and that there was nothing else left to negotiate on the two core terms is what signaled to us that, you know, we had an agreement on those terms.

Q. So I'm going to post another document in the chat, but just so you know you should keep your declaration open because we'll come back to it --

A. Okay.

Q. -- throughout. So don't close out of that.

(Exhibit Schultz-3 was marked for identification.)

BY MR. BILLER:

Q. Okay. I've posted what I've marked as Schultz Exhibit-3 to the chat. Let me know when you have that available.

MR. LIVERSIDGE: You want to see if you can get them open at the same time. We may have a paper copy too. Arthur, you're asking him to have two documents on the screen together? Is that the idea?

MR. BILLER: No, not together. Just after we're doing with Exhibit-3, we're

going to return to Exhibit-2.

MR. LIVERSIDGE: Okay. Got it. Thank you.

THE WITNESS: Okay. We have it open and I have reviewed it.

BY MR. BILLER:

Q. Great. Do you recognize Schultz Exhibit-3?

A. I do.

Q. Okay. This is an E-mail from Ms. Mellott at the Freshfields firm on May 1, 2025, to Mr. Goldstein at the Department of Justice; correct?

A. Yes.

Q. Okay. And the subject here is HPE/Juniper, confidential; correct?

A. That's the formal subject line, yes.

Q. And is this the settlement proposal from HPE to the United States that you were referring to earlier that came out of the April 30th meeting?

A. Well, it's not the actual proposal. I don't have the attachments, but this looks like the cover E-mail that accompanied the documents. And I think as indicated here, I believe Ms. Mellott and Mr. Goldstein had a brief telephone call about this either in advance of it being sent or shortly after just acknowledging the exchange.

Q. Right. And so if you scroll through Exhibit-3, you'll see that there are various attachments in that E-mail.
A. Okay. I just have the cover E-mail, but I'm looking. Okay. I'm looking at -- it looks like -- yeah, okay. I quickly scrolled down.
Q. So this is transmission of settlement proposal that you were saying came out of the April 30th meetings; is that right?
A. No. So the direction to send to Mr. Goldstein followed the April 30 meeting. The document you're looking at was the product of about a month's worth of negotiation and the meetings that I had testified to earlier, and it was the terms related to the software license and the Invest for America that at the April 30 meeting Mr. Assefi had indicated that nothing else was left to negotiate on those terms.
Q. Okay --
A. But in fairness to Mr. Assefi, unless I'm misremembering, he would not have seen this full slate of documents. Because I think what we were exchanging up to that point in time was a term sheet, and therefore we then put together these materials, sent them to Mr. Goldstein recognizing

Antitrust Division. As all negotiations up until this point were with folks inside the Antitrust Division.

Q. Other than Mr. Assefi, is it -- withdrawn.

Was it HPE's understanding that as of June 2nd, 2025, the Department of Justice did not consider license of the AI Ops for Mist source code to be an appropriate starting place for constructive discussion?

A. No, I wouldn't say that that was our understanding.

Q. Why not?

A. I would say that we had negotiated for 30 days with the person who had brought the case and had been indicated to be the person we should communicate with settlement about the case who believed, at least in those negotiations, that it was an appropriate remedy. And that had even been discussed at a meeting between Mr. Davis, Mr. Assefi, and Ms. Slater.

We then had a second phase with Mr. Hamer and Mr. Rinner in which they were indicating they didn't believe it was appropriate. And so it was very clear at that point to us that there were some split in the Antitrust Division around the approach

meeting was Mr. Davis, Mr. Assefi, and Ms. Slater discussing the terms of a potential settlement that included a source code license and an Invest for America plan. And that there was general support from Mr. Assefi and Ms. Slater for the structure of such settlement, which then prompted us to put that together and send an initial draft and then negotiate for an additional two weeks.

If in that meeting it had been indicated that that was not acceptable, no draft would have ever been put together let alone three drafts and multiple weeks of negotiation. Time was of the essence here, and so we would not have wasted our time if it had not been given general approval by the two principals from the Antitrust Division.

Q. Does HPE have any notes or written document contemporaneous with the April 15th meeting about what was discussed at that April 15th meeting?

A. I don't know. I did not go -- as part of the 30(b)(6) deposition I didn't try to search, so I don't know what privileged and internal communications might exist.

Q. Okay. Let's turn back to Exhibit-2.

A. Okay. All right. We have it.

Q. I want to pick up with paragraph 18.

A. I don't know whether he does or not, but he was not involved in any discussions around cleared material, at least not as it related to me, and I don't believe on behalf of the company he would have had any discussions on cleared material. And the discussions I participated in, we did not discuss cleared material. It wasn't required for purposes of the discussion.

Q. Going back to paragraph 18 where you wrote that HPE worked with its consultant Arthur Schwartz to engage with members of the defense and national intelligence community, which members of the defense and national intelligence community are you referring to?

A. Mr. Schwartz and I met with Bridge Colby, who is the director of strategy or policy at the Department of Defense in connection with their oversight of the NSA. And Mr. Schwartz and I met with the deputy director of the CIA, Mr. Ellis, and one of his colleagues.

Separate from that, we had other conversations I think that may be referenced here that did not involve Mr. Schwartz, and I believe Mr. Schwartz had one brief conversation with the director of the CIA, Mr. Ratcliffe, which was in

follow up to the discussion that we had with Mr. Ellis, and then which was also in follow up to the discussions that my colleague, Mr. Antczak had with operational members of the CIA.

Q. Other than the individuals that you just named, are you aware of Mr. Schwartz having communications with any other members of the defense and national intelligence community?

A. Mr. Schwartz, no.

Q. Other than the individuals you named, did HPE have any other conversations with members of the defense and national intelligence community?

A. Yes.

Q. Who else?

A. Well, as I indicated, I think from the time the deal was filed up and through, you know, the settlement, there would have been communications at the business level with the various folks that we support. And so I wouldn't have the details on those, but there would have been conversations at that level.

Myself and the CEO of the company had a conversation with the CIO of the NSA; my colleague, Mr. Antczak, and one of our public sector business leaders had conversations with members of the NSA.

A. We see the reporting of communicate -- that indicates that Mr. Ratcliffe, director of the CIA, spoke with members of the DOJ, which would be consistent with our understanding of the meetings that we had first with Mr. Ellis -- Deputy Director Ellis and then with the operational level of the CIA, which was all as we understood it to provide a briefing to Director Ratcliffe.
But I have not spoken directly to Director Ratcliffe, so that has not been confirmed nor has anyone in the DOJ specifically confirmed it to me. But I have seen reporting which would be consistent with the events that led up to that reporting.
Q. Other than the reporting that you've seen, do you have any knowledge of any members of any national security agency communicating with the Department of Justice about the HPE/Juniper merger?
A. I don't recall anyone specifically stating that they had, in fact, but my understanding I believe during the -- during the time of the discussions with Mr. Mizelle and Mr. Woodward, that there was an indication that that would occur. I believe that is consistent with why Mr. Schwartz had a communication in order to make sure that it was clear who would be communicated with.

done the majority of the talking for Hewlett Packard Enterprise. And certainly in light of the issues, I probably did the most talking between the three of us.

We did discuss, very briefly, I tried to raise the national security issues. I remember Ms. Slater indicating that while it had been banned from the market in 2019, that she had been I think in some form or fashion maybe at the FTC and involved in that.

And she believed that was the only thing relevant and that she was not willing to have a discussion about the national security points that we had raised in our letter, namely competing with Huawei and the rest of the world, and the national security interest there especially considering it's a global market. And the US defense and intelligence agencies' interest in having US technology in the most sensitive places around the world, and was not interested in having a conversation about what we do for the US government.

I remember taking a second run at the same issue and being told in no uncertain terms that that was not something that the Department was interested or would consider. We talked very briefly about the

what you're asking. Are you asking what happened at the meeting, what happened after the meeting, how did the meeting end?

Q. That's a fair question. Generally, what happened at that meeting?

A. So that meeting lasted an hour or so. We covered similar topics to those that we covered in the June 4th meeting -- excuse me, the June 5 meeting with the Antitrust Division, but we spent a fair bit more time talking about national defense issues in particular. We also talked about -- in detail about the health of the business and the activist investor threat.

It was clear Mr. Mizelle had done some homework on both the national security side and on the activist investor side. I believe he had a background perhaps in private equity hedge fund or the like. I was surprised that he was able to sort of ask questions about our stock performance, about our CEO, about our company in connection with the discussion of the activist investor threat. So he was clearly, you know, well informed and understood what the significance of that threat was.

As I said, we talked about national security, what we do at a high level. Obviously

nothing classified. He seemed to have some understanding of what it was that we had done and sort of our history in that space. He asked about the remedies, he was focused on whether we were willing to grant more than one source code license and said there was a pretty active discussion around whether we would lead to a second source code license. My recollection is that I did not agree to that in the meeting, but it was clearly something he was focused on.

We talked about engineering support and sales support and he was very interested in the extension of those items, meaning adding more to the settlement with respect to both engineering support and sales support. Again, I don't recall in the meeting that we agreed to any of that. I think we said we would take it for consideration.

I believe there was some questions about the Invest for America plan, as I believe we had been asked to send that over in advance of the meeting and had done so. It's possible that was after the meeting, but I believe it was before this meeting.

And so it was a very fulsome, detailed discussion. Frankly, it was a discussion that I was hoping we would have had on June 5th but did not

happen, and instead we had a really comprehensive and deep discussion that left us with some things to think about, namely the things that he had requested in the meeting. And those were sort of the takeaways for us in the meeting.

Q. Was there any discussion during that meeting about head-to-head competition between HPE and Juniper?

A. We would have talked about the merits, so we would have talked about what the competitive environment was, we would have talked about our view as to what the situation was between Juniper and HPE. I specifically recall discussing with Mr. Mizelle both what our expert had found and in fact what the DOJ's own expert had found.

I believe I indicated at the time that I believe the DOJ's expert had found, even under a theory of the case that is not a generally recognized theory, something like $80 million of competitive harm in a 4 or $5 billion market and that his number was actually closer to 50.

I think I shared with him that our expert had been the expert more than 50 percent of the time for the Department of Justice in mergers and acquisitions cases. That he uses the methodology

that the Department of Justice uses when he is the actual expert for the Department of Justice; and that his -- his -- Mr. Hill's expert testimony I think showed something like $30 million, which he considered de minimus harm. I believe I also shared with him that we had a second expert who had looked specifically at pricing dynamics and the like.

I think I also explained to Mr. Mizelle that fundamentally the Aruba business and the Juniper business compete with different technologies. The Juniper business and wireless LAN is a hundred percent in the cloud and has no on-prem offerings. More than 60 percent of the Aruba business is on-prem, so the DOJ had fundamentally misunderstood the market and the products, believing them to have this significant overlap, when in reality for more than 60-some percent of the business there's absolutely no overlap because Aruba is primarily on-prem and Juniper is exclusively in the cloud.

I'm sure there were other points that we made. It was honestly the first time at least I had participated in a meeting where we were having that level of a conversation and, you know, that kind of a dialogue. So I certainly used the opportunity to make sure that I shared all the points that we

the extent the witness is talking about Mr. Mizelle's personal thinking. I'm pretty sure the witness did say on the record that this is his impression, in which case it's not speculation.

THE WITNESS: Yeah, that absolutely was my impression.

BY MR. BILLER:

Q. Did you subsequently have either a meeting or a call with -- that involved Mr. Stanley Woodward?

A. Yes. At some point following the meeting, and it was I think, you know, a number of days later, Mr. Mizelle communicated to us, I think probably through Mr. Levi, that Mr. Woodward would be handling the settlement negotiations from this point. And so I had an initial call with Mr. Woodward and I believe an attorney from his office by the name of Ashleigh Bondoc.

Q. Did that occur on June 25th, 2025?

A. I believe so. It would have been June 25th, June 26th, something in that timeframe. I don't have my declaration back up. I think I referenced it in my declaration, if I recall. Whatever the date is there, that would have been the date.

an actual settlement draft.

Q. At the conclusion of your discussion with Mr. Woodward on June 25th, was it your understanding that you had reached an agreement to settle the case?

A. I don't think we had reached an agreement. I think where we were was that we had sort of flushed out the primary terms. I think in that session -- at least I think at some point in one of these sessions, maybe it's this one, Mr. Woodward had discussed pricing and the concept of a price commitment, and so I believe we put something together and include that in the draft.

So I think negotiations were still ongoing if I'm thinking -- if I have the timing right. Frankly, those negotiations were ongoing until the settlement was finalized in the communications between Mr. Rinner and Ms. Mellott.

(Exhibit Schultz-9 was marked for identification.)

BY MR. BILLER:

Q. I'm going to post a document to the chat that I'm labeling as Schultz Exhibit-9.

A. Okay.

Q. Let me know when you have that available.

disfavored by the Antitrust Division. And so there was some suggestion that rather than have a formalized settlement that would, in essence, set the precedent, that there might be a dismissal.

Again, we were ambivalent. We had proceeded all along as if there was going to be a settlement. And you can see in every turn we prepared a settlement document that would be filed with the Court, but obviously we were trying to be responsive in the negotiations.

And I think as you know, ultimately the pricing commitment was pulled out and was not part of the final agreement for reasons you'd have to ask the DOJ. But based on the communications I was a part of, I assumed it was because they decided they didn't want to set the precedent.

MR. GOLDSTEIN: Objection. Lack of foundation, calls for speculation. Again, I understand the witness to be talking based on conversations he had with individuals and not putting forward some sort of -- not suggesting that he has insight into state of mind of the many specific individual outside of statements that they may have made.

(Exhibit Schultz-10 was marked for

Do you see that?

A. I do.

Q. Do you recall having a conversation with Mr. Woodward on June 27th?

A. I do.

Q. What was discussed?

A. The settlement terms and specifically the desire to have Instant On added back into the settlement agreement as one of the remedies, the desire to have a penalty provision to make sure that it aligned to the pricing commitment that we had offered in response to their request, and the requested increase in university investments as part of the Invest for America element of the settlement.

Q. So I want to go to -- this will be at the end of your PDF or next to the last page of the PDF, actually. It's a document with the heading HPE Invest In America Plan. Let me know when you're there.

A. Got it.

Q. Okay. Can you see under the first line under the heading says, Hewlett Packard Enterprise will agree to invest more than $70 billion in the US over the next five years.

Is that right?

A. I haven't read it, so I can read it quickly now. Happy to take the time.
Q. That's fine.
A. I'm not seeing any. I don't remember any, but I just wanted to make sure. I'm not seeing any.
Q. I want to switch now to topic number three --
A. Just so I'm clear, you were talking about the competitive impact study. Correct?
Q. The competitive impact statement --
A. Impact statement. Okay. Yeah. I mean, national security is obviously a factor in settlement, but it's not necessarily a competitive impact. In any event, okay. Did you have more questions on that document or did you say you were moving somewhere?
Q. That's it for that. Thank you.
A. Okay.
Q. Let's turn to topic number three of the deposition notice, which relates to the Instant On divestiture.
A. Okay.
Q. Do you know how many parties expressed interest -- any interest at all in the Instant On divestiture to HPE?

States; is that right?
A. I'm trying to remember. I'm not down into the details of each of the companies, [redacted].
Q. Okay. Do you recall that [redacted] bid is [redacted]?
A. It sounds roughly correct.
Q. Okay. Another company that has put in a bid is a company called [redacted]; is that right?
A. Yes.
Q. [redacted]?
A. I'm recalling that they're an [redacted], I believe.
Q. Okay. And do you understand that [redacted]?
A. [redacted]. I think, again, like what we saw with Ubiquiti, it would be very consistent for certain of these folks as entrants into the market, you start in SMB and you work your way up. It's not that some folks don't enter at the top of the market and work their way down, but the more typical approach is the

Ubiquiti approach, come in at SMB and work your way up.

Q. Sure. But your understanding is that [redacted]; is that right?

A. [redacted].

Q. Okay. And another company that has put in a bid is a company called [redacted]; is that right?

A. I believe so, yeah. I think -- I think [redacted], if I recall correctly.

Q. Okay. With respect to Instant On, [redacted] has bid [redacted]; is that right?

A. That sounds roughly correct.

Q. Okay. [redacted]?

A. [redacted].

Q. Okay. Another company that has put in a bid for Instant On is [redacted]; is that right?

A. That is correct.

Q. [redacted]

flight. Thanks very much. We can go off the record.

MR. LIVERSIDGE: Hold on a second. I just have two follow-up questions. Not to keep everyone, I know you have to go.

EXAMINATION

BY MR. LIVERSIDGE:

Q. Mr. Schultz, you were asked some questions about an Invest in America proposal in late June 2025. Do you recall that?

A. I do.

Q. Was a commitment to Invest in America part of the final settlement agreement reached between HPE and the Department of Justice?

A. It was not. The Department of Justice ultimately decided I believe in the communications from Mr. Rinner -- excuse me, Mr. Rinner to Ms. Mellott that that was not one of the terms that they wish to include and so it did not make its way into the final agreement. And as a result, we have not -- we have not done anything to comply with.

MR. LIVERSIDGE: Okay. Thank you very much. That's all I have. We can go off the record.

VIDEOGRAPHER: Standby. The time