# EXHIBIT 5
# REDACTED

**From**: MELLOTT, Jenn (JEM) [jennifer.mellott@freshfields.com]
**Sent**: 6/4/2025 9:53:10 PM
**To**: Rinner, William (Bill) (ATR) [William.Rinner@usdoj.gov]
**CC**: 'Steven C. Sunshine (steve.sunshine@skadden.com)' [Steve.Sunshine@skadden.com]; Rancour, Joseph M (WAS) [joseph.rancour@skadden.com]; Stephen Weissman [SWeissman@gibsondunn.com]; LEHNER, Mary (MNL) [Mary.LEHNER@freshfields.com]
**Subject**: HPE/Juniper - CONFIDENTIAL
**Attachments**: Letter to A. Slater re HPE FRE 408 Settlement Proposal - CONFIDENTIAL.pdf

Letter sent for settlement purposes under FRE 408

Dear Bill -

Please see attached. We appreciate given the hour that Gail and your team may not be able to digest this before our meeting tomorrow, but are happy to speak to the points in the letter if helpful in addition to the proposal sent earlier today.

Please let me know if you have any questions.

Best,
Jenn

FRESHFIELDS

**Confidential**

**By Email**

The Honorable Abigail Slater
Assistant Attorney General
Antitrust Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

June 4, 2025

**PROVIDED FOR SETTLEMENT PURPOSES ONLY UNDER FRE 408**

**RE: United States v. Hewlett Packard Enterprise Co., et al., Case 5:25-cv-00951-PCP**

Dear Assistant Attorney General Slater:

On behalf of Hewlett Packard Enterprise Company (HPE) and Juniper Networks (Juniper), we write to address our mutual efforts to resolve the Antitrust Division's current legal action regarding the proposed acquisition of Juniper by HPE (the "Transaction").

The Parties continue to maintain that the Transaction will not result in a substantial lessening of competition and look forward to demonstrating this in court, but nevertheless wish to discuss a resolution to the litigation so that customers can begin to reap the benefits that the combination will bring, the national security interests of the United States can be protected, and the companies can seek to move past the significant disruption that the litigation has caused to their businesses.

This letter outlines an updated settlement proposal, which we look forward to discussing with you in our meeting scheduled for June 5, 2025. In addition, while we appreciate that your staff are very familiar with the case brought by the Division, given that we have not previously had an opportunity to meet or speak with you about the competitive assessment of the Transaction (because the investigation of the Transaction was handled almost entirely by the prior administration), this letter also sets out background on the Transaction and its implications for competition and national security that may be helpful context for you in advance of our meeting.

***Updated Proposal***

An updated proposal is included with this letter as Appendix A. This proposal sets out a package that would be sold to an existing WLAN competitor acceptable to the Division, expands upon the proposal submitted by the Parties on May 1, 2025 in material ways, and responds to the feedback from the Division by introducing a more traditional structural divestiture in addition to the structural remedy of a source code license previously offered by the companies. We look forward to discussing this proposal during our meeting.

***Competitive Assessment of the Transaction***

The Parties continue to believe that the Transaction will not lead to any anticompetitive effects

or lessening of competition, and that discovery in the pending litigation has borne out the view of the market set forth by the Parties during the investigative phase. Consistent with this, the Transaction was reviewed and cleared by 14 other jurisdictions (including the EU and UK) on substantially the same facts as are present in the United States, and the Division's challenge remains the only barrier to closing.[1]

As a threshold matter, the Parties' post-merger combined share in North America falls below 25%, below the 30% market share presumption laid out in *Philadelphia National Bank* and the 2023 Merger Guidelines. Moreover, the evidence adduced in discovery demonstrates that the Transaction is pro-competitive and will benefit customers, and there has been substantial customer support since the Transaction was announced January 2024.

Sales of WLAN hardware and software are, and will remain, highly competitive, with numerous credible participants that will continue to constrain the combined firm in the United States, North America, and worldwide. Through discovery, the Parties have identified customers of all sizes and in all verticals that rely on Arista, Fortinet, Extreme, Ruckus, Ubiquiti, and Nile to provide their WLAN, and the Parties will be prepared to demonstrate at trial that these competitors routinely challenge and win against HPE and Juniper in competitive tenders. Furthermore, enterprise customers for WLAN hardware and software, which are sophisticated commercial enterprises like Fortune 100 banks, manufacturing and retail companies, and even educational institutions, can and do use a highly competitive bidding process that will continue to constrain the combined company.

Equally important, post-Transaction, there will remain at least eight additional credible competitors in the hypothetical market for enterprise-grade WLAN in North America, several of which are comparable in size to Juniper today. These competitors, including the clear market leader—Cisco—will continue to put pressure on the Parties to compete on price and innovation. Beyond Cisco, the seven other competitors all offer sophisticated solutions with similar functionalities to the Parties. They all have well-established reputations and can serve all customers, including large enterprise customers. There is no significant difference between the hardware or software from one company to the next—any apparent strength with any customer segment is attributed to differences in each company's sales strategies, rather than product offerings or technical capabilities. Consequently, there are no specific verticals in which only a subset of players are capable of participating. In fact, the evidence bears out that every WLAN player can aggressively compete for customer bids in each customer vertical if the opportunity presents itself.

Barriers to entry in this market are low and have decreased over time, allowing new players to quickly and easily enter this space with limited investments. Like Juniper and HPE, competitors rely on third-party ODMs to build the hardware components of the access points and use the same underlying resources to develop network management software, such as Linux and generative AI technologies. Established competitors like Arista and Fortinet (with market caps of $118 billion and $78 billion, respectively, as compared to HPE's market cap of $23 billion) have leveraged their existing capabilities in data center networking and security, respectively, to enter the campus segment, including WLAN. Moreover, new business models, like networking-as-a-service ("NaaS") provided by Nile and Meter, are industry disruptors, providing even greater competition to traditional WLAN providers. NaaS is increasingly being adopted by large enterprises, and demand is expected to further grow from $18.7 billion in

[1] The Israeli Competition Authority is also waiting to clear the Transaction pending the outcome of the Division's challenge.

2023 to [2] $155.17 billion by 2030 We understand Nile is focused on enterprise customers, and Dollar Tree has testified to its decision to select Nile as its WLAN vendor and its confidence that Nile can serve its needs.

Neither documents nor data establish any particular closeness of competition between HPE and Juniper. While the Division has identified in its case examples of head-to-head competition between the Parties, the Parties have identified a myriad of documents for the Division Staff that show competitive tenders against and competitive intelligence gathering related to each of the competitors identified above. Juniper's documents and the testimony of its executives demonstrate a robust competitive landscape in which Juniper does not compete more closely with HPE than any other rival. Moreover, the internal documents of the other competitors in the market show that they consider HPE and Juniper to be their rivals, and have competitive intelligence and marketing materials targeted at defeating HPE and Juniper in tenders.

The Parties' data are consistent with the documents, which show that HPE does not compete with Juniper more frequently than Juniper's single-digit market share would suggest, and that Juniper does not constrain HPE's pricing (and vice versa). Consistent with third-party share estimates and win-loss data that point to a robust competitive landscape with several players, econometric analysis by Dr. Nicholas Hill shows that HPE does not offer lower prices or secure lower margins when it competes against Juniper (or Cisco) than when it competes against others.[3] Data from competitors similarly shows that all players in this segment compete against a broad range of rivals. These similar pricing and margin levels show the same thing as the documents and other data: HPE and Juniper compete aggressively regardless of which competitor it is up against in a bid.

With respect to innovation, the facts revealed in discovery also support the claims put forth by the Parties. Innovation is widespread across the industry and is primarily driven by customer demand and macro-level trends, as customers are focused on increasing automation, decreasing operational costs, and enhancing convergence with security. While one competitor or another may be better positioned to capitalize more quickly on a particular trend or feature, or to brand itself as superior in a particular area – such as Fortinet and security, Huawei and Ruckus with respect to Wi-Fi 7, and Juniper and AIOps – ultimately all WLAN competitors innovate in response to the same macro trends in response to customer demand. Consistent with this, the WLAN offerings of HPE, Juniper, Cisco, Fortinet, Arista, Extreme, Huawei, Ruckus, Ubiquiti, Nile, Meter and others have comparable features that are constantly being updated.

Within that context, AIOps is just one small piece of network management software, and Juniper no longer has a competitive advantage in AIOps. Because Mist had focused on incorporating AI into its products from inception, even prior to its acquisition by Juniper, Juniper was initially well placed to capitalize on the trend towards incorporation of AIOps into its network management software. This success was primarily a function of focused marketing, but it does not mean that Juniper is a unique source of innovation related to AIOps or cloud-managed WLAN. To the contrary, all competitors have since invested in AIOps in response to customer demand, and all competitors now have comparable software offerings that include AIOps functionality.[4] Simply put, AIOps is now table stakes. AIOps, including features

---

[2] Fortune Business Insights, Network as a Service Market Size, Share & COVID-19 Impact Analysis, 2023–2030 (Oct. 21, 2024), https://www.fortunebusinessinsights.com/network-as-a-service-market-106700.

[3] Notably, CRA and the Parties have engaged extensively with economists in DOJ's Expert Analysis Group regarding the opportunities data; EAG has not provided any alternative theories or analysis.

[4] *See* the Parties' September 3, 2024 Submission regarding innovation at 9–16 (citing numerous examples of

offered by Juniper, will continue to evolve, but there is no evidence on which to conclude that Juniper is a unique innovator when there are so many other competitors investing in this area.

All available data sets point to a consistent conclusion – the competitive landscape is robust, the Parties are not unique competitors, and Juniper is not a particularly important driver of innovation – such that the transaction will not result in a substantial lessening of competition.

***A Combined HPE/Juniper Also Enhances U.S. Innovation and Global Competition, Advancing U.S. National Security Interests***

**I. HPE is a critical partner to the U.S. Intelligence Community, Departments of Defense and Energy, and other agencies, and the closing of this deal secures HPE's ability to innovate in the future and expands the areas of cooperation with the parts of the U.S. government most dependent upon technological innovation.**

Both HPE and Juniper are proven, innovative, and trusted federal government partners. HPE currently provides roughly [redacted] worth of products and services annually to the Intelligence Community, Department of Defense, Department of Energy, and other federal government agencies. The U.S. Intelligence Community alone now purchases [redacted] from HPE per annum, building on HPE's decades-long partnership with that community. Almost everything HPE has done and is doing for the U.S. Intelligence Community cannot be described here, although we can identify the individuals in the Intelligence Community who can provide appropriate briefings. Please let us know if you would like us to identify those individuals for you. We can disclose one project: [redacted] That engagement remains in place today

Outside of the Intelligence Community, there are a myriad of examples of the work HPE is doing for the U.S. government to advance U.S. national interests. Just last year, HPE delivered the world's fastest supercomputer, El Capitan, to the United States Department of Energy's Lawrence Livermore National Laboratory;[5] El Capitan joined Frontier at Oak Ridge National Laboratory[6] and Aurora at Argonne National Laboratory[7] to give HPE the distinction of building the only three exascale systems in the world, helping the United States to lead the supercomputing race against the PRC. Importantly, these supercomputers are built in HPE's secure advanced technology center in Chippewa Falls, Wisconsin by hundreds of HPE team members holding TS/SCI clearances. We believe this facility is the only one of its kind in the United States. Another example is the [redacted] To the extent desired, we would be glad to provide a more extensive briefing on the non-confidential projects

---

organic and inorganic innovation in AIOps by all WLAN competitors, including Cisco's acquisition of 12 AI and ML firms since 2017 and Splunk in 2024, recognition of Arista, Nile, Ruckus, and Fortinet for achievement in AIOps by Gartner and others); the Parties' October 31, 2024 Submission answering certain Staff questions at 1–6 (describing in detail Huawei's global leadership in innovation). Companies other than Cisco have also acquired AI firms to drive AIOps implementations, such as Arista (Big Switch Networks, Awake Networks) and Fortinet (Next DLP, Lacework), among others.

[5] Press Release, *Hewlett Packard Enterprise Delivers World's Fastest Direct Liquid-Cooled Exascale Supercomputer, "El Capitan", for Lawrence Livermore National Laboratory*, HPE (Nov. 18, 2024), available here.

[6] *Oak Ridge National Laboratory*, HPE, available here (last visited Mar. 18, 2025).

[7] *Argonne National Laboratory*, HPE, available here (last visited Mar. 18, 2025).

HPE is performing for the U.S. government.

Similarly, Juniper is a key partner to the U.S. government, providing [redacted] per year in products and services. Among other areas of partnership, Juniper supplies [redacted] It also provides routing, switching, and security solutions for mission-critical infrastructure for the [redacted] the Department of Veterans Affairs, and the [redacted] Juniper also provides critical infrastructure in support of the [redacted] and it provides solutions to further key networks within the national security space.

In short, HPE and Juniper provide critical technology to the some of the most technologically advanced and dependent parts of the U.S. government. Post-close of this Transaction, the Parties fully expect that their areas of cooperation with the Intelligence Community and Departments of Defense and Energy will grow substantially and are confident that government partners recognize this opportunity, as well.

Together, a combined HPE-Juniper would also generate significant national security benefits by serving as a bulwark against Huawei's global expansion. The Transaction would also lead to economic benefits closer to home. Through investments in the United States—such as HPE's approximately $100 million investment in a high-performance manufacturing facility in Chippewa Falls, Wisconsin, which is staffed by cleared U.S. citizens—HPE-Juniper will also prevent skilled jobs and dollars from being lost to China.

**II. The transaction also advances critical U.S. national security interests by directly countering the dominance of Huawei and other Chinese technology companies.**

China is winning the battle for enterprise networking dominance globally, largely through its unfettered support for Huawei's global expansion in enterprise networking and broader set of enterprise technologies. All relevant parts of the U.S. government recognize the substantial national security risk to the United States posed by Huawei and China's technology strategy. Because networking equipment provides a critical path to hack into telecommunications systems, the company that provides this equipment serves as the gatekeeper against cyber-attacks. As CIA Director Ratcliffe previously explained, the PRC uses firms such as Huawei for "the introduction of vulnerabilities into software and equipment."[8]

Worse yet, Huawei is now making significant inroads with the governments of core U.S. allies and strategic partners around the world. Huawei has leveraged PRC funding to develop an unparalleled portfolio of networking, cloud, and data storage offerings – to offer a "full stack" solution, i.e., a comprehensive package for the entire network infrastructure, from user access to the network (wired and wireless), across the WAN, and into the data center or cloud, which is now being used to remove and replace U.S. competitors like HPE and Juniper from markets around the world.

With this significant competitive edge, Huawei follows an established playbook with enterprise clients: It leverages its size and complementary offerings to be a single solution for key government and commercial customers. Because Huawei can combine data center solutions (including routing and switching) with edge networking (such as WLAN) and networking

---

[8] Bill Gertz, *John Ratcliffe Says China Poses Greatest Threat to America*, Washington Times (Dec. 3, 2020), available here.

security products, it offers a suite of products and services to customers that purport to address all of their technical requests without resorting to third-party provider products.

Overall, HPE has lost over **1,000 opportunities** to Huawei in markets around the globe in the last few years. These lost opportunities include strategically critical and defense customers in Saudi Arabi, UAE, Mexico and South Africa[9] in areas of geopolitical importance. Juniper similarly has lost opportunities to Huawei.

Huawei's efforts to push out HPE and Juniper are further summarized in the graphic below:




Armed with the full backing of the CCP—including financial support, heavy-handed influence peddling, and outright bribery and corruption, Huawei is steadily capturing key markets in Europe, the Middle East, Latin America, Africa, and Asia.[10] Chinese firms are now often seen as having the "right of first refusal" for business in key regions, directly bolstered by government-to-government outreach by the PRC. For example, as of Q4 2024, with respect to enterprise routers, Huawei now controls [redacted] of the Middle East and Africa ("MEA") market, [redacted] of the Latin American ("LatAm") market, and [redacted] of the European Union ("EU"). Likewise, for service provider routers (i.e., routers for telecoms), Huawei controls [redacted] of the

[9] *E.g.*, **Saudi Arabia:** Huawei beat HPE to obtain contracts with the Ministry of Defense and Saudi Aramco, giving the CCP access to the backbone of one of the United States' key intelligence-sharing partners. **United Arab Emirates:** Huawei has embedded itself as the provider of core services to Etisalat, the world's 16th largest telecommunications provider. **Mexico:** Huawei beat HPE in bids to provide data center networking solutions for an IT provider to the Secretariat of National Defense (SEDENA). **Colombia:** Huawei has made major inroads with the government, including contracts to supply LAN and/or data center offerings with the Attorney General's Office, the National Police, and a state-owned bank. **Indonesia:** Huawei won a series of deals with a major manufacturer, a state-owned bank, and state-owned enterprises after HPE was unable to meet customer requirements for switches and routers. **South Africa:** Huawei beat out U.S. competitors, including HPE, to obtain data center and WLAN contracts for MTN, one of the largest telecommunications providers in Africa, and for a data center contract with the South African Department of Justice.

[10] Data from [redacted] market analysis.

MEA market, [redacted] of the LatAm market, [redacted] of the EU market, and [redacted] of the Asia-Pacific and Japanese market. And routers are far from the only market Huawei is cornering. In 2023, Huawei was the largest firewall vendor in Asia-Pacific (with [redacted] market share) and among the leading firewall vendors in the Caribbean and Latin America (with [redacted] market share). Huawei is also becoming a significant player in data center switches, capturing [redacted] of total market share in MEA.

[redacted]

In short, HPE is repeatedly losing to Huawei, in large part because it cannot offer a full stack solution. The combined HPE-Juniper would integrate complementary portfolios, offer a full stack suite of core technology products, and compete with Huawei in strategic areas around the world. By offering a comprehensive, full stack suite and gaining greater scale, the combined HPE-Juniper will be positioned to win contracts in areas of critical geopolitical importance and to prevent Huawei (and, by extension, the PRC) from succeeding in their state-sponsored plan to make the world's economies dependent on China for telecom and cybersecurity services. America cannot afford to lose.

| | | | Hewlett Packard Enterprise | Juniper | Hewlett Packard Enterprise + Juniper | HUAWEI |
|---|---|---|---|---|---|---|
| Edge Networking | Wireless | WLAN | ✓ | ✓ | 🇺🇸 | 🇨🇳 |
| | | Private 5G | ✓ | ✗ | 🇺🇸 | 🇨🇳 |
| | Campus Switching | | ✓ | ✓ | 🇺🇸 | 🇨🇳 |
| | SASE | SD-WAN | ✓ | ✓ | 🇺🇸 | 🇨🇳 |
| | | SSE | ✓ | ✗ | 🇺🇸 | 🇨🇳 |
| Wide Area Networking (Access / Core NW) | 5G RAN + Mobile Core | | ✓ | ✗ | 🇺🇸 | 🇨🇳 |
| | Routers | Telco | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| | | Enterprise | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| | | T1 | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| Cloud Networking | Next Generation Firewall | | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| | Switching | Enterprise | ✓ | ✓ | 🇺🇸 | 🇨🇳 |
| | | T1 | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| AI Networking | AI Interconnect | | ✗ | ✓ | 🇺🇸 | 🇨🇳 |
| Compute | | | ✓ | ✗ | 🇺🇸 | 🇨🇳 |
| Storage | | | ✓ | ✗ | 🇺🇸 | 🇨🇳 |

*Combining HPE and Juniper products would create a unique alternative to Huawei's full stack.*

### III. The Transaction will allow Juniper's and HPE's businesses to compete effectively against Huawei.

Today, despite offering widely desired products, Juniper's business is subscale, struggling to sell globally because it lacks channel partners. Unlike HPE, which earns a majority of revenue from international operations,[11] most of Juniper's revenue is domestic.[12] Access to HPE's stronger international brand, salesforce, and global network of distributors and resellers will help Juniper expand the reach of its products—including those where HPE has limited presence today—such as AI data centers, the small office/home office sector, routers, and firewalls. For more than a decade, Juniper's router business—one of only four in the global market—has been losing market share to foreign alternatives. **In 2015, Juniper had a market share of 25% of core routers,[13] but by 2023, its share of routers was only** [redacted][14] Absent the Transaction, Juniper does not have the resources to make a meaningful impact on a global scale.

The acquisition will also strengthen HPE's current prospects and reaffirm the United States' commercial presence around the world. American competitors require scale to compete with Huawei's considerable resources. Scale will also lower HPE and Juniper's costs through purchasing and operational efficiencies, enabling price reductions that are crucial to attracting customers in developing countries

To serve as a meaningful alternative for customers, HPE and Juniper must keep pace with Huawei in the innovation race. Since 2014, Huawei has invested more than 14% of its annual revenues into R&D,[15] and since 2021, that percentage has increased to more than 20% of its revenue.[16] While Huawei is excluded from selling in the United States, it still uses the U.S. patent system to extract royalties from American companies, shackling their ability to spend on innovation. In the last few days, Huawei has threatened to sue HPE to enjoin the sale of its wireless products unless it agrees to pay Huawei a $15M per year licensing fee.

Finally, the Transaction will enable strong cybersecurity protections. U.S. firms, including Juniper, are currently vulnerable to attacks at a time when China-nexus attacks are becoming more frequent and far more damaging. The Transaction provides the dual benefit of securing an existing offering in Juniper, and creating more secure alternatives to Huawei. HPE's market-leading security, as well as HPE's resources, will improve Juniper's product security, protecting against such attacks and securing its customers' systems and data. Indeed, the combined HPE-Juniper entity would provide the dual benefit of securing an existing offering in Juniper and creating more secure alternatives to Huawei.

### IV. As a matter of public interest, the Division should consider the national security interests which weigh in favor of clearing the Transaction

The proposed Transaction provides a host of meaningful national security benefits in must-win technologies and markets. The Division's decision to sue to prevent HPE from acquiring

---

[11] HPE, Annual Report on Form 10-K at 51 (Dec. 19, 2024), available here.
[12] Juniper Networks, Annual Report on Form 10-K at p. 53 (Feb. 21, 2025) (noting that U.S. sales accounted for 57% of revenue and Latin America accounted for less than 5% of revenue), available here.
[13] Trefis Team, *How Can Juniper Curb The Declines In Its Router Market Share*, Forbes (Sept. 10, 2015), available here.
[14] [redacted]
[15] Equal Ocean, *Huawei's Investment in R&D Ranks a Leading Position* (Apr. 30, 2019), available here.
[16] Huawei 2023 Annual Report at 5, available here.

Juniper runs counter to the national security interests of the United States.

As the Division has observed, national security concerns—even in the antitrust context—present a "a public interest of 'the highest order.'"[32] The Division's participation in the litigation by the FTC against Qualcomm highlights the importance of these very national security considerations: There, the Division urged the U.S. Court of Appeals for the Ninth Circuit to consider the national-security implications of a district court's order enjoining Qualcomm's practices on antitrust grounds. As the Division argued, "the public interest also takes account of national security concerns," and that case "present[ed] such concerns": "diminishment of Qualcomm's competitiveness in 5G innovation and standard-setting would significantly impact U.S. national security," and "Qualcomm is a trusted supplier of mission-critical products and services to the Department of Defense and the Department of Energy."[33] The Ninth Circuit credited those concerns, granting a stay of the injunction after noting that "the Department of Defense and Department of Energy aver that the injunction threatens national security, and the DOJ posits that the injunction has the effect of *harming* rather than *benefiting* consumers."[34]

Here, arguably more so than even in the Qualcomm matter, "serious national security considerations" argue decisively against antitrust enforcement.[35] HPE and Juniper, like Qualcomm, are "trusted suppliers" of "mission-critical systems" to the defense and intelligence communities. Blocking the Transaction, like an injunction prohibiting Qualcomm's practices, would kneecap American firms' abilities to compete globally in geopolitically critical sectors. If anything, the present situation is even more serious, because the entity poised to take America's place in global markets is Huawei—a PRC state-sponsored company that the U.S. government has already identified as a national-security threat. As stated earlier in this letter, we would be glad to identify for you the individuals in the relevant agencies willing to discuss HPE's critical work for the U.S. government.

In sum, a combined HPE-Juniper will bring together innovative American companies to be a more effective competitor to Huawei on the global stage. As separate companies, HPE and Juniper lack the full stack of offerings to compete at scale in countries of critical national security importance; as a result, Huawei is winning contracts with key companies and governments in regions of strategic importance to U.S. national security. A combined HPE-Juniper, in contrast, can leverage the companies' complementary portfolios of offerings, compete at scale, and invest in innovation.

***The Harm the DOJ's Litigation Will Cause to HPE's Broad Set of Customers, Competition Across Multiple Product Markets, U.S. National Security Interests and U.S. Innovation Outweighs Any Purported Competitive Benefits to Be Obtained in the Enterprise WLAN Market.***

We respectfully submit that DOJ should weigh public interest factors in continuing this lawsuit and believe for the reasons stated below that the very real harm that will occur if the deal is blocked overwhelms any theoretical competitive benefits DOJ hopes to maintain in the Enterprise WLAN market.

If the DOJ succeeds in blocking the deal, it is exceedingly likely that HPE (and quite possibly Juniper) will be forced to make dramatic governance, strategic, operational and financial changes that will diminish its ability to innovate and compete in the markets in which it does business, including the Enterprise WLAN Market. After the DOJ sued to block the deal in January 2025, HPE's stock dropped significantly (~23%), resulting in +$5 billion dollars of

losses to its investors and employees. Shortly after the stock drop, Elliott Investment Management ("Elliott"), a well-known activist investor, contacted HPE's Chair of the Board to reveal that it had accumulated a substantial position in HPE ($2 billion or 8.8% of outstandings shares) and to demand that HPE's Board of Directors fire HPE's CEO, Antonio Neri. Elliott's activist strategy here is what is known as merger arbitrage. If the deal closes, Elliott expects HPE's stock price to recover all or more of the 23% drop it experienced when the DOJ filed its lawsuit. If the deal is blocked, Elliott will likely seek to force the company to fire the CEO and the Chair of the Board, dramatically reduce costs (especially mid-term and long-term research and development that is the lifeblood of true innovation), and engage in "portfolio rationalization," which euphemistically means breaking up HPE.

Rather than fostering growth, innovation, or long-term competitiveness, activist strategies focus on near-term profits that frequently leave behind weakened businesses, disrupted workforces, and reduced innovation. In this scenario, HPE will not be a more competitive company – in WLAN or any other product market; nor will it be a more innovative partner for the U.S. Intelligence Community, the Departments of Defense or Energy or any other parts of the U.S. government. And HPE's eagerness to be a significant contributor to this Administration's Invest in America initiative – as evidenced by the substantial commitments set forth in the settlement proposals shared with the DOJ – is highly unlikely to be matched by an incoming activist investor.

For these reasons, a proper interest analysis must undertake a comparison between the world that exists if the Transaction is approved and the one that exists if the Transaction is blocked. By contrast, an interest analysis that simply weighs the state of a combined HPE-Juniper against how those companies exist separately today assumes the return to a status quo that ignores the realities described above, and, therefore, can lead to a miscalculation of the harm/benefit analysis of blocking this transaction. The most recent example of this type of miscalculation occurred with the prior administration's action to block the merger of Spirit Airlines and JetBlue Airlines. In succeeding, the DOJ convinced the Court that the merger would confer greater market power to the combined entity and would leave fewer options for consumers in the ultra-low fare market. DOJ claimed "JetBlue's plan would eliminate the unique competition that Spirit provides—and about half of all ultra-low-cost airline seats in the industry—and leave tens of millions of travelers to face higher fares and fewer options."[17] Despite strong evidence to the contrary from the companies themselves, DOJ told the Court that, without the acquisition, Spirit would continue to grow as "the evidence shows that Spirit has . . . growing revenues, a growing network, and plans to return to profitability."[18]

These predictions were wildly inaccurate. Spirit filed for bankruptcy in November 2024, eight months after abandoning the deal. The airline has lost more than $2.5 billion since 2020, has reduced its fleet by 23 aircraft and has substantially decreased flight operations. JetBlue has also struggled financially, not having a single profitable year in the last six years. JetBlue has undertaken significant route reductions and will have exited more than 50 routes since the court decided to block the deal. The real world consequences of such miscalculations are perhaps best evidenced by a letter to the court from a Spirit Airlines pilot stating that the court's decision (and the subsequent Spirit bankruptcy) resulted in a 25% reduction in compensation, 160 pilots being furloughed, and an additional 360 pilots subject to furlough in the months to

[17] Complaint at 2.
[18] Plaintiffs' Post-Trial Brief, *U.S. et al. v. JetBlue and Spirit*, Dec. 13, 2023, https://www.justice.gov/atr/media/1380331/dl/ at 36.

come.

We recognize that the investigation of the HPE-Juniper deal and perhaps even the decision to sue to block the deal may have been a product of the prior administration. We also concede that not all facts were known to the DOJ at the time it made its decision, and that with the benefit of several months of litigation discovery, new facts have emerged since the time the suit was filed. However, we would respectfully request that the DOJ reevaluate whether the current litigation, if successful, will actually achieve the public interests or even the competitive benefits it initially set out to protect. We believe it would not and ask that the DOJ act accordingly. We look forward to discussing these issues with you during our meeting tomorrow.

* * *

HPE and Juniper expressly designate this submission, and all attached, enclosed, or forthcoming materials as highly confidential. HPE and Juniper customarily and actually treat these documents and information as confidential business information and relies on the protections against disclosure available under all applicable statutes, regulations, and rules, including but not limited to, the Antitrust Civil Process Act, the Freedom of Information Act, and the Hart-Scott-Rodino Act, 15 U.S.C. 18a(h). Without prejudice to HPE's and Juniper's rights, if the Department of Justice should at any time contemplate disclosing any such materials to the public or to any third party for any reason and for any use—including, but not limited to, quoting from, attaching, or otherwise referring to such documents in a court or administrative proceeding, whether filed under seal or publicly—HPE and Juniper request an opportunity of no fewer than five business days' advance notice to allow sufficient time to object and, if necessary, seek protections against disclosure from a court of competent jurisdiction.

Sincerely,

Jenn Mellott
Freshfields US LLP

Steven C. Sunshine
Skadden, Arps, Slate, Meagher & Flom LLP

CC: William Rinner, Deputy Assistant Attorney General
Mark Hamer, Deputy Assistant Attorney General
Ryan Danks, Director of Civil Enforcement

**APPENDIX A:**

**PROPOSED SETTLEMENT: SUMMARY OF KEY TERMS**

This revised proposed settlement seeks to resolve the Division's lawsuit seeking to enjoin HPE's proposed acquisition of Juniper. HPE and Juniper firmly believe that the factual record confirms there is no basis for competition concerns and are prepared to try the case on its merits. Nevertheless, the Parties are eager to bring this litigation to an expedited close so that they and their customers can more quickly move forward and realize the synergies and pro-competitive benefits of the transaction.

To address the Division's concerns, HPE is willing, within 180 days of closing of the main transaction, to divest any or all of the following assets to a single existing WLAN competitor acceptable to the division:

***Divestiture of HPE's Instant On business***. HPE is willing to divest the assets of its Instant On campus and branch business, including:

- all tangible property including all hardware inventory;
- all contracts, contractual rights, and all other agreements, commitments, and purchase orders; all licenses, permits certifications, approvals, consents, registrations, waivers, and authorizations;
- all data and information controlled by HPE for the Instant On business;
- all research and development employees specific to the Instant On business, together with all tangible and electronic embodiments of know-how, documentation of ideas, research and development files, and other similar tangible or electronic materials specific to the Instant On business;
- all Instant On specific intellectual property owned, licensed, or sublicensed (and, for shared intellectual property, a perpetual license), including the Instant On trademark; and a license to the version of HPE's AOS 8 software used with Instant On; and
- all rights to causes of action, lawsuits, judgements, claims, defenses, indemnities, guarantees, refunds, rights of recovery, rights of set off and other rights and privileges against third parties and demands of any nature; goodwill in respect of, or arising primarily out of, the conduct of the Instant On business; guaranties, warranties, indemnities and similar rights granted by any third party relating to the Instant On business; assets and rights related to employee benefit plans; personnel records; and all other intangible property.

***Mist license***. HPE is willing to offer a full and perpetual non-exclusive license to the source code for Juniper's Mist AIOps software. The selected licensee would have full rights to use and incorporate Mist's AI capabilities into the Instant On product and/or the licensee's own WLAN network management solution. The licensee would also have the freedom to innovate on top of the Mist AI Ops source code and retain all rights to those innovations. HPE would retain the source code, which would "fork" into two versions as the software is developed by HPE on the one hand, and by the licensee on the other. HPE will also enter into a one-year transitional support agreement with the licensee whereby HPE will provide knowledge transfer

assistance, software updates, and engineering support for ordinary course maintenance and bug fixes and to assist the licensee in integrating the Mist AI Ops source code into its software.

***Additional Juniper assets, personnel, and know-how.*** To further ensure that the licensee has all of the necessary capabilities to make use of the Mist AIOps source code, HPE is willing to discuss divesting the following additional Juniper assets, personnel, and know-how with the license, if desired by the selected purchaser:

- **Engineering employees**: HPE will provide the licensee with a list of and relevant information about up to 20 Juniper engineers familiar with the Mist AIOps source code, which HPE believes based on its knowledge and experience is a sufficient number of engineers to incorporate the Mist AIOps source code into the licensee's offering, train the licensee's existing engineers on the Mist AIOps source code, and develop new features for and iterations on the Mist AIOps source code in the future. HPE will make these employees available for interviews with the licensee and will not interfere with any effort by the licensee to employ any such employee. To the extent that the licensee wishes to hire any of these employees, HPE will facilitate the hire and will provide financial incentives to encourage the relevant employee to transfer to the licensee. For twelve months from the date of the license, HPE will not solicit to rehire any such personnel. Similarly, the licensee will be required to agree not to solicit any additional Mist engineers for twelve months,

- **Supplier relationships**: HPE will provide the licensee with contacts for Juniper's ODM suppliers for WLAN hardware and will facilitate introductions to those suppliers. None of HPE or Juniper's contracts with suppliers for WLAN hardware are exclusive, such that the licensee would be free to contract with any such supplier for its hardware if it desires to do so.

- **Distributor relationships**: HPE will provide the licensee with contacts for Juniper's distributors for WLAN in the United States and will facilitate introductions to those distributors. None of Juniper's contracts with distributors for WLAN in the United States are exclusive, such that the licensee would be free to contract with any such supplier for its hardware if it desires to do so.

- **Channel partner relationships**: HPE will provide the licensee with contacts for Juniper's channel partners for WLAN in the United States and will facilitate introductions to those partners. None of Juniper's contracts with channel partners for WLAN in the United States are exclusive, such that the licensee would be free to contract with any such supplier for its hardware if it desires to do so.

As discussed during our meeting of May 27, 2025, the complaint alleges that Juniper has been successful in marketing its WLAN offering to customers primarily on the basis of Juniper's network management software, Mist, which, per the complaint, has "differentiated itself by building tools optimized for remote cloud management and using artificial intelligence and machine learning tools ('AIOps') to streamline network operations and improve the experience for network operators and users." A license of Mist's AI features, together with personnel, supply chain and sales channel assistance to allow the buyer make use of this technology, will allow the buyer to offer Mist's differentiating features to customers, closing any perceived gap in capabilities between the licensee and Juniper – thereby directly addressing and mitigating the theory of harm set out in the Division's complaint.

FRESHFIELDS



The addition of HPE's Instant On business adds an expanded structural divestiture component to the software license. Instant On is a cloud-based campus and branch product line of WLAN and campus switching products that use a version of HPE Aruba's AOS-8 operating system that can be managed through a customized management mobile app. While the Instant On product is today marketed by HPE to small and medium business customers, the underlying technology is the same technology used by HPE to serve all WLAN customers, could be used by the buyer to serve enterprise customers in any vertical, and can be further innovated and scaled if a buyer desires. The divestiture of the Instant On business will give the buyer a Campus and Branch business with an installed base and recurring contractual revenue, providing the buyer with a stable revenue stream that can support further investment in growth of its business in WLAN and in campus and branch networking more broadly. This business generated approximately $131 million in revenue in FY 2024. Transferring it to one of the many already credible competitors active in WLAN in the United States would reduce the combined share of HPE and Juniper in WLAN, and at the same time would increase the scale of any existing WLAN player (e.g., Arista, Fortinet, Ruckus, Extreme, Ubiquiti, Nile, or Meter) so that any would have a share of WLAN that is similar to or larger than Juniper today.

This offer is conditional on any settlement discussions (1) not affecting the July 9 trial date in the event that a settlement cannot be agreed; and (2) not being used against HPE or Juniper in this or any other legal proceedings, consistent with Federal Rule of Evidence 408.

We welcome an opportunity to discuss the proposal in more detail with the Division.